## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| PATRICIA LOWRY, individually and on behalf of all others similarly situated, | ) ) ) Case No: |
| Plaintiff, | ) ) **CLASS ACTION COMPLAINT FOR** ) **VIOLATIONS OF THE FEDERAL** ) **SECURITIES LAWS** |
| v. | ) ) JURY TRIAL DEMANDED |
| RTI SURGICAL HOLDINGS, INC., CAMILLE I. FARHAT, BRIAN K. HUTCHISON, JONATHON M. SINGER, ROBERT P. JORDHEIM, and JOHANNES W. LOUW, | ) ) ) ) ) |
| Defendants. | ) ) |

Plaintiff Patricia Lowry ("Plaintiff"), by Plaintiff's undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding RTI Surgical Holdings, Inc. ("RTI" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise

acquired publicly traded securities of RTI from March 7, 2016 through March 16, 2020, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 8 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §13rti91(b), as the Company conducts business and is headquartered in this District.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the attached Certification, acquired RTI securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

7.      Defendant RTI purports to operate as a surgical implant company that designs, develops, manufactures, and distributes biologic, metal, and synthetic implants worldwide. RTI is

a Delaware corporation maintaining its headquarters at 520 Lake Cook Road, Suite 315, Deerfield, Illinois. RTI's securities trade on the NASDAQ under the ticker symbol "RITX."

8.      On March 8, 2019, RTI Surgical, Inc. acquired with Paradigm Spine, LLC, a company focused on spinal infusion technology. The resultant company reorganized itself as RTI Surgical Holdings, Inc.

9.      Defendant Camille I. Farhat ("Farhat") has served as the Company's Chief Executive Officer ("CEO") since March 2017.

10.     Defendant Brian K. Hutchison ("Hutchison") served as the Company's CEO from December 2001 until December 2016.

11.     Defendant Jonathon M. Singer ("Singer") has served as the Company's Chief Financial Officer ("CFO") and Administrator since September 2017.

12.     Defendant Robert P. Jordheim ("Jordheim") served as the Company's Executive Vice President and CFO from July 2013 until September 2017, and interim CEO from December 2016 until March 2017.

13.     Defendant Johannes W. Louw ("Louw") served as the Company's Interim CFO from December 2016 until March 2017.

14.     Defendants Farhat, Hutchinson, Singer, Jordheim, and Louw are sometimes referred to herein as the "Individual Defendants."

15.     Each of the Individual Defendants:

        a.  directly participated in the management of the Company;

        b.  was directly involved in the day-to-day operations of the Company at the highest levels;

    c.  was privy to confidential proprietary information concerning the Company and its business and operations;

    d.  was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    e.  was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

    f.  was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

    g.  approved or ratified these statements in violation of the federal securities laws.

16.    RTI is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

17.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to RTI under *respondeat superior* and agency principles.

18.    Defendant RTI and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Class Period

19.    On March 7, 2016, the Company filed a Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K") with the SEC. The 2015 10-K was signed by Defendants Hutchison and Jordheim. The 2015 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Hutchison and Jordheim attesting to the accuracy of

financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

20.     The 2015 10-K stated, in pertinent part, the following concerning the Company's approach to revenue recognition:

> ***Revenue Recognition***—Revenue is recognized upon shipping, or receipt by the Company's customers of the implant, depending on the Company's distribution agreements with the Company's customers or distributors. Other revenues are recognized when all significant contractual obligations have been satisfied.
>
> The Company permits returns of implants in accordance with the terms of contractual agreements with customers if the implant is returned in a timely manner, in unopened packaging, and from the normal channels of distribution. Allowances for returns are provided based upon analysis of the Company's historical patterns of returns matched against the revenues from which they originated.
>
> The Company records estimated implant returns, discounts, rebates and other distribution incentives as a reduction of revenue in the same period revenue is recognized. Estimates of implant returns are recorded for anticipated implant returns based on historical distributions and returns information. Estimates of discounts, rebates and other distribution incentives are recorded based on contractual terms, historical experience and trend analysis.

21.     As to RTI's internal controls over financial reporting, the 2015 10-K stated "management believes that, as of December 31, 2015, the Company's internal control over financial reporting is effective."

22.     On March 13, 2017, the Company filed a Form 10-K for the year ended December 31, 2016 (the "2016 10-K") with the SEC. The 2016 10-K was signed by Defendants Hutchison and Louw. The 2016 10-K contained signed SOX certifications by Defendant Hutchison and Louw attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

23.     The 2016 10-K stated, in pertinent part, the following concerning the Company's approach to revenue recognition:

*Revenue Recognition*—Revenue is recognized upon shipping, or receipt by the Company's customers of the implant, depending on the Company's distribution agreements with the Company's customers or distributors. Other revenues are recognized when all significant contractual obligations have been satisfied.

The Company permits returns of implants in accordance with the terms of contractual agreements with customers if the implant is returned in a timely manner, in unopened packaging, and from the normal channels of distribution. Allowances for returns are provided based upon analysis of the Company's historical patterns of returns matched against the revenues from which they originated.

The Company records estimated implant returns, discounts, rebates and other distribution incentives as a reduction of revenue in the same period revenue is recognized. Estimates of implant returns are recorded for anticipated implant returns based on historical distributions and returns information. Estimates of discounts, rebates and other distribution incentives are recorded based on contractual terms, historical experience and trend analysis.

Other revenues consists of service processing, tissue recovery fees, biomedical laboratory fees, recognition of previously deferred revenues, shipping fees, distribution of reproductions of our allografts to distributors for demonstration purposes and restocking fees which is included in revenues.

24. As to RTI's internal controls over financial reporting, the 2016 10-K stated "management believes that, as of December 31, 2016, the Company's internal control over financial reporting is effective."

25. On March 2, 2018, the Company filed a Form 10-K for the year ended December 31, 2017 (the "2017 10-K") with the SEC. The 2017 10-K was signed by Defendants Farhat and Singer. The 2017 10-K contained signed SOX certifications by Defendant Farhat and Singer attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

26. The 2017 10-K stated, in pertinent part, the following concerning the Company's approach to revenue recognition:

*Revenue Recognition*—Revenue is recognized upon shipping, or receipt by the Company's customers of the implant, depending on the Company's distribution agreements with the Company's customers or distributors. Other revenues are recognized when all significant contractual obligations have been satisfied.

The Company permits returns of implants in accordance with the terms of contractual agreements with customers if the implant is returned in a timely manner, in unopened packaging, and from the normal channels of distribution. Allowances for returns are provided based upon analysis of the Company's historical patterns of returns matched against the revenues from which they originated.

The Company records estimated implant returns, discounts, rebates and other distribution incentives as a reduction of revenue in the same period revenue is recognized. Estimates of implant returns are recorded for anticipated implant returns based on historical distributions and returns information. Estimates of discounts, rebates and other distribution incentives are recorded based on contractual terms, historical experience and trend analysis.

Other revenues consists of service processing, tissue recovery fees, biomedical laboratory fees, recognition of previously deferred revenues, shipping fees, distribution of reproductions of our allografts to distributors for demonstration purposes and restocking fees which is included in revenues.

27.    The 2017 10-K stated the following concerning revenue from contracts with customers:

*Revenue from Contracts with Customers* — In May 2014, the FASB, issued a new revenue recognition standard which amends revenue recognition principles and provides a single, comprehensive set of criteria for revenue recognition within and across all industries. The new standard provides a five-step framework whereby revenue is recognized when control of promised goods or services are transferred to a customer at an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The standard also requires enhanced disclosures pertaining to revenue recognition in both interim and annual periods. In August 2015, the FASB deferred the effective date of the new revenue standard from January 1, 2017 to January 1, 2018. In March 2016, the FASB issued amendments to clarify the implementation guidance on principal versus agent considerations. In April 2016, the FASB issued amendments to clarify the guidance on accounting for licenses of intellectual property and identifying performance obligations. In May 2016, the FASB issued amendments related to collectability, non-cash consideration, the presentation of sales and other similar taxes collected from customers and transition. The standard allows for adoption using a full retrospective method or a modified retrospective method. On January 1, 2018, the Company adopted this standard using the modified retrospective method. The Company's implementation approach included performing a detailed review of its agreements. The Company has reviewed all types of customer contracts and has gone through the five step process outlined in the new revenue recognition standard for each type of contract. The new five step process required by the new revenue recognition standard provides results substantially consistent with the Company's current revenue recognition policies. In addition, the Company designed internal

controls to enable the preparation of financial information. The Company is in the process of finalizing its conclusions on key accounting assessments related to the new standard, including its assessment that the impact of accounting for costs incurred to obtain a contract.

The Company identified two contracts which previously resulted in revenue recognition occurring at the time of shipment; however, under the new revenue recognition standard, the Company is required to recognize revenue over time. The Company currently estimates the impact of adopting the new revenue standard on the two contracts will result in a $1,800 to $2,200 reduction in accumulated deficit, the cumulative effect adjustment under the modified retrospective approach, a $2,500 to $3,000 increase in accounts receivable, and a $700 to $800 decrease in deferred tax assets. The Company also identified a contract that contains significant upfront payments; however, the Company has not yet finalized its assessment of the contract. Except for the three contracts discussed above, the Company does not anticipate the finalization of this assessment will result in a material impact to the Company's financial position, results of operations, and disclosures.

28. As to RTI's internal controls over financial reporting, the 2017 10-K stated "management believes that, as of December 31, 2017, the Company's internal control over financial reporting is effective."

29. On March 5, 2019, the Company filed a Form 10-K for the year ended December 31, 2018 (the "2018 10-K") with the SEC. The 2018 10-K was signed by Defendants Farhat and Singer. The 2018 10-K contained signed SOX certifications by Defendant Farhat and Singer attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

30. The 2018 10-K stated, in pertinent part, the following concerning the Company's approach to revenue recognition:

*Revenue Recognition*— We recognize revenue upon shipping, or receipt by our customers of our products and implants, depending on our distribution agreements with our customers or distributors. Our performance obligations consist mainly of transferring control of implants identified in our contracts. We typically transfer control at a point in time upon shipment or delivery of the implants for direct sales, or upon implantation for sales of consigned inventory. Our customer is able to direct the use of, and obtain substantially all of the benefits from, the implant at the time the implant is shipped, delivered, or implanted, respectively, based on the

terms of the contract. For performance obligations related to our contracts with exclusively built inventory clauses, we typically satisfy our performance obligations evenly over the contract term as inventory is built. Such exclusively manufactured inventory has no alternative use and we have an enforceable right to payment for performance to date. We use the input method to measure the manufacturing activities completed to date, which depicts the progress of our performance obligation of transferring control of exclusively built inventory. For the contracts with upfront and annual exclusivity fees, revenue related to those fees is recognized over the contract term following a consistent method of measuring progress towards satisfaction of the performance obligation. We use the method and measure of progress that best depicts the transfer of control to the customer of the goods or services to date relative to the remaining goods or services promised under the contract.

The Company permits returns of implants in accordance with the terms of contractual agreements with customers if the implant is returned in a timely manner, in unopened packaging, and from the normal channels of distribution. Allowances for returns are provided based upon analysis of the Company's historical patterns of returns matched against the revenues from which they originated.

The Company records estimated implant returns, discounts, rebates and other distribution incentives as a reduction of revenue in the same period revenue is recognized. Estimates of implant returns are recorded for anticipated implant returns based on historical distributions and returns information. Estimates of discounts, rebates and other distribution incentives are recorded based on contractual terms, historical experience and trend analysis.

Other revenues consist of service processing, tissue recovery fees, biomedical laboratory fees, recognition of previously deferred revenues, shipping fees, distribution of reproductions of our allografts to distributors for demonstration purposes and restocking fees which is included in revenues.

31.    The 2018 10-K stated, in pertinent part, the following concerning revenue from contracts with customers:

**Revenue from Contracts with Customers**—On January 1, 2018, the Company adopted a new accounting standard issued by the FASB on revenue recognition using the modified retrospective method. This new accounting standard outlines a single comprehensive model to use in accounting for revenue arising from contracts with customers. This standard supersedes existing revenue recognition requirements and eliminates most industry-specific guidance from GAAP. The core principle of the new accounting standard is to recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. In addition, the adoption of this new accounting standard resulted in

increased disclosure, including qualitative and quantitative disclosures about the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers. The new accounting standard was applied to all contracts, apart from contracts for which all or substantially all revenue was recognized before January 1, 2018. Additionally, the Company elected to account for shipping and handling activities as a fulfillment cost rather than a separate performance obligation.

The Company identified three contracts which previously resulted in revenue recognition occurring at the time of shipment; however, under the new revenue recognition standard, the Company is required to recognize revenue over time. The assessment of our January 1, 2018, consolidated balance sheet under ASC Topic 606 resulted in a cumulative-effect adjustment to opening retained earnings, unbilled accounts receivable and costs incurred for inventory.

32. The 2018 10-K stated the following regarding its revenues from Original Equipment Manufacturers ("OEM"):

OEM—Revenues from OEM increased $10.0 million, or 9.0%, to $120.7 million for the year ended December 31, 2018 compared to $110.7 million for the year ended December 31, 2017. OEM revenues increased primarily as a result of higher orders and due to timing of delivery to certain OEM distributors, primarily in the dental and trauma markets.

33. As to RTI's internal controls over financial reporting, the 2018 10-K stated "management believes that, as of December 31, 2018, the Company's internal control over financial reporting is effective."

34. The statements referenced in ¶¶19-33 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company inappropriately recognized revenues with respect to certain contractual arrangements, including other equipment manufacturer customers; (2) the Company's internal controls over financial reporting were not effective; (3) as

10

a result, the Company would be forced to delay the filing of its Form 10-K; (4) as a result of the foregoing, RTI's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

35.     On March 16, 2020, after the market closed, RTI announced in a press release that it would file a Form 12b-25 with SEC due to its inability to timely file its Form 10-K for the fiscal year ended December 31, 2019. The Company disclosed that the cause of the delay was that its Audit Committee was investigating the Company's revenue recognition practices. The press release stated, in relevant part:

> DEERFIELD, Ill., March 16, 2020 (GLOBE NEWSWIRE) -- RTI Surgical Holdings, Inc. (RTIX), a global surgical implant company, announced it will file a Form 12b-25 Notification of Late Filing with the Securities and Exchange Commission (the "SEC") to provide a 15 calendar day extension within which to file its Form 10-K for the fiscal year ended December 31, 2019.
>
> The Audit Committee (the "Audit Committee") of the Company's Board of Directors, with the assistance of independent legal and forensic accounting advisors, ***is in the process of conducting an internal investigation of current and prior period matters relating to the Company's revenue recognition practices regarding the timing of revenue with respect to certain contractual arrangements, primarily with OEM customers, including the accounting treatment, financial reporting and internal controls related to such arrangements.*** The Audit Committee investigation was precipitated by an ongoing SEC investigation related to the periods 2014 through 2016. The Company will not be in a position to file its Form 10-K until the Audit Committee concludes its investigation and the Company and its independent auditor assess the results of that investigation. The Company is working to complete its analysis and file its Form 10-K for the year ended December 31, 2019 within the extension period (through March 31, 2020), but no assurance can be given that it will be able to do so.
>
> (Emphasis added.)

36.     On this news, RTI's shares fell $0.40 per share or over 14.55% to close at $2.35 per share on March 17, 2020, damaging investors.

37.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired RTI securities publicly traded on the NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

39.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, RTI securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by RTI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

41.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

42.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of RTI;

c.     whether the Individual Defendants caused RTI to issue false and misleading financial statements during the Class Period;

d.     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e.     whether the prices of RTI securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f.     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

43.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

44.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

    a.    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    b.    the omissions and misrepresentations were material;

    c.    RTI securities are traded in an efficient market;

    d.    the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

    e.    the Company traded on the NASDAQ and was covered by multiple analysts;

    f.    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

    g.    Plaintiff and members of the Class purchased, acquired and/or sold RTI securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

45.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

46.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
## Violations of Section 10(b) of The Exchange Act and Rule 10b-5
## Against All Defendants

47. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

49. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

50. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

   a. employed devices, schemes and artifices to defraud;

   b. made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

   c. engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of RTI securities during the Class Period.

51. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of RTI were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue

of their receipt of information reflecting the true facts of RTI, their control over, and/or receipt and/or modification of RTI's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning RTI, participated in the fraudulent scheme alleged herein.

52. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other RTI personnel to members of the investing public, including Plaintiff and the Class.

53. As a result of the foregoing, the market price of RTI securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of RTI securities during the Class Period in purchasing RTI securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

54. Had Plaintiff and the other members of the Class been aware that the market price of RTI securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased RTI securities at the artificially inflated prices that they did, or at all.

55. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

56. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of

the Class for substantial damages which they suffered in connection with their purchase of RTI securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

57.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

58.     During the Class Period, the Individual Defendants participated in the operation and management of RTI, and conducted and participated, directly and indirectly, in the conduct of RTI's business affairs. Because of their senior positions, they knew the adverse non-public information about RTI's current financial position and future business prospects.

59.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to RTI's business practices, and to correct promptly any public statements issued by RTI which had become materially false or misleading.

60.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which RTI disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause RTI to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of RTI within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of RTI securities.

61.     Each of the Individual Defendants, therefore, acted as a controlling person of RTI. By reason of their senior management positions and/or being directors of RTI, each of the

Individual Defendants had the power to direct the actions of, and exercised the same to cause, RTI to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of RTI and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

62. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by RTI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 23, 2020

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Louis C. Ludwig*
Patrick V. Dahlstrom
Louis C. Ludwig
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Email: pdahlstrom@pomlaw.com
Fax: (312) 229-8811
Email: lcludwig@pomlaw.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Laurence M. Rosen
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*