# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NIALL CAMPBELL, derivatively on behalf of RTI SURGICAL HOLDINGS, INC.,<br><br>    Plaintiff,<br><br>    vs.<br><br>CAMILLE I. FARHAT, BRIAN K. HUTCHISON, JONATHON M. SINGER, ROBERT P. JORDHEIM, JOHANNES W. LOUW, PETER F. GEAREN, THOMAS A. MCEACHIN, CURTIS M. SELQUIST, MARK D. STOLPER, CHRISTOPHER R. SWEENEY, PAUL G. THOMAS, NICHOLAS J. VALERIANI, and SHIRLEY A. WEIS,<br><br>    Defendants,<br><br>    and<br><br>RTI SURGICAL HOLDINGS, INC.,<br><br>    Nominal Defendant. | Case No.:<br><br><br>**JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Niall Campbell ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant RTI Surgical Holdings, Inc. ("RTI" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Camille I. Farhat, Brian K. Hutchison, Jonathon M. Singer, Robert P. Jordheim, Johannes W. Louw, Peter F. Gearen, Thomas A. McEachin, Curtis M. Selquist, Mark D. Stolper, Christopher R. Sweeney, Paul G. Thomas, Nicholas J. Valeriani, and Shirley A. Weis (collectively, the "Individual

1

Defendants," and together with RTI, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of RTI, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff's and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding RTI, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by RTI's directors and/or officers from March 7, 2016 through the present (the "Relevant Period").

2. RTI purports to be a leading global surgical implant company that provides surgeons with safe biologic, metal and synthetic implants. The Company's implants are utilized in sports medicine, general surgery, spine, orthopedic and trauma procedures, and are distributed in almost 50 countries.

3. On March 8, 2019, RTI Surgical, Inc. executed a merger and acquisition transaction to acquire Paradigm Spine, LLC ("Paradigm"), a motion preservation and non-fusion spinal implant technology company. The resulting entity reorganized itself as RTI Surgical Holdings, Inc., and RTI Surgical, Inc. (referred to as "Legacy RTI" following the acquisition),

became a wholly owned subsidiary of the Company.[1]

4.      During the Relevant Period, the Company had four main lines of businesses comprised of four franchises: spine; sports; original equipment manufacturer ("OEM"); and international. Since 2016, at least, OEM has accounted for the largest portion of the Company's overall revenue within its franchises. During the fourth quarter of 2019, RTI reorganized into two business lines: Spine and OEM.

5.      From as early as 2014, the Company has improperly recognized and reported revenue for certain contractual arrangements, primarily with RTI's OEM customers. Specifically, RTI inappropriately recognized revenue for certain invoices at earlier dates, due, in part, to deliveries made outside of agreed-upon delivery windows. Moreover, an improper adjustment was made to a product return provision in RTI's Direct Division in July 2017. RTI's accounting treatment of these contractual arrangements would result in an SEC investigation, an internal investigation by the Company's Audit Committee, RTI's inability to timely file its annual report for the fiscal year ended December 31, 2019 (the "2019 10-K") and the need to restate several years of SEC filings deemed incorrect and unreliable.

6.      The Company's improper accounting practices related to, *inter alia*, the manner in which the Company was recording revenue from third parties, resulted in material errors in the Company's financial statements filed throughout the Relevant Period. However, during this time, the Company maintained that its disclosures were accurate and complete. Moreover, as the Company would later reveal, RTI's internal controls suffered from material weaknesses from December 31, 2018, at least. The material weaknesses contributed to the material accounting errors identified for the 2018 and prior fiscal years.

---

[1] Prior to the acquisition, the Company's financial statements were that of RTI Surgical Inc.'s and its subsidiaries. Following March 8, 2019, RTI is the successor reporting company.

7. In addition to the accounting errors related to certain contractual arrangements described above, the Company's financial statements filed during the first three fiscal quarters of the year ended December 31, 2019, erroneously accounted for its acquisition of Paradigm.

8. Despite the Company's long-standing improper revenue recognition practices, investors remained uninformed of RTI's inaccurate financial reporting until March 16, 2020, when the Company issued a press release filed with a current report on a Form 8-K with the SEC, revealing that RTI would not be able to timely file its annual report on Form 10-K for the fiscal year ended December 31, 2019. The press release disclosed that the delay was due to RTI's internal audit investigation (the "Investigation") of current and prior period matters relating to the Company's revenue recognition practices, which had been triggered by an ongoing SEC inquiry related to the periods 2014 through 2016. The Investigation also examined certain transactions and practices related to manual journal entries for accrual and reserve accounts. The press release disclosed that RTI was not in a position to file its 2019 10-K and would file a Notification of Late Filing to obtain an extension from the SEC.

9. On this news, RTI's share price dropped $0.40 (over 14.5%) from closing at $2.75 on March 16, 2020, to close at $2.35 on March 17, 2020.

10. On March 20, 2020, the Company filed a current report on a Form 8-K with the SEC announcing that it had received a letter from the Listing Qualifications Department of the Nasdaq Stock Market LLC, indicating that the Company was not in compliance with the timely filing requirement for continued listing under Nasdaq Listing Rule 5250(c)(1). In the same report, the Company announced that its Vice President of Financial Planning and Analysis, Johannes W. Louw ("Louw") who had recently been promoted to Chief Financial Officer ("CFO") in January 2020, would end his employment with RTI by April 8, 2020.

11.     On April 9, 2020, the Company filed a current report on a Form 8-K with the SEC announcing that the Investigation remained ongoing and that investors should no longer rely on prior financial reports and reports concerning the internal controls over financial reporting for the fiscal years ended December 31, 2014, 2015, 2016, 2017 and 2018 and RTI's unaudited financial statements for the quarterly periods for 2016-2018 and the nine months ended September 30, 2019. RTI further announced its impending plans to restate those previously released financial statements.

12.     On June 8, 2020, the Company filed its restatement for RTI's previously issued audited financial statements for the years ended December 31, 2016, 2017, and 2018 as well as selected financial data for the years ended December 31, 2014 and 2015, and the unaudited financial statements for the quarterly periods filed for the fiscal years 2016 through 2018, in an annual report on Form 10-K/A for the fiscal year ended December 31, 2018 (the "Restatement"). The Restatement reaffirmed that the Company had failed to maintain effective internal controls for the fiscal year ended December 31, 2018, at least. The Restatement further revealed numerous errors identified by the Investigation for the fiscal years 2018, 2017, and/or 2016, including errors impacting (a) revenue recognition, (b) costs of processing and distribution, (c) operating expenses, (d) accounts receivable, (e) net inventories, (f) prepaid and other current assets, (g) net property, plant and equipment, (h) deferred tax assets, (i) net intangible assets, (j) accounts payable, (k) accrued expenses, (l) long-term liabilities, and (m) payments for treasury stock.

13.     The Restatement also provided corrections made to selected financial data reported for the fiscal years ended December 31, 2014 and 2015 for revenues, profit, income, and stockholders' equity, and restated certain line items for prior financial data reported for the

5

quarterly periods within the years ended December 31, 2018, 2017, and 2016, including those contained in RTI's condensed consolidated balance sheets and condensed consolidated statements of income.

14. Unexpectedly, the Restatement also disclosed that RTI had made numerous corrections to errors identified in the aforementioned periods that did not result from the Investigation, which the Restatement deemed were "immaterial."

15. The Restatement revised management's report on internal control over financial reporting, which admitted numerous failures of management to maintain an effective control environment, design and implement effective risk assessments and control activities, generate/provide adequate quality supporting information and communication, and design and implement effective monitoring activities. The Restatement further revealed that "[d]eficiencies in control activities contributed to material accounting errors identified and corrected in 2018 and prior years. These design deficiencies in control activities contributed to the potential for there to have been material accounting errors in substantially all financial statement account balances and disclosures."

16. The Company finally filed its 2019 10-K the same day, on June 8, 2020 (together with the Restatement, the "Restatements"). The 2019 10-K provided further insight into the previously announced Investigation and included restatements of RTI's previously filed financial statements for the quarters ended March 31, 2019, June 30, 2019, and September 30, 2019 to correct errors found (1) in connection with RTI's Investigation for the improper revenue recognition for certain invoices on product shipments that should have been recognized at a later date, as well as erroneous manual journal entries to accrual and reserve accounts; (2) *additional* errors identified in the first three quarters of 2019, separate from the Investigation, that primarily

6

related to RTI's accounting for its acquisition of Paradigm; and (3) *additional* "immaterial" corrections made by RTI during the restatement process.

17.     Specifically, the 2019 10-K restated errors discovered in the following categories during the Investigation for the quarters restated therein: revenues; costs of processing and distribution; accounts receivable; net inventories; and deferred tax assets.

18.     Moreover, the 2019 10-K corrected errors found in the following categories related to RTI's acquisition of Paradigm: costs of processing and distribution; marketing, general and administrative; net current inventories; non-current net inventories; deferred tax assets; goodwill; net intangible assets; and acquisition contingencies.

19.     The 2019 10-K also revealed numerous additional errors made in the covered financial periods that the Company designated as "immaterial" in the following categories: marketing, general and administrative; accounts receivable; prepaid and other current assets; net deferred tax assets; property, plant & equipment; net intangible assets; other net assets; accounts payable; accrued expenses; and payments for treasury stock.

20.     The Company also filed its preliminary Schedule 14A with the SEC for its 2020 annual shareholder meeting the same day. However, as of the time of filing this Complaint, the Company has yet to file its official Schedule 14A for 2020 (the "2020 Proxy Statement"), or its quarterly report for the quarter ended March 31, 2020, which was due in May.

21.     On June 9, 2020, the Company issued a press release, attached as an exhibit to a current report filed with the SEC on Form 8-K the same day announcing that the Company had completed the Investigation of certain accounting matters, had revised its financial statements to correct for errors, and filed the Restatements. The press release also noted that the SEC investigation remained ongoing.

22.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company improperly recognized and accounted for revenues for certain contractual arrangements, primarily involving OEM customers due, in part, to early deliveries made outside of agreed-to delivery windows; (2) some of these early shipments were unapproved and shipped by employees in order to generate more revenue; (3) additionally, certain adjustments were improperly or erroneously made through manual journal entries to accrual or reserve accounts; (4) thus, RTI's financial statements incorrectly reported revenues, costs of processing and distribution, accounts receivable, net inventories, deferred tax assets, operating expenses, prepaid and other current assets, deferred tax assets, other intangible assets, accounts payable, accrued expenses, and payments for treasury stock, among other line items; (5) these material errors would result in RTI's need to restate its previously reported financial statements; (6) RTI's financial statements also contained significant errors separate from the underlying Investigation; and (7) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

23.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

24.     The Individual Defendants also breached their fiduciary duties by causing the

8

Company to fail to maintain internal controls and to fail to timely file its financial statements with the SEC.

25. Furthermore, during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while one of them engaged in improper insider sales, netting proceeds of approximately $44,444. Approximately 1,023,566 shares of the Company's common stock were repurchased during the Relevant Period for over $4.5 million. As the Company's stock was actually only worth $2.35 per share during that time, the price at closing on March 17, 2020, the Company overpaid by over $2.1 million in total.

26. In light of the Individual Defendants' misconduct, which has subjected RTI, its Chief Executive Officer ('CEO"), its former CEO, its Chief Financial and Administrative Officer ("CFAO"), its former CFO, Executive Vice President, and interim CEO, and its most recent CFO to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of Illinois (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefited from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

27. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's liability in

the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of RTI's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

29. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

30. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

31. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

32. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

33. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in

numerous activities that had an effect in this District.

34. Venue is proper in this District because RTI and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

35. Plaintiff is a current shareholder of RTI common stock. Plaintiff has continuously held RTI common stock and has owned RTI common stock since before the beginning of the Relevant Period. Plaintiff is a citizen of the State of Florida.

### Nominal Defendant RTI

36. RTI is a Delaware corporation with its principal executive offices at 520 Lake Cook Road, Suite 315, Deerfield, Illinois 60015. RTI's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "RTIX."

### Defendant Farhat

37. Defendant Camille I. Farhat ("Farhat") has served as the Company's President, CEO, and as a Company director since March 2017. He also provided certain consulting services to RTI during 2016. According to the 2019 10-K, as of March 19, 2020, Defendant Farhat beneficially owned 1,110,619 shares of the Company's common stock, which represented 1.5% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on May 19, 2020 was $2.31, Defendant Farhat owned approximately $2.5 million worth of RTI stock.

38. For the fiscal year ended December 31, 2018, Defendant Farhat received $1,219,629 in compensation from the Company. This included $651,119 in salary, $550,383 in in non-equity incentive plan compensation, and $18,127 in all other compensation. For the fiscal year ended December 31, 2019, Defendant Farhat received $690,184 in compensation from the

Company. This included $664,148 in salary and $26,036 in all other compensation.

39.     The 2019 10-K stated the following about Defendant Farhat:

Mr. Farhat joined RTI as President and Chief Executive Officer in March 2017. Mr. Farhat's experience is built from extensive work across multiple companies in ten countries and nine industries, including experience in the healthcare industry globally spanning pharmaceuticals, implantable devices, capital equipment, consumables and services. During 2016 and until he became our President and Chief Executive Officer in March 2017, Mr. Farhat provided certain consulting services and fulfilled his board obligations. Prior to that, Mr. Farhat was President and Chief Executive Officer of American Medical Systems ("AMS") from 2012 to 2015. Prior to AMS, Mr. Farhat advanced several business segments for Baxter International, serving as Global General Manager of Baxter Pharmaceuticals & Technologies from 2008 to 2011 and Global General Manager of Global Infusion Systems from 2006 to 2008. Prior to Baxter Pharmaceuticals & Technologies, Mr. Farhat was Vice President of Business Development at Medtronic, and previously Global General Manager of Medtronic's gastroenterology and urology divisions from 2003 to 2006. Earlier in his career, Mr. Farhat gained executive and leadership experience during his thirteen years at General Electric. Mr. Farhat earned a Master of Business Administration from Harvard University, a degree in European Union Studies from Institut National d'Etudes Politiques de Paris and graduated summa cum laude from Northeastern University with a bachelor's degree in international finance and accounting. Mr. Farhat serves on the Board of ADVAMED (the Advanced Medical Technology Association), the Board of CMR Surgical and Northwestern University's Cerebrovascular Neurosurgery Advisory Council. Mr. Farhat brings to the Board significant experience revitalizing and profitably growing global businesses within the health care industry. It is also customary for the Chief Executive Officer to be a member of the Board of Directors.

40.     Upon information and belief, Defendant Farhat is a citizen of the State of Illinois.

**Defendant Hutchison**

41.     Defendant Brian K. Hutchison ("Hutchison") served as the Company's President and CEO from December 2001 through December 16, 2016, when he retired from his positions.

42.     For the fiscal year ended December 31, 2016, Defendant Hutchison received $1,388,802 in compensation from the Company. This included $590,796 in salary, $600,000 in stock awards, $150,000 in option awards, $25,150 in nonqualified deferred compensation earnings, and $22,856 in all other compensation.

43.     Upon information and belief, Defendant Hutchison is a citizen of the State of Florida.

**Defendant Singer**

44.     Defendant Jonathon M. Singer ("Singer") has served as the Company's CFAO since September 2017, and Corporate Secretary since November 2017. On January 10, 2020, RTI promoted Defendant Singer to Chief Operating Officer ("COO"), contingent and effective upon the Company's proposed sale of its OEM business. Previously, Defendant Singer served as a Company director from May 2016 to September 2017. According to the 2019 10-K, as of May 19, 2020, Defendant Singer beneficially owned 620,827 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 19, 2020 was $2.31, Defendant Singer owned approximately $1.4 million worth of RTI stock.

45.     For the fiscal year ended December 31, 2018, Defendant Singer received $2,188,311 in compensation from the Company. This included $450,000 in salary, $1,000,000 in bonus, $247,350 in stock awards, $247,487 in option awards, $223,763 in in non-equity incentive plan compensation, and $19,711 in all other compensation. For the fiscal year ended December 31, 2019, Defendant Singer received $1,003,652 in compensation from the Company. This included $460,347 in salary, $514,798 in stock awards, and $28,507 in all other compensation.

46.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Singer made the following sale of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| February 28, 2020 | 5,510 | $ 3.70 | $ 20,387 |
| February 26, 2020 | 5,940 | $ 4.05 | $ 24,057 |

Thus, in total, before the fraud was exposed, he sold 11,450 Company shares on inside information, for which he received approximately $44,444. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

47.     The 2019 10-K stated the following about Defendant Singer:

Jonathon M. Singer joined RTI in September 2017. He currently serves as Chief Financial and Administrative Officer. Contingent upon the successful completion of the Contemplated Transactions, Mr. Singer will be promoted to Chief Operating Officer of RTI. Mr. Singer previously served as Chief Financial and Administrative Officer, Corporate Secretary. Prior to becoming an executive of RTI, Mr. Singer previously served as a member of the Board from May 2016 to September 2017. Mr. Singer previously served as Chief Financial Officer of Sagent Pharmaceuticals from 2011 until 2017 and was appointed Executive Vice President and Chief Financial Officer in March 2012. Mr. Singer was Senior Vice President, Treasurer, Secretary and Chief Financial Officer of Landauer, Inc. from 2006 to 2011. From 2004 to 2006, Mr. Singer served as Vice President of Global Finance and Chief Financial Officer of the Medial Segment for Teleflex Inc. Prior to 2004, Mr. Singer worked in various capacities for R.R. Donnelley & Sons Company, Cardinal Health Inc., and KPMG LLP. Mr. Singer is a certified public accountant and received a Bachelor's Degree in Business Administration from Miami University in Ohio and a Master's Degree from Northwestern University's Kellogg Graduate School of Management.

48.     Upon information and belief, Defendant Singer is a citizen of the State of Illinois.

**Defendant Jordheim**

49.     Defendant Robert P. Jordheim served as the Company's Executive Vice President and CFO from March 15, 2017 through October 31, 2017, and from June 2010 through December 16, 2016, and as interim President and CEO from December 16, 2016 through March 15, 2017.

50.     For the fiscal year ended December 31, 2017, Defendant Jordheim received $1,009,489 in compensation from the Company. This included $335,499 in salary, $53,920 in bonus, $140,000 in stock awards, $140,099 in option awards, and $339,972 in all other compensation.

51.     Upon information and belief, Defendant Jordheim is a citizen of the State of Florida.

### Defendant Louw

52.     Defendant Louw served as the Company's Vice President of Financial Planning and Analysis from September 2018 until April 2020, when he was terminated from RTI. On January 10, 2020, RTI promoted Defendant Louw to CFO, contingent and effective upon the Company's proposed sale of its OEM business. Defendant Louw served in various capacities since joining RTI's finance team in June 2003, including as interim CFO, and Vice President of Finance and Corporate Controller.

53.     For the fiscal year ended December 31, 2018, Defendant Louw received $460,132 in compensation from the Company. This included $236,187 in salary, $64,525 in stock awards, $64,636 in option awards, $72,807 in in non-equity incentive plan compensation, and $319 in all other compensation.

54.     The Company's Schedule 14A filed with the SEC on March 25, 2019 (the "2019 Proxy Statement") stated the following about Defendant Louw:

> *Johannes W. Louw* joined the RTI finance team in June 2003. He currently serves as Vice President, Financial Planning and Analysis. He served as RTI's interim Chief Financial Officer from December 2016 until March 2017. He also served as RTI's Vice President of Finance and Corporate Controller from June 2010 until September 2018. Additionally, during his tenure with the Company, his responsibilities have included leading roles in the Company's business development activities, financing, implementation and oversight of the Company's internal control over financial reporting pursuant to the Sarbanes-Oxley Act of 2002. Prior to his tenure at the Company, Mr. Louw served as an auditor for Deloitte & Touche LLP both domestically and internationally. Mr. Louw earned bachelor degrees in Commerce and Computer Science from the University of Cape Town and a master's degree equivalent postgraduate diploma in accounting from the University of Cape Town. Mr. Louw is a Certified Public Accountant.

15

55.     Upon information and belief, Defendant Louw is a citizen of the State of Illinois.

**Defendant Gearen**

56.     Defendant Peter F. Gearen ("Gearen") joined RTI as a Company director in 1998. He was appointed Vice Chairman of the Board in February 2016 and served in such capacity until March 2019.

57.     For the fiscal year ended December 31, 2018, Defendant Gearen received $130,000 in compensation from the Company. This included $55,000 in fees earned or paid in cash and $75,000 in stock awards. For the fiscal year ended December 31, 2010, Defendant Gearen received $35,179 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

58.     The 2019 Proxy Statement stated the following about Defendant Gearen:

Dr. Gearen joined our Board of Directors in 1998 and was appointed Vice Chairman of the Board of Directors in February 2016. Dr. Gearen retired from practice on June 30, 2012. Dr. Gearen was an Associate Professor of Orthopedics at the University of Florida College of Medicine from 1993 to 2012. Dr. Gearen also was Chief of Staff at the Shands Hospital at the University of Florida and served as Assistant Dean of Clinical Affairs at the University of Florida College of Medicine from 1992 until 1999. Dr. Gearen was appointed Chairman of the Department of Orthopedics in May 2002 and stepped down as Chairman on June 30, 2010. Dr. Gearen holds a B.A. from Spring Hill College and an M.D. from the Stritch Loyola Medical School. Dr. Gearen has a depth of medical experience and healthcare knowledge and, as a former practicing orthopedic surgeon, is knowledgeable about our products and the orthopedic products market in general. Dr. Gearen will not be standing for re-election at the Annual Meeting.

59.     Upon information and belief, Defendant Gearen is a citizen of the State of Florida.

**Defendant McEachin**

60.     Defendant Thomas A. McEachin ("McEachin") has served as a Company director since December 2015. He also serves as chair of the Audit Committee. According to the 2019

16

10-K, as of May 19, 2020, Defendant McEachin beneficially owned 110,438 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 19, 2020 was $2.31, Defendant McEachin owned approximately $255,111 worth of RTI stock.

61.    For the fiscal year ended December 31, 2018, Defendant McEachin received $135,000 in compensation from the Company. This included $60,000 in fees earned or paid in cash and $75,000 in stock awards. For the fiscal year ended December 31, 2019, Defendant McEachin received $167,500 in compensation from the Company. This included $67,500 in fees earned or paid in cash and $100,000 in stock awards.

62.    The 2019 Proxy Statement stated the following about Defendant McEachin:

Mr. McEachin joined the Board in December 2015. He has been retired since 2012. Prior to his retirement, he served in executive capacities with Covidien Surgical Solutions, a division of Covidien plc, from 2008 to 2012, first as Vice President, Finance from 2008 to 2011, and then as Vice President and Group Chief Financial Officer from 2011 to 2012. From 1997 to 2008, Mr. McEachin served United Technologies and its subsidiaries in various finance capacities. Prior to joining United Technologies, Mr. McEachin served in various executive capacities with Digital Equipment Corporation from 1986 to 1997 and Xerox Corporation from 1975 to 1986. Mr. McEachin holds a B.S. from New York University and an MBA from Stanford University. Mr. McEachin's finance and executive management experience provides our Board with valuable financial reporting, compliance, accounting and controls, and corporate governance experience. Mr. McEachin also qualifies as an "Audit Committee Financial Expert."

63.    Upon information and belief, Defendant McEachin is a citizen of the State of Florida.

**Defendant Selquist**

64.    Defendant Curtis M. Selquist ("Selquist") has served as a Company director since July 2013 and as Chairman of the Board since February 2016. He also serves as chair of the Nominating & Governance Committee. According to the 2019 10-K, as of May 19, 2020,

17

Defendant Selquist beneficially owned 140,064 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 19, 2020 was $2.31, Defendant Selquist owned approximately $323,547 worth of RTI stock.

65.     For the fiscal year ended December 31, 2018, Defendant Selquist received $175,000 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $75,000 in stock awards. For the fiscal year ended December 31, 2019, Defendant Selquist received $207,500 in compensation from the Company. This included $107,600 in fees earned or paid in cash and $100,000 in stock awards.

66.     The 2019 10-K stated the following about Defendant Selquist:

Mr. Selquist joined the Board pursuant to the Investment Agreement by and between the Company and WSHP Biologics Holdings, LLC, an affiliate of Water Street Healthcare Partners, in July 2013 (the "Investment Agreement"). He has served as the Chairman of the Board since February 2016. Mr. Selquist has been an Operating Partner at Water Street, a strategic investor focused exclusively on the healthcare industry, since April 2007. Mr. Selquist has led and grown a number of global healthcare businesses during a distinguished 35-year career at Johnson & Johnson. Prior to joining Water Street, he was the Company Group Chairman of Johnson & Johnson Medical and Johnson & Johnson Healthcare Systems. Mr. Selquist also served as President of Johnson & Johnson Latin America. He was subsequently appointed Worldwide President of Johnson & Johnson, Merck Consumer Pharmaceuticals and Company Group Chairman, responsible for Johnson & Johnson Medical. Mr. Selquist was the founding Chairman of the Global Healthcare Exchange. He also served as Chairman of the National Alliance for Health Information Technology, and as a board member of the National Quality Forum. Mr. Selquist also chaired the National Quality Forum Leadership Network. Mr. Selquist serves as the Lead Director of Breg, Inc. (a manufacturer of medical braces and splints). He is also a Director of Temp Time, Inc. (a cold chain temperature monitoring business) where he serves as Chair of the Board, Chair of the Compensation Committee and a member of the Audit Committee. He was a Director of Health Fitness Corporation (a provider of health management and corporate fitness solutions) from 2007-2010, where he served on the Compensation Committee and Strategy Committee as Chair. He received a bachelor's degree in Finance and Management from Bradley University. We believe that Mr. Selquist's experience in the healthcare industry and numerous leadership positions qualifies him to be the Chairman of our company.

67.     Upon information and belief, Defendant Selquist is a citizen of the State of New

18

York.

**Defendant Stolper**

68.     Defendant Mark D. Stolper ("Stolper") has served as a Company director since March 2017. He also serves as a member of the Audit Committee and Compensation Committee. According to the 2019 10-K, as of May 19, 2020, Defendant Stolper beneficially owned 91,476 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 19, 2020 was $2.31, Defendant Stolper owned approximately $211,309 worth of RTI stock.

69.     For the fiscal year ended December 31, 2018, Defendant Stolper received $132,500 in compensation from the Company. This included $57,500 in fees earned or paid in cash and $75,000 in stock awards. For the fiscal year ended December 31, 2019, Defendant Stolper received $165,000 in compensation from the Company. This included $65,000 in fees earned or paid in cash and $100,000 in stock awards.

70.     The 2019 10-K stated the following about Defendant Stolper:

Mr. Stolper joined the Board in March 2017. He has served as Executive Vice President and Chief Financial Officer of RadNet, Inc., the largest owner and operator of freestanding medical diagnostic imaging centers, since July 2004, and he previously served as a member of the Board of RadNet, Inc. from March 2004 to July 2004. He has had diverse experiences in investment banking, private equity, venture capital investing and operations as follows: from 1993 to 1995, Mr. Stolper was a member of the corporate finance group at Dillon, Read & Co., Inc.; from 1995 to 1997, Mr. Stolper was a member of Archon Capital Partners; from 1997 to 1999, Mr. Stolper worked in business development for Eastman Kodak; and in 1999, Mr. Stolper co-founded Broadstream Capital Partners. Mr. Stolper has served on the Board, Compensation Committee and Audit Committee of Rotech Healthcare since February 2016. Mr. Stolper has also served on the Board, Audit Committee, Transaction Committee and Compliance Committee of 21st Century Oncology Holdings, Inc. since January 2018. Previously, Mr. Stolper served as a member of the Board of the following companies: On Track Innovations, Ltd. from 2012 until 2016; Surgical Solutions LLC from 2015 to February 2017; Alco Stores, Inc. from 2014 to 2015; Compumed, Inc. from 2008 to 2014; and Physiotherapy Associates from 2013 to

2016. Mr. Stolper graduated with a liberal arts degree from the University of Pennsylvania and a finance degree from the Wharton School. Additionally, Mr. Stolper earned a postgraduate Award in Accounting from the University of California, Los Angeles. Mr. Stolper's financial background in life sciences (particularly as a sitting Chief Financial Officer of a publicly-traded company), extensive experience in serving on boards of directors of both public and private companies, and broad mergers and acquisitions experience qualify him to serve on our Board.

71. Upon information and belief, Defendant Stolper is a citizen of the State of California.

**Defendant Sweeney**

72. Defendant Christopher R. Sweeney ("Sweeney") has served as a Company director since October 2015. According to the 2019 10-K, as of May 19, 2020, Defendant Sweeney beneficially owned 100,415 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 19, 2020 was $2.31, Defendant Sweeney owned approximately $231,958 worth of RTI stock.

73. For the fiscal year ended December 31, 2018, Defendant Sweeney received $115,000 in compensation from the Company. This included $40,000 in fees earned or paid in cash and $75,000 in stock awards. For the fiscal year ended December 31, 2019, Defendant Sweeney received $147,500 in compensation from the Company. This included $47,500 in fees earned or paid in cash and $100,000 in stock awards.

74. The 2019 10-K stated the following about Defendant Sweeney:

Mr. Sweeney joined the Board in October 2015 pursuant to the Investment Agreement. Mr. Sweeney has been employed by Water Street, a strategic investor focused exclusively on the healthcare industry, since 2005, serving initially as a principal and, since 2010, as a partner. Prior to joining Water Street, Mr. Sweeney was employed in various capacities with Cleary & Oxford, a middle market healthcare investment firm, from 1997-2005, ultimately serving as a principal. Mr. Sweeney holds a degree from Williams College. We believe that his investment banking experience as an investor in healthcare companies qualifies him to provide valuable insight to our Board.

20

75.     Upon information and belief, Defendant Sweeney is a citizen of the State of Illinois.

**Defendant Thomas**

76.     Defendant Paul G. Thomas ("Thomas") has served as a Company director since June 2016. He also serves as a member of the Compensation Committee and Nominating & Governance Committee. According to the 2019 10-K, as of May 19, 2020, Defendant Thomas beneficially owned 100,415 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 19, 2020 was $2.31, Defendant Thomas owned approximately $231,958 worth of RTI stock.

77.     For the fiscal year ended December 31, 2018, Defendant Thomas received $128,131 in compensation from the Company. This included $53,131 in fees earned or paid in cash and $75,000 in stock awards. For the fiscal year ended December 31, 2018, Defendant Thomas received $162,898 in compensation from the Company. This included $62,898 in fees earned or paid in cash and $100,000 in stock awards.

78.     The 2019 10-K stated the following about Defendant Thomas:

Mr. Thomas joined the Board in June 2016. He has served as the Founder and Chief Executive Officer of Prominex, a point-of-care molecular diagnostic company focused on infectious diseases since January 2018. Prior to Prominex, he served as Founder, Chief Executive Officer and President of Roka Bioscience, a molecular diagnostics company focused on food safety applications, from September 2009 until January 2017. Mr. Thomas previously served as Chairman, Chief Executive Officer and President of LifeCell Corporation, a publicly traded regenerative medicine company, from 1998 until it was acquired by KCI in 2008 in a transaction valued at $1.8 billion. Mr. Thomas previously held various senior positions, including President of the Pharmaceutical Products Division, during his tenure of 15 years with Ohmeda, a world leader in inhalation anesthetics and acute care pharmaceuticals. Mr. Thomas currently serves on the Board of Abiomed. Mr. Thomas formerly served on the Board of Roka Bioscience and Aegerion Pharmaceuticals. Mr. Thomas received his M.B.A. degree from Columbia University Graduate School of Business and completed his

21

postgraduate studies in Chemistry at the University of Georgia Graduate School of Arts and Science. He received his B.S. degree in Chemistry from St. Michael's College in Vermont. Mr. Thomas's extensive leadership experience with companies in the life science industry qualifies him to serve as a member of our Board. In addition, we regard Mr. Thomas's experience as a Chief Executive Officer to be of great importance to the Company in providing a broad perspective of the industry, as well as management issues.

79.     Upon information and belief, Defendant Thomas is a citizen of the State of California.

### Defendant Valeriani

80.     Defendant Nicholas J. Valeriani ("Valeriani") has served as a Company director since June 2016. He also serves as a member of the Compensation Committee and Nominating & Governance Committee. According to the 2019 10-K, as of May 19, 2020, Defendant Valeriani beneficially owned 111,415 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 19, 2020 was $2.31, Defendant Valeriani owned approximately $257,368 worth of RTI stock.

81.     For the fiscal year ended December 31, 2018, Defendant Valeriani received $127,500 in compensation from the Company. This included $52,500 in fees earned or paid in cash and $75,000 in stock awards. For the fiscal year ended December 31, 2019, Defendant Valeriani received $160,000 in compensation from the Company. This included $60,000 in fees earned or paid in cash and $100,000 in stock awards.

82.     The 2019 10-K stated the following about Defendant Valeriani:

Mr. Valeriani joined the Board in June 2016. He retired as the Chief Executive Officer of West Health, The Gary and Mary West Health Institute, an independent nonprofit medical research organization that works to create new and more effective ways of delivering healthcare at lower costs, a position he held until 2015. Previously, Mr. Valeriani served 34 years in key positions at Johnson & Johnson, including Company Group Chairman of Johnson & Johnson Ortho-Clinical Diagnostics from 2009 to 2012; Vice President, Office of Strategy and Growth from 2007 to 2009; Worldwide Chairman, Medical Devices and

Diagnostics from 2005 to 2007; and Corporate Vice President, Human Resources from 2003 to 2005. Mr. Valeriani also served on the Executive Committee of Johnston & Johnson during his tenure. Mr. Valeriani currently serves on the Board of Edwards Lifesciences Corp., SPR Therapeutics, Inc, and AgNovos Healthcare, LLC. Mr. Valeriani received a Bachelor's Degree in Industrial Engineering and a Master of Business Administration from Rutgers University. Mr. Valeriani's experience in the global medical device industry and his leadership in the areas of strategy, growth and human resources qualifies him to serve on our Board.

83. Upon information and belief, Defendant Valeriani is a citizen of the State of New Jersey.

**Defendant Weis**

84. Defendant Shirley A. Weis ("Weis") has served as a Company director since October 2014. She also serves as chair of the Compensation Committee. According to the 2019 10-K, as of May 19, 2020, Defendant Weis beneficially owned 121,531 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 19, 2020 was $2.31, Defendant Weis owned approximately $280,736 worth of RTI stock.

85. For the fiscal year ended December 31, 2018, Defendant Weis received $142,913 in compensation from the Company. This included $67,913 in fees earned or paid in cash and $75,000 in stock awards. For the fiscal year ended December 31, 2019, Defendant Weis received $168,297 in compensation from the Company. This included $68,297 in fees earned or paid in cash and $100,000 in stock awards.

86. The 2019 10-K stated the following about Defendant Weis:

Ms. Weis joined the Board in October 2014. She is president of Weis Associates, LLC, a consulting firm focused on healthcare management, strategic planning and leadership development, and emerita Vice President and Chief Administrative Officer of Mayo Clinic. Ms. Weis worked at Mayo Clinic in many different capacities since 1995, but, most recently, she was charged with overseeing the operations of 87 corporations that make up the Mayo Clinic system, including a

23

57,000-member staff. Ms. Weis was a member of the Mayo Clinic Board of Trustees and served as the secretary for the Mayo Clinic Board of Governors. Ms. Weis held a position until April 2019 on the Board of Sentry Insurance Company where she was a member of the Audit, Finance and Compensation Committees. She is a member of the board of The Medical Memory, LLC (now called Obex) and serves on the Compensation Committee. Ms. Weis is Professor of Practice in the W.P. Carey School of Business and the College of Nursing and Health Innovation at Arizona State University. Ms. Weis graduated with a master's degree in management from Aquinas College and received an honorary doctor of science degree from Michigan State University. Ms. Weis's background at the Mayo Clinic provides our Board with valuable healthcare and business strategy from the perspective of a purchaser of medical products. In addition, she has significant consulting and management experience, which has enabled her to provide valuable insight to our Board.

87. Upon information and belief, Defendant Weis is a citizen of the State of Arizona.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

88. By reason of their positions as officers, directors, and/or fiduciaries of RTI and because of their ability to control the business and corporate affairs of RTI, the Individual Defendants owed RTI and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage RTI in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of RTI and its shareholders so as to benefit all shareholders equally.

89. Each director and officer of the Company owes to RTI and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

90. The Individual Defendants, because of their positions of control and authority as directors and/or officers of RTI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

91. To discharge their duties, the officers and directors of RTI were required to

exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

92.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of RTI, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised RTI's Board at all relevant times.

93.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

94.     To discharge their duties, the officers and directors of RTI were required to

exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of RTI were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Illinois and the United States, and pursuant to RTI's own Code of Conduct and Code of Ethics (defined below);

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how RTI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of RTI and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that RTI's operations would comply with all applicable laws and RTI's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the

26

Company was required by law to disseminate;

(g)  refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)  examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

95.  Each of the Individual Defendants further owed to RTI and the shareholders the duty of loyalty requiring that each favor RTI's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

96.  At all times relevant hereto, the Individual Defendants were the agents of each other and of RTI and were at all times acting within the course and scope of such agency.

97.  Because of their advisory, executive, managerial, and directorial positions with RTI, each of the Individual Defendants had access to adverse, non-public information about the Company.

98.  The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements made by RTI.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

99.  In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants

further aided and abetted and/or assisted each other in breaching their respective duties.

100. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

101. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of RTI, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

102. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

103. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of RTI and was at all times acting within the course and scope of such agency.

**RTI'S CODE OF CONDUCT**

104. The Company's Code of Conduct "is a summary of the principles and standards

28

of business conduct expected of all employees []" and provides that "[a]ll of our officers, directors and employees must conduct themselves accordingly and seek to avoid even the appearance of improper behavior."

105.    The Code of Conduct provides that each employee must "[p]rovide full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission and in other public communications made by the Company."

106.    The Code of Conduct further provides that each employee must "[r]ecognize and report possible violations of this Code, as well as all policies, guidelines, applicable laws and regulatory requirements under which the Company operates."

107.    Pursuant to the Code of Conduct, RTI leaders and managers have "the increased responsibility of leading by example. We rely on our leaders and managers to reinforce the principles of our Code and Values through all levels of our workforce."

108.    The Code of Conduct also provides that RTI is committed to "offer only those products and services that we can deliver and strive to meet or exceed the commitments that we made. We compete fairly, engaging only in legal and ethical practice. Lastly, we meet our contractual obligations by reporting information accurately and charging honestly for our products and services."

109.    In a section titled, "Securities Trading & Insider Information," the Code of Conduct states that:

> Company policy forbids unauthorized disclosure of material non-public information about the Company or the companies it deals with, and both Company policy and the law forbid profiting from material non- public information relating to the Company or the companies with whom we do business. Material information includes any information that a reasonable investor is likely to consider important in determining whether to buy, sell or hold the

29

Company's stock.

## RTI'S CODE OF ETHICS FOR SENIOR FINANCIAL OFFICERS

110. In addition to adhering with the Code of Conduct, the Code of Conduct further provides that "senior executive officers and those responsible for our financial reporting face additional responsibilities and are required to sign the Code of Ethics for Senior Financial Officers which imposes strict obligations on them to take careful steps to assure that the Company properly tracks and reports our financial performance."

111. The Code of Ethics for Senior Financial Officers (the "Code of Ethics") aims to ensure "proper disclosure of financial information in filings with, or submissions to, the Securities and Exchange Commission and to deter wrongdoing." The Code of Ethics is "applicable to the Company's Chief Executive Officer, President, Chief Financial Officer, Director of Finance/Controller and other senior financial professional performing similar functions ('Senior Financial Professionals')." The Code of Ethics "is intended to supplement the [Code of Conduct] that is applicable to all employees and directors of the Company."

112. In a section titled "Honest and Ethical Conduct," the Code of Ethics provides that:

Senior Financial Professionals shall conduct themselves and their activities on behalf of the Company in an honest and ethical manner and in a manner, that complies with this Code, the Company's other policies and all applicable laws and regulations. Additionally, the Senior Financial Professionals shall promote a culture of honesty, integrity, ethical behavior and accountability among all employees of the Company and encourage employees to conduct themselves in accordance with this Code.

113. In a section titled "Maintenance of Records," the Code of Ethics states that:

Senior Financial Professionals shall maintain all Company accounting records and reports derived from Company accounting records in accordance with applicable laws, in a manner that fairly and accurately reflects the transactions or occurrences to which they relate and ensures that the Company accounting records fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues and expenses and do not contain any false or intentionally

30

misleading entries. In this regard, compliance with the Company's system of internal controls is required at all times.

114.  In a section titled "Disclosure in SEC Filings and Other Public Communications," the Code of Ethics states that:

> Senior Financial Professionals shall conduct themselves in a manner that promotes the full, fair, accurate, timely and understandable disclosure of all material information required to be included in: (1) each report or other document the Company files with, or submits to, the SEC and (2) in all other public communications made by the Company. To this end, the Senior Financial Professionals will establish and apply the Company's internal controls and disclosure controls and procedures in a manner that will enable the Company's financial statements to present fairly, in all material respects, the financial position, results of operations and cash flows of the Company.

115.  In a section titled "Compliance with Applicable Laws, Rules and Regulations," the Code of Ethics states that:

> The Senior Financial Professionals shall conduct themselves, and shall encourage all employees to conduct themselves, to ensure and facilitate compliance by the Company with the laws, rules and regulations applicable to its business. To this end, they are charged with overseeing the Company's various programs and policies concerning: (1) the "Whistleblower Protection" provisions of the Sarbanes-Oxley Act and similar laws applicable to the Company and (2) identifying and promptly reporting to the Audit Committee and correcting any material deviation from applicable laws, rules and regulations and Company policies.

116.  The Code of Ethics further provides that "Senior Financial Professionals are required to report to the Audit Committee any known or suspected violation of this Code by any Senior Financial Professional."

117.  In violation of the Code of Conduct and/or the Code of Ethics, the Individual Defendants conducted little, if any, oversight over the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of

31

corporate assets, unjust enrichment, and violations of the Exchange Act. Moreover, one of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct and/or the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct and/or the Code of Ethics.

**INDIVIDUAL DEFENDANTS' MISCONDUCT**

**Background**

118. RTI purports to be a leading global surgical implant company that provides surgeons with safe biologic, metal and synthetic implants. The Company's implants are utilized in sports medicine, general surgery, spine, orthopedic and trauma procedures, and are distributed in almost 50 countries.

119. On March 8, 2019, RTI Surgical, Inc. executed a merger and acquisition transaction to acquire Paradigm, a motion preservation and non-fusion spinal implant technology company. The resulting entity reorganized itself as RTI Surgical Holdings, Inc., and RTI Surgical, Inc. (referred to as "Legacy RTI" following the acquisition), became a wholly owned subsidiary of the Company.[2]

120. During the Relevant Period, RTI operated in one reportable segment composed of four franchise lines of business: spine; sports; OEM (aka Original Equipment Manufacturer) and international. Through its OEM franchise, RTI partners with OEM customers to "deliver surgical solutions with the goal of improving patient lives."[3] The OEM unit of RTI specializes in the design, development, and manufacture of biologic, metal and synthetic implants for medical

---

[2] Prior to the acquisition, the Company's financial statements were that of RTI Surgical Inc.'s and subsidiaries. Following March 8, 2019, RTI is the successor reporting company.

[3] https://www.rtix.com/en_us/oem. Last visited June 1, 2020.

technology companies. Since 2016, at least, RTI's OEM franchise has accounted for the largest percentage of its total revenues amongst the four franchises. During the fiscal year ended December 31, 2018, OEM accounted for 43% of RTI's total revenues. In the fourth quarter of 2019, RTI reorganized into two business lines that also became its operating and reportable segments: Spine and OEM.

121.   In 2017, the Company began implementing a transformation strategy to focus its business on its OEM and spine operations.

122.   Although RTI's OEM business had recently delivered record results during the second quarter of 2019,[4] on January 13, 2020, RTI issued a press release announcing that the Company had agreed to sell its OEM business to Montagu Private Equity LLP (the "Buyer"), a private European equity firm for a total consideration of $490 million.[5] The sale of its OEM business would render RTI a "Global Pure Play Spine Company." The Company's Board unanimously approved the transaction. According to RTI's January 13, 2020 press release, "[t]he sale of the OEM business to Montagu complete[d] the first phase of [RTI's] strategic transformation to reduce complexity, drive operational excellence and accelerate the growth of RTI Surgical[.]"

**False and Misleading Statements**

***March 7, 2016 10-K***

123.   On March 7, 2016, the Company filed its annual report with the SEC for the fiscal year ended December 31, 2015 on a Form 10-K (the "2015 10-K"), which was signed by Defendants Hutchison, Jordheim, Selquist, Gearen, McEachin, Sweeney, and Weis, and non-

---

[4]https://seekingalpha.com/article/4281148-rti-surgical-holdings-inc-rtix-ceo-camille-farhat-on-q2-2019-results-earnings-call-transcript?part=single. Last visited June 1, 2020.
[5]http://www.rtix.com/en_us/news/2020/rti-surgical-holdings-inc-announces-sale-of-oem-business-and-preliminary-fourth-quarter-and-full-year-2019-revenues. Last visited June 1, 2020.

parties Dean H. Bergy, Philip R. Chapman, and Adrian J.R. Smith. The 2015 10-K purported to provide accurate financial reports concerning the Company's financial results and operations for the fiscal year ended December 31, 2015.

124. The 2015 10-K described the Company's revenue recognition practices, including when revenue is recognized and how it is recorded, in relevant part, as follows:

> ***Revenue Recognition***—Revenue is recognized upon shipping, or receipt by the Company's customers of the implant, depending on the Company's distribution agreements with the Company's customers or distributors. Other revenues are recognized when all significant contractual obligations have been satisfied.

> The Company permits returns of implants in accordance with the terms of contractual agreements with customers if the implant is returned in a timely manner, in unopened packaging, and from the normal channels of distribution. Allowances for returns are provided based upon analysis of the Company's historical patterns of returns matched against the revenues from which they originated.

> The Company records estimated implant returns, discounts, rebates and other distribution incentives as a reduction of revenue in the same period revenue is recognized. Estimates of implant returns are recorded for anticipated implant returns based on historical distributions and returns information. Estimates of discounts, rebates and other distribution incentives are recorded based on contractual terms, historical experience and trend analysis.

125. Attached to the 2015 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Hutchison and Jordheim, attesting to the accuracy of the 2015 10-K.

126. However, several of the line items reported in the 2015 10-K were erroneously accounted for. Thus, the 2015 10-K contained materially false and misleading statements that misrepresented the true results and operations of RTI. As the Restatement would later reveal, *inter alia*, the Company's revenues were understated by $838, costs of processing and distribution was understated by $909, gross profit was overstated by $71, net income was overstated by $382, working capital was overstated by $1,432, total assets were overstated by

34

$1,221, and total stockholders' equity was overstated by $1,448.

### May 4, 2016 10-Q

127.    On May 4, 2016, the Company filed its quarterly report with the SEC for the first quarterly period ended March 31, 2016 on a Form 10-Q (the "1Q16 10-Q"), which was signed by Defendants Hutchison and Jordheim.  Attached to the 1Q16 10-Q were SOX certifications signed by Defendants Hutchison and Jordheim attesting to the accuracy of the 1Q16 10-Q.

128.    As reported in the 1Q16 10-Q, the Company's condensed consolidated balance sheets, including accounts of RTI's assets, liabilities and stockholders' equity were erroneously recorded. The Company's condensed consolidated statements of income, which reported quarterly revenues, costs of processing and distribution, gross profit, expenses, and loss income, among other line items, similarly contained errors. RTI's condensed consolidated statements of cash flows amounts, including, *inter alia*, cash flows from operating activities, investing activities, and financing activities also contained numerous errors that required correction.

129.    Specifically, the 1Q16 10-Q overstated accounts receivable by $3,428 understated net inventories by $1,904, overstated total assets by $1,482, and overstated total liabilities and stockholders' equity by $1,482 in RTI's consolidated balance sheets. In addition, the 1Q16 10-Q, understated revenues by $166, understated costs of processing and distribution by $488, and overstated gross profit by $322 in RTI's consolidated statements of income amounts. Lastly, among other errors, the 1Q16 10-Q overstated net income by $262, and overstated net inventories by $488 in its consolidated statement of cash flows amounts.

### August 4, 2016 10-Q

130.    On August 4, 2016, the Company filed its quarterly report with the SEC for the second quarterly period ended June 30, 2016 on a Form 10-Q (the "2Q16 10-Q"), which was

signed by Defendants Hutchison and Jordheim. Attached to the 2Q16 10-Q were SOX certifications signed by Defendants Hutchison and Jordheim attesting to the accuracy of the 2Q16 10-Q.

131.    As reported in the 2Q16 10-Q, the Company's condensed consolidated balance sheets, including accounts of RTI's assets, liabilities and stockholders' equity were erroneously recorded. The Company's condensed consolidated statements of income, which reported quarterly revenues, costs of processing and distribution, gross profit, expenses, and loss income, among other line items, similarly contained errors. RTI's condensed consolidated statements of cash flows amounts, including, *inter alia*, cash flows from operating activities, investing activities, and financing activities also contained numerous errors that required correction.

132.    Specifically, the 2Q16 10-Q understated accounts receivable by $1,188, understated net inventories by $168, understated total assets by $1,233, and overstated total liabilities and stockholders' equity by $1,233 in RTI's consolidated balance sheets. In addition, the 2Q16 10-Q, understated revenues by $2,304, understated costs of processing and distribution by 1,304, and understated gross profit by $1000 in RTI's consolidated statements of income amounts. Lastly, among other errors, the 2Q16 10-Q understated net income by $353 and overstated inventories by $1,792 in its consolidated statement of cash flows amounts.

### *November 7, 2016 10-Q*

133.    On November 7, 2016, the Company filed its quarterly report with the SEC for the third quarterly period ended September 30, 2016 on a Form 10-Q (the "3Q16 10-Q"), which was signed by Defendants Hutchison and Jordheim. Attached to the 3Q16 10-Q were SOX certifications signed by Defendants Hutchison and Jordheim attesting to the accuracy of the 3Q16 10-Q.

134. As reported in the 3Q16 10-Q, the Company's condensed consolidated balance sheets, including accounts of RTI's assets, liabilities and stockholders' equity were erroneously recorded. The Company's condensed consolidated statements of income, which reported quarterly revenues, costs of processing and distribution, gross profit, expenses, and loss income, among other line items, similarly contained errors. RTI's condensed consolidated statements of cash flows amounts, including, *inter alia*, cash flows from operating activities, investing activities, and financing activities also contained numerous errors that required correction.

135. Specifically, the 3Q16 10-Q overstated accounts receivable by $1,188, understated net inventories by $168, overstated total assets by $984, and overstated total liabilities and stockholders' equity by $1,233 in RTI's consolidated balance sheets. In addition, the 3Q16 10-Q, understated revenues by $2,405, understated costs of processing and distribution by $1,925, and understated gross profit by $480 in RTI's consolidated statements of income amounts. Lastly, among other errors, the 3Q16 10-Q overstated net loss by $464 in its consolidated statement of cash flows amounts.

### *March 13, 2017 10-K*

136. On March 13, 2017, the Company filed its annual report with the SEC for the fiscal year ended December 31, 2016 on a Form 10-K (the "2016 10-K"), which was signed by Defendants Jordheim, Louw, Selquist, Gearen, McEachin, Singer, Sweeney, Thomas, Valeriani, and Weis. The 2016 10-K purported to provide accurate financial reports concerning the Company's financial results and operations for the fiscal year ended December 31, 2016.

137. The 2016 10-K described the Company's revenue recognition practices as follows:

> ***Revenue Recognition***—Revenue is recognized upon shipping, or receipt by the Company's customers of the implant, depending on the Company's distribution

37

agreements with the Company's customers or distributors. Other revenues are recognized when all significant contractual obligations have been satisfied.

The Company permits returns of implants in accordance with the terms of contractual agreements with customers if the implant is returned in a timely manner, in unopened packaging, and from the normal channels of distribution. Allowances for returns are provided based upon analysis of the Company's historical patterns of returns matched against the revenues from which they originated.

The Company records estimated implant returns, discounts, rebates and other distribution incentives as a reduction of revenue in the same period revenue is recognized. Estimates of implant returns are recorded for anticipated implant returns based on historical distributions and returns information. Estimates of discounts, rebates and other distribution incentives are recorded based on contractual terms, historical experience and trend analysis.

Other revenues consists of service processing, tissue recovery fees, biomedical laboratory fees, recognition of previously deferred revenues, shipping fees, distribution of reproductions of our allografts to distributors for demonstration purposes and restocking fees which is included in revenues.

138. Attached to the 2016 10-K were SOX certifications signed by Defendants Jordheim and Louw, attesting to the accuracy of the 2016 10-K.

139. However, several of the line items reported in the 2016 10-K were erroneously accounted for. Thus, the 2016 10-K contained materially false and misleading statements that misrepresented the true results and operations of RTI. As the Restatement would later reveal, *inter alia*, the Company's revenues were understated by $3.1 million, costs of processing and distribution was understated by $2.1 million, operating expenses were understated by $0.6 million, accounts receivable was overstated by $0.6 million, net inventories were understated by $0.3 million, prepaid and other current assets were overstated by less than $0.1 million, net property, plant and equipment was understated by $0.1 million, deferred tax assets were understated by $0.1 million, net other intangible assets were understated by less than $0.1 million, accounts payable was overstated by less than $0.1 million, accrued expenses were

understated by $0.4 million, and other long-term liabilities were understated by $0.4 million.

### May 3, 2017 10-Q

140. On May 3, 2017, the Company filed its quarterly report with the SEC for the first quarterly period ended March 31, 2017 on a Form 10-Q (the "1Q17 10-Q"), which was signed by Defendants Farhat and Jordheim. Attached to the 1Q17 10-Q were SOX certifications signed by Defendants Farhat and Jordheim attesting to the accuracy of the 1Q17 10-Q.

141. As reported in the 1Q17 10-Q, the Company's condensed consolidated balance sheets, including accounts of RTI's assets, liabilities and stockholders' equity were erroneously recorded. The Company's condensed consolidated statements of income, which reported quarterly revenues, costs of processing and distribution, gross profit, expenses, and loss income, among other line items, similarly contained errors. RTI's condensed consolidated statements of cash flows amounts, including, *inter alia*, cash flows from operating activities, investing activities, and financing activities also contained numerous errors that required correction.

142. Specifically, the 1Q17 10-Q overstated accounts receivable by $115, understated net inventories by $186, understated total assets by $115, and understated total liabilities and stockholders' equity by $42 in RTI's consolidated balance sheets. In addition, the 1Q17 10-Q, understated revenues by $475, understated costs of processing and distribution by $65, and understated gross profit by $410 in RTI's consolidated statements of income amounts. Lastly, among other errors, the 1Q17 10-Q understated net loss by $5 in its consolidated statement of cash flows amounts.

### August 9, 2017 10-Q

143. On August 9, 2017, the Company filed its quarterly report with the SEC for the second quarterly period ended June 30, 2017 on a Form 10-Q (the "2Q17 10-Q"), which was

signed by Defendants Farhat and Jordheim. Attached to the 2Q17 10-Q were SOX certifications signed by Defendants Farhat and Jordheim attesting to the accuracy of the 2Q17 10-Q.

144. As reported in the 2Q17 10-Q, the Company's condensed consolidated balance sheets, including accounts of RTI's assets, liabilities and stockholders' equity were erroneously recorded. The Company's condensed consolidated statements of income, which reported quarterly revenues, costs of processing and distribution, gross profit, expenses, and loss income, among other line items, similarly contained errors. RTI's condensed consolidated statements of cash flows amounts, including, *inter alia*, cash flows from operating activities, investing activities, and financing activities also contained numerous errors that required correction.

145. Specifically, the 2Q17 10-Q overstated accounts receivable by $736, understated net inventories by $426, overstated total assets by $374, and overstated total liabilities and stockholders' equity by $374 in RTI's consolidated balance sheets. In addition, the 2Q17 10-Q, overstated revenues by $542, overstated costs of processing and distribution by $240, and overstated gross profit by $302 in RTI's consolidated statements of income amounts. Lastly, among other errors, the 2Q17 10-Q overstated net loss by $20 in its consolidated statement of cash flows amounts.

### *November 3, 2017 10-Q*

146. On November 3, 2017, the Company filed its quarterly report with the SEC for the third quarterly period ended September 30, 2017 on a Form 10-Q (the "3Q17 10-Q"), which was signed by Defendants Farhat and Singer. Attached to the 3Q17 10-Q were SOX certifications signed by Defendants Farhat and Singer attesting to the accuracy of the 3Q17 10-Q.

147. As reported in the 3Q17 10-Q, the Company's condensed consolidated balance sheets, including accounts of RTI's assets, liabilities and stockholders' equity were erroneously recorded. The Company's condensed consolidated statements of income, which reported quarterly revenues, costs of processing and distribution, gross profit, expenses, and loss income, among other line items, similarly contained errors. RTI's condensed consolidated statements of cash flows amounts, including, *inter alia*, cash flows from operating activities, investing activities, and financing activities also contained numerous errors that required correction.

148. Specifically, the 3Q17 10-Q overstated accounts receivable by $179, understated net inventories by $169, overstated total assets by $320, and overstated total liabilities and stockholders' equity by $320 in RTI's consolidated balance sheets. In addition, the 3Q17 10-Q, understated revenues by $558, understated costs of processing and distribution by $257, and understated gross profit by $301 in RTI's consolidated statements of income amounts. Lastly, among other errors, the 3Q17 10-Q understated net loss by $210 in its consolidated statement of cash flows amounts.

149. An improper adjustment was also made in July 2017 in the amount of $30,000 to a product return provision in the District Division, which resulted in an increase in the Direct Division's revenue in the prior quarter.

### *March 2, 2018 Form 10-K*

150. On March 2, 2018, the Company filed its annual report with the SEC for the fiscal year ended December 31, 2017 on a Form 10-K (the "2017 10-K"), which was signed by Defendants Farhat, Singer, Selquist, Gearen, McEachin, Stolper, Sweeney, Thomas, Valeriani, and Weis. The 2017 10-K purported to provide accurate financial reports concerning the

Company's financial results and operations for the fiscal year ended December 31, 2017.

151. The 2017 10-K described the Company's revenue recognition practices as follows:

*Revenue Recognition*—Revenue is recognized upon shipping, or receipt by the Company's customers of the implant, depending on the Company's distribution agreements with the Company's customers or distributors. Other revenues are recognized when all significant contractual obligations have been satisfied.

The Company permits returns of implants in accordance with the terms of contractual agreements with customers if the implant is returned in a timely manner, in unopened packaging, and from the normal channels of distribution. Allowances for returns are provided based upon analysis of the Company's historical patterns of returns matched against the revenues from which they originated.

The Company records estimated implant returns, discounts, rebates and other distribution incentives as a reduction of revenue in the same period revenue is recognized. Estimates of implant returns are recorded for anticipated implant returns based on historical distributions and returns information. Estimates of discounts, rebates and other distribution incentives are recorded based on contractual terms, historical experience and trend analysis.

Other revenues consist of service processing, tissue recovery fees, biomedical laboratory fees, recognition of previously deferred revenues, shipping fees, distribution of reproductions of our allografts to distributors for demonstration purposes and restocking fees which is included in revenues.

152. The 2017 10-K also stated the following, in relevant part, regarding RTI's revenue from contracts with customers and the Company's recent adoption of a five-step framework standard issued by the Financial Accounting Standards Board ("FASB"):

*Revenue from Contracts with Customers* — In May 2014, the FASB, issued a new revenue recognition standard which amends revenue recognition principles and provides a single, comprehensive set of criteria for revenue recognition within and across all industries. The new standard provides a five-step framework whereby revenue is recognized when control of promised goods or services are transferred to a customer at an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The standard also requires enhanced disclosures pertaining to revenue recognition in both interim and annual periods. In August 2015, the FASB deferred the effective date of the new revenue standard from January 1, 2017 to January 1, 2018. In March 2016, the FASB issued amendments to clarify the implementation guidance on principal versus agent considerations. In April 2016, the FASB issued

42

amendments to clarify the guidance on accounting for licenses of intellectual property and identifying performance obligations. In May 2016, the FASB issued amendments related to collectability, non-cash consideration, the presentation of sales and other similar taxes collected from customers and transition. The standard allows for adoption using a full retrospective method or a modified retrospective method. On January 1, 2018, the Company adopted this standard using the modified retrospective method. The Company's implementation approach included performing a detailed review of its agreements. The Company has reviewed all types of customer contracts and has gone through the five step process outlined in the new revenue recognition standard for each type of contract. The new five step process required by the new revenue recognition standard provides results substantially consistent with the Company's current revenue recognition policies. In addition, the Company designed internal controls to enable the preparation of financial information. The Company is in the process of finalizing its conclusions on key accounting assessments related to the new standard, including its assessment that the impact of accounting for costs incurred to obtain a contract.

The Company identified two contracts which previously resulted in revenue recognition occurring at the time of shipment; however, under the new revenue recognition standard, the Company is required to recognize revenue over time. The Company currently estimates the impact of adopting the new revenue standard on the two contracts will result in a $1,800 to $2,200 reduction in accumulated deficit, the cumulative effect adjustment under the modified retrospective approach, a $2,500 to $3,000 increase in accounts receivable, and a $700 to $800 decrease in deferred tax assets. The Company also identified a contract that contains significant upfront payments; however, the Company has not yet finalized its assessment of the contract. Except for the three contracts discussed above, the Company does not anticipate the finalization of this assessment will result in a material impact to the Company's financial position, results of operations, and disclosures.

153. Attached to the 2017 10-K were SOX certifications signed by Defendants Farhat and Singer, attesting to the accuracy of the 2017 10-K.

154. However, several of the line items reported in the 2017 10-K were erroneously accounted for. Thus, the 2017 10-K contained materially false and misleading statements that misrepresented the true results and operations of RTI. As the Restatement would later reveal, *inter alia*, the Company's revenues were understated by $0.8 million, costs of processing and distribution was understated by $0.2 million, operating expenses were understated by less than

$0.1 million, accounts receivable was understated by $0.1 million, net inventories were understated by less than $0.1 million, prepaid and other current assets were understated by $0.3 million, deferred tax assets were overstated by $0.1 million, net other intangible assets were overstated by less than $0.5 million, accounts payable was overstated by $0.1 million, and accrued expenses were understated by $0.1 million.

### March 26, 2018 Proxy Statement

155.    On March 26, 2018, the Company filed its Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Farhat, Gearen, McEachin, Selquist, Singer, Stolper, Sweeney, Thomas, Valeriani, and Weis solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[6]

156.    With respect to the Company's Code of Ethics, the 2018 Proxy Statement stated, "[o]ur Board of Directors has adopted a Code of Ethics for Senior Financial Professionals, applicable to our Chief Executive Officer, Chief Financial Officer and Vice President of Finance, Controller." With respect to the Company's Code of Conduct, the 2018 Proxy Statement stated, "[o]ur Board of Directors has also adopted a Code of Conduct applicable to all of our directors, officers and employees."

157.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct and Code of Ethics were not followed, as evidenced by the numerous false and misleading statements alleged herein, including material revenue misstatements in RTI's SEC filings, the insider trading engaged in by one of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct

---

[6] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

and/or Code of Ethics.

158.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including linking incentive award opportunities "to challenging performance goals that reinforce key business objectives and long-term shareholder value creation[,]"while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein. On the contrary, the 2018 Proxy Statement maintained that the Company's performance in 2017 and executive compensation awards "demonstrate[d] a strong alignment between executive compensation, Company performance, and shareholder value creation."

159.    The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company improperly recognized and accounted for revenues for certain contractual arrangements, primarily involving OEM customers due, in part, to early deliveries made outside of agreed-to delivery windows; (2) some of these early shipments were unapproved and shipped by employees in order to generate more revenue; (3) additionally, certain adjustments were improperly or erroneously made through manual journal entries to accrual or reserve accounts; (4) thus, RTI's financial statements incorrectly reported revenues, costs of processing and distribution, accounts receivable, net inventories, deferred tax assets, operating expenses, prepaid and other current assets, deferred tax assets, other intangible assets, accounts payable, accrued expenses, and payments for treasury stock, among other line items; (5) these material errors would result in RTI's need to restate its previously reported financial statements; (6) RTI's financial statements also contained significant errors separate from the underlying Investigation; and (7) the Company failed to maintain internal controls. As a result of the foregoing, the

Company's public statements were materially false and misleading at all relevant times.

### *May 4, 2018 10-Q*

160. On May 4, 2018, the Company filed its quarterly report with the SEC for the first quarterly period ended March 31, 2018 on a Form 10-Q (the "1Q18 10-Q"), which was signed by Defendants Farhat and Singer. Attached to the 1Q18 10-Q were SOX certifications signed by Defendants Farhat and Singer attesting to the accuracy of the 1Q18 10-Q.

161. As reported in the 1Q18 10-Q, the Company's condensed consolidated balance sheets, including accounts of RTI's assets, liabilities and stockholders' equity were erroneously recorded. The Company's condensed consolidated statements of income, which reported quarterly revenues, costs of processing and distribution, gross profit, expenses, and loss income, among other line items, similarly contained errors. RTI's condensed consolidated statements of cash flows amounts, including, *inter alia*, cash flows from operating activities, investing activities, and financing activities also contained numerous errors that required correction.

162. Specifically, the 1Q18 10-Q understated accounts receivable by $187, understated net inventories by $586, understated total assets by $354, and understated total liabilities and stockholders' equity by $354 in RTI's consolidated balance sheets. In addition, the 1Q18 10-Q, overstated revenues by $749, overstated costs of processing and distribution by $570, and overstated gross profit by $179 in RTI's consolidated statements of income amounts. Lastly, among other errors, the 1Q18 10-Q understated net loss by $152 in its consolidated statement of cash flows amounts.

### *August 3, 2018 10-Q*

163. On August 3, 2018, the Company filed its quarterly report with the SEC for the second quarterly period ended June 30, 2018 on a Form 10-Q (the "2Q18 10-Q"), which was

signed by Defendants Farhat and Singer. Attached to the 2Q18 10-Q were SOX certifications signed by Defendants Farhat and Singer attesting to the accuracy of the 2Q18 10-Q.

164. As reported in the 2Q18 10-Q, the Company's condensed consolidated balance sheets, including accounts of RTI's assets, liabilities and stockholders' equity were erroneously recorded. The Company's condensed consolidated statements of income, which reported quarterly revenues, costs of processing and distribution, gross profit, expenses, and loss income, among other line items, similarly contained errors. RTI's condensed consolidated statements of cash flows amounts, including, *inter alia*, cash flows from operating activities, investing activities, and financing activities also contained numerous errors that required correction.

165. Specifically, the 2Q18 10-Q overstated accounts receivable by $1,338, understated net inventories by $745, overstated total assets by $482, and overstated total liabilities and stockholders' equity by $912 in RTI's consolidated balance sheets. In addition, the 2Q18 10-Q, overstated revenues by $1,049, overstated costs of processing and distribution by $729, and overstated gross profit by $320 in RTI's consolidated statements of income amounts. Lastly, among other errors, the 2Q18 10-Q understated net loss by $494 in its consolidated statement of cash flows amounts.

### *November 2, 2018 10-Q*

166. On November 2, 2018, the Company filed its quarterly report with the SEC for the third quarterly period ended September 30, 2018 on a Form 10-Q (the "3Q18 10-Q"), which was signed by Defendants Farhat and Singer. Attached to the 3Q18 10-Q were SOX certifications signed by Defendants Farhat and Singer attesting to the accuracy of the 3Q18 10-Q.

167. As reported in the 3Q18 10-Q, the Company's condensed consolidated balance sheets, including accounts of RTI's assets, liabilities and stockholders' equity were erroneously recorded. The Company's condensed consolidated statements of income, which reported quarterly revenues, costs of processing and distribution, gross profit, expenses, and loss income, among other line items, similarly contained errors. RTI's condensed consolidated statements of cash flows amounts, including, *inter alia*, cash flows from operating activities, investing activities, and financing activities also contained numerous errors that required correction.

168. Specifically, the 3Q18 10-Q understated accounts receivable by $48, overstated net inventories by $68, overstated total assets by $320, and overstated total liabilities and stockholders' equity by $849 in RTI's consolidated balance sheets. In addition, the 3Q16 10-Q, understated revenues by $337, understated costs of processing and distribution by $84, and understated gross profit by $253 in RTI's consolidated statements of income amounts. Lastly, among other errors, the 3Q18 10-Q understated net income by $601 in its consolidated statement of cash flows amounts.

### *March 5, 2019 Form 10-K*

169. On March 5, 2019, the Company filed its annual report with the SEC for the fiscal year ended December 31, 2018 on a Form 10-K (the "2018 10-K"), which was signed by Defendants Farhat, Singer, Selquist, Gearen, McEachin, Stolper, Sweeney, Thomas, Valeriani, and Weis. The 2018 10-K purported to provide accurate financial reports concerning the Company's financial results and operations for the fiscal year ended December 31, 2018.

170. The 2018 10-K described the Company's revenue recognition practices as follows:

> ***Revenue Recognition***—The Company recognizes revenue upon shipping, or receipt by the Company's customers of its products and implants, depending on the Company's distribution agreements with its customers or distributors. The Company's performance obligations consist mainly of transferring control of

implants identified in the contracts. The Company typically transfers control at a point in time upon shipment or delivery of the implants for direct sales, or upon implantation for sales of consigned inventory. The customer is able to direct the use of, and obtain substantially all of the benefits from, the implant at the time the implant is shipped, delivered, or implanted, respectively based on the terms of the contract. For performance obligations related to the Company's contracts with exclusively built inventory clauses, the Company typically satisfies its performance obligations evenly over the contract term as inventory is built. Such exclusively manufactured inventory has no alternative use and the Company has an enforceable right to payment for performance to date. The Company uses the input method to measure the manufacturing activities completed to date, which depicts the progress of the Company's performance obligation of transferring control of exclusively built inventory. For the contracts with upfront and annual exclusivity fees, revenue related to those fees is recognized over the contract term following a consistent method of measuring progress towards satisfaction of the performance obligation. The Company uses the method and measure of progress that best depicts the transfer of control to the customer of the goods or services to date relative to the remaining goods or services promised under the contract.

The Company permits returns of implants in accordance with the terms of contractual agreements with customers if the implant is returned in a timely manner, in unopened packaging, and from the normal channels of distribution. Allowances for returns are provided based upon analysis of the Company's historical patterns of returns matched against the revenues from which they originated.

The Company records estimated implant returns, discounts, rebates and other distribution incentives as a reduction of revenue in the same period revenue is recognized. Estimates of implant returns are recorded for anticipated implant returns based on historical distributions and returns information. Estimates of discounts, rebates and other distribution incentives are recorded based on contractual terms, historical experience and trend analysis.

Other revenues consist of service processing, tissue recovery fees, biomedical laboratory fees, recognition of previously deferred revenues, shipping fees, distribution of reproductions of our allografts to distributors for demonstration purposes and restocking fees which is included in revenues.

171. The 2018 10-K also stated the following, in relevant part, regarding RTI's

revenue from contracts with customers:

*Revenue from Contracts with Customers*—On January 1, 2018, the Company adopted a new accounting standard issued by the FASB on revenue recognition using the modified retrospective method. This new accounting standard outlines a single comprehensive model to use in accounting for revenue arising from contracts with customers. This standard supersedes existing revenue recognition

49

requirements and eliminates most industry-specific guidance from GAAP. The core principle of the new accounting standard is to recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. In addition, the adoption of this new accounting standard resulted in increased disclosure, including qualitative and quantitative disclosures about the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers. The new accounting standard was applied to all contracts, apart from contracts for which all or substantially all revenue was recognized before January 1, 2018. Additionally, the Company elected to account for shipping and handling activities as a fulfillment cost rather than a separate performance obligation.

The Company identified three contracts which previously resulted in revenue recognition occurring at the time of shipment; however, under the new revenue recognition standard, the Company is required to recognize revenue over time. The assessment of our January 1, 2018, consolidated balance sheet under ASC Topic 606 resulted in a cumulative-effect adjustment to opening retained earnings, unbilled accounts receivable and costs incurred for inventory.

172. The 2018 10-K further reported OEM revenues for the fiscal years ended December 31, 2018 and 2017, respectively, as follows:

*OEM*—Revenues from OEM increased $10.0 million, or 9.0%, to $120.7 million for the year ended December 31, 2018 compared to $110.7 million for the year ended December 31, 2017. OEM revenues increased primarily as a result of higher orders and due to timing of delivery to certain OEM distributors, primarily in the dental and trauma markets.

173. As for RTI's internal controls over financial reporting, the 2018 10-K maintained the following in relevant part:

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2018. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control – Integrated Framework (2013)*. Based on this assessment, ***management believes that, as of December 31, 2018, the Company's internal control over financial reporting is effective*** based on those criteria.

(Emphasis added).

174. Attached to the 2018 10-K were SOX certifications signed by Defendants Farhat and Singer, attesting to the accuracy of the 2018 10-K.

50

175. As the Restatement would later reveal, *inter alia*, the Company's revenues were overstated by $0.5 million, costs of processing and distribution was overstated by less than $0.1 million, operating expenses were understated by $1.3 million, accounts receivable was overstated by $0.3 million, net inventories were understated by $0.2 million, prepaid and other current assets were overstated by $0.4 million, deferred tax assets were understated by $0.3 million, net other intangible assets were overstated by $0.8 million, accounts payable was overstated by $0.1 million, and accrued expenses were understated by $1.2 million.

176. Furthermore, certain material weaknesses existed in RTI's internal controls over financial reporting, rendering them ineffective as of December 31, 2018. Specifically, the Company's management, including certain of the Individual Defendants, failed to maintain an effective control environment to enable the identification and mitigation of risks of accounting errors based on factors related to RTI's insufficient "tone from executive management," failed to execute proper oversight, lacked appropriately skilled and trained personnel, failed to design and implement effective risk assessment and control activities based on the COSO framework, failed to implement consistent controls over recording and approving journal entries, failed to maintain consistent quality documentation pertaining to financial calculations and accrual adjustments, failed to communicate/implement adequate communication systems, and failed to implement effective monitoring activities, among other material weaknesses and related internal control failures.

177. As the Restatement later revealed, "[d]eficiencies in control activities contributed to material accounting errors identified and corrected in 2018 and prior years. These design deficiencies in control activities contributed to the potential for there to have been material accounting errors in substantially all financial statement account balances and disclosures."

*March 25, 2019 Proxy Statement*

178.    On March 25, 2019, the Company filed the 2019 Proxy Statement with the SEC. Defendants Farhat, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[7]

179.    With respect to the Company's Code of Ethics, the 2019 Proxy Statement stated, "[o]ur Board of Directors has adopted a Code of Ethics for Senior Financial Professionals, applicable to our Chief Executive Officer, Chief Financial Officer and Vice President of Finance, Controller." With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated, "[o]ur Board of Directors has also adopted a Code of Conduct applicable to all of our directors, officers and employees."

180.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct and Code of Ethics were not followed, as evidenced by the numerous false and misleading statements alleged herein, including material revenue misstatements in RTI's SEC filings, the insider trading engaged in by one of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct and/or Code of Ethics.

181.    The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including linking incentive award opportunities "to challenging performance goals that reinforce key business objectives and long-term shareholder value

---

[7] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

creation[,]"while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein. On the contrary, the 2019 Proxy Statement maintained that the Company's performance in 2018 and executive compensation awards "demonstrate[d] a strong alignment between executive compensation, Company performance, and stockholder value creation."

182. The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company improperly recognized and accounted for revenues for certain contractual arrangements, primarily involving OEM customers due, in part, to early deliveries made outside of agreed-to delivery windows; (2) some of these early shipments were unapproved and shipped by employees in order to generate more revenue; (3) additionally, certain adjustments were improperly or erroneously made through manual journal entries to accrual or reserve accounts; (4) thus, RTI's financial statements incorrectly reported revenues, costs of processing and distribution, accounts receivable, net inventories, deferred tax assets, operating expenses, prepaid and other current assets, deferred tax assets, other intangible assets, accounts payable, accrued expenses, and payments for treasury stock, among other line items; (5) these material errors would result in RTI's need to restate its previously reported financial statements; (6) RTI's financial statements also contained significant errors separate from the underlying Investigation, including improper accounting of RTI's acquisition of Paradigm; and (7) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *May 7, 2019 10-Q*

183. On May 5, 2019, the Company filed its quarterly report with the SEC for the first quarterly period ended March 31, 2019 on a Form 10-Q (the "1Q19 10-Q"), which was signed by

Defendants Farhat and Singer. The 1Q19 10-Q provided detailed reports regarding RTI's financial results and operations for the quarter ended March 31, 2019. Attached to the 1Q19 10-Q were SOX certifications signed by Defendants Farhat and Singer attesting to the accuracy of the 1Q19 10-Q.

184. However, several of the line items reported in the 1Q19 10-Q were erroneously accounted for, including those in connection with the Company's revenue recognition practices scrutinized by the SEC and the Investigation and additional errors regarding accounting for RTI's acquisition of Paradigm. Thus, the 1Q19 10-Q contained materially false and misleading statements that misrepresented the true results and operations of RTI. As the 2019 10-K would later reveal, *inter alia*, the Company's revenues were understated by $0.3 million, costs of processing and distribution was understated by $0.1 million, accounts receivable was understated by $0.4 million, net inventories was overstated by $0.1 million, and deferred tax assets were overstated by $0.6 million in the 1Q19 10-Q for the quarter ended March 31, 2019.

185. Moreover, with respect to RTI's accounting for the acquisition of Paradigm, the 1Q19 10-Q understated costs of processing and distribution by $0.3 million, understated marketing, general and administrative expenses by $0.7 million, understated net current inventories by $1.2 million, understated net non-current inventories by $10.3 million, understated deferred tax assets by $0.2 million, overstated goodwill by $113.5 million, understated other net intangible assets by $78.3 million, and overstated acquisition contingencies by $22.8 million.

### *August 5, 2019 10-Q*

186. On August 5, 2019, the Company filed its quarterly report with the SEC for the second quarterly period ended June 30, 2019 on a Form 10-Q (the "2Q19 10-Q"), which was

54

signed by Defendants Farhat and Singer. The 2Q19 10-Q provided detailed reports regarding RTI's financial results and operations for the quarter ended June 30, 2019. Attached to the 2Q19 10-Q were SOX certifications signed by Defendants Farhat and Singer attesting to the accuracy of the 2Q19 10-Q.

187. However, several of the line items reported in the 2Q19 10-Q were erroneously accounted for, including those in connection with the Company's revenue recognition practices scrutinized by the SEC and the Investigation and additional errors regarding accounting for RTI's acquisition of Paradigm. Thus, the 2Q19 10-Q contained materially false and misleading statements that misrepresented the true results and operations of RTI. As the 2019 10-K would later reveal, *inter alia*, the Company's revenues were overstated by $0.8 million, costs of processing and distribution was overstated by $0.2 million, accounts receivable was overstated by $0.3 million, net inventories was understated by $0.1 million, and deferred tax assets were overstated by $0.5 million in the 2Q19 10-Q for the quarter ended June 30, 2019.

188. Moreover, with respect to RTI's accounting for the acquisition of Paradigm, the 2Q19 10-Q overstated costs of processing and distribution by $1.9 million, understated marketing, general and administrative expenses by $2.1 million, overstated net current inventories by $12.6 million, overstated net non-current inventories by $11.2 million, understated deferred tax assets by $0.3 million, overstated goodwill by $76.4 million, understated other net intangible assets by $76.2 million, and overstated acquisition contingencies by $22.8 million.

### *November 7, 2019 10-Q*

189. On November 7, 2019, the Company filed its quarterly report with the SEC for

the third quarterly period ended September 30, 2019 on a Form 10-Q (the "3Q19 10-Q"), which was signed by Defendants Farhat and Singer. The 3Q19 10-Q provided detailed reports regarding RTI's financial results and operations for the quarter ended March 31, 2019. Attached to the 3Q19 10-Q were SOX certifications signed by Defendants Farhat and Singer attesting to the accuracy of the 3Q19 10-Q.

190. However, several of the line items reported in the 3Q19 10-Q were erroneously accounted for, including those in connection with the Company's revenue recognition practices scrutinized by the SEC and the Investigation and additional errors regarding accounting for RTI's acquisition of Paradigm. Thus, the 3Q19 10-Q contained materially false and misleading statements that misrepresented the true results and operations of RTI. As the 2019 10-K would later reveal, *inter alia*, the Company's revenues were understated by $0.6 million, costs of processing and distribution was understated by $0.1 million, accounts receivable was understated by $0.3 million, net inventories was understated by less than $0.1 million, and deferred tax assets were overstated by $0.6 million in the 3Q19 10-Q for the quarter ended September 30, 2019.

191. Moreover, with respect to RTI's accounting for the acquisition of Paradigm, the 3Q19 10-Q overstated costs of processing and distribution by $1.2 million, understated marketing, general and administrative expenses by $2.1 million, overstated net current inventories by $12.6 million, overstated net non-current inventories by $10 million, understated deferred tax assets by $0.5 million, overstated goodwill by $41.7 million, understated other net intangible assets by $74.1 million, and understated acquisition contingencies by $11.9 million.

192. The statements in ¶¶123-125, 127, 130, 133, 136-138, 140, 143, 146, 150-153, 160, 163, 166, 169-174, 183, 186, and 189, were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading.

Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company improperly recognized and accounted for revenues for certain contractual arrangements, primarily involving OEM customers due, in part, to early deliveries made outside of agreed-to delivery windows; (2) some of these early shipments were unapproved and shipped by employees in order to generate more revenue; (3) additionally, certain adjustments were improperly or erroneously made through manual journal entries to accrual or reserve accounts; (4) thus, RTI's financial statements incorrectly reported revenues, costs of processing and distribution, accounts receivable, net inventories, deferred tax assets, operating expenses, prepaid and other current assets, deferred tax assets, other intangible assets, accounts payable, accrued expenses, and payments for treasury stock, among other line items; (5) these material errors would result in RTI's need to restate its previously reported financial statements; (6) RTI's financial statements also contained significant errors separate from the underlying Investigation; and (7) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

193. On March 16, 2020, the Company issued a press release filed with a current report on a Form 8-K announcing its intention to file a Form 12b-25 with the SEC to obtain an extension for filing its annual report on Form 10-K for the fiscal year ended December 31, 2019. The press release revealed that the Audit Committee of the RTI's Board, with the assistance of independent legal and forensic accounting advisors was "***in the process of conducting an internal investigation of current and prior period matters relating to the Company's revenue recognition practices regarding the timing of revenue with respect to certain contractual arrangements, primarily with OEM customers, including the accounting treatment, financial***

57

*reporting and internal controls related to such arrangement***s**.” (Emphasis added). The press release continued to disclose that the Audit Committee's Investigation was "precipitated by an ongoing SEC investigation related to the periods 2014 through 2016." As a result of the Investigation, RTI would be unable to timely file its 2019 10-K. The press release stated that RTI would not be able to assure that its 2019 10-K would be filed within the extension period (through March 31, 2019).

194. On this news, RTI's share price dropped $0.40 (over 14.5%) from closing at $2.75 on March 16, 2020, to close at $2.35 on March 17, 2020.

### **Subsequent Events and Disclosures**

#### *March 20, 2020 Form 8-K and Press Release*

195. On March 20, 2020, the Company issued a press release filed with a current report on a Form 8-K with the SEC announcing that it had received a letter from the Listing Qualifications Department of the Nasdaq Stock Market LLC, indicating that the Company was not in compliance with the timely filing requirement for continued listing under Nasdaq Listing Rule 5250(c)(1). In the same report, the Company announced that Defendant Louw, who had recently been promoted to CFO in January 2020, would end his employment with RTI by April 8, 2020.

#### *March 30, 2020 Form 8-K*

196. On March 30, 2020, the Company filed a current report on a Form 8-K with the SEC announcing that on March 28 2020, RTI received a letter from the Buyer's counsel stating that the Company was in breach of its agreement with the Buyer for the sale of its OEM business due to its failure to timely file its 2020 Proxy Statement, and would have 30 days to cure the breach. The current report further disclosed that the Company was postponing its special meeting

of shareholders, scheduled for May 13, 2020 in order to obtain shareholder vote over the OEM

business sale, and its annual meeting, scheduled for the same day. The current report did not

provide new record dates.

### *April 9, 2020 Form 8-K*

197.    On April 9, 2020, the Company filed a current report on a Form 8-K with the SEC

revealing certain findings of Investigation. The current report maintained that the Investigation

remained ongoing, and revealed that on April 7, 2020, RTI's Audit Committee had concluded

that the Company would restate its previously issued audited financial statements for the years

ended December 31, 2014, 2015, 2016, 2017 and 2018 and its unaudited financial statements for

the quarterly periods for 2016 through 2018, and the nine months ended September 30, 2019.

The current report further stated, "[a]ccordingly, ***investors should no longer rely upon the***

***Company's previously released financial statements as of and for the years ended December***

***31, 2018, 2017, 2016, 2015, and 2014, and the reports on the financial statements and other***

***financial data released related to the Relevant Periods***." (Emphasis added).

198.    Moreover, the current report provided further details pertaining to RTI's improper

revenue recognition of certain contracts initially revealed on March 16, 2020. Specifically, the

current report stated in relevant part:

> ***The Company has concluded that revenue for certain invoices should have been***
> ***recognized at a later date than when originally recognized. In response to***
> ***binding purchase orders from certain OEM customers, goods were shipped and***
> ***received by the customers before requested delivery dates and agreed-upon***
> ***delivery windows. In many instances, the OEM customers requested or***
> ***approved the early shipments, but the Company has determined that on other***
> ***occasions the goods were delivered early without obtaining the customers'***
> ***affirmative approval. In addition, the Company has concluded that in July***
> ***2017, an adjustment was improperly made to a product return provision in the***
> ***Direct Division.*** Accordingly, the Company will revise its financial statements to
> correct these errors and any others as it finalizes the Investigation. The Company
> and the Audit Committee of the Board of Directors have discussed these matters

with Deloitte & Touche LLP, the Company's independent registered public accounting firm.

(Emphasis added).

199.    Lastly, the current report announced a date for the Company's previously postponed special meeting of shareholders and annual meeting for June 15, 2020.[8]

### *April 29, 2020 Form 8-K*

200.    On April 29, 2020, the Company filed a current report on a Form 8-K with the SEC announcing an amendment to its purchase agreement with the Buyer for the sale of its OEM business that, among other things, ***reduced*** the base purchase price by $50 million; from $490,000,000 to $440,000,000. The amendment provided the Company with, *inter alia*, an extension on the closing of the transaction and an extension to file its 2020 Proxy Statement and the 2019 10-K with the SEC.

201.    In the same current report, RTI disclosed that in connection with Defendant Louw's departure from the Company, RTI entered into a Separation Agreement and Release of Claims and a Consultant Agreement with Defendant Louw whereby Defendant Louw would be paid a separation payment by RTI in the amount of $195, 294, in exchange for his agreement to release the Company from certain claims arising prior to April 24, 2020 and reaffirmance of employment obligations to the Company with respect to confidentiality. Defendant Louw also agreed to provide consulting services to RTI until the earlier of:

> (i) the consummation of the sale of the Company's OEM business pursuant to the Purchase Agreement; and (ii) the termination of such agreement. In exchange for such consultant services, RTI Surgical agreed to pay to Mr. Louw the following compensation: (i) $23,741 per month; (ii) reimbursement for reasonable and documented out-of-pocked expenses incurred by Mr. Louw in connection with performance of such services; and (iii) reimbursement of actual travel expenses in accordance with RTI's travel policy at the time of travel.

---

[8] In another current report filed on Form 8-K with the SEC on May 6, 2020, the Company announced that it would be delaying both meetings once again until July 15, 2020.

*The Restatements*

202.    On June 8, 2020, RTI filed the Restatement on a Form 10-K/A for the fiscal year ended December 31, 2018.  As anticipated, the Restatement provided corrections to certain historical errors related to the timing of its revenue for certain contractual arrangements, mainly involving RTI's OEM customers, including the accounting treatment, financial reporting, and internal controls regarding those arrangements. The Investigation determined that invoices had been recognized earlier than they should have, due to shipments of binding purchase orders delivered "before requested delivery dates and agree-upon delivery windows." The Restatement confirmed that in some instances, these deliveries were made without the prior approval of the customer, to generate additional revenue. Resultingly, shipments were improperly pulled from future quarters and recognized during earlier quarters. The Restatement specifically provided the following background on the Investigation's results:

> Based on the results of the Investigation, the Company has concluded that revenue for certain invoices should have been recognized at a later date than when originally recognized. In response to binding purchase orders from certain OEM customers, goods were shipped and received by the customers before requested delivery dates and agreed-upon delivery windows. In many instances the OEM customers requested or approved the early shipments, but the Company has determined that on other occasions the goods were delivered early without obtaining the customers' affirmative approval. Some of those unapproved shipments were shipped by employees in order to generate additional revenue and resulted in shipments being pulled from a future quarter into an earlier quarter. The revenue for those shipments is being restated, as well as for other orders that shipped earlier than the purchase order due date in the system for which the Company could not locate evidence that the OEM customers had requested or approved the shipments.

203.    The Restatement further elaborated on additional improper accounting practices executed during the periods covered by the Restatement, including an improper adjustment made to a product return provision in the Direct Division in the amount of $30,000. The Restatement

also disclosed that:

> [t]he July 2017 adjustment prompted additional investigative steps. The Company has concluded that in the periods of the fourth quarter of 2015 through the fourth quarter of 2018 certain adjustments were improperly or erroneously made to manual journal entry accrual/reserve accounts, including a July 2017 adjustment to a product return provision in the Direct Division. Accordingly, the Company has restated its financial statements to correct these errors.

204. The Restatement also revealed that "[i]n addition to the correction of the errors discussed above, the Company has also made other immaterial corrections in all periods presented."

205. The Restatement summarized the overall impact of the corrections made in connection with the Investigation and all other adjustments made in the Restatement as follows:

a. Revenue – As noted above, the Company has concluded that in some instances revenue for certain invoices should have been recognized at a later date than when originally recognized. Under both ASC 605 and ASC 606, revenue on sales to OEM customers is typically recognized at a point in time upon shipment. The Company identified revenue from certain customer orders that was shipped early to customers without obtaining authorized approval, and thus was recognized in an incorrect period. There were also instances in which the Company could not locate evidence that the OEM customers had requested or approved the shipments. Correction of these errors, when including the rollover effect from the immediately preceding periods, decreased revenue by $0.5 million in 2018, increased revenue by $0.8 million in 2017, and increased revenue by $3.1 million in 2016.

b. Costs of processing and distribution – Primarily as a result of the error corrections noted above, when including the rollover effect from the immediately preceding periods, costs of processing and distribution decreased by less than $0.1 million in 2018, increased by $0.2 million in 2017, and increased by $2.1 million in 2016.

c. Operating expenses – The Company corrected certain errors noted above, separate from the Investigation which increased operating expenses by $1.3 million, less than $0.1 million and $0.6 million, as of December 31, 2018, 2017, and 2016, respectively.

d. Accounts receivable – Primarily as a result of the error corrections noted above relating to the timing of revenue recognition, accounts receivable decreased by $0.3 million, increased by $0.1 million, and decreased by

62

$0.6 million, as of December 31, 2018, 2017, and 2016, respectively.

e. <u>Inventories - net</u> – Primarily as a result of the error corrections noted above relating to the timing of revenue recognition, inventories - net increased by $0.2 million, less than $0.1 million, and $0.3 million as of December 31, 2018, 2017, and 2016, respectively.

f. <u>Prepaid and other current assets</u> – The Company corrected certain errors noted above, separate from the investigation, which decreased prepaid and other current assets by $0.4 million, increased by $0.3 million, and decreased by less than $0.1 million, as of December 31, 2018, 2017, and 2016, respectively.

g. <u>Property, plant and equipment – net</u> – The Company corrected certain errors noted above, separate from the investigation, which increased property, plant and equipment – net by $0.1 million, as of December 31, 2016.

h. <u>Deferred tax assets</u> – The Company corrected certain errors noted above, relating to the tax effects of changes to the timing of revenue recognition, which increased deferred tax assets by $0.3 million, decreased by $0.1 million, and increased by $0.1 million as of December 31, 2018, 2017, and 2016, respectively.

i. <u>Other intangible assets – net</u> – The Company corrected certain errors, separate from the investigation, which decreased net other intangible assets – net by $0.8 million and $0.5 million as of December 31, 2018 and 2017, respectively, and increased other intangible assets – net by less than $0.1 million as of December 31, 2016.

j. <u>Accounts payable</u> – The Company corrected certain errors, separate from the investigation, which decreased accounts payable by $0.1 million as of December 31, 2018 and 2017, and by less than $0.1 million as of December 31, 2016.

k. <u>Accrued expenses</u> – The Company corrected certain errors noted above, separate from the investigation, which increased accrued expenses by $1.2 million, $0.1 million, and $0.4 million, as of December 31, 2018, 2017, and 2016, respectively.

l. <u>Other long-term liabilities</u> – As a result of the impact of the error corrections noted above, separate from the investigation, long-term liabilities increased $0.4 million as of December 31, 2016.

m. <u>Payments for treasury stock</u> – The Company corrected certain errors, separate from the investigation, which reclassified operating cash flows to financing cash flows for purchases of treasury stock by $0.5 million and $3.3 million as of December 31, 2018 and 2017, respectively.

63

206.     The Restatement further provided detailed charted corrections made to selected financial data reported for the fiscal years ended December 31, 2014 and 2015 for revenues, profit, income, and stockholders' equity, and restated certain line items for prior financial data reported for the quarterly periods within the years ended December 31, 2018, 2017, and 2016, including those contained in RTI's condensed consolidated balance sheets, condensed consolidated statements of income, and condensed consolidated statements of cash flow amounts.

207.     As restated, total assets, liabilities, and stockholders' equity for the quarterly periods ended March 31, June 30, and September 30, 2018 were $360,948, $346,581, and $349,248, respectively. As restated, total assets, liabilities, and stockholders' equity for the quarterly periods ended March 31, June 30, and September 30, 2017 were $368,691, $366,220, and $352,962, respectively. As restated, total assets, liabilities and stockholders' equity for the quarterly periods ended March 31, June 30, and September 30, 2016 were $378,843, $375,409, and $373,177, respectively. The Restatement also corrected line items reported in the Company's condensed consolidated statements of income, which reported revenues, costs of processing and distribution, gross profit, and expenses, among other types of income.

208.     Finally, the Restatement detailed numerous material weaknesses in the Company's internal controls and provided a list of admitted failures that contributed to the accounting errors made in the current and prior periods. The Restatement stated in relevant part:

> We did not maintain an effective control environment based on the criteria established in the COSO framework. We have identified deficiencies in the principles associated with the control environment of the COSO framework. Specifically, these control deficiencies constitute material weaknesses, either individually or in the aggregate, relating to: (i) appropriate organizational structure, reporting lines, and authority and responsibilities in pursuit of objectives; (ii) our commitment to attract, develop, and retain competent individuals; and (iii) holding individuals accountable for their internal control related responsibilities. As

64

disclosed in the consolidated financial statements included in Item 8. "Financial Statements and Supplementary Data", these material weaknesses contributed to accounting errors.

209.     The Company also filed its 2019 10-K the same day as the Restatement, on June 8, 2019. The 2019 10-K reiterated the background behind the Restatement, and additionally disclosed, that, "other errors that were unrelated to the SEC investigation were identified that were corrected in the restated financial statements. Additional errors were made in connection with the recording of the acquisition of Paradigm Spine, LLC in 2019." The 2019 10-K also included restatements of RTI's previously filed financial statements for the quarters ended March 31, 2019, June 30, 2019, and September 30, 2019.

210.     The 2019 10-K summarized the errors identified and corrected in the periods covered by the 2019 10-K as a result of the Investigation as follows:

a.   Revenue – As noted above, the Company has concluded that in some instances revenue for certain invoices should have been recognized at a later date than when originally recognized. The Company identified revenue from certain customer orders that were shipped early to customers without obtaining authorized approval, and thus was recognized in an incorrect period. There were also instances in which the Company could not locate evidence that the OEM customers had requested or approved the shipments and therefore concluded revenue related to these shipments were an error. Correction of these errors, when including the rollover effect from the immediately preceding periods, increased revenue by $0.3 million in the quarter ended March 31, 2019, decreased by $0.8 million in the quarter ended June 30, 2019 and increased by $0.6 million in the quarter ended September 30, 2019.

b.   Costs of processing and distribution – Based on the corrections to the above revenue errors, when including the rollover effect from the immediately preceding periods, costs of processing and distribution increased by $0.1 million in the quarter ended March 31, 2019, decreased by $0.2 million in the quarter ended June 30, 2019 and increased by $0.1 million in the quarter ended September 30, 2019.

c.   Accounts receivable – As a result of the errors corrections above, accounts receivable increased by $0.4 million in the quarter ended March 31, 2019, decreased by $0.3 million in the quarter ended June 30, 2019 and increased

$0.3 million in the quarter ended September 30, 2019.

d. <u>Inventories, net</u> – As a result of the errors corrections above, net inventories decreased by $0.1 million in the quarter ended March 31, 2019, increased by $0.1 million in the quarter ended June 30, 2019 and increased by less than $0.1 million in the quarter ended September 30, 2019.

e. <u>Deferred tax assets</u> – As a result of the income tax impact of the errors corrections above, deferred tax assets decreased by $0.6 million in the quarter ended March 31, 2019, decreased by $0.5 million in the quarter ended June 30, 2019, and decreased by $0.6 million in the quarter ended September 30, 2019.

211. The 2019 10-K also detailed the errors found and corrections made to accountings

in connection with RTI's acquisition of Paradigm, stating in relevant part:

a. <u>Costs of processing and distribution</u> – Based on the corrections to the inventory valuation and Paradigm purchase accounting, costs of processing and distribution increased by $0.3 million in the quarter ended March 31, 2019, decreased by $1.9 million in the quarter ended June 30, 2019, and by $1.2 million in the quarter ended September 30, 2019.

b. <u>Marketing, general and administrative</u> – Based on the corrections to the amortization related to the other intangible assets' valuation and Paradigm purchase accounting, marketing, general and administrative expenses increased by $0.7 million in the quarter ended March 31, 2019 and increased $2.1 million in each of the quarters ended June 30, and September 30, 2019.

c. <u>Current inventories, net</u> – Based on the corrections to the inventory valuation and Paradigm purchase accounting, net current inventories increased by $1.2 million in quarter ended March 31, 2019, and decreased by $12.6 million in the quarters ended June 30, and September 30, 2019.

d. <u>Non-current inventories, net</u> – Based on the corrections to the inventory valuation and Paradigm purchase accounting, net non-current inventories increased by $10.3 million in quarter ended March 31, 2019, decreased $11.2 million in the quarter ended June 30, 2019, and decreased by $10.0 million in the quarter ended September 30, 2019.

e. <u>Deferred tax assets</u> – Based on the corrections to the Paradigm purchase accounting deferred tax assets increased by $0.2 million in quarter ended March 31, 2019, increased by $0.3 million in the quarter ended June 30, 2019, and increased by $0.5 million in the quarter ended September 30, 2019.

f. <u>Goodwill</u> – Based on the corrections to the Paradigm purchase accounting, goodwill decreased by $113.5 million in quarter ended March 31, 2019, decreased

$76.4 million in the quarter ended June 30, 2019, and decreased by $41.7 million in the quarter ended September 30, 2019.

g. Other intangible assets - net – Based on the corrections to the Paradigm purchase accounting, net other intangible assets increased by $78.3 million in the quarter ended March 31, 2019, increased $76.2 million in the quarter ended June 30, 2019, and increased $74.1 million in the quarter ended September 30, 2019.

h. Acquisition contingencies – Based on the corrections to the contingent liability valuation and Paradigm purchase accounting, acquisition contingencies decreased by $22.8 million in each of the quarters ended March 31, and June 30, 2019 and increased $11.9 million in the quarter ended September 30, 2019.

212. The 2019 10-K further detailed the additional "immaterial" corrections made for the periods presented as follows:

a. Marketing, general and administrative – The Company corrected certain errors which decreased marketing, general and administrative expenses by $0.5 million in the quarter ended March 31, 2019 and less than $0.1 million in each of the quarters ended June 30, and September 30, 2019.

b. Accounts receivable – The Company corrected certain errors which decreased accounts receivable by $0.4 million for the quarter ended March 31, 2019, and by $0.3 million for the quarters ended June 30, and September 30, 2019.

c. Prepaid and other current assets – The Company corrected certain errors which decreased prepaid and other current assets by $0.5 million for each of the quarters ended March 31, and June 30, 2019, and September 30, 2019.

d. Deferred tax assets - net – The Company corrected certain errors which increased net deferred tax assets by $0.7 million for the quarters ended March 31, June 30, and September 30, 2019.

e. Property, plant & equipment – The Company corrected certain errors which increased property, plant & equipment by $0.3 million for the quarters ended March 31, June 30, and September 30, 2019.

f. Other intangible assets - net – The Company corrected certain errors which decreased net other intangible assets by $0.8 million for each of the quarters ended March 31, June 30, and September 30, 2019.

g. Other assets - net – The Company corrected certain errors which decreased net other assets by $0.3 million for the quarters ended March 31, June 30, and September 30, 2019.

h. <u>Accounts payable</u> – The Company corrected certain errors which decreased accounts payable by $0.2 million for the quarters ended March 31, June 30, and September 30, 2019.

i. <u>Accrued expenses</u> – The Company corrected certain errors which increased accrued expenses by $0.6 million for the quarters ended March 31, June 30, and September 30, 2019.

j. <u>Payments for treasury stock</u> – The Company corrected certain errors which reclassified operating cash flows to financing cash flows for purchases of treasury stock by $0.1 million, $0.2 million, and $0.2 million for the quarters ended March 31, June 30, and September 30, 2019, respectively.

213. The 2019 10-K contained substantively the same enumerated material weaknesses in the Company's controls and procedures and its internal control over financial reporting.

214. The Restatements both outlined, *inter alia*, that RTI's internal controls were not effective as of December 31, 2019 or December 31, 2018, respectively, and that the Company had identified significant material weaknesses in its internal controls. The Restatements stated the following with respect to the Company's ineffective internal controls and the ongoing restatement efforts, in relevant part:

> In connection with this restatement of our prior consolidated financial statements, we have also identified material weaknesses in our internal control over financial reporting, and management has concluded that our internal control over financial reporting and disclosure controls and procedures were not effective as of December 31, 2018. For further discussion of the material weaknesses, please see "Item 9A. Controls and Procedures". Remediation efforts place a significant burden on management and add increased pressure to our financial resources and processes.

> If we are unable to successfully remediate our existing or any future material weaknesses or other deficiencies in our internal control over financial reporting or disclosure controls and procedures, investors may lose confidence in our financial reporting and the accuracy and timing of our financial reporting and disclosures and our business, reputation, results of operations, financial condition, market value of our debt securities, and ability to access the capital markets through debt issuances could be adversely affected.

***Post-Restatement***

215. On June 9, 2020, the Company issued a press release, attached as an exhibit to a

current report filed with the SEC on Form 8-K the same day announcing that the Company had completed the Investigation of certain accounting matters, had revised its financial statements to correct for errors, and filed the Restatements. The press release noted that the SEC investigation remains ongoing.

216. As of the time of filing this Complaint, the Company has yet to publish its official 2020 Proxy Statement, or its quarterly report for the quarter ended March 31, 2020, which was due in May.

## Repurchases During the Relevant Period

217. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $4.5 million to repurchase approximately 1,023,566 shares of its own common stock at artificially inflated prices from August 2016 through December 2019.

218. As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the Company overpaid approximately $2.1 million in total for these repurchases.

219. According to the 2016 10-K, during the month of August 2016, the Company purchased 109,506 shares of its common stock for approximately $362, 464 at an average price of $3.31 per share.

220. As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the amount the Company overpaid for repurchases of its own stock during August 2016 was approximately $105,125.

221. According to the 2017 10-K, during January 2017, February 2017, and November

2017, the Company purchased 745,122 shares of its common stock for approximately $3.4 million, at an average price of $4.65 per share.

222. As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the amount the Company overpaid for repurchases of its own stock during January, February, and November 2017 was approximately $1.7 million.

223. According to the 2018 10-K during the months of January, April, May, July, and August 2018, the Company purchased 107,109 shares of its common stock for approximately $478,591, at an average price of $4.47 per share.

224. As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the amount the Company overpaid for repurchases of its own stock during January, April, May, July, and August was approximately $226,885.

225. According to the 1Q19 10-Q, during the three month period ended March 31, 2019, the Company purchased 29,021 shares of its common stock for approximately $136,435, at an average price of $4.70 per share.

226. As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the amount the Company overpaid for repurchases of its own stock during the three month period ended March 31, 2019 was approximately $68,199.

227. According to the 2Q19 10-Q, during the three month period ended June 30, 2019, the Company purchased 7,748 shares of its common stock for approximately $38,032, at an average price of $4.94 per share.

228. As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the amount the Company overpaid for repurchases of its own stock during the three month period ended June 30, 2019 was approximately $19,825.

229. According to the 3Q19 10-Q, during the three month period ended September 30, 2019, the Company purchased 7,812 shares of its common stock for approximately $31,908, at an average price of $4.11 per share.

230. As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the amount the Company overpaid for repurchases of its own stock during the three month period ended September 30, 2019 was approximately $13,550.

231. According to the Company's 2019 10-K, during October 2019, the Company purchased 7,325 shares of its common stock for approximately $20,363, at an average price of $2.78 per share.

232. As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the amount the Company overpaid for repurchases of its own stock during October 2019 was approximately $3,150.

233. According to the Company's 2019 10-K, during December 2019, the Company purchased 9,923 shares of its common stock for approximately $44,851, at an average price of $4.52 per share.

234. As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the amount the Company overpaid for repurchases of its own stock during December 2019 was approximately $21,532.

235. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $2.1 million.

## DAMAGES TO RTI

236. As a direct and proximate result of the Individual Defendants' conduct, RTI has lost and expended, and will lose and expend, many millions of dollars.

237. Such expenditures include, but are not limited to, legal fees associated with the

71

Securities Class Action filed against the Company and certain of its current and former officers, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto, including the ongoing SEC investigation.

238. Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

239. Such losses include the Company's overpayment by approximately $2.1 million for repurchases of its own stock during the Relevant Period, during which the Company's stock price was artificially inflated due to the false and misleading statements discussed herein as well as the $50,000,000 reduction in the Company's purchase agreement with the Buyer for the sale of its OEM business.

240. Further, these expenditures include the costs of the Investigation into certain revenue recognition items overseen by the Audit Committee, and the costs of restating the Company's financial results for the fiscal years 2014, 2015, 2016, 2017, and 2018 and the Company's unaudited financial statements for the quarterly periods for 2016 through 2018 and the three quarters of 2019 in the Restatements.

241. As a direct and proximate result of the Individual Defendants' conduct, RTI has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

### DERIVATIVE ALLEGATIONS

242. Plaintiff brings this action derivatively and for the benefit of RTI to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

fiduciary duties as directors and/or officers of RTI, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, as well as the aiding and abetting thereof.

243. RTI is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

244. Plaintiff is, and has continuously been at all relevant times, a shareholder of RTI. Plaintiff will adequately and fairly represent the interests of RTI in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

245. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

246. A pre-suit demand on the Board of RTI is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following ten individuals: Defendants Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis (the "Director-Defendants"), along with non-parties Jeffrey C. Lightcap and Stuart F. Simpson (together, the "Directors"). Plaintiff needs only to allege demand futility as to five of these ten Directors.

247. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact while one of them engaged in insider sales based on material non-public information, and, at the same time, to cause the Company to overpay by over $2.1 million for repurchases of its own stock, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action

73

against themselves and the other perpetrators of the scheme.

248. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

249. Additional reasons that demand on Defendant Farhat is futile follow. Defendant Farhat has served as RTI's President, CEO, and as a Company director since March 2017. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Farhat with his principal occupation, and he receives handsome compensation as described above, including $1,219,629 during the fiscal year ended December 31, 2018. Defendant Farhat was ultimately responsible for the false and misleading statements and omissions made during his tenure, including those contained in the 2017 and 2018 10-Ks, and the quarterly reports filed on Form 10-Qs between May 2017 and November 2019, which he signed and signed SOX certifications for. As the Company's highest officer and as a trusted director, Defendant Farhat conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Farhat is a defendant in the Securities Class Action. Thus, for these reasons, too, Defendant Farhat breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

250. Additional reasons that demand on Defendant McEachin is futile follow.

74

Defendant McEachin has served as a Company director since December 2015. He also serves as the chair and of the Audit Committee. Defendant McEachin has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McEachin signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, and 2018 10-Ks. For these reasons, too, Defendant McEachin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

251. Additional reasons that demand on Defendant Selquist is futile follow. Defendant Selquist has served as a Company director since June 2013 and as Chairman of the Board since February 2016. He also serves as a member of the Nominating & Governance Committee. Defendant Selquist has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Selquist signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, and 2018 10-Ks. For these reasons, too, Defendant Selquist breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

252. Additional reasons that demand on Defendant Stolper is futile follow. Defendant

Stolper has served as a Company director since March 2017. He also serves as a member of the Audit Committee and Compensation Committee. Defendant Stolper has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Stolper signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, too, Defendant Stolper breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

253. Additional reasons that demand on Defendant Sweeney is futile follow. Defendant Sweeney has served as a Company director since October 2015. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Sweeney signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, and 2018 10-Ks. For these reasons, too, Defendant Sweeney breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

254. Additional reasons that demand on Defendant Thomas is futile follow. Defendant Thomas has served as a Company director since June 2016. He also serves as a member of the Compensation Committee and Nominating & Governance Committee. Defendant Thomas has received and continues to receive compensation for his role as a director as described herein. As

a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Thomas signed, and thus personally made the false and misleading statements in the 2016, 2017, and 2018 10-Ks. For these reasons, too, Defendant Thomas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

255. Additional reasons that demand on Defendant Valeriani is futile follow. Defendant Valeriani has served as a Company director since June 2016. He also serves as a member of the Compensation Committee and Nominating & Governance Committee. Defendant Valeriani has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Valeriani signed, and thus personally made the false and misleading statements in the 2016, 2017, and 2018 10-Ks. For these reasons, too, Defendant Valeriani breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

256. Additional reasons that demand on Defendant Weis is futile follow. Defendant Weis has served as a Company director since October 2014. She also serves as a member of the Compensation Committee and Nominating & Governance Committee and served as a member of the Audit Committee during the Relevant Period. Defendant Weis has received and continues to receive compensation for her role as a director as described herein. As a trusted Company

director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Weis signed, and thus personally made the false and misleading statements in the 2016, 2015, 2016, 2017, and 2018 10-Ks. For these reasons, too, Defendant Weis breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

257. Additional reasons that demand on the Board is futile follow.

258. Each of the Director-Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of unnecessary and harmful repurchases that caused the Company to overpay by millions of dollars for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

259. Defendants McEachin, Stolper, and Weis (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's accounting and financial reporting processes, the Company's significant risk exposures, the adequacy and effectiveness of RTI's internal controls, and the Company's compliance with legal and regulatory requirements. The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting

processes, as they are charged to do under the Audit Committee Charter, allowing the Company to issue false and misleading financial statements for nearly five years. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

260. The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Selquist and Sweeney both joined the Board pursuant to an Investment Agreement between RTI and WSHP Biologics Holdings, LLC ("WSHP"). WSHP is the record owner of approximately 15,152,761 shares of RTI common stock, which represented 17.1% of the Company's outstanding shares of common stock as of March 14, 2019. The managing member of WSHP is the Water Street Fund, which is owned and/or controlled by Water Street Healthcare Partners ("Water Street"). The Company recognizes Water Street as its largest stockholder. Selquist is the Operating Partner at Water Street, and Sweeney is a partner and founding member of Water Street. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

261. In violation of the Code of Conduct and/or Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting, and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and

violations of the Exchange Act. In violation of the Code of Conduct and/or Code of Ethics, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

262. RTI has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for RTI any part of the damages RTI suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

263. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

264. The acts complained of herein constitute violations of fiduciary duties owed by RTI officers and directors, and these acts are incapable of ratification.

265. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of RTI. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate

coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of RTI, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

266.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause RTI to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

267.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

268.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

269.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud

claims.

270. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

271. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

272. Under the direction and watch of the Directors, the 2018 and 2019 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the Company improperly recognized and accounted for revenues for certain contractual arrangements, primarily involving OEM customers due, in part, to early deliveries made outside of agreed-to delivery windows; (2) some of these early shipments were unapproved and shipped by employees in order to generate more revenue; (3) additionally, certain adjustments were improperly or erroneously made through manual journal entries to accrual or reserve accounts; (4) thus, RTI's financial statements incorrectly reported revenues, costs of processing and distribution, accounts receivable, net inventories, deferred tax assets, operating expenses, prepaid and other current assets, deferred tax assets, other intangible assets, accounts payable, accrued

82

expenses, and payments for treasury stock, among other line items; (5) these material errors would result in RTI's need to restate its previously reported financial statements; (6) RTI's financial statements also contained significant errors separate from the underlying Investigation; and (7) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

273. The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements including linking incentive award opportunities "to challenging performance goals that reinforce key business objectives and long-term shareholder value creation[,]"while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

274. Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct and the Code of Ethics, due to the Individual Defendants' failures to abide by them, their insider trading, and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

275. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including election of directors, advisory approval of

executive compensation, and, for the 2018 Proxy Statement, the adoption and approval of the 2018 Incentive Compensation Plan, which provided for, among other things, the reservation of 5 million, plus 738,142 shares for delivery as incentive awards. As officers and directors, the Individual Defendants at the Company during and following the 2018 Proxy Statement, were eligible to (and did) receive such incentive awards.

276. The false and misleading elements of the Proxy Statements led to the re-election of Defendants Farhat, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis during the Relevant Period, which allowed them to continue breaching their fiduciary duties to RTI.

277. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

278. Plaintiff on behalf of RTI has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

279. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

280. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding RTI. Not only is RTI now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon RTI by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices during the Relevant Period due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase thousands of its own shares at artificially-inflated prices, damaging RTI.

281. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's periodic reports filed with the SEC.

282. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about RTI not misleading.

283. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by RTI. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

284. In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or

director of the Company, they made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

285.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

286.    Plaintiff on behalf of RTI has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

287.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

288.    The Individual Defendants, by virtue of their positions with RTI and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of RTI and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause RTI and the other Individual Defendants to engage in the illegal conduct and practices complained of herein and violate § 10(b) of the Exchange Act.

289.    Plaintiff on behalf of RTI has no adequate remedy at law.

### FOURTH CLAIM

**Against Individual Defendants for Breach of Fiduciary Duties**

290.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

291.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of RTI's business and affairs.

292.    Each of the Individual Defendants violated and breached his or her fiduciary

86

duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

293. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of RTI.

294. In breach of their fiduciary duties owed to RTI, the Individual Defendants also willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company improperly recognized and accounted for revenues for certain contractual arrangements, primarily involving OEM customers due, in part, to early deliveries made outside of agreed-to delivery windows; (2) some of these early shipments were unapproved and shipped by employees in order to generate more revenue; (3) additionally, certain adjustments were improperly or erroneously made through manual journal entries to accrual or reserve accounts; (4) thus, RTI's financial statements incorrectly reported revenues, costs of processing and distribution, accounts receivable, net inventories, deferred tax assets, operating expenses, prepaid and other current assets, deferred tax assets, other intangible assets, accounts payable, accrued expenses, and payments for treasury stock, among other line items; (5) these material errors would result in RTI's need to restate its previously reported financial statements; (6) RTI's financial statements also contained significant errors separate from the underlying Investigation; and (7) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

295. The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and

omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

296. In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

297. The Individual Defendants also breached their fiduciary duties by causing the Company to repurchase over 1 million shares of its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while one of them engaged in improper insider sales, netting proceeds of approximately $44,444.

298. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities, and disguising insider sales.

299. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal

controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities, and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

300. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

301. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, RTI has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

302. Plaintiff on behalf of RTI has no adequate remedy at law.

## **FIFTH CLAIM**

### **Against Individual Defendants for Unjust Enrichment**

303. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

304. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, RTI.

305. The Individual Defendants either benefited financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from RTI that was tied to the performance or artificially inflated valuation of RTI, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

306. Plaintiff, as a shareholder and a representative of RTI, seeks restitution from the

Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

307.    Plaintiff on behalf of RTI has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

308.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

309.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused RTI to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, and to lose financing from investors and business from future customers who no longer trust the Company and its products. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

310.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

311.    Plaintiff on behalf of RTI has no adequate remedy at law.

## PRAYER FOR RELIEF

312.    FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of RTI, and that Plaintiff is an adequate representative of the Company;

90

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to RTI;

(c) Determining and awarding to RTI the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing RTI and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect RTI and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of RTI to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding RTI restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and

91

proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


Dated: June 12, 2020                           Respectfully submitted,

                                               \_\_/s/ Carl V. Malmstrom\_\_\_
                                               Carl V. Malmstrom
                                               **WOLF HALDENSTEIN ADLER
                                               FREEMAN & HERZ LLC**
                                               111 W. Jackson St., Suite 1700
                                               Chicago, IL 60604
                                               Tel: (312) 984-0000
                                               Fax: (212) 686-0114
                                               malmstrom@whafh.com

                                               *Liaison Counsel for Plaintiff*

                                               **THE BROWN LAW FIRM, P.C.**
                                               Timothy Brown
                                               240 Townsend Square
                                               Oyster Bay, New York 11771
                                               Tel: (516) 922-5427
                                               Fax: (516) 344-6204
                                               tbrown@thebrownlawfirm.net

                                               *Counsel for Plaintiff*

92