# EXHIBIT A

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DOMINICK DE FILIPPIS, Derivatively on Behalf of Nominal Defendant RTI SURGICAL HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> CAMILLE I. FARHAT, BRIAN K. HUTCHISON, JONATHON M. SINGER, ROBERT P. JORDHEIM, JOHANNES W. LOUW, PETER F. GEAREN, THOMAS A. MCEACHIN, CURTIS M. SELQUIST, MARK D. STOLPER, CHRISTOPHER R. SWEENEY, PAUL G. THOMAS, NICHOLAS J. VALERIANI, and SHIRLEY A. WEIS, <br><br> Defendants, <br><br> and <br><br> RTI SURGICAL HOLDINGS, INC., <br><br> Nominal Defendant. | Case No. |

**SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Dominick De Filippis ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, RTI Surgical Holdings, Inc. ("RTI" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, insider trading (i.e., *Brophy* claim), violations of Section 10(b) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), waste of corporate assets, and unjust enrichment. Plaintiff's

1

allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by RTI with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.    NATURE AND SUMMARY OF THE ACTION

1.      RTI is a global surgical implant company that provides surgeons with safe biologic, metal and synthetic implants, which are used in sports medicine, general surgery, spine, orthopedic and trauma procedures.

2.      For fiscal years 2015 through 2018, RTI reported strong results and a consistent revenue recognition policy and affirmed the effectiveness of its internal control over financial reporting.

3.      On March 8, 2019, RTI Surgical Inc. acquired Paradigm Spine, LLC and reorganized as RTI Surgical Holdings, Inc., the successor reporting company.

4.      Then, on January 13, 2020, the Company announced that it had reached an agreement to sell its original equipment manufacturer ("OEM") business for $490 million to Montagu Private Equity LLP, subject to closing conditions and shareholder approval.

5.      On March 16, 2020, after the market closed, RTI disclosed that it could not timely file its annual report on Form 10-K for fiscal 2019 due to ongoing investigations by the SEC and the Audit Committee regarding revenue recognition.  Specifically, the investigation concerned the timing of revenue with respect to certain contractual arrangements, primarily with OEM customers.

6.      On this news, RTI's stock price fell $0.40 per share, nearly 15%, to close at $2.35 per share on March 17, 2020, on unusually heavy trading volume.

7. Days later, the Company disclosed that, due to the failure to timely file a proxy statement with the SEC, RTI was in breach of the agreement with Montagu to sell the OEM business.

8. On April 9, 2020, the Company revealed that financial statements for fiscal years 2014 through 2018 should no longer be relied upon and would be restated. RTI disclosed that "goods were delivered early without obtaining the customers' affirmative approval," thus leading to improper revenue recognition, and that improper adjustments had been made for product returns.

9. On April 29, 2020, the Company announced certain amendments to its agreement to sell the OEM business, including, among other things, a $50 million reduction in the purchase price.

10. On June 8, 2020, RTI filed its restated financial statements for the previously disclosed periods, impacting various line items including revenue, operating expenses, accounts receivable, inventories, and accounts payable. RTI also identified material weaknesses, including that "the tone from executive management was insufficient to create the proper environment for effective internal control over financial reporting" and that "the Company's formal SOX compliance program did not have sufficient scope and focus on the key financial reporting risks."

11. The same day, the Company filed its belated 2019 annual report, which restated certain financial items that were previously reported in quarterly reports for fiscal 2019. It further identified "errors [that] were made in connection with the recording of the acquisition of Paradigm Spine, LLC in 2019."

12. Moreover, while the material information regarding revenue recognition with respect to OEM customers remained non-public, RTI spent an aggregate $4.5 million to repurchase approximately 1,006,318 shares of its own common stock at artificially inflated prices. As the

3

Company's stock was actually worth only $2.35, the price at the close of market on March 17, 2020, the Company overpaid for the purchases of its own stock by approximately $2.1 million.

13. These revelations precipitated the filing of a securities class action in the U.S. District Court for the Northern District of Illinois against RTI and certain of its officers, *Lowry v. RTI Surgical Holdings, Inc., et al.*, 1:20-cv-01939 (the "Securities Class Action").

14. Plaintiff did not make a litigation demand prior to filing this action because such demand would have been futile based upon the composition of the Board and the actions taken by the Board. The Board is currently composed of ten directors, eight of whom are named in this action. As alleged herein, at least eight directors knew the disclosures with respect to RTI's revenue recognition and the effectiveness of its internal controls were incomplete or inaccurate, yet allowed misleading statements to be disseminated. Thus, more than half the members would be interested in a demand to investigate their own wrongdoing.

## II. JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) and 10(b) of the Securities Exchange Act of 1934. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

16. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

### III. PARTIES

**Plaintiff**

17.    Plaintiff Dominick De Filippis purchased 500 shares of RTI stock in June 2015 and has continuously owned his RTI stock since that date.

**Nominal Defendant**

18.    Nominal Defendant RTI is a Delaware corporation with its principal executive offices located at 520 Lake Cook Road, Suite 315, Deerfield, Illinois 60015. The Company stock trades on the NASDAQ stock exchange under the symbol "RTIX."

**Defendants**

19.    Defendant Camille I. Farhat ("Farhat") has served as RTI's Chief Executive Officer ("CEO"), President and a director since March 2017. Farhat is named as a defendant in the Securities Class Action.

20.    Defendant Brian K. Hutchison ("Hutchison") served as RTI's CEO and President from December 2001 to December 2016. Hutchison is named as a defendant in the Securities Class Action.

21.    Defendant Jonathon M. Singer ("Singer") has served as RTI's Chief Financial and Administrative Officer ("CFAO") since September 2017 and as Corporate Secretary since November 2017. On January 10, 2020, Singer was promoted to serve as Chief Operating Officer ("COO"), contingent and effective upon the Company's proposed sale of its OEM business. He served as a director of RTI from May 2016 to September 2017. Singer is named as a defendant in the Securities Class Action.

22.    Defendant Robert P. Jordheim ("Jordheim") served as the Company's Chief Financial Officer ("CFO") and Executive Vice President from June 2010 to December 16, 2016 and from March 15, 2017 to October 31, 2017. He also served as interim President and CEO from

5

December 16, 2016 to March 15, 2017. Jordheim is named as a defendant in the Securities Class Action.

23. Defendant Johannes W. Louw ("Louw") served as the Company's Vice President of Financial Planning and Analysis from September 2018 to April 2020, when he was terminated from the Company. Louw served as interim CFO from December 2016 to March 2017. On January 10, 2020, he was promoted to CFO, contingent and effective upon the Company's proposed sale of its OEM business. After joining RTI in June 2003, he served in various roles, including interim CFO and Vice President of Finance and Corporate Controller. Louw is named as a defendant in the Securities Class Action.

24. Defendant Peter F. Gearen ("Gearen") served as a director of the Company from 1998 to March 2019. He served as Vice Chairman of the Board from February 2016 to March 2019.

25. Defendant Thomas A. McEachin ("McEachin") has served as a director of the Company since December 2015. He is Chair of the Audit Committee.

26. Defendant Curtis M. Selquist ("Selquist") has served as a director of the Company since July 2013 and as Chairman of the Board since February 2016.

27. Defendant Mark D. Stolper ("Stolper") has served as a director of the Company since March 2017. He is a member of the Audit and Compensation Committees.

28. Defendant Christopher R. Sweeney ("Sweeney") has served as a director of the Company since October 2015.

29. Defendant Paul G. Thomas ("Thomas") has served as a director of the Company since June 2016. He is a member of the Compensation Committee.

30. Defendant Nicholas J. Valeriani ("Valeriani") has served as a director of the Company since June 2016. He is a member of the Compensation Committee.

31. Defendant Shirley A. Weis ("Weis") has served as a director of the Company since October 2014. She served as a member of the Audit Committee until 2019.

32. Defendants Farhat, Hutchison, Singer, Jordheim, Louw, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis are sometimes referred to hereinafter as the "Individual Defendants." Defendants Farhat, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis are sometimes referred to hereinafter as the "Director Defendants."

**Non-Party Directors**

33. Jeffrey C. Lightcap has served as a director of the Company since March 8, 2019.

34. Stuart F. Simpson has served as a director of the Company since June 1, 2020.

## IV. DUTIES OF THE INDIVIDUAL DEFENDANTS

### A. Fiduciary Duties

35. By reason of their positions as officers, directors, and/or fiduciaries of RTI and because of their ability to control the business and corporate affairs of RTI, at all relevant times, the Individual Defendants owed RTI and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage RTI in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of RTI and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to RTI and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

36.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of RTI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with RTI, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

37.     To discharge their duties, the officers and directors of RTI were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of RTI were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.      Code of Conduct**

38.     RTI has a Code of Conduct, which requires the Company's officers, directors and employees to adhere to "principles and standards of business conduct . . . to avoid even the appearance of improper behavior."

39.     The Code of Conduct provides that each employee must "[p]rovide full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files

with or submits to the Securities and Exchange Commission and in other public communications made by the Company."

40.    The Code of Conduct further provides that each employee must "[r]ecognize and report possible violations of this Code, as well as all policies, guidelines, applicable laws and regulatory requirements under which the Company operates."

41.    The Code of Conduct also provides that RTI is committed to "offer only those products and services that we can deliver and strive to meet or exceed the commitments that we made. We compete fairly, engaging only in legal and ethical practice. Lastly, we meet our contractual obligations by reporting information accurately and charging honestly for our products and services."

42.    In a section titled, "Securities Trading & Insider Information," the Code of Conduct states that:

> Company policy forbids unauthorized disclosure of material non-public information about the Company or the companies it deals with, and both Company policy and the law forbid profiting from material non- public information relating to the Company or the companies with whom we do business. Material information includes any information that a reasonable investor is likely to consider important in determining whether to buy, sell or hold the Company's stock.

### C.    Code of Ethics for Senior Financial Officers

43.    The Code of Conduct also requires "senior executive officers and those responsible for our financial reporting" to adhere to "the Code of Ethics for Senior Financial Officers which imposes strict obligations on them to take careful steps to assure that the Company properly tracks and reports our financial performance."

44.    The Code of Ethics for Senior Financial Officers (the "Code of Ethics") aims to ensure "proper disclosure of financial information in filings with, or submissions to, the Securities and Exchange Commission and to deter wrongdoing."  The Code of Ethics is "applicable to the

Company's Chief Executive Officer, President, Chief Financial Officer, Director of Finance/Controller and other senior financial professional performing similar functions ('Senior Financial Professionals')." The Code of Ethics "is intended to supplement the [Code of Conduct] that is applicable to all employees and directors of the Company."

45. In addition to promoting "a culture of honesty, integrity, ethical behavior and accountability," Senior Financial Professionals must maintain accurate records. Specifically, the Code of Ethics states, in relevant part:

> Senior Financial Professionals shall maintain all Company accounting records and reports derived from Company accounting records in accordance with applicable laws, in a manner that fairly and accurately reflects the transactions or occurrences to which they relate and ensures that the Company accounting records fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues and expenses and do not contain any false or intentionally misleading entries. In this regard, compliance with the Company's system of internal controls is required at all times.

46. Moreover, under the heading "Disclosure in SEC Filings and Other Public Communications," the Code of Ethics states that:

> Senior Financial Professionals shall conduct themselves in a manner that promotes the full, fair, accurate, timely and understandable disclosure of all material information required to be included in: (1) each report or other document the Company files with, or submits to, the SEC and (2) in all other public communications made by the Company. To this end, the Senior Financial Professionals will establish and apply the Company's internal controls and disclosure controls and procedures in a manner that will enable the Company's financial statements to present fairly, in all material respects, the financial position, results of operations and cash flows of the Company.

47. In a section titled "Compliance with Applicable Laws, Rules and Regulations," the Code of Ethics states that:

> The Senior Financial Professionals shall conduct themselves, and shall encourage all employees to conduct themselves, to ensure and facilitate compliance by the Company with the laws, rules and regulations applicable to its business. To this end, they are charged with overseeing the Company's various programs and policies concerning: (1) the "Whistleblower Protection" provisions of the Sarbanes-

Oxley Act and similar laws applicable to the Company and (2) identifying and promptly reporting to the Audit Committee and correcting any material deviation from applicable laws, rules and regulations and Company policies.

48.     The Code of Ethics further provides that "Senior Financial Professionals are required to report to the Audit Committee any known or suspected violation of this Code by any Senior Financial Professional."

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background

49.     RTI is a global surgical implant company that provides surgeons with safe biologic, metal and synthetic implants, which are used in sports medicine, general surgery, spine, orthopedic and trauma procedures.

50.     On March 8, 2019, RTI Surgical, Inc. acquired Paradigm Spine, LLC, a motion preservation and non-fusion spinal implant technology company, and reorganized as RTI Surgical Holdings, Inc.  Thereafter, RTI Surgical, Inc. became a wholly owned subsidiary of RTI Surgical Holdings, Inc., the successor reporting company.

51.     Prior to the fourth quarter of 2019, RTI operated as one reporting segment comprised of four franchise lines: spine; sports; OEM ("Original Equipment Manufacturer") and international.  OEM, which accounts for the largest percentage of the Company's total revenues, focuses on the design, development, and manufacture of biologic, metal and synthetic implants for medical technology companies.  During the fiscal year ended December 31, 2018, OEM accounted for 43% of RTI's total revenues.  In the fourth quarter of 2019, the Company reorganized to operate under two operating segments: Global Spine and Global OEM. The Global Spine segment focuses on sales, distribution, and research and development activities for the global spine market, whereas the Global OEM segment focuses on the design, development, and manufacturing of biologics and hardware medical technology.

11

52.     Despite reporting record results for the OEM business in second quarter 2019, the Company announced on January 13, 2020 that it had agreed to sell its OEM Business to Montagu Private Equity LLP ("Montagu"), a private European equity firm, for $490 million.  Following the sale, RTI would become a "Global Pure Play Spine Company."  The transaction was unanimously approved by RTI's Board of Directors and subject to shareholder approval.  According to the press release announcing the transaction, the sale "complete[d] the first phase of [RTI's] strategic transformation to reduce complexity, drive operational excellence and accelerate the growth of RTI."

**B.      The Individual Defendants Caused RTI to Issue Materially Misleading Statements**

53.     On March 7, 2016, defendants Hutchison, Jordheim, Gearen, McEachin, Selquist Sweeney, and Weis caused RTI to file its annual report on Form 10-K with the SEC for the period ended December 31, 2015 (the "2015 10-K").  The report was signed by defendants Hutchison, Jordheim, Selquist, Gearen, McEachin, Sweeney, and Weis, and nonparties Dean H. Bergy, Philip R. Chapman, and Adrian J.R. Smith.  Regarding RTI's policy for revenue recognition, the 2015 10-K stated, in relevant part:

> ***Revenue Recognition***—Revenue is recognized upon shipping, or receipt by the Company's customers of the implant, depending on the Company's distribution agreements with the Company's customers or distributors. Other revenues are recognized when all significant contractual obligations have been satisfied.
>
> The Company permits returns of implants in accordance with the terms of contractual agreements with customers if the implant is returned in a timely manner, in unopened packaging, and from the normal channels of distribution. Allowances for returns are provided based upon analysis of the Company's historical patterns of returns matched against the revenues from which they originated.
>
> The Company records estimated implant returns, discounts, rebates and other distribution incentives as a reduction of revenue in the same period revenue is recognized. Estimates of implant returns are recorded for anticipated implant returns based on historical distributions and returns information. Estimates of

12

discounts, rebates and other distribution incentives are recorded based on contractual terms, historical experience and trend analysis.

54. The 2015 10-K stated that RTI's "management believes that, as of December 31, 2015, the Company's internal control over financial reporting is effective." Moreover, the 2015 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by defendants Hutchison and Jordheim, attesting to the accuracy of the financial statements contained therein, the disclosure of all fraud, and the effectiveness of the Company's internal control over financial reporting.

55. The statements in ¶¶ 53-54 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (3) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (4) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

56. On March 13, 2017, Jordheim, Louw, Singer, Gearen, McEachin, Selquist, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its annual report on Form 10-K with the SEC for the period ended December 31, 2016 (the "2016 10-K"), which was signed by these defendants. Regarding RTI's revenue recognition policy, the 2016 10-K stated, in relevant part:

> ***Revenue Recognition***—Revenue is recognized upon shipping, or receipt by the Company's customers of the implant, depending on the Company's distribution agreements with the Company's customers or distributors. Other revenues are recognized when all significant contractual obligations have been satisfied.

> The Company permits returns of implants in accordance with the terms of contractual agreements with customers if the implant is returned in a timely manner, in unopened packaging, and from the normal channels of distribution. Allowances

13

for returns are provided based upon analysis of the Company's historical patterns of returns matched against the revenues from which they originated.

The Company records estimated implant returns, discounts, rebates and other distribution incentives as a reduction of revenue in the same period revenue is recognized. Estimates of implant returns are recorded for anticipated implant returns based on historical distributions and returns information. Estimates of discounts, rebates and other distribution incentives are recorded based on contractual terms, historical experience and trend analysis.

Other revenues consists of service processing, tissue recovery fees, biomedical laboratory fees, recognition of previously deferred revenues, shipping fees, distribution of reproductions of our allografts to distributors for demonstration purposes and restocking fees which is included in revenues.

57.     The 2016 10-K stated that RTI's "management believes that, as of December 31, 2016, the Company's internal control over financial reporting is effective." Moreover, the 2016 10-K contained SOX certifications signed by defendants Jordheim and Louw, attesting to the accuracy of the financial statements contained therein, the disclosure of all fraud, and the effectiveness of the Company's internal control over financial reporting.

58.     The statements in ¶¶ 56-57 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (3) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (4) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

59.     On March 2, 2018, Farhat, Singer, Gearen, McEachin, Selquist, Stoper, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its annual report on Form 10-K with the SEC for the period ended December 31, 2017 (the "2017 10-K"), which was signed by these defendants. Regarding RTI's revenue recognition policy, the 2017 10-K stated, in relevant part:

14

*Revenue Recognition*—Revenue is recognized upon shipping, or receipt by the Company's customers of the implant, depending on the Company's distribution agreements with the Company's customers or distributors. Other revenues are recognized when all significant contractual obligations have been satisfied.

The Company permits returns of implants in accordance with the terms of contractual agreements with customers if the implant is returned in a timely manner, in unopened packaging, and from the normal channels of distribution. Allowances for returns are provided based upon analysis of the Company's historical patterns of returns matched against the revenues from which they originated.

The Company records estimated implant returns, discounts, rebates and other distribution incentives as a reduction of revenue in the same period revenue is recognized. Estimates of implant returns are recorded for anticipated implant returns based on historical distributions and returns information. Estimates of discounts, rebates and other distribution incentives are recorded based on contractual terms, historical experience and trend analysis.

Other revenues consist of service processing, tissue recovery fees, biomedical laboratory fees, recognition of previously deferred revenues, shipping fees, distribution of reproductions of our allografts to distributors for demonstration purposes and restocking fees which is included in revenues.

60.     In addition, the 2017 10-K stated that the Company had adopted a five-step framework set forth by the Financial Accounting Standards Board ("FASB") for revenue recognition.  Specifically, the report stated, in relevant part:

*Revenue from Contracts with Customers* — In May 2014, the FASB, issued a new revenue recognition standard which amends revenue recognition principles and provides a single, comprehensive set of criteria for revenue recognition within and across all industries. The new standard provides a five-step framework whereby revenue is recognized when control of promised goods or services are transferred to a customer at an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The standard also requires enhanced disclosures pertaining to revenue recognition in both interim and annual periods. In August 2015, the FASB deferred the effective date of the new revenue standard from January 1, 2017 to January 1, 2018. In March 2016, the FASB issued amendments to clarify the implementation guidance on principal versus agent considerations. In April 2016, the FASB issued amendments to clarify the guidance on accounting for licenses of intellectual property and identifying performance obligations. In May 2016, the FASB issued amendments related to collectability, non-cash consideration, the presentation of sales and other similar taxes collected from customers and transition. The standard allows for adoption using a full retrospective method or a modified retrospective method. On January 1, 2018, the

15

Company adopted this standard using the modified retrospective method. The Company's implementation approach included performing a detailed review of its agreements. The Company has reviewed all types of customer contracts and has gone through the five step process outlined in the new revenue recognition standard for each type of contract. The new five step process required by the new revenue recognition standard provides results substantially consistent with the Company's current revenue recognition policies. In addition, the Company designed internal controls to enable the preparation of financial information. The Company is in the process of finalizing its conclusions on key accounting assessments related to the new standard, including its assessment that the impact of accounting for costs incurred to obtain a contract.

The Company identified two contracts which previously resulted in revenue recognition occurring at the time of shipment; however, under the new revenue recognition standard, the Company is required to recognize revenue over time. The Company currently estimates the impact of adopting the new revenue standard on the two contracts will result in a $1,800 to $2,200 reduction in accumulated deficit, the cumulative effect adjustment under the modified retrospective approach, a $2,500 to $3,000 increase in accounts receivable, and a $700 to $800 decrease in deferred tax assets. The Company also identified a contract that contains significant upfront payments; however, the Company has not yet finalized its assessment of the contract. Except for the three contracts discussed above, the Company does not anticipate the finalization of this assessment will result in a material impact to the Company's financial position, results of operations, and disclosures.

61. The 2017 10-K stated that RTI's "management believes that, as of December 31, 2017, the Company's internal control over financial reporting is effective." Moreover, the 2017 10-K contained SOX certifications signed by defendants Farhat and Singer, attesting to the accuracy of the financial statements contained therein, the disclosure of all fraud, and the effectiveness of the Company's internal control over financial reporting.

62. The statements in ¶¶ 59-61 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (3)

that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and

(4) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

63. On March 26, 2018, defendants Farhat, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held April 30, 2018. In the proxy statement, these nine directors solicited stockholder votes in favor of three management proposals, including: (i) a proposal to elect Farhat, Gearen, McEachin, Stolper, Thomas, Valeriani, and Weis to new terms as directors; and (ii) a proposal to adopt the RTI Surgical Inc. 2018 Incentive Compensation Plan (the "2018 Plan").

64. The proxy statement disclosed that the Board had determined that defendant Farhat was not independent.

65. Regarding corporate governance and risk oversight, the proxy statement stated that the full board was responsible for:

> Strategic, financial and execution risks and exposures associated with our business strategy, management succession planning, policy matters, significant litigation and regulatory exposures, and other current matters that may present material risk to our financial performance, operations, infrastructure, plans, prospects or reputation, mergers and acquisition activities and related integration matters, and divestitures.

66. Moreover, the proxy statement stated that McEachin, Stolper, and Weis served on the Audit Committee. Regarding the Audit Committee's responsibilities, the proxy statement stated, in relevant part:

> [The Audit Committee's primary areas of oversight include:] Risks and exposures associated with financial matters, particularly financial reporting, tax, accounting, disclosure, internal control over financial reporting, financial infrastructure, investment guidelines and credit and liquidity matters. In addition, our programs and policies relating to legal and ethical compliance, quality, safety, environmental assurance and information technology security programs.

17

\*    \*    \*

Our Audit Committee is charged with, among other things, the appointment of our independent registered public accounting firm, as well as discussing and reviewing with the independent registered public accounting firm the scope and the results of the annual audit, pre-approving the engagement of the independent registered public accounting firm for all audit-related services and permissible non-audit related services, and reviewing and approving all related-party transactions. Our Audit Committee also reviews interim financial statements included in our quarterly reports and reviews financial statements and related documents filed with the Securities and Exchange Commission.

67.    Regarding non-employee director compensation, the proxy statement told stockholders that each of Gearen, McEachin, Singer, Thomas, Valeriani, and Weis received compensation from RTI for their service on the Board during 2017 ranging between $125,000 and $136,250.  In addition, Selquist received $175,000 in compensation, whereas Stolper and Sweeney received $102,000 and $115,000, respectively.

68.    In addition to this excessive compensation, the proxy statement solicited stockholder approval of the 2018 Plan.  According to the proxy statement, the 2018 Plan is administered by the Compensation Committee.  Specifically, the proxy statement stated:

The 2018 Plan is to be administered by the Compensation Committee of the Board, provided, however, that except as otherwise expressly provided in the 2018 Plan, the independent members of the Board may elect to exercise any power or authority granted to the Committee under the 2018 Plan. Subject to the terms of the 2018 Plan, the Committee is authorized to select eligible persons to receive Awards, grant Awards, determine the type, number and other terms and conditions of, and all other matters relating to, Awards, prescribe Award agreements (which need not be identical for each participant) and the rules and regulations for the administration of the 2018 Plan, construe and interpret the 2018 Plan and Award agreements, correct defects, supply omissions or reconcile inconsistencies therein, and make all other decisions and determinations as the Committee may deem necessary or advisable for the administration of the 2018 Plan. Decisions of the Committee shall be final, conclusive and binding on all persons or entities, including the Company, any subsidiary or any participant or beneficiary, or any transferee under the 2018 Plan or any other person claiming rights from or through any of the foregoing persons or entities.

69. If approved, the number of shares reserved for issuance under the 2018 Plan would be 5,738,142 shares, which represents 9.2% of the total number of shares outstanding as of March 9, 2018.

70. The proxy statement was materially misleading for the following reasons: (i) it misrepresented the actual activities of the Board, as well as the Audit Committee, with respect to risk management and oversight while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation. A reasonable shareholder would have found the truth to be material when deciding whether to vote for or against these proposals.

71. On May 1, 2018, the Company filed with the SEC a Form 8-K disclosing the results from the votes on the proposals contained in the 2018 proxy statement. In particular: (i) Farhat, Gearen, McEachin, Stolper, Thomas, Valeriani, and Weis were reelected to terms as directors; and (ii) the 2018 Plan was approved by stockholders. The reelection of Farhat, Gearen, McEachin, Stolper, Thomas, Valeriani, and Weis and the approval of the 2018 Plan based on the misleading statements contained in the 2018 proxy statement and other public filings was a fundamental link in these directors' continued breaches of fiduciary duties and the continued enrichment of at the expense of the Company's unaffiliated stockholders.

72. On March 5, 2019, Farhat, Singer, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its annual report on Form 10-K for the period ended December 31, 2018 (the "2018 10-K"), which was signed by these defendants. Regarding RTI's revenue recognition policy, the 2018 10-K stated, in relevant part:

> ***Revenue Recognition***—The Company recognizes revenue upon shipping, or receipt by the Company's customers of its products and implants, depending on the

Company's distribution agreements with its customers or distributors. The Company's performance obligations consist mainly of transferring control of implants identified in the contracts. The Company typically transfers control at a point in time upon shipment or delivery of the implants for direct sales, or upon implantation for sales of consigned inventory. The customer is able to direct the use of, and obtain substantially all of the benefits from, the implant at the time the implant is shipped, delivered, or implanted, respectively based on the terms of the contract. For performance obligations related to the Company's contracts with exclusively built inventory clauses, the Company typically satisfies its performance obligations evenly over the contract term as inventory is built. Such exclusively manufactured inventory has no alternative use and the Company has an enforceable right to payment for performance to date. The Company uses the input method to measure the manufacturing activities completed to date, which depicts the progress of the Company's performance obligation of transferring control of exclusively built inventory. For the contracts with upfront and annual exclusivity fees, revenue related to those fees is recognized over the contract term following a consistent method of measuring progress towards satisfaction of the performance obligation. The Company uses the method and measure of progress that best depicts the transfer of control to the customer of the goods or services to date relative to the remaining goods or services promised under the contract.

The Company permits returns of implants in accordance with the terms of contractual agreements with customers if the implant is returned in a timely manner, in unopened packaging, and from the normal channels of distribution. Allowances for returns are provided based upon analysis of the Company's historical patterns of returns matched against the revenues from which they originated.

The Company records estimated implant returns, discounts, rebates and other distribution incentives as a reduction of revenue in the same period revenue is recognized. Estimates of implant returns are recorded for anticipated implant returns based on historical distributions and returns information. Estimates of discounts, rebates and other distribution incentives are recorded based on contractual terms, historical experience and trend analysis.

Other revenues consist of service processing, tissue recovery fees, biomedical laboratory fees, recognition of previously deferred revenues, shipping fees, distribution of reproductions of our allografts to distributors for demonstration purposes and restocking fees which is included in revenues.

73.     Regarding revenue from contracts with customers, the 2018 10-K stated, in relevant

part:

***Revenue from Contracts with Customers***—On January 1, 2018, the Company adopted a new accounting standard issued by the FASB on revenue recognition using the modified retrospective method. This new accounting standard outlines a

single comprehensive model to use in accounting for revenue arising from contracts with customers. This standard supersedes existing revenue recognition requirements and eliminates most industry-specific guidance from GAAP. The core principle of the new accounting standard is to recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. In addition, the adoption of this new accounting standard resulted in increased disclosure, including qualitative and quantitative disclosures about the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers. The new accounting standard was applied to all contracts, apart from contracts for which all or substantially all revenue was recognized before January 1, 2018. Additionally, the Company elected to account for shipping and handling activities as a fulfillment cost rather than a separate performance obligation.

The Company identified three contracts which previously resulted in revenue recognition occurring at the time of shipment; however, under the new revenue recognition standard, the Company is required to recognize revenue over time. The assessment of our January 1, 2018, consolidated balance sheet under ASC Topic 606 resulted in a cumulative-effect adjustment to opening retained earnings, unbilled accounts receivable and costs incurred for inventory.

74.     The 2018 10-K further reported OEM revenues for the fiscal years ended December 31, 2018 and 2017, respectively, as follows:

OEM—Revenues from OEM increased $10.0 million, or 9.0%, to $120.7 million for the year ended December 31, 2018 compared to $110.7 million for the year ended December 31, 2017. OEM revenues increased primarily as a result of higher orders and due to timing of delivery to certain OEM distributors, primarily in the dental and trauma markets.

75.     The 2018 10-K stated that RTI's "management believes that, as of December 31, 2018, the Company's internal control over financial reporting is effective." Moreover, the 2018 10-K contained SOX certifications signed by defendants Farhat and Singer, attesting to the accuracy of the financial statements contained therein, the disclosure of all fraud, and the effectiveness of the Company's internal control over financial reporting.

76.     The statements in ¶¶ 72-75 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily

for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (3) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (4) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

77.     On May 7, 2019, defendants Farhat, Singer, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its quarterly report with the SEC for the period ended March 31, 2019 (the "1Q19 10-Q"). The report was signed by defendants Farhat and Singer. Therein, RTI reported revenue of $69.74 million and goodwill related to Paradigm of $248.55 million. Specifically, regarding the allocation of the purchase price for Paradigm, the Company reported:

|  | (In thousands) |
|---|---|
| Cash | $ 79 |
| Accounts receivable | 5,220 |
| Inventories | 5,898 |
| Other current assets | 1,752 |
| Property, plant and equipment | 379 |
| Current liabilities | (6,169) |
| Net tangible assets acquired | 7,159 |
| Goodwill | 248,547 |
| Total net assets acquired | $ 255,706 |

78.     The 1Q19 10-Q also stated that RTI's CEO and CFO had "concluded that the design and operation of [the Company's] disclosure controls and procedures were effective as of the end of the period covered by this report." Regarding internal control over financial reporting, the report stated, in relevant part:

> We implemented ASU 2016-02 as of January 1, 2019. As a result, we made the following significant modifications to internal control over financial reporting, including changes to accounting policies and procedures and documentation practices:

22

- Updated our policies and procedures related to accounting for lease assets and liabilities and related income and expense
- Modified our contract review controls
- Added controls for reevaluating our significant assumptions and judgments on a quarterly basis.
- Added controls to address required disclosures regarding leases, including our significant assumptions and judgments used in applying ASC 842.

Other than the items described above, there have not been any changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act during the three months ended March 31, 2019, that materially affected, or that we believe are reasonably likely to materially affect, our internal control over financial reporting.

79. The statements in ¶¶ 77-78 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that RTI did not appropriately prepare preliminary estimates of the purchase price allocation for Paradigm, resulting in errors impacting intangible assets, acquisition contingencies, inventory, and goodwill; (3) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (4) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (5) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

80. On August 5, 2019, Farhat, Singer, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its quarterly report for the period ended June 30, 2019 (the "2Q19 10-Q"), which was signed by defendants Farhat and Singer. Therein, the Company reported revenue of $82.31 million. Regarding the allocation of the purchase price for Paradigm, RTI reported:

23

| | Balance at | | |
|---|---|---|---|
| | June 30, 2019 | March 31, 2019 | Change |
| | | (In thousands) | |
| Cash | $ 79 | $ 79 | $ - |
| Accounts receivable | 5,220 | 5,220 | - |
| Inventories | 43,084 | 5,898 | 37,186 |
| Other current assets | 1,693 | 1,752 | (59) |
| Property, plant and equipment | 379 | 379 | - |
| Current liabilities | (6,380) | (6,169) | (211) |
| Net tangible assets acquired | 44,075 | 7,159 | 36,916 |
| Goodwill | 211,631 | 248,547 | (36,916) |
| Total net assets acquired | $ 255,706 | $ 255,706 | $ - |

81.     Regarding the Company's disclosure controls and procedures and its internal control over financial reporting, the 2Q19 10-Q was substantially similar to the statements identified with respect to the 1Q19 10-Q. The report also provided that RTI was "in the process of integrating Paradigm into [its] overall internal control over financial reporting processes."

82.     The statements in ¶¶ 80-81 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that RTI did not appropriately prepare preliminary estimates of the purchase price allocation for Paradigm, resulting in errors impacting intangible assets, acquisition contingencies, inventory, and goodwill; (3) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (4) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (5) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

83.     On November 7, 2019, Farhat, Singer, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its quarterly report for the period ended September 30, 2019 (the "3Q19 10-Q"), which was signed by defendants Farhat and Singer. Therein, the

24

Company reported revenue of $79.13 million. Regarding the allocation of the purchase price for Paradigm, RTI reported:

| | Balance at | | |
| | September 30, 2019 | June 30, 2019 | Change |
|---|---|---|---|
| | | (In thousands) | |
| Cash | $ 308 | $ 79 | $ 229 |
| Accounts receivable | 5,220 | 5,220 | - |
| Inventories | 43,084 | 43,084 | - |
| Other current assets | 1,693 | 1,693 | - |
| Property, plant and equipment | 379 | 379 | - |
| Current liabilities | (6,380) | (6,380) | - |
| Net tangible assets acquired | 44,304 | 44,075 | 229 |
| Goodwill | 176,749 | 211,631 | (34,882) |
| Total net assets acquired | $ 221,053 | $ 255,706 | $ (34,653) |

84. The 3Q19 10-Q stated that the Company's CEO and CFO had "concluded that the design and operation of [RTI's] disclosure controls and procedures were effective as of the end of the period covered by this report." It also stated that there "have not been any changes to [its] internal control over financial reporting" during the period.

85. The statements in ¶¶ 83-84 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that RTI did not appropriately prepare preliminary estimates of the purchase price allocation for Paradigm, resulting in errors impacting intangible assets, acquisition contingencies, inventory, and goodwill; (3) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (4) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (5) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

25

## C.     The Truth Begins to Emerge

86.     On March 16, 2020, after the market closed, RTI disclosed that it could not timely file its annual report on Form 10-K for fiscal 2019 due to ongoing investigations by the SEC and the Audit Committee regarding revenue recognition.  Specifically, in a press release, the Company stated, in relevant part:

> [RTI's Audit Committee] is ***in the process of conducting an internal investigation of current and prior period matters relating to the Company's revenue recognition practices regarding the timing of revenue with respect to certain contractual arrangements, primarily with OEM customers, including the accounting treatment, financial reporting and internal controls related to such arrangements***. The Audit Committee investigation was precipitated by an ongoing SEC investigation related to the periods 2014 through 2016. The Company will not be in a position to file its Form 10-K until the Audit Committee concludes its investigation and the Company and its independent auditor assess the results of that investigation. The Company is working to complete its analysis and file its Form 10-K for the year ended December 31, 2019 within the extension period (through March 31, 2020), but no assurance can be given that it will be able to do so.

87.     On this news, RTI's stock price fell $0.40 per share, nearly 15%, to close at $2.35 per share on March 17, 2020, on unusually heavy trading volume.

88.     On March 20, 2020, RTI issued a press release to disclose receipt of a letter from The Nasdaq Stock Market LLC, "indicating that, as a result of the Company's delay in filing its Form 10-K, the Company is not in compliance with the timely filing requirement for continued listing under Nasdaq Listing Rule 5250(c)(1)."

89.     The same day, the Company filed a Form 8-K with the SEC stating that "[o]n March 17, 2020 the Company and Johannes W. Louw, Vice President Financial Planning and Analysis, agreed that Mr. Louw's employment with the Company would end no later than April 8, 2020."

90.     On March 30, 2020, in a Form 8-K filed with the SEC, RTI revealed receipt of a letter on March 28, 2020 from counsel for Montagu "stating, among other things, that the Company is in breach of Section 7.5(a) of the Purchase Agreement as a result of its failure to file a proxy

26

statement with the SEC within the time period set forth in the Purchase Agreement." RTI had

thirty days to cure the breach. In the same report, the Company announced that it had postponed

the special meeting of shareholders, which was set to vote on various proposals necessary to close

the sale of the OEM business, and the annual meeting of shareholders, which had been scheduled

for May 13, 2020.

91. On April 9, 2020, in a Form 8-K filed with the SEC, RTI disclosed certain findings

from the Audit Committee's ongoing investigation, including that certain financial statements

would be restated. Specifically, the Company stated:

> On April 7, 2020, the Audit Committee of the Board of Directors concluded that the Company will restate its previously issued audited financial statements for the years ended December 31, 2014, 2015, 2016, 2017 and 2018 and its unaudited financial statements for the quarterly periods for 2016-2018 and the nine months ended September 30, 2019 (the "Relevant Periods"). Accordingly, investors should no longer rely upon the Company's previously released financial statements as of and for the years ended December 31, 2018, 2017, 2016, 2015, and 2014, and the reports on the financial statements and internal control over financial reporting of the Company's independent registered public accounting firm thereon; or the quarterly financial statements and other financial data released related to the Relevant Periods.
>
> ***The Company has concluded that revenue for certain invoices should have been recognized at a later date than when originally recognized.*** In response to binding purchase orders from certain OEM customers, goods were shipped and received by the customers before requested delivery dates and agreed-upon delivery windows. In many instances, the OEM customers requested or approved the early shipments, but the Company has determined that on other occasions ***the goods were delivered early without obtaining the customers' affirmative approval. In addition, the Company has concluded that in July 2017, an adjustment was improperly made to a product return provision in the Direct Division.*** Accordingly, the Company will revise its financial statements to correct these errors and any others as it finalizes the Investigation. The Company and the Audit Committee of the Board of Directors have discussed these matters with Deloitte & Touche LLP, the Company's independent registered public accounting firm.

92. On April 29, 2020, the Company announced certain amendments to its agreement

to sell the OEM business to Montagu, including, among other things, a $50 million reduction in

the purchase price, i.e. from $490 million to $440 million. The Company also agreed to an extension on the closing of the transaction and an extension to file its 2020 proxy statement and 2019 annual report with the SEC.

93. Moreover, in the same filing, RTI disclosed the terms of defendant Louw's separation from the Company. Specifically, the Company stated, in relevant part:

> As previously announced, on March 17, 2020, the Company and Johannes W. Louw, Vice President Financial Planning and Analysis, agreed that Mr. Louw's employment with RTI Surgical would end no later than April 8, 2020. In connection with his departure, on April 24, 2020, RTI Surgical entered into a Separation Agreement and Release of Claims (the "Separation Agreement") and a Consultant Agreement (the "Consultant Agreement") with Mr. Louw.

> Pursuant to the terms of the Separation Agreement, Mr. Louw agreed to release RTI Surgical as well as its past and current parents, subsidiaries and affiliated organizations (including the Company) from certain claims arising prior to April 24, 2020, and reaffirm certain ongoing and post-employment obligations to RTI Surgical and the Company with respect to confidentiality. In exchange for such release and reaffirmation, RTI Surgical agreed to provide Mr. Louw with a separation payment in the amount of $195,294.00.

> Pursuant to the terms of the Consultant Agreement, Mr. Louw agreed to provide certain services to RTI Surgical as a consultant from April 9, 2020 until the earlier of: (i) the consummation of the sale of the Company's OEM business pursuant to the Purchase Agreement; and (ii) the termination of such agreement. In exchange for such consultant services, RTI Surgical agreed to pay to Mr. Louw the following compensation: (i) $23,741 per month; (ii) reimbursement for reasonable and documented out-of-pocked expenses incurred by Mr. Louw in connection with performance of such services; and (iii) reimbursement of actual travel expenses in accordance with RTI's travel policy at the time of travel. Either party may terminate the Consultant Agreement at any time, with or without cause, by providing the other party 30 days' advance written notice.

**D.      The Truth Fully Emerges**

94. On June 8, 2020, the Company filed a Form 10-K/A for the year ended December 31, 2018 (the "2018 Amended 10-K") with the SEC to restate its financial results for prior periods because, among other things, "revenue for certain invoices should have been recorded at a later date than when originally recognized" and "adjustments [had been] improperly or erroneously

made to manual journal entry accrual/reserve accounts." Specifically, regarding the background

for the restatement, the report stated:

Based on the results of the Investigation, the Company has concluded that revenue for certain invoices should have been recognized at a later date than when originally recognized. In response to binding purchase orders from certain OEM customers, goods were shipped and received by the customers before requested delivery dates and agreed-upon delivery windows. In many instances the OEM customers requested or approved the early shipments, but the Company has determined that on other occasions the *goods were delivered early without obtaining the customers' affirmative approval. Some of those unapproved shipments were shipped by employees in order to generate additional revenue and resulted in shipments being pulled from a future quarter into an earlier quarter.* The revenue for those shipments is being restated, as well as for other orders that shipped earlier than the purchase order due date in the system for which the Company could not locate evidence that the OEM customers had requested or approved the shipments. In addition, the Investigation found that *in July 2017 a $30,000 adjustment was improperly made to a product return provision in the Direct Division that increased the Direct Division's revenue in the prior quarter.* The July 2017 adjustment prompted additional investigative steps. The Company has concluded that in the periods of the fourth quarter of 2015 through the fourth quarter of 2018 certain adjustments were improperly or erroneously made to manual journal entry accrual/reserve accounts, including a July 2017 adjustment to a product return provision in the Direct Division. Accordingly, the Company has restated its financial statements to correct these errors.

In addition to the correction of the errors discussed above, the Company has also made other immaterial corrections in all periods presented. Such immaterial corrections reflected in the restated periods and, together with the other corrections described above, are referred to herein as "Current and Prior Period Adjustments." The corrections are included in these financial statements contained herein, which we refer to herein collectively as the "Restatement".

95. The 2018 Amended 10-K detailed the restatement as follows:

a. <u>Revenue</u> – As noted above, the Company has concluded that in some instances revenue for certain invoices should have been recognized at a later date than when originally recognized. Under both ASC 605 and ASC 606, revenue on sales to OEM customers is typically recognized at a point in time upon shipment. The Company identified revenue from certain customer orders that was shipped early to customers without obtaining authorized approval, and thus was recognized in an incorrect period. There were also instances in which the Company could not locate evidence that the OEM customers had requested or approved the shipments. Correction of these errors, when including the rollover effect from the immediately preceding

29

periods, decreased revenue by $0.5 million in 2018, increased revenue by $0.8 million in 2017, and increased revenue by $3.1 million in 2016.

b. Costs of processing and distribution – Primarily as a result of the error corrections noted above, when including the rollover effect from the immediately preceding periods, costs of processing and distribution decreased by less than $0.1 million in 2018, increased by $0.2 million in 2017, and increased by $2.1 million in 2016.

c. Operating expenses – The Company corrected certain errors noted above, separate from the Investigation which increased operating expenses by $1.3 million, less than $0.1 million and $0.6 million, as of December 31, 2018, 2017, and 2016, respectively.

d. Accounts receivable – Primarily as a result of the error corrections noted above relating to the timing of revenue recognition, accounts receivable decreased by $0.3 million, increased by $0.1 million, and decreased by $0.6 million, as of December 31, 2018, 2017, and 2016, respectively.

e. Inventories - net – Primarily as a result of the error corrections noted above relating to the timing of revenue recognition, inventories - net increased by $0.2 million, less than $0.1 million, and $0.3 million as of December 31, 2018, 2017, and 2016, respectively.

f. Prepaid and other current assets – The Company corrected certain errors noted above, separate from the investigation, which decreased prepaid and other current assets by $0.4 million, increased by $0.3 million, and decreased by less than $0.1 million, as of December 31, 2018, 2017, and 2016, respectively.

g. Property, plant and equipment – net – The Company corrected certain errors noted above, separate from the investigation, which increased property, plant and equipment – net by $0.1 million, as of December 31, 2016.

h. Deferred tax assets – The Company corrected certain errors noted above, relating to the tax effects of changes to the timing of revenue recognition, which increased deferred tax assets by $0.3 million, decreased by $0.1 million, and increased by $0.1 million as of December 31, 2018, 2017, and 2016, respectively.

i. Other intangible assets – net – The Company corrected certain errors, separate from the investigation, which decreased net other intangible assets – net by $0.8 million and $0.5 million as of December 31, 2018 and 2017, respectively, and increased other intangible assets – net by less than $0.1 million as of December 31, 2016.

j. Accounts payable – The Company corrected certain errors, separate from the investigation, which decreased accounts payable by $0.1 million as of December 31, 2018 and 2017, and by less than $0.1 million as of December 31, 2016.

k. Accrued expenses – The Company corrected certain errors noted above, separate from the investigation, which increased accrued expenses by $1.2 million, $0.1 million, and $0.4 million, as of December 31, 2018, 2017, and 2016, respectively.

l. Other long-term liabilities – As a result of the impact of the error corrections noted above, separate from the investigation, long-term liabilities increased $0.4 million as of December 31, 2016.

m. Payments for treasury stock – The Company corrected certain errors, separate from the investigation, which reclassified operating cash flows to financing cash flows for purchases of treasury stock by $0.5 million and $3.3 million as of December 31, 2018 and 2017, respectively.

96.     The 2018 Amended 10-K contained restatements of line items for the financial statements for the relevant periods.  As to restatement for revenue, the report provided, in relevant part:

| Year Ended December 31, 2018 | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|
| Revenues | $   280,855 | $    (493) | $ 280,362 |
| Costs of processing and distribution | 140,732 | (13) | 140,719 |
| Gross profit | 140,123 | (480) | 139,643 |
| Marketing, general and administrative | 119,217 | 507 | 119,724 |
| Severance and restructuring costs | 2,280 | 528 | 2,808 |
| Asset impairment and abandonments | 4,774 | 296 | 5,070 |
| Total operating expenses | 142,624 | 1,331 | 143,955 |
| Operating (loss) | (2,501) | (1,811) | (4,312) |
| (Loss) before income tax benefit | (5,580) | (1,811) | (7,391) |
| Income tax benefit | 4,331 | (63) | 4,268 |
| Net (loss) | (1,249) | (1,874) | (3,123) |
| Net (loss) applicable to common shares | $   (3,369) | $  (1,874) | $   (5,243) |
| Comprehensive (loss) income | $   (4,310) | $  (1,874) | $   (6,184) |
| Net (loss) per common share - basic | $     (0.05) | $    (0.03) | $     (0.08) |
| Net (loss) per common share - diluted | $     (0.05) | $    (0.03) | $     (0.08) |

| Year Ended December 31, 2017 | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|
| Revenues | $ 279,563 | $ 786 | $ 280,349 |
| Costs of processing and distribution | 137,042 | 235 | 137,277 |
| Gross profit | 142,521 | 551 | 143,072 |
| Marketing, general and administrative | 115,103 | (94) | 115,009 |
| Research and development | 13,375 | (60) | 13,315 |
| Severance and restructuring costs | 12,173 | (157) | 12,016 |
| Executive transition costs | 2,781 | 37 | 2,818 |
| Asset impairment and abandonments | 3,739 | 295 | 4,034 |
| Total operating expenses | 113,711 | 21 | 113,732 |
| Operating income | 28,810 | 530 | 29,340 |
| Income before income tax (provision) | 25,725 | 530 | 26,255 |
| Income tax (provision) | (19,453) | 104 | (19,349) |
| Net income | 6,272 | 634 | 6,906 |
| Net income applicable to common shares | $ 2,549 | $ 634 | $ 3,183 |
| Comprehensive income | $ 4,536 | $ 634 | $ 5,170 |
| Net income per common share - basic | $ 0.04 | $ 0.01 | $ 0.05 |
| Net income per common share - diluted | $ 0.04 | $ 0.01 | $ 0.05 |

| Year Ended December 31, 2016 | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|
| Revenues | $ 272,865 | $ 3,119 | $ 275,984 |
| Costs of processing and distribution | 140,516 | 2,141 | 142,657 |
| Gross profit | 132,349 | 978 | 133,327 |
| Marketing, general and administrative | 116,125 | 541 | 116,666 |
| Research and development | 16,090 | 207 | 16,297 |
| Asset impairment and abandonments | 5,435 | (194) | 5,241 |
| Total operating expenses | 148,030 | 554 | 148,584 |
| Operating (loss) | (15,681) | 424 | (15,257) |
| Foreign exchange (loss) gain | (132) | 3 | (129) |
| Total other expense - net | (1,779) | 3 | (1,776) |
| (Loss) before income tax benefit | (17,460) | 427 | (17,033) |
| Income tax benefit | 3,061 | 167 | 3,228 |
| Net (loss) | (14,399) | 594 | (13,805) |
| Net (loss) applicable to common shares | $ (17,907) | $ 594 | $ (17,313) |
| Comprehensive (loss) | $ (19,181) | $ 594 | $ (18,587) |
| Net (loss) per common share - basic | $ (0.31) | $ 0.01 | $ (0.30) |
| Net (loss) per common share - diluted | $ (0.31) | $ 0.01 | $ (0.30) |

97.     In addition, the 2018 Amended 10-K identified material weaknesses in RTI's internal control over financial reporting.  Specifically, the report stated, in relevant part:

> Based on this evaluation of our disclosure controls and procedures, our CEO and CFO have concluded that our *disclosure controls and procedures were not effective as of December 31, 2018* because of certain material weaknesses in our internal control over financial reporting, as further described below.
>
> *     *     *
>
> Management, including our CEO and CFO, assessed the Company's internal control over financial reporting and concluded that they were not effective as of

32

December 31, 2018 ("Evaluation Date"). In making this assessment, management used the criteria set forth by the COSO framework. Based on evaluation under these criteria, management determined, based upon the existence of the material weaknesses described below, that we did not maintain effective internal control over financial reporting as of the Evaluation Date.

*     *     *

We did not maintain an effective control environment based on the criteria established in the COSO framework. ***We have identified deficiencies in the principles associated with the control environment of the COSO framework.*** Specifically, these control deficiencies constitute material weaknesses, either individually or in the aggregate, relating to: (i) appropriate organizational structure, reporting lines, and authority and responsibilities in pursuit of objectives; (ii) our commitment to attract, develop, and retain competent individuals; and (iii) holding individuals accountable for their internal control related responsibilities. As disclosed in the consolidated financial statements included in Item 8. "Financial Statements and Supplementary Data", these material weaknesses contributed to accounting errors.

We did not maintain an effective control environment to enable the identification and mitigation of risks of accounting errors based on the contributing factors to material weakness in the control environment, including: ***The tone from executive management was insufficient to create the proper environment for effective internal control over financial reporting and to ensure that: (i) there were adequate processes for oversight; (ii) there was accountability for the performance of internal control over financial reporting responsibilities; (iii) personnel with key positions had the appropriate training to carry out their responsibilities; and (iv) corrective activities were appropriately applied, prioritized, and implemented in a timely manner*** . . . .

We did not design and implement effective control activities based on the criteria established in the COSO framework. We have identified deficiencies in the principles associated with the control activities component of the COSO framework. Specifically, these control deficiencies constitute material weaknesses, either individually or in the aggregate, relating to: (i) selecting and developing control activities and information technology that contribute to the mitigation of risks and support achievement of objectives; and (ii) deploying control activities through policies that establish what is expected and procedures that put policies into action.

The following were contributing factors to the material weaknesses in control activities:
- Lack of consistently established controls to segregate the function of recording and approving journal entries, as well as preparation and review of reconciliations with appropriate supporting documentation.

33

- Inconsistent documentation and retention of support for the review and approval of manual journal entries.
- Inconsistent documentation and application of accounting policies and/or practice for the sales returns reserve and certain accrual accounts.
- Insufficient resources within the accounting and financial reporting department to review the accounting for non-recurring complex purchase accounting, contingent payment and segment reporting transactions.
- Insufficient design and operation of certain control activities to respond to potential risk of material misstatements in the area of revenue recognition. In particular: (i) no controls requiring customer approval for early shipments outside of agreed upon shipping terms; (ii) no controls requiring centralized retention of proof of customer approval or request related to shipping outside of agreed terms; (iii) no formal process for offering or approving discounts to customers for early shipments; and (iv) no formal controls to ensure appropriate cut-off of direct revenue to customers at period ends in line with shipping terms.

Deficiencies in control activities contributed to material accounting errors identified and corrected in 2018 and prior years. These design deficiencies in control activities contributed to the potential for there to have been material accounting errors in substantially all financial statement account balances and disclosures.

98.     The 2018 Amended 10-K also identified deficiencies in the Company's risk

assessment and monitoring activities. Specifically, the report stated, in relevant part:

We did not design and implement an effective risk assessment based on the criteria established in the COSO framework. We have identified deficiencies in the principles associated with the risk assessment component of the COSO framework. Specifically, these control deficiencies constitute material weaknesses, either individually or in the aggregate, relating to: (i) identifying, assessing, and communicating appropriate objectives; (ii) identifying and analyzing risks to achieve these objectives; (iii) considering the potential for fraud in assessing risks; and (iv) identifying and assessing changes in the business that could impact our system of internal controls.

***A contributing factor to material weaknesses in the risk assessment included the fact that the Company's formal SOX compliance program did not have sufficient scope and focus on the key financial reporting risks.***

\*        \*        \*

We did not design and implement effective monitoring activities based on the criteria established in the COSO framework. We have identified deficiencies in the principles associated with the monitoring component of the COSO framework.

Specifically, these control deficiencies constitute material weaknesses, either individually or in the aggregate, relating to: (i) selecting, developing, and performing ongoing evaluation to ascertain whether the components of internal controls are present and functioning; and (ii) evaluating and communicating internal control deficiencies in a timely manner to those parties responsible for taking corrective action.

***The following were contributing factors to the material weaknesses in monitoring activities:***

- Management did not properly evaluate the function and operating effectiveness of certain internal control activities, limiting its ability to detect and communicate deficiencies.
- Internal audit activities were insufficient to keep pace with the size and complexity of our business structure and organization, which limited our ability to effectively monitor internal controls.
- The Company's formal SOX compliance program did not have sufficient scope and focus on the key financial reporting risks.
- The Company did not have sufficient talent and resources with sufficient expertise to evaluate the risks and controls.
- The Company did not have sufficient oversight and supervision of the internal control evaluation process.

99.    Also on June 8, 2020, RTI filed its annual report on Form 10-K for the period ended December 31, 2019 (the "2019 10-K"). With respect to the errors in the quarterly financial statements issued in fiscal 2019, the 2019 10-K summarized:

a. <u>Revenue</u> – As noted above, the Company has concluded that in some instances revenue for certain invoices should have been recognized at a later date than when originally recognized. The Company identified revenue from certain customer orders that were shipped early to customers without obtaining authorized approval, and thus was recognized in an incorrect period. There were also instances in which the Company could not locate evidence that the OEM customers had requested or approved the shipments and therefore concluded revenue related to these shipments were an error. Correction of these errors, when including the rollover effect from the immediately preceding periods, increased revenue by $0.3 million in the quarter ended March 31, 2019, decreased by $0.8 million in the quarter ended June 30, 2019 and increased by $0.6 million in the quarter ended September 30, 2019.

b. <u>Costs of processing and distribution</u> – Based on the corrections to the above revenue errors, when including the rollover effect from the immediately preceding periods, costs of processing and distribution increased by $0.1 million in the quarter ended March 31, 2019, decreased by $0.2 million in the quarter ended June 30, 2019 and increased by $0.1 million in the quarter ended September 30, 2019.

c. <u>Accounts receivable</u> – As a result of the errors corrections above, accounts receivable increased by $0.4 million in the quarter ended March 31, 2019, decreased by $0.3 million in the quarter ended June 30, 2019 and increased $0.3 million in the quarter ended September 30, 2019.

d. <u>Inventories, net</u> – As a result of the errors corrections above, net inventories decreased by $0.1 million in the quarter ended March 31, 2019, increased by $0.1 million in the quarter ended June 30, 2019 and increased by less than $0.1 million in the quarter ended September 30, 2019.

e. <u>Deferred tax assets</u> – As a result of the income tax impact of the errors corrections above, deferred tax assets decreased by $0.6 million in the quarter ended March 31, 2019, decreased by $0.5 million in the quarter ended June 30, 2019, and decreased by $0.6 million in the quarter ended September 30, 2019.

100. In addition to the errors identified in the 2018 Amended 10-K, the 2019 10-K stated that "[a]dditional errors were made in connection with the recording of the acquisition of Paradigm Spine, LLC in 2019." Specifically, the report stated:

The following errors in the Company's quarterly financial statements were identified and corrected apart from the Investigation and related to accounting for our 2019 acquisition of Paradigm Spine, LLC for the first three quarters of 2019. ASC 805 *Business Combinations* states that if the initial accounting for a business combination is incomplete by the end of the reporting period in which the combination occurs, the acquirer shall report in its financial statements the provisional amounts for the items for which the accounting is incomplete. The acquisition occurred on March 8, 2019, before the end of the first quarter of 2019. Accordingly, based on the information known or knowable in the first quarter of 2019, the Company should have performed a preliminary allocation of the purchase price to assets acquired and liabilities assumed. The Company did not appropriately prepare a preliminary estimates of the purchase price allocation resulting in errors impacting intangible assets, acquisition contingencies, inventory, and goodwill. The correction of the errors related to accounting for the acquisition of Paradigm Spine, LLC are as follows:

a. <u>Costs of processing and distribution</u> – Based on the corrections to the inventory valuation and Paradigm purchase accounting, costs of processing and distribution increased by $0.3 million in the quarter ended March 31, 2019, decreased by $1.9 million in the quarter ended June 30, 2019, and by $1.2 million in the quarter ended September 30, 2019.

b. <u>Marketing, general and administrative</u> – Based on the corrections to the amortization related to the other intangible assets' valuation and Paradigm purchase

36

accounting, marketing, general and administrative expenses increased by $0.7 million in the quarter ended March 31, 2019 and increased $2.1 million in each of the quarters ended June 30, and September 30, 2019.

c. Current inventories, net – Based on the corrections to the inventory valuation and Paradigm purchase accounting, net current inventories increased by $1.2 million in quarter ended March 31, 2019, and decreased by $12.6 million in the quarters ended June 30, and September 30, 2019.

d. Non-current inventories, net – Based on the corrections to the inventory valuation and Paradigm purchase accounting, net non-current inventories increased by $10.3 million in quarter ended March 31, 2019, decreased $11.2 million in the quarter ended June 30, 2019, and decreased by $10.0 million in the quarter ended September 30, 2019.

e. Deferred tax assets – Based on the corrections to the Paradigm purchase accounting deferred tax assets increased by $0.2 million in quarter ended March 31, 2019, increased by $0.3 million in the quarter ended June 30, 2019, and increased by $0.5 million in the quarter ended September 30, 2019.

f. Goodwill – Based on the corrections to the Paradigm purchase accounting, goodwill decreased by $113.5 million in quarter ended March 31, 2019, decreased $76.4 million in the quarter ended June 30, 2019, and decreased by $41.7 million in the quarter ended September 30, 2019.

g. Other intangible assets - net – Based on the corrections to the Paradigm purchase accounting, net other intangible assets increased by $78.3 million in the quarter ended March 31, 2019, increased $76.2 million in the quarter ended June 30, 2019, and increased $74.1 million in the quarter ended September 30, 2019.

h. Acquisition contingencies – Based on the corrections to the contingent liability valuation and Paradigm purchase accounting, acquisition contingencies decreased by $22.8 million in each of the quarters ended March 31, and June 30, 2019 and increased $11.9 million in the quarter ended September 30, 2019.

101. The 2019 10-K also identified certain "immaterial corrections in all periods presented." Specifically, it summarized:

a. Marketing, general and administrative – The Company corrected certain errors which decreased marketing, general and administrative expenses by $0.5 million in the quarter ended March 31, 2019 and less than $0.1 million in each of the quarters ended June 30, and September 30, 2019.

37

b. Accounts receivable – The Company corrected certain errors which decreased accounts receivable by $0.4 million for the quarter ended March 31, 2019, and by $0.3 million for the quarters ended June 30, and September 30, 2019.

c. Prepaid and other current assets – The Company corrected certain errors which decreased prepaid and other current assets by $0.5 million for each of the quarters ended March 31, and June 30, 2019, and September 30, 2019.

d. Deferred tax assets - net – The Company corrected certain errors which increased net deferred tax assets by $0.7 million for the quarters ended March 31, June 30, and September 30, 2019.

e. Property, plant & equipment – The Company corrected certain errors which increased property, plant & equipment by $0.3 million for the quarters ended March 31, June 30, and September 30, 2019.

f. Other intangible assets - net – The Company corrected certain errors which decreased net other intangible assets by $0.8 million for each of the quarters ended March 31, June 30, and September 30, 2019.

g. Other assets - net – The Company corrected certain errors which decreased net other assets by $0.3 million for the quarters ended March 31, June 30, and September 30, 2019.

h. Accounts payable – The Company corrected certain errors which decreased accounts payable by $0.2 million for the quarters ended March 31, June 30, and September 30, 2019.

i. Accrued expenses – The Company corrected certain errors which increased accrued expenses by $0.6 million for the quarters ended March 31, June 30, and September 30, 2019.

j. Payments for treasury stock – The Company corrected certain errors which reclassified operating cash flows to financing cash flows for purchases of treasury stock by $0.1 million, $0.2 million, and $0.2 million for the quarters ended March 31, June 30, and September 30, 2019, respectively.

102. The 2019 10-K stated that RTI's "disclosure controls and procedures were not effective as of December 31, 2019 because of certain material weaknesses in [its] internal control over financial reporting" substantially similar to those identified in the 2018 Amended 10-K. The report also stated that "[r]emediation of the identified material weaknesses and strengthening [the

38

Company's] internal control environment will require a substantial effort throughout 2020 and beyond, as necessary."

**E. The Director Defendants Caused the Company to Expend Significant Funds to Repurchase Its Stock**

103. The Director Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, RTI spent an aggregate amount of over $4.5 million to repurchase approximately 1,006,318 shares of its own common stock at artificially inflated prices from August 2016 through March 2019.

104. According to the 2016 10-K, during August 2016, the Company purchased 109,506 shares of its common stock for approximately $362,464 at an average price of $3.31 per share. As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the Company overpaid by $105,125 for stock repurchases during this period.

105. According to the 2017 10-K, during January, February, and November 2017, the Company purchased 745,122 shares of its common stock for approximately $3.4 million at an average price of $4.65 per share. As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the Company overpaid by nearly $1.7 million for stock repurchases during this period.

106. According to the 2018 10-K, during the months of January, April, May, July, and August 2018, the Company purchased 107,109 shares of its common stock for approximately $478,591 at an average price of $4.47 per share. As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the Company overpaid by approximately $226,885 for stock repurchases during this period.

107. According to the 1Q19 10-Q, during the quarter ended March 31, 2019, the Company purchased 29,021 shares of its common stock for approximately $136,435 at an average

price of $4.70 per share. As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the Company overpaid by about $68,199 for stock repurchases during this period.

108. According to the 2Q19 10-Q, during the quarter ended June 30, 2019, the Company purchased 7,748 shares of its common stock for approximately $38,032 at an average price of $4.94 per share. As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the Company overpaid by $19,825 for stock repurchases during this period.

109. According to the 3Q19 10-Q, during the quarter ended September 30, 2019, the Company purchased 7,812 shares of its common stock for approximately $31,908 at an average price of $4.11 per share. As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the Company overpaid by approximately $13,550 for stock repurchases during this period.

110. In sum, the Company overpaid for repurchases of its own stock by over $2.1 million.

**F.      Defendant Singer Sold Nearly $45,000 in RTI Stock While in Possession of Material Non-Public Information**

111. Defendant Singer is the Company's CFO with a highly sophisticated understanding of the Company's results and their import.

112. As set forth herein, defendant Singer possessed material negative information which he knew was being concealed from investors. Defendant Singer consciously acted to exploit his knowledge by selling nearly $45,000 of RTI stock to his substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| 2/26/2020 | 5,940 | $4.05 | $24,057 |
| 2/28/2020 | 5,510 | $3.70 | $20,387 |

113.    Defendant Singer thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

## VI.    DAMAGES TO THE COMPANY

114.    As a direct and proximate result of the Individual Defendants' conduct, RTI has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

a)  Costs incurred in connection with the SEC's investigation;

b)  Funds expended in connection with the stock repurchases;

c)  The price reduction for the sale of the Company's OEM business;

d)  Fees for legal and professional fees incurred in connection with the Securities Class Action;

e)  Any funds paid to settle the Securities Class Action;  and

f)  Costs incurred from compensation and benefits paid to the defendants who have breached their duties to RTI.

115.    In addition, RTI's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

116.    The actions complained of herein have irreparably damaged RTI's corporate image and goodwill.  For at least the foreseeable future, RTI will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that RTI's ability to raise equity capital or debt on favorable terms in the future is now impaired.

41

## VII.  DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

117.  Plaintiff brings this action derivatively in the right and for the benefit of RTI to redress injuries suffered, and to be suffered, by RTI as a direct result of breaches of fiduciary duty by the Individual Defendants, insider trading, violations of Section 10(b) and 14(a) of the Exchange Act, waste of corporate assets, and unjust enrichment.  RTI is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

118.  Plaintiff will adequately and fairly represent the interests of RTI in enforcing and prosecuting its rights.

119.  Plaintiff has continuously been a shareholder of RTI at times relevant to the wrongdoing complained of and is a current RTI shareholder.

120.  When this action was filed, RTI's Board of Directors consisted of defendants Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis and non-party directors Jeffrey C. Lightcap and Stuart F. Simpson.  Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Defendant Farhat**

121.  Farhat serves as RTI's CEO, and therefore is not independent under NASDAQ listing rules.  As an employee, Farhat derives substantially all of his income from his employment with RTI, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.  Farhat personally issued the misleading statements alleged herein.  As a result, Farhat would be interested in a demand regarding his own wrongdoing, and demand is futile as to him.

42

**Defendants McEachin, Stolper, and Weis**

122.    McEachin, Stolper, and Weis served as the members of the Audit Committee at all relevant times.  As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations.  In their capacities as Audit Committee members, McEachin, Stolper, and Weis reviewed and approved the disclosures regarding the Company's financial statements, including with respect to revenue recognition for OEM customers.  As alleged herein, McEachin, Stolper, and Weis failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in RTI's SEC filings and other disclosures. Thus, McEachin, Stolper, and Weis breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**Defendants Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis**

123.    Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis each are responsible for the issuance of the misleading disclosures and omissions in the Form 10-Ks for fiscal years 2015, 2016, 2017, and 2018, having signed and issued the 10-K.  When Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis signed the Form 10-Ks, they knew that the Company had improperly recognized revenue with respect to OEM customers.  By intentionally issuing disclosures that misrepresented the Company's results, Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis breached their fiduciary duties and face a substantial likelihood of liability.

124.    Additionally, demand is excused as to Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis in connection with the insider selling of Singer.  The material negative nonpublic information known to Singer when he sold his stock is the same information as was known to Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani,

43

and Weis when they signed and issued the Form 10-Ks. Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis could not disinterestedly investigate allegations that Singer traded on nonpublic information because they are alleged to have concealed the same information, and finding that Singer had trading on such information would be admitting that indeed the information had been concealed, and was known by the Board and management when they issued the Form 10-Ks. As a result, demand is excused in connection with the *Brophy* claim alleged herein.

125. Moreover, Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis were directors at the time of the stock repurchases alleged herein and voted to conduct the stock repurchase. These defendants therefore by their intentional acts caused the Company to be harmed by over $2.1 million. They could not disinterestedly consider a demand for action or investigate their votes without being required to evaluate and make a decision on such topics as their states of mind, whether there was a reason to doubt they acted with business judgement. This they could not do disinterestedly and independently, and thus demand is excused.

126. Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis could not disinterestedly consider a demand to action in connection with the misleading proxy statement issued in 2018. These eight directors issued the proxy statement knowing that representations made in the Company's SEC filings and other disclosures were misleading with respect to the Company's revenue recognition, and they did not disclose the same prior to the issuance of the proxy statement or the shareholder vote in 2018. Had these eight directors truthfully and completely revealed the misleading nature of the Company's public statements, Farhat, Gearen, McEachin, Stolper, Thomas, Valeriani, and Weis would not have been reelected as directors and the 2018 Plan would not have been approved. As a result Farhat, McEachin, Selquist, Stolper,

44

Sweeney, Thomas, Valeriani, and Weis would be interested in a demand regarding the misleading proxy statement, and demand is excused as to them on that basis as well.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

127. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128. Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of RTI's business and affairs, particularly with respect to issues as fundamental as public disclosures.

129. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of RTI.

130. In breach of their fiduciary duties owed to RTI, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

131. In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

132. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, RTI has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets. As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Against Singer – *Brophy* Claim

133. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134. As alleged herein, Singer is a fiduciary of RTI, possessed material, non-public information of RTI, and used that information improperly to profit from sales of RTI stock. When Singer directed the stock sales set forth above, he was motivated to do so, in whole or in part, by the substance of the material, non-public information he possessed and he acted with scienter.

135. When Singer sold his RTI stock, he knew that the investing public was unaware of the negative material information that he possessed. He also knew that if the information were disclosed, the market price of RTI stock would be significantly lower. Singer timed his stock sale to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock he sold. He thereby benefitted by misappropriating RTI's non-public information.

136. Plaintiff has no adequate remedy at law.

### COUNT III
### (Against Farhat, Hutchison, Singer, Jordheim, and Louw for Contribution For Violations of Sections 10(b) and 21D of the Exchange Act)

137. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138. Defendants Farhat, Hutchison, Singer, Jordheim, and Louw are named as defendants in the related Securities Class Action. The conduct of these Defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

46

139.     RTI is named as a defendant in related securities class actions that allege and assert claims arising under § 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If RTI is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

140.     As officers, directors and otherwise, Defendants Farhat, Hutchison, Singer, Jordheim, and Louw had the power or ability to, and did, control or influence, either directly or indirectly, RTI's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

141.     Defendants Farhat, Hutchison, Singer, Jordheim, and Louw are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

142.     Defendants Farhat, Hutchison, Singer, Jordheim, and Louw have damaged the Company and are liable to the Company for contribution.

143.     No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

47

## COUNT IV

**Derivative Claim for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
Promulgated Thereunder Against Defendants Farhat, McEachin, Selquist, Stolper,
Sweeney, Thomas, Valeriani, and Weis**

144.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

145.    This Count is asserted on behalf of the Company against Defendants Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

146.    At all relevant times, in connection with RTI's repurchases of its shares, Defendants Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis made, disseminated, or approved false or misleading statements about the Company specified herein, which they knew or deliberately disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and Defendants Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis's course of conduct were designed to artificially inflate the price of the Company's common stock.

147.    At the same time that the price of the Company's common stock was inflated due to the false and misleading statements, defendant Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused the Company to repurchase millions of shares of its own stock at prices that were artificially inflated due to their false or misleading statements.  Defendants Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis engaged in a scheme to defraud the Company by causing it to repurchase its shares at inflated prices.

148.    Defendants Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices,

schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with the Company's purchases of RTI common stock at all relevant times.

149. Defendants Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made or disseminated various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made or disseminated, in light of the circumstances under which they were made or disseminated, not misleading; made or disseminated the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the Company's purchase of RTI common stock, which were intended to, and did deceive the Company regarding its performance and the effectiveness of its internal controls.

150. Defendants Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis were directors and senior management and of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made at all relevant times, as alleged above.

151. As described above, Defendants Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis acted with scienter at all relevant times, in that he acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth herein were either known to Defendants Farhat, McEachin,

Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis or were so that they should have been aware of them.

152. As a result of Defendants Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis's misconduct, RTI has suffered damages in that it paid artificially inflated prices for RTI common stock as part of the repurchase program and suffered losses when the true facts became known. The Company would not have purchased RTI common stock at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the false or misleading statements made by Defendants Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis.

153. As a direct and proximate result of Defendants Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis's wrongful conduct, the Company suffered damages in connection with its repurchases of RTI common stock during the relevant period. By reason of such conduct, Defendants Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

154. Plaintiff brought this claim within two years of its discovery of the facts constituting the violation and within five years of the violation.

## COUNT V

**Against Defendants Farhat, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis for Violation of Section 14 of the Exchange Act**

155. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

156. Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light

50

of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's proxy statement filed on March 26, 2018 violated §14(a) and Rule 14a-9 because: (i) it misrepresented the actual activities of the Board, as well as the Audit Committee, with respect to risk management and oversight while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation.

157. In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

158. The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The 2018 proxy statement solicited shareholder votes for: (i) director nominees; (ii) the 2018 Incentive Compensation Plan; and (iii) executive compensation. The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

159. The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## COUNT VI

### Against the Individual Defendants for Waste of Corporate Assets

160. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

161. The Individual Defendants breached their fiduciary duties and, thereby, caused RTI to waste its assets, expend millions of dollars of corporate funds, and impair its reputation and

51

credibility for no legitimate business purpose, as a result of which the Company has been and continues to be substantially damaged.

162. As a direct and proximate result of these breaches of their fiduciary duties, RTI has sustained and will continue to sustain significant damages, as alleged herein. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT VII

### Against All Defendants for Unjust Enrichment

163. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

164. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of RTI. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to RTI.

165. Plaintiff, as a stockholder and representative of RTI, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

166. Plaintiff, on behalf of RTI, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of RTI, demands judgment as follows:

A. Declaring that plaintiff may maintain this action on behalf of RTI and that plaintiff is an adequate representative of the Company;

52

B. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C. Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to RTI;

D. Directing RTI to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect RTI and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a proposal to strengthen the Company's controls over financial reporting;

2. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3. a proposal to strengthen RTI's oversight of its disclosure procedures;

4. a provision to control insider transactions; and

5. a provision to permit the stockholders of RTI to nominate at least three candidates for election to the Board;

E. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of RTI has an effective remedy;

53

F.      Awarding to RTI restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: July 7, 2020

By:  s/*Marvin A. Miller*
Marvin A. Miller
Andrew Szot
**MILLER LAW LLC**
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
312.332.3400
mmiller@millerlawllc.com
aszot@millerlawllc.com

Matthew M. Houston
Benjamin I. Sachs-Michaels
**GLANCY PRONGAY & MURRAY LLP**
712 Fifth Avenue
New York, New York 10019
Telephone:  (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

-and-

Robert V. Prongay
Pavithra Rajesh
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
E-mail:  rprongay@glancylaw.com

Frank R. Cruz
**THE LAW OFFICES OF FRANK R. CRUZ**
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Attorneys for Plaintiff Dominick De Filippis*

55

## **VERIFICATION**

I, Dominick De Filippis, do hereby verify that I am a holder of common stock of RTI Surgical Holdings, Inc., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Shareholder Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint. All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  7/6/2020

DocuSigned by:

*Dominick De Filippis*

64DCAA8FF2DA48F...

Dominick De Filippis

ILND 44 (Rev. 09/07/18)

# CIVIL COVER SHEET

The ILND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(See instructions on next page of this form.)*

**I. (a) PLAINTIFFS**

Dominick De Filippis

**DEFENDANTS**

Camille I. Farhat, et al.

**(b)** County of Residence of First Listed Plaintiff  Richmond County, NY
*(Except in U.S. plaintiff cases)*

County of Residence of First Listed Defendant
*(In U.S. plaintiff cases only)*

*Note: In land condemnation cases, use the location of the tract of land involved.*

**(c)** Attorneys *(firm name, address, and telephone number)*

Marvin A. Miller, Miller Law LLC, 115 S. LaSalle St., Ste 2910, Chicago, IL 60603, 312.332.3400

Attorneys *(if known)*

**II. BASIS OF JURISDICTION** *(Check one box, only.)*

- ☐ 1 U.S. Government Plaintiff
- ☑ 3 Federal Question *(U.S. Government not a party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate citizenship of parties in Item III.)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(For Diversity Cases Only.)*
*(Check one box, only for plaintiff and one box for defendant.)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Check one box, only.)*

| CONTRACT | TORTS | | PRISONER PETITIONS | LABOR | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | | 510 Motions to Vacate Sentence | ☐ 710 Fair Labor Standards Act | ☐ 375 False Claims Act |
| ☐ 120 Marine | 310 Airplane | ☐ 530 General | | 530 General | ☐ 720 Labor/Management Relations | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | 315 Airplane Product | ☐ 367 Health Care/ | | 535 Death Penalty | ☐ 740 Railway Labor Act | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability | Pharmaceutical | | **Habeas Corpus:** | ☐ 751 Family and Medical | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | 320 Assault, Libel & Slander | Personal Injury | | 540 Mandamus & Other | Leave Act | ☐ 430 Banks and Banking |
| & Enforcement of Judgment | 330 Federal Employers' | Product Liability | | 550 Civil Rights | ☐ 790 Other Labor Litigation | ☐ 450 Commerce |
| ☐ 151 Medicare Act | Liability | ☐ 368 Asbestos Personal Injury | | 555 Prison Condition | ☐ 791 Employee Retirement | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student | 340 Marine | Product Liability | | 560 Civil Detainee – Conditions | Income Security Act | ☐ 470 Racketeer Influenced and |
| Loans (Excludes Veterans) | 345 Marine Product Liability | | | of Confinement | | Corrupt Organizations |
| ☐ 153 Recovery of Veteran's Benefits | 350 Motor Vehicle | **PERSONAL PROPERTY** | | | | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | 355 Motor Vehicle | ☐ 370 Other Fraud | | | **PROPERTY RIGHTS** | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 371 Truth in Lending | | | ☐ 820 Copyrights | Protection Act (TCPA) |
| ☐ 195 Contract Product Liability | 360 Other Personal Injury | ☐ 380 Other Personal | | | ☐ 830 Patent | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | 362 Personal Injury - | Property Damage | | | ☐ 835 Patent – Abbreviated | ☑ 850 Securities/Commodities/ |
| | Medical Malpractice | ☐ 385 Property Damage | | | New Drug Application | Exchange |
| | | Product Liability | | | ☐ 840 Trademark | ☐ 890 Other Statutory Actions |
| | | | | | | ☐ 891 Agricultural Acts |
| | | | | | | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **BANKRUPTCY** | **FORFEITURE/PENALTY** | **SOCIAL SECURITY** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | 440 Other Civil Rights | ☐ 422 Appeal 28 USC 158 | | 625 Drug Related Seizure | ☐ 861 HIA (1395ff) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | 441 Voting | ☐ 423 Withdrawal 28 USC 157 | | of Property 21 USC 881 | ☐ 862 Black Lung (923) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | 442 Employment | | | 690 Other | ☐ 863 DIWC/DIWW (405(g)) | Act/Review or Appeal of |
| ☐ 240 Torts to Land | 443 Housing/ | | | | ☐ 864 SSID Title XVI | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | **IMMIGRATION** | | | ☐ 865 RSI (405(g)) | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | 445 Amer. w/Disabilities - | ☐ 462 Naturalization | | | | State Statutes |
| | Employment | Application | | | | |
| | 446 Amer. w/Disabilities - | ☐ 463 Habeas Corpus - Alien | | | **FEDERAL TAXES** | |
| | Other | Detainee (Prisoner Petition) | | | ☐ 870 Taxes (U.S. Plaintiff | |
| | 448 Education | ☐ 465 Other Immigration | | | or Defendant) | |
| | | Actions | | | ☐ 871 IRS—Third Party | |
| | | | | | 26 USC 7609 | |

**V. ORIGIN** *(Check one box, only.)*

- ☑ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation
- ☐ 8 Multidistrict Litigation Direct File

**VI. CAUSE OF ACTION** (Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)

Securities Exchange Act of 1934; securities fraud

**VII. PREVIOUS BANKRUPTCY MATTERS** (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.)

**VIII. REQUESTED IN COMPLAINT:** ☑ Check if this is a **class action** Under rule 23, **Demand $** F.R.CV.P.

Check Yes only if demanded in complaint.
**Jury Demand:** ☑ Yes  ☐ No

**IX. RELATED CASE(S) IF ANY** *(See instructions)*  Lowry et al. v. RTI  Judge Matthew F. Kennelly  Case Number 1:20-cv-01939

**X. Is this a previously dismissed or remanded case?** ☐ Yes ☑ No  If yes, Case #  Name of Judge

Date  July 7, 2020

Signature of attorney of record  /s/ Marvin A. Miller

INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority for Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.        **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

         (b)  County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of  filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

         (c)  Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an  attachment, noting in this section "(see attachment)".

II.        **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are  included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; NOTE: federal question actions take  precedence over diversity cases.)

III.        **Residence (citizenship) of Principal Parties**. This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.        **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.        **Origin**. Place an "X" in one of the six boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

VI.        **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. Do not cite jurisdictional statutes unless diversity. Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

VII.        **Previous Bankruptcy Matters**  For nature of suit 422 and 423 enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this court. Use a separate attachment if necessary.

VIII.        **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P. Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

IX.        **Related Cases**. This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

X.        **Refiling Information.** Place an "X" in the Yes box if the case is being refiled or if it is a remanded case, and indicate the case number and name of judge. If this case is not being refiled or has not been remanded, place an "X" in the No box.

         **Date and Attorney Signature.** Date and sign the civil cover sheet.

Rev. 09/07/2018