**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| PATRICIA LOWRY, individually and on behalf of all others similarly situated, ) ) ) ) Plaintiff, ) ) v. ) ) RTI SURGICAL HOLDINGS, INC., ) CAMILLE I. FARHAT, BRIAN K. ) HUTCHISON, JONATHON M. SINGER, ) ROBERT P. JORDHEIM, and JOHANNES ) W. LOUW, ) ) Defendants. ) | No.: 20-cv-01939 Honorable Matthew F. Kennelly |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

**HOLLAND & KNIGHT LLP**
Martin G. Durkin
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606

Louise McAlpin
Stephen Warren
Allison Kernisky
701 Brickell Avenue, Suite 3300
Miami, Florida 33131

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS ......................................................................................2

    RTI's Business Lines ....................................................................................3

    Internal Investigation and Financial Restatement ......................................5

SUMMARY OF THE ACTION ..............................................................................7

THE HEIGHTENED PLEADING STANDARDS FOR SECURITIES FRAUD CLASS ACTIONS ...............................................................................................8

ARGUMENT ..........................................................................................................9

I.     PLAINTIFF HAS NOT PLED FACTS SHOWING ANY IMPROPER REVENUE SMOOTHING BY THE DEFENDANTS ............................................9

II.    THE AC FAILS TO DEMONSTRATE A STRONG INFERENCE OF SCIENTER ......13

    A.     Plaintiff Does Not Allege Any Cogent Motive For Fraud ....................14

        1.     Individual Defendants' Stock Holdings Show They Had a Motive Not to Commit Fraud ...................................................15

        2.     Stock Sales to Pay Tax Obligations Are Not Indicative of Fraudulent Intent ..........................................................16

    B.     Confidential Witness Accounts Do Not Demonstrate Scienter .............17

    C.     Plaintiff's Core Operations Allegations Do Not Weigh In Favor of Scienter .......17

    D.     Neither the Restatement Nor the Deficient Internal Controls Support a Strong Showing of Scienter .............................................................19

    E.     No Scienter Based on RTI's Accounting Policies or Scope of Alleged Fraud ......21

    F.     Episodic Company Reviews Are Not Indicative of Recklessness .........22

    G.     The AC's Allegations Support A More Compelling Non-Culpable Inference ......23

III.   NO CLAIM FOR CONTROL PERSON LIABILITY UNDER SECTION 20(a) ............25

CONCLUSION .....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Elec. Pension Fund v. Asar*,
768 F. App'x 175 (5th Cir. 2019) ...........................................................16

*In re Allscripts, Inc. Sec. Litig.*,
2001 WL 743411 (N.D. Ill. June 29, 2001) ..........................................24

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
456 F. Supp. 2d 576 (S.D.N.Y. 2006)......................................................13

*In re Bally Total Fitness Sec. Litig.*,
2006 WL 3714708 (N.D. Ill. July 12, 2006)...........................................20

*In re Bally Total Fitness Sec. Litig.*,
2007 WL 551574 (N.D. Ill. Feb. 20, 2007) ............................................12

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004).....................................................16

*In re Career Educ. Corp. Sec. Litig.*,
2006 WL 999988 (N.D. Ill. Mar. 28, 2006).......................................11, 12

*In re Career Educ. Corp. Sec. Litig.*,
2007 WL 1029092 (N.D. Ill. Mar. 29, 2007), *vacated pursuant to settlement*,
2008 WL 8666579 (N.D. Ill. June 26, 2008)......................................20, 23

*In re Ceridian Corp. Sec. Litig.*,
542 F.3d 240 (8th Cir. 2008) ..................................................................17

*In re Chicago Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*,
390 F. Supp. 3d 916 (N.D. Ill. 2019) ......................................................14

*In re Chicago Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*,
435 F. Supp. 3d 845 (N.D. Ill. 2020) ......................................................14

*City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) ..................................................................10

*City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*,
388 F. Supp. 2d 932 (S.D. Ind. 2005)................................................11, 16

*Cornielsen v. Infinium Cap. Mgmt., LLC*,
916 F.3d 589 (7th Cir. 2019) ....................................................................8

*Davis v. SPSS, Inc.*,
  385 F. Supp. 2d 697 (N.D. Ill. 2005) ............................................................... *passim*

*Davis v. SPSS, Inc.*,
  431 F. Supp. 2d 823 (N.D. Ill. 2006) ...................................................12, 13, 25

*Fryman v. Atlas Fin. Holdings, Inc.*,
  2020 WL 2735366 (N.D. Ill. May 26, 2020) ...........................................17

*Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*,
  2011 WL 1303387 (N.D. Ill. Mar. 31, 2011) ...........................................15

*Hammerstone NV, Inc. v. Hoffman*,
  2010 WL 882887 (S.D.N.Y. Mar. 10, 2010) ...........................................16

*In re Hansen Nat. Corp. Sec. Litig.*,
  527 F. Supp. 2d 1142 (C.D. Cal. 2007) ...................................................24

*In re Harley-Davidson, Inc. Sec. Litig.*,
  660 F. Supp. 2d 969 (E.D. Wis. 2009) ...................................................16

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) ...........................................................11, 15, 20

*Johnson v. Tellabs, Inc.*,
  262 F. Supp. 2d 937 (N.D. Ill. 2003) ...................................................15

*Jones v. Corus Bankshares, Inc.*,
  701 F. Supp. 2d 1014 (N.D. Ill. 2010) ...........................................17, 18

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006) ...........................................................9

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ...................................................9, 17, 23

*In re Midway Games, Inc. Sec. Litig.*,
  332 F. Supp. 2d 1152 (N.D. Ill. 2004) ...................................................2

*In re Newell Rubbermaid Inc. Sec. Litig.*,
  2000 WL 1705279 (N.D. Ill. Nov. 14, 2000) ...........................................20

*Omnicare, Inc. v. Laborers Dist. Counsel Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015).........................................................................25

*Palda v. Gen. Dynamics Corp.*,
  47 F. 3d 872 (7th Cir. 1995) ...........................................................8

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
    266 F. Supp. 3d 1154 (E.D. Wis. 2017)................................................21, 24

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
    895 F.3d 933 (7th Cir. 2018) ........................................................ *passim*

*Phillips v. Harvest Nat. Res., Inc.*,
    2016 WL 4523849 (S.D. Tex. Aug. 25, 2016) ......................................21

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v.*
    *Allscripts-Misys Healthcare Sols., Inc.*,
    707 F. Supp. 2d 774 (N.D. Ill. 2010) ...............................................11

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ........................................................ *passim*

*Rossy v. Merge Healthcare Inc.*,
    169 F. Supp. 3d 774 (N.D. Ill. 2015) ...............................................10

*Roth v. OfficeMax, Inc.*,
    527 F. Supp. 2d 791 (N.D. Ill. 2007) ...........................................19, 21

*Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc.*,
    2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) ......................................15

*Stark Trading & Shepherd Inv. Int'l v. Falconbridge Ltd.*,
    2008 WL 153542 (E.D. Wis. Jan. 14, 2008)........................................25

*In re Supreme Indus., Inc. Sec. Litig.*,
    2018 WL 2364931 (N.D. Ind. May 23, 2018) .................................13, 18

*In re Supreme Indus., Inc. Sec. Litig.*,
    2019 WL 1436022 (N.D. Ind. Mar. 29, 2019)......................................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...............................................................10, 14

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*,
    20 F.3d 771 (7th Cir. 1994) ..........................................................9

*Wade v. Wellpoint, Inc.*,
    740 F. Supp. 2d 994 (S.D. Ind. 2010) ..............................................17

*Zerger v. Midway Games, Inc.*,
    2009 WL 3380653 (N.D. Ill. Oct. 19, 2009).......................................12

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ........................................................11

**Statutes**

15 U.S.C. § 78u-4(b)...............................................................................................9

I.R.C. § 83.............................................................................................................16

Private Securities Litigation Reform Act..................................................1, 8, 12

Securities Exchange Act of 1934...................................................................7, 25

**Other Authorities**

17 C.F.R. § 240.10b-5.......................................................................................7, 8

Fed. R. Civ. P. 12(b)(6)......................................................................................1, 8

Fed. R. Civ. P. 9(b) .......................................................................................1, 8, 12

## LIST OF EXHIBITS

| Ex. No. | Description |
|---|---|
| 1. | June 8, 2020 RTI Form 10-K/A for the Fiscal Year ended Dec. 31, 2018 |
| 2. | Mar. 7, 2016 RTI Form 10-K for the Fiscal Year ended Dec. 31, 2015 |
| 3. | Mar. 13, 2017 RTI Form 10-K for the Fiscal Year ended Dec. 31, 2016 |
| 4. | Mar. 2, 2018 RTI Form 10-K for the Fiscal Year ended Dec. 31, 2017 |
| 5. | June 8, 2020 RTI Form 10-K for the Fiscal Year ended Dec. 31, 2019 |
| 6. | July 27, 2016 RTI Conference Call Transcript |
| 7. | Jan. 15, 2020 RTI Form 8-K Press Release |
| 8. | Aug. 12, 2020 RTI Form 10-Q for the Quarterly Period ended June 30, 2020 |
| 9. | Feb. 28, 2020 Jonathon M. Singer Form 4 |
| 10. | Consolidated Chart of Beneficial Ownership of RTI shares by Camille I. Farhat, Brian K. Hutchison, Jonathon M. Singer, Robert P. Jordheim and Johannes W. Louw, including relevant Form 4s |
| 11. | July 27, 2016 RTI Form 8-K Press Release |

Pursuant to Fed. R. Civ. P. 12(b)(6), the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA") and Fed. R. Civ. P. 9(b), Defendants RTI Surgical Holdings, Inc.,[1] Camille I. Farhat, and Jonathon M. Singer submit this memorandum in support of their motion to dismiss the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws ("AC") of Lead Plaintiff Rosy Yeretsian ("Plaintiff").

## INTRODUCTION

Based largely upon the speculative and conclusory allegations of several anonymous witnesses, Plaintiff has filed the AC accusing RTI's current and former executives of perpetrating a fraud to artificially inflate the value of RTI's stock. The crux of Plaintiff's AC is that RTI engaged in a practice she calls "revenue smoothing," through which the Company shipped products to customers early, without their prior approval, so that management could achieve quarterly revenue targets. This practice, so Plaintiff argues, ultimately required RTI to restate its financials.

But a financial restatement is not an admission of fraud and nowhere in the AC does Plaintiff allege facts that, if true, would demonstrate that the Individual Defendants either knew about, or engaged in, any wrongdoing. Even though the AC spans 94 pages, the only so-called "support" Plaintiff is able to muster for her conclusory assertion that the Individual Defendants knew about the alleged fraud are vague allegations from four anonymous witnesses. The allegations attributed to those witnesses should, however, be discredited because they lack the requisite personal knowledge and reliability. Two of the witnesses were not employed at RTI during the Class Period and a third was never employed at RTI.

---

[1] The Company recently sold a portion of its business and was renamed Surgalign Holdings, Inc. AC ¶ 25. To avoid confusion and for ease of reference, we will refer to the Company as "RTI" in this Motion and describe RTI's business as it existed during the Class Period.

Moreover, the anonymous sources had virtually no contact with the Individual Defendants, and most of their testimony is based on rumor and innuendo. These are critical flaws because the heightened pleading standards for securities fraud actions require Plaintiff to plead facts to support a strong inference that each Defendant acted with scienter, yet the AC includes no allegations of a cogent motive for any of the Defendants to have engaged in the alleged fraud. Plaintiff offers up a half-hearted attempt at pleading motive by pointing to two stock sales by one of the Individual Defendants, but those sales were for tax purposes, not any improper self-enrichment.

Without the necessary facts to support her claim, Plaintiff resorts to "fraud by hindsight"— alleging that because there was a financial restatement, there must have been a fraud at RTI and its management must have been aware. The federal securities laws, however, do not countenance this form of pleading. Because Plaintiff has not pled facts that could possibly give rise to the requisite strong inference of fraud, as well as the other reasons set forth below, the AC should be dismissed as a matter of law.

## STATEMENT OF FACTS

During the proposed class period (Mar. 7, 2016–Mar. 27, 2020) (the "Class Period"), RTI designed, manufactured and sold surgical implants. AC ¶ 25; Ex. 1 at 73. The implants, which are distributed domestically and internationally, are used for orthopedic and other surgical applications. 2018 Ex. 1 at 73.[2] Throughout the Class Period, the Company employed approximately 1,000 employees in various locations including its: executive offices in Deerfield,

---

[2] In evaluating the sufficiency of Plaintiff's allegations, the Court may consider public documents filed with the SEC and documents referenced in the AC that are central to Plaintiff's claims. *See, e.g.*, *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1155 n.1 (N.D. Ill. 2004) (considering "SEC filings, press releases, and conference calls" in connection with motion to dismiss section 10(b) and 20(a) claims because the "materials" were "referred to" in the complaint and were "central to plaintiffs' claims"). All exhibits attached to this Motion were either cited in the AC, filed with the SEC, or, for ease of reference, contain information excerpted from the latter in a chart format.

Illinois; processing facilities in Florida and Germany; and manufacturing facilities in Michigan and North Carolina. *See, e.g.*, Ex. 2 at 1, 10; Ex. 1 at 1, 11.

During the Class Period, there was a transition in RTI's management team. At the beginning of the Class Period, Defendants Brian Hutchison and Robert Jordheim were the CEO and CFO, respectively. In December 2016, Mr. Hutchison retired, at which time Mr. Jordheim took over as Interim CEO and Defendant Johannes Louw took over as Interim CFO, while the Company searched for a CEO replacement. AC ¶¶ 28–30. In March 2017, Camille Farhat joined the Company as the new CEO, a position he held through the end of the Class Period. AC ¶ 27. When Mr. Farhat joined the Company, Mr. Jordheim returned to his prior CFO position, in which he remained until September 2017, when he was replaced by Mr. Singer, who served as CFO through the end of the Class Period. AC ¶¶ 29–30. Defendants Hutchison, Jordheim, Farhat, Singer, and Louw are collectively referred to herein as the "Individual Defendants."

RTI's Business Lines

At the start of the Class Period, RTI operated six business lines. Ex. 3 at 1. However, by January 2018, the Company had divested one business line and consolidated its reporting for the remaining lines down to four—Spine, Sports, International and Original Equipment Manufacturer ("OEM")—as part of an overall plan to increase efficiency and profitability.[3] Ex. 1 at 1. During that time, the Company marketed and distributed its implants through two channels: (1) direct distribution channels to healthcare providers, hospitals and other healthcare facilities for the Spine, Sports and International lines ("Direct"); and (2) via relationships with large commercial distributors for the OEM business. Ex. 1 at 3–4. During the Class Period, RTI's Direct sales

---

[3] Prior to October 1, 2017, RTI referred to its OEM line of business as the "Commercial" line. AC ¶ 42; Ex. 4 at 1.

3

generally accounted for the majority of the Company's overall revenues (usually around 60%), while the remainder was attributable to OEM sales. *See* Ex. 1 at 43; AC ¶ 41.

RTI's financial results were uneven during the Class Period. It reported a net profit in fiscal years 2015 and 2017, and a net loss in 2016, 2018 and 2019. *See, e.g.*, Ex. 5 at 32. During that time, the Company's total annual revenues showed a slight year-over-year upward trend.[4] *Id.*

Depending on its distribution agreements with customers or distributors, it was RTI's policy during the Class Period to recognize revenue when its products were shipped to, or received by, its customers. *See, e.g.*, Ex. 4 at 34. Although purchase orders submitted by the OEM customers specified requested delivery dates for each product, RTI and some of its OEM customers had agreed-upon delivery windows that allowed RTI to ship binding product orders before or after the requested delivery date. *See, e.g.*, AC ¶ 242. Thus, where the agreed-upon delivery window straddled the end of one quarter and the beginning of another, RTI had the flexibility to ship product in the earlier reporting period and to recognize revenue at the time of shipment.

In 2017, RTI brought in a new management team to, among other things, improve the Company's stature in the consolidating healthcare market by divesting non-core assets and focusing on its Spine and OEM business lines. Ex. 1 at 1. As part of this initiative, Mr. Farhat and his team sought to stabilize and grow the OEM business. After suffering declining OEM revenue

---

[4] Customer ordering patterns often impacted the reported revenue from RTI's OEM business and its year-over-year quarterly comparisons of revenue growth or contraction. *See, e.g.*, AC ¶ 95 citing Ex. 2 at 31 ("Our year over year revenue comparisons were impacted due to a significant amount of our revenue being derived from large commercial stocking distributors, whose timing of orders can vary from year to year. These ordering patterns can result in significant unit volume variations, which can result in significant variation in period over period comparisons."). For example, one of RTI's commercial distributors, which had anticipated increased sales as a result of its then-recent acquisitions, purchased a significant amount of product from the Company that was shipped in 2015. Ex. 6 at 7; AC ¶ 115. However, because the distributor's sales were slower than expected, it did not place a similarly large order in 2016, thereby unfavorably impacting RTI's year-over-year comparative OEM revenue that was reported during the Class Period. Ex. 6 at 7.

in the five quarters beginning January 2016, RTI reported comparative quarterly growth in OEM revenue in the second quarter of 2017 and all but one quarter thereafter through September 30, 2019. AC ¶¶ 107, 113, 122, 132, 142, 145, 163, 168, 172, 182, 186, 201, 204, 209, 213.

In March 2019, the Company advanced its strategic objective of expanding its footprint in targeted markets by acquiring Paradigm Spine, LLC, a spine focused business. AC ¶ 26. RTI further demonstrated its commitment to the spine business when it agreed in early 2020 to sell its OEM business and become a pure spine business. AC ¶ 49; Ex. 7 at 119. The OEM sale closed in July 2020 after RTI shareholders voted in favor of it. Ex. 8 at 4.

<u>Internal Investigation and Financial Restatement</u>

During the Class Period, Deloitte & Touche LLP ("Deloitte") audited RTI's financial statements. For each fiscal year in which an audit was finalized during the Class Period, Deloitte issued an unqualified opinion that RTI's financial statements were fairly and appropriately presented and were in compliance with generally accepted accounting principles ("GAAP"). Ex. 4 at 54. For each of those years, Deloitte also opined that the Company maintained, in all material respects, effective internal controls over its financial reporting. *See, e.g.*, Ex. 2 at 44; Ex 3 at 47.

On March 16, 2020, RTI announced that it would be unable to timely file its Form 10-K for fiscal year 2019 because its Audit Committee, with the assistance of independent legal and forensic advisors, was conducting an investigation into the Company's revenue recognition practices involving OEM customers (the "Internal Investigation"). AC ¶ 217. The Company further disclosed that the Internal Investigation was precipitated by an investigation by the Securities and Exchange Commission ("SEC"), with which the Company was cooperating. *Id.*

In June 2020, after the Internal Investigation was complete, the Company restated its previously-issued audited financial statements for fiscal years 2016–18, unaudited financial

statements for the quarterly periods for 2016–2018 and the nine months ended September 30, 2019, and selected financial data for fiscal years 2014 and 2015 (the "Restatement").[5] AC ¶¶ 225, 231; Ex. 1 at 12; Ex. 5 at Explanatory Note. The Restatement primarily involved the timing of revenue recognized from sales in the OEM business.[6] The Company explained that:

> [R]evenue for certain invoices should have been recognized at a later date than when originally recognized. In response to binding purchase orders from certain OEM customers, goods were shipped and received by the customers before requested delivery dates and agreed-upon delivery windows. In many instances the OEM customers requested or approved the early shipments, but the Company determined that on other occasions the goods were delivered early without obtaining the customers' affirmative approval.

Ex. 1 at 12. The Company also explained that "some of those unapproved shipments were shipped by employees in order to generate additional revenue and resulted in shipments being pulled from a future quarter into an earlier quarter." *Id.* at 53. In addition to restating revenue for products for which customer approval was not obtained before early shipment, the Company took a conservative approach and restated revenue "for other orders that shipped earlier than the purchase order due date in the system for which the Company could not locate evidence that the OEM customers had requested or approved the shipments." *Id.*

In connection with the Restatement, the Company's management concluded that RTI's internal controls over financial reporting were not effective as of December 31, 2018 because there were material deficiencies in the Company's: control environment; risk assessment; control activities; information and communications; and monitoring activities ("Internal Control Deficiencies"). AC ¶ 229. In the Restatement, RTI disclosed the actions it had taken to address the

---

[5] The filing of the Form 10-K for fiscal year 2019 was delayed as a result of the Internal Investigation and therefore was not part of the Restatement.

[6] The Restatement also corrected other errors, including some associated with the Paradigm Spine acquisition, that were unrelated to the Internal Investigation. AC ¶¶ 232–33; Ex. 1 at 53; Ex. 5 at 137.

Internal Control Deficiencies, other steps it was taking to strengthen controls, and that its commitment to remediating the identified weaknesses would likely take some time to prove effective. Ex. 1 at 56–59.

Because the Restatement focused on the timing of revenue recognition, certain revenue was reallocated among quarters. This re-allocation had an insignificant overall quantitative effect on the Company's annual revenues. In fiscal years 2016 and 2017, the Company's revenue *increased* by $3.1 million (or 1.1%) and by $800,000 (or 0.28%), respectively. In fiscal year 2018, revenue decreased by only $500,000 (or 0.17%). AC ¶ 228; Ex. 1 at 106–07. The Restatement did not change any previously reported annual net profit to a net loss.

## SUMMARY OF THE ACTION

In the AC, Plaintiff asserts two claims under the Securities Exchange Act of 1934: Count I – a Section 10(b) and Rule 10b-5 securities fraud claim against all Defendants; and Count II – a Section 20(a) control person claim against only the Individual Defendants. AC ¶¶ 268–83. Plaintiff sues on behalf of a class consisting of all persons who purchased RTI common stock during the four-year Class Period. AC ¶ 1.

According to the AC, the Individual Defendants engaged in "revenue smoothing," through which RTI allegedly shipped products to customers early so that management could hit quarterly revenue targets. AC ¶ 4. The AC further alleges that Defendants falsely assured investors, in nearly 90 public statements (the "Challenged Statements"), that RTI properly recognized revenue, its internal controls were adequate, and its public disclosures were complete. AC ¶¶ 2–3.

Working backwards from the Restatement, Plaintiff posits that all 90 of the Challenged Statements must be actionable because, in light of the later-identified errors in the Company's reported financial results and the reported Internal Control Deficiencies, the Defendants must have known at the time that the Challenged Statements were made that they were false. But fraud-by-

hindsight, as well as the AC's other hodgepodge of "should have known" allegations, do not satisfy the PSLRA's heightened pleading standards for securities fraud claims, including the requirement that a plaintiff allege facts that give rise to a strong inference of scienter. Moreover, the AC is deficient because: it does not sufficiently allege the Individual Defendants' purported involvement in any supposed revenue smoothing; there are inadequate allegations demonstrating the falsity or materiality of the Challenged Statements; and it includes non-actionable opinions.

## THE HEIGHTENED PLEADING STANDARDS
## FOR SECURITIES FRAUD CLASS ACTIONS

To state a claim for federal securities fraud under Section 10(b) and Rule 10b-5(b), Plaintiff must allege, with respect to each Defendant: "(1) a material misstatement or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[7] Under Rule 12(b)(6), the Court must accept Plaintiff's factual allegations as true and draw inferences from the AC in the light most favorable to Plaintiff.[8] But a complaint "which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)."[9] The latter rule is particularly important in securities fraud cases where the sufficiency of a complaint is governed by the heightened pleading standard in Federal Rule 9(b) and the even more stringent pleading requirements imposed by the PSLRA.[10]

---

[7] *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019) (citations and internal quotation marks omitted).

[8] *Pugh v. Tribune Co.*, 521 F.3d 686, 692 (7th Cir. 2008).

[9] *Palda v. Gen. Dynamics Corp.*, 47 F. 3d 872, 875 (7th Cir. 1995).

[10] *Cornielsen*, 916 F.3d at 598–99.

To comply with Rule 9(b) in the securities fraud context, Plaintiff must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The "circumstances constituting fraud" include "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff."[11] To satisfy the PSLRA's heightened pleading requirements, the complaint must not only "specify each statement alleged to have been misleading," but also "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). The complaint must also "'with respect to each act or omission . . . state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind.'"[12] Thus, Plaintiff "must not only plead a violation with particularity; [she] must also marshal sufficient facts to convince a court at the outset that the [D]efendants likely intended to deceive, manipulate, or defraud."[13]

## **ARGUMENT**

## I. **PLAINTIFF HAS NOT PLED FACTS SHOWING ANY IMPROPER REVENUE SMOOTHING BY THE DEFENDANTS**

It is important to establish what this lawsuit does *not* involve. This is not a case of a company booking phony revenue from fake contracts, products or customers. Nor does this case involve "channel stuffing," a practice where a company books revenue "on the basis of goods shipped but not really sold because the buyer can return them."[14] Rather, this case involves the

---

[11] *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994) (citations and internal quotation marks omitted).

[12] *Pugh*, 521 F.3d at 693 (quoting 15 U.S.C. § 78u-4(b)(2)).

[13] *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 594–95 (7th Cir. 2006) (citation and internal quotation marks omitted).

[14] *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) (holding that channel stuffing, whereby a company floods its customers with "more of one's product than one thinks one can sell"

timing of recognizing legitimate revenue on shipments of actual RTI products to real customers who placed purchase orders with RTI.

Plaintiff does not dispute that RTI transferred real implants to legitimate customers under binding purchase orders and recognized and received revenue as a result. Instead, Plaintiff's claim of securities fraud is premised on her unsupported assertion that during the Class Period the Defendants engaged in a fraudulent "revenue smoothing" practice through which they intentionally shipped RTI products early to customers, without proper authorization, in order to recognize revenue prematurely and hit quarterly revenue targets. *See* AC ¶¶ 4, 51–53. Yet, nowhere in the 94-page AC does Plaintiff specify what those revenue targets were, who at the Company set them, whether they were met, what was to be gained by hitting the unspecified targets, when product was supposedly improperly shipped early, who authorized the early shipments without customer approval, which customers received the early shipments, or how much additional revenue was purportedly generated early as a result. This lack of particularity fails to satisfy the PSLRA's heightened pleading requirements. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

Plaintiff's revenue smoothing theory rests exclusively on conclusory allegations from four confidential witnesses ("CWs") whose anecdotal accounts are unreliable, unmoored in time, and not linked to the Individual Defendants. AC ¶¶ 67–92. In the Seventh Circuit, allegations from CWs "require a heavy discount" because, among other reasons, the anonymous sources "may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, [and] may

---

in order to recognize more revenue, is fraudulent if buyer has absolute right of return making them "in effect sales on consignment").

even be nonexistent . . . ."[15] Before the Court can give any credit to allegations from confidential

sources, Plaintiff must first satisfy her burden to demonstrate that the CWs are reliable and their

testimony is based on first-hand knowledge.[16]

Plaintiff has not done so here. The reliability of the CW accounts is questionable (to be

generous) because there are no factual allegations showing that any of them had access to pertinent

information at RTI during the Class Period. In fact, two of the CWs—FE1 and FE4—were not

employed at RTI then. AC ¶¶ 67, 88. This alone requires that their allegations be discredited

because CWs who "were not employed by [the company] during the time period in question" lack

personal knowledge of the company's state of affairs during that time.[17] Similarly, the reliability

of FE2 and FE3 is undermined by the fact that each of them was reportedly employed at RTI for

---

[15] *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013) (holding CW allegations were insufficient to support a securities fraud action); *Rossy v. Merge Healthcare Inc.*, 169 F. Supp. 3d 774, 782 (N.D. Ill. 2015) (recognizing "the Seventh Circuit has repeatedly admonished [that] information obtained from [CWs] is generally subject to a 'discount' that it has alternately characterized as 'steep' and 'heavy'") (quoting *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007)).

[16] *See, e.g.*, *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 707 F. Supp. 2d 774, 783-84 (N.D. Ill. 2010) (concluding where complaint relies solely on CW allegations that plaintiff must allege sufficient facts "to support the probability that its sources had access to the information alleged in the complaint"); *In re Career Educ. Corp. Sec. Litig.*, 2006 WL 999988, at *4 (N.D. Ill. Mar. 28, 2006) (determining complaint must provide a court with a sufficient basis to determine whether a source "is speaking from personal knowledge or merely regurgitating gossip and innuendo") (internal quotation and citation omitted).

[17] *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (declining to consider allegations of several CWs whose statements failed to meet personal knowledge requirement since they "were simply not positioned to know the information alleged"); *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 942 (S.D. Ind. 2005) (granting motion to dismiss where, among other things, complaint "fail[ed] to establish that the witnesses were employed during the class period or that the witnesses had personal knowledge of the facts they reported").

less than half of the Class Period.[18] Even worse, none of the four CWs link any of the circumstances they recount to the Class Period.[19] This lack of a temporal link is fatal to all of their accounts.[20]

The CW accounts suffer from another material deficiency. There are no reliable allegations credited to the CWs that, if true, would show that any of the Individual Defendants knew about improper early shipments during the Class Period.[21] Three of the four CWs do not mention any Individual Defendant. And the fourth CW (FE3) references only one of the five Individual Defendants, but even that allegation—that Mr. Jordheim allegedly told FE3's subordinate at some unspecified time "that RTI needed to book additional revenue before the end of the quarter and that the Company would be shipping a purchase order early to one of" RTI's customers (AC ¶ 86)—should not be credited because it is both second-hand information and not temporally linked to the Class Period.[22]

---

[18] *See In re Career Educ. Corp.*, 2006 WL 999988, at *5-6 (concluding allegations insufficient where CWs were either "employed by [defendant company] for only a portion of the Class Period" or "not employed during the Class Period" and complaint failed to "explain how these witnesses . . . were in a position to know of the allegations about which they provided statements").

[19] *See, e.g.*, AC ¶ 68 (no date for when "top executives" allegedly ordered early shipment); ¶ 69 (alleging in "one instance" FE1 was instructed to ask a client if RTI could ship early); ¶ 70 (no timeframe alleged for when "FE1 personally heard" coworker complaint about business difficulties with client based on early shipments); ¶¶ 73–74 (no dates provided for meetings that FE2 purportedly attended); and ¶¶ 84–85 (no specific timeframe for when non-party operations manager told FE3's subordinate to ship product early).

[20] *See Zerger v. Midway Games, Inc.*, 2009 WL 3380653, at *9 (N.D. Ill. Oct. 19, 2009) (granting motion to dismiss where plaintiffs "fail to plead the 'when' of Defendants' alleged fraud with enough particularity . . . to satisfy either the PSLRA or Fed. R. Civ. P. 9(b)"); *In re Career Educ. Corp.*, 2006 WL 999988, at *6 (rejecting allegations from 22 CWs because "plaintiff failed to identify the time period when any of the alleged activities at issue occurred").

[21] Most of the CW accounts describe activities at RTI that are not improper. *See, e.g.*, AC ¶¶ 68, 78, 80, 82. For example, there is nothing wrong with an employee inquiring to see if "a customer would be willing to accept an early shipment" (AC ¶ 80), or if RTI shipped products early after obtaining customer approval to do so. It would, however, be improper for RTI to ship product if the customer rejected the early shipment request. Plaintiff asks this Court to take a quantum inferential leap and to assume all of the CW allegations involve the latter unauthorized shipments, which is clearly not the case.

[22] *See In re Bally Total Fitness Sec. Litig.*, 2007 WL 551574, at *7 (N.D. Ill. Feb. 20, 2007) (concluding CW testimony insufficient where witnesses did "not claim to have firsthand knowledge of the crux of the matter"); *Davis v. SPSS, Inc.*, 431 F. Supp. 2d 823, 831-32 (N.D. Ill. 2006) ("*Davis* II") (determining that

Finally, the AC includes no well-pleaded facts to corroborate any claim that during the Class Period the Individual Defendants participated in revenue smoothing at RTI or blindly ignored any such practice by others. The AC's cross-referencing of confidential witness accounts that are each individually deficient, provides no meaningful corroboration to bolster the reliability of their allegations.[23] If the revenue smoothing practice at RTI was as pervasive as Plaintiff would like this Court to believe, and the Individual Defendants were active participants in that practice, there should be other corroborating evidence documenting the practice and their role in it. The lack of such corroborating facts further undercuts the reliability of the confidential witness accounts.

Whether considered individually or as a whole, the CW allegations fail to demonstrate that RTI engaged in a revenue smoothing scheme during the Class Period or that the Individual Defendants were aware that lower-level employees sometimes shipped product without obtaining the OEM customers' affirmative approval.[24]

## II.    THE AC FAILS TO DEMONSTRATE A STRONG INFERENCE OF SCIENTER

The AC should also be dismissed for the independent reason that it fails to demonstrate the requisite scienter to state a claim for securities fraud. To satisfy the stringent scienter standard, Plaintiff must plead *with particularity* facts giving rise to a *strong inference* that, at the time each of the Challenged Statements was made, each Individual Defendant either knew it was false or he

---

"information witnesses received second- or third-hand is insufficient to establish its reliability" and refusing to credit CW allegations that were not fixed in time).

[23] *See Davis II*, 431 F. Supp. 2d at 831 ("[V]ague assertions by one [CW] corroborated by vague assertions by another are still insufficient."); *In re Supreme Indus., Inc. Sec. Litig.*, 2018 WL 2364931, at *10 (N.D. Ind. May 23, 2018) (discounting CW allegations where "there is no corroboration by other sources").

[24] *See In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) (dismissing securities fraud case based on nondisclosure of anticompetitive scheme because complaint included "nothing more than conclusory allegations that an anticompetitive scheme existed" and failed to allege specific facts to establish predicate scheme).

recklessly disregarded a substantial risk of that possibility.[25] *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018). The Court's inquiry into whether a complaint gives rise to a strong inference of scienter is "inherently comparative"; it "will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.*, 551 U.S. at 314.

### A. Plaintiff Does Not Allege Any Cogent Motive For Fraud

Plaintiff's failure to allege a cogent motive for the Individual Defendants' alleged involvement in the purported fraud speaks volumes.[26] According to the AC, the only motivation for the purported fraud that allegedly provided any personal benefit to the Individual Defendants was the $44,444 Mr. Singer supposedly received from sale of 11,450 of the more than 570,000 RTI shares he held at the time.[27] AC ¶¶ 29, 252–53. This makes no sense.[28] Plaintiff's theory seems to be that four professionals risked their livelihoods and reputations to carry out a fraud over four years in which they received no personal benefit, all so that Mr. Singer, who later joined RTI, could sell a tiny fraction of his RTI stock. This preposterous theory does not satisfy Plaintiff's scienter burden.

---

[25] "Recklessness is highly unreasonable conduct beyond simple or even inexcusable negligence that represents an extreme departure from the standards of ordinary care, such that its danger is either known to the defendant or so obvious that the defendant must have been aware of it." *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 712 (N.D. Ill. 2005) ("*Davis* I"). Simply "[a]lleging that a defendant should have known about fraud is not enough to show that the defendant was reckless." *In re Chicago Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 435 F. Supp. 3d 845, 861 (N.D. Ill. 2020).

[26] *See In re Chicago Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 390 F. Supp. 3d 916, 933–34 (N.D. Ill. 2019) (no scienter unless plaintiff can show defendant "benefitted in some concrete and personal way from the purported fraud") (quotation omitted).

[27] The sales, which occurred two days apart on February 26 and 28, 2020, were disclosed in a Form 4 filed with the SEC and amount to just two percent of Mr. Singer's RTI holdings at the time. *See* Ex. 9.

[28] Although, as discussed earlier, the AC alleges in conclusory fashion that the fraud was supposedly perpetrated so that RTI could hit unidentified quarterly targets, it fails altogether to allege whether those targets were actually met or, if they were, how any of the Individual Defendants personally benefitted.

1. Individual Defendants' Stock Holdings Show They Had a Motive Not to Commit Fraud

If, as Plaintiff suggests, the Individual Defendants were truly motivated to commit fraud, logic suggests that they would have cashed in on the fraud by selling all or large portions of their personal holdings of RTI stock at supposedly artificially inflated prices. But there are no allegations in the AC that any Individual Defendant other than Mr. Singer sold a single share of RTI stock during the Class Period.[29] This "*absence* of sales by [the other Individual Defendants] who would have been in the know (had news of the fraud reached [upper management]) implies that nothing was thought to be out of the ordinary" and no fraud was afoot. *Higginbotham v. Baxter Int'l, Inc*., 495 F.3d 753, 759 (7th Cir. 2007). In fact, the Individual Defendants collectively *increased* their RTI stock holdings by 37% during the Class Period.[30] This increase in holdings

---

[29] The lack of context in the AC for the two cited stock sales by Mr. Singer is fatal to Plaintiff's claim that they demonstrate scienter. Without information regarding Mr. Singer's prior trading practices, the Court cannot determine if the cited sales were "suspicious" or "dramatically out of line with his prior trading practices" to demonstrate fraudulent intent. *See Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 955-56 (N.D. Ill. 2003) (quotation omitted). Courts uniformly hold that barebones allegations, like those in the AC, regarding "individual stock sales are insufficient to show scienter without specific facts demonstrating whether the sales represented a significant portion of any individual's holdings or they sold more than they typically would." *Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc*., 2018 WL 4616356, at *8 (N.D. Ill. Sept. 26, 2018); *see also Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 941 (7th Cir. 2018) (finding that alleged stock sales by individual defendants were insufficient to support strong inference of scienter where complaint was devoid of necessary particulars for a determination as to whether those sales were unusual or suspicious in context). Given that the two cited sales, which amounted to only two percent of Mr. Singer's total RTI stock holdings at the time, were not suspicious as a matter of law, it is not surprising that the AC fails to include the necessary context regarding Mr. Singer's stock transactions. *See, e.g.*, *In re Supreme Indus., Inc. Sec. Litig.*, 2019 WL 1436022, at *11 (N.D. Ind. Mar. 29, 2019) (sale of 10% of holdings not suspicious).

[30] *See* Ex. 10 at 1 (Chart of Individual Defendants' Beneficial Ownership) (showing that the Individual Defendants held over 1.57 million shares collectively at the beginning of the Class Period and approximately 2.2 million shares at the end of the Class Period). In ruling on this Motion, the Court may consider information in publicly-filed Form 4s. *See Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, 2011 WL 1303387, at *13 (N.D. Ill. Mar. 31. 2011) (taking judicial notice of Form 4s filed during class period where the complaint included a table with all of the insiders' stock sales during the class period).

shows that the Individual Defendants had much to lose if the value of RTI's stock fell and consequently had a strong motivation *not* to engage in fraud.[31]

### 2. Stock Sales to Pay Tax Obligations Are Not Indicative of Fraudulent Intent

Contrary to the allegations in the AC, Mr. Singer did not pocket any cash from the two cited stock sales. In fact, conspicuously absent from the AC is the public disclosure at the time explaining the purely nonculpable purpose for those transactions—namely, to pay Mr. Singer's tax obligations arising from the vesting of restricted stock previously awarded to him.[32] Courts have squarely held that the surrender of shares for tax purposes do not support an inference of scienter.[33] Thus, the AC has not sufficiently alleged that either Mr. Singer, or any of the other Individual Defendants, all of whom retained large stock holdings in RTI, had any motivation to participate in, or condone, any alleged fraud at RTI.[34]

---

[31] *See In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 1001 (E.D. Wis. 2009) (finding no scienter because defendants "actually increased personal holdings during the class period"); *City of Austin Police Ret. Sys.*, 388 F. Supp. 2d at 951 ("The fact that all [defendants] retained significant holdings also weighs against any inference of scienter."); *see also Pugh*, 521 F.3d at 695 (no scienter because defendants "stood to lose a lot of money if the value of [the company]'s stock fell").

[32] *See* Ex. 9 (footnote explaining that "[s]hares withheld by RTI . . . to satisfy the withholding obligation in connection with the vesting of previously awarded restricted stock"). Under federal income tax rules, an employee receiving restricted stock is taxed when the stock vests (*i.e.*, when the restrictions expire). *See generally* I.R.C. § 83. Rather than pay the tax with cash, employees often choose to withhold a certain number of shares at vesting to cover their tax obligation per the terms of their restricted stock agreement. That is what Mr. Singer chose to do so. Thus, the transactions were not even open market "sales" because RTI simply kept a certain number of shares to cover the tax withholding obligation.

[33] *See, e.g.*, *Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 182 (5th Cir. 2019) ("Selling shares to pay taxes weighs against a nefarious motive."); *Hammerstone NV, Inc. v. Hoffman*, 2010 WL 882887, at *10 (S.D.N.Y. Mar. 10, 2010) (insider's sale of less than 10% of his shares for tax purposes "not sufficiently unusual to demonstrate motive"); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (insider's sales of stock for tax purposes "insufficient to carry [Plaintiff's] burden" of pleading scienter).

[34] *See Davis* I, 385 F. Supp. 2d at 715 (finding scienter not "most reasonable inference" because "[i]f [insiders] were acting in concert to inflate [company's] stock price and increase their personal wealth, why would [one of them] hold on to stock that he allegedly knew would fall from its inflated price?").

## B.    Confidential Witness Accounts Do Not Demonstrate Scienter

In addition to failing to show a credible motive for the alleged fraud, the AC is devoid of any reliable first-hand accounts establishing that any Individual Defendant acted with fraudulent intent.[35] As explained above, the confidential witnesses had no purported first-hand contact with any of the Individual Defendants. In fact, three of the CWs (FE1, FE2 and FE4) left their stated employment *before* Messrs. Farhat and Singer even joined RTI, so they have absolutely no basis for any reliable commentary on the state of mind of these executives during the Class Period. This absence of first-hand contact, coupled with the confidential witnesses' lack of employment during any or most of the Class Period, renders their accounts meaningless in the scienter analysis.[36]

## C.    Plaintiff's Core Operations Allegations Do Not Weigh In Favor of Scienter

Plaintiff asserts that, because the OEM business was RTI's "core" business and it accounted for the "largest portion" of RTI's "overall revenue" this Court can *assume* that the Individual Defendants knew OEM revenue was improperly recognized early during the Class Period. AC ¶ 240–41. Plaintiff is wrong.

Under the "core operations" theory, "[o]fficers of a company can be assumed to know of facts critical to a business' core operations" such as the company's general financial condition and the overall demand for its major products.[37] However, simply invoking a company's core

---

[35] The AC lumps the Individual Defendants together and fails to set forth individualized allegations as to the purported state of mind of each Defendant. This, alone, is grounds for its dismissal. *See Pugh*, 521 F.3d at 693.

[36] *See In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 247-48 (8th Cir. 2008) (concluding CW's "allegations give rise to no strong inference of scienter" where allegations concerned pre-Class period activity); *see also Wade v. Wellpoint, Inc.*, 740 F. Supp. 2d 994, 1009-10 (S.D. Ind. 2010) (holding complaint failed to allege scienter where "vast majority" of the 19 CWs had "nothing to say regarding any specific Defendant's knowledge").

[37] *Fryman v. Atlas Fin. Holdings, Inc.*, 2020 WL 2735366, at *10 (N.D. Ill. May 26, 2020) (quotation omitted); *see also Tellabs*, 513 F.3d at 709 (assuming officers were aware of decreasing demand for company's two major products and, as a result, finding they acted with scienter in making repeated

operations in a complaint is not enough. "[A] strong inference of scienter may [] be credited where it is *almost inconceivable* that an individual defendant would be unaware of the matters at issue."[38]

Here, Plaintiff seeks to extend the core operations theory beyond its reasonable bounds. As a preliminary matter, contrary to Plaintiff's characterization of RTI's Direct business as non-core, the facts show that the Company's Direct business accounted for the majority of RTI's revenue during the Class Period (approximately 60%), while OEM sales generated the remaining 40% of revenue. Ex. 1 at 43; AC ¶ 41. Moreover, it is not reasonable to assume—as Plaintiff does—that upper-level executives at RTI would be aware of the timing of each shipment within the OEM business (which was split between operations in Florida and Michigan), or that such knowledge would trigger any concerns given that OEM customers sometimes asked for shipments to be accelerated. *See* Ex. 1 at 12 (explaining that "[i]n many instances, the OEM customers requested . . . the early shipments"). While it may be appropriate for the Court to assume under the core operations theory that the Individual Defendants knew about normal components of RTI's OEM operations, the atypical revenue recognition issues do not fall into that category and they are not properly imputed to the Individual Defendants under any such theory.[39]

---

contradictory statements that demand for the products was strong); *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1029 (N.D. Ill. 2010) (inferring that CEO was aware of company's financial troubles and that his public statements about the company's financial health were misleading).

[38] *Jones*, 701 F. Supp. 2d at 1029 (emphasis added) (quotation omitted); *see also Kohl's Corp.*, 895 F.3d at 937 (acknowledging core operations doctrine but declin[ing] to take" a "simplistic approach" by assuming it supported an inference of scienter and instead looking at allegations "holistically" to determine that such an inference was not warranted).

[39] *See Kohl's Corp.*, 895 F.3d at 937, 939 (affirming dismissal for lack of scienter and refusing to impute knowledge of atypical improper accounting practices that occurred in core part of company's business where complaint "lack[ed] connective tissue" to show why the executives' failure to discover the accounting issues was more than simply negligent but, instead, reckless); *see also In re Supreme Ind., Inc. Sec. Litig.*, 2018 WL 2364931, at *9 (assuming that officers were aware of sales shortfalls and backlogs in corporation's core business but determining that plaintiff failed to connect the dots to explain how such knowledge demonstrated necessary scienter).

## D. Neither the Restatement Nor the Deficient Internal Controls Support a Strong Showing of Scienter

The fact that RTI restated its financial statements and had to improve its internal controls does not, without more, support an inference that the Individual Defendants acted with scienter. A "restatement itself does not create an inference of wrongdoing." *Davis v. SPSS, Inc*., 385 F. Supp. 2d 697, 713 (N.D. Ill. 2005) ("*Davis* I")*.* This is because restatements "provide[] no assistance in determining the intent behind the [alleged] misstatements." *Id.* The same is true of an admission that it internal controls were deficient, which is common in financial restatements.[40]

Plaintiff suggests that RTI's "internal controls and the defective corporate culture further support a strong inference that Defendants acted with the requisite scienter." AC ¶ 249. There is, however, no factual basis in the AC to support the unwarranted inference that anyone, much less the Individual Defendants, intentionally implemented weak internal controls at RTI. The fact that, on occasion, some lower level employees at RTI shipped products early without first obtaining the customer's authorization says nothing about any Individual Defendants' state of mind, and it certainly does not show that the Individual Defendants knew the internal controls were so weak that they increased the risk of fraud at RTI.

Nor does the AC identify any precipitous margin change, unusual financial result or other red flag that a Defendant either knew about, but deliberately disregarded, or that was so obvious it would have tipped off a vigilant executive during the Class Period to the later-identified issues at RTI.[41] In fact, the financials that were later restated were not so out of line with prior Company

---

[40] *Roth v. OfficeMax, Inc*., 527 F. Supp. 2d 791, 801 (N.D. Ill. 2007) ("An allegation that defendants should have known about internal control deficiencies based on nothing more than later acknowledgment of such weaknesses amounts to pleading fraud by hindsight.").

[41] *See, e.g.*, *Roth*, 527 F. Supp. 2d at 801–02 (holding that "should have known" statements regarding internal controls "insufficient to draw any inference, much less a compelling one, of scienter").

results to have triggered any reasonable suspicion about their accuracy when reported.[42] The Restatement reported relatively unremarkable revenue adjustments that had an insignificant overall quantitative effect on the Company's annual revenues and did not change any previously reported annual net profit to a net loss. *See* Ex. 1 at Explanatory Note (reporting increases of 1.1% and .28%, respectively, in RTI's annual revenues for 2016 and 2017 and a .17% decrease in 2018). These relatively minor adjustments arising from legitimate revenue that was recognized too early, support, at most, an inference of mismanagement and accounting errors, but not the "admi[ssion] to . . . fraudulent revenue recognition practices" (AC ¶ 5) and scienter that Plaintiff suggests.[43]

Plaintiff also contends that the Individual Defendants should be held liable for securities fraud because they "set a 'tone at the top' and cultural environment" that prioritized "hitting RTI's quarterly revenue targets" over accurate financial reporting. *See* AC ¶ 245. But Plaintiff fails to explain why pushing employees to achieve revenue targets—perfectly reasonable behavior in a company that strives to generate profits for its shareholders—supports an inference that the executives knew, during the Class Period, that the Company's financial statements were false.[44]

---

[42] *See Davis* I, 385 F. Supp. 2d at 713 ("Where the financial revisions are not unusually large, plaintiffs have more of an uphill battle in establishing scienter."); *see also In re Newell Rubbermaid Inc. Sec. Litig.*, 2000 WL 1705279, at *9 (N.D. Ill. Nov. 14, 2000) (recognizing plaintiffs' failure to explain how a reasonable investor "would have been at all affected by some slight shifting of revenues between years").

[43] *See, e.g., In re Bally Total Fitness Sec. Litig.*, 2006 WL 3714708, at *8 (N.D. Ill. July 12, 2006) (holding that restatement demonstrated mistakes rather than scienter because, among other things, revenues were not consistently overstated in earlier financials but were also understated in some quarters); *Davis* I, 385 F. Supp. 2d at 709 (ruling that "understatement of revenue amounting to less than 0.3% of [company's] restated revenue . . . leads one to infer not that [company] purposely manipulated its financials, but that reporting errors occurred").

[44] *See Higginbotham*, 495 F.3d at 759-60 (dismissing claim that defendants "knew" at time challenged statements were made, but failed to disclose to investors, that financial controls at its subsidiary were inadequate when hindsight gleaned from later report associated with restatement was only basis of the proposed inference); *In re Career Educ. Corp. Sec. Litig.*, 2007 WL 1029092, at *8 (N.D. Ill. Mar. 29, 2007) (determining that even "defendants' pressure on employees to meet financial and business goals does not establish an inference that defendants knew that any of their public statements were fraudulent"), *vacated pursuant to settlement*, 2008 WL 8666579 (N.D. Ill. June 26, 2008); *In re Bally Total Fitness Sec.*

## E.    No Scienter Based on RTI's Accounting Policies or Scope of Alleged Fraud

Plaintiff asks this Court to infer that because RTI's revenue recognition policy is supposedly "straightforward" and the purported revenue smoothing practice required "coordinated acts" by multiple employees over several years, it was reckless for the Individual Defendants to have made the Challenged Statements because they must have known about the alleged wrongdoing. No such inference is warranted from the record evidence before this Court.[45]

The fact that Deloitte issued clean audit opinions for all RTI financial statements that were later restated and did not uncover the revenue recognition issues while conducting those audits, belies any inference that the issues were so obvious that the Individual Defendants must have known about them during the Class Period.[46] And regardless of whether RTI's revenue recognition policy was "straightforward," the AC alleges "no facts to draw the conclusion that [D]efendants recognized red flags and ignored them before releasing the [challenged] statements."[47]

The leadership change at RTI demonstrates the implausibility of Plaintiff's theory, which posits that different management groups worked in unison and sequentially to commit fraud. In

_____

*Litig.*, 2006 WL 3714708, at *6-7 (granting motions to dismiss and reasoning that audit committee's finding that individual defendants were "responsible for a culture of aggressive accounting" were "essentially of negligence, but not scienter").

[45] Plaintiff is also wrong that the SOX certifications signed by the Individual Defendants show they acted with scienter. AC ¶ 251. This is because the Individual Defendants' "signature[s] on the SEC filings and Sarbanes Oxley certifications" do "not suffice to allege scienter without allegations that . . . [the Defendants were] . . . aware of the material weaknesses in its internal controls over financial reporting at the time [they] signed those statements or that such weaknesses were obvious." *Roth*, 527 F. Supp. 2d at 804; *see also Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 266 F. Supp. 3d 1154, 1167 (E.D. Wis. 2017) (explaining that crediting SOX certifications that later proved inaccurate as indicative of an intent to defraud would "eviscerat[e]" pleading requirements for scienter).

[46] *See Phillips v. Harvest Nat. Res., Inc.*, 2016 WL 4523849, at *3 (S.D. Tex. Aug. 25, 2016) ("That a major accounting firm approved the filings shows that the errors were not so obvious that their publication demonstrates an intent to defraud investors.").

[47] *Davis* I, 385 F. Supp. 2d at 713; *see also Kohl's Corp.*, 895 F.3d at 937 (holding that plaintiff must include factual allegations demonstrating why it was at least "reckless, rather than just negligent, that [the defendants] did not realize that something was amiss").

other words, Plaintiff believes Messrs. Hutchison and Jordheim started a fraudulent revenue smoothing scheme and then, midway through the Class Period, they left RTI and handed off that scheme to Messrs. Farhat and Singer, who agreed to carry it forward when they joined RTI. Such a scenario is not plausible, particularly where, as here, Plaintiff has articulated no purported motive for any of the Individual Defendants to have engaged in fraud in the first instance.

### F. Episodic Company Reviews Are Not Indicative of Recklessness

Plaintiff suggests that the Individual Defendants must have learned of the early revenue recognition through two episodic reviews: a strategic review that was designed to "look for additional ways to adapt to [a] changing industry and health care paradigm" and identify additional opportunities to increase stockholder value; and a review associated with RTI's adoption of a new accounting standard, ASC 606, on January 1, 2018.[48] This is an unwarranted conclusion, unsubstantiated by well-plead facts, that should not be credited.

To have even been in the position to uncover the revenue recognition issues (without any guarantee of discovery), the Individual Defendants would have needed to review the revenue recognized in each quarter, trace the revenue streams back to particular OEM purchase orders with specific customers, examine the agreed-upon delivery dates in the purchase orders and any other agreed-upon delivery windows for those customers, review shipping records to determine when the products were shipped and ensure that they were received by the customers within the agreed-

---

[48] AC ¶¶ 243, 254. Under ASC 606 "revenue is recognized when control of promised goods or services are transferred to a customer at an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services." Ex. 4 at 66; AC ¶ 169. This new standard did not affect the timing of revenue recognition for most of the Company's contracts. However, in a few cases, where RTI agreed to manufacture "safety stock" of product inventory to ensure customer demand could be met, the customer was deemed to have control of the products when they were manufactured so, under ASC 606, RTI could recognize revenue then. The ASC 606 review was designed to identify those atypical contracts for which revenue could be recognized at the time of manufacturing, not the contracts at issue here for which revenue was to be recognized at the time of shipping.

upon windows. But there are no well-plead facts in the AC to suggest that either review involved this type of granular deep dive into OEM contractual minutiae and shipping records or, for that matter, that any of the Individual Defendants personally participated in either of those reviews.[49] Accordingly, Plaintiff has failed to explain how any of the Individual Defendants was supposedly aware of any information gleaned from those reviews. Moreover, the unsubstantiated inference advanced by Plaintiff—that accounting errors and revenue timing issues that had gone undetected for years by Deloitte, whose primary responsibility was to conduct in depth audits at RTI, was uncovered by such episodic reviews focused on entirely other issues—is wholly unwarranted.[50] Thus, whether considered individually or in the aggregate, Plaintiff's allegations fail to demonstrate the requisite scienter.[51] *See In re Career Educ. Corp.*, 2007 WL 1029092, at *10 ("[A]ggregating all of plaintiffs' insufficient allegations does not add up to more than their sum.").

### G. The AC's Allegations Support A More Compelling Non-Culpable Inference

Having no credible motive or any factual allegations demonstrating that the Defendants knowingly or recklessly made any false statements, the AC's allegations support a more plausible non-culpable inference—that there was, at most, "negligent oversight of overzealous accounting

---

[49] In fact, neither Mr. Farhat nor Mr. Singer was employed at RTI when the strategic review was conducted.

[50] Plaintiff erroneously suggests that a quote from each of Mr. Singer and Mr. Farhat somehow demonstrates their scienter. However, Mr. Farhat's touting of the OEM business as "serving []leading medical technology companies under long-term high margin contracts" (AC ¶ 241) says nothing about whether he acted with fraudulent indent. And Mr. Singer's statement that "there's always a certain element of delivery window with the OEM customers that come into play at the end of the quarter" (AC ¶ 241) simply recognized the Company's flexibility in meeting customer demand and shipping product early, or on short notice, when asked to do so by its customers. These quotes say nothing about Mr. Farhat's or Mr. Singer's supposed knowledge that the Company's financial statements were inaccurate or that some lower level employee might have shipped product earlier than within a delivery window without customer approval to do so.

[51] With regard to RTI, Plaintiff can demonstrate corporate scienter only by showing that one of the Individual Defendants or someone else who was responsible for making the Challenged Statements, acted with the requisite fraudulent intent. *See Pugh*, 521 F.3d at 698 (affirming no corporate scienter where the plaintiffs "fail[ed] to establish the primary liability of any individual defendant"); *Tellabs Inc.*, 513 F.3d at 707-08. There has been no such showing to demonstrate scienter on the part of RTI.

staff or some other breakdown lower in the corporate hierarchy [at RTI]," rather than any fraudulent intent to deceive by any Defendant.[52]

The Individual Defendants *increased* their holdings in RTI shares during the Class Period, so they had every reason *not* to engage in a fraud that could harm the Company's share price. And they had no reason to doubt the veracity of RTI's financial statements or the effectiveness of its internal controls because year-after-year Deloitte issued unqualified opinions certifying the accuracy of RTI's financials and the effectiveness of its internal controls.[53] Moreover, in light of the relatively insignificant quantitative impact of the accounting adjustments on RTI's key financial metrics, it is simply not plausible that the Individual Defendants would embark on a years-long fraudulent scheme to achieve so little.[54]

Finally, the post-Class Period actions of Mr. Farhat, Mr. Singer and the Company undermine any inference of scienter. The Company voluntarily initiated the months-long and wide-ranging Internal Investigation, announced it to the public, engaged independent forensic and legal

---

[52] *See Kohl's Corp.*, 895 F.3d at 939, 941 (affirming dismissal of securities fraud action against corporation and two of its executives involving restatement of several years of financial statements due to recurring lease accounting issues, announcement that material weaknesses in company's internal controls allowed the accounting errors to go unnoticed and insider stock sales, but no alleged facts demonstrating that the issues resulted from an intent to defraud rather than "careless mistakes at the management level").

[53] *See Pension Tr. Fund for Operating Eng'rs*, 266 F. Supp. 3d at 1168 (failure to allege auditor expressed concern undermines inference of fraudulent intent); *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) (auditor's unqualified opinions support inference of lack of scienter).

[54] *In re Allscripts, Inc. Sec. Litig.*, 2001 WL 743411, at *11 (N.D. Ill. June 29, 2001) (concluding "[t]he small magnitude of the error, the Company's prompt acknowledgement of the error, and the fact that the revenue was ultimately realized all militate against an inference of scienter").

advisors to assist, expanded the scope as necessary, and caused RTI to issue the Restatement.[55]

*See* AC ¶ 217. These actions reflect responsible corporate governance, not a fraud cover-up.[56]

## III.    NO CLAIM FOR CONTROL PERSON LIABILITY UNDER SECTION 20(a)

The AC fails to state a control person claim under Section 20(a) of the Exchange Act because, where, as here, there is no primary violation under Section 10(b), there can be no control person liability under Section 20(a). *See Pugh*, 521 F.3d at 693.

## CONCLUSION

For all of the foregoing reasons, Defendants RTI and Messrs. Farhat and Singer respectfully request that the Court enter an order dismissing the AC in its entirety.

Dated: October 15, 2020                          Respectfully Submitted,

By: */s/* Martin G. Durkin
**HOLLAND & KNIGHT LLP**
Martin G. Durkin
martin.durkin@hklaw.com
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
T: 312.263.3600
F: 312.578.6666

---

[55] *See, e.g.*, *Stark Trading & Shepherd Inv. Int'l v. Falconbridge Ltd.*, 2008 WL 153542, at *10 (E.D. Wis. Jan. 14, 2008) ("If the defendants possessed a fraudulent intent and arguably were aware of any errors, . . . the most reasonable response from the defendants would have been silence.").

[56] Many of the Challenged Statements are opinions (AC ¶¶ 96–98, 108, 119, 130, 138, 140, 143, 155, 164, 166, 170, 178, 184, 187, 194, 198, 202, 207, 210, 215) about the effectiveness of RTI's internal controls or the accuracy of its financial statements. These opinions are nonactionable because, among other things, the AC is devoid of the necessary factual allegations showing that the opinion falsely described the speaker's own state of mind. *See Omnicare, Inc. v. Laborers Dist. Counsel Constr. Indus. Pension Fund*, 575 U.S. 175, 184–87 (2015). Other Challenged Statements (AC ¶¶ 93, 103, 160, 169, 193, 199, 200, 212) are likewise not actionable because the AC fails to sufficiently allege why they were either false or material. For example, many of these statements simply recite the Company's revenue recognition standards disclosed in SEC filings, including that "revenue is recognized upon shipping," but Plaintiff fails to explain how those statements were false where there is no dispute that RTI recognized revenue when goods were shipped. *See* AC ¶ 93. Moreover, Plaintiff has failed to sufficiently explain how the Challenged Statements reporting financial results amount to material misstatements where the re-allocation from the Restatement had an insignificant overall quantitative effect on the Company's key metrics. *See Davis* II, 431 F. Supp. 2d at 832 (rejecting claim that allegedly fraudulent sales which allowed company "to meet its revenue targets" were material where plaintiffs "failed to allege factual support for their claim of materiality").

Louise McAlpin*
louise.mcalpin@hklaw.com
Stephen P. Warren*
stephen.warren@hklaw.com
Allison Kernisky*
allison.kernisky@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
T: 305.374.8500
F: 305.789.7799

* Admitted *pro hac vice*

*Counsel for Defendant RTI Surgical
Holdings, Inc., Camille I. Farhat, and
Jonathon M. Singer*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 15, 2020, I electronically filed the foregoing document using the ECF System for the United States District Court for the Northern District of Illinois. Notice of this filing will be sent by operation of the Court's electronic filing system to all counsel of record in this matter registered on the ECF system.

*/s/ Martin G. Durkin*
Martin G. Durkin