# EXHIBIT 3

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, DC 20549**

———————————

# FORM 10-K

———————————

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2016**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____.**

**Commission file number: 0-31271**

———————————

# RTI SURGICAL, INC.
**(Exact Name of Registrant as Specified in Its Charter)**

———————————

| | |
|---|---|
| **Delaware** | **59-3466543** |
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification No.)** |

**11621 Research Circle, Alachua, Florida 32615**
**(Address of Principal Executive Offices) (Zip Code)**

**(386) 418-8888**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| | |
|---|---|
| **Common Stock, $0.001 par value** | **The NASDAQ Stock Market LLC** |
| **(Title of Each Class)** | **(Name of Each Exchange on Which Registered)** |

**Securities registered pursuant to Section 12(g) of the Act:**

**None**

———————————

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that registrant was required to submit and post such files.)   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See definition of "accelerated filer", "large accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | |
|---|---|---|
| Large accelerated filer   ☐ | Accelerated filer | ☒ |
| Non-accelerated filer   ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.):   Yes ☐   No ☒

The aggregate market value of the Common Stock held by non-affiliates of the registrant, based upon the last sale price of the Common Stock reported on the Nasdaq Stock Market as of the last business day of the registrant's most recently completed second fiscal quarter (June 30, 2016), was approximately $208.3 million.

The number of shares of Common Stock outstanding as of March 3, 2017 was 58,462,397.

**DOCUMENTS INCORPORATED BY REFERENCE**

As stated in Part III of this Annual Report on Form 10-K, portions of the registrant's definitive proxy statement for the registrant's 2017 Annual Meeting of Stockholders are incorporated by reference in Part III of this Annual Report on Form 10-K.

**Table of Contents**

**RTI SURGICAL, INC.**

**FORM 10-K Annual Report**
**Table of Contents**

|  |  |  | Page |
|---|---|---|---|
| Part I |  |  |  |
| Item 1 | Business |  | 1 |
|  |  | Company Overview | 1 |
|  |  | Corporate Information | 2 |
|  |  | Industry Overview | 2 |
|  |  | Marketing and Distribution | 3 |
|  |  | The BioCleanse® Tissue Sterilization Solution | 5 |
|  |  | The TUTOPLAST® Tissue Sterilization Solution | 5 |
|  |  | CANCELLE® SP DBM sterilization processes | 5 |
|  |  | Tissue Recovery | 5 |
|  |  | Research and Development | 6 |
|  |  | Intellectual Property | 6 |
|  |  | Competition | 7 |
|  |  | Government Regulation and Corporate Compliance | 7 |
|  |  | Environmental | 10 |
|  |  | Employees | 11 |
|  |  | Available Information | 11 |
| Item 1A | Risk Factors |  | 12 |
| Item 1B | Unresolved Staff Comments |  | 22 |
| Item 2 | Properties |  | 22 |
| Item 3 | Legal Proceedings |  | 23 |
| Item 4 | Mine Safety Disclosures |  | 23 |
| Part II |  |  |  |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities |  | 24 |
| Item 6 | Selected Financial Data |  | 26 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations |  | 28 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk |  | 42 |
| Item 8 | Financial Statements and Supplementary Data |  | 42 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure |  | 42 |
| Item 9A | Controls and Procedures |  | 42 |
| Item 9B | Other Information |  | 43 |
| Part III |  |  |  |
| Item 10 | Directors, Executive Officers and Corporate Governance |  | 44 |
| Item 11 | Executive Compensation |  | 44 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters |  | 44 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence |  | 44 |
| Item 14 | Principal Accounting Fees and Services |  | 44 |
| Part IV |  |  |  |
| Item 15 | Exhibits and Financial Statement Schedules |  | 45 |
|  | Index to Consolidated Financial Statements |  | 46 |

Table of Contents

## PART I

*This Annual Report on Form 10-K and the documents incorporated by reference contain forward-looking statements that have been made pursuant to the provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements are based on current expectations, estimates and projections about our industry, our management's beliefs and certain assumptions made by our management. Words such as "anticipates," "expects," "intends," "plans," "believes," "seeks," "estimates," "requires," "hopes," "may," "will," "assumes," variations of such words and similar expressions are intended to identify such forward-looking statements. Do not unduly rely on forward-looking statements. These statements give our expectations about future performance, but are not guarantees of future performance and are subject to certain risks, uncertainties and assumptions that are difficult to predict; therefore, actual results may differ materially from those expressed or forecasted in any such forward-looking statements. Some of the matters described below in the "Risk Factors" section constitute cautionary statements which identify factors regarding these forward-looking statements, including certain risks and uncertainties that could cause actual results to vary materially from the future results indicated in these forward-looking statements. Other factors could also cause actual results to vary materially from the future results indicated in such forward-looking statements. Forward-looking statements speak only as of the date they are made, and unless required by law, we undertake no obligation to update publicly any forward-looking statements, whether as a result of new information, future events or otherwise.*

**Item 1.     BUSINESS.**

**Company Overview**

We are a leader in the use of natural tissues, metals and synthetics to produce orthopedic and other surgical implants that repair and promote the natural healing of human bone and other human tissues and improve surgical outcomes. We process donated human musculoskeletal and other tissue, including bone, cartilage, tendon, ligament, fascia lata, pericardium, sclera and dermal tissue, and bovine and porcine animal tissue in producing allograft and xenograft implants utilizing proprietary BIOCLEANSE®, TUTOPLAST® and CANCELLE® SP sterilization processes and manufacture metal and synthetic implants for distribution to hospitals and surgeons. We process tissue at two facilities in Alachua, Florida and one facility in Neunkirchen, Germany, and manufacture metal and synthetic implants in Marquette, Michigan and Greenville, North Carolina. We distribute our implants and services in all 50 states and in over 45 countries worldwide.

We distribute human tissue, bovine and porcine animal tissue, metal and synthetic implants through various distribution channels. We operate in one reportable segment composed of six lines of business. Effective January 1, 2016, the reporting of our lines of business is composed primarily of six categories: spine; sports medicine and orthopedics; surgical specialties; cardiothoracic; international; and global commercial. Our previous lines of business were: spine; ortho fixation; sports medicine; bone graft substitutes and general orthopedic; dental; and surgical specialties. The prior year comparable revenue information has been restated to conform to the current year presentation. We believe that the change in the reporting of our lines of business will facilitate a better understanding of our lines of business and align more closely with the end markets in which we compete. Discrete financial information is not available for these six lines of business. The following table presents revenues from these six categories and other revenues and their respective percentages of our total revenues for the years ended December 31, 2016, 2015 and 2014:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | | **2015** | | **2014** | |
| | (In thousands) | | | | | |
| Revenues: | | | | | | |
| Spine | $ 73,907 | 27.1% | $ 57,983 | 20.5% | $ 52,270 | 19.9% |
| Sports medicine and orthopedics | 50,143 | 18.4% | 50,712 | 18.0% | 48,975 | 18.6% |
| Surgical specialties | 4,466 | 1.6% | 3,029 | 1.1% | 1,631 | 0.6% |
| Cardiothoracic | 11,147 | 4.1% | 8,699 | 3.1% | 6,997 | 2.7% |
| International | 21,185 | 7.8% | 18,338 | 6.5% | 20,327 | 7.7% |
| Subtotal direct | 160,848 | 59.0% | 138,761 | 49.2% | 130,200 | 49.5% |
| Global commercial | 99,127 | 36.3% | 129,930 | 46.0% | 120,910 | 46.0% |
| Other revenues | 12,890 | 4.7% | 13,602 | 4.8% | 11,700 | 4.5% |
| Total revenues | $272,865 | 100.0% | $282,293 | 100.0% | $262,810 | 100.0% |
| Domestic revenues | $247,756 | 90.8% | $260,387 | 92.2% | $238,936 | 90.9% |
| International revenues | 25,109 | 9.2% | 21,906 | 7.8% | 23,874 | 9.1% |
| Total revenues | $272,865 | 100.0% | $282,293 | 100.0% | $262,810 | 100.0% |

1

Table of Contents

For additional financial information concerning our operating performance, please refer to Management's Discussion and Analysis of Financial Condition and Results of Operations in Part II, Item 7 of this report and our Consolidated Financial Statements in Part II, Item 8 of this report.

## Corporate Information

We were incorporated in 1997 in Florida as a wholly-owned subsidiary of the University of Florida Tissue Bank, ("UFTB"). We began operations on February 12, 1998 when UFTB contributed to us its allograft processing operations, related equipment and technologies, distribution arrangements, research and development activities and certain other assets. At the time of our initial public offering in August 2000, we reincorporated in the State of Delaware. In July 2013, we completed our acquisition of Pioneer Surgical Technology, Inc. ("Pioneer") and, in connection with the acquisition, changed our name from RTI Biologics, Inc. to RTI Surgical, Inc. The results of Pioneer's operations have been included in our consolidated financial statements since the date of acquisition. Our principal offices are located at 11621 Research Circle, Alachua, Florida, and our phone number is (386) 418-8888.

## Industry Overview

Defects in bone and other human tissue can be caused by a variety of sources including trauma, congenital defects, aging, revision of joint replacements, infectious disease, cancer and other similar conditions. The predominant method used to repair injured or defective tissue is surgical intervention, primarily through the use of surgical implants. When considering a surgical procedure for tissue repair, surgeons and patients have a number of treatment options including:

- metals and synthetics;

- "xenograft" tissue from an animal source;

- "autograft" tissue from the patient; and

- "allograft" tissue from another human donor.

Depending on the specific surgery, surgeons may elect to use any number of these treatment options. We offer a broad line of metal, synthetic, xenograft and allograft solutions to meet their needs.

### *Metals and Synthetics*

The medical community has used metal and synthetic materials for implant procedures for many years. Metal and synthetic technologies are used to create both surgical implants as well as instruments used in surgical procedures. These implants are used in a variety of procedures in spine, cardiothoracic, trauma and other areas. Typical metals used include surgical stainless steel and titanium. These materials are chosen for their strength and durability. Synthetic implants provide alternative implant options for surgeons and also increase availability due to the variable supply of xenograft, autograft and allograft. One common example of a synthetic material is polyetheretherketone ("PEEK").

2

Table of Contents

### Xenograft Tissue

Xenograft tissue-based implants are common in many areas of medicine including cardiac and vascular procedures, soft tissue repair and wound care. Xenograft based implants are also used in the repair of bone defects in orthopedic surgery as carriers for demineralized bone matrix and bone morphogenic protein products. The production of xenograft implants involves recovering animal tissue, typically from cattle (bovine) or pigs (porcine), processing and sterilization, and then transplanting the xenograft implant into a human patient.

### Autograft and Allograft Tissue

Many surgeons use autograft and allograft tissue in their surgical procedures to take advantage of their natural characteristics. Autograft procedures involve a surgeon harvesting tissue from one part of a patient's body for transplant to another part of the body. Allograft tissues are recovered from cadaveric donors, processed for certain intended uses and then transplanted by a surgeon into the patient's body to make the needed repair.

Autograft and allograft bone implants are not only "osteoconductive," meaning they provide a scaffold for new bone to attach itself to, but can be "osteoinductive" as well, meaning they stimulate the growth of new tissue.

A significant drawback to autograft procedures is that they require an additional surgery to recover the tissue from a second site in the patient's body. Often in autograft procedures, the site where the patient's tissue is harvested becomes painful and uncomfortable, and can take longer to heal than the primary surgical site. Additional complications can involve infection, nerve and arterial injury and joint instability. Moreover, a patient may not have sufficient quantities of quality autograft tissue for transplant procedures.

## Marketing and Distribution

We market and distribute our implants through direct sales channels and non-exclusive commercial distributors. Our implants are used in the following markets: spine, sports medicine, orthobiologics, trauma, dental, and surgical specialties. Our implants range from metals, synthetics, allografts and xenografts that are precision machined for specific surgical applications to grafts conventionally processed for general surgical uses.

### Direct Channels

### Spine

The human spine consists of four regions: cervical (neck region), thoracic (back region attached to the ribs), Lumbar (lower back), and sacral (tail bone). We design, manufacture, and distribute surgical implants, instruments, and biologics used in the treatment of conditions affecting the spine caused by degenerative conditions, deformities or traumatic injury. Our principle implant offering includes a wide variety of systems comprised of components such as spine screws and rods, spinal spacers, plates, and various biologics offerings all designed to enhance and promote spinal fusion. Our principal implant offering by market segment are as follows:

- *Thoracolumbar*: Streamline® TL Spinal Fixation System, Quantum® Spinal Fixation System, Streamline® MIS Spinal Fixation System, MIS Fusion™ Instrumentation, Contact® Anterior Lumbar Plate System

- *Cervical*: Streamline® Posterior Cervical Spinal Fixation System, Slimfuse® Anterior Cervical Plate System, Aspect® Anterior Cervical Plate System

- *Lateral*: Clarity® Retractor System, Lat-Fuse™ Lateral Plate System

- *Interbody*: C Plus™ PEEK IBF System, Bullet™ PEEK IBF System, Cross-Fuse II® PEEK VBR/IBF System

- *Biologics*: map3® cellular allogeneic bone graft and the BioSet® DBM, BioReady® DBM, and BioAdapt® DBM families of paste implants

- *Synthetics*: nanOss® advanced bone graft substitute

3

Table of Contents

Our map3® cellular allogeneic bone graft is a natural and safe alternative to autograft that supports the body's innate healing mechanisms and provides the scaffold and signals to support the bone healing process. The implant contains three essential elements of bone formation, namely osteogenesis, osteoinduction and osteoconduction.

Our nanOss® advanced bone graft substitute is composed of nano-structured hydroxyapatite granules suspended in a porous gelatin-based foam matrix.

### Sports medicine and orthopedics

Many repetitive use and sports-related injuries can be addressed with allograft implants. The most prevalent surgeries in the knee include repairs to the anterior cruciate ligament ("ACL"), articular cartilage repair, and meniscus transplantation. The most prevalent surgeries in the shoulder include rotator cuff repair and articular cartilage repair. Our principal sports medicine allografts are tendons for ligament reconstruction, fresh osteochondral grafts for cartilage repair, and our meniscal allografts for advanced meniscus injuries. Many of our sports medicine tendon allografts utilize our patented pre-shaped technology, which greatly reduces preparation time in the operating room and are generally easier to implant as compared to non pre-shaped allografts. We also distribute Matrix HD human dermis implants for wound repair and soft tissue augmentation and map3® cellular allogeneic bone graft for foot and ankle repair.

### Surgical Specialties

We market and distribute implants for abdominal wall repair, and plastic and reconstructive surgery. These implants are processed through our validated Tutoplast tissue sterilization process, which has a proven track record of safety and performance. Principal products include Cortiva human dermis, Fortiva porcine dermis and Tutopatch and Tutomesh bovine pericardium.

### Cardiothoracic

We provide surgeons cardiothoracic cable, plating systems and a biologic implant. Cardiothoracic hardware implants offer increased stability and rigidity for sternal closures, ranging from routine closures to complex, high-risk closures. The cardiothoracic biologic implant reinforces soft tissue where weakness exists in general, as well as for repair of pericardial structures.

### International

Internationally we market and distribute our products through a direct distribution organization and a network of independent distributors.

### Commercial Channels

We also market and distribute our implants through relationships with commercial distributors.

Our spine interbody allograft impants are marketed and distributed domestically through our non-exclusive relationships with Aesculap Implant Systems, Inc. ("Aesculap"), Integra Life Sciences Corporation ("Integra"), Medtronic, PLC ("Medtronic"), Orthofix International NV ("Orthofix"), Stryker Spine, a division of Stryker Corporation ("Stryker"), and Zimmer Biomet Holdings, Inc. ("Zimmer").

Our allograft paste implants are marketed and distributed under Puros® DBM by Zimmer, the Opteform® brand with Exactech, Inc. ("Exactech"). DBM Boat implants are marketed under BIO DBM by Stryker.

Our surgical specialty implants are marketed and distributed through distributors including: Integra for dural repair applications; Davol, Inc., a subsidiary of C. R. Bard, Inc. ("Davol") for hernia repair and breast reconstruction; IOP, Inc. ("IOP") for ophthalmology and Coloplast A/S of Denmark ("Coloplast") for urology.

Our allograft dental implants including cancellous and cortical bone and human and bovine membranes primarily for dental procedures related to augmenting ridge restoration are distributed exclusively by Zimmer.

Our trauma implants are distributed through Zimmer and DePuy Synthes ("Synthes"), a Johnson & Johnson Inc. subsidiary.

4

**Table of Contents**

**The BIOCLEANSE® Tissue Sterilization Process**

We have developed and utilized in the United States the patented BIOCLEANSE® tissue sterilization process, which is an automated, pharmaceutical grade chemical sterilization process for musculoskeletal bone and certain soft tissue. This process is fully validated to kill or inactivate all classes of conventional pathogens, viruses, microbes, bacteria and fungi. Our BIOCLEANSE® process is able to remove greater than 99% of the blood, fats, lipids and other unwanted materials from the tissue we process. An important element of the BIOCLEANSE® process is that while it removes unwanted materials embedded within the tissue, it maintains the tissue's structural integrity and compression strength. Studies have shown that bone tissue sterilized with the BIOCLEANSE® process maintains the same compression strength as untreated tissue.

The BIOCLEANSE® process has been reviewed by the U.S. Food and Drug Administration ("FDA") which concluded that BIOCLEANSE® was a validated tissue sterilization process demonstrated to prevent contamination of tissue grafts. The significance of the review is that we are not aware of any other tissue sterilization process related to human tissue in our industry that has been reviewed or approved by the FDA. The FDA does not have a formal approval process in place for tissue related processing techniques.

**The TUTOPLAST® Tissue Sterilization Process**

The TUTOPLAST® tissue sterilization process utilizes solvent dehydration and chemical inactivation to remove blood, lipids and extraneous materials, and inactivate viruses and break down RNA and DNA into fragments not capable of replication and disease transmission while preserving the biological and mechanical properties.

We apply the TUTOPLAST® process to two types of preserved allografts: soft tissue, consisting of fascia lata, pericardium, dermis, sclera and cornea; and bone tissue, consisting of various configurations of cancellous and cortical bone material. Processed pericardium, fascia lata and dermis are collagenous tissue used to repair, replace or line native connective tissue primarily in dental, ophthalmology, urology, plastic and reconstructive surgeries. Dermis is also used in hernia repair and pelvic floor reconstruction. Sclera and cornea are used in ophthalmology procedures such as anterior and posterior segment patch grafting applications for glaucoma, retina and trauma surgery and oculoplastics, as well as contour wrapping of an orbital implant. Processed cortical and cancellous bone material is used in a wide variety of applications in spine, orthopedic and dental surgeries.

**The CANCELLE® SP DBM Sterilization Process**

DBM-based pastes and putties are sterilized through the CANCELLE® SP process, which is designed to preserve protein activity. In their final form, the DBM implants serve as bone void fillers in many applications, including spinal, general orthopedic, joint reconstruction and dental surgeries.

CANCELLE® SP is a proprietary process that sterilizes DBM pastes and putties while simultaneously allowing them to maintain their osteoinductive ("OI") potential, which is verified by 100 percent lot testing after sterilization. The determination of OI potential is made by lot release animal studies or testing for certain protein markers. These tests are not necessarily predictive of human clinical results. Through a combination of oxidative treatments and acid or alcohol washes, debris is removed and pathogens are inactivated. Cleansing rinses remove residual chemicals, maintaining biocompatibility and preserving the utility of the graft. The CANCELLE® SP irradiation dose is delivered terminally for most pastes and putties to achieve device-level sterility ("SAL $10^{-6}$").

**Tissue Recovery**

Tissue recovery is the actual removal of tissue from a donor after legal authorization has been obtained. Authorization is obtained by the tissue recovery group. We operate certain tissue recovery groups directly, and contract with other independent FDA registered tissue recovery groups which specialize in this activity. Tissue recovery personnel aseptically recover musculoskeletal tissue within 24 hours following a donor's death, using surgical instruments and sterile techniques similar to those used in hospitals for routine surgery. Recovered tissue is placed on wet or dry ice and then transported by the donor recovery agency to the tissue processor or possibly a research institution.

Under U.S. law, human tissue cannot be bought and sold. However, the law permits the recovery of reasonable payments for the provision of certain services, such as those involved in recovering, processing and storing tissue and related to the advancement of tissue processing technologies; all types of activities in which we are involved.

5

Table of Contents

Donor recovery groups recover a variety of tissue types from donors including the fibula, femur, tibia, humerus, ilium, pericardium, fascia lata, dermis, bone marrow, sclera, tendons and ligaments. In addition to tissue received from recovery groups we control, we also receive donated tissue through contractual relationships with other FDA registered tissue recovery organizations. These contracted tissue recovery organizations are responsible for obtaining appropriate authorization and conducting federally-mandated donor screening, such as a medical and social history interview with the next of kin with each donor evaluated against current acceptance criteria prior to donor tissue being sent to our processing facility. Upon receipt of the tissue, we conduct pre-processing donor screening to determine its medical suitability for transplantation. Pre-processing screening performed by us includes laboratory testing and a donor eligibility assessment. With respect to laboratory testing, we perform an extensive panel of serological and microbiological tests using Clinical Laboratory Improvements Amendment ("CLIA") approved laboratories and FDA test kits. These results are subject to stringent criteria in order to release the donor tissue to the processing stage.

We have relationships with tissue donor recovery agencies across the United States. We also have relationships outside the United States. We believe additional recovery group relationships would be available if needed and consequently that the loss of any one of our sources of donor tissue would not have a material impact on our operating results.

We continue to develop new xenograft tissue implants. Implants processed from xenograft tissue are regulated by the FDA as devices and require approval or licenses from the FDA prior to marketing in the United States. The sources of our bovine animal tissues are regulated closed herds. We believe the continued development of our xenograft implants will help us meet unmet demand for certain allografts and also allow us to develop new biological implants that cannot currently be made due to structural limitations of human tissue.

## Research and Development

Our research and development ("R&D") costs for the years ended December 31, 2016, 2015 and 2014 were $16.1 million, $15.1 million and $15.5 million, respectively. In 2016, we continued to invest in our R&D efforts by funding new projects including research and development projects at our facilities in our US locations and in Neunkirchen, Germany.

We plan to continue to develop new implants and technologies within our current markets, and to develop additional technologies for other markets to address unmet clinical needs. We plan to do this by building on our core technology platforms: BIOCLEANSE®, TUTOPLAST®, CANCELLE® SP, precision machining, assembled grafts, tissue-mediated osteoinduction and our metal and synthetics design and production expertise. We operate a dedicated research team working on advanced technologies, and have embedded development/technical teams who work with the business/marketing teams focused on expanding the scope and scale of existing competencies such as tissue machining and sterilization, and metal and synthetics manufacturing to meet specific surgical needs. This approach has resulted in the development of core science platforms, a pipeline of concepts for development and marketing, and focused projects to meet immediate needs.

In 2016, we launched 11 new implants and product enhancements in spine, ortho fixation, and BGS and general orthopedics developed by our research and development teams.

## Intellectual Property

Our business depends upon the significant know-how and proprietary technology we have developed. To protect this know-how and proprietary technology, we rely on a combination of trade secret laws, patents, licenses, trademarks and confidentiality agreements. The effect of these intellectual property rights is to define zones of exclusive use of the covered intellectual property. The duration of patent rights generally is 20 years from the date of filing of priority application, while trademarks, once registered, are essentially perpetual. Our trademarks and service marks provide us and our implants with a certain amount of brand recognition in our markets. However, we do not consider any single patent, trademark or service mark material to our business strategy, financial condition or results of operations. We have also entered into exclusive and non-exclusive licenses relating to a wide array of third-party technologies. In addition, we rely on our substantial body of know-how, including proprietary tissue recovery techniques and processes, research and development, tissue processing and quality assurance.

Our proprietary BIOCLEANSE®, TUTOPLAST® and CANCELLE® SP sterilization processes are covered by one or more U.S. and/or foreign patents, patent applications or trade secrets. Other U.S. and foreign holdings include, without limitation, patents, patent applications or trade secrets relating to or covering certain precision machined allograft intervertebral spacers and other spinal implants; matrix compositions including various bone graft substitutes; membrane tissue implants; and ligament, tendon or meniscus reconstruction and repair with certain precision shaped and/or assembled bone and soft tissue implants, synthetic bone graft substitutes; interbody fusion and motion implants; spinal and orthopedic plates; spinal rods, cables and screws and spinal fixation systems and related instrumentation.

6

Table of Contents

The medical device industry is characterized by the existence of a large number of patents and frequent litigation based on allegations of patent infringement. As the number of entrants into our market increases, the risk of an infringement claim against us, as well as the risk of a third party infringing on our patents, grows. While we attempt to ensure that our implants and methods do not infringe other parties' patents and proprietary rights, our competitors may assert that our implants, and the methods we employ, are covered by patents held by them. In addition, our competitors may assert that future implants and methods we may employ infringe their patents. If third parties claim that we infringe upon their intellectual property rights, we may incur liabilities and costs and may have to redesign or discontinue selling the affected implant. Even if we were to prevail, any litigation could be costly and time-consuming and would divert the attention of our management and key personnel from our business operations. We have in the past been, and may in the future be, involved in litigation relating to our intellectual property.

## Competition

Competition in the medical implant industry is intense and subject to rapid technological change and evolving industry requirements and standards. Companies within the industry compete on the basis of design of related instrumentation, efficacy of implants, relationships with the surgical community, depth of range of implants, scientific and clinical results and pricing.

Our principal competitors in the conventional allograft market include the Musculoskeletal Transplant Foundation ("MTF"), AlloSource Inc., LifeCell, Inc., a subsidiary of Allergan PLC and LifeNet Health, Inc. ("LifeNet"). Among our competitors in precision machined allograft are MTF, LifeNet and AlloSource. Other companies who process and distribute allograft pastes include Medtronic, AlloSource, Integra LifeSciences Holdings Corp. ("Integra"), Wright Medical Inc. and MTF. Companies who process and distribute xenograft tissue include Baxter, Inc., LifeCell, Cook Surgical and Medtronic.

We consider our principal competitors in the metal and synthetic markets to include Alphatec Holdings Inc. ("Alphatec"), Globus Medical Group, Inc. ("Globus"), K2M Group Holdings Inc. ("K2"), NuVasive, Inc. ("NuVasive") and Orthofix International NV ("Orthofix").

## Government Regulation and Corporate Compliance

### *Government Regulation*

Government regulation plays a significant role in the processing/manufacturing and distribution of allograft tissue implants and medical devices. We procure, where applicable, process/manufacture, and market our allograft tissue implants and medical devices worldwide. Although some standards of harmonization exist, each country in which we do business has its own specific regulatory requirements. These requirements are dynamic in nature and, as such, are continually changing. New regulations may be promulgated at any time and with limited notice. While we believe that we are in compliance with all existing pertinent international and domestic laws and regulations, there can be no assurance that changes in governmental administrations and regulations will not adversely affect our operations. Failure to comply with applicable requirements could result in fines, injunctions, civil penalties, recall or seizure of products, suspension of production, inability to market current products, criminal prosecution, and/or refusal of the government to authorize the marketing of new products.

In the United States, our allograft implants are regulated by the FDA under Title 21 of the Code of Federal Regulations (CFR), Parts 1270 and 1271, "Current Good Tissue Practice for Human Cell, Tissue, and Cellular and Tissue-Based Products" ("cGTPs"). Xenograft tissues and allograft bone paste are regulated as medical devices and subject to FDA 21 CFR, Part 820 Current Good Manufacturing Practices (GMPs) for Medical Devices and related statutes from the FDA. In addition, our U.S. operation is subject to certain state and local regulations, as well as compliance to the standards of the tissue bank industry's accrediting organization, the American Association of Tissue Banks ("AATB").

In Germany, allografts are classified as drugs and the German government regulates such implants in accordance with German Drug Law. On April 7, 2004, the European Commission issued a human tissue directive to regulate allografts within the European Union ("EU"). Our Neunkirchen facility is presently licensed by the German Health Authorities and in compliance with applicable international laws and regulations, allowing us to market our human and animal tissue implants globally.

The FDA and international regulatory bodies conduct periodic compliance inspections of both our U.S. and our German processing facilities. All operations are registered with the U.S. FDA Center for Devices and Radiological Health ("CDRH") for device manufacturing locations and Center for Biologics Evaluation and Research ("CBER") for human

7

**Table of Contents**

tissue recovery, processing and distribution locations and are certified to ISO 13485:2003. The Alachua facility is also accredited by the AATB and is licensed in the states of Florida, New York, California, Maryland, Delaware and Illinois. The Neunkirchen facility is registered with the German Health Authority ("BfArM") as a pharmaceutical and medical device manufacturer and is subject to German drug law. We believe that worldwide regulation of allografts and xenografts is likely to intensify as the international regulatory community focuses on the growing demand for these implants and the attendant safety and efficacy issues of citizen recipients.

We currently market and distribute allografts that are subject to the FDA's "Human Tissue Intended for Transplantation" and "Human Cells, Tissues, and Cellular and Tissue-Based Products" regulations. Under these regulations, we are required to perform donor screening and infectious disease testing and to document this screening and testing for each donor from whom we process tissue, and to process tissues in compliance with cGTP. The FDA has authority under the rules to inspect human tissue processing facilities, and to detain, recall, or destroy tissues for which appropriate documentation and evidence of compliance is not available. We are not required to obtain pre-market approval or clearance from the FDA for allografts that meet the regulation's definition of "human tissue."

The FDA may regulate certain allografts as medical devices, drugs, or biologics, which would require that we obtain approval or product licensure from the FDA. This would occur in those cases where the allograft is deemed to have been "more than minimally manipulated or indicated for non-homologous use." In general, "homologous use" occurs when tissue is used for the same basic function that it fulfilled in the donor. The definitional criteria for making these determinations appear in the FDA's rules. If the FDA decides that certain of our current or future allografts are more than minimally manipulated or indicated for non-homologous use, it would require licensure, approval or clearances of those allografts. Allografts requiring such pre-market review are subject to pervasive and continuing regulation by the FDA. We would be required to list these allografts as a drug, as a medical device, or as a biologic, and to manufacture them in specifically registered or licensed facilities in accordance with FDA regulation "Current Good Manufacturing Practices". We would also be subject to post-marketing surveillance and reporting requirements. In addition, our manufacturing facilities and processes would be subject to periodic inspection to assess compliance with cGMPs. Our labeling and promotional activities would be subject to scrutiny by the FDA and, in certain instances, by the Federal Trade Commission. The export of drugs, devices and biologics is also subject to more intensive regulation than is the case for human tissue implants.

Our research, development and clinical programs, as well as our manufacturing and marketing operations, are subject to extensive regulation in the United States and other countries. Most notably, all of our implants sold in the United States are subject to the federal Food, Drug, and Cosmetic Act and the Public Health Services Act as implemented and enforced by the FDA. The regulations that cover our implants and facilities vary widely based on implant type and classification both in the United States, and from country to country. The amount of time required to obtain approvals or clearances from regulatory authorities also differs from country to country.

Unless an exemption applies, each medical device that we wish to commercially distribute in the United States will be covered by either premarket notification ("510(k)") clearance or approval of a premarket approval application ("PMA") from the FDA. The FDA classifies medical devices into one of three classes. Devices deemed to pose lower risks are placed in either class I or II, which typically requires the manufacturer to submit to the FDA a premarket notification requesting permission to commercially distribute the device. This process is generally known as 510(k) clearance. Some low risk devices are exempted from this requirement. Devices deemed by the FDA to pose the greatest risks, such as life-sustaining, life-supporting or implantable devices, or devices deemed not substantially equivalent to a previously cleared 510(k) device, are placed in class III, requiring approval through the lengthy PMA process. Manufacturers of most class II medical devices are required to obtain 510(k) clearance prior to marketing their devices. To obtain 510(k) clearance, a company must submit a premarket notification demonstrating that the proposed device is "substantially equivalent" in intended use and in technological and performance characteristics to another legally marketed 510 (k)-cleared "predicate device." By regulation, the FDA is required to clear or deny a 510(k) premarket notification within 90 days of submission of the application. As a practical matter, clearance may take longer. The FDA may require further information, including clinical data, to make a determination regarding substantial equivalence. After a device receives 510(k) clearance, any modification that could significantly affect its safety or effectiveness, or that would constitute a major change in its intended use, requires a new 510(k) clearance or could require a PMA approval.

Class III medical devices are required to undergo the PMA approval process in which the manufacturer must establish the safety and effectiveness of the device to the FDA's satisfaction. A PMA application must provide extensive preclinical and clinical trial data and also information about the device and its components regarding, among other things, device design, manufacturing and labeling. Also during the review period, an advisory panel of experts from outside the FDA may be convened to review and evaluate the application and provide recommendations to the FDA as to the

8

Table of Contents

approvability of the device. In addition, the FDA will typically conduct a preapproval inspection of the manufacturing facility to ensure compliance with quality system regulations. FDA reviews of PMA applications, generally can take between one and three years, or longer.

The medical devices that we develop, manufacture, distribute and market are subject to rigorous regulation by the FDA and numerous other federal, state and foreign governmental authorities. The process of obtaining FDA clearance and other regulatory approvals to develop and market a medical device, particularly from the FDA, can be costly and time-consuming, and there can be no assurance that such approvals will be granted on a timely basis, if at all. While we believe that we have obtained all necessary clearances and approvals for the manufacture and sale of our implants and that they are in material compliance with applicable FDA and other material regulatory requirements, there can be no assurance that we will be able to continue such compliance. After a device is placed on the market, numerous regulatory requirements continue to apply. Those regulatory requirements include: product listing and establishment registration; Quality System Regulation ("QSR") which requires manufacturers, including third-party manufacturers, to follow stringent design, testing, control, documentation and other quality assurance procedures during all aspects of the manufacturing process; labeling regulations (including unique device identification ("UDI") requirements) and FDA prohibitions against the promotion of products for uncleared, unapproved or off-label uses or indications; clearance of product modifications that could significantly affect safety or efficacy or that would constitute a major change in intended use of one of our cleared devices; approval of product modifications that affect the safety or effectiveness of one of our PMA approved devices; Medical Device Reporting regulations, which require that manufacturers report to FDA if their device may have caused or contributed to a death or serious injury, or has malfunctioned in a way that would likely cause or contribute to a death or serious injury if the malfunction of the device or a similar device were to recur; post-approval restrictions or conditions, including post-approval study commitments; post-market surveillance regulations, which apply when necessary to protect the public health or to provide additional safety and effectiveness data for the device; the FDA's recall authority, whereby it can ask, or under certain conditions order, device manufacturers to recall from the market a product that is in violation of governing laws and regulations; regulations pertaining to voluntary recalls; and notices of corrections or removals.

We and certain of our suppliers also are subject to announced and unannounced inspections by the FDA to determine our compliance with FDA's QSR and other regulations. If the FDA were to find that we or certain of our suppliers have failed to comply with applicable regulations, the agency could institute a wide variety of enforcement actions, ranging from a public warning letter to more severe sanctions such as: fines and civil penalties against us, our officers, our employees or our suppliers; unanticipated expenditures to address or defend such actions; delays in clearing or approving, or refusal to clear or approve, our products; withdrawal or suspension of approval of our products or those of our third-party suppliers by the FDA or other regulatory bodies; product recall or seizure; interruption of production; operating restrictions; injunctions; and criminal prosecution. Moreover, governmental authorities outside the United States have become increasingly stringent in their regulation of medical devices, and our products may become subject to more rigorous regulation by non-U.S. governmental authorities in the future. U.S. or non-U.S. government regulations may be imposed in the future that may have a material adverse effect on our business and operations. The European Union has nationally transposed regulations based on the European Commission ("EC") Medical Device Directives for the control of medical devices with which manufacturers must comply. Under these directives, manufacturing plants must have received CE certification from a "notified body" in order to be able to sell products within the member states of the European Union. Certification allows manufacturers to stamp the products of certified plants with a "CE" mark. Products covered by the EC directives that do not bear the CE mark cannot be sold or distributed within the European Union. We have received certification for all currently existing manufacturing facilities and products.

Our products may be reimbursed by third-party payers, such as government programs, including Medicare, Medicaid, and Tricare or private insurance plans and healthcare networks. Third-party payers may deny reimbursement if they determine that a device provided to a patient or used in a procedure does not meet applicable payment criteria or if the policy holder's healthcare insurance benefits are limited. Also, third-party payers are increasingly challenging the medical necessity and prices paid for our products and services.

Civil False Claims Act and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as well as numerous state laws, regulate healthcare and insurance. These laws are enforced by the Office of Inspector General within the U.S. Department of Health and Human Services, the U.S. Department of Justice, and other federal, state and local agencies. Among other things, these laws and others generally: (1) prohibit the provision of anything of value in exchange for the referral of patients for, or the purchase, order, or recommendation of, any item or service reimbursed by a federal healthcare program, (including Medicare and Medicaid); (2) require that claims for payment submitted to federal healthcare programs be truthful; (3) prohibit the transmission of protected healthcare information to persons not authorized to receive that information; and (4) require the maintenance of certain government licenses and permits.

9

Table of Contents

In addition, U.S. federal and state laws protect the confidentiality of certain health information, in particular individually identifiable information such as medical records and restrict the use and disclosure of that protected information. At the federal level, the Department of Health and Human Services promulgated health information privacy and security rules under HIPAA. These rules protect health information by regulating its use and disclosure, including for research and other purposes. Failure of a HIPAA "covered entity" to comply with HIPAA regarding such "protected health information" could constitute a violation of federal law, subject to civil and criminal penalties. Covered entities include healthcare providers (including those that sell devices or equipment) that engage in particular electronic transactions, including the transmission of claims to health plans. Consequently, health information that we access, collect, analyze, and otherwise use and/or disclose includes protected health information that is subject to HIPAA. As noted above, many state laws also pertain to the confidentiality of health information. Such laws are not necessarily preempted by HIPAA, in particular those state laws that afford greater privacy protection to the individual than HIPAA. These state laws typically have their own penalty provisions, which could be applied in the event of an unlawful action affecting health information.

On September 30, 2014, we received a letter from the FDA regarding our map3® cellular allogeneic bone graft. The letter addresses some technical aspects of the processing of the map3® allograft, as well as language included on our website. We have ongoing dialogue with the FDA where comprehensive packages of data have been provided to address the FDA's comments and provide clarifying information regarding the technical components of the implant processing. We believe that in both developing and processing of map3®, we have properly considered the relevant regulatory requirements. Additionally, we have removed the relevant information from our website. We are committed to resolving the concerns raised by the FDA. However, it is not possible to predict the specific outcome or timing of a resolution at this time.

*Corporate Compliance*

We have a comprehensive compliance program. It is a fundamental policy of our company to conduct business in accordance with the highest ethical and legal standards. Our corporate compliance and ethics program is designed to promote legal compliance and ethical business practices throughout our domestic and international businesses.

Our compliance program is designed to meet U.S. Sentencing Commission Guidelines for effective organizational compliance and ethics programs and to prevent and detect violations of applicable federal, state and local laws.

Key elements of our compliance program include:

• Organizational oversight by senior-level personnel responsible for the compliance functions within our company.

• Written standards and procedures, including a Code of Business Conduct.

• Methods for communicating compliance concerns, including anonymous reporting mechanisms.

• Investigation and remediation measures to ensure prompt response to reported matters and timely corrective action.

• Compliance education and training for employees and contracted business associates such as distributors.

• Auditing and monitoring controls to promote compliance with applicable laws and assess program effectiveness.

• Oversight of interactions with healthcare professionals to ensure compliance with healthcare fraud & abuse laws, including mandated reporting of transfers of value to healthcare professionals under the Affordable Care Act.

• Disciplinary guidelines to enforce compliance and address violations.

• Screening of employees and contracted business associates.

• Risk assessments to identify areas of regulatory compliance risk.

**Environmental**

Our allografts and xenografts, as well as the chemicals used in processing natural tissues and also in the manufacturing of metal and synthetic implants, are handled and disposed of in accordance with country-specific, federal, provincial, regional, state and/or local regulations, as applicable. We contract with independent, third parties to perform all gamma irradiation of our surgical implants. In view of the engagement of a third party to perform irradiation services, the requirements for compliance with radiation hazardous waste do not apply, and therefore we do not anticipate that having any material adverse effect upon our capital expenditures, results of operations or financial condition. However, we are responsible for assuring that the service is being performed in accordance with applicable regulations.

10

Table of Contents

**Employees**

As of December 31, 2016, we had a total of 1,140 employees of which 208 were employed outside of the United States. Management believes its relations with its employees are good.

**Available Information**

Our Internet address is www.rtix.com. Information included on our website is not incorporated by reference in our Form 10-K. We make available, free of charge, on or through the investor relations portion of our website, our annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K and amendments to such reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as soon as reasonably practicable after we file such material with, or furnish it to the Securities and Exchange Commission ("SEC"). These filings are also available on the SEC's website at www.sec.gov. Also available on our website is our Corporate Governance Guidelines, our Code of Conduct, our Code of Ethics for Senior Financial Professionals, our California Compliance Program Declaration and the charters for our Audit Committee, Compensation Committee, Nominating and Governance Committee and Science and Technology Committee. Within the time period required by the SEC and Nasdaq, we will post any amendment to our Code of Ethics for our senior financial professionals and any waiver of our Code of Conduct applicable to our senior financial professionals, executive officers and directors.

11

Table of Contents

**Item 1A.     RISK FACTORS**

*An investment in our common stock involves a high degree of risk. You should consider each of the risks and uncertainties described in this section and all of the other information in this document before deciding to invest in our common stock. Any of the risk factors we describe below could severely harm our business, financial condition and results of operations. The market price of our common stock could decline if any of these risks or uncertainties develops into actual events and you may lose all or part of your investment.*

*We depend heavily upon sources of human tissue, and any failure to obtain tissue from these sources in a timely manner will interfere with our ability to process and distribute allografts.*

The supply of human tissue has at times limited our growth, and may not be sufficient to meet our future needs. In addition, due to seasonal changes in mortality rates, some scarce tissues that we currently use for allografts are at times in particularly short supply. Other factors, some of which are unpredictable, such as negative publicity and regulatory actions in the industry in which we operate (and which may not involve us) also could unexpectedly reduce the available supply of tissue.

We rely on donor recovery groups for their human tissue supplies and we have relationships with tissue donor recovery groups across the country. We also have relationships outside the United States. Donor recovery groups are part of relatively complex relationships. They provide support to donor families, are regulated by the FDA and applicable foreign equivalents, and are often affiliated with hospitals, universities or organ procurement organizations. Our relationships with donor recovery groups, which are critical to our supply of tissue, could be affected by relationships recovery groups have with other organizations. Any negative impact arising from potential regulatory and disease transmission issues facing the industry, as well as the negative publicity that these issues could create, could adversely affect our ability to negotiate contracts with recovery groups.

We cannot be sure that the supply of human tissue will continue to be available at current levels or will be sufficient to meet our needs. If we are not able to obtain tissue from current sources sufficient to meet our needs, we may not be able to locate additional replacement sources of tissue on commercially reasonable terms, if at all. Any interruption of our business caused by the need to locate additional sources of tissue could significantly impact our revenues. We expect that our revenues from allografts would decline in proportion to any decline in tissue supply.

*We depend on various third-party suppliers and, in some cases, a single third-party supplier for key raw materials and component parts, apart from human tissue, used in our tissue processing and manufacturing processes, and the loss of any of these third-party suppliers, or their inability to supply us with adequate raw materials, could harm our business.*

We use a number of raw materials in addition to human tissue, including titanium, titanium alloys, stainless steel, PEEK, PEKK, and animal tissue. We rely from time to time on a number of suppliers and, in some cases, on a single source vendor. Our dependence on single third-party suppliers, or even a limited number of third-party suppliers in certain instances, creates several risks, including limited control over pricing, availability, quality and delivery schedules. In addition, any supply interruption or cancellation in a limited or sole sourced component or raw material could materially harm our ability to manufacture our products until a new source of supply, if any, could be found. We may be unable to find a sufficient alternative supply channel in a reasonable time period or on commercially reasonable terms, if at all, which would have an adverse effect on our business, financial condition and results of operations. In addition, a change in manufactures will require qualification of the new supplier to ensure they comply with or quality standards. Delays in qualifying a new supplier or re-qualifying an existing supplier could have an adverse effect on our business, financial condition and results of operations.

*Consolidation in the healthcare industry could lead to demands for price concessions or to the exclusion of some suppliers from certain of our markets, which could have an adverse effect on our business, financial condition or results of operations.*

Numerous initiatives and reforms initiated by legislators, regulators and third-party payers to curb rising healthcare costs, in addition to other economic factors, have resulted in a consolidation trend in the healthcare industry to create new companies with greater market power, including hospitals. As the healthcare industry consolidates, competition to provide products and services to industry participants has become, and will likely continue to become, more intense. This in turn has resulted, and will likely continue to result in, greater pricing pressures and the exclusion of certain suppliers from various market segments as GPOs, independent delivery networks ("IDNs"), and large single accounts continue to use their

12

Table of Contents

market power to consolidate purchasing decisions for some of our existing and prospective customers. We expect the market demand, government regulation, and third-party reimbursement policies, among other potential factors, will continue to change the worldwide healthcare industry, resulting in further business consolidations and alliances among our customers and prospective customers, which may reduce competition among our existing and prospective customers, exert further downward pressure on the prices of our implants and may adversely impact our business, financial condition or results of operations.

*Our administrative headquarters and a majority of all of our allograft processing facilities are currently conducted in locations that may be at risk of damage from hurricanes, fire, or other natural disasters. If a natural disaster strikes our administrative headquarters or any of our other processing or manufacturing facilities, our operations may be interrupted and we may be unable to process or manufacture certain products for a substantial amount of time.*

Our administrative headquarters and a majority of all of our allograft processing facilities are located in Alachua, Florida, in an area with historical occurrences of hurricane damage and wild fires. We have taken precautions to safeguard our facilities, including obtaining property, casualty and business interruption insurance. We have also developed an information technology disaster recovery plan. However, any future natural disaster at this or our other locations could cause substantial delays in our operations, damage or destroy our facilities, equipment or inventory, and cause us to incur additional expenses. A disaster could seriously harm our business, financial condition and results of operations. Our facilities would be difficult to replace and would require substantial lead time to repair or replace. The insurance we maintain may not be adequate to cover our losses in any particular case and may not continue to be available to us on acceptable terms, or at all.

*If we fail to maintain existing strategic relationships or are unable to identify distributors of our implants, revenues may decrease.*

We currently derive a significant amount of our revenues through distributors such as Zimmer, Medtronic and Davol. In addition, our spine distributors provide nearly all of the instrumentation, surgeon training, distribution assistance and marketing materials for the lines of spinal implants that we produce and they distribute.

Variations in the timing and volume of orders by our distributors, particularly those who distribute a significant amount of our implants, may have a material effect upon our revenues. If our relationships with our distributors are terminated or reduced for any reason and we are unable to replace these relationships with other means of distribution, we could suffer a material decrease in revenues.

We may need, or decide it is otherwise advantageous to us, to obtain the assistance of additional distributors to market and distribute our new implants and technologies, as well as to market and distribute our existing implants and technologies, to new markets or geographical areas. We may not be able to find additional distributors who will agree to and are able to successfully market and distribute our implants and technologies on commercially reasonable terms, if at all. If we are unable to establish additional distribution relationships on favorable terms, our revenues may decline.

Also, our financial results are dependent upon the service efforts of our distributors. If our distributors are unsuccessful in adequately servicing our products, our sales could significantly decrease.

*If third-party payers fail to provide appropriate levels of reimbursement for the use of our implants, revenues could be adversely affected.*

The impact of United States healthcare reform legislation on our business remains uncertain. In 2010 federal legislation to reform the United States healthcare system was enacted into law. The impact of this far-reaching legislation, including Medicare provisions purportedly aimed at improving quality and decreasing costs, comparative effectiveness research, an independent payment advisory board, and pilot programs to evaluate alternative payment methodologies, could meaningfully change the way healthcare is designed and delivered. With the arrival of a new presidential administration and control of both the U.S. Senate and House of Representatives, all of which are under control of the same political party, as of yet undetermined aspects of currently enacted legislation may change. The extent of any such changes and the impact on our business is uncertain. We therefore cannot predict what other healthcare programs and regulations will be ultimately implemented at the federal or state level, or the effect of any future legislation or regulation in the United States. Amendments to, or rescissions of, existing laws and regulations, or the implementation of new ones, could meaningfully change the way healthcare is designed and delivered. Any change that lowers reimbursement for an implant, our services, or our other technologies, or that reduces medical procedure volumes, would likely adversely impact our business and results of operations.

13

Table of Contents

***If we fail to maintain the high processing standards that implants require or if we are unable to develop processing capacity as required, our commercial opportunity will be reduced or eliminated.***

Implants require careful calibration and precise, high-quality processing and/or manufacturing. Achieving precision and quality control requires skill and diligence by our personnel. If we fail to achieve and maintain these high standards, including avoiding processing and manufacturing errors, and, depending on the nature of the complaint, design defects or component failures; we could be forced to recall, withdraw or suspend distribution of our implants; our implants and technologies could fail quality assurance and performance tests; production and deliveries of our implants could be delayed or cancelled and our processing and/or manufacturing costs could increase.

Further, to be successful, we will need to manage our human tissue processing capacity related to tissue recovery and demand for our allografts. It may be difficult for us to match our processing capacity to demand due to problems related to the amount of suitable tissue, quality control and assurance, tissue availability, adequacy of control policies and procedures and lack of skilled personnel. If we are unable to process and produce our implants on a timely basis, at acceptable quality and costs, and in sufficient quantities, or if we experience unanticipated technological problems or delays in processing, it may reduce revenues, increase our cost per allograft processed or both.

***We operate in a highly regulated industry. An inability to meet current or future regulatory requirements in the U.S. or foreign jurisdictions, or any deficiencies with our manufacturing or quality systems and processes identified by regulatory agencies, could disrupt our business, subject us to regulatory action and costly litigation, damage our reputation for high quality production, cause a loss of confidence in the company and our implants and negatively impact our financial position and operating results.***

The FDA and several states have statutory authority to regulate allograft processing, including our BIOCLEANSE®, TUTOPLAST® and CANCELLE® SP processes, and allograft-based materials. We must register our facilities, whether located in the United States or elsewhere, with the FDA as well as regulators outside the U.S., and our implants must be made in a manner consistent with current good tissue practices ("cGTP") or similar standards in each jurisdiction in which we manufacture. In addition, the FDA and other agencies perform periodic audits to ensure that our facilities remain in compliance with all appropriate regulations, including primarily the quality system regulations and medical device reporting regulations. Following an inspection, an agency may issue a notice listing conditions that are believed to violate cGTP or other regulations (such as a FDA report on Form 483, Notice of Observations), or a warning letter for violations of "regulatory significance" that may result in enforcement action if not promptly and adequately corrected.

Since 2009, the FDA has significantly increased its oversight of companies subject to its regulations, including medical device companies, by hiring new investigators and stepping up inspections of manufacturing facilities. In recent years, the FDA has also significantly increased the number of warning and untitled letters issued to companies. If the FDA were to conclude that we are not in compliance with applicable laws or regulations, or that any of our implants are ineffective or pose an unreasonable health risk, the FDA could ban such implants, detain or seize adulterated or misbranded implants, order a recall, repair, replacement, or refund of such implants, refuse to grant pending premarket approval applications or require certificates of foreign governments for exports and/or require us to notify health professionals and others that the implants present unreasonable risks of substantial harm to the public health. The FDA may also impose operating restrictions, enjoin and restrain certain violations of applicable law pertaining to medical devices and assess civil or criminal penalties against our officers, employees or us. The FDA may also recommend prosecution to the Department of Justice. Any adverse regulatory action, depending on its magnitude, may restrict us from effectively marketing and selling our implants. Any inability to meet current or future regulatory requirements in the United States or foreign jurisdictions, or any deficiencies with our manufacturing or quality systems and processes identified by regulatory agencies would likely disrupt our business, subject us to regulatory action and costly litigation, damage our reputation for high quality production, cause a loss of confidence in the company and our implants and negatively impact our financial position and operating results.

If any of our allografts fall under the FDA's definitions of "more than minimally manipulated or indicated for non-homologous use," we would be required to obtain medical device approval or clearance or biologics licenses, which could require clinical testing and could result in disapproval of our license applications and restricted distribution of any of our allografts which may become subject to pre-market approval. The FDA could require post-market testing and surveillance to monitor the effects of such allografts, could restrict the commercial applications of these allografts, and could conduct periodic inspections of our facilities and our suppliers. Delays encountered during the FDA approval process could shorten the patent protection period during which we have the exclusive right to commercialize such technologies or could allow others to come to market before us with similar technologies.

14

Table of Contents

cGTP covers all stages of allograft processing, from procurement of tissue to distribution of final allografts. In addition, these regulations have a significant effect upon recovery agencies which supply us with tissue and have increased the cost of recovery activities. These increases have translated into increased costs for us, because we are expected to reimburse the recovery agencies based on their cost of recovery.

In addition to the FDA, several state agencies regulate tissue banking. Regulations issued by Florida, New York, California and Maryland are particularly relevant to our business. Most states do not currently have tissue banking regulations, but it is possible that others may make allegations against us or against donor recovery groups or tissue banks, including those with which we have relationships, about non-compliance with applicable FDA regulations or other relevant statutes and regulations. Allegations like these could cause regulators or other authorities to take investigative or other action, or could cause negative publicity for our business and the industry in which we operate.

Some of our implants contain tissue derived from animals, commonly referred to as xenografts. Xenograft implants are medical devices that are subject to pre-market approval or clearance by the FDA. We have received FDA clearance on several xenograft implants. However, we may not receive FDA approval or clearance to market new implants as we attempt to expand the quantity of xenograft implants available for distribution.

*The allograft industry is subject to additional local, state, federal and international government regulations and any increased regulations of our activities could significantly increase the cost of doing business, thereby reducing profitability.*

Some aspects of our business are subject to additional local, state, federal or international regulation. Changes in the laws or new interpretations of existing laws could negatively affect our business, revenues or prospects, and increase the costs associated with conducting our business. In particular, the procurement and transplantation of allograft tissue is subject to federal regulation under the National Organ Transplant Act ("NOTA"), a criminal statute that prohibits the purchase and sale of human organs, including bone and other tissue. NOTA permits the payment of reasonable fees associated with the transportation, processing, preservation, quality control and storage of human tissue. If NOTA were amended or interpreted in a way that made us unable to include some of these costs in the amounts we charge our customers, it could reduce our revenues and therefore negatively impact our business. It is possible that more restrictive interpretations or expansions of NOTA could be adopted which could require us to change one or more aspects of our business, at a substantial cost, in order to continue to comply with this statute.

A variety of additional local, state, federal and international government laws and regulations govern our business, including those relating to the storage, handling, generation, manufacture and disposal of medical wastes from the processing of tissue and collaborations with health care professionals. If we fail to conduct our business in compliance with these laws and regulations, we could be subject to significant liabilities for which our insurance may not be adequate. Moreover, such insurance may not always be available in the future on commercially reasonable terms, if at all. If our insurance proves to be inadequate to pay a damage award, we may not have sufficient funds to do so, which would harm our financial condition and liquidity.

*Our success depends on the continued acceptance of our surgical implants and technologies by the medical community.*

New allograft, xenograft, metal or synthetic implants, technologies or enhancements to our existing implants may never achieve broad market acceptance, which can be affected by numerous factors, including lack of clinical acceptance of implants and technologies; introduction of competitive treatment options which render implants and technologies too expensive or obsolete; lack of availability of third-party reimbursement; and difficulty training surgeons in the use of tissue implants and technologies.

Market acceptance will also depend on our ability to demonstrate that our existing and new implants and technologies are an attractive alternative to existing treatment options. Our ability to do so will depend on surgeons' evaluations of the clinical safety, efficacy, ease of use, reliability and cost-effectiveness of these treatment options and technologies. For example, we believe that some in the medical community have lingering concerns over the risk of disease transmission through the use of allografts.

15

Table of Contents

Furthermore, we believe that even if the medical community generally accepts our implants and technologies, acceptance and recommendations by influential surgeons will be important to the broad commercial success of our implants and technologies. If our implants and technologies are not broadly accepted in the marketplace, we may not remain competitive in the market.

### *Rapid technological changes could result in reduced demand for our implants and products.*

Technologies change rapidly in the industry in which we operate. For example, steady improvements have been made in synthetic human tissue substitutes which compete with our tissue implants. Unlike allografts, synthetic tissue technologies are not dependent on the availability of tissue. If one of our competitors successfully introduces synthetic technologies using recombinant technologies, which stimulate the growth of tissue surrounding an implant, it could result in a decline in demand for tissue implants. We may not be able to respond effectively to technological changes and emerging industry standards, or to successfully identify, develop or support new technologies or enhancements to existing implants in a timely and cost-effective manner, if at all. If we are unable to achieve the improvements in our implants necessary for their successful commercialization, the demand for our implants will suffer.

### *We face intense competition, which could result in reduced acceptance and demand for our implants and technologies.*

The medical technology/biotechnology industry is intensely competitive. We compete with companies in the United States and internationally that engage in the development and production of medical technologies and processes including biotechnology, orthopedic, pharmaceutical, biomaterial and other companies; academic and scientific institutions; and public and private research organizations.

Many of our competitors have much greater financial, technical, research, marketing, distribution, service and other resources than we do. Moreover, our competitors may offer a broader array of tissue repair treatment products and technologies or may have greater name recognition in the marketplace. We compete with a number of companies with significantly greater resources and brand recognition than ours. Our competitors, including several development stage companies, may develop or market technologies that are more effective or commercially attractive than our technologies, or that may render our technologies obsolete. For example, the development of a synthetic tissue implant that permits remodeling of bones could reduce the demand for allograft and xenograft-based implants and technologies.

### *If we do not manage the medical release of donor tissue into processing in an effective and efficient manner, it could adversely affect profitability.*

Many factors affect the level and timing of donor medical releases, including the effectiveness of donor screening performed by donor recovery groups, the timely receipt, recording and review of required medical documentation, and employee loss and turnover in our medical records department. We can provide no assurance that releases will occur at levels which maximize our processing efficiency and minimize our cost per allograft processed.

### *Negative publicity concerning methods of human tissue recovery and screening of donor tissue in the industry in which we operate may reduce demand for our allografts and impact the supply of available donor tissue.*

Media reports or other negative publicity concerning both methods of tissue recovery from donors and actual or potential disease transmission from donated tissue may limit widespread acceptance of our allografts, whether directed to allografts generally or our allografts specifically. Unfavorable reports of improper or illegal tissue recovery practices by any participant in the industry, both in the United States and internationally, as well as incidents of improperly processed tissue leading to transmission of disease, may broadly affect the rate of future tissue donation and market acceptance of allograft technologies.

Potential patients may not be able to distinguish our allografts, technologies and the tissue recovery and the processing procedures from those of our competitors or others engaged in tissue recovery. In addition, families of potential donors may become reluctant to agree to donate tissue to for-profit tissue processors.

### *If our patents and the other means we use to protect our intellectual property prove to be inadequate, our competitors could exploit our intellectual property to compete more effectively against us.*

The law of patents and trade secrets is constantly evolving and often involves complex legal and factual questions. The U.S. government may deny or significantly reduce the coverage we seek for our patent applications before or after a patent is issued. We cannot be sure that any particular patent for which we apply will be issued, that the scope of the patent

16

Table of Contents

protection will be comprehensive enough to provide adequate protection from competing technologies, that interference, derivation, reexamination, post-grant review or inter parties review proceedings regarding any of our patent applications will not be filed, or that we will achieve any other competitive advantage from a patent. In addition, it is possible that one or more of our patents will be held invalid or reduced in scope of claims if challenged or that others will claim rights in or ownership of our patents and other proprietary rights. If any of these events occur, our competitors may be able to use our intellectual property to compete more effectively against us.

Because patent applications remain secret until published (typically 18 months after first filing) and the publication of discoveries in the scientific or patent literature often lag behind actual discoveries, we cannot be certain that our patent application was the first application filed disclosing or potentially covering a particular invention. If another party's rights to an invention are superior to ours, we may not be able to obtain a license to use that party's invention on commercially reasonable terms, if at all. In addition, our competitors, many of which have greater resources than ours, could obtain patents that will prevent, limit or interfere with our ability to make use of our inventions either in the United States or in international markets. Further, the laws of some foreign countries do not always protect our intellectual property rights to the same extent as the laws of the United States. Litigation or regulatory proceedings in the United States or foreign countries also may be necessary to enforce our patent or other intellectual property rights or to determine the scope and validity of the proprietary rights of our competitors. These proceedings may prove unsuccessful and may also be costly, result in development delays, and divert the attention of our management.

We rely upon unpatented proprietary techniques and processes in tissue recovery, research and development, tissue processing, manufacturing and quality assurance. It is possible that others will independently develop technology similar to our technology or otherwise gain access to or disclose our proprietary technologies. We may not be able to meaningfully protect our rights in these proprietary technologies, which would reduce our ability to compete.

***Our success depends in part on our ability to operate without infringing on or misappropriating the proprietary rights of others, and if we are unable to do so we may be liable for damages.***

We cannot be certain that U.S. or foreign patents or patent applications of other companies do not exist or will not be issued that would prevent us from commercializing our allografts, xenografts, surgical implants and other technologies. Third parties may sue us for infringing or misappropriating their patent or other intellectual property rights. Intellectual property litigation is costly. If we do not prevail in litigation, in addition to any damages we might have to pay, we could be required to cease the infringing activity or obtain a license requiring us to make royalty payments. It is possible that a required license may not be available to us on commercially acceptable terms, if at all. In addition, a required license may be non-exclusive, and therefore our competitors may have access to the same technology licensed to us. If we fail to obtain a required license or are unable to design around another company's patent, we may be unable to make use of some of the affected technologies or distribute the affected allografts, xenografts or surgical implants, which would reduce our revenues.

The defense costs and settlements for patent infringement lawsuits are not covered by insurance. Patent infringement lawsuits can take years to settle. If we are not successful in our defenses or are not successful in obtaining dismissals of any such lawsuit, legal fees or settlement costs could have a material adverse effect on our results of operations and financial position.

***We or our competitors may be exposed to product or professional liability claims which could cause us to be liable for damages or cause investors to think we will be liable for similar claims in the future.***

The development of implants and technologies for human tissue repair and treatment entails an inherent risk of product or professional liability claims, and substantial product or professional liability claims may be asserted against us. We are party to a number of legal proceedings relating to professional liability. The prevailing view among the states throughout the United States is that providing allografts is a service and not the sale of a product. As such, allografts are not typically subject to product liability causes of action. However, the law of a particular state could change in response to legislative changes or by judicial interpretation in a state where such issue has either not been previously addressed or prior precedent is overturned or subject to different interpretations by a court of higher precedential authority. In addition, due to the international scope of our activities we are subject to the laws of foreign jurisdictions which may treat allografts as products in those jurisdictions.

The implantation of donated human tissue implants creates the potential for transmission of communicable diseases. Although we comply with federal, state and foreign regulations and guidelines intended to prevent communicable disease transmission, and our tissue suppliers are also required to comply with such regulations, there can be no assurances

17

Table of Contents

that: (i) our tissue suppliers will comply with such regulations intended to prevent communicable disease transmissions; (ii) even if such compliance is achieved, that our implants have not been or will not be associated with transmission of disease; or (iii) a patient otherwise infected with disease would not erroneously assert a claim that the use of our implants resulted in disease transmission.

We currently have $15 million of product and $25 million of professional liability insurance to cover claims. This amount of insurance may not be adequate for potential claims if we are not successful in our defenses. Moreover, insurance covering our business may not always be available in the future on commercially reasonable terms, if at all. If our insurance proves to be inadequate to pay a damage award, we may not have sufficient funds to do so, which would harm our financial condition and liquidity. In addition, successful product liability claims made against one of our competitors could cause claims to be made against us or expose us to a perception that we are vulnerable to similar claims. Claims against us, regardless of their merit or potential outcome, may also hurt our ability to obtain surgeon acceptance of our implants or to expand our business.

*We are subject to federal, state and foreign laws and regulations, including fraud and abuse laws, as well as anti-bribery laws, and could face substantial penalties if we fail to fully comply with such regulations and laws.*

Our relationship with foreign and domestic government entities and healthcare professionals, such as physicians, hospitals and those to whom and through whom we may market our implants and technologies, are subject to scrutiny under various federal, state and territorial laws in the United States and other jurisdictions in which we conduct business. These include, for example, anti-kickback laws, physician self-referral laws, false claims laws, criminal health care fraud laws, and anti-bribery laws (e.g., the United States Foreign Corrupt Practices Act). Violations of these laws are punishable by criminal and/or civil sanctions, including, in some instances, fines, imprisonment and, within the United States, exclusion from participation in government healthcare programs, including Medicare, Medicaid and Veterans Administration health programs. These laws are administered by, among others, the U.S. Department of Justice, the Office of Inspector General of the Department of Health and Human Services, state attorneys general, and their respective counterparts in the applicable foreign jurisdictions in which we conduct business. Many of these agencies have increased their enforcement activities with respect to medical device manufacturers in recent years.

*If we are not successful in expanding our distribution activities into international markets, we will not be able to pursue one of our strategies for increasing revenues.*

Our international distribution strategies vary by market, as well as within each country in which we operate. For example, we distribute only a portion of our line of allograft and xenograft implants within each country. Our international operations will be subject to a number of risks which may vary from the risks we face in the United States, including the need to obtain regulatory approvals in additional foreign countries before we can offer our implants and technologies for use; the potential burdens of complying with a variety of foreign laws; longer distribution-to-collection cycles, as well as difficulty in collecting accounts receivable; dependence on local distributors; limited protection of intellectual property rights; fluctuations in the values of foreign currencies; and political and economic instability.

*Security breaches, loss of data and other disruptions could compromise sensitive information related to our business, prevent us from accessing critical information or expose us to liability, which could adversely affect our business and our reputation.*

In the ordinary course of our business, we collect and store sensitive data, including patient health information, personally identifiable information about our employees, intellectual property, and proprietary business information. We manage and maintain our applications and data utilizing on-site and off-site systems. These applications and data encompass a wide variety of business critical information including research and development information, commercial information and business and financial information.

The secure processing, storage, maintenance and transmission of this critical information is vital to our operations and business strategy, and we devote significant resources to protecting such information. Although we take measures to protect sensitive information from unauthorized access or disclosure, our information technology and infrastructure may be vulnerable to attacks by hackers, viruses, breaches or interruptions due to employee error or malfeasance, terrorist attacks, hurricanes, fire, flood, other natural disasters, power loss, computer systems failure, data network failure, internet failure, or lapses in compliance with privacy and security mandates. Any such virus, breach or interruption could compromise our networks and the information stored there could be accessed by unauthorized parties, publicly disclosed, lost or stolen. We have measures in place that are designed to detect and respond to such security incidents and breaches of privacy and security mandates. Any such access, disclosure or other loss of information could result in legal claims or proceedings,

18

**Table of Contents**

liability under laws that protect the privacy of personal information, government enforcement actions and regulatory penalties. Unauthorized access, loss or dissemination could also interrupt our operations, including our ability to receive and ship orders from customers, bill our customers, provide customer support services, conduct research and development activities, process and prepare company financial information, manage various general and administrative aspects of our business and damage our reputation, any of which could adversely affect our business.

*The outcome of litigation or arbitration in which we are involved is unpredictable and an adverse decision in any such matter could adversely impact our business, financial condition or results of operations.*

We are from time to time subject to legal proceedings and claims that arise in the ordinary course of business.

An adverse resolution of lawsuits or arbitrations could adversely impact our business, financial condition or results of operations.

*Any acquisitions, strategic investments, divestures, mergers or joint ventures we make may require the issuance of a significant amount of equity or debt securities and may not be scientifically or commercially successful.*

Our long-term strategy may include identifying and acquiring, investing in or merging with suitable candidates on acceptable terms, divesting of certain business lines or activities or entering into joint ventures. In particular, over time, we may acquire, make investments in, or merge with providers of product offerings that complement our business or may terminate such activities. Mergers, acquisitions and divestitures include a number of risks and present financial, managerial and operational challenges, including but not limited to:

Further, acquisitions involve a number of operational risks, such as:

- difficulty and expense of assimilating the operations, technology and personnel of the acquired business;

- our inability to retain the management, key personnel and other employees of the acquired business;

- our inability to maintain the acquired company's relationship with customers and key third parties, such as alliance partners;

- exposure to legal claims for activities of the acquired business prior to the acquisition;

- the potential need to implement financial and other systems and add management resources;

- the potential for internal control deficiencies in the internal controls of the acquired operations;

- potential inexperience in a business area that is either new to us or more significant to us than prior to the acquisition;

- the diversion of our management's attention from our core business;

- the potential impairment of goodwill and write-off of in-process research and development costs, adversely affecting our reported results of operations; and

- increased costs to integrate or, in the case of a divestiture or joint venture, separate the technology, personnel, customer base and business practices of the acquired or divested business or assets.

Any one of these risks could prevent an acquisition, strategic investment, divesture, merger or joint venture from being scientifically or commercially successful, which could have a material impact on our results of operations, and financial condition.

*Water Street may exercise significant influence over us, including through its ability to elect up to two members of our Board of Directors.*

We issued 50,000 shares of Series A convertible preferred stock ("Preferred Stock") to WSHP Biologics Holdings, LLC, an affiliate of Water Street Healthcare Partners, a leading healthcare-focused private equity firm ("Water Street"), in connection with the closing of the Pioneer acquisition. As holders of this Preferred Stock, Water Street is entitled to vote on an as-converted basis upon all matters upon which holders of our common stock have the right to vote. The shares of Preferred Stock owned by Water Street currently represent approximately 19% of the voting rights in respect of our share capital on an as-converted basis; accordingly, Water Street has the ability to significantly influence the outcome of any matter submitted for the vote of our stockholders (also, Water Street is not prohibited from buying shares of our common stock). In addition, to the extent dividends are not paid in cash in any quarter for any reason, including any restriction on making such distributions under the terms of our credit agreement with TD Bank (as discussed below), the dividends which have accrued on each outstanding share of Preferred Stock during such three-month period are accumulated and are added to the liquidation value with respect to such share of Preferred Stock. We did not pay dividends on the Preferred Stock from the fourth quarter of 2013 through 2016. Consequently we have accrued $10.7 million in preferred dividends payable as of December 31, 2016. To the extent dividends continue to accrue on the Preferred Stock, Water Street's voting rights in respect of our share capital on an as-converted basis will continue to increase.

19

Table of Contents

Water Street may have interests that diverge from, or even conflict with, those of our other stockholders. In addition, our Amended and Restated Certificate of Incorporation and Investor Rights Agreement with Water Street provide that Water Street's consent is required before we may take certain actions for so long as Water Street and its permitted transferees beneficially own in the aggregate at least 10% of our issued share capital.

In addition, our Amended and Restated Certificate of Incorporation and our Investor Rights Agreement with Water Street provide that Water Street has the right to designate and nominate, respectively, directors to our Board of Directors such that the percentage of our board members so designated or nominated is approximately equal to Water Street's percentage equity ownership interest in the company. The maximum number of directors that Water Street is able to designate or nominate is two, with at least one of such directors to serve on each of our Board committees. If Water Street's ownership of our share capital on an as-converted basis falls below 5% (calculated on a fully diluted basis, assuming conversion of the Preferred Stock at the then-existing conversion price), Water Street would have no further director designation or nomination rights under our Amended and Restated Certificate of Incorporation or the investor rights agreement.

In addition, the ownership position and the governance rights of Water Street could discourage a third party from proposing a change of control or other strategic transaction with us.

*Our level of indebtedness could adversely affect our ability to raise additional capital to fund our operations.*

In connection with the closing of the acquisition of Pioneer, we obtained from our lenders a 5-year, $80 million senior secured facility, which includes a $60 million term loan and a $20 million revolving credit facility (which was increased to $45 million in June 2016 and decreased to $42.5 million in November 2016). Our level of indebtedness may limit our ability to react to changes in the economy or our industry and prevent us from meeting our obligations under the agreements relating to our indebtedness.

*Our ability to pay dividends and to make distributions may be limited or prohibited by the terms of our indebtedness or Preferred Stock.*

We are, and may in the future become, party to agreements and instruments that restrict or prevent the payment of dividends on our capital stock. Under the terms of our credit agreement with TD Bank, we are restricted from paying dividends on our common stock without the prior written consent of the administrative agent. We are also restricted from paying dividends or making distributions on our common stock without the prior written consent of the holders of a majority of the Preferred Stock pursuant to the terms of the Certificate of Designation of Series A Convertible Preferred Stock, so long as any shares of the Preferred Stock remain outstanding. In addition, under the terms of our credit agreement with TD Bank, distributions to holders of our Preferred Stock are permitted only to the extent that we can satisfy certain financial covenant tests (based on the ratio of our total indebtedness to consolidated EBITDA) and meet other requirements. In the event that we fail to pay the accrued dividends payable on our Preferred Stock for any reason, including any restriction on making such distributions under the terms of our credit agreement with TD Bank, dividends payable will continue to accrue on such Preferred Stock.

*Our credit agreement contains financial and operating restrictions that may limit our access to credit. If we fail to comply with financial or other covenants in our credit agreement, we may be required to repay indebtedness to our existing lenders, which may harm our liquidity.*

Provisions in our credit agreement impose restrictions on our ability to, among other things:

- merge or consolidate;

- make strategic acquisitions;

- make dispositions of property;

- create liens;

- enter into transactions with affiliates;

- become a guarantor;

- pay dividends and make distributions;

- incur more debt; and

- make investments.

Our credit agreement also contains financial covenants that require us to maintain compliance with specified financial ratios and maintain a specified amount of cash on hand.

20

**Table of Contents**

We may not be able to comply with the financial covenants in the future. In the absence of a waiver from our lenders, any failure by us to comply with these covenants in the future may result in the declaration of an event of default, which could prevent us from borrowing under our credit agreement. In addition to preventing additional borrowings under our credit agreement, an event of default, if not cured or waived, may result in the acceleration of the maturity of indebtedness outstanding, if any, under the agreement, which would require us to pay all amounts outstanding. If an event of default occurs, we may not be able to cure it within any applicable cure period, if at all. If the maturity of our indebtedness is accelerated, we then may not have sufficient funds available for repayment or the ability to borrow or obtain sufficient funds to replace the accelerated indebtedness on terms acceptable to us, or at all. For example, in December 2013, we entered into an amendment to the credit agreement which, in part, modified certain financial covenants so that we could maintain compliance with the financial ratios. In October 2014, we entered into a second amendment to the second amended and restated loan agreement with TD Bank, N.A. and Regions Bank, which amended the loan agreement to remove certain financial covenants. In June 2015, we entered into a Third Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which increased the maximum revolving credit amount from $20.0 million to $30.0 million. In June 2016, we entered into a Fourth Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which increased the maximum revolving credit amount from $30.0 million to $45.0 million. In November 2016, we entered into a Fifth Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which provided for: (i) a decrease in the maximum revolving credit amount from $45.0 million to $42.5 million; (ii) an increase in our leverage to EBITDA ratio from 2.50 to 1.00 to (A) 3.25 to 1.00 through March 31, 2017 and (B) 3.00 to 1.00 after March 31, 2017 and (iii) certain corresponding amendments. In February 2017, we entered into a Sixth Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which modified the definition of "Extraordinary Expenses" and to increase to 300 basis points the LIBOR Spread applicable when our financial performance under its Leverage Ratio is greater than 3.0x.

***Our health insurance and prescription drug coverage, along with our self-insurance reserves, may not cover future claims.***

For the health insurance year beginning January 1, 2016, we began to self-insure for our U.S. employees' medical and prescription drug insurance coverage. We are responsible for losses up to certain retention limits on both a per-claim and aggregate basis.

For policies under which we are responsible for losses, we record a liability that represents our estimated cost of claims incurred and unpaid as of the balance sheet date. Our estimated liability is not discounted and is based on a number of assumptions and factors, including historical trends and economic conditions, and is closely monitored and adjusted when warranted by changing circumstances. Fluctuating healthcare costs, severity of claims, increases in the employee population, and deviations from our expectations could affect the accuracy of estimates based on historical experience. If actual claims are greater in number and/or severity compared to what was estimated or medical costs increase beyond what was expected, our accrued liabilities might not be sufficient and we may be required to record additional expense. Unanticipated changes may produce materially different amounts of expense than that reported under these programs, which could adversely impact our operating results.

***We may be subject to suit under a state or federal whistleblower statute.***

Those who engage in business with the federal government, directly or indirectly, may be sued under a federal whistleblower statute designed to combat fraud and abuse in the healthcare industry. These lawsuits, known as qui tam suits, are authorized under certain circumstances by the False Claims Act and can involve significant monetary damages and award bounties to private plaintiffs who successfully bring these suits. If any of these lawsuits were to be brought against us, such suits combined with increased operating costs and substantial uninsured liabilities could have a material adverse effect on our financial condition and operations.

The Affordable Care Act has sought to link the violations of the Anti-Kickback Statute with violations of the False Claims Act, making it arguably easier for the government or for whistleblowers, acting in the name of the government, to sue medical manufactures under the False Claims Act.

In addition to federal whistleblower laws, various states in which we operate also have separate whistleblower laws to which we may be subject.

21

Table of Contents

***Our business could be negatively affected as a result of actions of activist stockholders, and such activism could impact the trading value of our securities.***

Responding to actions by activist stockholders can be costly and time-consuming, disrupting our operations and diverting the attention of management and our employees. Such activities could interfere with our ability to execute our strategic plan. In addition, a proxy contest for the election of directors at our annual meeting would likely require us to incur significant legal fees and proxy solicitation expenses and require significant time and attention by management and our board of directors. The perceived uncertainties as to our future direction also could affect the market price and volatility of our securities.

***The tax treatment of corporations could be subject to potential legislative, administrative or judicial changes or interpretations.***

The present federal income tax treatment of corporations may be modified by legislative, administrative or judicial changes or interpretations at any time. For example, the current administration has indicated it will propose reductions to the corporate statutory tax rate. A decline in the federal corporate tax rate may lower our tax provision expense. However, it may also significantly decrease the value of our deferred tax assets ("DTAs"), which would result in a reduction of net income in the period in which the tax change is enacted. At December 31, 2016, our net DTAs were approximately $25 million.

We are unable to predict whether any of these changes, or other proposals, will ultimately be enacted. Any such changes could materially adversely affect us.

***We are dependent on our key management and technical personnel for continued success.***

Our senior management team is concentrated in a small number of key members, and our future success depends to a meaningful extent on the services of our executive officers and other key team members, including members of our scientific staff. Generally, our executive officers and employees can terminate their employment relationship at any time. The loss of any key employees or our inability to attract or retain other qualified personnel could materially harm our business and prospects.

Effective succession planning is important to our long-term success. In December 2016, Brian K. Hutchison retired consistent with the transition plan previously announced by us and Robert Jordheim assumed the position of interim Chief Executive Officer. In January 2017, we announced that Camille Farhat would be appointed Chief Executive Officer effective March 15, 2017. Additionally, we are in the process of the reorganization of our business, as part of our ongoing business transformation, which has resulted in a number of additional leadership changes. Disruptions in the transition or reorganization could have a material adverse effect on our business, results of operations, and financial condition and could adversely affect our ability to attract and retain other key executives.

Competition for qualified leadership and scientific personnel in our industry is intense, and we compete for leadership and scientific personnel with other companies that have greater financial and other resources than we do. Our future success will depend in large part on our ability to attract, retain, and motivate highly qualified leadership and scientific personnel, and there can be no assurance that we are able to do so. Any difficulty in hiring or retaining needed personnel, or increased costs related thereto, could have a material adverse effect on our business, results of operations, and financial condition.

**Item 1B.     UNRESOLVED STAFF COMMENTS.**

None.

**Item 2.     PROPERTIES.**

UNITED STATES

Our headquarters and U.S natural tissue processing facilities are located in Alachua, Florida, near metropolitan Gainesville, including five buildings on approximately 23 acres of property that we own.

*Processing, Manufacturing and Laboratory Facilities*

In Alachua, Florida, we own a 65,500 square foot processing facility and lease a 8,000 square foot facility for the processing of natural tissues utilizing our BioCleanse® and TUTOPLAST® and CANCELLE® SP sterilization processes. In addition, we also own a 42,000 square foot logistics and technology center.

In Marquette, Michigan, we own a 106,000 square foot facility for manufacturing metal and synthetic implants and instruments that also houses laboratory facilities.

In Greenville, North Carolina, we lease a 15,500 square foot facility for manufacturing synthetic implants.

Our processing and manufacturing facilities meet the FDA's Current Good Manufacturing Practices requirements and allows us to meet the requirements of an FDA approved medical device manufacturer.

*Administrative and Distribution and Marketing Offices*

In Alachua, Florida, we own three buildings totaling 86,000 square feet which house our corporate headquarters as well as administrative and distribution and marketing functions.

In Jacksonville, Florida, we lease 5,300 square feet for distribution and marketing functions.

In Austin, Texas, we lease 10,600 square feet for distribution, marketing and research and development functions.

GERMANY

In Neunkirchen, Germany we own six buildings totaling approximately 60,000 square feet on approximately two acres of land, including 11,000 square feet of area for processing natural tissues utilizing the TUTOPLAST sterilization process.

THE NETHERLANDS

Our facility in Houten consists of approximately 10,000 square feet of a sales and distribution office.

SINGAPORE

Our facility in Singapore consists of a small leased administrative and sales office.

We believe that we have sufficient space and facilities to meet our current and foreseeable future needs.

22

Table of Contents

**Item 3.**        **LEGAL PROCEEDINGS.**

      The Company is, from time to time, involved in litigation relating to claims arising out of its operations in the ordinary course of business. The Company believes that none of these claims that were outstanding as of December 31, 2016 will have a material adverse impact on its financial position or results of operations. Please see Note 23, Legal and Regulatory Actions, to the consolidated financial statements contained in Part II, Item 8 of this report for additional information.

**Item 4.**        **MINE SAFETY DISCLOSURES.**

      Not applicable.

23

Table of Contents

**PART II**

**Item 5.    MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Market Information and Holders**

Our common stock is quoted on the Nasdaq Stock Market under the symbol "RTIX." The following table sets forth the range of high and low sales prices for our common stock for each quarterly period in the last two fiscal years.

| 2015 | High | Low |
|---|---|---|
| First Quarter | $5.74 | $4.36 |
| Second Quarter | $7.11 | $4.90 |
| Third Quarter | $7.48 | $5.30 |
| Fourth Quarter | $5.74 | $3.56 |

| 2016 | High | Low |
|---|---|---|
| First Quarter | $4.16 | $2.81 |
| Second Quarter | $4.65 | $3.50 |
| Third Quarter | $3.91 | $2.98 |
| Fourth Quarter | $3.50 | $2.50 |

As of March 3, 2017, we had 304 stockholders of record of our common stock. The closing sale price of our common stock on March 3, 2017 was $3.75 per share.

The following table presents information with respect to our repurchases of our common stock during the year ended December 31, 2016.

| Period | Total Number of Shares Purchased (1) | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| January 1, 2016 to January 31, 2016 | — | — | — | — |
| February 1, 2016 to February 29, 2016 | 29,091 | $ 3.36 | — | — |
| March 1, 2016 to March 31, 2016 | — | — | — | — |
| April 1, 2016 to April 30, 2016 | — | — | — | — |
| May 1, 2016 to May 31, 2016 | — | — | — | — |
| June 1, 2016 to June 30, 2016 | — | — | — | — |
| July 1, 2016 to July 31, 2016 | — | — | — | — |
| August 1, 2016 to August 31, 2016 | 109,506 | $ 3.31 | — | — |
| September 1, 2016 to September 30, 2016 | — | — | — | — |
| October 1, 2016 to October 31, 2016 | — | — | — | — |
| November 1, 2016 to November 30, 2016 | — | — | — | — |
| December 1, 2016 to December 31, 2016 | — | — | — | — |
| Total | 138,597 | $ 3.32 | — | — |

(1)    The purchases reflect amounts that are attributable to shares surrendered to us by employees to satisfy, in connection with the vesting of restricted stock awards, their tax withholdings obligations.

24

Table of Contents

**Stock Performance Graph**

The SEC requires us to present a chart comparing the cumulative total stockholder return on our common stock with the cumulative total stockholder return of: (1) a broad equity market index and (2) a published industry or line-of-business index. We selected the Standard & Poor's 500 Health Care Equipment Index based on our good faith determination that this index fairly represents the companies which compete in the same industry or line-of-business as we do. The chart below compares our common stock with the Nasdaq Composite Index and the Standard & Poor's 500 Health Care Equipment Index and assumes an investment of $100.00 on December 31, 2011 in each of the common stock, the stocks comprising the Nasdaq Composite Index and the stocks comprising the Standard & Poor's 500 Health Care Equipment Index.

**5-YEAR CUMULATIVE TOTAL RETURNS**



| Total Return Analysis | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| RTI Surgical, Inc. | $100.00 | $ 96.17 | $ 79.73 | $117.12 | $ 89.41 | $ 73.20 |
| NASDAQ Composite | 100.00 | 117.45 | 164.57 | 188.84 | 201.98 | 219.89 |
| S&P 500 Health Care Equipment Index | 100.00 | 117.27 | 149.74 | 189.09 | 200.39 | 213.38 |

Table of Contents

**Dividend Policy**

We have never paid cash dividends to holders of our common stock. We do not expect to declare or pay any dividends on our common stock in the foreseeable future. Other than the possibility that we may pay dividends on our preferred stock, we intend to retain all earnings, if any, to invest in our operations. The payment of future dividends, if any, will depend upon our future earnings, if any, our capital requirements, financial condition, debt covenant terms, our ability to do so under applicable laws, and other relevant factors. Under our current credit agreement with TD Bank, we are restricted from paying dividends on our common stock without the prior written consent of the administrative agent. In addition, pursuant to the terms of the Certificate of Designation of Series A Convertible Preferred Stock, so long as any shares of the Preferred Stock remain outstanding, we may not pay any dividend or make any distribution upon any junior securities (including the common stock) without the prior written consent of the holders of a majority of the Preferred Stock.

**Item 6.        SELECTED FINANCIAL DATA.**

The statement of operations data set forth below for the years ended December 31, 2016, 2015 and 2014, and selected balance sheet data as of December 31, 2016 and 2015 have been derived from our audited consolidated financial statements and accompanying notes. The consolidated financial statements as of December 31, 2016 and 2015 and for the three years ended December 31, 2016 are included elsewhere in this Form 10-K. The selected consolidated financial data set forth below should be read along with "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations," and our consolidated financial statements and accompanying notes included elsewhere in this document.

26

Table of Contents

The statement of operations data set forth below for the years ended December 31, 2013 and 2012, and the balance sheet data set forth as of December 31, 2014, 2013 and 2012 have been derived from our audited consolidated financial statements and accompanying notes which are not included elsewhere in this Form 10-K.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2016 | 2015 | 2014 | 2013 | 2012 |
| | (In thousands, except share and per share data) | | | | |
| **Statements of Operations Data:** | | | | | |
| Revenues | $ 272,865 | $ 282,293 | $ 262,810 | $ 197,979 | $ 178,113 |
| Costs of processing and distribution | 140,516 | 132,551 | 129,013 | 117,874 | 92,896 |
| Gross profit | 132,349 | 149,742 | 133,797 | 80,105 | 85,217 |
| Expenses: | | | | | |
| Marketing, general and administrative | 116,125 | 107,439 | 107,653 | 81,635 | 58,376 |
| Research and development | 16,090 | 15,065 | 15,536 | 15,241 | 12,231 |
| Strategic review costs | 1,150 | — | — | — | — |
| CEO Retirement and transition costs | 4,404 | — | — | — | — |
| Contested proxy expenses | 2,680 | — | — | — | — |
| Asset impairment and abandonments | 5,435 | 814 | — | — | 20 |
| Litigation settlement and settlement charges | — | 804 | 185 | 3,000 | 2,350 |
| Restructuring charges | 1,107 | — | — | 2,881 | — |
| Acquisition expenses | — | — | — | 6,004 | — |
| Severance costs | 1,039 | 995 | 4,798 | — | — |
| Total operating expenses | 148,030 | 125,117 | 128,172 | 108,761 | 72,977 |
| Operating (loss) income | (15,681) | 24,625 | 5,625 | (28,656) | 12,240 |
| Other (expense) income: | | | | | |
| Interest expense | (1,655) | (1,492) | (1,357) | (542) | 0 |
| Interest income | 8 | 3 | 9 | 23 | 185 |
| Foreign exchange (loss) gain | (132) | 78 | (88) | 251 | 19 |
| Total other (expense) income - net | (1,779) | (1,411) | (1,436) | (268) | 204 |
| (Loss) income before income tax benefit (provision) | (17,460) | 23,214 | 4,189 | (28,924) | 12,444 |
| Income tax benefit (provision) | 3,061 | (8,299) | (1,493) | 11,110 | (4,042) |
| Net (loss) income | (14,399) | 14,915 | 2,696 | (17,814) | 8,402 |
| Convertible preferred dividend | (3,508) | (3,305) | (3,113) | (1,375) | — |
| Net (loss) income applicable to common shares | $ (17,907) | $ 11,610 | $ (417) | $ (19,189) | $ 8,402 |
| Net (loss) income per common share - basic | $ (0.31) | $ 0.20 | $ (0.01) | $ (0.34) | $ 0.15 |
| Net (loss) income per common share - diluted | $ (0.31) | $ 0.20 | $ (0.01) | $ (0.34) | $ 0.15 |
| Weighted average shares outstanding - basic | 58,236,745 | 57,611,231 | 56,735,924 | 56,258,624 | 55,861,957 |
| Weighted average shares outstanding - diluted | 58,236,745 | 58,590,494 | 56,735,924 | 56,258,624 | 56,068,795 |

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| | 2016 | 2015 | 2014 | 2013 | 2012 |
| **Balance Sheet Data:** | | | | | |
| Cash and cash equivalents | $ 13,849 | $ 12,614 | $ 15,703 | $ 18,721 | $ 49,696 |
| Working capital | 121,329 | 131,941 | 133,510 | 134,302 | 129,110 |
| Total assets | 368,031 | 380,662 | 378,135 | 369,854 | 241,409 |
| Long-term obligations - less current portion | 77,267 | 73,384 | 69,413 | 67,706 | 4 |
| Redeemable preferred stock | 60,016 | 56,323 | 52,834 | 49,537 | — |
| Total stockholders' equity | 164,916 | 181,356 | 167,835 | 168,053 | 183,992 |

Table of Contents

**Item 7.       MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*You should read the following discussion of our financial condition and results of operations together with those financial statements and the notes to those statements included elsewhere in this filing. This discussion contains forward looking statements based on our current expectations, assumptions, estimates and projections about us and our industry. Our actual results could differ materially from those anticipated in these forward looking statements. We undertake no obligation to update publicly any forward looking statements for any reason, even if new information becomes available or other events occur in the future.*

**Management Overview:**

RTI Surgical, Inc. together with its subsidiaries, designs, develops, manufactures and distributes surgical implants for use in a variety of surgical procedures. We are a leader in providing tissue implants as well as metal and synthetic implants for the benefit of surgeons and patients worldwide. We process donated human musculoskeletal and other tissues including bone, cartilage, tendons, ligaments, fascia lata, pericardium, sclera, cornea and dermal tissues, as well as bovine and porcine animal tissues to produce allograft and xenograft implants. We process the majority of our tissue implants using our proprietary BIOCLEANSE®, TUTOPLAST® and CANCELLE® SP sterilization processes. In addition, we manufacture, market and distribute metal and synthetic implants for treatment of spinal and other orthopedic disorders. Our implants are used in the following markets: spine, sports medicine, orthobiologics, trauma, dental, and surgical specialties. We distribute our implants to hospitals and surgeons in the United States and internationally through a direct distribution organization, as well as through a network of independent distributors. We were founded in 1997 and are headquartered in Alachua, Florida.

Domestic distributions and services accounted for 91% of total revenues in 2016. Our implants are distributed directly to healthcare providers, hospitals and other healthcare facilities through direct distribution force, independent distributors and through various strategic relationships.

International distributions and services accounted for 9% of total revenues in 2016. Our implants are distributed in over 45 countries through a direct distribution force in Germany and through independent distributors in the rest of the world outside of Germany and the U.S.

Our business is generally not seasonal in nature; however, the number of orthopedic implant surgeries and elective procedures generally declines during the summer months.

Our principal goals are to reach as many patients as possible while building our competitive strength in the marketplace to increase revenues, profitability and cash flow as we focus on improved operational efficiency, productivity and asset management. We are making investments in new product development and in our direct distribution network in an effort to promote growth in 2017 and beyond.

We continue to maintain our commitment to research and development and the introduction of new strategically targeted allograft, xenograft, metal and synthetic implants as well as focused clinical efforts to support their acceptance in the marketplace. In addition, we consider strategic acquisitions from time to time for new technologies intended to augment our existing product offerings.

**Critical Accounting Policies**

The preparation of our financial statements in accordance with accounting principles generally accepted in the United States ("U.S. GAAP") often requires us to make estimates and judgments that affect reported amounts. These estimates and judgments are based on historical experience and assumptions that we believe to be reasonable under the circumstances. Assumptions and judgments based on historical experience may provide reported results which differ from actual results; however, these assumptions and judgments historically have not varied significantly from actual experience and we therefore do not expect them to vary significantly in the future.

The accounting policies which we believe are "critical," or require the most use of estimates and judgment, relate to the following items presented in our financial statements: 1) Tissue Inventory Valuation; 2) Accounts Receivable Allowances; 3) Long-Lived Assets; 4) Intangible Assets and Goodwill; 5) Revenue Recognition; 6) Stock-Based Compensation Plans; and 7) Income Taxes.

28

Table of Contents

*Tissue Inventory Valuation.* U.S. GAAP requires that inventory be stated at the lower of cost or market value. Due to various reasons, some tissue within our inventory will never become available for distribution. Therefore, we must make estimates of future distribution from existing inventory in order to write-off inventory which will not be distributed and which therefore has reduced or no market value.

Our management reviews available information regarding processing costs, inventory distribution rates, industry supply and demand, medical releases and processed tissue rejections, in order to determine write-offs of cost above market value. For a variety of reasons, we may from time to time be required to adjust our assumptions as processes change and as we gain better information. Although we continue to refine the information on which we base our estimates, we cannot be sure that our estimates are accurate indicators of future events. Accordingly, future adjustments may result from refining these estimates. Such adjustments may be significant.

*Accounts Receivable Allowances.* We maintain allowances for doubtful accounts based on our review and assessment of payment history and our estimate of the ability of each customer to make payments on amounts invoiced. If the financial condition of any of our customers were to deteriorate, additional allowances might be required. From time to time we must adjust our estimates. Changes in estimates of the collection risk related to accounts receivable can result in decreases and increases to current period net income.

*Long-Lived Assets.* We periodically evaluate the period of depreciation or amortization for long-lived assets to determine whether current circumstances warrant revised estimates of useful lives. We review our property, plant and equipment for impairment whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable. Recoverability is measured by a comparison of the carrying amount to the net undiscounted cash flows expected to be generated by the asset. An impairment loss would be recorded for the excess of net carrying value over the fair value of the asset impaired. The fair value is estimated based on expected discounted future cash flows. The results of impairment tests are subject to management's estimates and assumptions of projected cash flows and operating results. Changes in assumptions or market conditions could result in a change in estimated future cash flows and the likelihood of materially different reported results. Past estimates by management of the fair values and useful lives of long-lived assets and investments have periodically been impacted by one-time events. During the fourth quarter of 2016, we concluded a strategic review of our business lines and operations, and updated our financial projections. As a result, our financial projections related to our hernia business line were adjusted downward. This business line is a significant driver of revenue for the Tutogen Germany asset group. As a result, during the fourth quarter of 2016, we completed an asset group impairment test and determined the carrying value was not recoverable as of December 31, 2016. We used a market approach to determine the fair value of the Tutogen Germany asset group's long lived assets and recognized impairment charges related to identified intangibles and property and equipment of $5.4 million. During 2015 we incurred asset abandonments of certain long-term assets at our German facility of $814,000.

*Intangible Assets and Goodwill.* Financial Accounting Standards Board ("FASB") ASC 350, *Goodwill and Other Intangible Assets*, requires companies to test goodwill for impairment on an annual basis at the reporting unit level (or an interim basis if an event occurs that might reduce the fair value of a reporting unit below its carrying value). We have one reporting unit and the annual impairment test is performed at each year-end unless indicators of impairment are present and require more frequent testing. FASB ASC 350 also requires that the carrying value of an identifiable intangible asset that has an indefinite life be determined by using a fair value based approach.

Intangible assets generally consist of patents, trademarks, procurement contracts, customer lists, non-compete agreements, distribution agreements and acquired exclusivity rights. Patents and trademarks are amortized on the straight-line method over the shorter of the remaining protection period or estimated useful lives of between 8 and 16 years. Procurement contracts, customer lists, acquired exclusivity rights, non-compete agreements and distribution agreements are amortized over estimated useful lives of between 5 to 25 years.

Goodwill is tested for impairment by comparing the fair value of the reporting unit to its carrying amount, including goodwill. In concluding as to fair value of the reporting unit for purposes of testing goodwill, an income approach and a market approach are utilized. The conclusion from these two approaches are weighted equally and then adjusted to incorporate a control premium or acquisition premium that reflects the additional amount a buyer is willing to pay for elements of control and for a premium that reflects the buyer's perception of its ability to add value through synergies.

In general, the income approach employs a discounted cash flow model that considers: 1) assumptions that marketplace participants would use in their estimates of fair value, including the cash flow period, terminal values based on a terminal growth rate and the discount rate; 2) current period actual results, and 3) projected results for future periods that have been prepared and approved by our senior management. The forecasted cash flows do not include synergies that a marketplace participant would be expecting to achieve.

29

**Table of Contents**

The market approach employs market multiples from guideline public companies operating in our industry. Estimates of fair value are derived by applying multiples based on revenue and earnings before interest, taxes, depreciation and amortization ("EBITDA") adjusted for size and performance metrics relative to peer companies. A control premium was included in determining the fair value under this approach.

If the carrying amount of the reporting unit exceeds its calculated fair value, the second step of the goodwill impairment test is performed in accordance with FASB ASC 805 to measure the amount of the impairment loss, if any.

Both approaches used in the analysis have a degree of uncertainty. Potential events or changes in circumstances which could impact the key assumptions used in our goodwill impairment evaluation are as follows:

- Change in peer group or performance of peer group companies

- Change in the company's markets and estimates of future operating performance

- Change in the company's estimated market cost of capital

- Change in implied control premiums related to acquisitions in the medical device industry.

The valuation of goodwill and intangible assets with indefinite useful lives requires management to use significant judgments and estimates including, but not limited to, projected future revenue and cash flows. Changes in assumptions or market conditions could result in a change in estimated future cash flows and the likelihood of materially different reported results.

If we overestimate the useful life of an asset, or overestimate the fair value of an asset, and at some time in the future we dispose of that asset for a lower amount than its carrying value, our historically reported total assets and net income would have been higher than they would have been during periods prior to our recognition of the loss on disposal of assets, and lower during the period when we recognize the loss.

The fair value of these long-term investments is dependent on their performance, as well as volatility inherent in the external markets for these investments. These determinations require complex calculations based on estimated future benefit and fair value. We have often made investments for which the expected future benefit has not been easily estimated. Examples of such investments include, but are not limited to, our acquisition of Pioneer and our acquisition of Tutogen Medical, Inc., ("TMI"), our investment in equipment; and our investment in obtaining patents. In assessing potential impairment for these investments, we consider these factors as well as forecasted financial performance. If forecasts are not met, impairment charges may be required.

*Revenue Recognition.* We recognize revenue upon shipping, or receipt by our customers of our products and implants, depending on our distribution agreements with our customers or distributors. We recognize our other revenues when all appropriate contractual obligations have been satisfied.

We permit returns of tissue in accordance with the terms of contractual agreements with customers if the tissue is returned in a timely manner, in unopened packaging and from the normal channels of distribution. We provide allowances for returns based upon analysis of our historical patterns of returns, matched against the fees from which they originated. Historical returns have been within the amounts we reserved.

*Stock-Based Compensation Plans.* We account for our stock-based compensation plans in accordance with FASB ASC 718, Accounting for Stock Compensation. FASB ASC 718 requires the measurement and recognition of compensation expense for all stock-based awards made to employees and directors, including employee stock options and restricted stock. Under the provisions of FASB ASC 718, and SEC Staff Accounting Bulletin No. 107, stock-based compensation cost is measured at the grant date, based on the calculated fair value of the award, and is recognized as an expense on a straight-line basis over the requisite service period of the entire award (generally the vesting period of the award).

*Income Taxes.* We use the asset and liability method of accounting for income taxes. Deferred income taxes are recorded to reflect the tax consequences on future years for differences between the tax basis of assets and liabilities and their financial reporting amounts at each year-end based on enacted tax laws and statutory tax rates applicable to the periods in which the differences are expected to affect taxable income. Valuation allowances are established when necessary to reduce deferred tax assets to amounts which are more likely than not to be realized.

30

Table of Contents

**Off Balance-Sheet Arrangements**

As of December 31, 2016, we had no off-balance-sheet arrangements, as defined in Item 303(a) (4) (ii) of Regulation S-K.

**Regulatory Approvals in 2016**

AMERICAS

- US 510(k) Clearance of Unison-C Anterior Cervical Fixation System
- US 510(k) Clearance of Release Laminoplasty Fixation System
- US 510(k) Clearance of Tritium Sternal Cable Plate System (extension)
- US 510(k) Clearance of Streamline OCT Occipito-Cervico-Thoracic System (extension)
- Mexico Approval for a commercial partner product

EUROPE, MIDDLE EAST, AFRICA

- European Union (EU) Approval of nanOss Bioactive Loaded
- European Union (EU) Approval of nanOss Bioactive 3D
- European Union (EU) Approval of Fortiva (extension)
- Portugal Registrations of Streamline TL, Streamline MIS, Quantum, BacFuse, PAC Plate
- Russia Clearance of Tutobone
- Switzerland Registrations for four commercial partner products

ASIA-PACIFIC

- Australia Registration of nanOss Bioactive
- Australia Registrations of Streamline TL Instruments, MIS Fusion Instrument Set
- Australia Registration of Fortiva Porcine Dermis
- New Zealand Listing of nanOss ABGS, nanOss Loaded ABGS, nanOss 3D ABGS
- New Zealand Listing of Elemax Cortical Cancellous Allograft and Instruments
- New Zealand Listing of BioCleanse Allograft Tendon
- New Zealand Listing of BioSet, BioReady DBM Putty, BioReady DBM Putty with Chips, BioAdapt DBM Strips, and BioAdapt Bridge
- New Zealand Listing of map3 Cellular Allogenic Bone Graft, Chips and Strips
- New Zealand Listing for a commercial partner product
- Singapore Licenses for Cortiva Allograft Dermis
- Singapore License for Unicortical Bone Dowell
- South Korea Registration of Sternal Cable

**Certifications, Accreditations and Inspections in 2016**

AMERICAS

- BSI ISO 13485 re-accreditation audit at the Alachua, Florida and Allendale, New Jersey facilities
- American Association of Tissue Banks re-inspection as a follow up to the 2015 inspection was performed at the Alachua, Florida facility for RTI Donor Services

- U.S. Food and Drug Administration (FDA) routine inspections of the RTI Surgical and RTI Donor Services located in Alachua, FL, Marquette, MI, Greenville, NC, and off-site locations for RTI Donor Services in Melbourne, FL and Middleton, Wisconsin

- BSI ISO 13485 surveillance audit of the Marquette, Michigan; Austin, Texas; and Greenville, North Carolina facilities

- Australia authority of Therapeutic Goods Administration (TGA) inspection performed of the RTI Surgical Alachua, FL facility

- German Authorities (PEI & ROF) inspection performed of the RTI Surgical Alachua, FL Facility

- Korean authority of Ministry of Food and Drug Safety (MFDS) inspection performed of the RTI Surgical Alachua, FL facility

31

**Table of Contents**

EUROPE

- German authority (ROF) inspection of Tutogen Medical facility located in Neunkirchen, Germany

- BSI ISO 13485 re-certification audit of the Tutogen Medical facility located in Neunkirchen, Germany

- BSI ISO 13485 surveillance audit of the Houten, Netherlands facility

- Australia authority of Therapeutic Goods Administration (TGA) inspection performed of the Neunkirchen, Germany facility

    All registrations, licensures, certifications and accreditations were renewed or continued for all locations.


**Implant and Product Recalls**

   In 2016, there were seven voluntary recalls with the Center for Devices and Radiological Health (CDRH) of the Food and Drug Administration (FDA).

- March 2016 (RES-73659) – One recall was filed involving eleven lots of Streamline OCP Final Drivers. These drivers had their material weakened as a result of the TiN-1 coating process. This recall has been considered closed by RTI Surgical and the FDA since September 14, 2016.

- April 2016 (RES-74031) – One recall was filed involving one lot of Streamline OCT Crosslink Counter Torque Sleeve instrument. This lot of instruments may have a weld obstruction in the cannula not allowing the driver to pass through them. This recall has been considered closed by RTI Surgical on June 22, 2016. This recall remains open with the FDA. Last correspondence with them was on January 5, 2017.

- September 16, 2016 (RES-75242) – One recall was filed involving two lots of Streamline OCT, Straight Rod, CoCr, 3.2mm (D) x 240 mm (L). These lots of implants were suspected to have cracks in them that were created by the supplier of these rods. All returned rods were inspected and no cracks were found. This recall is still open. The last correspondence with the FDA was on January 9, 2017.

    Reportable to the National Competent Authorities in the UK and Poland:

- May 2016 (2016(005/005/601/006) – One Field Safety Corrective Action (FSCA) was filed involving one lot of Nunec Cervical Arthroplasty System, Implant, Medium-Deep, 7mm. This lot of implants were missing a feature that allowed them to connect to the inserter for implantation. This FSCA has been considered closed by RTI Surgical, MHRA and the Office of Registration of Medicinal Products, Poland as of October 28, 2016.

    Reportable to the China Food and Drug Administration (CFDA):

- December 14, 2016 – One recall involving 9 lots of Vertebral Body Replacement implants from RTI Surgical's product lines C-Plus and T-Plus. These lots were incorrectly labeled with the wrong expiration date. All of the recalled devices that were not implanted have been removed from the field and corrected. Currently this recall is considered still open by RTI Surgical and the CFDA.

- December 21, 2016 – One recall involving 1 lot of Quantum Spinal Rods, 400mm. It was found in a local CFDA inspection of one of RTI Surgical's distributors that one rod was out of specification for length. Currently this recall is considered still open by RTI Surgical and the CFDA.

- December 21, 2016 – One recall involving 1 lot of Anterior Cervical Plate, 355 mm, Standard. It was found in a local CFDA inspection of one of RTI Surgical's distributors that this implant lot was out of specification for thickness. Currently this recall is considered still open by RTI Surgical and the CFDA.

32

Table of Contents

**Results of Operations**

The following tables set forth, in both dollars and as a percentage of revenues, the results of our operations for the years indicated:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | | **2015** | | **2014** | |
| | | | (Dollars in thousands) | | | |
| **Statement of Operations Data:** | | | | | | |
| Revenues | $272,865 | 100.0% | $282,293 | 100.0% | $262,810 | 100.0% |
| Costs of processing and distribution | 140,516 | 51.5 | 132,551 | 47.0 | 129,013 | 49.1 |
| Gross profit | 132,349 | 48.5 | 149,742 | 53.0 | 133,797 | 50.9 |
| Expenses: | | | | | | |
| Marketing, general and administrative | 116,125 | 42.6 | 107,439 | 38.1 | 107,653 | 41.0 |
| Research and development | 16,090 | 5.9 | 15,065 | 5.3 | 15,536 | 5.9 |
| Strategic review costs | 1,150 | 0.4 | — | — | — | — |
| CEO Retirement and transition costs | 4,404 | 1.6 | — | — | — | — |
| Contested proxy expenses | 2,680 | 1.0 | — | — | — | — |
| Asset impairment and abandonments | 5,435 | 2.0 | 814 | 0.3 | — | — |
| Litigation settlement and settlement charges | — | — | 804 | 0.3 | 185 | 0.1 |
| Restructuring charges | 1,107 | 0.4 | — | — | — | — |
| Severance costs | 1,039 | 0.4 | 995 | 0.4 | 4,798 | 1.8 |
| Total operating expenses | 148,030 | 54.3 | 125,117 | 44.3 | 128,172 | 48.8 |
| Operating (loss) income | (15,681) | (5.8) | 24,625 | 8.7 | 5,625 | 2.1 |
| Other (expense) income: | | | | | | |
| Interest expense | (1,655) | (0.7) | (1,492) | (0.5) | (1,357) | (0.5) |
| Interest income | 8 | 0.0 | 3 | 0.0 | 9 | 0.0 |
| Foreign exchange (loss) gain | (132) | (0.0) | 78 | 0.0 | (88) | (0.0) |
| Total other expense - net | (1,779) | (0.7) | (1,411) | (0.5) | (1,436) | (0.5) |
| (Loss) income before income tax benefit (provision) | (17,460) | (6.5) | 23,214 | 8.2 | 4,189 | 1.6 |
| Income tax benefit (provision) | 3,061 | 1.1 | (8,299) | (2.9) | (1,493) | (0.6) |
| Net (loss) income | (14,399) | (5.4) | 14,915 | 5.3 | 2,696 | 1.0 |
| Convertible preferred dividend | (3,508) | (1.3) | (3,305) | (1.2) | (3,113) | (1.2) |
| Net (loss) income applicable to common shares | $(17,907) | (6.7%) | $ 11,610 | 4.1% | $ (417) | (0.2%) |

| | Year Ended December 31, | | | Percent Change | |
|---|---|---|---|---|---|
| | **2016** | **2015** | **2014** | **2016/2015** | **2015/2014** |
| Revenues: | | | | | |
| Spine | $ 73,907 | $ 57,983 | $ 52,270 | 27.5% | 10.9% |
| Sports medicine and orthopedics | 50,143 | 50,712 | 48,975 | -1.1% | 3.5% |
| Surgical specialties | 4,466 | 3,029 | 1,631 | 47.4% | 85.7% |
| Cardiothoracic | 11,147 | 8,699 | 6,997 | 28.1% | 24.3% |
| International | 21,185 | 18,338 | 20,327 | 15.5% | -9.8% |
| Subtotal direct | 160,848 | 138,761 | 130,200 | 15.9% | 6.6% |
| Global commercial | 99,127 | 129,930 | 120,910 | -23.7% | 7.5% |
| Other revenues | 12,890 | 13,602 | 11,700 | -5.2% | 16.3% |
| Total revenues | $272,865 | $282,293 | $262,810 | -3.3% | 7.4% |
| Domestic revenues | $247,756 | $260,387 | $238,936 | -4.9% | 9.0% |
| International revenues | 25,109 | 21,906 | 23,874 | 14.6% | -8.2% |
| Total revenues | $272,865 | $282,293 | $262,810 | -3.3% | 7.4% |

33

Table of Contents

**2016 Compared to 2015**

*Total Revenues.* Effective January 1, 2016, the reporting of our lines of business are composed primarily of six categories: spine; sports medicine and orthopedics; surgical specialties; cardiothoracic; international; and global commercial. Our previous lines of business were composed of: spine; ortho fixation; sports medicine; bone graft substitutes and general orthopedic; dental; and surgical specialties. The prior year comparable revenue information has been restated to conform to the current year presentation. We believe that the change in the reporting of our lines of business will facilitate a better understanding of our lines of business and align more closely with the end markets in which we compete.

Our total revenues decreased $9.4 million, or 3.3%, to $272.9 million for the year ended December 31, 2016 compared to $282.3 million for the year ended December 31, 2015. Our direct revenues increased by $22.1 million, or 15.9%, to $160.8 million, offset by our global commercial revenues which decreased by $30.8 million, or 23.7%, to $99.1 million. The causes of the increase in our direct revenues are discussed below. Our global commercial revenue comparisons were impacted due to a significant amount of our revenue being derived from large global commercial stocking distributors, whose timing of orders can vary from year to year. These ordering patterns can result in significant unit volume variations, which can result in significant variation in year over year comparisons. In addition, global commercial revenues decreased primarily as a result of lower orders from certain commercial distributors, primarily in the spinal, dental and trauma markets.

*Direct Revenues*

*Spine* - Revenues from spinal implants increased $15.9 million, or 27.5%, to $73.9 million for the year ended December 31, 2016 compared to $58.0 million for the year ended December 31, 2015. Spine revenues increased primarily as a result of new surgeon customers and increased distributions of our map3® and nanOss® implants.

*Sports Medicine and Orthopedics* - Revenues from sports medicine and orthopedics allografts decreased $569,000, or 1.1%, to $50.1 million for the year ended December 31, 2016 compared to $50.7 million for the year ended December 31, 2015. Sports medicine and orthopedics revenues decreased primarily as a result of lower unit volumes and a procedural shift to autograft in the marketplace.

*Surgical Specialties* - Revenues from surgical specialty allografts increased $1.4 million, or 47.4%, to $4.5 million for the year ended December 31, 2016 compared to $3.0 million for the year ended December 31, 2015. Surgical Specialties revenues increased primarily as a result of new customers.

*Cardiothoracic* - Revenues from cardiothoracic implants increased $2.4 million, or 28.1%, to $11.1 million for the year ended December 31, 2016 compared to $8.7 million for the year ended December 31, 2015. Cardiothoracic revenues increased primarily as a result of increased sales of sternal cables and sternal closure plates resulting from expanded investment in distribution channels.

*International Revenues* - International revenues include distributions from our foreign affiliates as well as domestic export revenues. International revenues increased $2.8 million, or 15.5%, to $21.2 million for the year ended December 31, 2016 compared to $18.3 million for the year ended December 31, 2015. International revenues increased primarily as a result of higher distributions in Europe and Asia Pacific due to expanded distribution channels.

*Global Commercial*

Revenues from global commercial decreased $30.8 million, or 23.7%, to $99.1 million for the year ended December 31, 2016 compared to $129.9 million for the year ended December 31, 2015. Global commercial revenues decreased primarily as a result of significantly high orders in 2015 which did not repeat in 2016, primarily in the spinal, dental and trauma markets.

*Other Revenues*

Revenues from other sources consisting of service processing, tissue recovery fees, biomedical laboratory fees, recognition of previously deferred revenues, shipping fees, distribution of reproductions of our allografts to distributors for demonstration purposes and restocking fees, decreased $712,000, or 5.2%, to $12.9 million for the year ended December 31, 2016 compared to $13.6 million for the year ended December 31, 2015. The decrease was primarily due to the acceleration of deferred revenue recognition of $1.5 million relating to Davol relinquishing its exclusive distribution rights in the breast reconstruction market for the year ended December 31, 2015, partially offset by increased service processing fees.

34

**Table of Contents**

*Costs of Processing and Distribution.* Costs of processing and distribution increased $8.0 million, or 6.0%, to $140.5 million for the year ended December 31, 2016 from $132.6 million for the year ended December 31, 2015. Costs of processing and distribution increased as a percentage of revenues from 47.0% for the year ended December 31, 2015 to 51.5% for the year ended December 31, 2016. Costs of processing and distribution as a percentage was negatively impacted by a decrease in manufacturing processing levels as a result of lower global commercial revenue distributions and an inventory charge of $9.6 million as a result of writing-off certain excess quantities primarily of hernia and sports medicine inventory.

*Marketing, General and Administrative Expenses.* Marketing, general and administrative expenses increased $8.7 million, or 8.1%, to $116.1 million for the year ended December 31, 2016 compared to $107.4 million for the year ended December 31, 2015. Marketing, general and administrative expenses increased as a percentage of revenues from 38.1% for the year ended December 31, 2015 to 42.6% for the year ended December 31, 2016 due to higher variable compensation and distributor commission expenses on increasing direct revenue distributions.

*Research and Development Expenses.* Research and development expenses increased $1.0 million, or 6.8%, to $16.1 million for the year ended December 31, 2016 compared to $15.1 million for the year ended December 31, 2015. As a percentage of revenues, research and development expenses increased from 5.3% for the year ended December 31, 2015 to 5.9% for the year ended December 31, 2016. The increase was primarily due to higher research study related expenses.

*Strategic Review Costs.* Strategic review costs related to the comprehensive strategic review of the Company's business lines and operations to leverage the Company's expertise, technology and products and identify opportunities to increase stockholder values, resulted in $1.2 million of expenses for the year ended December 31, 2016. There were no strategic review costs in the year ended December 31, 2015.

*Chief Executive Officer Retirement and Transition Costs.* Chief Executive Officer retirement and transition costs related to the retirement of our former Chief Executive Officer pursuant to the Executive Transition Agreement dated August 29, 2012 (as amended and extended to date), and Executive Separation Agreement dated August 15, 2016, resulted in $4.4 million of severance, stock-based compensation and other retirement related expenses for the year ended December 31, 2016. There were no Chief Executive Officer retirement and transition costs in the year ended December 31, 2015.

*Contested Proxy Expenses.* The Company incurred contested proxy expenses of $2.7 million for the year ended December 31, 2016. There were no contested proxy expenses for the year ended December 31, 2015.

*Asset Impairment and Abandonments.* Asset impairment and abandonments related to an asset impairment at our German facility of $5.4 million for the year ended December 31, 2016 compared to $814,000 asset abandonments of certain long-term assets at our German facility for the year ended December 31, 2015.

*Restructuring Charges.* Restructuring charges related to the closure of our French distribution and tissue procurement office was $1.1 million for the year ended December 31, 2016. There were no restructuring charges in the year ended December 31, 2015.

*Severance Charges.* Severance charges related to the termination of former employees resulted in $1.0 million of expenses for the year ended December 31, 2016 compared to $1.0 million for the year ended December 31, 2015 as a result of us reorganizing our distribution force.

*Net Other (Expense) Income.* Net other expense was $1.8 million for the year ended December 31, 2016 compared to $1.4 million for the year ended December 31, 2015. The increase in net other expense is primarily attributable to higher interest expense of $163,000 as a result of higher average debt balance as compared to the year ended December 31, 2015 and due to a foreign currency exchange transaction loss of $132,000 for the year ended December 31, 2016, compared to a foreign currency exchange transaction gain of $78,000 for the year ended December 31, 2015, resulting from changes in the value of the U.S. dollar versus the Euro and the timing of payments on foreign currency liabilities.

*Income Tax Benefit (Provision).* Income tax benefit for the year ended December 31, 2016 was $3.1 million compared to an income tax provision of $8.3 million for the year ended December 31, 2015. Our effective tax rate for the year ended December 31, 2016 and 2015 was 17.5% and 35.7% respectively. During the year ending December 31, 2016, the Company's German operations entered into a cumulative net loss position. As a result, the Company recorded a full valuation allowance on its German subsidiary's deferred tax assets. For the year ended December 31, 2016, our income tax rate was impacted due to the full valuation allowance recorded.

35

Table of Contents

*Convertible Preferred Dividend*. As a result of the acquisition of Pioneer and pursuant to the terms of the investment agreement with Water Street, we accrued a convertible preferred dividend of $3.5 million for the year ended December 31, 2016 compared to $3.3 million for the year ended December 31, 2015.

**2015 Compared to 2014**

*Total Revenues.* Effective January 1, 2016, the reporting of our lines of business are composed primarily of six categories: spine; sports medicine and orthopedics; surgical specialties; cardiothoracic; international; and global commercial. Our previous lines of business were composed of: spine; ortho fixation; sports medicine; bone graft substitutes and general orthopedic; dental; and surgical specialties. The prior year comparable revenue information has been restated to conform to the current year presentation. We believe that the change in the reporting of our lines of business will facilitate a better understanding of our lines of business and align more closely with the end markets in which we compete.

Our total revenues increased $19.5 million, or 7.4%, to $282.3 million for the year ended December 31, 2015 compared to $262.8 million for the year ended December 31, 2014. Our direct revenues increased by $8.6 million, or 6.6%, to $138.8 million. Our global commercial revenues increased by $9.0 million, or 7.5%, to $129.9 million. Our global commercial revenue comparisons were impacted due to a significant amount of our revenue being derived from large global commercial stocking distributors, whose timing of orders can vary from year to year. These ordering patterns can result in significant unit volume variations, which can result in significant variation in year over year comparisons. In addition, global commercial revenues increased primarily as a result of higher orders from certain commercial distributors, primarily in the dental and trauma markets.

### Direct Revenues

*Spine* - Revenues from spinal implants increased $5.7 million, or 10.9%, to $58.0 million for the year ended December 31, 2015 compared to $52.3 million for the year ended December 31, 2014. Spine revenues increased primarily as a result of new surgeon customers.

*Sports Medicine and Orthopedics* - Revenues from sports medicine and orthopedics allografts increased $1.7 million, or 3.5%, to $50.7 million for the year ended December 31, 2015 compared to $49.0 million for the year ended December 31, 2014. Sports medicine and orthopedics revenues increased primarily as a result of higher unit volumes.

*Surgical Specialties* - Revenues from surgical specialty allografts increased $1.4 million, or 85.7%, to $3.0 million for the year ended December 31, 2015 compared to $1.6 million for the year ended December 31, 2014. Surgical Specialties revenues increased primarily as a result of new customers.

*Cardiothoracic* - Revenues from cardiothoracic implants increased $1.7 million, or 24.3%, to $8.7 million for the year ended December 31, 2015 compared to $7.0 million for the year ended December 31, 2014. Cardiothoracic revenues increased primarily as a result of increased sales of sternal cables and sternal closure plates.

*International Revenues* - International revenues include distributions from our foreign affiliates as well as domestic export revenues. International revenues decreased $2.0 million, or 9.8%, to $18.3 million for the year ended December 31, 2015 compared to $20.3 million for the year ended December 31, 2014. International revenues decreased primarily as a result of lower distributions in Europe.

### Global Commercial

Revenues from global commercial increased $9.0 million, or 7.5%, to $129.9 million for the year ended December 31, 2015 compared to $120.9 million for the year ended December 31, 2014. Global commercial revenues increased primarily as a result of higher orders from certain commercial distributors, primarily in the dental and trauma markets.

### Other Revenues

Revenues from other sources consisting of service processing, tissue recovery fees, biomedical laboratory fees, recognition of previously deferred revenues, shipping fees, distribution of reproductions of our allografts to distributors for demonstration purposes and restocking fees, increased $1.9 million, or 16.3%, to $13.6 million for the year ended December 31, 2015 compared to $11.7 million for the year ended December 31, 2014. The increase was primarily due to increased service processing fees and the acceleration of deferred revenue recognition of $1.5 million relating to Davol relinquishing its exclusive distribution rights in the breast market.

36

Table of Contents

*Costs of Processing and Distribution.* Costs of processing and distribution increased by $3.5 million, or 2.7%, to $132.6 million for the year ended December 31, 2015 from $129.0 million for the year ended December 31, 2014. The increase was primarily due to higher costs of processing and distribution arising from higher revenue levels. Costs of processing and distribution decreased as a percentage of revenues from 49.1% for the year ended December 31, 2014 to 47.0% for the year ended December 31, 2015. The decrease was primarily due to changes in distribution mix.

*Marketing, General and Administrative Expenses.* Marketing, general and administrative expenses of $107.4 million for the year ended December 31, 2015 were comparable to the year ended December 31, 2014. Marketing, general and administrative expenses decreased as a percentage of revenues from 41.0% for the year ended December 31, 2014 to 38.1% for the year ended December 31, 2015 due to lower compensation expenses as a result of us flattening our organizational structure in 2014.

*Research and Development Expenses.* Research and development expenses decreased by $471,000, or 3.0%, to $15.1 million for the year ended December 31, 2015 compared to $15.5 million for the year ended December 31, 2014. As a percentage of revenues, research and development expenses decreased from 5.9% for the year ended December 31, 2014 to 5.3% for the year ended December 31, 2015. The decrease was primarily due to lower research study related expenses.

*Asset Abandonments.* Asset abandonments related to abandonment of certain long-term assets at our German facility was $814,000 for the year ended December 31, 2015. There were no asset abandonments in the year ended December 31, 2014.

*Litigation and Settlement Charges.* Litigation and settlement charges relating to the settlement of domestic and international distributor disputes resulted in $804,000 of expenses for the year ended December 31, 2015 compared to $185,000 for the year ended December 31, 2014.

*Severance Charges*. Severance charges related to the termination of former employees as a result of us reorganizing our distribution force resulted in $995,000 of expenses for the year ended December 31, 2015 compared to $4.8 million for the year ended December 31, 2014 as a result of us flattening our organizational structure.

*Net Other (Expense) Income.* Net other expense was $1.4 million for both the year ended December 31, 2015 and the year ended December 31, 2014.

*Income Tax Provision.* Income tax provision for the year ended December 31, 2015 was $8.3 million compared to $1.5 million for the year ended December 31, 2014. Our effective tax rate for the year ended December 31, 2015 and 2014 was 35.7% and 35.6% respectively.

*Convertible Preferred Dividend*. As a result of the acquisition of Pioneer and pursuant to the terms of the investment agreement with Water Street, we recorded a convertible preferred dividend of $3.3 million for the year ended December 31, 2015 compared to $3.1 million for the year ended December 31, 2014.

**Non-GAAP Financial Measures**

We utilize certain financial measures that are not calculated based on Generally Accepted Accounting Principles ("GAAP"). Certain of these financial measures are considered "non-GAAP" financial measures within the meaning of Item 10 of Regulation S-K promulgated by the SEC. We believe that non-GAAP financial measures reflect an additional way of viewing aspects of our operations that, when viewed with the GAAP results, provide a more complete understanding of our results of operations and the factors and trends affecting our business. These non-GAAP financial measures are also used by our management to evaluate financial results and to plan and forecast future periods. However, non-GAAP financial measures should be considered as a supplement to, and not as a substitute for, or superior to, the corresponding measures calculated in accordance with GAAP. Non-GAAP financial measures used by us may differ from the non-GAAP measures used by other companies, including our competitors.

37

Table of Contents

To supplement our consolidated financial statements presented on a GAAP basis, we disclose certain non-GAAP financial measures that exclude certain amounts, including non-GAAP net income applicable to common shares, adjusted. The calculation of the tax effect on the adjustments between GAAP net (loss) income applicable to common shares and non-GAAP net income applicable to common shares is based upon our estimated annual GAAP tax rate, adjusted to account for items excluded from GAAP net (loss) income applicable to common shares in calculating non-GAAP net income applicable to common shares. Reconciliations of each of these non-GAAP financial measures to the corresponding GAAP measures are included in the reconciliation below:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| | (In thousands) | | |
| Net (loss) income applicable to common shares, as reported | $(17,907) | $ 11,610 | $ (417) |
| Excess inventory charge | 9,556 | — | — |
| Strategic review costs | 1,150 | — | — |
| CEO Retirement and transition costs | 4,404 | — | — |
| Contested proxy expenses | 2,680 | — | — |
| Asset impairment and abandonments | 5,435 | 814 | — |
| Litigation and settlement charges | — | 804 | 185 |
| Inventory purchase price adjustment | — | — | 5,708 |
| Restructuring charges | 1,107 | — | — |
| Severance charges | 1,039 | 995 | 4,798 |
| European net operating loss valuation reserve | 1,224 | — | — |
| Tax effect on adjustments | (6,602) | (871) | (4,084) |
| Non-GAAP net income applicable to common shares, adjusted | $ 2,086 | $ 13,352 | $ 6,190 |

The following are explanations of the adjustments that management excluded as part of the non-GAAP measures for the years ended December 31, 2016 and 2015 as well as the reasons for excluding the individual items:

2016 Excess inventory charge – This adjustment represents an inventory charge as a result of writing-off certain excess quantities primarily of hernia and sports medicine inventory. Management removes the amount of these expenses from our operating results to supplement a comparison to our past operating performance.

2016 Strategic review costs – This adjustment represents charges relating to a comprehensive strategic review of the Company's business lines and operations to leverage the Company's expertise, technology and products and identify opportunities to increase stockholder value. Management removes the amount of these expenses from our operating results to supplement a comparison to our past operating performance.

2016 CEO Retirement and transition costs – This adjustment represents charges relating to the retirement of our former Chief Executive Officer pursuant to the Executive Transition Agreement dated August 29, 2012 (as amended and extended to date) and Executive Separation Agreement dated August 15, 2016. Management removes the amount of these expenses from our operating results to supplement a comparison to our past operating performance.

2016 Contested proxy expenses – This adjustment represent charges relating to contested proxy expenses. Management removes the amount of these costs from our operating results to supplement a comparison to our past operating performance.

2016 and 2015 Asset impairment and abandonments – This adjustment represents an asset impairment and abandonment of certain long-term assets at our German facility. Management removes the amount of these costs from our operating results to supplement a comparison to our past operating performance.

2015 and 2014 Litigation and settlement charges – This adjustment represents charges relating to settlements of domestic and international distributor disputes. Management removes the amount of these costs from our operating results to supplement a comparison to our past operating performance.

2014 Inventory purchase price adjustment – This adjustment represents the purchase price effects of acquired Pioneer inventory that was sold in 2014 and which has been included in costs of processing and distribution. Management removes the amount of these costs from our operating results to supplement a comparison to our past operating performance.

2016 Restructuring charges – This adjustment represents the closure of our French distribution and tissue procurement office. Management removes the amount of these costs from our operating results to supplement a comparison to our past operating performance.

2016, 2015 and 2014 Severance charges – This adjustment represents charges relating to the termination of former employees. Management removes the amount of these costs from our operating results to supplement a comparison to our past operating performance.

38

Table of Contents

2016 Foreign net operating loss valuation reserve – This adjustment represents charges relating to a foreign net operating loss valuation reserve. Management removes the amount of these costs from our operating results to supplement a comparison to our past operating performance.

## Liquidity and Capital Resources

### 2016 Compared to 2015

Our working capital at December 31, 2016 decreased $10.6 million to $121.3 million from $131.9 million at December 31, 2015 primarily as a result of higher cash receipts from customers than shipments and corresponding billings to customers, partially offset by an increase in accounts payable and accrued expenses.

At December 31, 2016, we had 55 days of revenues outstanding in trade accounts receivable, a decrease of 6 days compared to December 31, 2015. The decrease was due to higher cash receipts from customers than shipments and corresponding billings to customers during 2016.

At December 31, 2016, we had 312 days of inventory on hand, a decrease of 8 days compared to December 31, 2015. The decrease was primarily due to an inventory write-off of excess inventory quantities on hand in the fourth quarter of 2016. We believe that our inventory levels will be adequate to support our on-going operations for the next twelve months.

We had $13.8 million of cash and cash equivalents at December 31, 2016. At December 31, 2016, our foreign subsidiaries held $2.2 million in cash which is not available for use in the U.S. without incurring U.S. taxes. U.S. income taxes have not been paid or accrued for on the undistributed earnings of our foreign subsidiaries. We intend to indefinitely reinvest the earnings of our foreign subsidiaries. We do not believe that this policy of indefinitely reinvesting the earnings of our foreign subsidiaries will have a material adverse effect on the business as a whole.

Our short-term and long-term obligations at December 31, 2016 increased $4.1 million to $83.3 million from $79.2 million at December 31, 2015. The increase in short- and long-term obligations was primarily due to planned additional borrowings to reduce current liabilities partially offset by principal payments on long-term obligations. In June 2016, we entered into a Fourth Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which increased the maximum revolving credit amount from $30.0 million to $45.0 million. In November 2016, we entered into a Fifth Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which provided for: (i) a decrease in the maximum revolving credit amount from $45.0 million to $42.5 million; (ii) an increase in our leverage to EBITDA ratio from 2.50 to 1.00 to (A) 3.25 to 1.00 through March 31, 2017 and (B) 3.00 to 1.00 after March 31, 2017 and (iii) certain corresponding amendments. At December 31, 2016, we have $9.5 million of borrowing capacity available under our revolving credit facilities. In February 2017, we entered into a Sixth Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which modified the definition of "Extraordinary Expenses" and to increase to 300 basis points the LIBOR Spread applicable when our financial performance under its Leverage Ratio is greater than 3.0x.

As of December 31, 2016, we believe that our working capital, together with our borrowing ability under our revolving credit facilities, will be adequate to fund our ongoing operations for the next twelve months.

### 2015 Compared to 2014

Our working capital at December 31, 2015 decreased $1.6 million to $131.9 million from $133.5 million at December 31, 2014 primarily as a result of a change in the classification of deferred tax assets from current to long-term primarily offset by increases in accounts receivable and inventory.

At December 31, 2015, we had 61 days of revenues outstanding in trade accounts receivable, an increase of 7 days compared to December 31, 2014. The increase was due to lower cash receipts from customers than shipments and corresponding billings to customers during 2015.

At December 31, 2015, we had 320 days of inventory on hand, a decrease of 9 days compared to December 31, 2014. The decrease was primarily due to higher product distributions in the fourth quarter of 2015. We believe that our inventory levels will be adequate to support our on-going operations for the next twelve months.

We had $12.6 million of cash and cash equivalents at December 31, 2015. At December 31, 2015, our foreign subsidiaries held $888,000 in cash which is not available for use in the U.S. without incurring U.S. taxes. U.S. income taxes have not been paid or accrued for on the undistributed earnings of our foreign subsidiaries. We intend to indefinitely reinvest the earnings of our foreign subsidiaries. We do not believe that our policy of indefinitely reinvesting the earnings of our foreign subsidiaries will have a material adverse effect on the business as a whole.

Our short-term and long-term obligations at December 31, 2015 increased $3.3 million to $79.2 million from $75.9 million at December 31, 2014. The increase in short- and long-term obligations was primarily due to planned additional borrowings to reduce current liabilities partially offset by principal payments on long-term obligations. On June 29, 2015, we entered into a third amendment to the second amended and restated

loan agreement with TD Bank, N.A. and Regions Bank, which increased the maximum revolving credit amount from $20 million to $30 million. At December 31, 2015, we have $6.4 million of borrowing capacity available under our revolving credit facilities.

As of December 31, 2015, we believe that our working capital, together with our borrowing ability under our revolving credit facilities, will be adequate to fund our ongoing operations for the next twelve months.

On July 16, 2013, we completed our acquisition of Pioneer. Under the terms of the merger agreement dated June 12, 2013, we acquired Pioneer for $126.3 million in cash. The transaction was funded through a combination of cash on hand, a new credit facility and a concurrent private placement of convertible preferred equity as summarized below:

|  | (In thousands) |
| --- | --- |
| Cash proceeds from term loan | $ 60,000 |
| Net cash proceeds from preferred share issuance | 48,710 |
| Cash from RTI Surgical | 17,597 |
| Total purchase price | $ 126,307 |

The Preferred Stock accrues dividends at a rate of 6% per annum or $3.0 million payable in cash on a quarterly basis for each outstanding share of Preferred Stock. The payments of the dividends are subject to certain bank covenant restrictions. To the extent dividends are not paid in cash in any quarter, the dividends which have accrued on each outstanding share of Preferred Stock during such three-month period are accumulated and remain accumulated dividends with respect to such share of Preferred Stock until paid in cash or converted to common stock. We accrued $3.3 million, $3.1 million and $1.4 million in preferred dividends payable for the years ended December 31, 2015, 2014 and 2013, respectively, and paid the third quarter 2013 dividend of $625,000 in October 2013.

*Certain Commitments.*

On October 12, 2013, we entered into a distribution agreement with Medtronic, pursuant to which Medtronic will distribute certain allograft implants for use in spinal, general orthopedic and trauma surgery. Under the terms of this distribution agreement, Medtronic will be a non-exclusive distributor except for certain specified implants for which Medtronic will be the exclusive distributor. Medtronic will maintain its exclusivity with respect to these specified implants unless the cumulative fees received by us from Medtronic in respect of these specified implants decline by a certain amount during any trailing 12-month period. The initial term of this distribution agreement was through December 31, 2017. The term automatically renews for successive five-year periods, unless either party provides written notice of its intent not to renew at least one year prior to the expiration of the initial term or the applicable renewal period. Neither party provided notice of non-renewal on or before December 31, 2016, thereby triggering the five-year automatic renewal period upon the expiration of the initial term. The distribution agreement will therefore continue at least through December 31, 2022.

On September 10, 2010, we entered into an Exclusive License Agreement with Athersys, Inc. ("Athersys"), pursuant to which Athersys will provide us access to its Multipotent Adult Progenitor Cell ("MAPC") technologies to

39

Table of Contents

develop and commercialize MAPC technology-based biologic implants for certain orthopedic applications. In consideration for the Exclusive License, we agreed to pay Athersys the following: 1) a non-refundable $3.0 million license fee, payable in three time-based $1.0 million installments, the last of which was paid in the first quarter of 2011; 2) payment of $2.0 million contingent upon successful achievement of certain development milestones which we paid in 2012; and 3) up to $32.5 million contingent upon achievement of certain cumulative revenue milestones in future years. In addition, we pay Athersys royalties from the distribution of implants under a tiered royalty structure based on achievement of certain cumulative revenue milestones. The term of this license agreement is the longer of five years, or the remaining life of any patent or trade secret. These acquired licensing rights are being amortized to expense on a straight-line basis over the expected life of the asset.

On September 3, 2010, we entered into an exclusive distribution agreement with Zimmer Dental Inc. ("Zimmer Dental"), a subsidiary of Zimmer, with an effective date of September 30, 2010. The Agreement has an initial term of ten years. Under the terms of this distribution agreement, we agreed to supply sterilized allograft and xenograft implants at an agreed upon transfer price, and Zimmer Dental has agreed to be the exclusive distributor of the implants for dental and oral applications worldwide (except Ukraine), subject to certain Company obligations under an existing distribution agreement with a third party with respect to certain implants for the dental market. In consideration for Zimmer Dental's exclusive distribution rights, Zimmer Dental agreed to the following: 1) payment to us of $13.0 million within ten days of the effective date (the "Upfront Payment"); 2) annual exclusivity fees ("Annual Exclusivity Fees") paid annually for the term of the contract to be paid at the beginning of each calendar year; and 3) escalating annual purchase minimums to maintain exclusivity. Upon occurrence of an event that materially and adversely affects Zimmer Dental's ability to distribute the implants, Zimmer Dental may be entitled to certain refund rights with respect to the Upfront Payment and the then current Annual Exclusivity Fee, where such refund would be in an amount limited by a formula specified in this agreement that is based substantially on the number of days from the occurrence of such event to the date that it is cured by us to the satisfaction of Zimmer Dental. The Upfront Payment, the Annual Exclusivity Fees and the fees associated with distributions of processed tissue are considered to be a single unit of accounting. Accordingly, the Upfront Payment and the Annual Exclusivity Fees are deferred as received and are being recognized as other revenues over the term of this distribution agreement based on the expected contractual escalating annual purchase minimums relative to the total contractual minimum purchase requirements in this distribution agreement. Additionally, we considered the potential impact of this distribution agreement's contractual refund provisions and do not expect these provisions to impact future expected revenue related to this distribution agreement.

On July 13, 2009, we and Davol amended their previous distribution agreement with TMI for human dermis implants. Under the amended agreement: 1) Davol paid us $8.0 million in non-refundable fees for exclusive distribution rights for the distribution to the breast reconstruction market until July 13, 2019; 2) the exclusive worldwide distribution agreement related to the hernia market was extended to July 13, 2019; and 3) Davol agreed to pay us certain additional exclusive distribution rights fees contingent upon the achievement of certain revenue milestones by Davol during the duration of the contract. In the fourth quarter of 2010, Davol paid the first revenue milestone payment of $3.5 million. The non-refundable fees and the fees associated with distributions of processed tissue are considered to be a single unit of accounting. Accordingly, the $8.0 million and $3.5 million exclusivity payments were deferred and were being recognized as other revenues on a straight-line basis over the initial term of the amended contract of ten years, and the remaining term of the amended contract, respectively. Davol did not achieve certain revenue growth milestones which resulted in Davol relinquishing its exclusive distribution rights in the hernia market effective January 1, 2013 and in the breast reconstruction market effective January 1, 2015. As a result, the Company recognized additional deferred revenue as other revenues during the three months ended March 31, 2013 and 2015, of $1.7 million and $1.5 million, respectively, due to the acceleration of deferred revenue recognition relating to Davol relinquishing its exclusive distribution rights in the hernia and the breast reconstruction markets. The remaining balance is being recognized as other revenues on a straight-line basis over the remaining term of the amended contract.

Our debt obligations and availability of credit as of December 31, 2016 are as follows:

| | Outstanding Balance | | Available Credit | |
|---|---|---|---|---|
| | (In thousands) | | | |
| Term loan | $ | 50,347 | $ | — |
| Credit facility | | 33,000 | | 9,500 |
| Total | $ | 83,347 | $ | 9,500 |

40

**Table of Contents**

We obtained from TD Bank and Regions Bank, a 5-year, $80.0 million senior secured facility, which includes a $60.0 million term loan and a $20.0 million revolving credit facility that matures on July 16, 2018, with a variable interest rate between 100 and 275 basis points in excess of the one month LIBOR rate. On October 15, 2014, we entered into a Second Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which amended the loan agreement to remove certain financial covenants. On June 29, 2015, we entered into a Third Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which increased the maximum revolving credit amount from $20.0 million to $30.0 million. On June 29, 2016, we entered into a Fourth Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which increased the maximum revolving credit amount from $30.0 million to $45.0 million. On November 7, 2016, we entered into a Fifth Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which provided for: (i) a decrease in the maximum revolving credit amount from $45.0 million to $42.5 million; (ii) an increase in our leverage to EBITDA ratio from 2.50 to 1.00 to (A) 3.25 to 1.00 through March 31, 2017 and (B) 3.00 to 1.00 after March 31, 2017 and (iii) certain corresponding amendments. On February 28, 2017, we entered into a Sixth Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which modified the definition of "Extraordinary Expenses" and to increase to 300 basis points the LIBOR Spread applicable when our financial performance under its Leverage Ratio is greater than 3.0x. At December 31, 2016, the interest rate for the term loan and revolving credit facility is 3.37%. The facility is secured by substantially all the assets of the Company and its subsidiaries and guaranteed by the Company's domestic subsidiaries, other than RTI Donor Services, Inc. ("RTIDS"). As of December 31, 2016, there was $33.0 million outstanding on the revolving credit facility. The term loan facility requires aggregate principal payments of $8.3 million from March 31, 2017 through June 30, 2018, with a final balloon principal payment of $41.4 million on July 2, 2018. The credit agreement also contains various restrictive covenants which limit, among other things, indebtedness and liens, as well as payment of dividends, while requiring a minimum cash balance on hand of $10.0 million and certain financial covenant ratios.

In addition to the credit facility with TD Bank and Regions Bank, we had through our German subsidiary, three credit facilities with three German banks. As of December 31, 2016, the three credit facilities with the three German banks were paid off and terminated.

The total available credit on our one revolving credit facility at December 31, 2016 was $9.5 million. Our ability to access our revolving credit facility is subject to and can be limited by our compliance with our financial and other covenants. We were in compliance with the financial covenants related to our revolving credit facility as of December 31, 2016.

As of December 31, 2016, we paid off all remaining capital leases.

The following table provides a summary of our debt obligations, operating lease obligations and other significant obligations as of December 31, 2016.

| | Total | 2017 | 2018 | 2019 | 2020 | 2021 and Beyond |
|---|---|---|---|---|---|---|
| | | | (In thousands) | | | |
| Short and long-term debt obligations | $ 83,347 | $ 6,080 | $77,267 | $ — | $— | $ — |
| Operating lease obligations | 4,992 | 1,936 | 1,347 | 1,007 | 587 | 115 |
| Purchase obligations (1) | 12,089 | 12,089 | — | — | — | — |
| Unrecognized tax benefits | — | — | — | — | — | — |
| Total | $100,428 | $20,105 | $78,614 | $1,007 | $587 | $ 115 |

Contractual Obligations Due by Period

*(1)  These amounts consist of contractual obligations for capital expenditures and open purchase orders.*

**Impact of Inflation**

Inflation generally affects us by increasing our cost of labor, equipment and processing tools and supplies. We do not believe that the relatively low rates of inflation experienced in the United States since the time we began operations have had any material effect on our business.

41

**Table of Contents**

**Item 7A.      QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

We are subject to market risk from exposure to changes in interest rates based upon our financing, investing and cash management activities.

We are exposed to interest rate risk in the United States and Germany. Changes in interest rates affect interest income earned on cash and cash equivalents and interest expense on revolving credit arrangements. We have not entered into derivative transactions related to cash and cash equivalents or debt. Our borrowings under our term loan and credit facility expose us to market risk related to changes in interest rates. As of December 31, 2016, our outstanding floating rate indebtedness totaled $83.3 million. The primary base interest rate is LIBOR. Assuming the outstanding balance on our floating rate indebtedness remains constant over a year, a 100 basis point increase in the interest rate would decrease net income and cash flow by approximately $0.5 million. Other outstanding debt consists of fixed rate instruments. We do not expect changes in interest rates to have a material adverse effect on our income or our cash flows in 2017. However, we can give no assurance that interest rates will not significantly change in the future.

The value of the U.S. dollar compared to the Euro affects our financial results. Changes in exchange rates may positively or negatively affect revenues, gross margins, operating expenses and net income. Our international operations currently transact business primarily in the Euro. Assets and liabilities of foreign subsidiaries are translated at the period end exchange rate while revenues and expenses are translated at the average exchange rate for the period. Intercompany transactions are translated from the Euro to the U.S. dollar. Based on December 31, 2016 outstanding intercompany balances, a 1% change in currency rates would have had a de-minimis impact on our results of operations.

We do not expect changes in exchange rates to have a material adverse effect on our income or our cash flows in 2017. However, we can give no assurance that exchange rates will not significantly change in the future.

**Item 8.      FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.**

Our consolidated financial statements and supplementary data required in this item are set forth at the pages indicated in Item 15(a)(1).

**Item 9.      CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

Not applicable.

**Item 9A.      CONTROLS AND PROCEDURES.**

Attached as exhibits to this Form 10-K are certifications of our Interim Chief Executive Officer and Interim Chief Financial Officer, which are required in accordance with Rule 13a-15 of the Exchange Act. This "Controls and Procedures" section includes information concerning the controls and controls evaluation referred to in the certifications.

As of the end of the period covered by this report, an evaluation was performed on the effectiveness of the design and operation of our disclosure controls and procedures under the supervision and with the participation of our management, including our Interim Chief Executive Officer and Interim Chief Financial Officer. Disclosure controls and procedures include controls and other procedures that are designed to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms, and accumulated and communicated to the Company's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Based upon that evaluation, our Interim Chief Executive Officer and Interim Chief Financial Officer concluded that the design and operation of our disclosure controls and procedures were effective as of the end of the period covered by this report.

**Changes in Internal Controls**

We expanded the use of our enterprise resource system SAP in 2016. On August 31, 2016, we completed a phase of our implementation of SAP. We completed our evaluation on the impact to our internal control over financial reporting due to the completion of SAP. There have been no changes in our internal control over financial reporting during our last fiscal quarter that materially affected, or are reasonably likely to materially affect our internal control over financial reporting.

Table of Contents

**Management's Report on Effectiveness of Internal Controls**

The management of RTI Surgical, Inc. and subsidiaries (the "Company") is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Securities Exchange Act Rules 13a-15(f) and 15d-15(f)). The Company's internal control system was designed to provide reasonable assurance to the Company's management and board of directors regarding the preparation and fair presentation of published financial statements.

All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2016. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control – Integrated Framework (2013)*. Based on this assessment, management believes that, as of December 31, 2016, the Company's internal control over financial reporting is effective based on those criteria.

The Company's independent registered public accounting firm has issued a report on the Company's internal control over financial reporting. This report appears on page 47.

**Item 9B.      OTHER INFORMATION.**

As disclosed in the Company's Current Report on 8-K filed with the SEC on January 24, 2017, the Company and Ms. Caroline A. Hartill, the Company's former Executive Vice President and Chief Scientific Officer, agreed on January 18, 2017 to Ms. Hartill's separation from the Company. The separation occurred on January 31, 2017. In connection with the separation, the Company and Ms. Hartill executed the following documents: a Consultant Agreement, dated February 1, 2017 (the "Consultant Agreement"); an Executive Separation Agreement, dated January 31, 2017 (the "Executive Separation Agreement"); and a Release Agreement, dated February 1, 2017 (the "Release Agreement").

The Consultant Agreement's term began on February 1, 2017 and will continue through September 30, 2017 (unless earlier terminated or mutually extended). For the first three months of the term, the Company will pay to Ms. Hartill $7,500 per month (with any hours above 20 per month compensated at an hourly rate of $375). After this initial three-month period, Ms. Hartill will provide services at the request of the Company at an hourly rate of $375 for the remainder of the term.

Under the Executive Separation Agreement, Ms. Hartill will receive certain benefits from the Company. These benefits include: (a) all of the unvested stock options and restricted stock awards held by Ms. Hartill became fully vested as of January 31, 2017 and (b) all of Ms. Hartill's stock options are exercisable through the close of business on the 90th day following the end of her services under the Consultant Agreement (currently expected to be December 31, 2017) but if the Company terminates the Consultant Agreement before September 30, 2017 (other for breach of such Consultant Agreement), the date such options can be exercised will be extended to the close of business on December 31, 2017. In consideration for these benefits, Ms. Hartill agreed to a mutual non-disparagement covenant and entered into the Release Agreement.

The above description of the Consultant Agreement is qualified in its entirety by reference to the full text of the Consultant Agreement, which is filed as Exhibit 10.39 to this Annual Report on Form 10-K and incorporated by reference into this Item 9B. The above description of the Executive Separation Agreement is qualified in its entirety by reference to the full text of the Executive Separation Agreement, which is filed as Exhibit 10.40 to this Annual Report on Form 10-K and incorporated by reference into this Item 9B. The above description of the Release Agreement is qualified in its entirety by reference to the full text of the Release Agreement, which is filed as Exhibit 10.41 to this Annual Report on Form 10-K and incorporated by reference into this Item 9B.

43

**Table of Contents**

## PART III

**Item 10.      DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.**

The information required by Item 10 relating to our directors, executive officers and corporate governance is incorporated by reference to our definitive proxy statement for 2017 Annual Meeting of Stockholders to be filed within 120 days after December 31, 2016.

Information relating to our Code of Ethics that applies to our senior financial professionals is available on our website http://www.rtix.com/investors/corporate-governance. Any amendments to, or waiver of, any provision of the Code of Ethics will be posted on our website.

**Item 11.      EXECUTIVE COMPENSATION.**

The information required by Item 11 relating to executive compensation is incorporated by reference to our definitive proxy statement for our 2017 Annual Meeting of Stockholders to be filed within 120 days after December 31, 2016.

**Item 12.      SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS.**

The information required by Item 12 relating to security ownership of certain beneficial owners and management, securities authorized for issuance under equity compensation plans and related shareholders matters is incorporated by reference to our definitive proxy statement for our 2017 Annual Meeting of Stockholders to be filed within 120 days after December 31, 2016.

**Item 13.      CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.**

The information required by Item 13 relating to certain relationships and related transactions, and director independence is incorporated by reference to our definitive proxy statement for our 2017 Annual Meeting of Stockholders to be filed within 120 days after December 31, 2016.

**Item 14.      PRINCIPAL ACCOUNTING FEES AND SERVICES.**

The information required by Item 14 relating to principal accounting fees and services is incorporated by reference to our definitive proxy statement for our 2017 Annual Meeting of Stockholders to be filed within 120 days after December 31, 2016.

**Table of Contents**

**PART IV**

**Item 15.     EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.**

(a)          (1)     *Financial Statements*:

See "Index to Consolidated Financial Statements and Financial Statement Schedule" on page 46, the Independent Registered Public Accounting Firm's Report on page 47 and the Consolidated Financial Statements on pages 48 to 51, all of which are incorporated herein by reference.

(2)     *Financial Statement Schedule*:

The following Financial Statement Schedule is filed as part of this Report:

Schedule II, Valuation and Qualifying Accounts for the years ended December 31, 2016, 2015 and 2014 is included in the Consolidated Financial Statements of RTI Surgical, Inc. on page 72. All other financial statement schedules are omitted because they are inapplicable, not required or the information is indicated elsewhere in the consolidated financial statements or the notes thereto.

(3)     *Exhibits*:

The information required by this item is set forth on the exhibit index that follows the signature page of this report.

45

Table of Contents

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS
AND FINANCIAL STATEMENT SCHEDULE**

Page

**Consolidated Financial Statements of RTI Surgical, Inc. and Subsidiaries**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | 47 |
| Consolidated Balance Sheets—December 31, 2016 and 2015 | 48 |
| Consolidated Statements of Comprehensive (Loss) Income —Years Ended December 31, 2016, 2015 and 2014 | 49 |
| Consolidated Statements of Stockholders' Equity — Years Ended December 31, 2016, 2015 and 2014 | 50 |
| Consolidated Statements of Cash Flows— Years Ended December 31, 2016, 2015 and 2014 | 51 |
| Notes to Consolidated Financial Statements—Years Ended December 31, 2016, 2015 and 2014 | 52– 71 |
| Schedule II – Valuation and Qualifying Accounts | 72 |

46

Table of Contents

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of
RTI Surgical, Inc.
Alachua, Florida

We have audited the accompanying consolidated balance sheets of RTI Surgical, Inc. and subsidiaries (the "Company") as of December 31, 2016 and 2015, and the related consolidated statements of comprehensive (loss) income stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2016. Our audits also included the financial statement schedule listed in the Index at Item 15(a)(2). We also have audited the Company's internal control over financial reporting as of December 31, 2016, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for these financial statements and the financial statement schedule, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Effectiveness of Internal Controls. Our responsibility is to express an opinion on these financial statements and the financial statement schedule and an opinion on the Company's internal control over financial reporting based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of RTI Surgical, Inc. and subsidiaries as of December 31, 2016 and 2015, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2016, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein. Also, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2016, based on the criteria established in *Internal Control—Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

/s/ DELOITTE & TOUCHE LLP
Certified Public Accountants

Tampa, Florida
March 13, 2017

47

Table of Contents

**RTI SURGICAL, INC. AND SUBSIDIARIES**
**Consolidated Balance Sheets**
**(In thousands, except share data)**

| | December 31, 2016 | December 31, 2015 |
|---|---|---|
| **Assets** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 13,849 | $ 12,614 |
| Accounts receivable - less allowances of $1,728 at December 31, 2016 and $1,454 at December 31, 2015 | 41,488 | 47,243 |
| Inventories - net | 119,743 | 118,673 |
| Prepaid and other current assets | 5,213 | 13,184 |
| Total current assets | 180,293 | 191,714 |
| Property, plant and equipment - net | 83,298 | 84,992 |
| Deferred tax assets - net | 24,968 | 22,385 |
| Goodwill | 54,887 | 54,887 |
| Other intangible assets - net | 23,994 | 26,213 |
| Other assets - net | 591 | 471 |
| Total assets | $ 368,031 | $ 380,662 |
| **Liabilities and Stockholders' Equity** | | |
| Current Liabilities: | | |
| Accounts payable | $ 26,112 | $ 20,446 |
| Accrued expenses | 22,030 | 28,609 |
| Current portion of deferred revenue | 4,742 | 4,865 |
| Current portion of short and long-term obligations | 6,080 | 5,853 |
| Total current liabilities | 58,964 | 59,773 |
| Long-term obligations - less current portion | 77,267 | 73,384 |
| Other long-term liabilities | 256 | 472 |
| Deferred revenue | 6,612 | 9,354 |
| Total liabilities | 143,099 | 142,983 |
| Preferred stock Series A, $.001 par value: 5,000,000 shares authorized; 50,000 shares issued and outstanding | 60,016 | 56,323 |
| Stockholders' equity: | | |
| Common stock, $.001 par value: 150,000,000 shares authorized; 58,433,397 and 57,803,111 shares issued and outstanding, respectively | 58 | 58 |
| Additional paid-in capital | 417,428 | 417,725 |
| Accumulated other comprehensive loss | (8,316) | (7,042) |
| Accumulated deficit | (243,338) | (228,939) |
| Less treasury stock, 368,949 and 230,352 shares, respectively, at cost | (916) | (446) |
| Total stockholders' equity | 164,916 | 181,356 |
| Total liabilities and stockholders' equity | $ 368,031 | $ 380,662 |

See notes to consolidated financial statements.

48

Table of Contents

**RTI SURGICAL, INC. AND SUBSIDIARIES**
**Consolidated Statements of Comprehensive (Loss) Income**
**(In thousands, except share and per share data)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | 2014 |
| Revenues | $ 272,865 | $ 282,293 | $ 262,810 |
| Costs of processing and distribution | 140,516 | 132,551 | 129,013 |
| Gross profit | 132,349 | 149,742 | 133,797 |
| Expenses: | | | |
| Marketing, general and administrative | 116,125 | 107,439 | 107,653 |
| Research and development | 16,090 | 15,065 | 15,536 |
| Strategic review costs | 1,150 | — | — |
| CEO Retirement and transition costs | 4,404 | — | — |
| Contested proxy expenses | 2,680 | — | — |
| Asset impairment and abandonments | 5,435 | 814 | — |
| Litigation settlement and settlement charges | — | 804 | 185 |
| Restructuring charges | 1,107 | — | — |
| Severance costs | 1,039 | 995 | 4,798 |
| Total operating expenses | 148,030 | 125,117 | 128,172 |
| Operating (loss) income | (15,681) | 24,625 | 5,625 |
| Other (expense) income: | | | |
| Interest expense | (1,655) | (1,492) | (1,357) |
| Interest income | 8 | 3 | 9 |
| Foreign exchange (loss) gain | (132) | 78 | (88) |
| Total other expense - net | (1,779) | (1,411) | (1,436) |
| (Loss) income before income tax benefit (provision) | (17,460) | 23,214 | 4,189 |
| Income tax benefit (provision) | 3,061 | (8,299) | (1,493) |
| Net (loss) income | (14,399) | 14,915 | 2,696 |
| Convertible preferred dividend | (3,508) | (3,305) | (3,113) |
| Net (loss) income applicable to common shares | $ (17,907) | $ 11,610 | $ (417) |
| Other comprehensive loss: | | | |
| Unrealized foreign currency translation loss | (1,274) | (3,161) | (3,069) |
| Comprehensive (loss) income | $ (19,181) | $ 8,449 | $ (3,486) |
| Net (loss) income per common share - basic | $ (0.31) | $ 0.20 | $ (0.01) |
| Net (loss) income per common share - diluted | $ (0.31) | $ 0.20 | $ (0.01) |
| Weighted average shares outstanding - basic | 58,236,745 | 57,611,231 | 56,735,924 |
| Weighted average shares outstanding - diluted | 58,236,745 | 58,590,494 | 56,735,924 |

See notes to consolidated financial statements.

49

Table of Contents

**RTI SURGICAL, INC. AND SUBSIDIARIES**
**Consolidated Statements of Stockholders' Equity**
**(In thousands)**

| | Common Stock | Additional Paid-in Capital | Accumulated Other Comprehensive Loss | Accumulated Deficit | Treasury Stock | Total |
|---|---|---|---|---|---|---|
| Balance, January 1, 2014 | $ 56 | $ 415,426 | $ (812) | $ (246,550) | $ (67) | $168,053 |
| Net income | — | — | — | 2,696 | — | 2,696 |
| Foreign currency translation adjustment | — | — | (3,069) | — | — | (3,069) |
| Exercise of common stock options | 1 | 888 | — | — | — | 889 |
| Stock-based compensation | — | 3,032 | — | — | — | 3,032 |
| Purchase of treasury stock | — | — | — | — | (122) | (122) |
| Amortization of preferred stock Series A issuance costs | — | (184) | — | — | — | (184) |
| Preferred stock Series A dividend | — | (3,113) | — | — | — | (3,113) |
| Change in income tax benefit from stock-based compensation | — | (347) | — | — | — | (347) |
| Balance, December 31, 2014 | 57 | 415,702 | (3,881) | (243,854) | (189) | 167,835 |
| Net income | — | — | — | 14,915 | — | 14,915 |
| Foreign currency translation adjustment | — | — | (3,161) | — | — | (3,161) |
| Exercise of common stock options | 1 | 2,504 | — | — | — | 2,505 |
| Stock-based compensation | — | 2,858 | — | — | — | 2,858 |
| Purchase of treasury stock | — | — | — | — | (257) | (257) |
| Amortization of preferred stock Series A issuance costs | — | (186) | — | — | — | (186) |
| Preferred stock Series A dividend | — | (3,305) | — | — | — | (3,305) |
| Change in income tax benefit from stock-based compensation | — | 152 | — | — | — | 152 |
| Balance, December 31, 2015 | 58 | 417,725 | (7,042) | (228,939) | (446) | 181,356 |
| Net loss | — | — | — | (14,399) | — | (14,399) |
| Foreign currency translation adjustment | — | — | (1,274) | — | — | (1,274) |
| Exercise of common stock options | — | 57 | — | — | — | 57 |
| Stock-based compensation | — | 3,590 | — | — | — | 3,590 |
| Purchase of treasury stock | — | — | — | — | (470) | (470) |
| Amortization of preferred stock Series A issuance costs | — | (185) | — | — | — | (185) |
| Preferred stock Series A dividend | — | (3,508) | — | — | — | (3,508) |
| Change in income tax benefit from stock-based compensation | — | (251) | — | — | — | (251) |
| Balance, December 31, 2016 | $ 58 | $ 417,428 | $ (8,316) | $ (243,338) | $ (916) | $164,916 |

See notes to consolidated financial statements.

50

Table of Contents

**RTI SURGICAL, INC. AND SUBSIDIARIES**
**Consolidated Statements of Cash Flows**
**(In thousands)**

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2016** | **2015** | **2014** |
| **Cash flows from operating activities:** | | | |
| Net (loss) income | $(14,399) | $ 14,915 | $ 2,696 |
| Adjustments to reconcile net (loss) income to net cash provided by operating activities: | | | |
| Depreciation and amortization expense | 16,510 | 16,522 | 15,395 |
| Provision for bad debts and product returns | 895 | 1,568 | 891 |
| Provision for inventory write-downs | 13,880 | 5,390 | 3,763 |
| Amortization of deferred revenue | (4,867) | (6,225) | (5,420) |
| Deferred income tax provision | (3,395) | 5,543 | 502 |
| Stock-based compensation | 3,590 | 2,548 | 3,032 |
| Asset impairment | 5,435 | — | — |
| Other | 603 | 2,280 | 958 |
| Change in assets and liabilities: | | | |
| Accounts receivable | 4,756 | (10,435) | (8,058) |
| Inventories | (15,369) | (11,990) | (11,244) |
| Accounts payable | 4,583 | (12,660) | 4,087 |
| Accrued expenses | (6,536) | 5,532 | 1,375 |
| Deferred revenue | 2,000 | 2,000 | — |
| Other operating assets and liabilities | 7,637 | (5,992) | (1,083) |
| Net cash provided by operating activities | 15,323 | 8,996 | 6,894 |
| **Cash flows from investing activities:** | | | |
| Purchases of property, plant and equipment | (15,337) | (17,740) | (15,577) |
| Patent and acquired intangible asset costs | (2,615) | (498) | (737) |
| Net cash used in investing activities | (17,952) | (18,238) | (16,314) |
| **Cash flows from financing activities:** | | | |
| Proceeds from exercise of common stock options | 57 | 2,505 | 889 |
| Proceeds from long-term obligations | 17,000 | 8,750 | 7,000 |
| Net (payments) proceeds from short-term obligations | (1,511) | 422 | 658 |
| Payments on long-term obligations | (11,424) | (5,294) | (682) |
| Other financing activities | (458) | (109) | 5 |
| Net cash provided by financing activities | 3,664 | 6,274 | 7,870 |
| Effect of exchange rate changes on cash and cash equivalents | 200 | (121) | (1,468) |
| Net increase (decrease) in cash and cash equivalents | 1,235 | (3,089) | (3,018) |
| Cash and cash equivalents, beginning of period | 12,614 | 15,703 | 18,721 |
| Cash and cash equivalents, end of period | $ 13,849 | $ 12,614 | $ 15,703 |
| | | | |
| **Supplemental cash flow disclosure:** | | | |
| Cash paid for interest | $ 1,224 | $ 1,425 | $ 1,624 |
| Cash paid for income taxes, net of refunds | (238) | 3,667 | 578 |
| Non-cash acquisition of property, plant and equipment | 952 | 3,795 | 1,947 |
| Stock-based compensation related to severance | — | 310 | — |
| Change in accrual for dividend payable | 3,508 | 3,305 | 3,113 |

See notes to consolidated financial statements.

51

**Table of Contents**

**RTI SURGICAL, INC. AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements**
**Years Ended December 31, 2016, 2015 and 2014**
**(In thousands, except share and per share data)**

## 1. Business

RTI Surgical, Inc. (the "Company"), and its subsidiaries recover and process human and animal tissue and manufacture metal and synthetic implants and instruments. The processing transforms the tissue into either conventional or precision machined allograft implants (human) or xenograft implants (animal). The implants are used for orthopedic and other surgical applications to promote the natural healing of human bone and other human tissue. These implants are distributed domestically and internationally, for use in reconstruction and fracture repair.

## 2. Summary of Significant Accounting Policies

*Principles of Consolidation*—The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries, Pioneer Surgical Technology, Inc. ("Pioneer"), Tutogen Medical, Inc. ("TMI"), RTI Surgical, Inc. – Cardiovascular (inactive), Biological Recovery Group Inc. (inactive), and RTI Services, Inc. (inactive). The consolidated financial statements also include the accounts of RTI Donor Services, Inc. ("RTIDS"), which is a controlled entity. The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). All intercompany balances and transactions have been eliminated in consolidation.

RTIDS is a taxable not-for-profit entity organized and controlled by the Company. RTIDS is the corporate entity that is responsible for procuring tissue for the Company. Expenses incurred by RTIDS to procure tissue are passed through to the Company. RTIDS has no significant assets or liabilities except for its intercompany accounts receivable and accounts payable to tissue recovery agencies. The Company pays all expenses of RTIDS.

*Use of Estimates*—The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Estimates and assumptions relating to inventories, receivables, long-lived assets, investment valuations and litigation are made at the end of each financial reporting period by management. Actual results could differ from those estimates.

*Foreign Currency Translation*—The functional currency of the Company's foreign subsidiaries is the Euro. Assets and liabilities of the foreign subsidiaries are translated at the period end exchange rate while revenues and expenses are translated at the average exchange rate for the period. The resulting translation adjustments, representing unrealized, noncash gains and losses are recorded and presented as a component of comprehensive (loss) income. Gains and losses resulting from transactions of the Company and its subsidiaries, which are made in currencies different from their own, are included in income or loss as they occur and are included in other (expense) income in the consolidated statements of comprehensive (loss) income.

*Fair Value of Financial Instruments*—The estimated fair value of financial instruments disclosed in the consolidated financial statements has been determined by using available market information and appropriate valuation methodologies. The carrying value of all current assets and current liabilities approximates fair value because of their short-term nature. The carrying value of the long-term debt obligations approximates fair value. The carrying value of capital lease obligations approximates their fair value, based on current market prices.

*Cash and Cash Equivalents*— The Company considers all funds in banks and short-term highly liquid investments with an original maturity of three months or less to be cash and cash equivalents. Cash equivalents comprise overnight repurchase agreements. Cash balances are held at a few financial institutions and usually exceed insurable amounts. The Company mitigates this risk by depositing its uninsured cash in major well capitalized financial institutions, and by investing excess operating cash in overnight repurchase agreements which are 101% collateralized by U.S. Government backed securities with the Company's bank. At December 31, 2016 and 2015, the Company had no cash equivalents.

*Accounts Receivable Allowances*— The Company maintains allowances for doubtful accounts based on the Company's review and assessment of payment history and its estimate of the ability of each customer to make payments on amounts invoiced. If the financial condition of any of its customers were to deteriorate, additional allowances might be required. From time to time the Company must adjust its estimates. Changes in estimates of the collection risk related to accounts receivable can result in decreases and increases to current period net income.

**Table of Contents**

*Inventories*—Inventories are stated at the lower of cost or market, with cost determined using the first-in, first-out method. Inventory write-downs for unprocessed donor tissue are recorded based on the estimated amount of inventory that will not pass the quality control process based on historical data, and the amount of inventory that is not readily distributable or is unusable. In addition, provisions for inventory write-downs are estimated for tissue in process inventory that is not readily distributable or is unusable. Any implantable donor tissue deemed to be obsolete is included in the write-down at the time the determination is made. Non-tissue inventory is evaluated for obsolescence and excess quantities by analyzing inventory levels, historical loss trends, expected product lives, product at risk of expiration, sales levels by product and projections of future sales demand.

*Implant and Product Recalls*—The Company accrues the estimated cost of recalls at the date the recall is initiated. The cost of recalls is primarily comprised of implant replacement costs. The Company incurred immaterial costs related to all of the recalls for the years ended December 31, 2016, 2015 and 2014.

*Surgical Instruments*—Surgical instruments which are included in property, plant and equipment are handheld devices used by surgeons during implant procedures. The Company retains title to the surgical instruments. Depreciation for surgical instruments is included in selling and marketing expenses in the accompanying consolidated statements of comprehensive (loss) income.

*Property, Plant and Equipment*—Property, plant and equipment are stated at cost less accumulated depreciation. The cost of equipment under capital leases and leasehold improvements is amortized on the straight-line method over the shorter of the lease term or the estimated useful life of the asset. Depreciation is computed on the straight-line method over the following estimated useful lives of the assets:

| | |
|---|---|
| Buildings | 25 to 40 years |
| Building improvements and leasehold improvements | 8 to 40 years |
| Processing equipment | 7 to 10 years |
| Office equipment, furniture and fixtures | 5 to 7 years |
| Computer hardware and software | 3 to 7 years |
| Surgical instruments | 3 to 5 years |

*Software Costs*—Included in property, plant and equipment are costs related to purchased software that are capitalized.

*Debt Issuance Costs*—Debt issuance costs include costs incurred to obtain financing and are amortized using the straight-line method, which approximates the effective interest method, over the life of the related debt. Debt issuance costs related to a recognized debt liability are presented in the balance sheet as a direct deduction from the carrying amount of that debt liability.

*Long-Lived Assets*— The Company periodically evaluates the period of depreciation or amortization for long-lived assets to determine whether current circumstances warrant revised estimates of useful lives. The Company reviews its property, plant and equipment for impairment whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable. Recoverability is measured by a comparison of the carrying amount to the net undiscounted cash flows expected to be generated by the asset. An impairment loss would be recorded for the excess of net carrying value over the fair value of the asset impaired. The fair value is estimated based on expected discounted future cash flows. The results of impairment tests are subject to management's estimates and assumptions of projected cash flows and operating results. Changes in assumptions or market conditions could result in a change in estimated future cash flows and the likelihood of materially different reported results. During the fourth quarter of 2016, the Company concluded a strategic review of its business lines and operations, and updated its financial projections. As a result, the Company's financial projections related to its hernia business line were adjusted downward. This business line is a significant driver of revenue for the Tutogen Germany asset group. As a result, during the fourth quarter of 2016, the Company completed an asset group impairment test and determined the carrying value was not recoverable as of December 31, 2016. The Company used a market approach to determine the fair value of the Tutogen Germany asset group's long lived assets and recognized impairment charges related to identified intangibles and property and equipment of $5.4 million. During 2015 the Company incurred asset abandonments of certain long-term assets at our German facility of $814,000.

*Goodwill*— Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 350, *Goodwill and Other Intangible Assets* ("FASB ASC 350"), requires companies to test goodwill for impairment on an annual basis at the reporting unit level (or an interim basis if an event occurs that might reduce the fair value of a reporting unit below its carrying value). The Company has one reporting

53

Table of Contents

unit and the annual impairment test is performed at each year-end unless indicators of impairment are present and require more frequent testing. The Company did not have any other identifiable intangible assets with indefinite useful lives as of December 31, 2016 and 2015.

Goodwill is tested for impairment annually by comparing the fair value of the reporting unit to its carrying amount, including goodwill. The Company adopted Accounting Standards Update ("ASU") No. 2011-08, *Intangibles – Goodwill and Other: Testing Goodwill for Impairment,* which permits the consideration of qualitative indicators of the fair value of a reporting unit when it is unlikely that a reporting unit has impaired goodwill. If the Company determines the fair value is more-likely- than-not greater than its carrying amount, no additional testing is considered necessary. However, if the Company determines the fair value is more-likely-than-not below the carrying value of the reporting unit, the Company performs the two step goodwill impairment test. If the two step goodwill impairment test is required, an income approach and a market approach are utilized. The conclusion from these two approaches are generally weighted equally and then adjusted to incorporate a control premium or acquisition premium that reflects the additional amount a buyer is willing to pay for elements of control and for a premium that reflects the buyer's perception of its ability to add value through synergies.

In general, the income approach employs a discounted cash flow model that considers: 1) assumptions that marketplace participants would use in their estimates of fair value, including the cash flow period, terminal values based on a terminal growth rate and the discount rate; 2) current period actual results; and 3) projected results for future periods that have been prepared and approved by senior management of the Company. The forecasted cash flows do not include synergies that a marketplace participant would be expecting to achieve.

The market approach employs market multiples from guideline public companies operating in our industry. Estimates of fair value are derived by applying multiples based on revenue and earnings before interest, taxes, depreciation and amortization ("EBITDA") adjusted for size and performance metrics relative to peer companies. A control premium was included in determining the fair value under this approach.

If the carrying amount of the reporting unit exceeds its calculated fair value, the second step of the goodwill impairment test is performed in accordance with FASB ASC 350 to measure the amount of the impairment loss, if any.

Both approaches used in the analysis have a degree of uncertainty. Potential events or changes in circumstances which could impact the key assumptions used in our goodwill impairment evaluation are as follows:

- Change in peer group or performance of peer group companies

- Change in the Company's markets and estimates of future operating performance

- Change in the Company's estimated market cost of capital

- Change in implied control premiums related to acquisitions in the medical device industry.

Goodwill represents the excess of purchase price over fair value of tangible net assets of acquired businesses at the acquisition date, after amounts allocated to other identifiable intangible assets. Factors that contribute to the recognition of goodwill include securing synergies that are specific to our business and not available to other market participants and are expected to increase revenues and profits; acquisition of a talented workforce; cost savings opportunities; the strategic benefit of expanding our presence in core and adjacent markets; and diversifying our product portfolio.

*Other Intangible Assets* —Other intangible assets, which constitutes finite lives assets, generally consist of patents, acquired exclusivity rights, licensing rights, trademarks, customer lists, non-compete agreements, distribution agreements, and procurement contracts. Patents and trademarks are amortized on the straight-line method over the shorter of the remaining protection period or estimated useful lives of between 8 and 16 years. The acquired exclusivity rights are being amortized over eight years, the remaining term of the amended distribution agreement. Licensing rights, customer lists, non-compete agreements, distribution agreements, and procurement contracts are amortized over estimated useful lives of between 5 to 25 years.

Other intangible assets are tested for impairment annually (if indefinite lived) or whenever events or circumstances indicate that the carrying amount of an asset or asset group may not be recoverable. The recoverability test is described in the Company's accounting policy for long-lived assets set forth above.

*Revenue Recognition*—Revenue is recognized upon shipping, or receipt by the Company's customers of the implant, depending on the Company's distribution agreements with the Company's customers or distributors. Other revenues are recognized when all significant contractual obligations have been satisfied.

54

Table of Contents

The Company permits returns of implants in accordance with the terms of contractual agreements with customers if the implant is returned in a timely manner, in unopened packaging, and from the normal channels of distribution. Allowances for returns are provided based upon analysis of the Company's historical patterns of returns matched against the revenues from which they originated.

The Company records estimated implant returns, discounts, rebates and other distribution incentives as a reduction of revenue in the same period revenue is recognized. Estimates of implant returns are recorded for anticipated implant returns based on historical distributions and returns information. Estimates of discounts, rebates and other distribution incentives are recorded based on contractual terms, historical experience and trend analysis.

Other revenues consists of service processing, tissue recovery fees, biomedical laboratory fees, recognition of previously deferred revenues, shipping fees, distribution of reproductions of our allografts to distributors for demonstration purposes and restocking fees which is included in revenues.

*Stock-Based Compensation Plans*—The Company accounts for its stock-based compensation plans in accordance with FASB ASC 718, *Accounting for Stock Compensation* ("FASB ASC 718"). FASB ASC 718 requires the measurement and recognition of compensation expense for all stock-based awards made to employees and directors, including employee stock options and restricted stock. Under the provisions of FASB ASC 718, and U.S. Securities and Exchange Commission *Staff Accounting Bulletin No. 107*, stock-based compensation cost is measured at the grant date, based on the calculated fair value of the award, and is recognized as an expense on a straight-line basis over the requisite service period of the entire award (generally the vesting period of the award). The Company uses the Black-Scholes model to value its stock option grants under FASB ASC 718 and expenses the related compensation cost using the straight-line method over the vesting period. The fair value of stock options is determined on the grant date using assumptions for the expected term, expected volatility, dividend yield, and the risk free interest rate. The term assumption is primarily based on the contractual vesting term of the option and historic data related to exercise and post-vesting cancellation history experienced by the Company. The Company uses the simplified method for estimating the expected term used to determine the fair value of options under FASB ASC 718. The expected term is determined separately for options issued to the Company's directors and to employees. The Company's anticipated volatility level is primarily based on the historic volatility of the Company's common stock. The Company's model includes a zero dividend yield assumption, as the Company has not historically paid nor does it anticipate paying dividends on its common stock. The risk free interest rate approximates recent U.S. Treasury note auction results with a similar life to that of the option. The Company's model does not include a discount for post-vesting restrictions, as the Company has not issued awards with such restrictions. The period expense is then determined based on the valuation of the options, and at that time an estimated forfeiture rate is used to reduce the expense recorded. The Company's estimate of pre-vesting forfeitures is primarily based on the recent historical experience of the Company, and is adjusted to reflect actual forfeitures as the options vest.

*Research and Development Costs*—Research and development costs, including the cost of research and development conducted for others and the cost of contracted research and development, are expensed as incurred.

*Income Taxes*—The Company uses the asset and liability method of accounting for income taxes. Deferred income taxes are recorded to reflect the tax consequences on future years for differences between the tax basis of assets and liabilities and their financial reporting amounts at each year-end based on enacted tax laws and statutory tax rates applicable to the periods in which the differences are expected to affect taxable income. Valuation allowances are established when necessary to reduce deferred tax assets to amounts which are more likely than not to be realized.

*Earnings Per Share*—Basic earnings per share ("EPS") is computed by dividing earnings attributable to common stockholders by the weighted-average number of common shares outstanding for the periods. Diluted EPS reflects the potential dilution of securities that could share in the earnings. A reconciliation of the number of common shares used in the calculation of basic and diluted EPS is presented below:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | 2014 |
| Basic shares | 58,236,745 | 57,611,231 | 56,735,924 |
| Effect of dilutive securities: | | | |
| Stock options | — | 979,263 | — |
| Diluted shares | 58,236,745 | 58,590,494 | 56,735,924 |

55

**Table of Contents**

Options to purchase 5,764,607 shares of common stock at prices ranging from $2.69 to $9.57 per share which were outstanding as of December 31, 2016, were not included in the computation of diluted EPS because dilutive shares are not factored into the calculation of EPS when a loss applicable to common shares is reported as they would be anti-dilutive.

Options to purchase 5,661,514 shares of common stock at prices ranging from $2.69 to $9.57 per share which were outstanding as of December 31, 2015, were included in the computation of diluted EPS because dilutive shares are factored into the calculation of EPS when income applicable to common shares is reported.

Options to purchase 5,735,784 shares of common stock at prices ranging from $2.69 to $9.57 per share which were outstanding as of December 31, 2014, were not included in the computation of diluted EPS because dilutive shares are not factored into the calculation of EPS when a loss applicable to common shares is reported as they would be anti-dilutive.

For the years ended December 31, 2016, 2015 and 2014, 50,000 shares of convertible preferred stock and accrued but unpaid dividends were anti-dilutive on an as if-converted basis and were not included in the computation of diluted net (loss) income per common share.

**3. Recently Issued Accounting Standards.**

*Simplifying the Test for Goodwill Impairment* — In January 2017, the FASB issued ASU No. 2017-04, "*Simplifying the Test for Goodwill Impairment*" (Topic 350) ("ASU No. 2017-04"). The amendments in ASU No. 2017-04 are intended to reduce the cost and complexity of the goodwill impairment test by eliminating Step 2 from the that impairment test. The amendments modify the concept of impairment from the condition that exists when the carrying amount of goodwill exceeds its implied fair value to the condition that exists when the carrying amount of a reporting unit exceeds its fair value. Under the amendments in ASU No. 2017-04, an entity will perform its annual, or interim, goodwill impairment test by comparing the fair value of the reporting unit with its carrying amount. An impairment charge should be recognized for the amount which the carrying amount exceeds the reporting unit's fair value; however, the loss recognized should not exceed the total amount of goodwill allocated to that reporting unit. The amendments in ASU No. 2017-04 are effective for the Company's annual or any interim goodwill impairment test in fiscal years beginning after December 15, 2019. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The Company is currently evaluating the impact ASU No. 2017-04 will have on the Company's results of operations, financial position and disclosures, but it is not expected to have a material impact.

*Business Combinations – Clarifying the Definition of a Business* — In January 2017, FASB issued ASU No. 2017-01, "*Business Combinations – Clarifying the Definition of a Business*" (Topic 805) ("ASU No. 2017-01"). ASU 2017-01 provides a framework to use in determining when a set of assets and activities is a business. ASU 2017-01 provides more consistency in applying the business combination guidance, reduces the costs of application, and makes the definition of a business more operable. ASU 2017-01 is effective for interim and annual periods within those annual periods beginning after December 15, 2017. The Company is currently evaluating the impact ASU 2017-01 will have on the Company's results of operations, financial position and disclosures, but it is not expected to have a material impact.

*Compensation – Stock Compensation* — In March 2016, the FASB issued ASU No. 2016-09, "*Compensation – Stock Compensation*" (Topic 718) ("ASU 2016-09"). ASU 2016-09 identifies areas for simplification involving several aspects of accounting for share-based payment transactions, including the income tax consequences, classification of awards as either equity or liabilities, an option to recognize gross stock compensation expense with actual forfeitures recognized as they occur, as well as certain classifications on the statement of cash flows. The ASU is effective for annual reporting periods beginning after December 15, 2016. The Company is currently assessing the impact of adopting ASU 2016-09 on its consolidated financial statements and footnote disclosures.

*Leases* — In February 2016, the FASB issued ASU No. 2016-02 ("ASU 2016-02"), *Leases (Topic 842)*, which supersedes existing guidance on accounting for leases in *"Leases (Topic 840)"* and generally requires all leases to be recognized in the statement of financial position. The provisions of ASU 2016-02 are effective for reporting periods beginning after December 15, 2018; early adoption is permitted. The provisions of this ASU are to be applied using a modified retrospective approach. The Company is currently evaluating the effect that this ASU will have on its consolidated financial statements.

*Income Taxes* — On November 20, 2015, the FASB issued ASU No. 2015-17, *"Income Taxes (Topic 740)"*. Update No. 2015-17 is effective for annual reporting periods beginning after December 15, 2016 and interim periods within those fiscal years. The Company early adopted ASU 2015-17 effective December 31, 2015 on a prospective basis. Adoption of this ASU resulted in a reclassification of the Company's net current deferred tax assets to net non-current deferred tax assets in its consolidated balance sheet as of December 31, 2015. No prior periods were retrospectively adjusted as allowed by this ASU.

56

Table of Contents

*Simplifying the Measurement of Inventory* — In July 2015, the FASB issued ASU No. 2015-11, *"Inventory (Topic 330): Simplifying the Measurement of Inventory"*. Update No. 2015-11 more closely aligns the measurement of inventory in U.S. GAAP with the measurement of inventory in International Financial Reporting Standards by requiring companies using the first-in, first-out and average costs methods to measure inventory using the lower of cost and net realizable value, where net realizable value is the estimated distribution prices of the inventory in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation. Update No. 2015-11 is effective for annual reporting periods beginning after December 15, 2016 and interim periods within those fiscal years. Update No. 2015-11 should be applied prospectively with earlier application permitted as of the beginning of an interim or annual reporting period. The Company is evaluating the impact of this ASU on its financial position, results of operations, and cash flows and has not yet determined if it will early adopt the ASU.

*Presentation of Financial Statements - Going Concern* — In August 2014, the FASB issued ASU 2014-15, *"Presentation of Financial Statements - Going Concern (Subtopic 205-40)."* The new guidance addresses management's responsibility to evaluate whether there is substantial doubt about an entity's ability to continue as a going concern and to provide related footnote disclosures. Management's evaluation should be based on relevant conditions and events that are known and reasonably knowable at the date that the financial statements are issued. The standard is effective for annual periods ending after December 15, 2016, and for annual and interim periods thereafter. The Company has adopted this standard and it did not have a material impact on the Company's consolidated financial statements.

*Simplifying the Presentation of Debt Issuance Costs* — In April 2015, the FASB issued ASU No. 2015-03, "*Interest – Imputation of Interest: Simplifying the Presentation of Debt Issuance Costs"* (Topic 835) ("ASU No. 2015-03"). ASU No. 2015-03 simplifies the accounting for debt issuance costs by requiring such costs to be presented as a direct deduction from the related debt liability rather than as an asset. Debt disclosures will include the face amount of the debt liability and the effective interest rate. ASU No. 2015-03 requires retrospective application and represents a change in accounting principle. The Company adopted ASU No. 2015-03 effective January 1, 2016 and has presented debt issuance costs of $403 as of both December 31, 2016 and 2015 as a direct deduction from the carrying amounts of its debt liabilities. The December 31, 2015 amount was previously recorded in "Other assets-net".

*Revenue from Contracts with Customers* — In May 2014, the FASB issued ASU No. 2014-09, *"Revenue from Contracts with Customers"* (Topic 606) ("ASU 2014-09"), which supersedes the revenue recognition requirements in Accounting Standards Codification ("ASC") Topic 605, *"Revenue Recognition"*. ASU 2014-09 is based on the principle that revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASU 2014-09 also requires additional disclosure about the nature, amount, timing and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments and assets recognized from costs incurred to obtain or fulfill a contract. As updated in August 2015, the effective date of ASU 2014-09 will be annual reporting periods beginning after December 15, 2017, using one of two retrospective application methods.

In March and April 2016, the FASB issued two updates to the revenue recognition guidance: ASU 2016-08 *"Principal Versus Agent Considerations"* (Topic 606) (Reporting Revenue Gross Versus Net), and ASU 2016-10, *"Identifying Performance Obligations and Licensing"* (Topic 606).

In May 2016, the FASB issued ASU Update No. 2016-12 *"Narrow-Scope Improvements and Practical Expedients"* (Topic 606) ("ASU 2016-12") which narrowly amended the revenue recognition guidance regarding collectability, noncash consideration, presentation of sales tax and transition.

The Company has not determined the impact ASU 2014-09, ASU 2016-08, ASU 2016-10 and ASU 2016-12 will have on its consolidated financial statements and footnote disclosures. However, we have completed our preliminary assessment, which included a review of a subset of representative contracts. During 2017, we will expand the scope of our assessment to include all contracts with customers.

## 4. Stock-Based Compensation

The Company's policy is to grant stock options at an exercise price equal to 100% of the market value of a share of common stock at closing on the date of the grant. The Company's stock options generally have ten-year contractual terms and vest over a one to five year period from the date of grant. The Company's policy is to grant restricted stock awards at a fair value equal to 100% of the market value of a share of common stock at closing on the date of the grant. The Company's restricted stock awards generally vest over one to three year periods.

Table of Contents

*2015 Incentive Compensation Plan* – On April 14, 2015, the Company's stockholders approved and adopted the 2015 Incentive Compensation Plan (the "2015 Plan"). The 2015 Plan provides for the grant of incentive and nonqualified stock options and restricted stock to key employees, including officers and directors of the Company and consultants and advisors. The 2015 Plan allows for up to 4,656,587 shares of common stock to be issued with respect to awards granted.

The following weighted-average assumptions were used to determine the fair value of options under FASB ASC 718:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2016 | 2015 | 2014 |
| Expected term (years) | 6.50 | 6.50 | 6.50 |
| Risk free interest rate | 1.85% | 1.67% | 2.29% |
| Volatility factor | 45.57% | 46.29% | 46.53% |
| Dividend yield | — | — | — |

*Stock Options*

Stock options outstanding, exercisable and available for grant at December 31, 2016, are summarized as follows:

|  | Number of Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (Years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at January 1, 2016 | 5,661,514 | $ 4.49 | | |
| Granted | 619,352 | 3.31 | | |
| Exercised | (21,000) | 2.72 | | |
| Forfeited or expired | (495,259) | 5.54 | | |
| Outstanding at December 31, 2016 | 5,764,607 | $ 4.28 | 4.49 | $ 348 |
| Vested or expected to vest at December 31, 2016 | 5,590,546 | $ 4.28 | 4.35 | $ 348 |
| Exercisable at December 31, 2016 | 4,082,632 | $ 4.33 | 3.07 | $ 348 |
| Available for grant at December 31, 2016 | 3,314,686 | | | |

The aggregate intrinsic value in the table above represents the total pre-tax intrinsic value of stock options for which the fair market value of the underlying common stock exceeded the respective stock option exercise price.

For the years ended December 31, 2016, 2015 and 2014, the Company recognized stock-based compensation as follows:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2016 | 2015 | 2014 |
| Stock-based compensation: | | | |
| Costs of processing and distribution | $ 140 | $ 132 | $ 132 |
| Marketing, general and administrative | 3,406 | 2,356 | 2,840 |
| Research and development | 44 | 60 | 60 |
| Total | $3,590 | $2,548 | $3,032 |

For the years ended December 31, 2016, 2015, and 2014, the Company recognized total income tax benefits from stock-based compensation of $1,460, $1,022, and $1,198, respectively.

As of December 31, 2016, there was $2,212 of total unrecognized stock-based compensation related to nonvested stock options. That expense is expected to be recognized over a weighted-average period of 2.92 years.

Table of Contents

Other information concerning stock options are as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Weighted average fair value of stock options granted | $1.55 | $ 2.50 | $1.87 |
| Aggregate intrinsic value of stock options exercised | 12 | 1,584 | 295 |

The aggregate intrinsic value of stock options exercised in a period represents the pre-tax cumulative difference, for the stock options exercised during the period, between the fair market value of the underlying common stock and the stock option exercise prices.

*Restricted Stock Awards*

During the first quarter of 2016, the Company granted 223,563 shares of time-based restricted stock and 223,563 shares of performance-based restricted stock. Both sets of awards vest over a three-year period, with a weighted-average grant date fair value of $3.31 per share. During the third quarter of 2016, the Company granted 162,160 shares of restricted stock with a weighted-average grant date fair value of $3.70 per share which vest over a one-year period. As of December 31, 2016, there was $961 of total unrecognized stock-based compensation related to time-based, nonvested restricted stock. That expense is expected to be recognized on a straight-line basis over a weighted-average period of 1.40 years.

**5. Inventories**

Inventories by stage of completion are as follows:

| | December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Unprocessed tissue, raw materials and supplies | $ 31,745 | $ 33,028 |
| Tissue and work in process | 38,552 | 36,614 |
| Implantable tissue and finished goods | 49,446 | 49,031 |
| | $119,743 | $118,673 |

For the years ended December 31, 2016, 2015, and 2014, the Company had inventory write-downs of $13,880, $5,390 and $3,763, respectively, relating primarily to excess quantities and obsolescence of inventories. The increase in 2016 primarily relates to an inventory charge of $9,556 as a result of writing-off certain excess quantities primarily of hernia and sports medicine inventory.

**6. Property, Plant and Equipment**

Property, plant and equipment are as follows:

| | December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Land | $ 2,324 | $ 2,319 |
| Buildings and improvements | 59,187 | 63,699 |
| Processing equipment | 38,387 | 41,831 |
| Surgical instruments | 18,394 | 15,702 |
| Office equipment, furniture and fixtures | 1,701 | 4,657 |
| Computer equipment and software | 11,852 | 11,804 |
| Construction in process | 17,554 | 10,850 |
| Office equipment under capital leases | — | 152 |
| | 149,399 | 151,014 |
| Less accumulated depreciation | (66,101) | (66,022) |
| | $ 83,298 | $ 84,992 |

59

Table of Contents

For the years ended December 31, 2016, 2015, and 2014, the Company had depreciation expense in connection with property, plant and equipment of $12,835, $12,240, and $11,010, respectively.

## 7. Goodwill

Goodwill for both years ended December 31, 2016 and 2015 was $54,887. The Company performed its annual goodwill impairment test as of December 31, 2016, and concluded that there was no impairment of goodwill.

## 8. Other Intangible Assets

Other intangible assets are as follows:

| | December 31, 2016 | | December 31, 2015 | |
| --- | --- | --- | --- | --- |
| | Gross Carrying Amount | Accumulated Amortization | Gross Carrying Amount | Accumulated Amortization |
| Patents | $ 11,559 | $ 4,159 | $ 11,532 | $ 3,448 |
| Acquired licensing rights | 12,204 | 8,302 | 10,850 | 7,691 |
| Marketing and procurement intangible assets | 20,694 | 8,002 | 22,179 | 7,209 |
| Total | $ 44,457 | $ 20,463 | $ 44,561 | $ 18,348 |

For the years ended December 31, 2016, 2015, and 2014, the Company had amortization expense of other intangible assets of $3,675, $4,282, and $4,385, respectively. At December 31, 2016, management's estimates of future amortization expense for the next five years are as follows:

| | Amortization Expense |
| --- | --- |
| 2017 | $ 3,400 |
| 2018 | 3,400 |
| 2019 | 3,400 |
| 2020 | 3,400 |
| 2021 | 3,400 |
| | $ 17,000 |

## 9. Fair Value Information

Long-lived assets, including property and equipment and intangible assets subject to amortization were impaired and written down to their estimated fair values during the fourth quarter of 2016. Fair value is measured as of the impairment date using Level 3 inputs. Level 3 is defined as unobservable inputs in which there is little or no market data available, which require the reporting entity to develop its own assumptions. The long-lived asset level 3 fair value was determined using a market approach, which used inputs that included replacement costs (unobservable), physical deterioration estimates (unobservable), economic obsolescence (unobservable), and market sales data for comparable assets.

The following table summarizes impairments of long-lived assets and the related post impairment fair values of the corresponding assets for the year ended December 31, 2016:

| | Year Ended December 31, 2016 | |
| --- | --- | --- |
| | Impairment | Fair Value |
| Property, plant and equipment - net | $ 4,717 | $ 4,708 |
| Other intangible assets - net | 718 | 150 |
| | $ 5,435 | $ 4,858 |

60

Table of Contents

## 10. Accrued Expenses

Accrued expenses are as follows:

| | December 31, | |
| --- | --- | --- |
| | **2016** | **2015** |
| Accrued compensation | $ 4,904 | $ 4,740 |
| Accrued severance charges | 410 | 865 |
| Accrued restructuring charges | 95 | — |
| Accrued CEO retirement and transition costs | 2,406 | — |
| Accrued distributor commissions | 4,422 | 3,835 |
| Accrued donor recovery fees | 6,350 | 7,144 |
| Accrued taxes | — | 514 |
| Accrued indemnification liability | — | 6,579 |
| Other | 3,443 | 4,932 |
| | $22,030 | $28,609 |

The Company accrues for the estimated donor recovery fees due to third party recovery agencies as tissue is received. In addition, on July 11, 2016, the Company resolved all final claims on the indemnification escrow fund regarding the 2013 Pioneer acquisition under the terms of the acquisition agreement. The resolution of the final claims resulted in a reduction in prepaid and other current assets and accrued expenses of $6,694 and $6,579 respectively with no impact on the Statement of Comprehensive (Loss) Income.

## 11. Short and Long-Term Obligations

Short and long-term obligations are as follows:

| | December 31, | |
| --- | --- | --- |
| | **2016** | **2015** |
| Term loan | $50,347 | $53,722 |
| Credit facilities | 33,000 | 25,477 |
| Capital leases | — | 38 |
| Total | 83,347 | 79,237 |
| Less current portion | (6,080) | (5,853) |
| Long-term portion | $77,267 | $73,384 |

The Company obtained from TD Bank and Regions Bank, a 5-year, $80,000 senior secured facility, which includes a $60,000 term loan and a $20,000 revolving credit facility that matures on July 16, 2018, with a variable interest rate between 100 and 275 basis points in excess of the one month LIBOR rate. On October 15, 2014, the Company entered into a Second Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which amended the loan agreement to remove certain financial covenants. On June 29, 2015, the Company entered into a Third Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which increased the maximum revolving credit amount from $20,000 to $30,000. On June 29, 2016, the Company entered into a Fourth Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which increased the maximum revolving credit amount from $30,000 to $45,000. On November 7, 2016, the Company entered into a Fifth Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which provided for: (i) a decrease in the maximum revolving credit amount from $45,000 to $42,500; (ii) an increase in the Company's leverage to EBITDA ratio from 2.50 to 1.00 to (A) 3.25 to 1.00 through March 31, 2017 and (B) 3.00 to 1.00 after March 31, 2017 and (iii) certain corresponding amendments. On February 28, 2017, the Company entered into a Sixth Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which modified the definition of "Extraordinary Expenses" and to increase to 300 basis points the LIBOR Spread applicable when the Company's financial performance under its Leverage Ratio is greater than 3.0x. At December 31, 2016, the interest rate for the term loan and revolving credit facility is 3.37%. The facility is secured by substantially all the assets of the Company and its subsidiaries and guaranteed by the Company's domestic subsidiaries, other than RTIDS. As of December 31, 2016, there was $33,000 outstanding on the revolving credit facility. The term loan facility requires aggregate principal payments of $8,250 from March 31, 2017 through June 30, 2018, with a final balloon principal payment of $41,375 on July 2,

61

**Table of Contents**

2018. The credit agreement also contains various restrictive covenants which limit, among other things, indebtedness and liens, as well as payment of dividends, while requiring a minimum cash balance on hand of $10,000 and certain financial covenant ratios.

In addition to the credit facility with TD Bank and Regions Bank, the Company had through its German subsidiary, three credit facilities with three German banks. As of December 31, 2016, the three credit facilities with the three German banks were paid off and terminated.

The total available credit on the Company's one revolving credit facility at December 31, 2016 was $9,500. The Company's ability to access its revolving credit facility is subject to and can be limited by the Company's compliance with the Company's financial and other covenants. The Company was in compliance with the financial covenants related to its revolving credit facility as of December 31, 2016.

As of December 31, 2016, the Company paid off all remaining capital leases.

Interest expense associated with the amortization of debt issuance costs for the years ended December 31, 2016, 2015 and 2014 was $202, $148 and $142, respectively.

As of December 31, 2016, contractual maturities of short and long-term obligations are as follows:

|  | Term Loan | Credit Facilities | Total |
|---|---|---|---|
| 2017 | $ 6,080 | $ — | $ 6,080 |
| 2018 | 44,267 | 33,000 | 77,267 |
|  | $ 50,347 | $ 33,000 | $83,347 |

## 12. Income Taxes

The Company's income tax benefit (provision) consists of the following components:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2016** | **2015** | **2014** |
| Current: |  |  |  |
| Federal | $ (150) | $ (988) | $(1,062) |
| State | (92) | (159) | (150) |
| International | 456 | (544) | (86) |
| Total current | 214 | (1,691) | (1,298) |
| Deferred: |  |  |  |
| Federal | 2,477 | (5,695) | (1,118) |
| State | 562 | 68 | (76) |
| International | (192) | (981) | 999 |
| Total deferred | 2,847 | (6,608) | (195) |
| Total income tax benefit (provision) | $3,061 | $(8,299) | $(1,493) |

62

Table of Contents

The components of the deferred tax assets and liabilities consisted of the following at:

| | December 31, 2016 Deferred Income Tax | | December 31, 2015 Deferred Income Tax | |
| --- | --- | --- | --- | --- |
| | Assets | Liabilities | Assets | Liabilities |
| Allowance for bad debts | $ 485 | $ — | $ 376 | $ — |
| Deferred compensation | 4,675 | — | 4,013 | — |
| Inventory | 12,811 | — | 10,604 | — |
| Fixed assets and intangibles | — | (5,690) | — | (7,667) |
| Investments | 2,133 | — | 2,133 | — |
| Net operating losses | 4,547 | — | 2,830 | — |
| Tax credits | 5,235 | — | 4,645 | — |
| Deferred revenue | 3,804 | — | 4,968 | — |
| Accrued liabilities | 2,004 | — | 1,847 | — |
| Other | — | (120) | — | (258) |
| Valuation allowance | (4,916) | — | (1,106) | — |
| Total | $30,778 | $ (5,810) | $30,310 | $ (7,925) |

The Company expects its deferred tax assets of $24,968, net of the valuation allowance at December 31, 2016 of $4,916, to be realized through the generation of future taxable income and the reversal of existing taxable temporary differences, see Note 3.

Valuation allowances are established when necessary to reduce deferred tax assets to amounts which are more likely than not to be realized. As such, valuation allowances of $4,916 and $1,106 have been established at December 31, 2016 and December 31, 2015, respectively, against a portion of the deferred tax assets.

The Company recorded a tax benefit from the exercise of stock options in the amount of $546, $1,139, and $539 for the years ended December 31, 2016, 2015 and 2014, respectively.

As of December 31, 2016, the Company has U.S. federal net operating loss carryforwards of $1,978 that will expire in the years 2026 and 2027.

As of December 31, 2016, the Company has U.S. state net operating loss carryforwards of $22,799 that will expire in the years 2018 through 2036.

As of December 31, 2016, the Company has foreign net operating loss carryforwards of $10,194 that will carryfoward indefinitely.

As of December 31, 2016, the Company has research tax credit carryforwards of $6,002 that will expire in years 2028 through 2036. As of December 31, 2016, the Company has alternative minimum tax credit carryforwards of $827 that will carryfoward indefinitely.

U.S. income taxes have not been provided on the undistributed earnings of the Company's foreign subsidiaries. It is not practicable to estimate the amount of tax that might be payable. The Company's intention is to indefinitely reinvest earnings of its foreign subsidiaries outside of the U.S. As of December 31, 2016 and 2015, the amount of undistributed earnings related to the Company's foreign subsidiaries considered to be indefinitely reinvested was $5,031 and $11,227, respectively.

The Company evaluates the need for deferred tax asset valuation allowances based on a more likely than not standard. The ability to realize deferred tax assets depends on the ability to generate sufficient taxable income within the carryback or carryforward periods provided for in the tax law for each applicable tax jurisdiction.

The assessment regarding whether a valuation allowance is required or should be adjusted also considers all available positive and negative evidence. It is difficult to conclude a valuation allowance is not required when there is significant objective and verifiable negative evidence, such as cumulative losses in recent years. The Company utilizes a rolling three years of actual results as the primary measure of cumulative losses in recent years.

On a rolling three years, the Company's U.S. operations are in a cumulative income position. The Company considers this objectively verifiable evidence that its current U.S. operations existing on December 31, 2016, have consistently demonstrated the ability to operate at a profit. The Company has a history of utilizing 100 percent of its U.S. deferred taxes assets before they expire and the forecasts of taxable earnings project a complete realization of all U.S. deferred tax assets before they expire, including under stressed scenarios.

Table of Contents

The Company's French and German operations are in cumulative loss positions. Since inception, the Company's French operations have generated losses. As a result, the Company has historically recorded a full valuation allowance on its French subsidiary's deferred tax assets. During the quarter ended September 30, 2016, the Company's German operations entered into a cumulative loss position. As a result, the Company recorded a full valuation allowance on its German subsidiary's deferred tax assets.

The Company has evaluated all available positive and negative evidence, including the extent to which that evidence was objectively verifiable. The Company has concluded, for those jurisdictions where valuation allowances have not been established, the positive evidence outweighed the negative evidence and the deferred tax assets are more likely than not realizable as of December 31, 2016.

The Company will continue to regularly assess the realizability of our deferred tax assets. Changes in historical earnings performance and future earnings projections, among other factors, may cause the Company to adjust its valuation allowance, which would impact the Company's income tax expense in the period the Company determines that these factors have changed.

As of December 31, 2016, the Company has $1,591 of unrecognized tax benefits, which was recorded net against deferred tax assets in the accompanying consolidated balance sheet.

The Company's unrecognized tax benefits are summarized as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | 2014 |
| Opening balance | $1,986 | $1,787 | $2,825 |
| Reductions based on tax positions related to the current year | — | — | (136) |
| Additions for tax positions of prior years | — | 199 | — |
| Reductions for tax positions of prior years | (60) | — | (902) |
| Reductions for expiration of statute of limitations | (335) | — | — |
| | $1,591 | $1,986 | $1,787 |

The unrecognized tax benefits if recognized, would favorably impact the Company's effective tax rate.

The Company's policy is to recognize interest accrued related to unrecognized tax benefits in interest expense and penalties in the provision for income taxes. There were no interest and penalties recorded in 2016, 2015 and 2014 and no interest and penalties accrued at December 31, 2016 and 2015.

The Company is undergoing an examination by the Internal Revenue Service ("IRS"). The IRS examination covers the 2015 tax year. During the year ended December 31, 2016, the Company's German subsidiary completed an examination by the German tax authorities. The examination covered the German subsidiary's 2010 through 2013 tax years. No material adjustments were recorded as a result of the German examination.

The effective tax rate differs from the statutory federal income tax rate for the following reasons:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | 2014 |
| Statutory federal rate | 35.00% | 35.00% | 35.00% |
| State income taxes—net of federal tax benefit | 1.73% | 0.25% | 3.51% |
| Foreign rate differential | (3.29%) | (2.18%) | 4.99% |
| Other permanent items | (3.15%) | 0.56% | (1.25%) |
| Research tax credits | 7.02% | (0.28%) | (7.52%) |
| Domestic production activities deduction | 1.38% | — | (4.33%) |
| Valuation allowance | (21.71%) | 0.85% | 5.26% |
| Other reconciling items, net | 0.55% | 1.55% | (0.02%) |
| Effective tax rate | 17.53% | 35.75% | 35.64% |

64

Table of Contents

For the years ended December 31, 2016, 2015 and 2014, the Company had no individually significant other reconciling items.

## 13. Preferred Stock

Preferred stock is as follows:

| | Preferred Stock Liquidation Value | Preferred Stock Issuance Costs | Net Total |
|---|---|---|---|
| Balance at January 1, 2014 | $ 50,750 | $ (1,213) | $49,537 |
| Accrued dividend payable | 3,113 | — | 3,113 |
| Amortization of preferred stock issuance costs | — | 184 | 184 |
| Balance at December 31, 2014 | 53,863 | (1,029) | 52,834 |
| Accrued dividend payable | 3,305 | — | 3,305 |
| Amortization of preferred stock issuance costs | — | 184 | 184 |
| Balance at December 31, 2015 | 57,168 | (845) | 56,323 |
| Accrued dividend payable | 3,508 | — | 3,508 |
| Amortization of preferred stock issuance costs | — | 185 | 185 |
| Balance at December 31, 2016 | $ 60,676 | $ (660) | $60,016 |

On June 12, 2013, the Company and WSHP entered into an investment agreement. Pursuant to the terms of the investment agreement, the Company agreed to a $50,000 private placement of convertible preferred equity with WSHP. In connection with the closing of the transactions contemplated by the investment agreement, the Company and WSHP amended the investment agreement on July 15, 2013, and the Company filed a Certificate of Designation of Series A Convertible Preferred Stock creating the Series A Convertible Preferred Stock, par value $0.001 per share (the "Preferred Stock"), and establishing the designations, preferences, and other rights of the Preferred Stock. The Preferred Stock accrues dividends at a rate of 6% per annum. To the extent dividends are not paid in cash in any quarter, the dividends which have accrued on each outstanding share of Preferred Stock during such three-month period will accumulate until paid in cash or converted to common stock. The Company's credit agreement with TD Bank and Regions Bank contains various covenants of financial conditions which, if not met, would restrict the Company from paying dividends.

The Preferred Stock will be convertible at the election of the holders into shares of the Company's common stock at an initial conversion price of $4.39 per share which would result in a conversion ratio of approximately 228 shares of common stock for each share of Preferred Stock. The Preferred Stock is convertible at the election of the Company five years after its issuance or at any time if the Company's common stock closes at or above $7.98 per share for at least 20 consecutive trading days.

The Company may, upon 30 days' notice, redeem the Preferred Stock, in whole or in part, five years after its issuance at the initial liquidation preference of $1,000 per share of the Preferred Stock plus an amount per share equal to accrued but unpaid dividends (collectively, the "Liquidation Value"). The holders of the Preferred Stock may require the Company to redeem their Preferred Stock, in whole or in part, at the Liquidation Value seven years after its issuance or upon the occurrence of a change of control.

## 14. Stockholders' Equity

*Preferred Stock*—The Company has 5,000,000 shares of preferred stock authorized under its Certificate of Incorporation of which 50,000 are currently issued and outstanding. These shares may be issued in one or more series having such terms as may be determined by the Company's Board of Directors.

*Common Stock*—The Company has 150,000,000 shares of common stock authorized. The common stock's voting, dividend, and liquidation rights presently are subject to or qualified by the rights of the holders of any outstanding shares of preferred stock. Holders of common stock are entitled to one vote for each share held at all stockholder meetings. Shares of common stock do not have redemption rights.

65

Table of Contents

## 15. Strategic Review Costs

The Company recorded strategic review costs related to the comprehensive strategic review of the Company's business lines and operations to leverage the Company's expertise, technology and products and identify opportunities to increase stockholder value, which resulted in $1,150 of expenses for the year ended December 31, 2016.

## 16. CEO Retirement and Transition Costs

The Company recorded Chief Executive Officer retirement and transition costs related to the retirement of our former Chief Executive Officer pursuant to the Executive Transition Agreement dated August 29, 2012 (as amended and extended to date), which resulted in $4,404 of expenses for the year ended December 31, 2016. The total Chief Executive Officer retirement and transition costs are expected to be paid in full prior to the first quarter of 2019. The following table includes a rollforward of CEO retirement and transition costs included in accrued expenses, see Note 10.

| | |
|---|---|
| Accrued CEO retirement and transition costs at January 1, 2016 | $ — |
| CEO retirement and transition costs accured in 2016 | 4,404 |
| Stock-based compensation | (1,535) |
| Cash payments | (463) |
| Accrued restructuring charges at December 31, 2016 | $ 2,406 |

## 17. Contested Proxy Expenses

The Company recorded contested proxy expenses of $2,680 for the year ended December 31, 2016.

## 18. Restructuring Charges

The Company instituted a restructuring plan which was completed in 2016 primarily related to closure of our French distribution and tissue procurement office, which resulted in $1,107 of expenses for the year ended December 31, 2016. The following table includes a rollforward of restructuring charges included in accrued expenses, see Note 10.

| | |
|---|---|
| Accrued restructuring charges at January 1, 2016 | $ — |
| French distribution and tissue procurement office closure costs | 1,107 |
| Asset abandonments | (640) |
| Cash payments | (372) |
| Accrued restructuring charges at December 31, 2016 | $ 95 |

## 19. Severance Charges

The Company recorded severance charges related to the termination of former employees as a result of the Company reorganizing its distribution force, which resulted in $995 of expenses for the year ended December 31, 2015. The total severance charges were paid in full by December 31, 2016. Severance payments were made to terminated employees over periods ranging from one month to twelve months and did not have a material impact on cash flows of the Company in any quarterly period.

66

Table of Contents

The Company recorded additional severance charges to reduce headcount and improve operational efficiencies, which resulted in $1,039 of expenses for the year ended December 31, 2016. The total severance charges are expected to be paid in full prior to the first quarter of 2018. Severance payments are made to terminated employees over periods ranging from one month to twelve months and are not expected to have a material impact on cash flows of the Company in any quarterly period. The following table includes a rollforward of severance charges included in accrued expenses, see Note 10.

| | |
|---|---|
| Accrued severance charges at January 1, 2015 | $ 2,771 |
| Employee separation expenses accrued in 2015 | 995 |
| Severance cash payments | (2,591) |
| Stock based compensation | (310) |
| Accrued severance charges at December 31, 2015 | 865 |
| Employee separation expenses accrued in 2016 | 1,039 |
| Severance cash payments | (1,494) |
| Accrued severance charges at December 31, 2016 | $ 410 |

Subsequent to December 31, 2016, we have continued to execute on a restructuring plan, and have incurred additional severance related charges that will be recognized in 2017.

## 20. Retirement Benefits

The Company has a qualified 401(k) plan available to all U.S. employees who meet certain eligibility requirements. The 401(k) plan allows each employee to contribute up to the annual maximum allowed under the Internal Revenue Code. The Company has the discretion to make matching contributions up to 6% of the employee's earnings. For the years ended December 31, 2016, 2015 and 2014, the amounts expensed under the plan were $3,094, $3,034 and $2,663, respectively.

## 21. Concentrations of Risk

*Distribution*—The Company's principal concentration of risk is related to its limited distribution channels. The Company's revenues include the distribution efforts of twelve independent companies with significant revenues coming from three of the distribution companies, Zimmer Biomet Holdings Inc. ("Zimmer"), Medtronic, PLC ("Medtronic") and Davol Inc. ("Davol"). The following table presents percentage of total revenues derived from the Company's largest distributors and international distribution:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Percent of revenues derived from: | | | |
| Distributor | | | |
| Zimmer | 16% | 24% | 18% |
| Medtronic | 9% | 10% | 12% |
| Davol | 3% | 3% | 5% |
| International | 9% | 8% | 9% |

The Company's distribution agreements are subject to termination by either party for a variety of causes. No assurance can be given that such distribution agreements will be renewed beyond their expiration dates, continue in their current form or at similar rate structures. Any termination or interruption in the distribution of the Company's implants through one of its major distributors could have a material adverse effect on the Company's operations.

*Tissue Supply*—The Company's operations are dependent on the availability of tissue from human donors. For the majority of the tissue recoveries, the Company relies on the efforts of independent procurement agencies to educate the public and increase the willingness to donate bone tissue. These procurement agencies may not be able to obtain sufficient tissue to meet present or future demands. Any interruption in the supply of tissue from these procurement agencies could have a material adverse effect on the Company's operations.

## 22. Commitments and Contingencies

*Distribution Agreement with Medtronic* – On October 12, 2013, the Company entered into a replacement distribution agreement with Medtronic, plc. ("Medtronic"), pursuant to which Medtronic will distribute certain allograft implants for use in spinal, general orthopedic and trauma surgery. Under the terms of this distribution agreement, Medtronic will be a non-exclusive distributor except for certain specified implants for which Medtronic will be the exclusive distributor. Medtronic will maintain its exclusivity with respect to these specified implants unless the cumulative fees received by us from Medtronic for these specified implants decline by a certain amount during any trailing 12-month period. The initial term of this distribution agreement was to have been through December 31, 2017. The term automatically renews for successive five-year periods, unless either party provides written notice of its intent not to renew at least one year prior to the expiration of the initial term or the applicable renewal period. Neither party provided notice of non-renewal on or before December 31, 2016, thereby triggering the five-year automatic

renewal period upon the expiration of the initial term. The distribution agreement will therefore continue at least through December 31, 2022. This distribution agreement superseded and replaced our prior distribution agreement with Medtronic which would have expired in accordance with its terms in June 2014.

67

Table of Contents

*Exclusive License Agreement with Athersys* - On September 10, 2010, the Company entered into an Exclusive License Agreement with Athersys, pursuant to which Athersys will provide the Company access to its MAPC technologies to develop and commercialize MAPC technology-based biologic implants for certain orthopedic applications. In consideration for the Exclusive License, the Company agreed to pay Athersys the following: 1) a non-refundable $3,000 license fee, payable in three time-based $1,000 installments, the last of which was paid in the first quarter of 2011, 2) payment of $2,000 contingent upon successful achievement of certain development milestones which the Company paid in 2012, and 3) up to $32,500 contingent upon achievement of certain cumulative revenue milestones in future years. In addition, the Company pays Athersys royalties from the distribution of implants under a tiered royalty structure based on achievement of certain cumulative revenue milestones. The term of this license agreement is the remaining life of any applicable patent or trade secret. These acquired licensing rights are being amortized to expense on a straight-line basis over the expected life of the asset.

*Distribution Agreement with Zimmer Dental Inc.* - On September 3, 2010, the Company and Zimmer Dental Inc. ("Zimmer Dental"), a subsidiary of Zimmer, entered into an exclusive distribution agreement, with an effective date of September 30, 2010. This distribution agreement has an initial term of ten years. Under the terms of this distribution agreement, the Company has agreed to supply sterilized allograft and xenograft implants at an agreed upon transfer price, and Zimmer Dental has agreed to be the exclusive distributor of the implants for dental and oral applications worldwide (except Ukraine), subject to certain Company obligations under an existing distribution agreement with a third party with respect to certain implants for the dental market. In consideration for Zimmer Dental's exclusive distribution rights, Zimmer Dental agreed to the following: 1) payment to the Company of $13,000 within ten days of the effective date (the "Upfront Payment"); 2) annual exclusivity fees ("Annual Exclusivity Fees") paid annually for the term of the contract to be paid at the beginning of each calendar year; and 3) escalating annual purchase minimums to maintain exclusivity. Upon occurrence of an event that materially and adversely affects Zimmer Dental 's ability to distribute the implants, Zimmer Dental may be entitled to certain refund rights with respect to the Upfront Payment and the then current Annual Exclusivity Fee, where such refund would be in an amount limited by a formula specified in this distribution agreement that is based substantially on the number of days from the occurrence of such event to the date that it is cured by the Company to the satisfaction of Zimmer Dental. The Upfront Payment, the Annual Exclusivity Fees and the fees associated with distributions of processed tissue are considered to be a single unit of accounting. Accordingly, the Upfront Payment and the Annual Exclusivity Fees are deferred as received and are being recognized as other revenues over the term of this distribution agreement based on the expected contractual escalating annual purchase minimums relative to the total contractual minimum purchase requirements in this distribution agreement. Additionally, the Company has considered the potential impact of this distribution agreement's contractual refund provisions and does not expect these provisions to impact future expected revenue related to this distribution agreement.

*Distribution Agreement with Davol* - On July 13, 2009, the Company and Davol amended their previous distribution agreement with TMI for human dermis implants. Under the amended agreement: 1) Davol paid the Company $8,000 in non-refundable fees for exclusive distribution rights for the distribution to the breast reconstruction market until July 13, 2019; 2) the exclusive worldwide distribution agreement related to the hernia market was extended to July 13, 2019; and 3) Davol agreed to pay the Company certain additional exclusive distribution rights fees contingent upon the achievement of certain revenue milestones by Davol during the duration of the contract. In the fourth quarter of 2010, Davol paid the first revenue milestone payment of $3,500. The non-refundable fees and the fees associated with distributions of processed tissue are considered to be a single unit of accounting. Accordingly, the $8,000 and $3,500 exclusivity payments were deferred and were being recognized as other revenues on a straight-line basis over the initial term of the amended contract of ten years, and the remaining term of the amended contract, respectively. Davol did not achieve certain revenue growth milestones which resulted in Davol relinquishing its exclusive distribution rights in the hernia market effective January 1, 2013 and in the breast reconstruction market effective January 1, 2015. As a result, the Company recognized additional deferred revenue as other revenues during the three months ended March 31, 2013 and 2015, of $1,715 and $1,500, respectively, due to the acceleration of deferred revenue recognition relating to Davol relinquishing its exclusive distribution rights in the hernia and the breast reconstruction markets. The remaining balance is being recognized as other revenues on a straight-line basis over the remaining term of the amended contract.

The Company's aforementioned revenue recognition methods related to the Zimmer and Davol distribution agreements do not result in the deferral of revenue less than amounts that would be refundable in the event the agreements were to be terminated in future periods. Additionally, the Company evaluates the appropriateness of the aforementioned revenue recognition methods on an ongoing basis.

*Leases*—The Company leases certain facilities, items of office equipment and vehicles under non-cancelable operating lease arrangements expiring on various dates through 2019. The facility leases generally contain renewal options and escalation clauses based upon increases in the lessors' operating expenses and other charges. The Company anticipates that most of these leases will be renewed or replaced upon expiration. Rent expense for the years ended December 31, 2016, 2015, and 2014 was $1,378, $1,443 and $1,609, respectively, and is included as a component of marketing, general and administrative expenses.

68

Table of Contents

Future minimum lease commitments under non-cancelable operating leases as of December 31, 2016 are as follows:

| | Operating Leases |
|---|---|
| 2017 | $ 1,936 |
| 2018 | 1,347 |
| 2019 | 1,007 |
| 2020 | 587 |
| 2021 and beyond | 115 |
| | $ 4,992 |

**23. Legal and Regulatory Actions**

The Company is, from time to time, involved in litigation relating to claims arising out of its operations in the ordinary course of business. The Company believes that none of these claims that were outstanding as of December 31, 2016 will have a material adverse impact on its financial position or results of operations.

*Litigation and Settlement Charges.* — In the fourth quarter of 2015, the Company reached agreements with three separate entities for the resolution of various claims asserted by these entities for breach of contract. Consequently, the Company recorded cumulative litigation and settlement charges of $804 pertaining to the aforementioned agreements in the fourth quarter of 2015.

*Coloplast* — The Company is presently named as co-defendant along with other companies in a small percentage of the transvaginal surgical mesh ("TSM") mass tort claims being brought in various state and federal courts. The TSM litigation has as its catalyst various Public Health Notifications issued by the U.S. Food and Drug Administration ("FDA") with respect to the placement of certain TSM implants that were the subject of 510k regulatory clearance prior to their distribution. The Company does not process or otherwise manufacture for distribution in the U.S. any implants that were the subject of these FDA Public Health Notifications. The Company denies any allegations against it and intends to continue to vigorously defend itself.

In addition to claims made directly against the Company, Coloplast, a distributor of TSM's and certain allografts processed and private labeled for them under a contract with the Company, has also been named as a defendant in individual TSM cases in various federal and state courts. Coloplast requested that the Company indemnify or defend Coloplast in those claims which allege injuries caused by the Company's allograft implants, and on April 24, 2014, Coloplast sued RTI Surgical, Inc. in the Fourth Judicial District of Minnesota for declaratory relief and breach of contract. On December 11, 2014, Coloplast entered into a settlement agreement with RTI Surgical, Inc. and Tutogen Medical, Inc. (the "Company Parties") resulting in dismissal of the case. Under the terms of the settlement agreement, the Company Parties are responsible for the defense and indemnification of two categories of present and future claims: (1) tissue only (where Coloplast is solely the distributor of Company processed allograft tissue and no Coloplast-manufactured or distributed synthetic mesh is identified) ("Tissue Only Claims"), and (2) tissue plus non-Coloplast synthetic mesh ("Tissue-Non-Coloplast Claims") (the Tissue Only Claims and the Tissue-Non-Coloplast Claims being collectively referred to as "Indemnified Claims"). As of December 31, 2016, there are a cumulative total of 1,445 Indemnified Claims for which the Company Parties are providing defense and indemnification. The defense and indemnification of these cases are covered under the Company's insurance policy subject to a reservation of rights by the insurer.

Based on the current information available to the Company, it is not possible to evaluate and estimate with reasonable certainty the impact that current or any future TSM litigation may have on the Company.

The Company's accounting policy is to accrue for legal costs as they are incurred.

On September 30, 2014, the Company received a letter from the FDA regarding our map3® cellular allogeneic bone graft. The letter addresses some technical aspects of the processing of the map3® allograft, as well as language included on the Company's website. The Company has ongoing dialogue with the FDA where comprehensive packages of data have been provided to address the FDA's comments and provide clarifying information regarding the technical components of the implant processing. The Company believes that in both developing and processing of map3®, the Company has properly considered the relevant regulatory requirements. Additionally, the Company has removed the relevant information from the Company's website. The Company is committed to resolving the concerns raised by the FDA. However, it is not possible to predict the specific outcome or timing of a resolution at this time.

69

Table of Contents

**24. Segment Data**

The Company distributes human tissue, bovine and porcine animal tissue, metal and synthetic implants through various distribution channels. The Company operates in one reportable segment composed of six lines of business. Effective January 1, 2016, the reporting of the Company's lines of business is composed primarily of six categories: spine; sports medicine and orthopedics; surgical specialties; cardiothoracic; international; and global commercial. The Company's previous lines of business were composed of: spine; ortho fixation; sports medicine; bone graft substitutes and general orthopedic; dental; and surgical specialties. The prior year comparable revenue information has been restated to conform to the current year presentation. The Company believes that the change in the reporting of its lines of business will facilitate a better understanding of the Company's lines of business and align more closely with the end markets in which the Company competes. Discrete financial information is not available for these six lines of business. The following table presents revenues from these six categories and other revenues and their respective percentages of the Company's total revenues for the years ended December 31, 2016, 2015 and 2014:

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2016 | | 2015 | | 2014 | |
| | (In thousands) | | | | | |
| Revenues: | | | | | | |
| Spine | $ 73,907 | 27.1% | $ 57,983 | 20.5% | $ 52,270 | 19.9% |
| Sports medicine and orthopedics | 50,143 | 18.4% | 50,712 | 18.0% | 48,975 | 18.6% |
| Surgical specialties | 4,466 | 1.6% | 3,029 | 1.1% | 1,631 | 0.6% |
| Cardiothoracic | 11,147 | 4.1% | 8,699 | 3.1% | 6,997 | 2.7% |
| International | 21,185 | 7.8% | 18,338 | 6.5% | 20,327 | 7.7% |
| Subtotal direct | 160,848 | 59.0% | 138,761 | 49.2% | 130,200 | 49.5% |
| Global commercial | 99,127 | 36.3% | 129,930 | 46.0% | 120,910 | 46.0% |
| Other revenues | 12,890 | 4.7% | 13,602 | 4.8% | 11,700 | 4.5% |
| Total revenues | $272,865 | 100.0% | $282,293 | 100.0% | $262,810 | 100.0% |
| Domestic revenues | $247,756 | 90.8% | $260,387 | 92.2% | $238,936 | 90.9% |
| International revenues | 25,109 | 9.2% | 21,906 | 7.8% | 23,874 | 9.1% |
| Total revenues | $272,865 | 100.0% | $282,293 | 100.0% | $262,810 | 100.0% |

The following table presents property, plant and equipment - net by significant geographic location:

| | December 31, | |
| --- | --- | --- |
| | 2016 | 2015 |
| Property, plant and equipment - net: | | |
| Domestic | $77,596 | $72,901 |
| International | 5,702 | 12,091 |
| Total | $83,298 | $84,992 |

70

Table of Contents

## 25. Quarterly Results of Operations (Unaudited)

The following table sets forth the results of operations for the periods indicated:

| | March 31, 2016 | June 30, 2016 | September 30, 2016 | December 31, 2016 |
|---|---|---|---|---|
| Quarter Ended: | | | | |
| Revenues | $ 67,351 | $ 67,620 | $ 66,547 | $ 71,347 |
| Gross profit | 36,025 | 33,949 | 34,274 | 28,101 |
| Net income (loss) applicable to common shares | 1,543 | (3,162) | (4,489) | (11,799) |
| Net income (loss) per common share: | | | | |
| Basic | $ 0.03 | $ (0.05) | $ (0.08) | $ (0.20) |
| Diluted | 0.03 | (0.05) | $ (0.08) | $ (0.20) |

In 2016, the Company's net income was negatively impacted by an excess inventory charge of $9,556, strategic review costs of $1,150, CEO retirement and transition costs of $4,404, contested proxy expenses of $2,680, asset impairment of $5,435, restructuring charges of $1,107 and severance charges of $1,039.

The following table sets forth the results of operations for the periods indicated:

| | March 31, 2015 | June 30, 2015 | September 30, 2015 | December 31, 2015 |
|---|---|---|---|---|
| Quarter Ended: | | | | |
| Revenues | $ 68,034 | $ 71,609 | $ 66,529 | $ 76,121 |
| Gross profit | 36,999 | 37,203 | 35,233 | 40,307 |
| Net income applicable to common shares | 2,934 | 2,685 | 2,670 | 3,321 |
| Net income per common share: | | | | |
| Basic | $ 0.05 | $ 0.05 | $ 0.05 | $ 0.06 |
| Diluted | 0.05 | 0.05 | 0.05 | 0.06 |

In the fourth quarter of 2015, the Company's net income was negatively impacted by asset abandonments of $814, litigation and settlement charges of $804 and severance charges of $995.

## 26. Subsequent Events

The Company evaluated subsequent events as of the issuance date of the consolidated financial statements as defined by FASB ASC 855 *Subsequent Events*, and identified no subsequent events that require adjustment to, or disclosure of, in these consolidated financial statements.

71

Table of Contents

**RTI SURGICAL, INC. AND SUBSIDIARIES**
**Schedule II**
**Valuation and Qualifying Accounts**
**Years Ended December 31, 2016, 2015 and 2014**
**(Dollars in thousands)**

| Description | Balance at Beginning of Period | | Charged to Costs and Expenses | | Deductions-Write-offs, Payments | | Balance at End of Period | |
|---|---|---|---|---|---|---|---|---|
| For the year ended December 31, 2016: | | | | | | | | |
| Allowance for doubtful accounts | $ | 1,454 | $ | 645 | $ | 371 | $ | 1,728 |
| Allowance for product returns | | 714 | | 250 | | 335 | | 629 |
| Allowance for excess and obsolescence | | 7,083 | | 13,880 | | 6,165 | | 14,798 |
| Deferred tax asset valuation allowance | | 1,106 | | 3,833 | | 23 | | 4,916 |
| For the year ended December 31, 2015: | | | | | | | | |
| Allowance for doubtful accounts | | 818 | | 1,037 | | 401 | | 1,454 |
| Allowance for product returns | | 525 | | 531 | | 342 | | 714 |
| Allowance for excess and obsolescence | | 5,112 | | 5,390 | | 3,419 | | 7,083 |
| Deferred tax asset valuation allowance | | 959 | | 197 | | 50 | | 1,106 |
| For the year ended December 31, 2014: | | | | | | | | |
| Allowance for doubtful accounts | | 492 | | 709 | | 383 | | 818 |
| Allowance for product returns | | 343 | | 182 | | — | | 525 |
| Allowance for excess and obsolescence | | 5,399 | | 3,763 | | 4,050 | | 5,112 |
| Deferred tax asset valuation allowance | | 469 | | 490 | | — | | 959 |

72

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

March 13, 2017

RTI SURGICAL, INC.

By: /s/ Robert P. Jordheim
Robert P. Jordheim
Interim President and Interim Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Robert P. Jordheim<br>Robert P. Jordheim | Interim President and Interim Chief Executive Officer (Principal Executive Officer) and Director | March 13, 2017 |
| /s/ Johannes W. Louw<br>Johannes W. Louw | Interim Chief Financial Officer (Principal Financial and Chief Accounting Officer) | March 13, 2017 |
| /s/ Curt M. Selquist<br>Curt M. Selquist | Chairman | March 13, 2017 |
| /s/ Peter F. Gearen<br>Peter F. Gearen | Vice Chairman | March 13, 2017 |
| /s/ Thomas A. McEachin<br>Thomas A. McEachin | Director | March 13, 2017 |
| /s/ Jonathon M. Singer<br>Jonathon M. Singer | Director | March 13, 2017 |
| /s/ Christopher R. Sweeney<br>Christopher R. Sweeney | Director | March 13, 2017 |
| /s/ Paul G. Thomas<br>Paul G. Thomas | Director | March 13, 2017 |
| /s/ Nicholas J. Valeriani<br>Nicholas J. Valeriani | Director | March 13, 2017 |
| /s/ Shirley A. Weis<br>Shirley A. Weis | Director | March 13, 2017 |

Table of Contents

## EXHIBIT INDEX

| Exhibit No. | Description | Incorporated by Reference | | |
|---|---|---|---|---|
| | | Form | File No. | Date Filed |
| 3.1 | Amended and Restated Certificate of Incorporation of RTI Surgical, Inc. | 10-K (2015) | 000-31271 | 3/7/2016 |
| 3.2 | Amended and Restated Bylaws of RTI Surgical, Inc. | 8-K | 000-31271 | 7/11/2016 |
| 3.3 | Certificate of Designation of Series A Convertible Preferred Stock of RTI Surgical, Inc., dated July 16, 2013. | 8-K | 000-31271 | 7/19/2013 |
| 3.4 | Certificate of Ownership and Merger dated July 16, 2013. | 8-K | 000-31271 | 7/19/2013 |
| 4.3 | Specimen Stock Certificate. | S-1/A | 333-35756 | 8/02/2000 |
| 10.1‡ | Omnibus Stock Option Plan. | S-1 | 333-35756 | 4/27/2000 |
| 10.2‡ | Year 2000 Compensation Plan. | S-1 | 333-35756 | 4/27/2000 |
| 10.3‡ | RTI Regeneration Technologies, Inc. 2004 Equity Incentive Plan. | 10-Q | 000-31271 | 8/6/2004 |
| 10.4‡ | Form of Nonqualified Stock Option Grant Agreement. | 10-K (2004) | 000-31271 | 3/16/2005 |
| 10.5‡ | Form of Incentive Stock Option Grant Agreement. | 10-K (2004) | 000-31271 | 3/16/2005 |
| 10.6‡ | RTI Surgical, Inc. 2010 Equity Incentive Plan. | DEF 14A | 000-31271 | 3/19/2010 |
| 10.7‡ | RTI Surgical, Inc. 2015 Incentive Compensation Plan. | S-8 | 333-203861 | 5/5/2015 |
| 10.8‡ | Form of Incentive Stock Option Agreement (under 2015 Plan). | S-8 | 333-203861 | 5/5/2015 |
| 10.9‡ | Form of Nonqualified Stock Option Agreement (under 2015 Plan). | S-8 | 333-203861 | 5/5/2015 |
| 10.10‡ | Form of Restricted Stock Agreement (under 2015 Plan). | S-8 | 333-203861 | 5/5/2015 |
| 10.11† | Exclusive Distribution Agreement between RTI Biologics, Inc. and Zimmer Dental Inc., dated as of September 3, 2010 and effective as of September 30, 2010. | 10-Q (Q3 2010) | 000-31271 | 11/08/2010 |
| 10.12‡ | RTI Biologics, Inc. Executive Nonqualified Excess Plan. | 10-K (2011) | 000-31271 | 2/15/2012 |
| 10.13‡ | Form of Executive Transition Agreement. | 8-K | 000-31271 | 9/4/2012 |
| 10.14‡ | Executive Transition Agreement with Brian K. Hutchison, dated August 29, 2012. | 8-K | 000-31271 | 9/4/2012 |
| 10.15‡ | Extension Letter with Brian K. Hutchison, dated August 28, 2015, extending Executive Transition Agreement through December 31, 2015. | 8-K | 000-31271 | 8/31/2015 |
| 10.16‡* | Executive Separation Agreement, effective August 15, 2016, by and between Brian K. Hutchison and RTI Surgical, Inc. | 8-K | 000-31271 | 8/16/2016 |
| 10.17‡* | Release Agreement, effective December 31, 2016, by and between Brian K. Hutchison and RTI Surgical, Inc. | 8-K | 000-31271 | 12/19/2016 |
| 10.18‡ | Extension Letter with Robert P. Jordheim, dated August 28, 2015, extending Executive Transition Agreement through December 31, 2015. | 8-K | 000-31271 | 8/31/2015 |
| 10.19‡ | Extension Letter with Roger W. Rose, dated August 28, 2015, extending Executive Transition Agreement through December 31, 2015. | 8-K | 000-31271 | 8/31/2015 |
| 10.20‡ | Extension Letter with Caroline A. Hartill, dated August 28, 2015, extending Executive Transition Agreement through December 31, 2015. | 8-K | 000-31271 | 8/31/2015 |
| 10.21‡ | Extension Letter with Brian K. Hutchison, dated December 3, 2015, extending Executive Transition Agreement through December 31, 2018. | 8-K | 000-31271 | 12/4/2015 |
| 10.22‡ | Extension Letter with Robert P. Jordheim, dated December 3, 2015, extending Executive Transition Agreement through December 31, 2018. | 8-K | 000-31271 | 12/4/2015 |
| 10.23‡ | Extension Letter with Roger W. Rose, dated December 3, 2015, extending Executive Transition Agreement through December 31, 2018. | 8-K | 000-31271 | 12/4/2015 |
| 10.24‡ | Extension Letter with Caroline A. Hartill, dated December 3, 2015, extending Executive Transition Agreement through December 31, 2018. | 8-K | 000-31271 | 12/4/2015 |

10.25     Second Amended and Restated Loan Agreement dated July 16, 2013 by and among RTI Surgical, Inc., TD Bank, N.A., a national banking association, as administrative agent for the Lenders and each of the Lenders from time to time a party thereto.     8-K     000-31271     7/19/2013

**Table of Contents**

| Exhibit No. | Description | Form | Incorporated by Reference File No. | Date Filed |
|---|---|---|---|---|
| 10.26 | First Amendment to the Second Amended and Restated Loan Agreement dated December 30, 2013 by and among RTI Surgical, Inc., TD Bank, N.A., a national banking association, as administrative agent for the Lenders and each of the Lenders from time to time a party thereto. | 8-K | 000-31271 | 12/30/2013 |
| 10.27 | Investment Agreement, dated as of June 12, 2013, by and between RTI Biologics, Inc. and WSHP Biologics Holdings, LLC. | 8-K | 000-31271 | 6/13/2013 |
| 10.28 | Amendment to Investment Agreement, dated as of July 15, 2013 by and among RTI Biologics, Inc. and WSHP Biologics Holdings, LLC. | 8-K | 000-31271 | 7/19/2013 |
| 10.29 | Investor Rights Agreement dated as of July 16, 2013 by and between RTI Surgical, Inc. and WSHP Biologics Holdings, LLC. | 8-K | 000-31271 | 7/19/2013 |
| 10.30‡ | Form of Water Street Director Indemnification Agreement. | 8-K | 000-31271 | 7/19/2013 |
| 10.31‡ | Form of Director Indemnification Agreement. | 8-K | 000-31271 | 7/19/2013 |
| 10.32† | 2013 Distribution Agreement, effective as of October 12, 2013, between RTI Surgical, Inc. and Medtronic Sofamor Danek USA, Inc. | 10-K (2013) | 000-31271 | 3/10/2014 |
| 10.33 | Second Amendment to the Second Amended and Restated Loan Agreement dated October 15, 2014 by and among RTI Surgical, Inc., TD Bank, N.A., a national banking association, as administrative agent for the Lenders and each of the Lenders from time to time a party thereto. | 10-K (2014) | 000-31271 | 3/4/2015 |
| 10.34 | Third Amendment to the Second Amended and Restated Loan Agreement dated June 29, 2015 by and among RTI Surgical, Inc., TD Bank, N.A., a national banking association, as administrative agent for the Lenders and each of the Lenders from time to time a party thereto. | 8-K | 000-31271 | 7/2/2015 |
| 10.35 | Form of Executive Indemnification Agreement. | 10-Q (Q1 2016) | 000-31271 | 5/4/2016 |
| 10.36 | Fourth Amendment to the Second Amended and Restated Loan Agreement dated June 29, 2016 by and among RTI Surgical, Inc., TD Bank, N.A., a national banking association, as administrative agent for the Lenders and each of the Lenders from time to time a party thereto. | 8-K | 000-31271 | 7/5/2016 |
| 10.37 | Fifth Amendment to the Second Amended and Restated Loan Agreement dated November 7, 2016 by and among RTI Surgical, Inc., TD Bank, N.A., a national banking association, as administrative agent for the Lenders and each of the Lenders from time to time a party thereto. | 8-K | 000-31271 | 11/8/2016 |
| 10.38* | Sixth Amendment to the Second Amended and Restated Loan Agreement dated February 28, 2017 by and among RTI Surgical, Inc., TD Bank, N.A., a national banking association, as administrative agent for the Lenders and each of the Lenders from time to time a party thereto. | | | |
| 10.39* | Consultant Agreement, effective February 1, 2017, by and between Caroline A. Hartill and RTI Surgical, Inc. | | | |
| 10.40* | Executive Separation Agreement, effective January 31, 2017, by and between Caroline A. Hartill and RTI Surgical, Inc. | | | |
| 10.41* | Release Agreement, effective February 1, 2017, by and between Caroline A. Hartill and RTI Surgical, Inc. | | | |
| 23.1* | Consent of Independent Registered Public Accounting Firm. | | | |
| 31.1* | Certification of Principal Executive Officer pursuant to Exchange Act Rules 13a-14(a)/15d-14(a) as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | |
| 31.2* | Certification of Principal Financial Officer pursuant to Exchange Act Rules 13a-14(a)/15d-14(a) as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | |

32.1*   Certification of Principal Executive Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

32.2*   Certification of Principal Financial Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

**Table of Contents**

| Exhibit No. | Description | Incorporated by Reference | | |
|---|---|---|---|---|
| | | Form | File No. | Date Filed |
| 101.INS* | XBRL Instance Document | | | |
| 101.SCH* | XBRL Taxonomy Extension Schema Document | | | |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document | | | |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document | | | |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document | | | |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document | | | |

—————————

† Confidential treatment requested as to certain portions, which portions were omitted and filed separately with the Commission.

‡ Indicates a management contract or any compensatory plan, contract, or arrangement.

* Filed herewith.

**Exhibit 10.38**

**SIXTH AMENDMENT**
**TO**
**SECOND AMENDED AND RESTATED LOAN AGREEMENT**

This Sixth Amendment to Second Amended and Restated Loan Agreement (this "Amendment") is dated February 28, 2017, by and among: (i) RTI Surgical, Inc., a Delaware corporation formerly known as RTI Biologics, Inc. ("Borrower"); (ii) TD Bank, N.A., a national banking association, as administrative agent for the Lenders (in such capacity, including any successor thereto, the "Administrative Agent"); and (iii) each of the Lenders from time to time party to the Loan Agreement.

Capitalized terms used herein without definition shall have the respective meaning assigned to such terms in that certain Second Amended and Restated Loan Agreement, dated July 16, 2013, by and among Borrower, the Administrative Agent and the Lenders, as amended by: (i) that certain First Amendment to Second Amended and Restated Loan Agreement, dated December 30, 2013; (ii) that certain Second Amendment to Second Amended and Restated Loan Agreement, dated October 15, 2014; (iii) that certain Third Amendment to Second Amended and Restated Loan Agreement, dated June 29, 2015, (iv) that certain Fourth Amendment to Second Amended and Restated Loan Agreement, dated June 29, 2016, and (v) that certain Fifth Amendment to Second Amended and Restated Loan Agreement, dated November 7, 2016 (collectively, the "Loan Agreement").

Borrower, the Administrative Agent and the Lenders are party to the Loan Agreement pursuant to which the Lenders have extended credit to Borrower on the terms set forth in the Loan Agreement.

Borrower, the Administrative Agent and the Lenders desire to amend the Loan Agreement to modify the definition of "Extraordinary Expenses" in Section 1.1(eee) of the Loan Agreement and to increase to 300 basis points the LIBOR Spread applicable when Borrower's financial performance under its Leverage Ratio is greater than 3.0x.

Borrower, the Administrative Agent and the Lenders are willing to make such amendments to the Loan Agreement on the terms and conditions set forth in this Amendment.

Now, therefore, the parties hereto, intending to be legally bound, hereby agree as follows:

SECTION 1
AMENDMENTS TO LOAN AGREEMENT

1.1    Amendment of Section 1.1(eee), Definition of Extraordinary Expenses. Section 1.1(eee) of the Loan Agreement is deleted in its entirety and the following new Section 1.1(eee) is substituted in its place:

(eee)    "Extraordinary Expenses" means any one-time expenses such as: (i) non-cash intangible asset impairment charges; provided, however, the amount of such charges for purposes of determining Consolidated EBITDA under this Agreement is subject to review and approval of Administrative Agent and Lenders; (ii) expenses related to Strategic Review costs and the Hutchinson retirement for the period of October 1, 2016 through December 31, 2016, not to exceed Seven Hundred Ninety-Seven Thousand and 00/100 Dollars ($797,000.00); (iii) reorganization costs for the period of July 1, 2016 through September 30, 2016, not to exceed Three Million Five Hundred Fifty Thousand and 00/100 Dollars ($3,550,000.00); (iv) the actual amount of severance/reorganization charges for the period of January 1, 2017 through March 31, 2017, not to exceed Four Million and 00/100 Dollars ($4,000,000.00); and (v) one-time, non-cash charges for inventory write-downs and Germany asset impairment for the period of October 1, 2016 through December 31, 2016, not to exceed Fourteen Million Eight Hundred Twenty-Seven Thousand and 00/100 Dollars ($14,827,000.00).

1.2    Amendment of Section 2.4(c), LIBOR Spread. The chart included in Section 2.4(c) of the Loan Agreement is hereby deleted in its entirety and the following new chart is substituted in its place:

| Leverage Ratio | LIBOR Spread Applicable Basis Points per annum |
|---|---|
| Less than 1x | 100 basis points |
| Equal to or greater than 1x but less than 1.5x | 125 basis points |
| Equal to or greater than 1.5x but less than 2x | 150 basis points |
| Equal to or greater than 2x but less than 2.5x | 200 basis points |
| Equal to or greater than 2.5x but less than 3.0x | 225 basis points |
| Greater than 3.0x | 300 basis points |

The "LIBOR Spread" shall be: (i) for the period commencing on the Amendment Date and continuing through, but not including, the final day of the Quarter End in which the Borrower's one-time Extraordinary Expenses comprise less than twenty-five percent (25.0%) of Borrower's Consolidated EBITDA ("Spread Adjustment Date"), three hundred (300) basis points per annum.

SECTION 2
CONDITIONS TO EFFECTIVENESS OF AMENDMENT

2.1    Conditions to Effectiveness. This Amendment shall become effective as of the date (the "Amendment Date") when each of the following conditions is met (all instruments, documents and agreements to be in form and substance satisfactory to Administrative Agent and Lenders):

(a)    Receipt by the Administrative Agent of this Amendment duly and properly authorized, executed and delivered by each of the respective parties to this Amendment.

(b)    Receipt by the Administrative Agent of certified copies of (i) resolutions of Borrower's board of directors authorizing the execution, delivery and performance of this Amendment and (ii) Borrower's certificate of incorporation and by-laws.

(c)    Receipt by the Administrative Agent of an incumbency certificate for Borrower identifying all Authorized Officers, with specimen signatures.

(d)    Receipt of a certification by an officer of Borrower that, after giving effect to this Amendment, there has not occurred any Post-Closing Material Adverse Effect.

(e)    Receipt of the Lien searches.

(f)    Payment by Borrower of the Amendment Fee.

(g)    Payment by Borrower of all of the Administrative Agent's reasonable legal fees and expenses incurred in connection with the preparation and negotiation of this Amendment.

2

SECTION 3
REPRESENTATIONS AND WARRANTIES

3.1     Representations and Warranties. Borrower represents and warrants to the Administrative Agent and the Lenders as follows:

(a)     The making and performance of this Amendment will not violate any Requirement of Law, or the charter, minutes or bylaw provisions of Borrower, or violate or result in a default (immediately or with the passage of time) under any material contract, agreement or instrument to which Borrower is a party, or by which Borrower is bound. Borrower is not in violation of any term of any material agreement or instrument to which it is a party or by which it may be bound which violation has or could reasonably be expected to have a Material Adverse Effect, or of its charter, minutes or bylaw provisions.

(b)     Borrower has all requisite power and authority to enter into and perform this Agreement and to incur the obligations herein provided for, and has taken all proper and necessary action to authorize the execution, delivery and performance of this Amendment.

(c)     This Amendment, when delivered, will be valid and binding upon Borrower, and enforceable in accordance with their respective terms except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting the enforcement of creditors' rights generally and by general equitable principles.

(d)     The execution, delivery and performance by Borrower of this Amendment does not require any approval or consent of, or filing with, any governmental agency or authority other than those already obtained, if any.

(e)     The representations and warranties contained in Section 4 of the Loan Agreement and the other Loan Documents are true and correct in all material respects as of the Amendment Date as though made on and as of the Amendment Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date and except to the extent of changes resulting from transactions contemplated or permitted by this Amendment and changes occurring in the ordinary course of business which singly or in the aggregate do not have a Material Adverse Effect. For purposes of this Section 3, the representations and warranties contained in Section 4.7 of the Loan Agreement shall be deemed to refer to the most recent financial statements furnished pursuant to Section 5.14(a) of the Loan Agreement.

(f)     After giving effect to this Amendment, no Default or Event of Default under the Loan Agreement has occurred and is continuing.

SECTION 4
MISCELLANEOUS

4.1     Amendment Fee. At Closing, Lenders shall have fully earned and Borrower shall unconditionally pay to Lenders, a non-refundable fee with respect to this Amendment (the "Amendment Fee") of Ninety-Two Thousand One Hundred Twenty-Five and 00/100 Dollars ($92,125.00).

4.2     Ratification and Confirmation. Except as expressly amended by this Amendment, the Loan Agreement, the other Loan Documents and all documents, instruments and agreements related thereto are hereby ratified and confirmed in all respects and shall continue in full force and effect. This Amendment and the Loan Agreement shall hereafter be read and construed together as a single document, and all references in the Loan Agreement, any other Loan Document or any agreement or instrument related to the Loan Agreement shall hereafter refer to the Loan Agreement as amended by this Amendment.

3

4.3     Governing Law. THIS AMENDMENT, AND ALL MATTERS ARISING OUT OF OR RELATING TO THIS AMENDMENT, AND ALL RELATED AGREEMENTS AND DOCUMENTS, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS OF THE STATE OF FLORIDA. THE PROVISIONS OF THIS AMENDMENT AND ALL OTHER AGREEMENTS AND DOCUMENTS REFERRED TO HEREIN ARE TO BE DEEMED SEVERABLE, AND THE INVALIDITY OR UNENFORCEABILITY OF ANY PROVISION SHALL NOT AFFECT OR IMPAIR THE REMAINING PROVISIONS WHICH SHALL CONTINUE IN FULL FORCE AND EFFECT.

4.4     Successors and Assigns. This Amendment shall inure to the benefit of and be binding upon the successors and assigns of each of the parties.

4.5     Duplicate Originals. Two (2) or more duplicate originals of this Agreement may be signed by the parties, each of which shall be an original but all of which together shall constitute one and the same instrument.

**[SIGNATURES TO FOLLOW ON SEPARATE PAGE]**

4

**WITNESS** the due execution of this Sixth Amendment to Second Amended and Restated Loan Agreement as a document under seal as of the date first written above.

RTI SURGICAL, INC., as Borrower

By:             /s/ Robert P Jordhein

Name:         Robert P. Jordheim

Title:         Interim CEO

*(Signature Page to Sixth Amendment to Second Amended and Restated Loan Agreement)*

5

TD BANK, N.A., as Administrative Agent

By:                               /s/ James G. Hanning

Name:                            James G. Hanning

Title:                        Senior Vice President

TD BANK, N.A., as Lender

By:                               /s/ James G. Hanning

Name:                            James G. Hanning

Title:                        Senior Vice President

REGIONS BANK, as Lender

By:                               /s/ Philip Dermody

Name:                            Philip Dermody

Title:                        Vice President

*(Signature Page to Sixth Amendment to Second Amended and Restated Loan Agreement)*

6

**Exhibit 10.39**

## CONSULTANT AGREEMENT

This CONSULTANT AGREEMENT ("Agreement"), effective on the 1ST day of February, 2017 ("Effective Date"), is by and between **Caroline A. Hartill**, an individual whose address is 642 Statenville Court, Ocoee, Florida 34761 ("Consultant") and **RTI Surgical, Inc.**, a Delaware corporation with a principal address of 11621 Research Circle, Alachua, FL 32615 ("RTI") (each individually a "Party", and collectively the "Parties").

**WHEREAS,** RTI is involved with the processing and distribution of tissue for surgical implantation around the world, and seeks to promote the advancement of medical technologies related to medical devices and to tissue implantation, the enhancement of safe and effective use of medical technologies related to tissue implantation and medical devices, the encouragement of research and education, and the fostering of charitable donations and giving (the "Mission");

**WHEREAS,** Consultant possesses and wishes to offer certain knowledge and expertise to RTI which may be of assistance to the Mission; and

**WHEREAS**, RTI desires to receive certain knowledge from the Consultant which would be of assistance to RTI.

**NOW, THEREFORE,** in consideration of the foregoing and the mutual covenants contained herein, RTI and Consultant agree as follows:

### 1 – CONSULTING MATTERS

1.1     Consultant shall provide consulting services ("Services") as requested in writing by RTI in the Schedule of Services, a copy of which is attached hereto and incorporated herein by reference as Exhibit A. The Services to be provided by Consultant may be adjusted from time to time by amending the Schedule of Services as mutually agreed to in writing by the Parties. The exact services to be rendered shall be as directed by the Chief Executive Officer of RTI (including any Interim Chief Executive Officer) or his or her designee.

1.2     Consultant shall perform the Services in a professional manner, in compliance with all applicable federal, state, local and foreign laws, rules and regulations ("Laws").

### 2 – COMPENSATION

2.1     Consultant shall receive the following compensation for Services performed hereunder, as requested by RTI:

2.1.1     Seven Thousand Five Hundred dollars ($7,500.00) per month for the first three months of the Term (as defined below). It is understood that the Consultant shall not be required to perform more than 20 hours of service for RTI in any month. Consultant will notify RTI's designee upon having exhausted the 20 hour allotment of time for the month. Additional hours in a given month as agreed to by Consultant and RTI shall be compensated as provided for below at an hourly rate of $375. After the initial three-month period, Consultant's services will be "on request" (as contemplated by Section 1.1 above) at an hourly rate of $375.00 for the remaining six months of the Term (as defined below).

1

2.1.2   Reimbursement for reasonable and documented out-of-pocket expenses incurred by Consultant in connection with performance of the Services.

2.1.3   All Consultant travel plans relating to this Agreement must be pre-approved by RTI. Consultant will be entitled to reimbursement of actual travel expenses in accordance with RTI's travel policy in effect at the time of travel. It is understood that all air travel will be directly billed to the Company and that any cumulative air travel of eight hours or more shall be in business class (or the equivalent).

2.1.4   Consultant shall bill travel time at the rate of $187.50 per hour, capped at eight hours per one way trip outside of North America and four hours per one way trip inside of North America.

2.2   Consultant shall provide an invoice to RTI within thirty (30) days of Services rendered. The invoice shall at a minimum specify (1) the date(s) on which Services were rendered, (2) a detailed description of the Services performed on the corresponding date, (3) the time spent rendering such services measured in 0.1 hour increments, and (4) receipts for out-of-pocket expenses.

2.3   All undisputed amounts per Consultant's invoice shall be due and payable net thirty (30) days of RTI's receipt of invoice.

## 3 - INTELLECTUAL PROPERTY MATTERS

3.1   For the purposes of this Agreement, "Work Product" is defined as all work product, deliverables, devices, inventions (whether or not patentable or reduced to practice), ideas, information and works of authorship (whether in written or other form and whether or not patentable or protectable by copyright), and know-how that have been discovered, developed or otherwise created by Consultant as a result of performance under this Agreement, or through the use of knowledge or information obtained from RTI under this Agreement or previous employment with RTI (including its subsidiaries and affiliates). Consultant shall disclose all Work Product to RTI. Work Product comprised of copyrightable works shall be deemed work made for hire for the benefit of RTI. Consultant acknowledges all Work Product, and all associated patent, copyright, trademark, trade secret and other intellectual property rights embodied in such Work Product, or otherwise created by Consultant in the course of performing hereunder ("IP Rights"), shall be the exclusive property of RTI. Consultant further acknowledges and agrees that RTI may, in its sole discretion, create derivative works from such Work Product, including, but not limited to, audio recordings, audiovisual recordings or any other form of derivative work in which such Work Product may be recast, transformed or adapted. Such derivative works shall also be the exclusive property of RTI. Consultant is not granted any rights, whether expressly, implied or by estoppel, to such Work Product, derivative works or IP Rights. To the extent exclusive right, title and interest in and to such Work Product, derivative works and IP Rights do not reside exclusively with RTI by operation of law or this Agreement, Consultant agrees to and hereby does assign to RTI all right, title and interest in and to such Work Product, derivative works and IP Rights. To the extent such Work Product, derivative works and/or IP Rights cannot be assigned to RTI, Consultant agrees to and hereby does waive all rights of Consultant in and to such Work Product, derivative works and IP Rights. Consultant will cooperate with all requests of RTI to perfect the assignments and waivers set forth in this Section, including cooperation in the form of execution and filing of additional assignment documents and patent applications.

2

3.1.1    Consultant represents and warrants that all Work Product shall be the original work of Consultant and that such Work Product, and Consultant's provision of the Services hereunder, do not infringe or misappropriate the intellectual property rights of any third party.

3.2    During the Term (as defined below), as may be extended, and for a period of five (5) years following the termination or expiration of this Agreement, Consultant agrees to keep in confidence and not use any Confidential Information in any manner whatsoever, other than for the sole purpose of assisting RTI pursuant to this Agreement. Without limiting the generality of the foregoing, Consultant shall not use any Confidential Information for the purposes of trading securities. As used in this Agreement, "Confidential Information" means the Work Product, as well as RTI trade secrets, formulas, processes, methods, know-how and other information related to tissue engineering and surgical implants including, but not limited to, allograft and xenograft tissue grafts, and associated patents and patent applications, trade secrets, know-how, inventions, surgical instruments, technical data, drawings or specifications, testing and/or production methods, business or financial information, research and development activities, product and marketing plans, donor information, medical records, and customer and supplier information, which are proprietary and of a confidential nature, and when furnished, shown or disclosed to Consultant are specifically designated in writing or orally (followed by a written confirmation and summary) as "confidential", or which are of such nature and character that a reasonable person in the trade would understand it to be confidential without the necessity of it being so designated. The obligations of Consultant under this Section 3 shall survive expiration or termination of this Agreement.

3.3    Consultant shall not disclose, publish, communicate, or reveal RTI's Confidential Information to any third party unless:

a.    express prior written permission is given by RTI and only after such third party executes an agreement with contractual obligations of confidentiality and non-use with respect to such Confidential Information that are at least as protective as those contained in this Agreement, and provided that Consultant remains ultimately responsible for such third party's acts and omissions with respect to such Confidential Information; or

b.    in the event Confidential Information is required to be disclosed to comply with applicable Laws, or with a court or administrative order, Consultant shall (i) provide RTI with immediate notice upon learning that such disclosure is required, (ii) use best efforts to assist RTI in taking all reasonable and lawful actions as deemed prudent by RTI to obtain confidential treatment for the Confidential Information for which disclosure is sought, and (iii) minimize the extent of such disclosure.

3.4.    The provisions of this Agreement regarding confidentiality and non-use of Confidential Information will not apply to, and Confidential Information does not include, information which:

a.    was independently developed or discovered by Consultant without use or benefit of RTI's Confidential Information, as demonstrated by Consultant's written records;

3

     b.     is already available to the public;

     c.     becomes available to the public through no fault of the Consultant; or

     d.     is provided to Consultant without obligations of confidentiality and non-use by a third party having the right to so provide such information.

Notwithstanding anything herein to the contrary, Consultant shall remain bound to any and all obligations of confidentiality for any knowledge gained under previous employment with RTI or its subsidiaries or affiliates.

3.5    Consultant shall not publish or share any Work Product or Confidential Information developed or received under this Agreement without the prior written consent of RTI.

3.6    Upon the expiration or termination of this Agreement, or within ten (10) days from receipt of request by RTI, Consultant shall return to RTI all originals, copies, and summaries of documents, material, and other tangible manifestations of Work Product and Confidential Information in the possession or control of Consultant, and destroy all intangible manifestations thereof (e.g., electronic files). The obligation of Consultant to return Work Product and Confidential Information to RTI and to destroy intangible manifestations thereof shall survive until fulfilled.

3.7    Consultant acknowledges that RTI processes and distributes allograft and xenograft tissue products for transplantation throughout the world and stipulates that the restrictions set forth herein are necessary to protect the legitimate business interests of RTI in guarding trade secrets and patentable subject matter, preserving the goodwill of its customers and business, preventing solicitation of its customers, and preventing the unauthorized use of its Confidential Information and the Work Product created hereunder.

## 4 - <u>TERM AND TERMINATION</u>

4.1    The term of this Agreement shall commence on the Effective Date and continue until September 30, 2017 (the "Term"), unless otherwise terminated early as set forth in Section 4.2 herein. This Agreement may be extended with the mutual written agreement of the Parties.

4.2    Either Party hereto may terminate this Agreement at any time, with or without cause, by providing the other Party with thirty (30) days' advance written notice. Sections 3, 4.2 and 5 herein shall survive the termination or expiration of this Agreement. The expiration of outstanding options shall be governed by Section 4 of the Executive Separation Agreement between RTI and Hartill.

## 5 – <u>GENERAL PROVISIONS</u>

5.1    Consultant represents and warrants that she is not cognizant of any issues that would be a conflict of interest with the terms and provisions of this Agreement or Consultant's

4

performance hereunder. In the event RTI or Consultant identifies a conflict of interest issue, the identifying Party will immediately notify the other Party in writing, and the Parties will work together to rectify the conflict of interest issue. Any such conflict of interest shall be resolved to the satisfaction of RTI within forty eight (48) hours of such notice, or this Agreement is otherwise immediately terminable by RTI in its sole discretion.

5.2     This Agreement may not be transferred or assigned by the Consultant, in whole or in part, except with the prior written consent of RTI. RTI may in its sole discretion assign this Agreement or its rights hereunder. Notwithstanding the above, the Consultant may assign this Agreement to Regulatory Strategies LLC ("RSL") upon written notice to RTI. However, at all times during the term the Consultant must: (a) personally perform all services required under this Agreement; (b) remain the only equity holder of RSL; (c) remain personally liable for the performance of all obligations due to RTI under this Agreement of RSL and (d) remain bound by the terms of this Agreement, including, without limitation, those set forth in Section 3. After the written notification of assignment has been received by RTI, RTI shall direct all payments under this Agreement to RSL.

5.3     This Agreement is governed by and shall be construed and enforced in accordance with the laws of the State of Florida, without regard to conflict of law rules. Venue for any legal proceeding or action at equity or law arising out of or for purposes of this Agreement shall lie in the state courts of Alachua County, Florida, or the United States District Court for the Northern District of Florida, Gainesville Division, and Consultant agrees that such courts shall have personal jurisdiction over Consultant and hereby waives any objection thereto. The prevailing Party in any dispute arising under, out of, or in relation to this Agreement shall be entitled to recover reasonable attorneys' fees and costs from the non-prevailing Party, including, as applicable, any cost of appeal.

5.4     Nothing in this Agreement shall be construed as granting by implication, estoppel, or otherwise, any license or rights under patents, trade secrets, know-how, copyrights, or other intangible rights of RTI other than those specifically set forth herein.

5.5     The Parties do not intend that this Agreement shall confer on any third party any right, remedy or benefit or that any third party shall have any right to enforce any provision of this Agreement.

5.6     OTHER THAN ANY WARRANTY EXPRESSLY MADE IN THIS AGREEMENT, RTI MAKES NO REPRESENTATIONS AND EXTENDS NO WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE. TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, IN NO EVENT SHALL (A) RTI BE LIABLE HEREUNDER FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES, REGARDLESS OF WHETHER RTI KNEW OF THE POSSIBILITY OF SUCH DAMAGES; OR (B) RTI'S AGGREGATE LIABILITY HEREUNDER EXCEED THE AMOUNTS ACTUALLY PAID BY RTI TO CONSULTANT HEREUNDER.

5.7     The right of either Party to terminate this Agreement, as provided under Section 4 herein, shall not be an exclusive remedy, and either Party shall be entitled, if the circumstances warrant, alternatively or cumulatively, to damages for breach of this Agreement, or to an order or injunction requiring performance of the obligations of this Agreement or to any other remedy available at law or equity.

5

5.8    This Agreement constitutes the entire agreement and understanding of the Parties with regard to the subject matter hereof and supersedes all prior discussions, negotiations, understandings and agreements between the Parties concerning the subject matter hereof. This Agreement may be amended only by written agreement of the Parties hereto. If any term of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then this Agreement, including all of the remaining terms, will remain in full force and effect as if such invalid or unenforceable term had never been included.

5.9    In the event any portion of this Agreement may be deemed less stringent than applicable Laws, regulations, or official guidance from an applicable governmental authority, the Parties agrees to confer and negotiate in good faith to amend this Agreement to comply with the more stringent standard.

5.10    Each Party to this Agreement hereby agrees to execute, acknowledge and deliver all such further instruments as may be necessary or appropriate to carry out the intent and purposes of this Agreement.

5.11    The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

5.12    Neither party shall be responsible or liable to the other party for nonperformance or delay in performance of any terms or conditions of this Agreement, except for those relative to the protection of proprietary rights, due to circumstances beyond the control of the nonperforming or delaying party including, but not limited to, acts of God, acts of government, wars, riots, third party criminal acts, strikes or other labor disputes, shortages of labor or materials, fires and floods; provided the nonperforming or delaying party provides to the other party written notice of the existence and reason for such nonperformance or delay. Notwithstanding the foregoing, the nonperformance or delay by any party in excess of thirty (30) days shall constitute cause for termination of this Agreement with such notice given in writing by one Party to the other.

5.13    Any notice or other communication required under this Agreement shall be in writing and delivered to the other Party as follows:

**Consultant:**

Caroline A. Hartill
642 Statenville Court
Ocoee, FL 34761

| **RTI:** | With copy to: |
|---|---|
| Chief Executive Officer | Legal Department |
| RTI Surgical, Inc. | RTI Surgical, Inc. |
| 11621 Research Circle | 11621 Research Circle |
| Alachua, FL 32615 | Alachua, FL 32615 |

All notices shall be deemed duly served on the date delivered to the other Party at the address stated above, whether in person, by certified mail, postage prepaid, return receipt requested, or sent by Federal Express (or other similar recognized courier) postage prepaid. Either Party may change its address for purposes of this Agreement by giving the other Party written notice of such as provided herein.

6

5.14    RTI and Consultant each acknowledge that they are independent contractors with regard to the subject matter hereof. Nothing in this Agreement shall be interpreted or construed as creating or establishing the relationship of employer and employee between RTI and Consultant. Both Parties acknowledge that Consultant is not an employee of RTI for state or federal tax purposes, workers' compensation, or any other purpose or benefit. Neither Consultant nor RTI shall have any right to enter into any contract or commitment in the name of, or on behalf of the other, or to bind the other in any respect whatsoever.

5.15    This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of which taken together shall constitute but one and the same instrument.

*[Signature Page Follows]*

7

**IN WITNESS WHEREOF**, the Parties have caused this instrument to be executed.

**Caroline A. Hartill**                                                     **RTI Surgical, Inc.**

Signature:  /s/ Caroline A. Hartill                                        By:      /s/ Robert P Jordhein
                                                                            Name:  Robert P. Jordhein
                                                                            Title:   Interim President and Chief Executive Officer
Date:        January 31, 2017                                              Date:   January 31, 2017

8

EXHIBIT A

Schedule of Services

Consulting relating to Regulatory Affairs, Quality Assurance and Clinical matters.

9

**Exhibit 10.40**

### EXECUTIVE SEPARATION AGREEMENT

This Executive Separation Agreement (the "Agreement"), effective January 31, 2017, is by and between Caroline A. Hartill ("Hartill") and RTI Surgical, Inc. ("RTI" or the "Company").

### RECITALS

WHEREAS, Hartill has served as the Executive Vice President and Chief Scientific Officer of RTI since June 2010 and has been an officer of RTI since 2003;

WHEREAS, Hartill and RTI are parties to the RTI Biologics, Inc. Executive Transition Agreement with Caroline A. Hartill, dated August 29, 2012 and extended on December 3, 2015 for a term to expire on December 31, 2018 (collectively, the "Transition Agreement");

WHEREAS, without prejudicing, altering or eliminating any rights or obligations Hartill has under the Transition Agreement, Hartill and RTI have agreed that Hartill shall separate from employment "without cause" as Executive Vice President and Chief Scientific Officer;

WHEREAS, Hartill and RTI agree that it is desirable to restate and clarify the rights and responsibilities of Hartill and RTI to each other; and

WHEREAS, simultaneously with the execution of this Agreement, Hartill and the Company are entering into a Consultant Agreement (the "Consultant Agreement").

NOW, THEREFORE, the parties, intending to be legally bound hereby and in consideration of the mutual promises contained herein, agree as follows:

### TERMS

1. Recitals. The Recitals are true and correct and are incorporated into this Agreement.

2. Separation from Employment. Hartill will separate from employment at RTI on January 31, 2017 (it is understood that such date shall be the "Termination Date" for the purposes of paragraph 1(f) of the Transition Agreement). Prior to that time Hartill shall continue to perform the duties of Executive Vice President and Chief Scientific Officer of RTI, retain all power and authority to execute her duties, and will be paid or receive all compensation and benefits due her during this period based on the schedule of compensation and benefits attached as Exhibit A. Hartill agrees that her separation from employment with RTI will be stated as a "separation," provided however that for all purposes Hartill's separation from employment is and shall be treated as a "Severance Event" "by the Company without Cause" pursuant to Section 1(e) of the Transition Agreement. Unless specifically stated herein, nothing in this Agreement alters, affects, voids or supersedes any rights Hartill has or are available to her under the Transition Agreement as a result of a Severance Event occurring.

3. Obligations of RTI to Hartill Pursuant to the Transition Agreement. Section 3 of the Transition Agreement (relating to Severance Protection) defines and specifies the Severance Protection

Benefits for Hartill in the event of a Severance Event. RTI will pay or cause to be paid the Severance Protection amounts and benefits to Hartill. The salary, bonus opportunity, and health insurance amounts to be used for computing certain Severance Protection benefits are specified in Exhibit A.

4. Additional Benefits to Hartill. In addition to (and not in lieu of) any benefit available to Hartill under the Transition Agreement, RTI shall provide Hartill with or allow or permit the following:

(a) Attached as Exhibit B is an Option and Award Summary dated January 31, 2017 for Hartill. All stock options and restricted stock awards shall become fully vested as of the date of this Agreement. Notwithstanding anything to the contrary in any applicable plan(s), the last date by which such stock options can be exercised is the close of business on the 90th day following the end of her services under the Consultant Agreement (currently expected to be December 31, 2017), but if the Company terminates the Consultant Agreement before September 30, 2017 (other than for breach of the Consultant Agreement), the date such options can be exercised shall be extended to the close of business on December 31, 2017. For the avoidance of doubt, if Hartill (or Hartill's permitted assignee) terminates the Consultant Agreement or if RTI terminates the Consultant because of Hartill's breach (or Hartill's permitted assignee's breach), the options may be exercised only for 90 days following the termination of the Consultant Agreement.

(b) RTI agrees that except as required by applicable law, it will not directly or indirectly: (i) disparage or say or write negative things about Hartill; or (ii) initiate or participate in any discussion or communication that reflects negatively on Hartill. A disparaging or negative statement is any communication, oral or written, which would tend to cause the recipient of the communication to question the business condition, integrity, competence, fairness, or good character of the person or entity to whom the communication relates.

5. Hartill's Obligation.

(a) Hartill agrees to comply with all obligations under the Transition Agreement, including executing the Release Agreement attached as Exhibit A to the Transition Agreement.

(b) Hartill agrees that except as required by applicable law, she will not directly or indirectly: (i) disparage or say or write negative things about the Company; or (ii) initiate or participate in any discussion or communication that reflects negatively on the Company. A disparaging or negative statement is any communication, oral or written, which would tend to cause the recipient of the communication to question the business condition, integrity, competence, fairness, or good character of the person or entity to whom the communication relates.

(c) Hartill represents that she does not now have pending any claims or lawsuits against RTI, she has not suffered an on-the-job injury for which she has not already filed a claim, and she will not commence or join in any lawsuit against RTI or its personnel in the future.

(d) Upon service on Hartill, or anyone acting on her behalf, of any subpoena, order, directive, or other legal process requiring Hartill to disclose any information about RTI, Hartill or her attorney shall promptly notify RTI of such service and of the content of any testimony or information to be provided pursuant to such subpoena, order, directive, or other legal process and within five business days send to the designated representative of RTI via overnight delivery a copy of said documents.

Page **2** of **8**

6. <u>Non-Competition Restriction</u>. Except as may later be agreed upon in writing by Hartill and the Company, the entities listed below (hereinafter the "Excluded Entities") shall be subject to the full restrictions provided for in Section 4 of Exhibit B to the Transition Agreement, and are not subject to the exceptions set forth herein. Other than the Excluded Entities, and anything in Section 4 of Exhibit B to the Transition Agreement notwithstanding, Executive may be employed by or contract with persons or entities for the limited purpose of providing such persons or entities with regulatory and quality assurance advice and strategy services (the "Permitted Services"), provided, however, that no Confidential Information is used or relied upon by Executive in rendering the Permitted Services.

(a) The Excluded Entities are the following, including their subsidiary or controlled entities:

(1)     Musculoskeletal Transplant Foundation (including Biocon Inc.)

(2)     LifeNet Health

(3)     AlloSource

(4)     University of Miami Tissue Bank (or its successor organization)

(5)     Community Tissue Services

(6)     LifeLink

(7)     Joint Research Foundation (JRF)

(8)     CellectCell, Inc.

(9)     Vivex Biomedical

7. <u>EEOC and SEC</u>. Nothing in this Agreement shall be construed to prohibit Hartill from (a) filing a charge or complaint with the United States Equal Employment Opportunity Commission ("EEOC") or other fair employment practices agency; (b) communicating directly with the United States Securities and Exchange Commission ("SEC") or any member of its staff, about any possible violation federal securities laws; (c) making any disclosure protected under the whistleblower provisions of federal laws or regulations; or (d) participating in any investigation or proceeding conducted by the EEOC or the SEC or any such agency. The approval of RTI or any RTI officer, employee or agent is not necessary prior to communicating directly with the EEOC or the SEC or their staff. However, if Hartill files a charge with the EEOC or similar agency, or if such a charge is filed on her behalf, Hartill forever waives and relinquishes any rights to recover damages resulting from any such charge.

8. <u>Attorneys' Fees</u>. RTI and Hartill agree that in the event it becomes necessary to enforce any provision of this Agreement, the prevailing party in such action shall be entitled to recover all of their costs and attorneys' fees, including those associated with appeals. Notwithstanding the above, the Company will reimburse Hartill for up to $5,000 in attorneys fees in connection with the negotiation of this Agreement.

9. <u>Entire Agreement.</u> Unless specified herein, nothing in this Agreement supersedes or voids the Transition Agreement. The Transition Agreement shall remain in place as originally written or as modified by this Agreement.

10. <u>Capitalized Terms.</u> All capitalized terms used in this Agreement and not defined herein shall have the meaning given to them in the Transition Agreement.

Page **3** of **8**

11. Counterparts and Facsimile. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument. This Agreement may be signed and delivered by facsimile or other electronic transmission which will be deemed the same as an original.

12. Assignment. This Agreement may be assigned, sold or otherwise conveyed by RTI to a successor or any other entity without Hartill's authorization or agreement, provided, however that in the event of non-payment to Hartill by the assignee, or any such successor, RTI shall remain responsible for such payments under this Agreement. This Agreement shall be enforceable by any such successor or assign. This Agreement will survive a merger, restructure, change of control or sale of the companies involved in this Agreement. Hartill does not have the ability to assign, sell or otherwise convey this Agreement, and any attempt to do so shall be null and void ab initio. If Hartill should die while any payment or benefit is due to her hereunder, such payment or benefit shall pass to her designated beneficiary (or if there is no designated beneficiary, to her estate), including, without limitation, the exercise of her options.

13. Voluntary Agreement. Each party to this Agreement acknowledges and represents that she or it (a) has fully and carefully read this Agreement prior to signing it, (b) has been, or has had the opportunity to be, advised by independent legal counsel of her or its own choice as to the legal effect and meaning of each of the terms and conditions of this Agreement, and (c) is signing and entering into this Agreement as a free and voluntary act without duress or undue pressure or influence of any kind or nature whatsoever and has not relied on any promises, representations or warranties regarding the subject matter hereof other than as set forth in this Agreement.

14. Governing Law. This Agreement shall be governed by the laws of the State of Florida, excluding its conflict of law rules.

[*Signature Page Follows*]

Page **4** of **8**

**IN WITNESS WHEREOF**, the Parties have set their hands and seals to this Executive Separation Agreement of the date set forth above.

RTI SURGICAL, INC.

By: _____  /s/ Robert P. Jordhein

Name:  Robert P. Jordhein

Title:  Interim President and Chief Executive Officer

By: _____  /s/ Caroline A. Hartill

Name:  Caroline A. Hartill

Page **5** of **8**

EXHIBIT A

Severance Protection Benefits

**Carrie Hartill – Compensation & Benefits**

Base Salary

Annual Base Salary: $361,238.51
Annual Employee Share of Benefits:
- Medical - $3,835.26
- Dental - $430.82
- Vision - $122.98
- ID Theft Protection - $227.50
- Total - $4,616.56

Annual Base Salary + Gross up for Benefits: $365,855.07

Short Term Incentive

Annual Bonus Opportunity @ Plan: 50% of base salary
Annual Bonus Amount @ Plan: $180,619.26

*COBRA cost would be as follows as RTI currently pays approximately 75% of the total cost on employee + spouse coverage for full time employees.*

**COBRA Costs**

| Benefit | Monthly Cost | 18 Month Total Cost |
|---|---|---|
| Medical | $ 1,309.07 | $ 23,563.26 |
| Dental | $ 74.01 | $ 1,332.18 |
| Vision | $ 10.46 | $ 188.28 |
| ID Theft Protection | $ 18.95 | $ 341.10 |
| **Total** | **$1,412.49** | **$25,424.82** |

| | Threshold for payout | Target | Maximum |
|---|---|---|---|
| Performance | $ 251,316 | $264,543 | $ 290,997 |
| % of Performance Target | 95% | 100% | 110% |
| Payout % | 50% | 100% | 150% |
| *Individual Opportunity* | $ 18,062 | $ 36,124 | $ 54,186 |

Base Revenue (20.0% of Bonus Calculation)

| | Threshold for payout | Target | Maximum |
|---|---|---|---|
| Performance | $ 26,163 | $ 30,780 | $ 33,858 |
| % of Performance Target | 85% | 100% | 110% |
| Payout % | 75% | 100% | 150% |
| *Individual Opportunity* | $ 13,546 | $ 18,062 | $ 27,093 |

Focus Products Revenue (10% of Bonus Calculation)

| | Threshold for Payout | Target | Maximum |
|---|---|---|---|
| Performance | 8.2% | 9.1% | 10.5% |
| % of Performance Target | 90% | 100% | 115% |
| Payout % | 50% | 100% | 150% |
| *Individual Opportunity* | $ 27,093 | $ 54,186 | $ 81,279 |

Operating Margin % (30% of Bonus Calculation)

| | Threshold for Payout | Target | Maximum |
|---|---|---|---|
| Performance | $ 15,653 | $ 17,392 | $ 20,001 |
| % of Performance Target | 90% | 100% | 115% |
| Payout % | 50% | 100% | 150% |
| *Individual Opportunity* | $ 36,124 | $ 72,248 | $ 108,372 |

Free Cash Flow Improvement (40% of Bonus Calculation)

| | *Total Target Opportunity* | | $180,619 |
|---|---|---|---|

Page **6** of **8**

Welfare Benefits

| Benefit | Coverage Level | Description |
|---|---|---|
| Medical/Rx Insurance | Employee + Spouse | Traditional PPO Plan w/ Florida Blue 80/20 coinsurance |
| Dental Insurance | Employee + Spouse | Traditional PPO Plan w/ Delta Dental |

| Benefit | Coverage Level | Description |
|---|---|---|
| Vision Insurance | Employee + Spouse | Traditional PPO Plan w/ Humana |
| Identity Theft Protection | Family Coverage | ID Theft Protection and Restoration through Legal Shield |
| Short Term Disability | 60% of earnings | Max weekly benefit $800 |
| Long Term Disability | 66 2/3rds% of earnings | Max monthly benefit $8,000 |
| Group Life Insurance | $50,000 Term/AD&D | Group Policy for all full time employees |
| 401k Retirement Plan | 5% deferral elected | Company matches $1 for $1 up to 6% |
| Personal Life Insurance | $500,000 Term Life | Term Life Policy – RTI reimburses as a TBF annual premium w/ Genworth Life and Annuity $720 |
| Mayo Clinic Annual Physical | Approx. Annual Cost: $8,820 | Mayo Clinic Executive Health Program |

Page **7** of **8**

EXHIBIT B

Option and Award Summary

**Outstanding Stock Options**

| | | | Total Options | | |
| | Grant | | | | |
| Type | Date | Price | Issued | Vested | Unvested (1) |
|---|---|---|---|---|---|
| **Stock Options** | | | | | |
| | 3/2/2007 | $7.25 | 30,000 | 30,000 | — |
| | 1/28/2008 | $7.45 | 30,000 | 30,000 | — |
| | 2/10/2009 | $2.98 | 60,000 | 60,000 | — |
| | 4/20/2010 | $4.30 | 80,000 | 80,000 | — |
| | 2/28/2011 | $2.69 | 60,000 | 60,000 | — |
| | 2/9/2012 | $4.02 | 60,000 | 48,000 | 12,000 |
| | 2/25/2013 | $3.60 | 60,000 | 36,000 | 24,000 |
| | 2/25/2014 | $3.78 | 60,000 | 24,000 | 36,000 |
| | 2/17/2015 | $5.23 | 60,000 | 12,000 | 48,000 |
| | 2/24/2016 | $3.31 | 38,710 | — | 38,710 |
| **Total Options** | | | **538,710** | **380,000** | **158,710** |

**Outstanding Restricted Stock Awards**

| | | | Total RSAs | | |
| | Grant | | | | |
| | Date | Price | Issued | Vested | Unvested (1) |
|---|---|---|---|---|---|
| **Restricted Stock** | | | | | |
| | 2/25/2014 | $3.78 | 20,000 | 13,333 | 6,667 |
| | 2/17/2015 | $5.23 | 20,000 | 6,666 | 13,334 |
| | 2/24/2016 | $3.31 | 30,211 | — | 30,211 |
| **Total Restricted Stock** | | | **70,211** | **19,999** | **50,212** |

(1)     **Subject to accelerated vesting under the Executive Transition Agreement**

Page **8** of **8**

**Exhibit 10.41**

## RELEASE AGREEMENT

This Release Agreement ("Agreement") is made as of February 1, 2017 by and between Caroline A. Hartill ("Executive") and RTI Surgical, Inc. (the "Company").

## BACKGROUND

The Company and Executive previously entered into an Executive Transition Agreement, dated August 29, 2012 and extended on December 3, 2015 (the "Executive Transition Agreement"), that (among other things) requires Executive to deliver a release in the form of this Agreement in order to receive and retain the consideration set forth in the Executive Transition Agreement.

The Company and the Executive entered into an Executive Separation Agreement dated January 31, 2016 ("the Executive Separation Agreement"), that also requires Executive to deliver a release in the form of this Agreement in order to receive and retain consideration set forth in the Executive Transition Agreement and the Executive Separation Agreement. Accordingly, in consideration of the covenants and agreements in this Agreement, the Executive Transition Agreement and the Executive Separation Agreement, the receipt and sufficiency of which are acknowledged, the Company and Executive agrees as follows:

## TERMS

1. This will confirm that a Severance Event as described in Section 1(e) of Executive Transition Agreement has occurred. In accordance with Section 4 of the Executive Transition Agreement and Section 5 of the Executive Separation Agreement, Executive's right to receive and retain certain severance payments and benefits under Section 3 of the Executive Transition Agreement, as well as Sections 3 and 4 of the Executive Separation Agreement, is conditioned upon the timely receipt by the Company of a general release by Executive in favor of the Company, its affiliates and their officers, directors and employees, which is no longer subject to revocation. Accordingly, in consideration of the severance payments and benefits under the Executive Transition Agreement and the Executive Separation Agreement and other good and valuable consideration, Executive for herself and for the executors and administrators of Executive's estate, Executive's heirs, successors and assigns, hereby releases and forever discharges the Company and its affiliates and each of its or their current and former officers, directors, employees and stockholders (the "Releasees") from any and all claims, actions, causes of action, suits, sums of money, debts, dues, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, demands or damages of any nature whatsoever or by reason of any matter, cause or thing regardless of whether known or unknown at present, which against the Releasees Executive ever had, now has or may have arising out of or relating to any transaction, dealing, relationship, conduct, act or omission, or any other matters or things occurring or existing at any time prior to and including the date of this Release (collectively defined herein as "Claims"). This Release includes, but is not limited to, all Claims Executive might have under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e, *et. seq.*; 42 U.S.C. §§1981, *et. seq.*; the Americans with Disabilities Act, 29 U.S.C. §§2000e, *et. seq.*; the Age Discrimination in Employment Act; the Older Workers Benefits Protection Act; the federal Family and Medical Leave Act; Section 451 *et. seq.*; similar state laws, and any and all statutory and common law causes of action for defamation; slander; *slander per se*; defamation *per se*; false light; tortious interference with prospective business relationships; assault; sexual assault; battery; sexual harassment; sexual discrimination; hostile work environment; discrimination; retaliation; workers' compensation; wrongful termination; intentional infliction of emotional distress; breach of a duty or obligation of any kind or description, including any implied covenant of good faith and fair dealing; and for breach of contract or any tort whatsoever, as well as any expenses or attorney's fees associated with such Claims. The parties acknowledge that this Release does not either affect the rights and responsibilities of the Equal Employment Opportunity Commission to enforce the Age Discrimination in Employment Act, or justify interfering with the protected right of an employee to file a charge or participate in an investigation or proceeding conducted by the Equal Employment Opportunity Commission under the Age Discrimination in Employment Act. In the event the Equal Employment Opportunity Commission commences a proceeding against the Company in which Executive is a named party, Executive agrees to waive and forego any monetary claims which may be alleged by the Equal Employment Opportunity Commission to be owed to Executive. Notwithstanding the foregoing, nothing in the provisions of this Release shall act as a release by Executive of any Claims against the Company with respect to (i) any amounts or benefits to which Executive may be entitled under and in accordance with the terms of the Executive Transition Agreement or the

Executive Separation Agreement, (ii) any right Executive may have to indemnification under the terms of the Executive Transition Agreement, the Executive Separation Agreement, or under the terms of any other applicable indemnification agreement, the organizational documents of the Company, the terms of any insurance policy, the terms of any Company indemnification policy, the terms of applicable law or otherwise, (iii) Executive's rights under and in accordance with the terms of any employee benefit plan in which Executive participates, and (iv) any Claims arising with respect to acts, events or occurrences taking place after the date of this Release, including any Claims arising with respect to any consultant agreement executed by the Company and the Executive. For the purposes hereof, the term "Company" shall include any direct or indirect successor to the Company. Executive does not waive or release any claims which arise after the date Executive executes this Agreement.

2. Executive has been advised to consult with an attorney prior to executing this Agreement. By executing this Agreement, Executive acknowledges that (a) Executive has been provided with an opportunity to consult with an attorney or other advisor of Executive's choice regarding the terms of this Agreement, (b) this is a final offer and Executive has been given 45 days in which to consider whether Executive wishes to enter into this Agreement, (c) Executive has elected to enter into this Agreement knowingly and voluntarily and (d) if Executive does so within fewer than 45 days from receipt of the final document Executive has knowingly and voluntarily waived the remaining time. This Agreement shall be fully effective and binding upon all parties hereto immediately upon execution of this Agreement except as to rights or claims arising under the ADEA, in which case Executive has 7 days following execution of this Agreement to change Executive's mind.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

/s/ Caroline A. Hartill

Caroline A. Hartill

RTI SURGICAL, INC.

By: /s/ Robert P Jordhein

Robert P. Jordheim,
Interim President and Interim Chief Executive Officer

**Exhibit 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Registration Statements Nos. 333-203861, 333-54378, 333-128232, 333-149418 and 333-166543 on Form S-8 and No. 333-191215 on Form S-3 of our report dated March 13, 2017, relating to the financial statements and financial statement schedule of RTI Surgical, Inc., and the effectiveness of RTI Surgical, Inc.'s internal control over financial reporting appearing in this Annual Report on Form 10-K of RTI Surgical, Inc. for the year ended December 31, 2016.

/s/ DELOITTE & TOUCHE LLP

Tampa, Florida
March 13, 2017

**Exhibit 31.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO
EXCHANGE ACT RULES 13a-14(a)/15d-14(a) AS ADOPTED PURSUANT TO
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Robert P. Jordheim, certify that:

1. I have reviewed this Annual Report on Form 10-K of RTI Surgical, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 13, 2017

/s/ Robert P. Jordheim
Name:  Robert P. Jordheim
Title:  Interim President and Interim Chief Executive Officer

**Exhibit 31.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER PURSUANT TO
EXCHANGE ACT RULES 13a-14(a)/15d-14(a) AS ADOPTED PURSUANT TO
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Johannes W. Louw, certify that:

1.    I have reviewed this Annual Report on Form 10-K of RTI Surgical, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 13, 2017

/s/ Johannes W. Louw
Name:   Johannes W. Louw
Title:    Interim Chief Financial Officer

**Exhibit 32.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO**
**18 U.S.C. SECTION 1350 AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of RTI Surgical, Inc. (the "Company") on Form 10-K for the year ended December 31, 2016, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Robert P. Jordheim, Interim President and Interim Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, and to the best of my knowledge, that:

1. the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 13, 2017

/s/ Robert P. Jordheim
Name:  Robert P. Jordheim
Title:    Interim President and Interim Chief Executive Officer

The foregoing certification is being furnished solely pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and is not being filed as part of the Report or as a separate disclosure document. **A signed original of this written statement required by Section 906 has been provided to RTI Surgical, Inc. and will be retained by RTI Surgical, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.**

**Exhibit 32.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER PURSUANT TO
18 U.S.C. SECTION 1350 AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of RTI Surgical, Inc. (the "Company") on Form 10-K for the year ended December 31, 2016, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Johannes W. Louw, Interim Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, and to the best of my knowledge, that:

1.  the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 13, 2017

/s/ Johannes W. Louw
Name:  Johannes W. Louw
Title:    Interim Chief Financial Officer

The foregoing certification is being furnished solely pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and is not being filed as part of the Report or as a separate disclosure document. **A signed original of this written statement required by Section 906 has been provided to RTI Surgical, Inc. and will be retained by RTI Surgical, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.**

| Document and Entity Information - USD ($) $ in Millions | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Mar. 03, 2017 | Jun. 30, 2016 |
| **Document And Entity Information [Abstract]** | | | |
| Document Type | 10-K | | |
| Amendment Flag | false | | |
| Document Period End Date | Dec. 31, 2016 | | |
| Document Fiscal Year Focus | 2016 | | |
| Document Fiscal Period Focus | FY | | |
| Trading Symbol | RTIX | | |
| Entity Registrant Name | RTI SURGICAL, INC. | | |
| Entity Central Index Key | 0001100441 | | |
| Current Fiscal Year End Date | --12-31 | | |
| Entity Well-known Seasoned Issuer | No | | |
| Entity Current Reporting Status | Yes | | |
| Entity Voluntary Filers | No | | |
| Entity Filer Category | Accelerated Filer | | |
| Entity Common Stock, Shares Outstanding | | 58,462,397 | |
| Entity Public Float | | | $ 208.3 |

| Consolidated Balance Sheets - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Current Assets:** | | |
| Cash and cash equivalents | $ 13,849 | $ 12,614 |
| Accounts receivable - less allowances of $1,728 at December 31, 2016 and $1,454 at December 31, 2015 | 41,488 | 47,243 |
| Inventories - net | 119,743 | 118,673 |
| Prepaid and other current assets | 5,213 | 13,184 |
| Total current assets | 180,293 | 191,714 |
| Property, plant and equipment - net | 83,298 | 84,992 |
| Deferred tax assets - net | 24,968 | 22,385 |
| Goodwill | 54,887 | 54,887 |
| Other intangible assets - net | 23,994 | 26,213 |
| Other assets - net | 591 | 471 |
| Total assets | 368,031 | 380,662 |
| **Current Liabilities:** | | |
| Accounts payable | 26,112 | 20,446 |
| Accrued expenses | 22,030 | 28,609 |
| Current portion of deferred revenue | 4,742 | 4,865 |
| Current portion of short and long-term obligations | 6,080 | 5,853 |
| Total current liabilities | 58,964 | 59,773 |
| Long-term obligations - less current portion | 77,267 | 73,384 |
| Other long-term liabilities | 256 | 472 |
| Deferred revenue | 6,612 | 9,354 |
| Total liabilities | 143,099 | 142,983 |
| Preferred stock Series A, $.001 par value: 5,000,000 shares authorized; 50,000 shares issued and outstanding | 60,016 | 56,323 |
| **Stockholders' equity:** | | |
| Common stock, $.001 par value: 150,000,000 shares authorized; 58,433,397 and 57,803,111 shares issued and outstanding, respectively | 58 | 58 |
| Additional paid-in capital | 417,428 | 417,725 |
| Accumulated other comprehensive loss | (8,316) | (7,042) |
| Accumulated deficit | (243,338) | (228,939) |
| Less treasury stock, 368,949 and 230,352 shares, respectively, at cost | (916) | (446) |
| Total stockholders' equity | 164,916 | 181,356 |
| Total liabilities and stockholders' equity | $ 368,031 | $ 380,662 |

| Consolidated Balance Sheets (Parenthetical) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Statement of Financial Position [Abstract]** | | |
| Accounts receivable, allowances | $ 1,728 | $ 1,454 |
| Preferred stock, par value | $ 0.001 | $ 0.001 |
| Preferred stock, shares authorized | 5,000,000 | 5,000,000 |
| Preferred stock, shares issued | 50,000 | 50,000 |
| Preferred stock, shares outstanding | 50,000 | 50,000 |
| Common stock, par value | $ 0.001 | $ 0.001 |
| Common stock, shares authorized | 150,000,000 | 150,000,000 |
| Common stock, shares issued | 58,433,397 | 58,433,397 |
| Common stock, shares outstanding | 57,803,111 | 57,803,111 |
| Treasury stock, shares | 368,949 | 230,352 |

| Consolidated Statements of Comprehensive (Loss) Income - USD ($) $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Income Statement [Abstract]** | | | |
| Revenues | $ 272,865 | $ 282,293 | $ 262,810 |
| Costs of processing and distribution | 140,516 | 132,551 | 129,013 |
| Gross profit | 132,349 | 149,742 | 133,797 |
| **Expenses:** | | | |
| Marketing, general and administrative | 116,125 | 107,439 | 107,653 |
| Research and development | 16,090 | 15,065 | 15,536 |
| Strategic review costs | 1,150 | | |
| CEO Retirement and transition costs | 4,404 | | |
| Contested proxy expenses | 2,680 | | |
| Asset impairment and abandonments | 5,435 | 814 | |
| Litigation settlement and settlement charges | | 804 | 185 |
| Restructuring charges | 1,107 | | |
| Severance costs | 1,039 | 995 | 4,798 |
| Total operating expenses | 148,030 | 125,117 | 128,172 |
| Operating (loss) income | (15,681) | 24,625 | 5,625 |
| **Other (expense) income:** | | | |
| Interest expense | (1,655) | (1,492) | (1,357) |
| Interest income | 8 | 3 | 9 |
| Foreign exchange (loss) gain | (132) | 78 | (88) |
| Total other expense - net | (1,779) | (1,411) | (1,436) |
| (Loss) income before income tax benefit (provision) | (17,460) | 23,214 | 4,189 |
| Income tax benefit (provision) | 3,061 | (8,299) | (1,493) |
| Net (loss) income | (14,399) | 14,915 | 2,696 |
| Convertible preferred dividend | (3,508) | (3,305) | (3,113) |
| Net (loss) income applicable to common shares | (17,907) | 11,610 | (417) |
| **Other comprehensive loss:** | | | |
| Unrealized foreign currency translation loss | (1,274) | (3,161) | (3,069) |
| Comprehensive (loss) income | $ (19,181) | $ 8,449 | $ (3,486) |
| Net (loss) income per common share - basic | $ (0.31) | $ 0.20 | $ (0.01) |
| Net (loss) income per common share - diluted | $ (0.31) | $ 0.20 | $ (0.01) |
| Weighted average shares outstanding - basic | 58,236,745 | 57,611,231 | 56,735,924 |
| Weighted average shares outstanding - diluted | 58,236,745 | 58,590,494 | 56,735,924 |

| Consolidated Statements of Stockholders' Equity - USD ($) $ in Thousands | Total | Series A Preferred Stock [Member] | Common Stock [Member] | Additional Paid-in Capital [Member] | Additional Paid-in Capital [Member] Series A Preferred Stock [Member] | Accumulated Other Comprehensive Loss [Member] | Accumulated Deficit [Member] | Treasury Stock [Member] |
|---|---|---|---|---|---|---|---|---|
| Beginning Balance at Dec. 31, 2013 | $ 168,053 | | $ 56 | $ 415,426 | | $ (812) | $ (246,550) | $ (67) |
| Net (loss) income | 2,696 | | | | | | 2,696 | |
| Foreign currency translation adjustment | (3,069) | | | | | (3,069) | | |
| Exercise of common stock options | 889 | | 1 | 888 | | | | |
| Stock-based compensation | 3,032 | | | 3,032 | | | | |
| Purchase of treasury stock | (122) | | | | | | | (122) |
| Amortization of preferred stock Series A issuance costs | | $ (184) | | | $ (184) | | | |
| Preferred stock Series A dividend | | (3,113) | | | (3,113) | | | |
| Change in income tax benefit from stock-based compensation | (347) | | | (347) | | | | |
| Ending Balance at Dec. 31, 2014 | 167,835 | | 57 | 415,702 | | (3,881) | (243,854) | (189) |
| Net (loss) income | 14,915 | | | | | | 14,915 | |
| Foreign currency translation adjustment | (3,161) | | | | | (3,161) | | |
| Exercise of common stock options | 2,505 | | 1 | 2,504 | | | | |
| Stock-based compensation | 2,858 | | | 2,858 | | | | |
| Purchase of treasury stock | (257) | | | | | | | (257) |
| Amortization of preferred stock Series A issuance costs | | (186) | | | (186) | | | |
| Preferred stock Series A dividend | | (3,305) | | | (3,305) | | | |
| Change in income tax benefit from stock-based compensation | 152 | | | 152 | | | | |
| Ending Balance at Dec. 31, 2015 | 181,356 | | 58 | 417,725 | | (7,042) | (228,939) | (446) |
| Net (loss) income | (14,399) | | | | | | (14,399) | |
| Foreign currency translation adjustment | (1,274) | | | | | (1,274) | | |
| Exercise of common stock options | 57 | | | 57 | | | | |
| Stock-based compensation | 3,590 | | | 3,590 | | | | |
| Purchase of treasury stock | (470) | | | | | | | (470) |
| Amortization of preferred stock Series A issuance costs | | (185) | | | (185) | | | |
| Preferred stock Series A dividend | | $ (3,508) | | | $ (3,508) | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Change in income tax benefit from stock-based compensation | (251) | | (251) | | | |
| Ending Balance at Dec. 31, 2016 | $ 164,916 | $ 58 | $ 417,428 | $ (8,316) | $ (243,338) | $ (916) |

| Consolidated Statements of Cash Flows - USD ($) $ in Thousands | 12 Months Ended | | |
| --- | --- | --- | --- |
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Cash flows from operating activities:** | | | |
| Net (loss) income | $ (14,399) | $ 14,915 | $ 2,696 |
| **Adjustments to reconcile net (loss) income to net cash provided by operating activities:** | | | |
| Depreciation and amortization expense | 16,510 | 16,522 | 15,395 |
| Provision for bad debts and product returns | 895 | 1,568 | 891 |
| Provision for inventory write-downs | 13,880 | 5,390 | 3,763 |
| Amortization of deferred revenue | (4,867) | (6,225) | (5,420) |
| Deferred income tax provision | (3,395) | 5,543 | 502 |
| Stock-based compensation | 3,590 | 2,548 | 3,032 |
| Asset impairment | 5,435 | | |
| Other | 603 | 2,280 | 958 |
| **Change in assets and liabilities:** | | | |
| Accounts receivable | 4,756 | (10,435) | (8,058) |
| Inventories | (15,369) | (11,990) | (11,244) |
| Accounts payable | 4,583 | (12,660) | 4,087 |
| Accrued expenses | (6,536) | 5,532 | 1,375 |
| Deferred revenue | 2,000 | 2,000 | |
| Other operating assets and liabilities | 7,637 | (5,992) | (1,083) |
| Net cash provided by operating activities | 15,323 | 8,996 | 6,894 |
| **Cash flows from investing activities:** | | | |
| Purchases of property, plant and equipment | (15,337) | (17,740) | (15,577) |
| Patent and acquired intangible asset costs | (2,615) | (498) | (737) |
| Net cash used in investing activities | (17,952) | (18,238) | (16,314) |
| **Cash flows from financing activities:** | | | |
| Proceeds from exercise of common stock options | 57 | 2,505 | 889 |
| Proceeds from long-term obligations | 17,000 | 8,750 | 7,000 |
| Net (payments) proceeds from short-term obligations | (1,511) | 422 | 658 |
| Payments on long-term obligations | (11,424) | (5,294) | (682) |
| Other financing activities | (458) | (109) | 5 |
| Net cash provided by financing activities | 3,664 | 6,274 | 7,870 |
| Effect of exchange rate changes on cash and cash equivalents | 200 | (121) | (1,468) |
| Net increase (decrease) in cash and cash equivalents | 1,235 | (3,089) | (3,018) |
| Cash and cash equivalents, beginning of period | 12,614 | 15,703 | 18,721 |
| Cash and cash equivalents, end of period | 13,849 | 12,614 | 15,703 |
| **Supplemental cash flow disclosure:** | | | |
| Cash paid for interest | 1,224 | 1,425 | 1,624 |
| Cash paid for income taxes, net of refunds | (238) | 3,667 | 578 |
| Non-cash acquisition of property, plant and equipment | 952 | 3,795 | 1,947 |
| Stock-based compensation related to severance | | 310 | |
| Change in accrual for dividend payable | $ 3,508 | $ 3,305 | $ 3,113 |

| **Business** | **12 Months Ended**<br>**Dec. 31, 2016** |

**Organization, Consolidation and**
**Presentation of Financial Statements**
**[Abstract]**

Business

**1. Business**

      RTI Surgical, Inc. (the "Company"), and its subsidiaries recover and process human and animal tissue and manufacture metal and synthetic implants and instruments. The processing transforms the tissue into either conventional or precision machined allograft implants (human) or xenograft implants (animal). The implants are used for orthopedic and other surgical applications to promote the natural healing of human bone and other human tissue. These implants are distributed domestically and internationally, for use in reconstruction and fracture repair.

| Summary of Significant Accounting Policies | 12 Months Ended Dec. 31, 2016 |
|---|---|

**Accounting Policies [Abstract]**

Summary of Significant Accounting Policies

**2. Summary of Significant Accounting Policies**

*Principles of Consolidation*—The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries, Pioneer Surgical Technology, Inc. ("Pioneer"), Tutogen Medical, Inc. ("TMI"), RTI Surgical, Inc. – Cardiovascular (inactive), Biological Recovery Group Inc. (inactive), and RTI Services, Inc. (inactive). The consolidated financial statements also include the accounts of RTI Donor Services, Inc. ("RTIDS"), which is a controlled entity. The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). All intercompany balances and transactions have been eliminated in consolidation.

RTIDS is a taxable not-for-profit entity organized and controlled by the Company. RTIDS is the corporate entity that is responsible for procuring tissue for the Company. Expenses incurred by RTIDS to procure tissue are passed through to the Company. RTIDS has no significant assets or liabilities except for its intercompany accounts receivable and accounts payable to tissue recovery agencies. The Company pays all expenses of RTIDS.

*Use of Estimates*—The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Estimates and assumptions relating to inventories, receivables, long-lived assets, investment valuations and litigation are made at the end of each financial reporting period by management. Actual results could differ from those estimates.

*Foreign Currency Translation*—The functional currency of the Company's foreign subsidiaries is the Euro. Assets and liabilities of the foreign subsidiaries are translated at the period end exchange rate while revenues and expenses are translated at the average exchange rate for the period. The resulting translation adjustments, representing unrealized, noncash gains and losses are recorded and presented as a component of comprehensive (loss) income. Gains and losses resulting from transactions of the Company and its subsidiaries, which are made in currencies different from their own, are included in income or loss as they occur and are included in other (expense) income in the consolidated statements of comprehensive (loss) income.

*Fair Value of Financial Instruments*—The estimated fair value of financial instruments disclosed in the consolidated financial statements has been determined by using available market information and appropriate valuation methodologies. The carrying value of all current assets and current liabilities approximates fair value because of their short-term nature. The carrying value of the long-term debt obligations approximates fair value. The carrying value of capital lease obligations approximates their fair value, based on current market prices.

*Cash and Cash Equivalents*— The Company considers all funds in banks and short-term highly liquid investments with an original maturity of three months or less to be cash and cash equivalents. Cash equivalents comprise overnight repurchase agreements. Cash balances are held at a few financial institutions and usually exceed insurable amounts. The Company mitigates this risk by depositing its uninsured cash in major well capitalized financial institutions, and by investing excess operating cash in overnight repurchase agreements which are 101% collateralized by U.S. Government backed securities with the Company's bank. At December 31, 2016 and 2015, the Company had no cash equivalents.

*Accounts Receivable Allowances*— The Company maintains allowances for doubtful accounts based on the Company's review and assessment of payment history and its estimate of the ability of each customer to make payments on amounts invoiced. If the financial condition of any of its customers were to deteriorate, additional allowances might be required. From time to time the Company must adjust its estimates. Changes in estimates of the collection risk related to accounts receivable can result in decreases and increases to current period net income.

*Inventories*—Inventories are stated at the lower of cost or market, with cost determined using the first-in, first-out method. Inventory write-downs for unprocessed donor tissue are recorded based on the estimated amount of inventory that will not pass the quality control process based on historical data, and the amount of inventory that is not readily distributable or is unusable. In addition, provisions for inventory write-downs are estimated for tissue in process inventory that is not readily distributable or is unusable. Any implantable donor tissue deemed to be obsolete is included in the write-down at the time

the determination is made. Non-tissue inventory is evaluated for obsolescence and excess quantities by analyzing inventory levels, historical loss trends, expected product lives, product at risk of expiration, sales levels by product and projections of future sales demand.

*Implant and Product Recalls*—The Company accrues the estimated cost of recalls at the date the recall is initiated. The cost of recalls is primarily comprised of implant replacement costs. The Company incurred immaterial costs related to all of the recalls for the years ended December 31, 2016, 2015 and 2014.

*Surgical Instruments*—Surgical instruments which are included in property, plant and equipment are handheld devices used by surgeons during implant procedures. The Company retains title to the surgical instruments. Depreciation for surgical instruments is included in selling and marketing expenses in the accompanying consolidated statements of comprehensive (loss) income.

*Property, Plant and Equipment*—Property, plant and equipment are stated at cost less accumulated depreciation. The cost of equipment under capital leases and leasehold improvements is amortized on the straight-line method over the shorter of the lease term or the estimated useful life of the asset. Depreciation is computed on the straight-line method over the following estimated useful lives of the assets:

| | |
|---|---|
| Buildings | 25 to 40 years |
| Building improvements and leasehold improvements | 8 to 40 years |
| Processing equipment | 7 to 10 years |
| Office equipment, furniture and fixtures | 5 to 7 years |
| Computer hardware and software | 3 to 7 years |
| Surgical instruments | 3 to 5 years |

*Software Costs*—Included in property, plant and equipment are costs related to purchased software that are capitalized.

*Debt Issuance Costs*—Debt issuance costs include costs incurred to obtain financing and are amortized using the straight-line method, which approximates the effective interest method, over the life of the related debt. Debt issuance costs related to a recognized debt liability are presented in the balance sheet as a direct deduction from the carrying amount of that debt liability.

*Long-Lived Assets*— The Company periodically evaluates the period of depreciation or amortization for long-lived assets to determine whether current circumstances warrant revised estimates of useful lives. The Company reviews its property, plant and equipment for impairment whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable. Recoverability is measured by a comparison of the carrying amount to the net undiscounted cash flows expected to be generated by the asset. An impairment loss would be recorded for the excess of net carrying value over the fair value of the asset impaired. The fair value is estimated based on expected discounted future cash flows. The results of impairment tests are subject to management's estimates and assumptions of projected cash flows and operating results. Changes in assumptions or market conditions could result in a change in estimated future cash flows and the likelihood of materially different reported results. During the fourth quarter of 2016, the Company concluded a strategic review of its business lines and operations, and updated its financial projections. As a result, the Company's financial projections related to its hernia business line were adjusted downward. This business line is a significant driver of revenue for the Tutogen Germany asset group. As a result, during the fourth quarter of 2016, the Company completed an asset group impairment test and determined the carrying value was not recoverable as of December 31, 2016. The Company used a market approach to determine the fair value of the Tutogen Germany asset group's long lived assets and recognized impairment charges related to identified intangibles and property and equipment of $5.4 million. During 2015 the Company incurred asset abandonments of certain long-term assets at our German facility of $814,000.

*Goodwill*— Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 350, *Goodwill and Other Intangible Assets* ("FASB ASC 350"), requires companies to test goodwill for impairment on an annual basis at the reporting unit level (or an interim basis if an event occurs that might reduce the fair value of a reporting unit below its carrying value). The Company has one reporting unit and the annual impairment test is performed at each year-end unless indicators of impairment are present and require more frequent testing. The Company did not have any other identifiable intangible assets with indefinite useful lives as of December 31, 2016 and 2015.

Goodwill is tested for impairment annually by comparing the fair value of the reporting unit to its carrying amount, including goodwill. The Company adopted Accounting Standards Update ("ASU") No. 2011-08, *Intangibles – Goodwill and Other: Testing Goodwill for Impairment,* which permits the consideration of qualitative indicators of the fair value of a reporting unit when it is unlikely that a reporting unit has impaired goodwill. If the Company determines the fair value is more-likely-than-not greater than its carrying amount, no additional testing is considered necessary. However, if the Company determines the fair value is more-likely-than-not below the carrying value of the reporting unit,

the Company performs the two step goodwill impairment test. If the two step goodwill impairment test is required, an income approach and a market approach are utilized. The conclusion from these two approaches are generally weighted equally and then adjusted to incorporate a control premium or acquisition premium that reflects the additional amount a buyer is willing to pay for elements of control and for a premium that reflects the buyer's perception of its ability to add value through synergies.

In general, the income approach employs a discounted cash flow model that considers: 1) assumptions that marketplace participants would use in their estimates of fair value, including the cash flow period, terminal values based on a terminal growth rate and the discount rate; 2) current period actual results; and 3) projected results for future periods that have been prepared and approved by senior management of the Company. The forecasted cash flows do not include synergies that a marketplace participant would be expecting to achieve.

The market approach employs market multiples from guideline public companies operating in our industry. Estimates of fair value are derived by applying multiples based on revenue and earnings before interest, taxes, depreciation and amortization ("EBITDA") adjusted for size and performance metrics relative to peer companies. A control premium was included in determining the fair value under this approach.

If the carrying amount of the reporting unit exceeds its calculated fair value, the second step of the goodwill impairment test is performed in accordance with FASB ASC 350 to measure the amount of the impairment loss, if any.

Both approaches used in the analysis have a degree of uncertainty. Potential events or changes in circumstances which could impact the key assumptions used in our goodwill impairment evaluation are as follows:

- Change in peer group or performance of peer group companies

- Change in the Company's markets and estimates of future operating performance

- Change in the Company's estimated market cost of capital

- Change in implied control premiums related to acquisitions in the medical device industry.

Goodwill represents the excess of purchase price over fair value of tangible net assets of acquired businesses at the acquisition date, after amounts allocated to other identifiable intangible assets. Factors that contribute to the recognition of goodwill include securing synergies that are specific to our business and not available to other market participants and are expected to increase revenues and profits; acquisition of a talented workforce; cost savings opportunities; the strategic benefit of expanding our presence in core and adjacent markets; and diversifying our product portfolio.

*Other Intangible Assets* —Other intangible assets, which constitutes finite lives assets, generally consist of patents, acquired exclusivity rights, licensing rights, trademarks, customer lists, non-compete agreements, distribution agreements, and procurement contracts. Patents and trademarks are amortized on the straight-line method over the shorter of the remaining protection period or estimated useful lives of between 8 and 16 years. The acquired exclusivity rights are being amortized over eight years, the remaining term of the amended distribution agreement. Licensing rights, customer lists, non-compete agreements, distribution agreements, and procurement contracts are amortized over estimated useful lives of between 5 to 25 years.

Other intangible assets are tested for impairment annually (if indefinite lived) or whenever events or circumstances indicate that the carrying amount of an asset or asset group may not be recoverable. The recoverability test is described in the Company's accounting policy for long-lived assets set forth above.

*Revenue Recognition*—Revenue is recognized upon shipping, or receipt by the Company's customers of the implant, depending on the Company's distribution agreements with the Company's customers or distributors. Other revenues are recognized when all significant contractual obligations have been satisfied.

The Company permits returns of implants in accordance with the terms of contractual agreements with customers if the implant is returned in a timely manner, in unopened packaging, and from the normal channels of distribution. Allowances for returns are provided based upon analysis of the Company's historical patterns of returns matched against the revenues from which they originated.

The Company records estimated implant returns, discounts, rebates and other distribution incentives as a reduction of revenue in the same period revenue is recognized. Estimates of implant returns are recorded for anticipated implant returns based on historical distributions and returns information. Estimates of discounts, rebates and other distribution incentives are recorded based on contractual terms,

historical experience and trend analysis.

Other revenues consists of service processing, tissue recovery fees, biomedical laboratory fees, recognition of previously deferred revenues, shipping fees, distribution of reproductions of our allografts to distributors for demonstration purposes and restocking fees which is included in revenues.

**Stock-Based Compensation Plans**—The Company accounts for its stock-based compensation plans in accordance with FASB ASC 718, *Accounting for Stock Compensation* ("FASB ASC 718"). FASB ASC 718 requires the measurement and recognition of compensation expense for all stock-based awards made to employees and directors, including employee stock options and restricted stock. Under the provisions of FASB ASC 718, and U.S. Securities and Exchange Commission *Staff Accounting Bulletin No. 107*, stock-based compensation cost is measured at the grant date, based on the calculated fair value of the award, and is recognized as an expense on a straight-line basis over the requisite service period of the entire award (generally the vesting period of the award). The Company uses the Black-Scholes model to value its stock option grants under FASB ASC 718 and expenses the related compensation cost using the straight-line method over the vesting period. The fair value of stock options is determined on the grant date using assumptions for the expected term, expected volatility, dividend yield, and the risk free interest rate. The term assumption is primarily based on the contractual vesting term of the option and historic data related to exercise and post-vesting cancellation history experienced by the Company. The Company uses the simplified method for estimating the expected term used to determine the fair value of options under FASB ASC 718. The expected term is determined separately for options issued to the Company's directors and to employees. The Company's anticipated volatility level is primarily based on the historic volatility of the Company's common stock. The Company's model includes a zero dividend yield assumption, as the Company has not historically paid nor does it anticipate paying dividends on its common stock. The risk free interest rate approximates recent U.S. Treasury note auction results with a similar life to that of the option. The Company's model does not include a discount for post-vesting restrictions, as the Company has not issued awards with such restrictions. The period expense is then determined based on the valuation of the options, and at that time an estimated forfeiture rate is used to reduce the expense recorded. The Company's estimate of pre-vesting forfeitures is primarily based on the recent historical experience of the Company, and is adjusted to reflect actual forfeitures as the options vest.

**Research and Development Costs**—Research and development costs, including the cost of research and development conducted for others and the cost of contracted research and development, are expensed as incurred.

**Income Taxes**—The Company uses the asset and liability method of accounting for income taxes. Deferred income taxes are recorded to reflect the tax consequences on future years for differences between the tax basis of assets and liabilities and their financial reporting amounts at each year-end based on enacted tax laws and statutory tax rates applicable to the periods in which the differences are expected to affect taxable income. Valuation allowances are established when necessary to reduce deferred tax assets to amounts which are more likely than not to be realized.

**Earnings Per Share**—Basic earnings per share ("EPS") is computed by dividing earnings attributable to common stockholders by the weighted-average number of common shares outstanding for the periods. Diluted EPS reflects the potential dilution of securities that could share in the earnings. A reconciliation of the number of common shares used in the calculation of basic and diluted EPS is presented below:

|  | Year Ended December 31, | | |
|  | 2016 | 2015 | 2014 |
|---|---|---|---|
| Basic shares | 58,236,745 | 57,611,231 | 56,735,924 |
| Effect of dilutive securities: | | | |
| Stock options | — | 979,263 | — |
| Diluted shares | 58,236,745 | 58,590,494 | 56,735,924 |

Options to purchase 5,764,607 shares of common stock at prices ranging from $2.69 to $9.57 per share which were outstanding as of December 31, 2016, were not included in the computation of diluted EPS because dilutive shares are not factored into the calculation of EPS when a loss applicable to common shares is reported as they would be anti-dilutive.

Options to purchase 5,661,514 shares of common stock at prices ranging from $2.69 to $9.57 per share which were outstanding as of December 31, 2015, were included in the computation of diluted EPS because dilutive shares are factored into the calculation of EPS when income applicable to common shares is reported.

Options to purchase 5,735,784 shares of common stock at prices ranging from $2.69 to $9.57 per

share which were outstanding as of December 31, 2014, were not included in the computation of diluted EPS because dilutive shares are not factored into the calculation of EPS when a loss applicable to common shares is reported as they would be anti-dilutive.

For the years ended December 31, 2016, 2015 and 2014, 50,000 shares of convertible preferred stock and accrued but unpaid dividends were anti-dilutive on an as if-converted basis and were not included in the computation of diluted net (loss) income per common share.

| **Recently Issued Accounting Standards** | **12 Months Ended Dec. 31, 2016** |
|---|---|

**Accounting Changes and Error Corrections [Abstract]**

Recently Issued Accounting Standards

**3. Recently Issued Accounting Standards.**

*Simplifying the Test for Goodwill Impairment* — In January 2017, the FASB issued ASU No. 2017-04, "*Simplifying the Test for Goodwill Impairment*" (Topic 350) ("ASU No. 2017-04"). The amendments in ASU No. 2017-04 are intended to reduce the cost and complexity of the goodwill impairment test by eliminating Step 2 from the that impairment test. The amendments modify the concept of impairment from the condition that exists when the carrying amount of goodwill exceeds its implied fair value to the condition that exists when the carrying amount of a reporting unit exceeds its fair value. Under the amendments in ASU No. 2017-04, an entity will perform its annual, or interim, goodwill impairment test by comparing the fair value of the reporting unit with its carrying amount. An impairment charge should be recognized for the amount which the carrying amount exceeds the reporting unit's fair value; however, the loss recognized should not exceed the total amount of goodwill allocated to that reporting unit. The amendments in ASU No. 2017-04 are effective for the Company's annual or any interim goodwill impairment test in fiscal years beginning after December 15, 2019. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The Company is currently evaluating the impact ASU No. 2017-04 will have on the Company's results of operations, financial position and disclosures, but it is not expected to have a material impact.

*Business Combinations – Clarifying the Definition of a Business* — In January 2017, FASB issued ASU No. 2017-01, "*Business Combinations – Clarifying the Definition of a Business*" (Topic 805) ("ASU No. 2017-01"). ASU 2017-01 provides a framework to use in determining when a set of assets and activities is a business. ASU 2017-01 provides more consistency in applying the business combination guidance, reduces the costs of application, and makes the definition of a business more operable. ASU 2017-01 is effective for interim and annual periods within those annual periods beginning after December 15, 2017. The Company is currently evaluating the impact ASU 2017-01 will have on the Company's results of operations, financial position and disclosures, but it is not expected to have a material impact.

*Compensation – Stock Compensation* — In March 2016, the FASB issued ASU No. 2016-09, "*Compensation – Stock Compensation*" (Topic 718) ("ASU 2016-09"). ASU 2016-09 identifies areas for simplification involving several aspects of accounting for share-based payment transactions, including the income tax consequences, classification of awards as either equity or liabilities, an option to recognize gross stock compensation expense with actual forfeitures recognized as they occur, as well as certain classifications on the statement of cash flows. The ASU is effective for annual reporting periods beginning after December 15, 2016. The Company is currently assessing the impact of adopting ASU 2016-09 on its consolidated financial statements and footnote disclosures.

*Leases* — In February 2016, the FASB issued ASU No. 2016-02 ("ASU 2016-02"), *Leases (Topic 842)*, which supersedes existing guidance on accounting for leases in *"Leases (Topic 840)"* and generally requires all leases to be recognized in the statement of financial position. The provisions of ASU 2016-02 are effective for reporting periods beginning after December 15, 2018; early adoption is permitted. The provisions of this ASU are to be applied using a modified retrospective approach. The Company is currently evaluating the effect that this ASU will have on its consolidated financial statements.

*Income Taxes* — On November 20, 2015, the FASB issued ASU No. 2015-17, *"Income Taxes (Topic 740)"*. Update No. 2015-17 is effective for annual reporting periods beginning after December 15, 2016 and interim periods within those fiscal years. The Company early adopted ASU 2015-17 effective December 31, 2015 on a prospective basis. Adoption of this ASU resulted in a reclassification of the Company's net current deferred tax assets to net non-current deferred tax assets in its consolidated balance sheet as of December 31, 2015. No prior periods were retrospectively adjusted as allowed by this ASU.

*Simplifying the Measurement of Inventory* — In July 2015, the FASB issued ASU No. 2015-11, *"Inventory (Topic 330): Simplifying the Measurement of Inventory"*. Update No. 2015-11 more closely aligns the measurement of inventory in U.S. GAAP with the measurement of inventory in International Financial Reporting Standards by requiring companies using the first-in, first-out and average costs methods to measure inventory using the lower of cost and net realizable value, where net realizable value is the estimated distribution prices of the inventory in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation. Update No. 2015-11 is effective for annual reporting periods beginning after December 15, 2016 and interim

periods within those fiscal years. Update No. 2015-11should be applied prospectively with earlier application permitted as of the beginning of an interim or annual reporting period. The Company is evaluating the impact of this ASU on its financial position, results of operations, and cash flows and has not yet determined if it will early adopt the ASU.

*Presentation of Financial Statements - Going Concern* — In August 2014, the FASB issued ASU 2014-15, *"Presentation of Financial Statements - Going Concern (Subtopic 205-40)."* The new guidance addresses management's responsibility to evaluate whether there is substantial doubt about an entity's ability to continue as a going concern and to provide related footnote disclosures. Management's evaluation should be based on relevant conditions and events that are known and reasonably knowable at the date that the financial statements are issued. The standard is effective for annual periods ending after December 15, 2016, and for annual and interim periods thereafter. The Company has adopted this standard and it did not have a material impact on the Company's consolidated financial statements.

*Simplifying the Presentation of Debt Issuance Costs* — In April 2015, the FASB issued ASU No. 2015-03, *"Interest –*
*Imputation of Interest: Simplifying the Presentation of Debt Issuance Costs"* (Topic 835) ("ASU No. 2015-03"). ASU No. 2015-03 simplifies the accounting for debt issuance costs by requiring such costs to be presented as a direct deduction from the related debt liability rather than as an asset. Debt disclosures will include the face amount of the debt liability and the effective interest rate. ASU No. 2015-03 requires retrospective application and represents a change in accounting principle. The Company adopted ASU No. 2015-03 effective January 1, 2016 and has presented debt issuance costs of $403 as of both December 31, 2016 and 2015 as a direct deduction from the carrying amounts of its debt liabilities. The December 31, 2015 amount was previously recorded in "Other assets-net".

*Revenue from Contracts with Customers* — In May 2014, the FASB issued ASU No. 2014-09, *"Revenue from Contracts with Customers"* (Topic 606) ("ASU 2014-09"), which supersedes the revenue recognition requirements in Accounting Standards Codification ("ASC") Topic 605, *"Revenue Recognition"*. ASU 2014-09 is based on the principle that revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASU 2014-09 also requires additional disclosure about the nature, amount, timing and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments and assets recognized from costs incurred to obtain or fulfill a contract. As updated in August 2015, the effective date of ASU 2014-09 will be annual reporting periods beginning after December 15, 2017, using one of two retrospective application methods.

In March and April 2016, the FASB issued two updates to the revenue recognition guidance: ASU 2016-08 *"Principal Versus Agent Considerations"* (Topic 606) (Reporting Revenue Gross Versus Net), and ASU 2016-10, *"Identifying Performance Obligations and Licensing"* (Topic 606).

In May 2016, the FASB issued ASU Update No. 2016-12 *"Narrow-Scope Improvements and Practical Expedients"* (Topic 606) ("ASU 2016-12") which narrowly amended the revenue recognition guidance regarding collectability, noncash consideration, presentation of sales tax and transition.

The Company has not determined the impact ASU 2014-09, ASU 2016-08, ASU 2016-10 and ASU 2016-12 will have on its consolidated financial statements and footnote disclosures. However, we have completed our preliminary assessment, which included a review of a subset of representative contracts. During 2017, we will expand the scope of our assessment to include all contracts with customers.

| Stock-Based Compensation | 12 Months Ended |
| --- | --- |
| | Dec. 31, 2016 |

**Disclosure of Compensation Related Costs, Share-based Payments [Abstract]**

Stock-Based Compensation

**4. Stock-Based Compensation**

The Company's policy is to grant stock options at an exercise price equal to 100% of the market value of a share of common stock at closing on the date of the grant. The Company's stock options generally have ten-year contractual terms and vest over a one to five year period from the date of grant. The Company's policy is to grant restricted stock awards at a fair value equal to 100% of the market value of a share of common stock at closing on the date of the grant. The Company's restricted stock awards generally vest over one to three year periods.

*2015 Incentive Compensation Plan* – On April 14, 2015, the Company's stockholders approved and adopted the 2015 Incentive Compensation Plan (the "2015 Plan"). The 2015 Plan provides for the grant of incentive and nonqualified stock options and restricted stock to key employees, including officers and directors of the Company and consultants and advisors. The 2015 Plan allows for up to 4,656,587 shares of common stock to be issued with respect to awards granted.

The following weighted-average assumptions were used to determine the fair value of options under FASB ASC 718:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | 2014 |
| Expected term (years) | 6.50 | 6.50 | 6.50 |
| Risk free interest rate | 1.85% | 1.67% | 2.29% |
| Volatility factor | 45.57% | 46.29% | 46.53% |
| Dividend yield | — | — | — |

*Stock Options*

Stock options outstanding, exercisable and available for grant at December 31, 2016, are summarized as follows:

| | Number of Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (Years) | Aggregate Intrinsic Value |
| --- | --- | --- | --- | --- |
| Outstanding at January 1, 2016 | 5,661,514 | $ 4.49 | | |
| Granted | 619,352 | 3.31 | | |
| Exercised | (21,000) | 2.72 | | |
| Forfeited or expired | (495,259) | 5.54 | | |
| Outstanding at December 31, 2016 | 5,764,607 | $ 4.28 | 4.49 | $ 348 |
| Vested or expected to vest at December 31, 2016 | 5,590,546 | $ 4.28 | 4.35 | $ 348 |
| Exercisable at December 31, 2016 | 4,082,632 | $ 4.33 | 3.07 | $ 348 |
| Available for grant at December 31, 2016 | 3,314,686 | | | |

The aggregate intrinsic value in the table above represents the total pre-tax intrinsic value of stock options for which the fair market value of the underlying common stock exceeded the respective stock option exercise price.

For the years ended December 31, 2016, 2015 and 2014, the Company recognized stock-based compensation as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | 2014 |
| Stock-based compensation: | | | |
| Costs of processing and distribution | $ 140 | $ 132 | $ 132 |

| | | | |
|---|---|---|---|
| Marketing, general and administrative | 3,406 | 2,356 | 2,840 |
| Research and development | 44 | 60 | 60 |
| Total | $3,590 | $2,548 | $3,032 |

For the years ended December 31, 2016, 2015, and 2014, the Company recognized total income tax benefits from stock-based compensation of $1,460, $1,022, and $1,198, respectively.

As of December 31, 2016, there was $2,212 of total unrecognized stock-based compensation related to nonvested stock options. That expense is expected to be recognized over a weighted-average period of 2.92 years.

Other information concerning stock options are as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2016** | **2015** | **2014** |
| Weighted average fair value of stock options granted | $1.55 | $ 2.50 | $1.87 |
| Aggregate intrinsic value of stock options exercised | 12 | 1,584 | 295 |

The aggregate intrinsic value of stock options exercised in a period represents the pre-tax cumulative difference, for the stock options exercised during the period, between the fair market value of the underlying common stock and the stock option exercise prices.

*Restricted Stock Awards*

During the first quarter of 2016, the Company granted 223,563 shares of time-based restricted stock and 223,563 shares of performance-based restricted stock. Both sets of awards vest over a three-year period, with a weighted-average grant date fair value of $3.31 per share. During the third quarter of 2016, the Company granted 162,160 shares of restricted stock with a weighted-average grant date fair value of $3.70 per share which vest over a one-year period. As of December 31, 2016, there was $961 of total unrecognized stock-based compensation related to time-based, nonvested restricted stock. That expense is expected to be recognized on a straight-line basis over a weighted-average period of 1.40 years.

| **Inventories** | **12 Months Ended** |
| | **Dec. 31, 2016** |

**Inventory Disclosure**
**[Abstract]**
Inventories

**5. Inventories**

Inventories by stage of completion are as follows:

| | December 31, | |
| --- | --- | --- |
| | **2016** | **2015** |
| Unprocessed tissue, raw materials and supplies | $ 31,745 | $ 33,028 |
| Tissue and work in process | 38,552 | 36,614 |
| Implantable tissue and finished goods | 49,446 | 49,031 |
| | $119,743 | $118,673 |

For the years ended December 31, 2016, 2015, and 2014, the Company had inventory write-downs of $13,880, $5,390 and $3,763, respectively, relating primarily to excess quantities and obsolescence of inventories. The increase in 2016 primarily relates to an inventory charge of $9,556 as a result of writing-off certain excess quantities primarily of hernia and sports medicine inventory.

| Property, Plant and Equipment | 12 Months Ended |
| --- | --- |
| | Dec. 31, 2016 |

**Property, Plant and Equipment [Abstract]**

Property, Plant and Equipment

**6. Property, Plant and Equipment**

Property, plant and equipment are as follows:

| | December 31, | |
| --- | --- | --- |
| | 2016 | 2015 |
| Land | $ 2,324 | $ 2,319 |
| Buildings and improvements | 59,187 | 63,699 |
| Processing equipment | 38,387 | 41,831 |
| Surgical instruments | 18,394 | 15,702 |
| Office equipment, furniture and fixtures | 1,701 | 4,657 |
| Computer equipment and software | 11,852 | 11,804 |
| Construction in process | 17,554 | 10,850 |
| Office equipment under capital leases | — | 152 |
| | 149,399 | 151,014 |
| Less accumulated depreciation | (66,101) | (66,022) |
| | $ 83,298 | $ 84,992 |

For the years ended December 31, 2016, 2015, and 2014, the Company had depreciation expense in connection with property, plant and equipment of $12,835, $12,240, and $11,010, respectively.

|  | **12 Months Ended** |
|---|---|
| **Goodwill** | **Dec. 31, 2016** |

**Goodwill and Intangible Assets Disclosure [Abstract]**

Goodwill

**7. Goodwill**

Goodwill for both years ended December 31, 2016 and 2015 was $54,887. The Company performed its annual goodwill impairment test as of December 31, 2016, and concluded that there was no impairment of goodwill.

**Other Intangible Assets**

**12 Months Ended**

**Dec. 31, 2016**

**Goodwill and Intangible Assets Disclosure [Abstract]**

Other Intangible Assets

**8. Other Intangible Assets**

Other intangible assets are as follows:

|  | December 31, 2016 | | December 31, 2015 | |
|---|---|---|---|---|
|  | Gross Carrying Amount | Accumulated Amortization | Gross Carrying Amount | Accumulated Amortization |
| Patents | $ 11,559 | $ 4,159 | $ 11,532 | $ 3,448 |
| Acquired licensing rights | 12,204 | 8,302 | 10,850 | 7,691 |
| Marketing and procurement intangible assets | 20,694 | 8,002 | 22,179 | 7,209 |
| Total | $ 44,457 | $ 20,463 | $ 44,561 | $ 18,348 |

For the years ended December 31, 2016, 2015, and 2014, the Company had amortization expense of other intangible assets of $3,675, $4,282, and $4,385, respectively. At December 31, 2016, management's estimates of future amortization expense for the next five years are as follows:

|  | Amortization Expense |
|---|---|
| 2017 | $ 3,400 |
| 2018 | 3,400 |
| 2019 | 3,400 |
| 2020 | 3,400 |
| 2021 | 3,400 |
|  | $ 17,000 |

| **Fair Value Information** | **12 Months Ended** |
| | **Dec. 31, 2016** |

**Fair Value Disclosures [Abstract]**

Fair Value Information

**9. Fair Value Information**

Long-lived assets, including property and equipment and intangible assets subject to amortization were impaired and written down to their estimated fair values during the fourth quarter of 2016. Fair value is measured as of the impairment date using Level 3 inputs. Level 3 is defined as unobservable inputs in which there is little or no market data available, which require the reporting entity to develop its own assumptions. The long-lived asset level 3 fair value was determined using a market approach, which used inputs that included replacement costs (unobservable), physical deterioration estimates (unobservable), economic obsolescence (unobservable), and market sales data for comparable assets.

The following table summarizes impairments of long-lived assets and the related post impairment fair values of the corresponding assets for the year ended December 31, 2016:

| | **Year Ended December 31, 2016** | |
| | **Impairment** | **Fair Value** |
|---|---|---|
| Property, plant and equipment - net | $ 4,717 | $ 4,708 |
| Other intangible assets - net | 718 | 150 |
| | $ 5,435 | $ 4,858 |

| **Accrued Expenses** | **12 Months Ended** |
| --- | --- |
| | **Dec. 31, 2016** |

**Other Liabilities Disclosure [Abstract]**

Accrued Expenses

**10. Accrued Expenses**

Accrued expenses are as follows:

| | December 31, | |
| --- | --- | --- |
| | **2016** | **2015** |
| Accrued compensation | $ 4,904 | $ 4,740 |
| Accrued severance charges | 410 | 865 |
| Accrued restructuring charges | 95 | — |
| Accrued CEO retirement and transition costs | 2,406 | — |
| Accrued distributor commissions | 4,422 | 3,835 |
| Accrued donor recovery fees | 6,350 | 7,144 |
| Accrued taxes | — | 514 |
| Accrued indemnification liability | — | 6,579 |
| Other | 3,443 | 4,932 |
| | $22,030 | $28,609 |

The Company accrues for the estimated donor recovery fees due to third party recovery agencies as tissue is received. In addition, on July 11, 2016, the Company resolved all final claims on the indemnification escrow fund regarding the 2013 Pioneer acquisition under the terms of the acquisition agreement. The resolution of the final claims resulted in a reduction in prepaid and other current assets and accrued expenses of $6,694 and $6,579 respectively with no impact on the Statement of Comprehensive (Loss) Income.

| Short and Long-Term Obligations | 12 Months Ended Dec. 31, 2016 |
|---|---|

**Debt Disclosure [Abstract]**

Short and Long-Term Obligations

**11. Short and Long-Term Obligations**

Short and long-term obligations are as follows:

|  | December 31, | |
|---|---|---|
|  | **2016** | **2015** |
| Term loan | $50,347 | $53,722 |
| Credit facilities | 33,000 | 25,477 |
| Capital leases | — | 38 |
| Total | 83,347 | 79,237 |
| Less current portion | (6,080) | (5,853) |
| Long-term portion | $77,267 | $73,384 |

The Company obtained from TD Bank and Regions Bank, a 5-year, $80,000 senior secured facility, which includes a $60,000 term loan and a $20,000 revolving credit facility that matures on July 16, 2018, with a variable interest rate between 100 and 275 basis points in excess of the one month LIBOR rate. On October 15, 2014, the Company entered into a Second Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which amended the loan agreement to remove certain financial covenants. On June 29, 2015, the Company entered into a Third Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which increased the maximum revolving credit amount from $20,000 to $30,000. On June 29, 2016, the Company entered into a Fourth Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which increased the maximum revolving credit amount from $30,000 to $45,000. On November 7, 2016, the Company entered into a Fifth Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which provided for: (i) a decrease in the maximum revolving credit amount from $45,000 to $42,500; (ii) an increase in the Company's leverage to EBITDA ratio from 2.50 to 1.00 to (A) 3.25 to 1.00 through March 31, 2017 and (B) 3.00 to 1.00 after March 31, 2017 and (iii) certain corresponding amendments. On February 28, 2017, the Company entered into a Sixth Amendment to the Second Amended and Restated Loan Agreement with TD Bank, N.A. and Regions Bank, which modified the definition of "Extraordinary Expenses" and to increase to 300 basis points the LIBOR Spread applicable when the Company's financial performance under its Leverage Ratio is greater than 3.0x. At December 31, 2016, the interest rate for the term loan and revolving credit facility is 3.37%. The facility is secured by substantially all the assets of the Company and its subsidiaries and guaranteed by the Company's domestic subsidiaries, other than RTIDS. As of December 31, 2016, there was $33,000 outstanding on the revolving credit facility. The term loan facility requires aggregate principal payments of $8,250 from March 31, 2017 through June 30, 2018, with a final balloon principal payment of $41,375 on July 2, 2018. The credit agreement also contains various restrictive covenants which limit, among other things, indebtedness and liens, as well as payment of dividends, while requiring a minimum cash balance on hand of $10,000 and certain financial covenant ratios.

In addition to the credit facility with TD Bank and Regions Bank, the Company had through its German subsidiary, three credit facilities with three German banks. As of December 31, 2016, the three credit facilities with the three German banks were paid off and terminated.

The total available credit on the Company's one revolving credit facility at December 31, 2016 was $9,500. The Company's ability to access its revolving credit facility is subject to and can be limited by the Company's compliance with the Company's financial and other covenants. The Company was in compliance with the financial covenants related to its revolving credit facility as of December 31, 2016.

As of December 31, 2016, the Company paid off all remaining capital leases.

Interest expense associated with the amortization of debt issuance costs for the years ended December 31, 2016, 2015 and 2014 was $202, $148 and $142, respectively.

As of December 31, 2016, contractual maturities of short and long-term obligations are as follows:

|  | Term Loan | Credit Facilities | Total |
|---|---|---|---|
| 2017 | $ 6,080 | $ — | $ 6,080 |
| 2018 | 44,267 | 33,000 | 77,267 |

| | | |
|---|---|---|
| $ 50,347 | $ 33,000 | $83,347 |

| **Income Taxes** | **12 Months Ended** |
| | **Dec. 31, 2016** |

**Income Tax Disclosure
[Abstract]**

Income Taxes

**12. Income Taxes**

The Company's income tax benefit (provision) consists of the following components:

| | | Year Ended December 31, | |
| | 2016 | 2015 | 2014 |
| --- | --- | --- | --- |
| Current: | | | |
|    Federal | $ (150) | $ (988) | $(1,062) |
|    State | (92) | (159) | (150) |
|    International | 456 | (544) | (86) |
| Total current | 214 | (1,691) | (1,298) |
| Deferred: | | | |
|    Federal | 2,477 | (5,695) | (1,118) |
|    State | 562 | 68 | (76) |
|    International | (192) | (981) | 999 |
| Total deferred | 2,847 | (6,608) | (195) |
| Total income tax benefit (provision) | $3,061 | $(8,299) | $(1,493) |

The components of the deferred tax assets and liabilities consisted of the following at:

| | December 31, 2016 | | December 31, 2015 | |
| | Deferred Income Tax | | Deferred Income Tax | |
| | Assets | Liabilities | Assets | Liabilities |
| --- | --- | --- | --- | --- |
| Allowance for bad debts | $ 485 | $ — | $ 376 | $ — |
| Deferred compensation | 4,675 | — | 4,013 | — |
| Inventory | 12,811 | — | 10,604 | — |
| Fixed assets and intangibles | — | (5,690) | — | (7,667) |
| Investments | 2,133 | — | 2,133 | — |
| Net operating losses | 4,547 | — | 2,830 | — |
| Tax credits | 5,235 | — | 4,645 | — |
| Deferred revenue | 3,804 | — | 4,968 | — |
| Accrued liabilities | 2,004 | — | 1,847 | — |
| Other | — | (120) | — | (258) |
| Valuation allowance | (4,916) | — | (1,106) | — |
| Total | $30,778 | $ (5,810) | $30,310 | $ (7,925) |

The Company expects its deferred tax assets of $24,968, net of the valuation allowance at December 31, 2016 of $4,916, to be realized through the generation of future taxable income and the reversal of existing taxable temporary differences, see Note 3.

Valuation allowances are established when necessary to reduce deferred tax assets to amounts which are more likely than not to be realized. As such, valuation allowances of $4,916 and $1,106 have been established at December 31, 2016 and December 31, 2015, respectively, against a portion of the deferred tax assets.

The Company recorded a tax benefit from the exercise of stock options in the amount of $546, $1,139, and $539 for the years ended December 31, 2016, 2015 and 2014, respectively.

As of December 31, 2016, the Company has U.S. federal net operating loss carryforwards of $1,978 that will expire in the years 2026 and 2027.

As of December 31, 2016, the Company has U.S. state net operating loss carryforwards of $22,799 that will expire in the years 2018 through 2036.

As of December 31, 2016, the Company has foreign net operating loss carryforwards of $10,194 that will carryfoward indefinitely.

As of December 31, 2016, the Company has research tax credit carryforwards of $6,002 that will expire in years 2028 through 2036. As of December 31, 2016, the Company has alternative minimum tax credit carryforwards of $827 that will carryfoward indefinitely.

U.S. income taxes have not been provided on the undistributed earnings of the Company's foreign subsidiaries. It is not practicable to estimate the amount of tax that might be payable. The Company's intention is to indefinitely reinvest earnings of its foreign subsidiaries outside of the U.S. As of December 31, 2016 and 2015, the amount of undistributed earnings related to the Company's foreign subsidiaries considered to be indefinitely reinvested was $5,031 and $11,227, respectively.

The Company evaluates the need for deferred tax asset valuation allowances based on a more likely than not standard. The ability to realize deferred tax assets depends on the ability to generate sufficient taxable income within the carryback or carryforward periods provided for in the tax law for each applicable tax jurisdiction.

The assessment regarding whether a valuation allowance is required or should be adjusted also considers all available positive and negative evidence. It is difficult to conclude a valuation allowance is not required when there is significant objective and verifiable negative evidence, such as cumulative losses in recent years. The Company utilizes a rolling three years of actual results as the primary measure of cumulative losses in recent years.

On a rolling three years, the Company's U.S. operations are in a cumulative income position. The Company considers this objectively verifiable evidence that its current U.S. operations existing on December 31, 2016, have consistently demonstrated the ability to operate at a profit. The Company has a history of utilizing 100 percent of its U.S. deferred taxes assets before they expire and the forecasts of taxable earnings project a complete realization of all U.S. deferred tax assets before they expire, including under stressed scenarios.

The Company's French and German operations are in cumulative loss positions. Since inception, the Company's French operations have generated losses. As a result, the Company has historically recorded a full valuation allowance on its French subsidiary's deferred tax assets. During the quarter ended September 30, 2016, the Company's German operations entered into a cumulative loss position. As a result, the Company recorded a full valuation allowance on its German subsidiary's deferred tax assets.

The Company has evaluated all available positive and negative evidence, including the extent to which that evidence was objectively verifiable. The Company has concluded, for those jurisdictions where valuation allowances have not been established, the positive evidence outweighed the negative evidence and the deferred tax assets are more likely than not realizable as of December 31, 2016.

The Company will continue to regularly assess the realizability of our deferred tax assets. Changes in historical earnings performance and future earnings projections, among other factors, may cause the Company to adjust its valuation allowance, which would impact the Company's income tax expense in the period the Company determines that these factors have changed.

As of December 31, 2016, the Company has $1,591 of unrecognized tax benefits, which was recorded net against deferred tax assets in the accompanying consolidated balance sheet.

The Company's unrecognized tax benefits are summarized as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | 2014 |
| Opening balance | $1,986 | $1,787 | $2,825 |
| Reductions based on tax positions related to the current year | — | — | (136) |
| Additions for tax positions of prior years | — | 199 | — |
| Reductions for tax positions of prior years | (60) | — | (902) |
| Reductions for expiration of statute of limitations | (335) | — | — |
| | $1,591 | $1,986 | $1,787 |

The unrecognized tax benefits if recognized, would favorably impact the Company's effective tax rate.

The Company's policy is to recognize interest accrued related to unrecognized tax benefits in interest expense and penalties in the provision for income taxes. There were no interest and penalties recorded in 2016, 2015 and 2014 and no interest and penalties accrued at December 31, 2016 and 2015.

The Company is undergoing an examination by the Internal Revenue Service ("IRS"). The IRS

examination covers the 2015 tax year. During the year ended December 31, 2016, the Company's German subsidiary completed an examination by the German tax authorities. The examination covered the German subsidiary's 2010 through 2013 tax years. No material adjustments were recorded as a result of the German examination.

The effective tax rate differs from the statutory federal income tax rate for the following reasons:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2016** | **2015** | **2014** |
| Statutory federal rate | 35.00% | 35.00% | 35.00% |
| State income taxes—net of federal tax benefit | 1.73% | 0.25% | 3.51% |
| Foreign rate differential | (3.29%) | (2.18%) | 4.99% |
| Other permanent items | (3.15%) | 0.56% | (1.25%) |
| Research tax credits | 7.02% | (0.28%) | (7.52%) |
| Domestic production activities deduction | 1.38% | — | (4.33%) |
| Valuation allowance | (21.71%) | 0.85% | 5.26% |
| Other reconciling items, net | 0.55% | 1.55% | (0.02%) |
| Effective tax rate | 17.53% | 35.75% | 35.64% |

For the years ended December 31, 2016, 2015 and 2014, the Company had no individually significant other reconciling items.

**Preferred Stock**

**12 Months Ended**

**Dec. 31, 2016**

Equity [Abstract]

Preferred Stock

13. Preferred Stock

Preferred stock is as follows:

| | Preferred Stock Liquidation Value | Preferred Stock Issuance Costs | Net Total |
|---|---|---|---|
| Balance at January 1, 2014 | $ 50,750 | $ (1,213) | $49,537 |
| Accrued dividend payable | 3,113 | — | 3,113 |
| Amortization of preferred stock issuance costs | — | 184 | 184 |
| Balance at December 31, 2014 | 53,863 | (1,029) | 52,834 |
| Accrued dividend payable | 3,305 | — | 3,305 |
| Amortization of preferred stock issuance costs | — | 184 | 184 |
| Balance at December 31, 2015 | 57,168 | (845) | 56,323 |
| Accrued dividend payable | 3,508 | — | 3,508 |
| Amortization of preferred stock issuance costs | — | 185 | 185 |
| Balance at December 31, 2016 | $ 60,676 | $ (660) | $60,016 |

On June 12, 2013, the Company and WSHP entered into an investment agreement. Pursuant to the terms of the investment agreement, the Company agreed to a $50,000 private placement of convertible preferred equity with WSHP. In connection with the closing of the transactions contemplated by the investment agreement, the Company and WSHP amended the investment agreement on July 15, 2013, and the Company filed a Certificate of Designation of Series A Convertible Preferred Stock creating the Series A Convertible Preferred Stock, par value $0.001 per share (the "Preferred Stock"), and establishing the designations, preferences, and other rights of the Preferred Stock. The Preferred Stock accrues dividends at a rate of 6% per annum. To the extent dividends are not paid in cash in any quarter, the dividends which have accrued on each outstanding share of Preferred Stock during such three-month period will accumulate until paid in cash or converted to common stock. The Company's credit agreement with TD Bank and Regions Bank contains various covenants of financial conditions which, if not met, would restrict the Company from paying dividends.

The Preferred Stock will be convertible at the election of the holders into shares of the Company's common stock at an initial conversion price of $4.39 per share which would result in a conversion ratio of approximately 228 shares of common stock for each share of Preferred Stock. The Preferred Stock is convertible at the election of the Company five years after its issuance or at any time if the Company's common stock closes at or above $7.98 per share for at least 20 consecutive trading days.

The Company may, upon 30 days' notice, redeem the Preferred Stock, in whole or in part, five years after its issuance at the initial liquidation preference of $1,000 per share of the Preferred Stock plus an amount per share equal to accrued but unpaid dividends (collectively, the "Liquidation Value"). The holders of the Preferred Stock may require the Company to redeem their Preferred Stock, in whole or in part, at the Liquidation Value seven years after its issuance or upon the occurrence of a change of control.

| **Stockholders' Equity** | **12 Months Ended** |
| --- | --- |
| | **Dec. 31, 2016** |

**Equity [Abstract]**

Stockholders' Equity

**14. Stockholders' Equity**

**Preferred Stock**—The Company has 5,000,000 shares of preferred stock authorized under its Certificate of Incorporation of which 50,000 are currently issued and outstanding. These shares may be issued in one or more series having such terms as may be determined by the Company's Board of Directors.

**Common Stock**—The Company has 150,000,000 shares of common stock authorized. The common stock's voting, dividend, and liquidation rights presently are subject to or qualified by the rights of the holders of any outstanding shares of preferred stock. Holders of common stock are entitled to one vote for each share held at all stockholder meetings. Shares of common stock do not have redemption rights.

| **Strategic Review Costs** | **12 Months Ended** |
| | **Dec. 31, 2016** |

**Text Block [Abstract]**

Strategic Review Costs

**15. Strategic Review Costs**

The Company recorded strategic review costs related to the comprehensive strategic review of the Company's business lines and operations to leverage the Company's expertise, technology and products and identify opportunities to increase stockholder value, which resulted in $1,150 of expenses for the year ended December 31, 2016.

| CEO Retirement and Transition Costs | 12 Months Ended Dec. 31, 2016 |
|---|---|

**Postemployment Benefits [Abstract]**

CEO Retirement and Transition Costs

**16. CEO Retirement and Transition Costs**

The Company recorded Chief Executive Officer retirement and transition costs related to the retirement of our former Chief Executive Officer pursuant to the Executive Transition Agreement dated August 29, 2012 (as amended and extended to date), which resulted in $4,404 of expenses for the year ended December 31, 2016. The total Chief Executive Officer retirement and transition costs are expected to be paid in full prior to the first quarter of 2019. The following table includes a rollforward of CEO retirement and transition costs included in accrued expenses, see Note 10.

| | |
|---|---|
| Accrued CEO retirement and transition costs at January 1, 2016 | $ — |
| CEO retirement and transition costs accured in 2016 | 4,404 |
| Stock-based compensation | (1,535) |
| Cash payments | (463) |
| Accrued restructuring charges at December 31, 2016 | $ 2,406 |

| Contested Proxy Expenses | 12 Months Ended<br>Dec. 31, 2016 |
|---|---|

**Text Block [Abstract]**

Contested Proxy Expenses

**17. Contested Proxy Expenses**

The Company recorded contested proxy expenses of $2,680 for the year ended December 31, 2016.

**Restructuring Charges**

**12 Months Ended**

**Dec. 31, 2016**

Restructuring Charges

### 18. Restructuring Charges

The Company instituted a restructuring plan which was completed in 2016 primarily related to closure of our French distribution and tissue procurement office, which resulted in $1,107 of expenses for the year ended December 31, 2016. The following table includes a rollforward of restructuring charges included in accrued expenses, see Note 10.

| | |
|---|---|
| Accrued restructuring charges at January 1, 2016 | $ — |
| French distribution and tissue procurement office closure costs | 1,107 |
| Asset abandonments | (640) |
| Cash payments | (372) |
| Accrued restructuring charges at December 31, 2016 | $ 95 |

Employee Severance [Member]

Restructuring Charges

### 19. Severance Charges

The Company recorded severance charges related to the termination of former employees as a result of the Company reorganizing its distribution force, which resulted in $995 of expenses for the year ended December 31, 2015. The total severance charges were paid in full by December 31, 2016. Severance payments were made to terminated employees over periods ranging from one month to twelve months and did not have a material impact on cash flows of the Company in any quarterly period.

The Company recorded additional severance charges to reduce headcount and improve operational efficiencies, which resulted in $1,039 of expenses for the year ended December 31, 2016. The total severance charges are expected to be paid in full prior to the first quarter of 2018. Severance payments are made to terminated employees over periods ranging from one month to twelve months and are not expected to have a material impact on cash flows of the Company in any quarterly period. The following table includes a rollforward of severance charges included in accrued expenses, see Note 10.

| | |
|---|---|
| Accrued severance charges at January 1, 2015 | $ 2,771 |
| Employee separation expenses accrued in 2015 | 995 |
| Severance cash payments | (2,591) |
| Stock based compensation | (310) |
| Accrued severance charges at December 31, 2015 | 865 |
| Employee separation expenses accrued in 2016 | 1,039 |
| Severance cash payments | (1,494) |
| Accrued severance charges at December 31, 2016 | $ 410 |

Subsequent to December 31, 2016, we have continued to execute on a restructuring plan, and have incurred additional severance related charges that will be recognized in 2017.

| **Retirement Benefits** | **12 Months Ended** |
| --- | --- |
| | **Dec. 31, 2016** |

**Compensation and Retirement Disclosure [Abstract]**

Retirement Benefits

**20. Retirement Benefits**

The Company has a qualified 401(k) plan available to all U.S. employees who meet certain eligibility requirements. The 401(k) plan allows each employee to contribute up to the annual maximum allowed under the Internal Revenue Code. The Company has the discretion to make matching contributions up to 6% of the employee's earnings. For the years ended December 31, 2016, 2015 and 2014, the amounts expensed under the plan were $3,094, $3,034 and $2,663, respectively.

**Concentrations of Risk**

**12 Months Ended**

**Dec. 31, 2016**

**Risks and Uncertainties [Abstract]**

Concentrations of Risk

**21. Concentrations of Risk**

*Distribution*—The Company's principal concentration of risk is related to its limited distribution channels. The Company's revenues include the distribution efforts of twelve independent companies with significant revenues coming from three of the distribution companies, Zimmer Biomet Holdings Inc. ("Zimmer"), Medtronic, PLC ("Medtronic") and Davol Inc. ("Davol"). The following table presents percentage of total revenues derived from the Company's largest distributors and international distribution:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2016** | **2015** | **2014** |
| Percent of revenues derived from: | | | |
| Distributor | | | |
| Zimmer | 16% | 24% | 18% |
| Medtronic | 9% | 10% | 12% |
| Davol | 3% | 3% | 5% |
| International | 9% | 8% | 9% |

The Company's distribution agreements are subject to termination by either party for a variety of causes. No assurance can be given that such distribution agreements will be renewed beyond their expiration dates, continue in their current form or at similar rate structures. Any termination or interruption in the distribution of the Company's implants through one of its major distributors could have a material adverse effect on the Company's operations.

*Tissue Supply*—The Company's operations are dependent on the availability of tissue from human donors. For the majority of the tissue recoveries, the Company relies on the efforts of independent procurement agencies to educate the public and increase the willingness to donate bone tissue. These procurement agencies may not be able to obtain sufficient tissue to meet present or future demands. Any interruption in the supply of tissue from these procurement agencies could have a material adverse effect on the Company's operations.

| Commitments and Contingencies | 12 Months Ended Dec. 31, 2016 |
|---|---|

**Commitments and Contingencies Disclosure [Abstract]**

Commitments and Contingencies

**22. Commitments and Contingencies**

*Distribution Agreement with Medtronic* – On October 12, 2013, the Company entered into a replacement distribution agreement with Medtronic, plc. ("Medtronic"), pursuant to which Medtronic will distribute certain allograft implants for use in spinal, general orthopedic and trauma surgery. Under the terms of this distribution agreement, Medtronic will be a non-exclusive distributor except for certain specified implants for which Medtronic will be the exclusive distributor. Medtronic will maintain its exclusivity with respect to these specified implants unless the cumulative fees received by us from Medtronic for these specified implants decline by a certain amount during any trailing 12-month period. The initial term of this distribution agreement was to have been through December 31, 2017. The term automatically renews for successive five-year periods, unless either party provides written notice of its intent not to renew at least one year prior to the expiration of the initial term or the applicable renewal period. Neither party provided notice of non-renewal on or before December 31, 2016, thereby triggering the five-year automatic renewal period upon the expiration of the initial term. The distribution agreement will therefore continue at least through December 31, 2022. This distribution agreement superseded and replaced our prior distribution agreement with Medtronic which would have expired in accordance with its terms in June 2014.

*Exclusive License Agreement with Athersys* - On September 10, 2010, the Company entered into an Exclusive License Agreement with Athersys, pursuant to which Athersys will provide the Company access to its MAPC technologies to develop and commercialize MAPC technology-based biologic implants for certain orthopedic applications. In consideration for the Exclusive License, the Company agreed to pay Athersys the following: 1) a non-refundable $3,000 license fee, payable in three time-based $1,000 installments, the last of which was paid in the first quarter of 2011, 2) payment of $2,000 contingent upon successful achievement of certain development milestones which the Company paid in 2012, and 3) up to $32,500 contingent upon achievement of certain cumulative revenue milestones in future years. In addition, the Company pays Athersys royalties from the distribution of implants under a tiered royalty structure based on achievement of certain cumulative revenue milestones. The term of this license agreement is the remaining life of any applicable patent or trade secret. These acquired licensing rights are being amortized to expense on a straight-line basis over the expected life of the asset.

*Distribution Agreement with Zimmer Dental Inc.* - On September 3, 2010, the Company and Zimmer Dental Inc. ("Zimmer Dental"), a subsidiary of Zimmer, entered into an exclusive distribution agreement, with an effective date of September 30, 2010. This distribution agreement has an initial term of ten years. Under the terms of this distribution agreement, the Company has agreed to supply sterilized allograft and xenograft implants at an agreed upon transfer price, and Zimmer Dental has agreed to be the exclusive distributor of the implants for dental and oral applications worldwide (except Ukraine), subject to certain Company obligations under an existing distribution agreement with a third party with respect to certain implants for the dental market. In consideration for Zimmer Dental's exclusive distribution rights, Zimmer Dental agreed to the following: 1) payment to the Company of $13,000 within ten days of the effective date (the "Upfront Payment"); 2) annual exclusivity fees ("Annual Exclusivity Fees") paid annually for the term of the contract to be paid at the beginning of each calendar year; and 3) escalating annual purchase minimums to maintain exclusivity. Upon occurrence of an event that materially and adversely affects Zimmer Dental 's ability to distribute the implants, Zimmer Dental may be entitled to certain refund rights with respect to the Upfront Payment and the then current Annual Exclusivity Fee, where such refund would be in an amount limited by a formula specified in this distribution agreement that is based substantially on the number of days from the occurrence of such event to the date that it is cured by the Company to the satisfaction of Zimmer Dental. The Upfront Payment, the Annual Exclusivity Fees and the fees associated with distributions of processed tissue are considered to be a single unit of accounting. Accordingly, the Upfront Payment and the Annual Exclusivity Fees are deferred as received and are being recognized as other revenues over the term of this distribution agreement based on the expected contractual escalating annual purchase minimums relative to the total contractual minimum purchase requirements in this distribution agreement. Additionally, the Company has considered the potential impact of this distribution agreement's contractual refund provisions and does not expect these provisions to impact future expected revenue related to this distribution agreement.

*Distribution Agreement with Davol* - On July 13, 2009, the Company and Davol amended their previous distribution agreement with TMI for human dermis implants. Under the amended agreement: 1) Davol paid the Company $8,000 in non-refundable fees for exclusive distribution rights for the distribution to the breast reconstruction market until July 13, 2019; 2) the exclusive worldwide distribution agreement

related to the hernia market was extended to July 13, 2019; and 3) Davol agreed to pay the Company certain additional exclusive distribution rights fees contingent upon the achievement of certain revenue milestones by Davol during the duration of the contract. In the fourth quarter of 2010, Davol paid the first revenue milestone payment of $3,500. The non-refundable fees and the fees associated with distributions of processed tissue are considered to be a single unit of accounting. Accordingly, the $8,000 and $3,500 exclusivity payments were deferred and were being recognized as other revenues on a straight-line basis over the initial term of the amended contract of ten years, and the remaining term of the amended contract, respectively. Davol did not achieve certain revenue growth milestones which resulted in Davol relinquishing its exclusive distribution rights in the hernia market effective January 1, 2013 and in the breast reconstruction market effective January 1, 2015. As a result, the Company recognized additional deferred revenue as other revenues during the three months ended March 31, 2013 and 2015, of $1,715 and $1,500, respectively, due to the acceleration of deferred revenue recognition relating to Davol relinquishing its exclusive distribution rights in the hernia and the breast reconstruction markets. The remaining balance is being recognized as other revenues on a straight-line basis over the remaining term of the amended contract.

The Company's aforementioned revenue recognition methods related to the Zimmer and Davol distribution agreements do not result in the deferral of revenue less than amounts that would be refundable in the event the agreements were to be terminated in future periods. Additionally, the Company evaluates the appropriateness of the aforementioned revenue recognition methods on an ongoing basis.

*Leases*—The Company leases certain facilities, items of office equipment and vehicles under non-cancelable operating lease arrangements expiring on various dates through 2019. The facility leases generally contain renewal options and escalation clauses based upon increases in the lessors' operating expenses and other charges. The Company anticipates that most of these leases will be renewed or replaced upon expiration. Rent expense for the years ended December 31, 2016, 2015, and 2014 was $1,378, $1,443 and $1,609, respectively, and is included as a component of marketing, general and administrative expenses.

Future minimum lease commitments under non-cancelable operating leases as of December 31, 2016 are as follows:

|  | Operating Leases |
| --- | --- |
| 2017 | $ 1,936 |
| 2018 | 1,347 |
| 2019 | 1,007 |
| 2020 | 587 |
| 2021 and beyond | 115 |
|  | $ 4,992 |

**Legal and Regulatory Actions**

**12 Months Ended**

**Dec. 31, 2016**

**Commitments and Contingencies Disclosure [Abstract]**

Legal and Regulatory Actions

**23. Legal and Regulatory Actions**

The Company is, from time to time, involved in litigation relating to claims arising out of its operations in the ordinary course of business. The Company believes that none of these claims that were outstanding as of December 31, 2016 will have a material adverse impact on its financial position or results of operations.

*Litigation and Settlement Charges.* — In the fourth quarter of 2015, the Company reached agreements with three separate entities for the resolution of various claims asserted by these entities for breach of contract. Consequently, the Company recorded cumulative litigation and settlement charges of $804 pertaining to the aforementioned agreements in the fourth quarter of 2015.

*Coloplast* — The Company is presently named as co-defendant along with other companies in a small percentage of the transvaginal surgical mesh ("TSM") mass tort claims being brought in various state and federal courts. The TSM litigation has as its catalyst various Public Health Notifications issued by the U.S. Food and Drug Administration ("FDA") with respect to the placement of certain TSM implants that were the subject of 510k regulatory clearance prior to their distribution. The Company does not process or otherwise manufacture for distribution in the U.S. any implants that were the subject of these FDA Public Health Notifications. The Company denies any allegations against it and intends to continue to vigorously defend itself.

In addition to claims made directly against the Company, Coloplast, a distributor of TSM's and certain allografts processed and private labeled for them under a contract with the Company, has also been named as a defendant in individual TSM cases in various federal and state courts. Coloplast requested that the Company indemnify or defend Coloplast in those claims which allege injuries caused by the Company's allograft implants, and on April 24, 2014, Coloplast sued RTI Surgical, Inc. in the Fourth Judicial District of Minnesota for declaratory relief and breach of contract. On December 11, 2014, Coloplast entered into a settlement agreement with RTI Surgical, Inc. and Tutogen Medical, Inc. (the "Company Parties") resulting in dismissal of the case. Under the terms of the settlement agreement, the Company Parties are responsible for the defense and indemnification of two categories of present and future claims: (1) tissue only (where Coloplast is solely the distributor of Company processed allograft tissue and no Coloplast-manufactured or distributed synthetic mesh is identified) ("Tissue Only Claims"), and (2) tissue plus non-Coloplast synthetic mesh ("Tissue-Non-Coloplast Claims") (the Tissue Only Claims and the Tissue-Non-Coloplast Claims being collectively referred to as "Indemnified Claims"). As of December 31, 2016, there are a cumulative total of 1,445 Indemnified Claims for which the Company Parties are providing defense and indemnification. The defense and indemnification of these cases are covered under the Company's insurance policy subject to a reservation of rights by the insurer.

Based on the current information available to the Company, it is not possible to evaluate and estimate with reasonable certainty the impact that current or any future TSM litigation may have on the Company.

The Company's accounting policy is to accrue for legal costs as they are incurred.

On September 30, 2014, the Company received a letter from the FDA regarding our map3® cellular allogeneic bone graft. The letter addresses some technical aspects of the processing of the map3® allograft, as well as language included on the Company's website. The Company has ongoing dialogue with the FDA where comprehensive packages of data have been provided to address the FDA's comments and provide clarifying information regarding the technical components of the implant processing. The Company believes that in both developing and processing of map3®, the Company has properly considered the relevant regulatory requirements. Additionally, the Company has removed the relevant information from the Company's website. The Company is committed to resolving the concerns raised by the FDA. However, it is not possible to predict the specific outcome or timing of a resolution at this time.

| Segment Data | 12 Months Ended |
| --- | --- |
| | Dec. 31, 2016 |

## Segment Reporting [Abstract]

Segment Data

**24. Segment Data**

The Company distributes human tissue, bovine and porcine animal tissue, metal and synthetic implants through various distribution channels. The Company operates in one reportable segment composed of six lines of business. Effective January 1, 2016, the reporting of the Company's lines of business is composed primarily of six categories: spine; sports medicine and orthopedics; surgical specialties; cardiothoracic; international; and global commercial. The Company's previous lines of business were composed of: spine; ortho fixation; sports medicine; bone graft substitutes and general orthopedic; dental; and surgical specialties. The prior year comparable revenue information has been restated to conform to the current year presentation. The Company believes that the change in the reporting of its lines of business will facilitate a better understanding of the Company's lines of business and align more closely with the end markets in which the Company competes. Discrete financial information is not available for these six lines of business. The following table presents revenues from these six categories and other revenues and their respective percentages of the Company's total revenues for the years ended December 31, 2016, 2015 and 2014:

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2016 | | 2015 | | 2014 | |
| | (In thousands) | | | | | |
| Revenues: | | | | | | |
| Spine | $ 73,907 | 27.1% | $ 57,983 | 20.5% | $ 52,270 | 19.9% |
| Sports medicine and orthopedics | 50,143 | 18.4% | 50,712 | 18.0% | 48,975 | 18.6% |
| Surgical specialties | 4,466 | 1.6% | 3,029 | 1.1% | 1,631 | 0.6% |
| Cardiothoracic | 11,147 | 4.1% | 8,699 | 3.1% | 6,997 | 2.7% |
| International | 21,185 | 7.8% | 18,338 | 6.5% | 20,327 | 7.7% |
| Subtotal direct | 160,848 | 59.0% | 138,761 | 49.2% | 130,200 | 49.5% |
| Global commercial | 99,127 | 36.3% | 129,930 | 46.0% | 120,910 | 46.0% |
| Other revenues | 12,890 | 4.7% | 13,602 | 4.8% | 11,700 | 4.5% |
| Total revenues | $272,865 | 100.0% | $282,293 | 100.0% | $262,810 | 100.0% |
| Domestic revenues | $247,756 | 90.8% | $260,387 | 92.2% | $238,936 | 90.9% |
| International revenues | 25,109 | 9.2% | 21,906 | 7.8% | 23,874 | 9.1% |
| Total revenues | $272,865 | 100.0% | $282,293 | 100.0% | $262,810 | 100.0% |

The following table presents property, plant and equipment - net by significant geographic location:

| | December 31, | |
| --- | --- | --- |
| | 2016 | 2015 |
| Property, plant and equipment - net: | | |
| Domestic | $77,596 | $72,901 |
| International | 5,702 | 12,091 |
| Total | $83,298 | $84,992 |

| Quarterly Results of Operations (Unaudited) | 12 Months Ended Dec. 31, 2016 |
|---|---|

**Quarterly Financial Information Disclosure [Abstract]**

Quarterly Results of Operations (Unaudited)

**25. Quarterly Results of Operations (Unaudited)**

The following table sets forth the results of operations for the periods indicated:

| | March 31, 2016 | June 30, 2016 | September 30, 2016 | December 31, 2016 |
|---|---|---|---|---|
| Quarter Ended: | | | | |
| Revenues | $ 67,351 | $ 67,620 | $ 66,547 | $ 71,347 |
| Gross profit | 36,025 | 33,949 | 34,274 | 28,101 |
| Net income (loss) applicable to common shares | 1,543 | (3,162) | (4,489) | (11,799) |
| Net income (loss) per common share: | | | | |
| Basic | $ 0.03 | $ (0.05) | $ (0.08) | $ (0.20) |
| Diluted | 0.03 | (0.05) | $ (0.08) | $ (0.20) |

In 2016, the Company's net income was negatively impacted by an excess inventory charge of $9,556, strategic review costs of $1,150, CEO retirement and transition costs of $4,404, contested proxy expenses of $2,680, asset impairment of $5,435, restructuring charges of $1,107 and severance charges of $1,039.

The following table sets forth the results of operations for the periods indicated:

| | March 31, 2015 | June 30, 2015 | September 30, 2015 | December 31, 2015 |
|---|---|---|---|---|
| Quarter Ended: | | | | |
| Revenues | $ 68,034 | $ 71,609 | $ 66,529 | $ 76,121 |
| Gross profit | 36,999 | 37,203 | 35,233 | 40,307 |
| Net income applicable to common shares | 2,934 | 2,685 | 2,670 | 3,321 |
| Net income per common share: | | | | |
| Basic | $ 0.05 | $ 0.05 | $ 0.05 | $ 0.06 |
| Diluted | 0.05 | 0.05 | 0.05 | 0.06 |

In the fourth quarter of 2015, the Company's net income was negatively impacted by asset abandonments of $814, litigation and settlement charges of $804 and severance charges of $995.

| **Subsequent Events** | **12 Months Ended** |
| --- | --- |
| | **Dec. 31, 2016** |

**Subsequent Events [Abstract]**

Subsequent Events

**26. Subsequent Events**

The Company evaluated subsequent events as of the issuance date of the consolidated financial statements as defined by FASB ASC 855 *Subsequent Events*, and identified no subsequent events that require adjustment to, or disclosure of, in these consolidated financial statements.

**Schedule II - Valuation and Qualifying Accounts**

**12 Months Ended**

**Dec. 31, 2016**

**Valuation and Qualifying Accounts [Abstract]**

Schedule II - Valuation and Qualifying Accounts

**RTI SURGICAL, INC. AND SUBSIDIARIES**
**Schedule II**
**Valuation and Qualifying Accounts**
**Years Ended December 31, 2016, 2015 and 2014**
**(Dollars in thousands)**

| Description | Balance at Beginning of Period | Charged to Costs and Expenses | Deductions- Write-offs, Payments | Balance at End of Period |
|---|---|---|---|---|
| **For the year ended December 31, 2016:** | | | | |
| Allowance for doubtful accounts | $ 1,454 | $ 645 | $ 371 | $ 1,728 |
| Allowance for product returns | 714 | 250 | 335 | 629 |
| Allowance for excess and obsolescence | 7,083 | 13,880 | 6,165 | 14,798 |
| Deferred tax asset valuation allowance | 1,106 | 3,833 | 23 | 4,916 |
| **For the year ended December 31, 2015:** | | | | |
| Allowance for doubtful accounts | 818 | 1,037 | 401 | 1,454 |
| Allowance for product returns | 525 | 531 | 342 | 714 |
| Allowance for excess and obsolescence | 5,112 | 5,390 | 3,419 | 7,083 |
| Deferred tax asset valuation allowance | 959 | 197 | 50 | 1,106 |
| **For the year ended December 31, 2014:** | | | | |
| Allowance for doubtful accounts | 492 | 709 | 383 | 818 |
| Allowance for product returns | 343 | 182 | — | 525 |
| Allowance for excess and obsolescence | 5,399 | 3,763 | 4,050 | 5,112 |
| Deferred tax asset valuation allowance | 469 | 490 | — | 959 |

| Summary of Significant Accounting Policies (Policies) | 12 Months Ended Dec. 31, 2016 |
|---|---|

**Accounting Policies [Abstract]**

Principles of Consolidation

*Principles of Consolidation*—The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries, Pioneer Surgical Technology, Inc. ("Pioneer"), Tutogen Medical, Inc. ("TMI"), RTI Surgical, Inc. – Cardiovascular (inactive), Biological Recovery Group Inc. (inactive), and RTI Services, Inc. (inactive). The consolidated financial statements also include the accounts of RTI Donor Services, Inc. ("RTIDS"), which is a controlled entity. The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). All intercompany balances and transactions have been eliminated in consolidation.

RTIDS is a taxable not-for-profit entity organized and controlled by the Company. RTIDS is the corporate entity that is responsible for procuring tissue for the Company. Expenses incurred by RTIDS to procure tissue are passed through to the Company. RTIDS has no significant assets or liabilities except for its intercompany accounts receivable and accounts payable to tissue recovery agencies. The Company pays all expenses of RTIDS.

Use of Estimates

*Use of Estimates*—The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Estimates and assumptions relating to inventories, receivables, long-lived assets, investment valuations and litigation are made at the end of each financial reporting period by management. Actual results could differ from those estimates.

Foreign Currency Translation

*Foreign Currency Translation*—The functional currency of the Company's foreign subsidiaries is the Euro. Assets and liabilities of the foreign subsidiaries are translated at the period end exchange rate while revenues and expenses are translated at the average exchange rate for the period. The resulting translation adjustments, representing unrealized, noncash gains and losses are recorded and presented as a component of comprehensive (loss) income. Gains and losses resulting from transactions of the Company and its subsidiaries, which are made in currencies different from their own, are included in income or loss as they occur and are included in other (expense) income in the consolidated statements of comprehensive (loss) income.

Presentation of Financial Statements - Going Concern

*Presentation of Financial Statements - Going Concern* — In August 2014, the FASB issued ASU 2014-15, *"Presentation of Financial Statements - Going Concern (Subtopic 205-40)."* The new guidance addresses management's responsibility to evaluate whether there is substantial doubt about an entity's ability to continue as a going concern and to provide related footnote disclosures. Management's evaluation should be based on relevant conditions and events that are known and reasonably knowable at the date that the financial statements are issued. The standard is effective for annual periods ending after December 15, 2016, and for annual and interim periods thereafter. The Company has adopted this standard and it did not have a material impact on the Company's consolidated financial statements.

Fair Value of Financial Instruments

*Fair Value of Financial Instruments*—The estimated fair value of financial instruments disclosed in the consolidated financial statements has been determined by using available market information and appropriate valuation methodologies. The carrying value of all current assets and current liabilities approximates fair value because of their short-term nature. The carrying value of the long-term debt obligations approximates fair value. The carrying value of capital lease obligations approximates their fair value, based on current market prices.

Cash and Cash Equivalents

*Cash and Cash Equivalents*— The Company considers all funds in banks and short-term highly liquid investments with an original maturity of three months or less to be cash and cash equivalents. Cash equivalents comprise overnight repurchase agreements. Cash balances are held at a few financial institutions and usually exceed insurable amounts. The Company mitigates this risk by depositing its uninsured cash in major well capitalized financial institutions, and by investing excess operating cash in overnight repurchase agreements which are 101% collateralized by U.S. Government backed securities with the Company's bank. At December 31, 2016 and 2015, the Company had no cash equivalents.

Accounts Receivable Allowances

*Accounts Receivable Allowances*— The Company maintains allowances for doubtful accounts based on the Company's review and assessment of payment history and its estimate of the ability of each customer to make payments on amounts invoiced. If the financial condition of any of its customers were to deteriorate, additional allowances might be required. From time to time the Company must adjust its estimates. Changes in estimates of the collection risk related to accounts receivable can

result in decreases and increases to current period net income.

## Inventories

***Inventories***—Inventories are stated at the lower of cost or market, with cost determined using the first-in, first-out method. Inventory write-downs for unprocessed donor tissue are recorded based on the estimated amount of inventory that will not pass the quality control process based on historical data, and the amount of inventory that is not readily distributable or is unusable. In addition, provisions for inventory write-downs are estimated for tissue in process inventory that is not readily distributable or is unusable. Any implantable donor tissue deemed to be obsolete is included in the write-down at the time the determination is made. Non-tissue inventory is evaluated for obsolescence and excess quantities by analyzing inventory levels, historical loss trends, expected product lives, product at risk of expiration, sales levels by product and projections of future sales demand.

***Simplifying the Measurement of Inventory*** — In July 2015, the FASB issued ASU No. 2015-11, *"Inventory (Topic 330): Simplifying the Measurement of Inventory"*. Update No. 2015-11 more closely aligns the measurement of inventory in U.S. GAAP with the measurement of inventory in International Financial Reporting Standards by requiring companies using the first-in, first-out and average costs methods to measure inventory using the lower of cost and net realizable value, where net realizable value is the estimated distribution prices of the inventory in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation. Update No. 2015-11 is effective for annual reporting periods beginning after December 15, 2016 and interim periods within those fiscal years. Update No. 2015-11 should be applied prospectively with earlier application permitted as of the beginning of an interim or annual reporting period. The Company is evaluating the impact of this ASU on its financial position, results of operations, and cash flows and has not yet determined if it will early adopt the ASU.

## Implant and Product Recalls

***Implant and Product Recalls***—The Company accrues the estimated cost of recalls at the date the recall is initiated. The cost of recalls is primarily comprised of implant replacement costs. The Company incurred immaterial costs related to all of the recalls for the years ended December 31, 2016, 2015 and 2014.

## Surgical Instruments

***Surgical Instruments***—Surgical instruments which are included in property, plant and equipment are handheld devices used by surgeons during implant procedures. The Company retains title to the surgical instruments. Depreciation for surgical instruments is included in selling and marketing expenses in the accompanying consolidated statements of comprehensive (loss) income.

## Property, Plant and Equipment

***Property, Plant and Equipment***—Property, plant and equipment are stated at cost less accumulated depreciation. The cost of equipment under capital leases and leasehold improvements is amortized on the straight-line method over the shorter of the lease term or the estimated useful life of the asset. Depreciation is computed on the straight-line method over the following estimated useful lives of the assets:

| | |
|---|---|
| Buildings | 25 to 40 years |
| Building improvements and leasehold improvements | 8 to 40 years |
| Processing equipment | 7 to 10 years |
| Office equipment, furniture and fixtures | 5 to 7 years |
| Computer hardware and software | 3 to 7 years |
| Surgical instruments | 3 to 5 years |

## Software Costs

***Software Costs***—Included in property, plant and equipment are costs related to purchased software that are capitalized.

## Debt Issuance Costs

***Debt Issuance Costs***—Debt issuance costs include costs incurred to obtain financing and are amortized using the straight-line method, which approximates the effective interest method, over the life of the related debt. Debt issuance costs related to a recognized debt liability are presented in the balance sheet as a direct deduction from the carrying amount of that debt liability.

## Long-Lived Assets

***Long-Lived Assets***— The Company periodically evaluates the period of depreciation or amortization for long-lived assets to determine whether current circumstances warrant revised estimates of useful lives. The Company reviews its property, plant and equipment for impairment whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable. Recoverability is measured by a comparison of the carrying amount to the net undiscounted cash flows expected to be generated by the asset. An impairment loss would be recorded for the excess of net carrying value over the fair value of the asset impaired. The fair value is estimated based on expected discounted future cash flows. The results of impairment tests are subject to management's estimates and assumptions of projected cash flows and operating results. Changes in assumptions or market conditions could result in a change in estimated future cash flows and the likelihood of materially different

reported results. During the fourth quarter of 2016, the Company concluded a strategic review of its business lines and operations, and updated its financial projections. As a result, the Company's financial projections related to its hernia business line were adjusted downward. This business line is a significant driver of revenue for the Tutogen Germany asset group. As a result, during the fourth quarter of 2016, the Company completed an asset group impairment test and determined the carrying value was not recoverable as of December 31, 2016. The Company used a market approach to determine the fair value of the Tutogen Germany asset group's long lived assets and recognized impairment charges related to identified intangibles and property and equipment of $5.4 million. During 2015 the Company incurred asset abandonments of certain long-term assets at our German facility of $814,000.

<u>Goodwill</u>

***Goodwill*** — Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 350, *Goodwill and Other Intangible Assets* ("FASB ASC 350"), requires companies to test goodwill for impairment on an annual basis at the reporting unit level (or an interim basis if an event occurs that might reduce the fair value of a reporting unit below its carrying value). The Company has one reporting unit and the annual impairment test is performed at each year-end unless indicators of impairment are present and require more frequent testing. The Company did not have any other identifiable intangible assets with indefinite useful lives as of December 31, 2016 and 2015.

Goodwill is tested for impairment annually by comparing the fair value of the reporting unit to its carrying amount, including goodwill. The Company adopted Accounting Standards Update ("ASU") No. 2011-08, *Intangibles – Goodwill and Other: TestingGoodwill for Impairment,* which permits the consideration of qualitative indicators of the fair value of a reporting unit when it is unlikely that a reporting unit has impaired goodwill. If the Company determines the fair value is more-likely-than-not greater than its carrying amount, no additional testing is considered necessary. However, if the Company determines the fair value is more-likely-than-not below the carrying value of the reporting unit, the Company performs the two step goodwill impairment test. If the two step goodwill impairment test is required, an income approach and a market approach are utilized. The conclusion from these two approaches are generally weighted equally and then adjusted to incorporate a control premium or acquisition premium that reflects the additional amount a buyer is willing to pay for elements of control and for a premium that reflects the buyer's perception of its ability to add value through synergies.

In general, the income approach employs a discounted cash flow model that considers: 1) assumptions that marketplace participants would use in their estimates of fair value, including the cash flow period, terminal values based on a terminal growth rate and the discount rate; 2) current period actual results; and 3) projected results for future periods that have been prepared and approved by senior management of the Company. The forecasted cash flows do not include synergies that a marketplace participant would be expecting to achieve.

The market approach employs market multiples from guideline public companies operating in our industry. Estimates of fair value are derived by applying multiples based on revenue and earnings before interest, taxes, depreciation and amortization ("EBITDA") adjusted for size and performance metrics relative to peer companies. A control premium was included in determining the fair value under this approach.

If the carrying amount of the reporting unit exceeds its calculated fair value, the second step of the goodwill impairment test is performed in accordance with FASB ASC 350 to measure the amount of the impairment loss, if any.

Both approaches used in the analysis have a degree of uncertainty. Potential events or changes in circumstances which could impact the key assumptions used in our goodwill impairment evaluation are as follows:

- Change in peer group or performance of peer group companies

- Change in the Company's markets and estimates of future operating performance

- Change in the Company's estimated market cost of capital

- Change in implied control premiums related to acquisitions in the medical device industry.

Goodwill represents the excess of purchase price over fair value of tangible net assets of acquired businesses at the acquisition date, after amounts allocated to other identifiable intangible assets. Factors that contribute to the recognition of goodwill include securing synergies that are specific to our business and not available to other market participants and are expected to increase revenues and profits; acquisition of a talented workforce; cost savings opportunities; the strategic benefit of expanding our presence in core and adjacent markets; and diversifying our product portfolio.

*Simplifying the Test for Goodwill Impairment* — In January 2017, the FASB issued ASU No. 2017-04, "*Simplifying the Test for Goodwill Impairment*" (Topic 350) ("ASU No. 2017-04"). The amendments in ASU No. 2017-04 are intended to reduce the cost and complexity of the goodwill impairment test by eliminating Step 2 from the that impairment test. The amendments modify the concept of impairment from the condition that exists when the carrying amount of goodwill exceeds its implied fair value to the condition that exists when the carrying amount of a reporting unit exceeds its fair value. Under the amendments in ASU No. 2017-04, an entity will perform its annual, or interim, goodwill impairment test by comparing the fair value of the reporting unit with its carrying amount. An impairment charge should be recognized for the amount which the carrying amount exceeds the reporting unit's fair value; however, the loss recognized should not exceed the total amount of goodwill allocated to that reporting unit. The amendments in ASU No. 2017-04 are effective for the Company's annual or any interim goodwill impairment test in fiscal years beginning after December 15, 2019. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The Company is currently evaluating the impact ASU No. 2017-04 will have on the Company's results of operations, financial position and disclosures, but it is not expected to have a material impact.

## Other Intangible Assets

*Other Intangible Assets* —Other intangible assets, which constitutes finite lives assets, generally consist of patents, acquired exclusivity rights, licensing rights, trademarks, customer lists, non-compete agreements, distribution agreements, and procurement contracts. Patents and trademarks are amortized on the straight-line method over the shorter of the remaining protection period or estimated useful lives of between 8 and 16 years. The acquired exclusivity rights are being amortized over eight years, the remaining term of the amended distribution agreement. Licensing rights, customer lists, non-compete agreements, distribution agreements, and procurement contracts are amortized over estimated useful lives of between 5 to 25 years.

Other intangible assets are tested for impairment annually (if indefinite lived) or whenever events or circumstances indicate that the carrying amount of an asset or asset group may not be recoverable. The recoverability test is described in the Company's accounting policy for long-lived assets set forth above.

## Revenue Recognition

*Revenue Recognition*—Revenue is recognized upon shipping, or receipt by the Company's customers of the implant, depending on the Company's distribution agreements with the Company's customers or distributors. Other revenues are recognized when all significant contractual obligations have been satisfied.

The Company permits returns of implants in accordance with the terms of contractual agreements with customers if the implant is returned in a timely manner, in unopened packaging, and from the normal channels of distribution. Allowances for returns are provided based upon analysis of the Company's historical patterns of returns matched against the revenues from which they originated.

The Company records estimated implant returns, discounts, rebates and other distribution incentives as a reduction of revenue in the same period revenue is recognized. Estimates of implant returns are recorded for anticipated implant returns based on historical distributions and returns information. Estimates of discounts, rebates and other distribution incentives are recorded based on contractual terms, historical experience and trend analysis.

Other revenues consists of service processing, tissue recovery fees, biomedical laboratory fees, recognition of previously deferred revenues, shipping fees, distribution of reproductions of our allografts to distributors for demonstration purposes and restocking fees which is included in revenues.

## Stock-Based Compensation Plans

*Stock-Based Compensation Plans*—The Company accounts for its stock-based compensation plans in accordance with FASB ASC 718, *Accounting for Stock Compensation* ("FASB ASC 718"). FASB ASC 718 requires the measurement and recognition of compensation expense for all stock-based awards made to employees and directors, including employee stock options and restricted stock. Under the provisions of FASB ASC 718, and U.S. Securities and Exchange Commission *Staff Accounting Bulletin No. 107*, stock-based compensation cost is measured at the grant date, based on the calculated fair value of the award, and is recognized as an expense on a straight-line basis over the requisite service period of the entire award (generally the vesting period of the award). The Company uses the Black-Scholes model to value its stock option grants under FASB ASC 718 and expenses the related compensation cost using the straight-line method over the vesting period. The fair value of stock options is determined on the grant date using assumptions for the expected term, expected volatility, dividend yield, and the risk free interest rate. The term assumption is primarily based on the

contractual vesting term of the option and historic data related to exercise and post-vesting cancellation history experienced by the Company. The Company uses the simplified method for estimating the expected term used to determine the fair value of options under FASB ASC 718. The expected term is determined separately for options issued to the Company's directors and to employees. The Company's anticipated volatility level is primarily based on the historic volatility of the Company's common stock. The Company's model includes a zero dividend yield assumption, as the Company has not historically paid nor does it anticipate paying dividends on its common stock. The risk free interest rate approximates recent U.S. Treasury note auction results with a similar life to that of the option. The Company's model does not include a discount for post-vesting restrictions, as the Company has not issued awards with such restrictions. The period expense is then determined based on the valuation of the options, and at that time an estimated forfeiture rate is used to reduce the expense recorded. The Company's estimate of pre-vesting forfeitures is primarily based on the recent historical experience of the Company, and is adjusted to reflect actual forfeitures as the options vest.

*Compensation – Stock Compensation* — In March 2016, the FASB issued ASU No. 2016-09, *"Compensation – Stock Compensation"* (Topic 718) ("ASU 2016-09"). ASU 2016-09 identifies areas for simplification involving several aspects of accounting for share-based payment transactions, including the income tax consequences, classification of awards as either equity or liabilities, an option to recognize gross stock compensation expense with actual forfeitures recognized as they occur, as well as certain classifications on the statement of cash flows. The ASU is effective for annual reporting periods beginning after December 15, 2016. The Company is currently assessing the impact of adopting ASU 2016-09 on its consolidated financial statements and footnote disclosures.

Research and Development Costs

*Research and Development Costs*—Research and development costs, including the cost of research and development conducted for others and the cost of contracted research and development, are expensed as incurred.

Income Taxes

*Income Taxes*—The Company uses the asset and liability method of accounting for income taxes. Deferred income taxes are recorded to reflect the tax consequences on future years for differences between the tax basis of assets and liabilities and their financial reporting amounts at each year-end based on enacted tax laws and statutory tax rates applicable to the periods in which the differences are expected to affect taxable income. Valuation allowances are established when necessary to reduce deferred tax assets to amounts which are more likely than not to be realized.

*Income Taxes* — On November 20, 2015, the FASB issued ASU No. 2015-17, *"Income Taxes (Topic 740)"*. Update No. 2015-17 is effective for annual reporting periods beginning after December 15, 2016 and interim periods within those fiscal years. The Company early adopted ASU 2015-17 effective December 31, 2015 on a prospective basis. Adoption of this ASU resulted in a reclassification of the Company's net current deferred tax assets to net non-current deferred tax assets in its consolidated balance sheet as of December 31, 2015. No prior periods were retrospectively adjusted as allowed by this ASU.

Earnings Per Share

*Earnings Per Share*—Basic earnings per share ("EPS") is computed by dividing earnings attributable to common stockholders by the weighted-average number of common shares outstanding for the periods. Diluted EPS reflects the potential dilution of securities that could share in the earnings. A reconciliation of the number of common shares used in the calculation of basic and diluted EPS is presented below:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | 2014 |
| Basic shares | 58,236,745 | 57,611,231 | 56,735,924 |
| Effect of dilutive securities: | | | |
|    Stock options | — | 979,263 | — |
| Diluted shares | 58,236,745 | 58,590,494 | 56,735,924 |

Options to purchase 5,764,607 shares of common stock at prices ranging from $2.69 to $9.57 per share which were outstanding as of December 31, 2016, were not included in the computation of diluted EPS because dilutive shares are not factored into the calculation of EPS when a loss applicable to common shares is reported as they would be anti-dilutive.

Options to purchase 5,661,514 shares of common stock at prices ranging from $2.69 to $9.57 per share which were outstanding as of December 31, 2015, were included in the computation of diluted EPS because dilutive shares are factored into the calculation of EPS when income applicable to common shares is reported.

Options to purchase 5,735,784 shares of common stock at prices ranging from $2.69 to $9.57 per share which were outstanding as of December 31, 2014, were not included in the computation of diluted

EPS because dilutive shares are not factored into the calculation of EPS when a loss applicable to common shares is reported as they would be anti-dilutive.

For the years ended December 31, 2016, 2015 and 2014, 50,000 shares of convertible preferred stock and accrued but unpaid dividends were anti-dilutive on an as if-converted basis and were not included in the computation of diluted net (loss) income per common share.

Business Combinations - Clarifying the Definition of a Business

*Business Combinations – Clarifying the Definition of a Business* — In January 2017, FASB issued ASU No. 2017-01, "*Business Combinations – Clarifying the Definition of a Business"* (Topic 805) ("ASU No. 2017-01"). ASU 2017-01 provides a framework to use in determining when a set of assets and activities is a business. ASU 2017-01 provides more consistency in applying the business combination guidance, reduces the costs of application, and makes the definition of a business more operable. ASU 2017-01 is effective for interim and annual periods within those annual periods beginning after December 15, 2017. The Company is currently evaluating the impact ASU 2017-01 will have on the Company's results of operations, financial position and disclosures, but it is not expected to have a material impact.

Leases

*Leases* — In February 2016, the FASB issued ASU No. 2016-02 ("ASU 2016-02"), *Leases (Topic 842)*, which supersedes existing guidance on accounting for leases in *"Leases (Topic 840)"* and generally requires all leases to be recognized in the statement of financial position. The provisions of ASU 2016-02 are effective for reporting periods beginning after December 15, 2018; early adoption is permitted. The provisions of this ASU are to be applied using a modified retrospective approach. The Company is currently evaluating the effect that this ASU will have on its consolidated financial statements.

Simplifying the Presentation of Debt Issuance Costs

*Simplifying the Presentation of Debt Issuance Costs* — In April 2015, the FASB issued ASU No. 2015-03, "*Interest – Imputation of Interest: Simplifying the Presentation of Debt Issuance Costs"* (Topic 835) ("ASU No. 2015-03"). ASU No. 2015-03 simplifies the accounting for debt issuance costs by requiring such costs to be presented as a direct deduction from the related debt liability rather than as an asset. Debt disclosures will include the face amount of the debt liability and the effective interest rate. ASU No. 2015-03 requires retrospective application and represents a change in accounting principle. The Company adopted ASU No. 2015-03 effective January 1, 2016 and has presented debt issuance costs of $403 as of both December 31, 2016 and 2015 as a direct deduction from the carrying amounts of its debt liabilities. The December 31, 2015 amount was previously recorded in "Other assets-net".

Revenue from Contracts with Customers

*Revenue from Contracts with Customers* — In May 2014, the FASB issued ASU No. 2014-09, *"Revenue from Contracts with Customers"* (Topic 606) ("ASU 2014-09"), which supersedes the revenue recognition requirements in Accounting Standards Codification ("ASC") Topic 605, *"Revenue Recognition"*. ASU 2014-09 is based on the principle that revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASU 2014-09 also requires additional disclosure about the nature, amount, timing and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments and assets recognized from costs incurred to obtain or fulfill a contract. As updated in August 2015, the effective date of ASU 2014-09 will be annual reporting periods beginning after December 15, 2017, using one of two retrospective application methods.

In March and April 2016, the FASB issued two updates to the revenue recognition guidance: ASU 2016-08 *"Principal Versus Agent Considerations"* (Topic 606) (Reporting Revenue Gross Versus Net), and ASU 2016-10, *"Identifying Performance Obligations and Licensing"* (Topic 606).

In May 2016, the FASB issued ASU Update No. 2016-12 *"Narrow-Scope Improvements and Practical Expedients"* (Topic 606) ("ASU 2016-12") which narrowly amended the revenue recognition guidance regarding collectability, noncash consideration, presentation of sales tax and transition.

The Company has not determined the impact ASU 2014-09, ASU 2016-08, ASU 2016-10 and ASU 2016-12 will have on its consolidated financial statements and footnote disclosures. However, we have completed our preliminary assessment, which included a review of a subset of representative contracts. During 2017, we will expand the scope of our assessment to include all contracts with customers.

| **Summary of Significant Accounting Policies (Tables)** | **12 Months Ended**<br>**Dec. 31, 2016** |

**Accounting Policies [Abstract]**

| Property, Plant, and Equipment are Stated at Cost Less Accumulated Depreciation | Depreciation is computed on the straight-line method over the following estimated useful lives of the assets: |

| | |
|---|---|
| Buildings | 25 to 40 years |
| Building improvements and leasehold improvements | 8 to 40 years |
| Processing equipment | 7 to 10 years |
| Office equipment, furniture and fixtures | 5 to 7 years |
| Computer hardware and software | 3 to 7 years |
| Surgical instruments | 3 to 5 years |

| Reconciliation of Common Stock used in Calculation of Basic and Diluted Earnings Per Share | A reconciliation of the number of common shares used in the calculation of basic and diluted EPS is presented below: |

| | **Year Ended December 31,** | | |
|---|---|---|---|
| | **2016** | **2015** | **2014** |
| Basic shares | 58,236,745 | 57,611,231 | 56,735,924 |
| Effect of dilutive securities: | | | |
| Stock options | — | 979,263 | — |
| Diluted shares | 58,236,745 | 58,590,494 | 56,735,924 |

| **Stock-Based Compensation** | **12 Months Ended** |
| **(Tables)** | **Dec. 31, 2016** |

**Disclosure of Compensation Related Costs,
Share-based Payments [Abstract]**

Weighted-Average Assumptions Used to
Determine Fair Value of Options

The following weighted-average assumptions were used to determine the fair value of options under FASB ASC 718:

| | Year Ended December 31, | | |
| | 2016 | 2015 | 2014 |
|---|---|---|---|
| Expected term (years) | 6.50 | 6.50 | 6.50 |
| Risk free interest rate | 1.85% | 1.67% | 2.29% |
| Volatility factor | 45.57% | 46.29% | 46.53% |
| Dividend yield | — | — | — |

Stock Options Outstanding, Exercisable and
Available for Grant

Stock options outstanding, exercisable and available for grant at December 31, 2016, are summarized as follows:

| | Number of Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (Years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at January 1, 2016 | 5,661,514 | $ 4.49 | | |
| Granted | 619,352 | 3.31 | | |
| Exercised | (21,000) | 2.72 | | |
| Forfeited or expired | (495,259) | 5.54 | | |
| Outstanding at December 31, 2016 | 5,764,607 | $ 4.28 | 4.49 | $ 348 |
| Vested or expected to vest at December 31, 2016 | 5,590,546 | $ 4.28 | 4.35 | $ 348 |
| Exercisable at December 31, 2016 | 4,082,632 | $ 4.33 | 3.07 | $ 348 |
| Available for grant at December 31, 2016 | 3,314,686 | | | |

Stock-Based Compensation Recognized

For the years ended December 31, 2016, 2015 and 2014, the Company recognized stock-based compensation as follows:

| | Year Ended December 31, | | |
| | 2016 | 2015 | 2014 |
|---|---|---|---|
| Stock-based compensation: | | | |
| Costs of processing and distribution | $ 140 | $ 132 | $ 132 |
| Marketing, general and administrative | 3,406 | 2,356 | 2,840 |
| Research and development | 44 | 60 | 60 |
| Total | $3,590 | $2,548 | $3,032 |

Other Information Concerning Stock Options

Other information concerning stock options are as follows:

| | Year Ended December 31, | | |
| | 2016 | 2015 | 2014 |
|---|---|---|---|
| Weighted average fair value of stock options granted | $1.55 | $ 2.50 | $1.87 |
| Aggregate intrinsic value of stock options exercised | 12 | 1,584 | 295 |

|  | 12 Months Ended |
|---|---|
| **Inventories (Tables)** | **Dec. 31, 2016** |

**Inventory Disclosure [Abstract]**

Components of Inventories

Inventories by stage of completion are as follows:

|  | December 31, | |
|---|---|---|
|  | **2016** | **2015** |
| Unprocessed tissue, raw materials and supplies | $ 31,745 | $ 33,028 |
| Tissue and work in process | 38,552 | 36,614 |
| Implantable tissue and finished goods | 49,446 | 49,031 |
|  | $119,743 | $118,673 |

| Property, Plant and Equipment (Tables) | 12 Months Ended |
| --- | --- |
| | Dec. 31, 2016 |

**Property, Plant and Equipment [Abstract]**

Components of Property, Plant and Equipment

Property, plant and equipment are as follows:

| | December 31, | |
| --- | --- | --- |
| | 2016 | 2015 |
| Land | $ 2,324 | $ 2,319 |
| Buildings and improvements | 59,187 | 63,699 |
| Processing equipment | 38,387 | 41,831 |
| Surgical instruments | 18,394 | 15,702 |
| Office equipment, furniture and fixtures | 1,701 | 4,657 |
| Computer equipment and software | 11,852 | 11,804 |
| Construction in process | 17,554 | 10,850 |
| Office equipment under capital leases | — | 152 |
| | 149,399 | 151,014 |
| Less accumulated depreciation | (66,101) | (66,022) |
| | $ 83,298 | $ 84,992 |

| **Other Intangible Assets**<br>**(Tables)** | **12 Months Ended**<br>**Dec. 31, 2016** |
|---|---|

**Goodwill and Intangible Assets**
**Disclosure [Abstract]**

Components of Other Intangible Assets

Other intangible assets are as follows:

| | December 31, 2016 | | December 31, 2015 | |
|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Gross Carrying Amount | Accumulated Amortization |
| Patents | $ 11,559 | $ 4,159 | $ 11,532 | $ 3,448 |
| Acquired licensing rights | 12,204 | 8,302 | 10,850 | 7,691 |
| Marketing and procurement intangible assets | 20,694 | 8,002 | 22,179 | 7,209 |
| Total | $ 44,457 | $ 20,463 | $ 44,561 | $ 18,348 |

Estimates of Future Amortization Expense

At December 31, 2016, management's estimates of future amortization expense for the next five years are as follows:

| | Amortization Expense |
|---|---|
| 2017 | $ 3,400 |
| 2018 | 3,400 |
| 2019 | 3,400 |
| 2020 | 3,400 |
| 2021 | 3,400 |
| | $ 17,000 |

| **Fair Value Information** | **12 Months Ended** |
| :---: | :---: |
| **(Tables)** | **Dec. 31, 2016** |

**Fair Value Disclosures [Abstract]**

Summary of Impairments of Long-Lived Assets and Related Post Impairment Fair Values

The following table summarizes impairments of long-lived assets and the related post impairment fair values of the corresponding assets for the year ended December 31, 2016:

| | Year Ended December 31, 2016 | | | |
| --- | ---: | ---: | ---: | ---: |
| | **Impairment** | | **Fair Value** | |
| Property, plant and equipment - net | $ | 4,717 | $ | 4,708 |
| Other intangible assets - net | | 718 | | 150 |
| | $ | 5,435 | $ | 4,858 |

| **Accrued Expenses (Tables)** | **12 Months Ended** |
| | **Dec. 31, 2016** |

**Other Liabilities Disclosure [Abstract]**

Accrued Expenses

Accrued expenses are as follows:

| | December 31, | |
| --- | --- | --- |
| | **2016** | **2015** |
| Accrued compensation | $ 4,904 | $ 4,740 |
| Accrued severance charges | 410 | 865 |
| Accrued restructuring charges | 95 | — |
| Accrued CEO retirement and transition costs | 2,406 | — |
| Accrued distributor commissions | 4,422 | 3,835 |
| Accrued donor recovery fees | 6,350 | 7,144 |
| Accrued taxes | — | 514 |
| Accrued indemnification liability | — | 6,579 |
| Other | 3,443 | 4,932 |
| | $22,030 | $28,609 |

| **Short and Long-Term Obligations (Tables)** | **12 Months Ended Dec. 31, 2016** |
|---|---|

**Debt Disclosure [Abstract]**

Short and Long-Term Obligations

Short and long-term obligations are as follows:

| | December 31, | |
|---|---|---|
| | **2016** | **2015** |
| Term loan | $50,347 | $53,722 |
| Credit facilities | 33,000 | 25,477 |
| Capital leases | — | 38 |
| Total | 83,347 | 79,237 |
| Less current portion | (6,080) | (5,853) |
| Long-term portion | $77,267 | $73,384 |

Contractual Maturities of Long-Term Obligations

As of December 31, 2016, contractual maturities of short and long-term obligations are as follows:

| | **Term Loan** | **Credit Facilities** | **Total** |
|---|---|---|---|
| 2017 | $ 6,080 | $ — | $ 6,080 |
| 2018 | 44,267 | 33,000 | 77,267 |
| | $ 50,347 | $ 33,000 | $83,347 |

**Income Taxes (Tables)**

**12 Months Ended**

**Dec. 31, 2016**

## Income Tax Disclosure [Abstract]

Income Tax Benefit (Provision)

The Company's income tax benefit (provision) consists of the following components:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | 2014 |
| Current: | | | |
| Federal | $ (150) | $ (988) | $(1,062) |
| State | (92) | (159) | (150) |
| International | 456 | (544) | (86) |
| Total current | 214 | (1,691) | (1,298) |
| Deferred: | | | |
| Federal | 2,477 | (5,695) | (1,118) |
| State | 562 | 68 | (76) |
| International | (192) | (981) | 999 |
| Total deferred | 2,847 | (6,608) | (195) |
| Total income tax benefit (provision) | $3,061 | $(8,299) | $(1,493) |

Deferred Tax Assets and Liabilities

The components of the deferred tax assets and liabilities consisted of the following at:

| | December 31, 2016 | | December 31, 2015 | |
| --- | --- | --- | --- | --- |
| | Deferred Income Tax | | Deferred Income Tax | |
| | Assets | Liabilities | Assets | Liabilities |
| Allowance for bad debts | $ 485 | $ — | $ 376 | $ — |
| Deferred compensation | 4,675 | — | 4,013 | — |
| Inventory | 12,811 | — | 10,604 | — |
| Fixed assets and intangibles | — | (5,690) | — | (7,667) |
| Investments | 2,133 | — | 2,133 | — |
| Net operating losses | 4,547 | — | 2,830 | — |
| Tax credits | 5,235 | — | 4,645 | — |
| Deferred revenue | 3,804 | — | 4,968 | — |
| Accrued liabilities | 2,004 | — | 1,847 | — |
| Other | — | (120) | — | (258) |
| Valuation allowance | (4,916) | — | (1,106) | — |
| Total | $30,778 | $ (5,810) | $30,310 | $ (7,925) |

Unrecognized Tax Benefits

The Company's unrecognized tax benefits are summarized as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | 2014 |
| Opening balance | $1,986 | $1,787 | $2,825 |
| Reductions based on tax positions related to the current year | — | — | (136) |
| Additions for tax positions of prior years | — | 199 | — |
| Reductions for tax positions of prior years | (60) | — | (902) |
| Reductions for expiration of statute of limitations | (335) | — | — |
| | $1,591 | $1,986 | $1,787 |

Effective Tax Rate Differs from the Statutory Federal Income Tax Rate

The effective tax rate differs from the statutory federal income tax rate for the following reasons:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | 2014 |
| Statutory federal rate | 35.00% | 35.00% | 35.00% |
| State income taxes—net of federal tax | | | |

| | | | |
|---|---|---|---|
| benefit | 1.73% | 0.25% | 3.51% |
| Foreign rate differential | (3.29%) | (2.18%) | 4.99% |
| Other permanent items | (3.15%) | 0.56% | (1.25%) |
| Research tax credits | 7.02% | (0.28%) | (7.52%) |
| Domestic production activities deduction | 1.38% | — | (4.33%) |
| Valuation allowance | (21.71%) | 0.85% | 5.26% |
| Other reconciling items, net | 0.55% | 1.55% | (0.02%) |
| Effective tax rate | 17.53% | 35.75% | 35.64% |

**Preferred Stock (Tables)**

**12 Months Ended**

**Dec. 31, 2016**

**Equity [Abstract]**

Schedule of Preferred Stock

Preferred stock is as follows:

| | Preferred Stock Liquidation Value | | Preferred Stock Issuance Costs | | Net Total |
|---|---|---|---|---|---|
| Balance at January 1, 2014 | $ | 50,750 | $ | (1,213) | $49,537 |
| Accrued dividend payable | | 3,113 | | — | 3,113 |
| Amortization of preferred stock issuance costs | | — | | 184 | 184 |
| Balance at December 31, 2014 | | 53,863 | | (1,029) | 52,834 |
| Accrued dividend payable | | 3,305 | | — | 3,305 |
| Amortization of preferred stock issuance costs | | — | | 184 | 184 |
| Balance at December 31, 2015 | | 57,168 | | (845) | 56,323 |
| Accrued dividend payable | | 3,508 | | — | 3,508 |
| Amortization of preferred stock issuance costs | | — | | 185 | 185 |
| Balance at December 31, 2016 | $ | 60,676 | $ | (660) | $60,016 |

| **CEO Retirement and Transition Costs (Tables)** | **12 Months Ended Dec. 31, 2016** |
|---|---|

Schedule of Restructuring Charges

The following table includes a rollforward of restructuring charges included in accrued expenses, see Note 10.

| | |
|---|---|
| Accrued restructuring charges at January 1, 2016 | $ — |
| French distribution and tissue procurement office closure costs | 1,107 |
| Asset abandonments | (640) |
| Cash payments | (372) |
| Accrued restructuring charges at December 31, 2016 | $   95 |

Employee Severance [Member]

Schedule of Restructuring Charges

The following table includes a rollforward of severance charges included in accrued expenses, see Note 10.

| | |
|---|---|
| Accrued severance charges at January 1, 2015 | $ 2,771 |
| Employee separation expenses accrued in 2015 | 995 |
| Severance cash payments | (2,591) |
| Stock based compensation | (310) |
| Accrued severance charges at December 31, 2015 | 865 |
| Employee separation expenses accrued in 2016 | 1,039 |
| Severance cash payments | (1,494) |
| Accrued severance charges at December 31, 2016 | $   410 |

Former Chief Executive Officer [Member]

Schedule of Restructuring Charges

The following table includes a rollforward of CEO retirement and transition costs included in accrued expenses, see Note 10.

| | |
|---|---|
| Accrued CEO retirement and transition costs at January 1, 2016 | $   — |
| CEO retirement and transition costs accured in 2016 | 4,404 |
| Stock-based compensation | (1,535) |
| Cash payments | (463) |
| Accrued restructuring charges at December 31, 2016 | $ 2,406 |

| Concentrations of Risk (Tables) | 12 Months Ended Dec. 31, 2016 |
|---|---|

**Risks and Uncertainties [Abstract]**

Schedule of Percentage of Total Revenues Derived from Company's Largest Distributors and International Distribution

The following table presents percentage of total revenues derived from the Company's largest distributors and international distribution:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2016** | **2015** | **2014** |
| Percent of revenues derived from: | | | |
| Distributor | | | |
| Zimmer | 16% | 24% | 18% |
| Medtronic | 9% | 10% | 12% |
| Davol | 3% | 3% | 5% |
| International | 9% | 8% | 9% |

| **Commitments and Contingencies (Tables)** | **12 Months Ended** |
|---|---|
| | **Dec. 31, 2016** |

**Commitments and Contingencies Disclosure [Abstract]**

Future Minimum Lease Commitments under Non-Cancelable Operating Leases

Future minimum lease commitments under non-cancelable operating leases as of December 31, 2016 are as follows:

| | Operating Leases |
|---|---|
| 2017 | $ 1,936 |
| 2018 | 1,347 |
| 2019 | 1,007 |
| 2020 | 587 |
| 2021 and beyond | 115 |
| | $ 4,992 |

| **Segment Data (Tables)** | **12 Months Ended** |
| --- | --- |
| | **Dec. 31, 2016** |

**Segment Reporting [Abstract]**

Revenues from Tissue Distribution and Other Revenues

The following table presents revenues from these six categories and other revenues and their respective percentages of the Company's total revenues for the years ended December 31, 2016, 2015 and 2014:

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2016** | | **2015** | | **2014** | |
| | (In thousands) | | | | | |
| Revenues: | | | | | | |
| Spine | $ 73,907 | 27.1% | $ 57,983 | 20.5% | $ 52,270 | 19.9% |
| Sports medicine and orthopedics | 50,143 | 18.4% | 50,712 | 18.0% | 48,975 | 18.6% |
| Surgical specialties | 4,466 | 1.6% | 3,029 | 1.1% | 1,631 | 0.6% |
| Cardiothoracic | 11,147 | 4.1% | 8,699 | 3.1% | 6,997 | 2.7% |
| International | 21,185 | 7.8% | 18,338 | 6.5% | 20,327 | 7.7% |
| Subtotal direct | 160,848 | 59.0% | 138,761 | 49.2% | 130,200 | 49.5% |
| Global commercial | 99,127 | 36.3% | 129,930 | 46.0% | 120,910 | 46.0% |
| Other revenues | 12,890 | 4.7% | 13,602 | 4.8% | 11,700 | 4.5% |
| Total revenues | $272,865 | 100.0% | $282,293 | 100.0% | $262,810 | 100.0% |
| Domestic revenues | $247,756 | 90.8% | $260,387 | 92.2% | $238,936 | 90.9% |
| International revenues | 25,109 | 9.2% | 21,906 | 7.8% | 23,874 | 9.1% |
| Total revenues | $272,865 | 100.0% | $282,293 | 100.0% | $262,810 | 100.0% |

Schedule of Property, Plant and Equipment - Net by Significant Geographic Location

The following table presents property, plant and equipment - net by significant geographic location:

| | December 31, | |
| --- | --- | --- |
| | **2016** | **2015** |
| Property, plant and equipment - net: | | |
| Domestic | $77,596 | $72,901 |
| International | 5,702 | 12,091 |
| Total | $83,298 | $84,992 |

| **Quarterly Results of Operations (Unaudited) (Tables)** | **12 Months Ended**<br>**Dec. 31, 2016** |
|---|---|

**Quarterly Financial Information Disclosure [Abstract]**

Results of Operations

The following table sets forth the results of operations for the periods indicated:

| | March 31, 2016 | June 30, 2016 | September 30, 2016 | December 31, 2016 |
|---|---|---|---|---|
| Quarter Ended: | | | | |
| Revenues | $ 67,351 | $ 67,620 | $ 66,547 | $ 71,347 |
| Gross profit | 36,025 | 33,949 | 34,274 | 28,101 |
| Net income (loss) applicable to common shares | 1,543 | (3,162) | (4,489) | (11,799) |
| Net income (loss) per common share: | | | | |
| Basic | $ 0.03 | $ (0.05) | $ (0.08) | $ (0.20) |
| Diluted | 0.03 | (0.05) | $ (0.08) | $ (0.20) |

| | March 31, 2015 | June 30, 2015 | September 30, 2015 | December 31, 2015 |
|---|---|---|---|---|
| Quarter Ended: | | | | |
| Revenues | $ 68,034 | $ 71,609 | $ 66,529 | $ 76,121 |
| Gross profit | 36,999 | 37,203 | 35,233 | 40,307 |
| Net income applicable to common shares | 2,934 | 2,685 | 2,670 | 3,321 |
| Net income per common share: | | | | |
| Basic | $ 0.05 | $ 0.05 | $ 0.05 | $ 0.06 |
| Diluted | 0.05 | 0.05 | 0.05 | 0.06 |

| Summary of Significant Accounting Policies - Additional Information (Detail) | 3 Months Ended | 12 Months Ended | | |
|---|---|---|---|---|
| | Dec. 31, 2015 USD ($) $ / shares | Dec. 31, 2016 USD ($) Segment $ / shares shares | Dec. 31, 2015 USD ($) $ / shares shares | Dec. 31, 2014 $ / shares shares |
| **Summary Of Significant Accounting Policies [Line Items]** | | | | |
| Cash equivalents | $ 0 | $ 0 | $ 0 | |
| Banks and short-term investments with an original maturity | | Three months or less | | |
| Banks and short-term investments with an original maturity | | 3 months | | |
| Cash and cash equivalents including overnight repurchase agreements backed by US Government securities | | 101.00% | | |
| Asset abandonments | (814,000) | $ (5,435,000) | (814,000) | |
| Number of reportable segments | Segment | | 1 | | |
| Other identifiable intangible assets | $ 0 | $ 0 | $ 0 | |
| Acquired exclusivity rights, remaining amortization period | | 8 years | | |
| Dividend yield | | 0.00% | | |
| Common stock price ranging | $ / shares | $ 4.49 | $ 4.28 | $ 4.49 | |
| **Stock Options [Member]** | | | | |
| **Summary Of Significant Accounting Policies [Line Items]** | | | | |
| Dividend yield | | 0.00% | 0.00% | 0.00% |
| Antidilutive securities excluded from computation of earnings per share | shares | | 5,764,607 | 5,661,514 | 5,735,784 |
| **German Bank Credit Facilities [Member]** | | | | |
| **Summary Of Significant Accounting Policies [Line Items]** | | | | |
| Asset abandonments | | $ (5,400,000) | $ (814,000) | |
| **Convertible Preferred Stock [Member]** | | | | |
| **Summary Of Significant Accounting Policies [Line Items]** | | | | |
| Antidilutive securities excluded from computation of earnings per share | shares | | 50,000 | 50,000 | 50,000 |
| **Minimum [Member]** | | | | |
| **Summary Of Significant Accounting Policies [Line Items]** | | | | |
| Common stock price ranging | $ / shares | 2.69 | $ 2.69 | $ 2.69 | $ 2.69 |
| **Minimum [Member] | Patents [Member]** | | | | |
| **Summary Of Significant Accounting Policies [Line Items]** | | | | |
| Intangible assets, amortization period | | 8 years | | |
| **Minimum [Member] | Trademarks [Member]** | | | | |
| **Summary Of Significant Accounting Policies [Line Items]** | | | | |
| Intangible assets, amortization period | | 5 years | | |
| **Minimum [Member] | Acquired Licensing Rights [Member]** | | | | |
| **Summary Of Significant Accounting Policies [Line Items]** | | | | |
| Intangible assets, amortization period | | 5 years | | |
| **Minimum [Member] | Customer Lists [Member]** | | | | |
| **Summary Of Significant Accounting Policies [Line Items]** | | | | |

Intangible assets, amortization period — 5 years

**Minimum [Member] | Non-compete Agreements [Member]**

**Summary Of Significant Accounting Policies [Line Items]**

Intangible assets, amortization period — 5 years

Minimum [Member] | Distribution Agreement [Member]

**Summary Of Significant Accounting Policies [Line Items]**

Intangible assets, amortization period — 5 years

Minimum [Member] | Procurement Contracts [Member]

**Summary Of Significant Accounting Policies [Line Items]**

Intangible assets, amortization period — 5 years

Maximum [Member]

**Summary Of Significant Accounting Policies [Line Items]**

Common stock price ranging | $ / shares — $ 9.57 | $ 9.57 | $ 9.57 | $ 9.57

Maximum [Member] | Patents [Member]

**Summary Of Significant Accounting Policies [Line Items]**

Intangible assets, amortization period — 16 years

Maximum [Member] | Trademarks [Member]

**Summary Of Significant Accounting Policies [Line Items]**

Intangible assets, amortization period — 25 years

Maximum [Member] | Acquired Licensing Rights [Member]

**Summary Of Significant Accounting Policies [Line Items]**

Intangible assets, amortization period — 25 years

Maximum [Member] | Customer Lists [Member]

**Summary Of Significant Accounting Policies [Line Items]**

Intangible assets, amortization period — 25 years

Maximum [Member] | Non-compete Agreements [Member]

**Summary Of Significant Accounting Policies [Line Items]**

Intangible assets, amortization period — 25 years

Maximum [Member] | Distribution Agreement [Member]

**Summary Of Significant Accounting Policies [Line Items]**

Intangible assets, amortization period — 25 years

Maximum [Member] | Procurement Contracts [Member]

**Summary Of Significant Accounting Policies [Line Items]**

Intangible assets, amortization period — 25 years

| Summary of Significant Accounting Policies - Property, Plant, and Equipment are Stated at Cost Less Accumulated Depreciation (Detail) | 12 Months Ended Dec. 31, 2016 |
|---|---|
| Minimum [Member] \| Building [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment useful life | 25 years |
| Minimum [Member] \| Buildings and Improvements [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment useful life | 8 years |
| Minimum [Member] \| Processing Equipment [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment useful life | 7 years |
| Minimum [Member] \| Office Equipment, Furniture and Fixtures [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment useful life | 5 years |
| Minimum [Member] \| Computer Hardware and Software [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment useful life | 3 years |
| Minimum [Member] \| Surgical Instruments [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment useful life | 3 years |
| Maximum [Member] \| Building [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment useful life | 40 years |
| Maximum [Member] \| Buildings and Improvements [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment useful life | 40 years |
| Maximum [Member] \| Processing Equipment [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment useful life | 10 years |
| Maximum [Member] \| Office Equipment, Furniture and Fixtures [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment useful life | 7 years |
| Maximum [Member] \| Computer Hardware and Software [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment useful life | 7 years |
| Maximum [Member] \| Surgical Instruments [Member] | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment useful life | 5 years |

| Summary of Significant Accounting Policies - Reconciliation of Common Stock Used in Calculation of Basic and Diluted Earnings Per Share (Detail) - shares | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Earnings Per Share [Abstract]** | | | |
| Basic shares | 58,236,745 | 57,611,231 | 56,735,924 |
| Effect of dilutive securities: Stock options | | 979,263 | |
| Diluted shares | 58,236,745 | 58,590,494 | 56,735,924 |

| Recently Issued Accounting Standards - Additional Information (Detail) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Accounting Changes and Error Corrections [Abstract]** | | |
| Debt issuance costs | $ 403 | $ 403 |

| Stock-Based Compensation - Additional Information (Detail) - USD ($) $ / shares in Units, $ in Thousands | 3 Months Ended | | 12 Months Ended | | |
|---|---|---|---|---|---|
| | Sep. 30, 2016 | Mar. 31, 2016 | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | |
| Contractual term of stock options granted | | | 10 years | | |
| Percentage of market value of common stock, stock options exercise price | | | 100.00% | | |
| Percentage of market value of common stock, restricted stock award granted | | | 100.00% | | |
| Income tax benefits | | | $ (3,061) | $ 8,299 | $ 1,493 |
| Total unrecognized stock-based compensation | | | $ 961 | | |
| Stock-based compensation awards, weighted-average period recognized | | | 1 year 4 months 24 days | | |
| Restricted Stock Awards [Member] | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | |
| Stock-based compensation award, vesting period | 1 year | | | | |
| Restricted stock granted during period | 162,160 | | | | |
| Weighted-average grant date fair value of restricted stock granted | $ 3.70 | | | | |
| Restricted Stock Awards [Member] \| Minimum [Member] | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | |
| Stock-based compensation award, vesting period | | | 1 year | | |
| Restricted Stock Awards [Member] \| Maximum [Member] | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | |
| Stock-based compensation award, vesting period | | | 3 years | | |
| Stock Options [Member] | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | |
| Income tax benefits | | | $ 1,460 | $ 1,022 | $ 1,198 |
| Total unrecognized stock-based compensation | | | $ 2,212 | | |
| Stock-based compensation awards, weighted-average period recognized | | | 2 years 11 months 1 day | | |
| Stock Options [Member] \| Minimum [Member] | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | |
| Stock-based compensation award, vesting period | | | 1 year | | |
| Stock Options [Member] \| Maximum [Member] | | | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | | | |
| Stock-based compensation award, vesting period | | | 5 years | | |
| 2015 Equity Incentive Plan [Member] | | | | | |

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

| | |
|---|---|
| Shares of common stock allowed to be issued | 4,656,587 |
| Performance Based Restricted Stock [Member] | |

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

| | |
|---|---|
| Stock-based compensation award, vesting period | 3 years |
| Restricted stock granted during period | 223,563 |
| Weighted-average grant date fair value of restricted stock granted | $ 3.31 |
| Time Based Restricted Stock [Member] | |

**Share-based Compensation Arrangement by Share-based Payment Award [Line Items]**

| | |
|---|---|
| Stock-based compensation award, vesting period | 3 years |
| Restricted stock granted during period | 223,563 |
| Weighted-average grant date fair value of restricted stock granted | $ 3.31 |

| Stock-Based Compensation - Weighted-Average Assumptions Used to Determine Fair Value of Options (Detail) | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Dividend yield | 0.00% | | |
| Stock Options [Member] | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Expected term (years) | 6 years 6 months | 6 years 6 months | 6 years 6 months |
| Risk free interest rate | 1.85% | 1.67% | 2.29% |
| Volatility factor | 45.57% | 46.29% | 46.53% |
| Dividend yield | 0.00% | 0.00% | 0.00% |

| Stock-Based Compensation - Stock Options Outstanding, Exercisable and Available for Grant (Detail) $ / shares in Units, $ in Thousands | 12 Months Ended Dec. 31, 2016 USD ($) $ / shares shares |
|---|---|
| **Disclosure of Compensation Related Costs, Share-based Payments [Abstract]** | |
| Outstanding, Number of Options | 5,661,514 |
| Granted, Number of Options | 619,352 |
| Exercised, Number of Options | (21,000) |
| Forfeited or expired, Number of Options | (495,259) |
| Outstanding, Number of Options | 5,764,607 |
| Vested or expected to vest, Number of Options | 5,590,546 |
| Exercisable, Number of Options | 4,082,632 |
| Available for grant, Number of Options | 3,314,686 |
| Outstanding, Weighted Average Exercise Price \| $ / shares | $ 4.49 |
| Granted, Weighted Average Exercise Price \| $ / shares | 3.31 |
| Exercised, Weighted Average Exercise Price \| $ / shares | 2.72 |
| Forfeited or expired, Weighted Average Exercise Price \| $ / shares | 5.54 |
| Outstanding, Weighted Average Exercise Price \| $ / shares | 4.28 |
| Vested or expected to vest, Weighted Average Exercise Price \| $ / shares | 4.28 |
| Exercisable, Weighted Average Exercise Price \| $ / shares | $ 4.33 |
| Outstanding, Weighted Average Remaining Contractual Life (Years) | 4 years 5 months 27 days |
| Vested or expected to vest, Weighted Average Remaining Contractual Life (Years) | 4 years 4 months 6 days |
| Exercisable, Weighted Average Remaining Contractual Life (Years) | 3 years 26 days |
| Outstanding, Aggregate Intrinsic Value \| $ | $ 348 |
| Vested or expected to vest, Aggregate Intrinsic Value \| $ | 348 |
| Exercisable, Aggregate Intrinsic Value \| $ | $ 348 |

| Stock-Based Compensation - Stock-Based Compensation Recognized (Detail) - USD ($) $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Share-based Compensation Arrangement by Share-based Payment Award, Compensation Cost [Line Items]** | | | |
| Stock-based compensation | $ 3,590 | $ 2,548 | $ 3,032 |
| Costs of Processing and Distribution [Member] | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award, Compensation Cost [Line Items]** | | | |
| Stock-based compensation | 140 | 132 | 132 |
| Marketing, General and Administrative [Member] | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award, Compensation Cost [Line Items]** | | | |
| Stock-based compensation | 3,406 | 2,356 | 2,840 |
| Research and Development [Member] | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award, Compensation Cost [Line Items]** | | | |
| Stock-based compensation | $ 44 | $ 60 | $ 60 |

| Stock-Based Compensation - Other Information Concerning Stock Options (Detail) - USD ($) $ / shares in Units, $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Disclosure of Compensation Related Costs, Share-based Payments [Abstract]** | | | |
| Weighted average fair value of stock options granted | $ 1.55 | $ 2.50 | $ 1.87 |
| Aggregate intrinsic value of stock options exercised | $ 12 | $ 1,584 | $ 295 |

| Inventories - Components of Inventories (Detail) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Inventory Disclosure [Abstract]** | | |
| Unprocessed tissue, raw materials and supplies | $ 31,745 | $ 33,028 |
| Tissue and work in process | 38,552 | 36,614 |
| Implantable tissue and finished goods | 49,446 | 49,031 |
| Inventory - net | $ 119,743 | $ 118,673 |

| Inventories - Additional Information (Detail) - USD ($) $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Inventory [Line Items]** | | | |
| Provision for inventory write-downs | $ 13,880 | $ 5,390 | $ 3,763 |
| Excess inventory charge | 9,556 | | |
| Hernia and Sports Medicine Inventory [Member] | | | |
| **Inventory [Line Items]** | | | |
| Excess inventory charge | $ 9,556 | | |

| Property, Plant and Equipment - Components of Property, Plant and Equipment (Detail) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Property, Plant and Equipment [Line Items]** | | |
| Property, plant and equipment, gross | $ 149,399 | $ 151,014 |
| Less accumulated depreciation | (66,101) | (66,022) |
| Property, plant and equipment, net | 83,298 | 84,992 |
| Land [Member] | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Property, plant and equipment, gross | 2,324 | 2,319 |
| Buildings and Improvements [Member] | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Property, plant and equipment, gross | 59,187 | 63,699 |
| Processing Equipment [Member] | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Property, plant and equipment, gross | 38,387 | 41,831 |
| Surgical Instruments [Member] | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Property, plant and equipment, gross | 18,394 | 15,702 |
| Office Equipment, Furniture and Fixtures [Member] | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Property, plant and equipment, gross | 1,701 | 4,657 |
| Computer Equipment and Software [Member] | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Property, plant and equipment, gross | 11,852 | 11,804 |
| Construction in Process [Member] | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Property, plant and equipment, gross | $ 17,554 | 10,850 |
| Office Equipment Under Capital Leases [Member] | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Property, plant and equipment, gross | | $ 152 |

| **Property,Plant and Equipment - Additional Information (Detail) - USD ($)** <br> **$ in Thousands** | **12 Months Ended** | | |
|---|---|---|---|
| | **Dec. 31, 2016** | **Dec. 31, 2015** | **Dec. 31, 2014** |
| **Property, Plant and Equipment [Abstract]** | | | |
| Depreciation expense in connection with property, plant and equipment | $ 12,835 | $ 12,240 | $ 11,010 |

| Goodwill - Additional Information (Detail) - USD ($) $ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Goodwill and Intangible Assets Disclosure [Abstract]** | | |
| Goodwill | $ 54,887 | $ 54,887 |
| Goodwill impairment loss | $ 0 | |

| Other Intangible Assets - Components of Other Intangible Assets (Detail) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Finite-Lived Intangible Assets [Line Items]** | | |
| Gross Carrying Amount | $ 44,457 | $ 44,561 |
| Accumulated Amortization | 20,463 | 18,348 |
| Patents [Member] | | |
| **Finite-Lived Intangible Assets [Line Items]** | | |
| Gross Carrying Amount | 11,559 | 11,532 |
| Accumulated Amortization | 4,159 | 3,448 |
| Acquired Licensing Rights [Member] | | |
| **Finite-Lived Intangible Assets [Line Items]** | | |
| Gross Carrying Amount | 12,204 | 10,850 |
| Accumulated Amortization | 8,302 | 7,691 |
| Marketing and Procurement Intangible Assets [Member] | | |
| **Finite-Lived Intangible Assets [Line Items]** | | |
| Gross Carrying Amount | 20,694 | 22,179 |
| Accumulated Amortization | $ 8,002 | $ 7,209 |

| Other Intangible Assets - Additional Information (Detail) - USD ($) $ in Thousands | 12 Months Ended | | |
| --- | --- | --- | --- |
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Goodwill and Intangible Assets Disclosure [Abstract]** | | | |
| Amortization expense of other intangible assets | $ 3,675 | $ 4,282 | $ 4,385 |

| Other Intangible Assets - Estimates of Future Amortization Expense (Detail) $ in Thousands | Dec. 31, 2016 USD ($) |
|---|---|
| **Goodwill and Intangible Assets Disclosure [Abstract]** | |
| 2017 | $ 3,400 |
| 2018 | 3,400 |
| 2019 | 3,400 |
| 2020 | 3,400 |
| 2021 | 3,400 |
| Total future amortization expense | $ 17,000 |

| Fair Value Information - Summary of Impairments of Long-Lived Assets and Related Post Impairment Fair Values (Detail) $ in Thousands | 12 Months Ended Dec. 31, 2016 USD ($) |
|---|---|
| **Fair Value Disclosures [Abstract]** | |
| Property, plant and equipment - net, impairment | $ 4,717 |
| Other intangible assets - net, impairment | 718 |
| Asset impairment | 5,435 |
| Property, plant and equipment - net, fair value | 4,708 |
| Other intangible assets - net, fair value | 150 |
| Post impairment fair values | $ 4,858 |

| Accrued Expenses - Accrued Expenses (Detail) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Payables and Accruals [Abstract]** | | |
| Accrued compensation | $ 4,904 | $ 4,740 |
| Accrued severance charges | 410 | 865 |
| Accrued restructuring charges | 95 | |
| Accrued CEO retirement and transition costs | 2,406 | |
| Accrued distributor commissions | 4,422 | 3,835 |
| Accrued donor recovery fees | 6,350 | 7,144 |
| Accrued taxes | | 514 |
| Accrued indemnification liability | | 6,579 |
| Other | 3,443 | 4,932 |
| Total accrued expenses | $ 22,030 | $ 28,609 |

| Accrued Expenses - Additional Information (Detail) - USD ($) $ in Thousands | 12 Months Ended | | | |
|---|---|---|---|---|
| | Jul. 11, 2016 | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Payables and Accruals [Abstract]** | | | | |
| Reduction in prepaid and other current assets | $ 6,694 | | | |
| Reduction in accrued expenses | $ 6,579 | $ (6,536) | $ 5,532 | $ 1,375 |

| Short and Long-Term Obligations - Short and Long-Term Obligations (Detail) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Debt Disclosure [Abstract]** | | |
| Term loan | $ 50,347 | $ 53,722 |
| Credit facilities | 33,000 | 25,477 |
| Capital leases | | 38 |
| Debt and capital lease obligation, total | 83,347 | 79,237 |
| Debt and capital lease obligation, total | 83,347 | 79,237 |
| Less current portion | (6,080) | (5,853) |
| Long-term portion | $ 77,267 | $ 73,384 |

| Short and Long-Term Obligations - Additional Information (Detail) | Mar. 31, 2017 | 1 Months Ended Nov. 07, 2016 USD ($) | Feb. 28, 2017 | 12 Months Ended Dec. 31, 2016 USD ($) Debt_Instruments | Dec. 31, 2015 USD ($) | Dec. 31, 2014 USD ($) | Nov. 06, 2016 USD ($) | Jun. 29, 2016 USD ($) | Jun. 29, 2015 USD ($) |
|---|---|---|---|---|---|---|---|---|---|
| **Line of Credit Facility [Line Items]** | | | | | | | | | |
| Credit outstanding | | | | $ 33,000,000 | $ 25,477,000 | | | | |
| Interest expense associated with the amortization of debt issuance costs | | | | 202,000 | $ 148,000 | $ 142,000 | | | |
| Minimum [Member] | | | | | | | | | |
| **Line of Credit Facility [Line Items]** | | | | | | | | | |
| Leverage to EBITDA Ratio | | 250.00% | | | | | | | |
| Maximum [Member] | | | | | | | | | |
| **Line of Credit Facility [Line Items]** | | | | | | | | | |
| Leverage to EBITDA Ratio | | 325.00% | | | | | | | |
| Scenario, Forecast [Member] | | | | | | | | | |
| **Line of Credit Facility [Line Items]** | | | | | | | | | |
| Leverage to EBITDA Ratio | 300.00% | | | | | | | | |
| Credit Facilities [Member] | | | | | | | | | |
| **Line of Credit Facility [Line Items]** | | | | | | | | | |
| Credit outstanding | | | | $ 33,000,000 | | | | | |
| Long-term obligations outstanding, number \| Debt_Instruments | | | | 1 | | | | | |
| Current borrowing capacity | | | | $ 9,500,000 | | | | | |
| TD Bank and Regions Bank Senior Secured Facility [Member] | | | | | | | | | |
| **Line of Credit Facility [Line Items]** | | | | | | | | | |
| Term of senior secured credit facility | | | | 5 years | | | | | |
| Amount of senior secured facility obtained | | | | $ 80,000,000 | | | | | |
| Maturity date of senior secured credit facility | | | | Jul. 16, 2018 | | | | | |
| Description of variable interest rate basis | | | | One month LIBOR rate | | | | | |
| Revolving credit facility, variable interest rate | | | | 3.37% | | | | | |
| Aggregate principal payment on term loan | | | | $ 8,250,000 | | | | | |
| Minimum cash balance required for covenant compliance | | | | $ 10,000,000 | | | | | |
| Covenant Terms of Credit | | | | The credit | | | | | |

| Facility | | | | | |
|---|---|---|---|---|---|
| | agreement also contains various restrictive covenants which limit, among other things, indebtedness and liens, as well as payment of dividends, while requiring a minimum cash balance on hand of $10,000 and certain financial covenant ratios. | | | | |
| Amount of final balloon principal payment | | $ 41,375,000 | | | |

**TD Bank and Regions Bank Senior Secured Facility [Member] | Minimum [Member]**

**Line of Credit Facility [Line Items]**

| | | | | | |
|---|---|---|---|---|---|
| Variable interest rate | | 1.00% | | | |

**TD Bank and Regions Bank Senior Secured Facility [Member] | Maximum [Member]**

**Line of Credit Facility [Line Items]**

| | | | | | |
|---|---|---|---|---|---|
| Variable interest rate | | 2.75% | | | |

**TD Bank and Regions Bank Senior Secured Facility [Member] | Scenario, Forecast [Member]**

**Line of Credit Facility [Line Items]**

| | | | | | |
|---|---|---|---|---|---|
| Variable interest rate | 3.00% | | | | |

**TD Bank and Regions Bank Senior Secured Facility [Member] | Revolving Credit Facility [Member]**

**Line of Credit Facility [Line Items]**

| | | | | | |
|---|---|---|---|---|---|
| Credit facility, borrowing capacity | $ 42,500,000 | $ 20,000,000 | $ 45,000,000 | $ 45,000,000 | $ 30,000,000 |

**TD Bank and Regions Bank Senior Secured Facility [Member] | Term Loan [Member]**

**Line of Credit Facility [Line Items]**

| | | | | | |
|---|---|---|---|---|---|
| Amount of senior secured facility obtained | | $ 60,000,000 | | | |

**German Bank Credit Facilities [Member]**

**Line of Credit Facility [Line Items]**

| | | | | | |
|---|---|---|---|---|---|
| Long-term obligations outstanding, number \| Debt Instruments | | 3 | | | |

Number of credit facilities paid
off and cancelled |                                    3
Debt_Instruments

| Short and Long-Term Obligations - Contractual Maturities of Long-Term Obligations (Detail) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Debt Instrument [Line Items]** | | |
| 2017 | $ 6,080 | |
| 2018 | 77,267 | |
| Debt and capital lease obligation, total | 83,347 | $ 79,237 |
| Term Loan [Member] | | |
| **Debt Instrument [Line Items]** | | |
| 2017 | 6,080 | |
| 2018 | 44,267 | |
| Debt and capital lease obligation, total | 50,347 | |
| Credit Facilities [Member] | | |
| **Debt Instrument [Line Items]** | | |
| 2018 | 33,000 | |
| Debt and capital lease obligation, total | $ 33,000 | |

| Income Taxes - Income Tax Benefit (Provision) (Detail) - USD ($) $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Current:** | | | |
| Federal | $ (150) | $ (988) | $ (1,062) |
| State | (92) | (159) | (150) |
| International | 456 | (544) | (86) |
| Total current | 214 | (1,691) | (1,298) |
| **Deferred:** | | | |
| Federal | 2,477 | (5,695) | (1,118) |
| State | 562 | 68 | (76) |
| International | (192) | (981) | 999 |
| Total deferred | 2,847 | (6,608) | (195) |
| Total income tax benefit (provision) | $ 3,061 | $ (8,299) | $ (1,493) |

| Income Taxes - Deferred Tax Assets and Liabilities (Detail) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Income Tax Disclosure [Abstract]** | | |
| Deferred income tax asset, allowance for bad debts | $ 485 | $ 376 |
| Deferred income tax asset, deferred compensation | 4,675 | 4,013 |
| Deferred income tax asset, inventory | 12,811 | 10,604 |
| Deferred income tax asset, fixed assets and intangibles | 0 | 0 |
| Deferred income tax asset, investments | 2,133 | 2,133 |
| Deferred income tax asset, net operating losses | 4,547 | 2,830 |
| Deferred income tax asset, tax credits | 5,235 | 4,645 |
| Deferred income tax asset, deferred revenue | 3,804 | 4,968 |
| Deferred income tax asset, accrued liabilities | 2,004 | 1,847 |
| Deferred income tax asset, other | 0 | 0 |
| Deferred income tax asset, valuation allowance | (4,916) | (1,106) |
| Deferred income tax asset, total | 30,778 | 30,310 |
| Deferred income tax liability, allowance for bad debts | 0 | 0 |
| Deferred income tax liability, deferred compensation | 0 | 0 |
| Deferred income tax liability, inventory | 0 | 0 |
| Deferred income tax liability, fixed assets and intangibles | (5,690) | (7,667) |
| Deferred income tax liability, investments | 0 | 0 |
| Deferred income tax liability, net operating losses | 0 | 0 |
| Deferred income tax liability, tax credits | 0 | 0 |
| Deferred income tax liability, deferred revenue | 0 | 0 |
| Deferred income tax liability, accrued liabilities | 0 | 0 |
| Deferred income tax liability, other | (120) | (258) |
| Deferred income tax liability, valuation allowance | 0 | 0 |
| Deferred income tax liability, total | $ (5,810) | $ (7,925) |

| Income Taxes - Additional Information (Detail) - USD ($) | 12 Months Ended | | | |
|---|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 | Dec. 31, 2013 |
| **Operating Loss Carryforwards [Line Items]** | | | | |
| Deferred tax assets | $ 24,968,000 | | | |
| Deferred tax assets, valuation allowances | 4,916,000 | | | |
| Tax benefit from exercise of stock options | 546,000 | $ 1,139,000 | $ 539,000 | |
| Research tax credit carryforwards | $ 6,002,000 | | | |
| Research tax credit carryforwards, first year of expiration period | 2028 | | | |
| Research tax credit carryforwards, last year of expiration period | 2036 | | | |
| Alternative minimum tax credit carryforwards | $ 827,000 | | | |
| Undistributed earnings of foreign subsidiaries | $ 5,031,000 | 11,227,000 | | |
| Primary measure of cumulative losses, number of rolling years | 3 years | | | |
| Utilized percentage of deferred tax assets before expiration | 100.00% | | | |
| Unrecognized tax benefits | $ 1,591,000 | 1,986,000 | 1,787,000 | $ 2,825,000 |
| Interest and penalties recorded | 0 | 0 | 0 | |
| Interest and penalties accrued | 0 | 0 | | |
| Significant other reconciling items | 0 | 0 | $ 0 | |
| Domestic Tax Authority [Member] | | | | |
| **Operating Loss Carryforwards [Line Items]** | | | | |
| Deferred tax assets, valuation allowances | 4,916,000 | $ 1,106,000 | | |
| U S Federal [Member] | | | | |
| **Operating Loss Carryforwards [Line Items]** | | | | |
| Net operating loss carryforwards | 1,978,000 | | | |
| Net operating loss carryforwards, expiration start year | | 2026 | | |
| Net operating loss carryforwards, expiration end year | | | 2027 | |
| U S State [Member] | | | | |
| **Operating Loss Carryforwards [Line Items]** | | | | |
| Net operating loss carryforwards | $ 22,799,000 | | | |
| Net operating loss carryforward expiration period, start year | 2018 | | | |
| Net operating loss carryforward expiration period, end year | 2036 | | | |
| Foreign Tax Authority [Member] | | | | |
| **Operating Loss Carryforwards [Line Items]** | | | | |
| Net operating loss carryforwards | $ 10,194,000 | | | |
| Foreign Tax Authority [Member] \| Earliest Tax Year [Member] | | | | |
| **Operating Loss Carryforwards [Line Items]** | | | | |
| Income tax examination year | 2010 | | | |
| Foreign Tax Authority [Member] \| Latest Tax Year [Member] | | | | |
| **Operating Loss Carryforwards [Line Items]** | | | | |
| Income tax examination year | 2013 | | | |

| Income Taxes - Unrecognized Tax Benefits (Detail) - USD ($) $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Income Tax Disclosure [Abstract]** | | | |
| Opening balance | $ 1,986 | $ 1,787 | $ 2,825 |
| Reductions based on tax positions related to the current year | | | (136) |
| Additions for tax positions of prior years | | 199 | |
| Reductions for tax positions of prior years | (60) | | (902) |
| Reductions for expiration of statute of limitations | (335) | | |
| Closing balance | $ 1,591 | $ 1,986 | $ 1,787 |

| **Income Taxes - Effective Tax Rate Differs from the Statutory Federal Income Tax Rate (Detail)** | **12 Months Ended** | | |
|---|---|---|---|
| | **Dec. 31, 2016** | **Dec. 31, 2015** | **Dec. 31, 2014** |
| **Income Tax Disclosure [Abstract]** | | | |
| Statutory federal rate | 35.00% | 35.00% | 35.00% |
| State income taxes-net of federal tax benefit | 1.73% | 0.25% | 3.51% |
| Foreign rate differential | (3.29%) | (2.18%) | 4.99% |
| Other permanent items | (3.15%) | 0.56% | (1.25%) |
| Research tax credits | 7.02% | (0.28%) | (7.52%) |
| Domestic production activities deduction | 1.38% | | (4.33%) |
| Valuation allowance | (21.71%) | 0.85% | 5.26% |
| Other reconciling items, net | 0.55% | 1.55% | (0.02%) |
| Effective tax rate | 17.53% | 35.75% | 35.64% |

| Preferred Stock - Schedule of Preferred Stock (Detail) - USD ($) $ in Thousands | 12 Months Ended | | | |
| --- | --- | --- | --- | --- |
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 | Jan. 01, 2014 |
| **Temporary Equity [Line Items]** | | | | |
| Net Total | $ 60,016 | $ 56,323 | $ 52,834 | $ 49,537 |
| Accrued dividend payable | 3,508 | 3,305 | 3,113 | |
| Amortization of preferred stock issuance costs | 185 | 184 | 184 | |
| Amortization of preferred stock issuance costs | 185 | 184 | 184 | |
| Series A Preferred Stock [Member] | | | | |
| **Temporary Equity [Line Items]** | | | | |
| Preferred Stock Liquidation Value | 60,676 | 57,168 | 53,863 | 50,750 |
| Preferred Stock Issuance Costs | (660) | (845) | (1,029) | $ (1,213) |
| Accrued dividend payable | $ 3,508 | $ 3,305 | $ 3,113 | |

| Preferred Stock - Additional Information (Detail) - Private Placement with WSHP [Member] - USD ($) $ / shares in Units, $ in Thousands | | | 12 Months Ended |
|---|---|---|---|
| | Jul. 15, 2013 | Jun. 12, 2013 | Dec. 31, 2016 |
| Convertible Preferred Stock [Member] | | | |
| **Temporary Equity [Line Items]** | | | |
| Convertible preferred stock issued | | $ 50,000 | |
| Convertible preferred stock, par value | $ 0.001 | | |
| Series A Preferred Stock [Member] | | | |
| **Temporary Equity [Line Items]** | | | |
| Preferred stock dividend rate | 6.00% | | |
| Preferred stock conversion price per share | $ 4.39 | | |
| Convertible preferred stock, shares to be issued upon approval for each share of preferred stock | 228 | | |
| Closing price of share | $ 7.98 | | |
| Convertible preferred stock, Description of Conversion | | | The Preferred Stock will be convertible at the election of the holders into shares of the Company's common stock at an initial conversion price of $4.39 per share which would result in a conversion ratio of approximately 228 shares of common stock for each share of Preferred Stock. The Preferred Stock is convertible at the election of the Company five years after its issuance or at any time if the Company's common stock closes at or above $7.98 per share for at least 20 consecutive trading days. |
| Preferred stock conversion period after issuance | 5 years | | |
| Liquidation value | $ 1,000 | | |
| Convertible preferred stock, Description of Conversion Two | | | The Company may, upon 30 days notice, redeem the Preferred Stock, in whole or in part, five years after its issuance at the initial liquidation preference of $1,000 per share of the Preferred Stock plus an amount per share equal to accrued but unpaid dividends (collectively, the "Liquidation Value"). The holders of the Preferred Stock may require the Company to redeem their Preferred Stock, in whole or in part, at the Liquidation Value seven years after its issuance or upon the occurrence of a change of control. |
| Preferred stock conversion after issuance, Conversion Two | 7 years | | |
| Series A Preferred Stock [Member] \| Minimum [Member] | | | |
| **Temporary Equity [Line Items]** | | | |
| Consecutive trading days | 20 days | | |

| Stockholders' Equity - Additional Information (Detail) | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 Vote shares | Dec. 31, 2015 shares |
| **Equity [Abstract]** | | |
| Preferred stock, shares authorized | 5,000,000 | 5,000,000 |
| Preferred stock, shares issued | 50,000 | 50,000 |
| Preferred stock, shares outstanding | 50,000 | 50,000 |
| Common stock, shares authorized | 150,000,000 | 150,000,000 |
| Votes per common share \| Vote | 1 | |

| **Strategic Review Costs - Additional Information (Detail) $ in Thousands** | **12 Months Ended** |
|---|---|
| | **Dec. 31, 2016 USD ($)** |
| **Research and Development [Abstract]** | |
| Strategic review costs | $ 1,150 |

| CEO Retirement and Transition Costs - Additional Information (Detail)<br>$ in Thousands | 12 Months Ended<br>Dec. 31, 2016<br>USD ($) |
|---|---|
| **Postemployment Benefits Disclosure [Line Items]** | |
| Retirement and transition costs | $ 4,404 |
| Former Chief Executive Officer [Member] | |
| **Postemployment Benefits Disclosure [Line Items]** | |
| Retirement and transition costs | $ 4,404 |

| CEO Retirement and Transition Costs - Schedule of Restructuring Charges (Detail) - USD ($) $ in Thousands | 12 Months Ended | |
| --- | --- | --- |
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Restructuring Cost and Reserve [Line Items]** | | |
| CEO retirement and transition costs accrued in 2016 | $ 4,404 | |
| Stock-based compensation | | $ (310) |
| Cash payments | (372) | |
| Accrued restructuring charges at December 31, 2016 | 2,406 | |
| Former Chief Executive Officer [Member] | | |
| **Restructuring Cost and Reserve [Line Items]** | | |
| CEO retirement and transition costs accrued in 2016 | 4,404 | |
| Stock-based compensation | (1,535) | |
| Cash payments | (463) | |
| Accrued restructuring charges at December 31, 2016 | $ 2,406 | |

| Contested Proxy Expenses - Additional Information (Detail) $ in Thousands | 12 Months Ended Dec. 31, 2016 USD ($) |
|---|---|
| **Other Income and Expenses [Abstract]** | |
| Contested proxy expenses | $ 2,680 |

| Restructuring Charges - Additional Information (Detail) $ in Thousands | 12 Months Ended Dec. 31, 2016 USD ($) |
|---|---|

**Restructuring and Related Activities [Abstract]**

| | |
|---|---|
| French distribution and tissue procurement office closure costs | $ 1,107 |

| Restructuring Charges - Schedule of Restructuring Charges (Detail) $ in Thousands | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 USD ($) |
| **Restructuring and Related Activities [Abstract]** | |
| French distribution and tissue procurement office closure costs | $ 1,107 |
| Asset abandonments | (640) |
| Cash payments | (372) |
| Accrued restructuring charges, ending balance | $ 95 |

| Severance Charges - Additional Information (Detail) - USD ($) $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Restructuring and Related Activities [Abstract]** | | | |
| Severance charges related to the termination of former employees | $ 1,039 | $ 995 | $ 4,798 |

| Severance Charges - Schedule of Restructuring Charges (Detail) - USD ($) $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Restructuring Cost and Reserve [Line Items]** | | | |
| Employee separation expenses accrued | $ 1,039 | $ 995 | $ 4,798 |
| Severance cash payments | (372) | | |
| Stock based compensation | | (310) | |
| Accrued restructuring charges, ending balance | 95 | | |
| Employee Severance [Member] | | | |
| **Restructuring Cost and Reserve [Line Items]** | | | |
| Accrued restructuring charges, beginning balance | 865 | 2,771 | |
| Employee separation expenses accrued | 1,039 | 995 | |
| Severance cash payments | (1,494) | (2,591) | |
| Stock based compensation | | (310) | |
| Accrued restructuring charges, ending balance | $ 410 | $ 865 | $ 2,771 |

| Retirement Benefits - Additional Information (Detail) - USD ($) $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |
| Cost recognized under benefit plan | $ 3,094 | $ 3,034 | $ 2,663 |
| Maximum [Member] | | | |
| **Defined Benefit Plan Disclosure [Line Items]** | | | |
| Retirement benefits, employer contribution percent | 6.00% | | |

| Concentrations of Risk - Additional Information (Detail) | 12 Months Ended |
| --- | --- |
| | Dec. 31, 2016 Companies |
| **Risks and Uncertainties [Abstract]** | |
| Companies with revenues | 12 |
| Companies with significant revenues | 3 |

| Concentrations of Risk - Schedule of Percentage of Total Revenues Derived from Company's Largest Distributors and International Distribution (Detail) - Distributors Concentration Risk [Member] - Sales Revenue, Net [Member] | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Zimmer Biomet Holdings, Inc. [Member]** | | | |
| **Concentration Risk [Line Items]** | | | |
| Percentage of sales revenue | 16.00% | 24.00% | 18.00% |
| Medtronic, PLC [Member] | | | |
| **Concentration Risk [Line Items]** | | | |
| Percentage of sales revenue | 9.00% | 10.00% | 12.00% |
| Davol, Inc. [Member] | | | |
| **Concentration Risk [Line Items]** | | | |
| Percentage of sales revenue | 3.00% | 3.00% | 5.00% |
| International Customers [Member] | | | |
| **Concentration Risk [Line Items]** | | | |
| Percentage of sales revenue | 9.00% | 8.00% | 9.00% |

| Commitments and Contingencies - Additional Information (Detail) - USD ($) $ in Thousands | Oct. 12, 2013 | Sep. 30, 2010 | Sep. 10, 2010 | Jul. 13, 2009 | 3 Months Ended | | Dec. 31, 2010 | 12 Months Ended | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Mar. 31, 2015 | Mar. 31, 2013 | | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Commitment And Contingencies [Line Items]** | | | | | | | | | | |
| Exclusivity payments | | | | | | | | $ 3,500 | | |
| Deferred revenue recognition | | | | | | | | 2,000 | $ 2,000 | |
| Rent expense | | | | | | | | $ 1,378 | $ 1,443 | $ 1,609 |
| Davol, Inc. [Member] | | | | | | | | | | |
| **Commitment And Contingencies [Line Items]** | | | | | | | | | | |
| Non-refundable license fee | | | | $ 8,000 | | | | | | |
| Initial agreement term | | | | | | | | 10 years | | |
| Revenue milestone payment | | | | | | $ 3,500 | | | | |
| Exclusivity payments | | | | | | | | $ 8,000 | | |
| Exclusive worldwide distribution agreement, extended expiration date | | | | | | | | Jul. 13, 2019 | | |
| Deferred revenue recognition | | | | | $ 1,500 | $ 1,715 | | | | |
| Medtronic, PLC [Member] | | | | | | | | | | |
| **Commitment And Contingencies [Line Items]** | | | | | | | | | | |
| Decline in cumulative fees received, trailing period | 12 months | | | | | | | | | |
| Distribution agreement automatic renewal term | 5 years | | | | | | | | | |
| Period prior to expiration of initial term for notice | 1 year | | | | | | | | | |
| Agreement expiration date | Jun. 30, 2014 | | | | | | | | | |
| Athersys, Inc. [Member] | | | | | | | | | | |
| **Commitment And Contingencies [Line Items]** | | | | | | | | | | |
| Non-refundable license fee | | | $ 3,000 | | | | | | | |
| License fee payable in three time-based installments | | | 1,000 | | | | | | | |
| Payment contingent upon successful achievement of certain development milestones | | | 2,000 | | | | | | | |
| Payment contingent upon achievement of certain cumulative revenue milestones | | | $ 32,500 | | | | | | | |

| | |
|---|---|
| Exclusive license agreement, period maximum | 5 years |
| Zimmer Biomet Holdings, Inc. [Member] | |

**Commitment And Contingencies [Line Items]**

| | |
|---|---|
| Initial agreement term | 10 years |
| Upfront payment | $ 13,000 |
| Upfront payment period | 10 days |

| Commitments and Contingencies - Future Minimum Lease Commitments under Non-Cancelable Operating Leases (Detail) $ in Thousands | Dec. 31, 2016 USD ($) |
|---|---|
| **Commitments and Contingencies Disclosure [Abstract]** | |
| 2017 | $ 1,936 |
| 2018 | 1,347 |
| 2019 | 1,007 |
| 2020 | 587 |
| 2021 and beyond | 115 |
| Total | $ 4,992 |

| Legal and Regulatory Actions - Additional Information (Detail) $ in Thousands | 3 Months Ended Dec. 31, 2015 USD ($) Entity | 12 Months Ended Dec. 31, 2016 Litigation Claims |
|---|---|---|
| **Commitments and Contingencies Disclosure [Abstract]** | | |
| Outstanding claims \| Litigation | | 0 |
| Litigation and settlement charges \| $ | $ 804 | |
| Number of entities which agreement signed \| Entity | 3 | |
| Claims for which the Company Parties are providing defense and indemnification \| Claims | | 1,445 |

| Segment Data - Additional Information (Detail) | 12 Months Ended Dec. 31, 2016 Segment |
|---|---|
| **Segment Reporting [Abstract]** | |
| Number of reportable segments | 1 |
| Lines of business | 6 |

| Segment Data - Revenues from Tissue Distribution and Other Revenues (Detail) - USD ($) $ in Thousands | 3 Months Ended | | | | | | | | 12 Months Ended | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Dec. 31, 2016 | Sep. 30, 2016 | Jun. 30, 2016 | Mar. 31, 2016 | Dec. 31, 2015 | Sep. 30, 2015 | Jun. 30, 2015 | Mar. 31, 2015 | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Segment Reporting Information [Line Items]** | | | | | | | | | | | |
| Other revenues | | | | | | | | | $ 12,890 | $ 13,602 | $ 11,700 |
| Revenues | $ 71,347 | $ 66,547 | $ 67,620 | $ 67,351 | $ 76,121 | $ 66,529 | $ 71,609 | $ 68,034 | $ 272,865 | $ 282,293 | $ 262,810 |
| Percentage of other revenues | | | | | | | | | 4.70% | 4.80% | 4.50% |
| Percentage of revenues | | | | | | | | | 100.00% | 100.00% | 100.00% |
| Domestic [Member] | | | | | | | | | | | |
| **Segment Reporting Information [Line Items]** | | | | | | | | | | | |
| Revenues | | | | | | | | | $ 247,756 | $ 260,387 | $ 238,936 |
| Percentage of domestic revenues | | | | | | | | | 90.80% | 92.20% | 90.90% |
| International [Member] | | | | | | | | | | | |
| **Segment Reporting Information [Line Items]** | | | | | | | | | | | |
| Revenues | | | | | | | | | $ 25,109 | $ 21,906 | $ 23,874 |
| Percentage of international revenues | | | | | | | | | 9.20% | 7.80% | 9.10% |
| Tissue Distribution [Member] | | | | | | | | | | | |
| **Segment Reporting Information [Line Items]** | | | | | | | | | | | |
| Tissue distribution | | | | | | | | | $ 160,848 | $ 138,761 | $ 130,200 |
| Percentage of sales revenue | | | | | | | | | 59.00% | 49.20% | 49.50% |
| Spine [Member] \| Tissue Distribution [Member] | | | | | | | | | | | |
| **Segment Reporting Information [Line Items]** | | | | | | | | | | | |
| Tissue distribution | | | | | | | | | $ 73,907 | $ 57,983 | $ 52,270 |
| Percentage of sales revenue | | | | | | | | | 27.10% | 20.50% | 19.90% |
| Sports Medicine and Orthopedics [Member] \| Tissue Distribution [Member] | | | | | | | | | | | |
| **Segment Reporting Information [Line Items]** | | | | | | | | | | | |
| Tissue distribution | | | | | | | | | $ 50,143 | $ 50,712 | $ 48,975 |
| Percentage of sales revenue | | | | | | | | | 18.40% | 18.00% | 18.60% |
| Surgical Specialties [Member] \| Tissue Distribution [Member] | | | | | | | | | | | |
| **Segment Reporting Information [Line Items]** | | | | | | | | | | | |
| Tissue distribution | | | | | | | | | $ 4,466 | $ 3,029 | $ 1,631 |

| | | | |
|---|---|---|---|
| Percentage of sales revenue | 1.60% | 1.10% | 0.60% |
| Cardiothoracic [Member] \| Tissue Distribution [Member] | | | |
| **Segment Reporting Information [Line Items]** | | | |
| Tissue distribution | $ 11,147 | $ 8,699 | $ 6,997 |
| Percentage of sales revenue | 4.10% | 3.10% | 2.70% |
| International [Member] \| Tissue Distribution [Member] | | | |
| **Segment Reporting Information [Line Items]** | | | |
| Tissue distribution | $ 21,185 | $ 18,338 | $ 20,327 |
| Percentage of sales revenue | 7.80% | 6.50% | 7.70% |
| Global Commercial [Member] \| Tissue Distribution [Member] | | | |
| **Segment Reporting Information [Line Items]** | | | |
| Tissue distribution | $ 99,127 | $ 129,930 | $ 120,910 |
| Percentage of sales revenue | 36.30% | 46.00% | 46.00% |

| Segment Data - Schedule of Property, Plant and Equipment - Net by Significant Geographic Location (Detail) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Property, Plant and Equipment [Line Items]** | | |
| Property, plant and equipment - net | $ 83,298 | $ 84,992 |
| Domestic [Member] | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Property, plant and equipment - net | 77,596 | 72,901 |
| International [Member] | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Property, plant and equipment - net | $ 5,702 | $ 12,091 |

| Quarterly Results of Operations (Unaudited) - Results of Operations (Detail) - USD ($) $ / shares in Units, $ in Thousands | 3 Months Ended | | | | | | | | 12 Months Ended | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Dec. 31, 2016 | Sep. 30, 2016 | Jun. 30, 2016 | Mar. 31, 2016 | Dec. 31, 2015 | Sep. 30, 2015 | Jun. 30, 2015 | Mar. 31, 2015 | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Quarterly Financial Information Disclosure [Abstract]** | | | | | | | | | | | |
| Revenues | $ 71,347 | $ 66,547 | $ 67,620 | $ 67,351 | $ 76,121 | $ 66,529 | $ 71,609 | $ 68,034 | $ 272,865 | $ 282,293 | $ 262,810 |
| Gross profit | 28,101 | 34,274 | 33,949 | 36,025 | 40,307 | 35,233 | 37,203 | 36,999 | 132,349 | 149,742 | 133,797 |
| Net income (loss) applicable to common shares | $ (11,799) | $ (4,489) | $ (3,162) | $ 1,543 | $ 3,321 | $ 2,670 | $ 2,685 | $ 2,934 | $ (17,907) | $ 11,610 | $ (417) |
| **Net income (loss) per common share:** | | | | | | | | | | | |
| Basic | $ (0.20) | $ (0.08) | $ (0.05) | $ 0.03 | $ 0.06 | $ 0.05 | $ 0.05 | $ 0.05 | $ (0.31) | $ 0.20 | $ (0.01) |
| Diluted | $ (0.20) | $ (0.08) | $ (0.05) | $ 0.03 | $ 0.06 | $ 0.05 | $ 0.05 | $ 0.05 | $ (0.31) | $ 0.20 | $ (0.01) |

| Quarterly Results of Operations (Unaudited) - Additional Information (Detail) - USD ($) $ in Thousands | 3 Months Ended | | 12 Months Ended | |
|---|---|---|---|---|
| | Dec. 31, 2015 | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Interim Reporting [Line Items]** | | | | |
| Excess inventory charge | | $ 9,556 | | |
| Strategic review costs | | 1,150 | | |
| CEO Retirement and transition costs | | 4,404 | | |
| Contested proxy expenses | | 2,680 | | |
| Asset abandonments | $ 814 | 5,435 | $ 814 | |
| Restructuring charges | | 1,107 | | |
| Severance charges | | $ 1,039 | $ 995 | $ 4,798 |
| Litigation settlement charge | 804 | | | |
| Pioneer [Member] | | | | |
| **Interim Reporting [Line Items]** | | | | |
| Severance charges | $ 995 | | | |

| Schedule II - Valuation and Qualifying Accounts (Detail) - USD ($) $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Dec. 31, 2014 |
| **Allowance for Doubtful Accounts [Member]** | | | |
| **Valuation and Qualifying Accounts Disclosure [Line Items]** | | | |
| Balance at Beginning of Period | $ 1,454 | $ 818 | $ 492 |
| Charged to Costs and Expenses | 645 | 1,037 | 709 |
| Deductions- Write-offs, Payments | 371 | 401 | 383 |
| Balance at End of Period | 1,728 | 1,454 | 818 |
| **Allowance for Product Returns [Member]** | | | |
| **Valuation and Qualifying Accounts Disclosure [Line Items]** | | | |
| Balance at Beginning of Period | 714 | 525 | 343 |
| Charged to Costs and Expenses | 250 | 531 | 182 |
| Deductions- Write-offs, Payments | 335 | 342 | |
| Balance at End of Period | 629 | 714 | 525 |
| **Allowance for Excess and Obsolescence [Member]** | | | |
| **Valuation and Qualifying Accounts Disclosure [Line Items]** | | | |
| Balance at Beginning of Period | 7,083 | 5,112 | 5,399 |
| Charged to Costs and Expenses | 13,880 | 5,390 | 3,763 |
| Deductions- Write-offs, Payments | 6,165 | 3,419 | 4,050 |
| Balance at End of Period | 14,798 | 7,083 | 5,112 |
| **Deferred Tax Asset Valuation Allowance [Member]** | | | |
| **Valuation and Qualifying Accounts Disclosure [Line Items]** | | | |
| Balance at Beginning of Period | 1,106 | 959 | 469 |
| Charged to Costs and Expenses | 3,833 | 197 | 490 |
| Deductions- Write-offs, Payments | 23 | 50 | |
| Balance at End of Period | $ 4,916 | $ 1,106 | $ 959 |