# EXHIBIT 8

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-Q

**(Mark One)**

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2020**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from       to      **

**Commission file number 001-38832**

---

# SURGALIGN HOLDINGS, INC.
**(Exact name of registrant as specified in its charter)**

---

| | |
|---|---|
| **Delaware** | **83-2540607** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **520 Lake Cook Road, Suite 315, Deerfield, Illinois** | **60015** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (224) 303-4651**

---

**RTI Surgical Holdings, Inc.**

**(Former name, former address and former fiscal year, if changed since last report)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol | Name of exchange on which registered |
|---|---|---|
| common stock, $0.001 par value | SRGA | Nasdaq Global Select Market |

---

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that registrant was required to submit such files.) Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☐ | | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ | | Smaller reporting company | ☐ |
| | | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.): Yes ☐ No ☒

Shares of common stock, $0.001 par value, outstanding on July 29, 2020: 75,954,373

**SURGALIGN HOLDINGS, INC.**
**FORM 10-Q For the Quarter Ended June 30, 2020**

**Index**

|  |  | Page # |
|---|---|---|
| **Part I  Financial Information** | | |
| Item 1 | Unaudited Condensed Consolidated Financial Statements | 1 - 28 |
| Item 2 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 29 - 38 |
| Item 3 | Quantitative and Qualitative Disclosures About Market Risk | 39 |
| Item 4 | Controls and Procedures | 39 |
| **Part II  Other Information** | | |
| Item 1 | Legal Proceedings | 40 |
| Item 1A | Risk Factors | 41 |
| Item 2 | Unregistered Sales of Equity Securities and Use of Proceeds | 41 |
| Item 3 | Defaults Upon Senior Securities | 41 |
| Item 4 | Mine Safety Disclosures | 41 |
| Item 5 | Other Information | 41 |
| Item 6 | Exhibits | 42 |
| Signatures | | 43 |

**Part I    Financial Information**
**Item 1.    Unaudited Condensed Consolidated Financial Statements**

### SURGALIGN HOLDINGS, INC. AND SUBSIDIARIES
#### Condensed Consolidated Balance Sheets
#### (Unaudited, in thousands, except share data)

| | June 30, 2020 | December 31, 2019 |
|---|---|---|
| **Assets** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 2,229 | $ 5,608 |
| Accounts receivable - less allowances of $5,717 at June 30, 2020 and $5,098 at December 31, 2019 | 46,865 | 59,288 |
| Inventories - net | 122,596 | 124,149 |
| Prepaid and other current assets | 9,493 | 6,769 |
| Total current assets | 181,183 | 195,814 |
| Non-current inventories - net | 5,194 | 6,637 |
| Property, plant and equipment - net | 70,131 | 69,890 |
| Deferred tax assets - net | 3,300 | - |
| Goodwill | 55,384 | 55,384 |
| Other intangible assets - net | 10,614 | 10,492 |
| Other assets - net | 6,007 | 6,292 |
| Total assets | $ 331,813 | $ 344,509 |
| **Liabilities and Stockholders' Equity** | | |
| Current Liabilities: | | |
| Accounts payable | $ 37,490 | $ 30,126 |
| Accrued expenses | 29,920 | 33,337 |

| | 2020 | 2019 |
|---|---|---|
| Derivative liability | 23,020 | - |
| Current portion of deferred revenue | 3,328 | 2,748 |
| Current portion of long-term obligations | 189,121 | 174,177 |
| Total current liabilities | 282,879 | 240,388 |
| Other long-term liabilities | 2,316 | 3,147 |
| Total liabilities | 285,195 | 243,535 |
| Commitments and contingencies (Note 22) | | |
| Preferred stock Series A, $.001 par value: 5,000,000 shares authorized; 50,000 shares issued and outstanding | 66,502 | 66,410 |
| Stockholders' equity: | | |
| Common stock, $.001 par value: 150,000,000 shares authorized; 75,954,373 and 75,213,515 shares issued and outstanding, respectively | 75 | 75 |
| Additional paid-in capital | 500,701 | 498,438 |
| Accumulated other comprehensive loss | (7,701) | (7,629) |
| Accumulated deficit | (507,606) | (451,179) |
| Less treasury stock, 1,353,026 and 1,285,224 shares, respectively, at cost | (5,353) | (5,141) |
| Total stockholders' equity | (19,884) | 34,564 |
| Total liabilities and stockholders' equity | $ 331,813 | $ 344,509 |

See notes to unaudited condensed consolidated financial statement.

1

**SURGALIGN HOLDINGS, INC. AND SUBSIDIARIES**
**Condensed Consolidated Statements of Comprehensive Loss**
**(Unaudited, in thousands, except share and per share data)**

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| Revenues | $ 54,225 | $ 81,554 | $ 127,951 | $ 151,575 |
| Costs of processing and distribution | 31,093 | 35,430 | 64,366 | 67,564 |
| Gross profit | 23,132 | 46,124 | 63,585 | 84,011 |
| Expenses: | | | | |
| Marketing, general and administrative | 37,066 | 41,108 | 79,719 | 73,224 |
| Research and development | 3,274 | 3,868 | 7,556 | 8,204 |
| Severance and restructuring costs | 604 | — | 604 | — |
| Gain on acquisition contingency | (130) | (1,590) | (130) | (1,590) |
| Asset impairment and abandonments | 882 | — | 2,761 | 15 |
| Transaction and integration expenses | 4,923 | 1,953 | 14,203 | 10,910 |
| Total operating expenses | 46,619 | 45,339 | 104,713 | 90,763 |
| Operating income (loss) | (23,487) | 785 | (41,128) | (6,752) |
| Other (expense) income: | | | | |
| Interest expense | (5,972) | (3,635) | (9,537) | (5,239) |
| Interest income | 21 | 26 | 71 | 157 |
| Derivative loss | (12,641) | — | (12,641) | — |
| Foreign exchange loss | 217 | (19) | (29) | (50) |
| Total other expense - net | (18,375) | (3,628) | (22,136) | (5,132) |
| Loss before income tax benefit (expense) | (41,862) | (2,843) | (63,264) | (11,884) |
| Income tax benefit (expense) | 3,298 | 3,031 | 6,837 | 2,721 |
| Net loss | (38,564) | 188 | (56,427) | (9,163) |
| Net income (loss) applicable to common shares | (38,564) | 188 | (56,427) | (9,163) |
| Other comprehensive (loss) gain: | | | | |
| Unrealized foreign currency translation loss | 298 | 395 | (72) | 2 |
| Comprehensive loss | $ (38,266) | $ 583 | $ (56,499) | $ (9,161) |
| Net loss per common share - basic | $ (0.51) | $ - | $ (0.74) | $ (0.13) |
| Net loss per common share - diluted | $ (0.51) | $ - | $ (0.74) | $ (0.13) |
| Weighted average shares outstanding - basic | 75,814,668 | 75,144,488 | 75,995,324 | 70,409,839 |
| Weighted average shares outstanding - diluted | 75,814,668 | 91,120,956 | 75,995,324 | 70,409,839 |

See notes to unaudited condensed consolidated financial statements.

2

**SURGALIGN HOLDINGS, INC. AND SUBSIDIARIES**
**Condensed Consolidated Statement of Stockholders' Equity**

(Unaudited, in thousands)

| | Common Stock | Additional Paid-In Capital | Accumulated Other Comprehensive Loss | Accumulated Deficit | Treasury Stock | Total |
|---|---|---|---|---|---|---|
| Balance, January 1, 2020 | $ 75 | $ 498,438 | $ (7,629) | $ (451,179) | $ (5,141) | $ 34,564 |
| Net loss | — | — | — | (17,863) | — | (17,863) |
| Foreign currency translation adjustment | — | — | (370) | — | — | (370) |
| Exercise of common stock options | — | 20 | — | — | — | 20 |
| Stock-based compensation | — | 1,310 | — | — | — | 1,310 |
| Purchase of treasury stock | — | — | — | — | (193) | (193) |
| Amortization of preferred stock series A issuance costs | — | (44) | — | — | — | (44) |
| Balance, March 31, 2020 | $ 75 | $ 499,724 | $ (7,999) | $ (469,042) | $ (5,334) | $ 17,424 |
| Net loss | — | — | — | (38,564) | — | (38,564) |
| Foreign currency translation adjustment | — | — | 298 | — | — | 298 |
| Exercise of common stock options | — | — | — | — | — | — |
| Stock-based compensation | — | 1,023 | — | — | — | 1,023 |
| Purchase of treasury stock | — | — | — | — | (19) | (19) |
| Amortization of preferred stock series A issuance costs | — | (46) | — | — | — | (46) |
| Balance, June 30, 2020 | $ 75 | $ 500,701 | $ (7,701) | $ (507,606) | $ (5,353) | $ (19,884) |

| | Common Stock | Additional Paid-In Capital | Accumulated Other Comprehensive Loss | Accumulated Deficit | Treasury Stock | Total |
|---|---|---|---|---|---|---|
| Balance, January 1, 2019 | $ 64 | $ 433,143 | $ (7,270) | $ (239,537) | $ (4,869) | $ 181,531 |
| Net loss | — | — | — | (9,351) | — | (9,351) |
| Foreign currency translation adjustment | — | — | (393) | — | — | (393) |
| Exercise of common stock options | — | 284 | — | — | — | 284 |
| Equity instruments issued in connection with Paradigm Spine acquisition - net of fees | 11 | 60,719 | — | — | — | 60,730 |
| Stock-based compensation | — | 1,163 | — | — | — | 1,163 |
| Purchase of treasury stock | — | — | — | — | (130) | (130) |
| Amortization of preferred stock series A issuance costs | — | (46) | — | — | — | (46) |
| Balance, March 31, 2019 | $ 75 | $ 495,263 | $ (7,663) | $ (248,888) | $ (4,999) | $ 233,788 |
| Net income | — | — | — | 188 | — | 188 |
| Foreign currency translation adjustment | — | — | 395 | — | — | 395 |
| Exercise of common stock options | — | 111 | — | — | — | 111 |
| Stock-based compensation | — | 1,267 | — | — | — | 1,267 |
| Purchase of treasury stock | — | — | — | — | (42) | (42) |
| Amortization of preferred stock series A issuance costs | — | (45) | — | — | — | (45) |
| Balance, June 30, 2019 | $ 75 | $ 496,596 | $ (7,268) | $ (248,700) | $ (5,041) | $ 235,662 |

See notes to unaudited condensed consolidated financial statements.

3

**SURGALIGN HOLDINGS, INC. AND SUBSIDIARIES**
**Condensed Consolidated Statements of Cash Flows**
**(Unaudited, in thousands)**

| | For the Six Months Ended June 30, | |
|---|---|---|
| | 2020 | 2019 |
| **Cash flows from operating activities:** | | |
| Net loss | $ (56,427) | $ (9,163) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization expense | 4,687 | 10,308 |
| Provision for bad debts and product returns | 1,436 | 899 |
| Provision for inventory write-downs | 1,947 | 3,274 |

| | | |
|---|---:|---:|
| Amortization of deferred revenue | (2,375) | (2,585) |
| Deferred income tax benefit | (3,614) | (2,969) |
| Stock-based compensation | 2,344 | 2,430 |
| Asset impairment and abandonments | 2,761 | — |
| Gain on acquisition contingency | (130) | (1,590) |
| Paid in kind interest expense | 3,434 | 1,473 |
| Amortization of debt issuance costs | 283 | 361 |
| Amortization of debt discount | 2,479 | — |
| Derivative loss | 12,641 | — |
| Other | 131 | 516 |
| Change in assets and liabilities: | | |
|    Accounts receivable | 10,950 | (3,141) |
|    Inventories | 1,062 | (2,658) |
|    Accounts payable | 7,459 | (9,751) |
|    Accrued expenses | (4,420) | (2,583) |
|    Deferred revenue | 2,955 | 2,000 |
|    Other operating assets and liabilities | (2,192) | 240 |
|      Net cash used in operating activities | (14,589) | (12,939) |
| **Cash flows from investing activities:** | | |
|   Purchases of property, plant and equipment | (7,315) | (6,912) |
|   Patent and acquired intangible asset costs | (419) | (1,126) |
|   Acquisition of Paradigm Spine | — | (99,921) |
|      Net cash used in investing activities | (7,734) | (107,959) |
| **Cash flows from financing activities:** | | |
|   Proceeds from exercise of common stock options | 20 | 395 |
|   Proceeds from long-term obligations | 72,829 | 115,000 |
|   Payments of debt issuance costs | (1,740) | (729) |
|   Payments on long-term obligations | (51,962) | — |
|   Payments for treasury stock | (212) | (172) |
|      Net cash provided by financing activities | 18,935 | 114,494 |
| Effect of exchange rate changes on cash and cash equivalents | 9 | (27) |
| Net decrease in cash and cash equivalents | (3,379) | (6,431) |
| Cash and cash equivalents, beginning of period | 5,608 | 10,949 |
| Cash and cash equivalents, end of period | $ 2,229 | $ 4,518 |
| **Supplemental cash flow disclosure:** | | |
|   Cash paid for interest | $ 4,082 | $ 2,732 |
|   Income tax refunds, net of payments | (1,962) | 1,982 |
|   Non-cash acquisition of property, plant and equipment | 342 | 456 |
|   Non-cash embedded derivative associated with Ares | 10,379 | - |
|   Non-cash acquisition of Paradigm Spine | — | 60,730 |
|   Non-cash common stock issuance | — | 60,730 |

See notes to unaudited condensed consolidated financial statements.

4

**SURGALIGN HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(In thousands, except share and per share data)**

1.      **Operations and Organization**

Surgalign Holdings Inc. and Subsidiaries. (formerly known as RTI Surgical Holdings, Inc. and Subsidiaries ("RTI") ("Surgalign" or the "Company") is a global medical technology company advancing the science of spine care, focused on delivering innovative solutions that drive superior clinical and economic outcomes. The company is building off a legacy of high quality and differentiated products, and continues to invest in clinically validated innovation to deliver better surgical outcomes and improve patient's lives. Surgalign markets products throughout the United States and in more than 50 countries worldwide through an expanding network of top independent distributors. Surgalign, a member of AdvaMed ("Advanced Medical Technology Association") , is headquartered in Deerfield, Illinois, and as of the date of filing of this Form 10-Q, has commercial, innovation and design centers in San Diego, California, and Wurmlingen, Germany.

On July 20, 2020, RTI completed the disposition of the original equipment manufacturer ("OEM") business, refere to subsequent event for further discussion in FN 25, and was renamed to Surgalign Holdings, Inc.  References in this Form 10-Q to Surgalign or the Company refer to the Company as of June 30, 2020, prior to the disposition of the OEM business, unless otherwise noted or obvious from the context.  "Legacy RTI" refers to the Company prior to the acquisition of Paradigm Spine on March 8, 2019. In conjunction with the sale of the OEM business the Company repaid and terminated all outstanding debt held on the books as of June 30, 2020.

**COVID-19**

The coronavirus (COVID-19) pandemic, as well as the corresponding governmental response and the Company's management of the crisis has had a significant impact on the Company's business. The consequences of the outbreak and impact on the economy continues to evolve and the full extent of the impact is uncertain as of the date of this filing. The outbreak has already brought a significant disruption to the operations of the Company.

Many hospitals and other medical facilities have canceled elective surgeries, reduced and diverted staffing and diverted other resources to patients suffering from the infectious disease and limited hospital access for non-patients, including our direct and indirect sales representatives. Because of the COVID-19 pandemic, surgeons and their patients are required, or are choosing, to defer procedures in which our products would be used, and many facilities that specialize in the procedures in which our products would be used have closed or reduced operating hours. These circumstances have negatively impacted the ability of our employees and distributors to effectively market and sell our products. In addition, even after the pandemic has subsided and/or governmental orders no longer prohibit or recommend against performing such procedures, patients may continue to defer such procedures out of concern of being exposed to coronavirus or for other reasons.

The COVID-19 pandemic has also caused adverse effects on general commercial activity and the global economy, which has led to an economic slowdown or recession, and which has adversely affected our business, operating results or financial condition. The adverse effect of the pandemic on the broader economy has also negatively affected demand for procedures using our products, and could cause one or more of our distributors, customers, and suppliers to experience financial distress, cancel, postpone or delay orders, be unable to perform under a contract, file for bankruptcy protection, go out of business, or suffer disruptions in their business. This could impact our ability to provide products and otherwise operate our business, as well as increase our costs and expenses.

The COVID-19 pandemic has also led to and could continue to lead to severe disruption and volatility in the global capital markets, which could increase our cost of future capital and adversely affect our ability to access the capital markets in the future.

The above and other continued disruptions to our business as a result of COVID-19 has resulted in a material adverse effect on our business, operating results and financial condition. The full extent to which the COVID-19 pandemic will impact our business will depend on future developments that are highly uncertain and cannot be accurately predicted, including the possibility that new adverse information may emerge concerning COVID-19 and additional actions to contain it or treat its impact may be required.

In response to the COVID-19 novel coronavirus pandemic and the resulting federal and local guidelines, beginning April 6, 2020, the Company furloughed or reduced the hours of over 500 of its U.S.-based employees. While many of those employees have returned to work, the Company cannot predict when it will be able to fully resume normal operations and will continue to carefully monitor the situation and the needs of the business. In addition, most current employees have taken base salary reductions until business conditions improve.

5

## 2.     Basis of Presentation

The accompanying unaudited condensed consolidated financial statements include all adjustments, consisting of normal recurring accruals, which the Company considers necessary for a fair presentation of the results of operations for the periods shown. The condensed consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X, and, therefore, do not include all information and footnotes necessary for a fair presentation of condensed consolidated financial position, results of operations, comprehensive loss and cash flows in conformity with accounting principles generally accepted in the United States of America ("GAAP"). All intercompany balances and transactions have been eliminated in consolidation. The results of operations for any interim period are not necessarily indicative of the results to be expected for the full year. For further information, refer to the consolidated financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2019. As noted in the Company's Annual Report on Form 10-K for the year ended December 31, 2019, certain June 30, 2019 balances have been restated. The Company includes acquisition, disposal, integration and separation related costs, which are predominantly composed of legal, consulting, advisor fee expenses, within the Transaction and integration expense line on the condensed consolidated comprehensive loss.

The condensed consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries, Surgalign, Inc., Paradigm Spine, LLC ("Paradigm"), Pioneer Surgical Technology, Inc. ("Pioneer Surgical"), Tutogen Medical, Inc. ("TMI"), and Zyga Technology, Inc. ("Zyga"). Prior to the completion of the acquisition of Paradigm, the financial statements were that of RTI Surgical, Inc. and subsidiaries ("Legacy RTI"). Subsequent to the acquisition of Paradigm, Surgalign Holdings, Inc. and Subsidiaries is the successor reporting company.

### Significant Accounting Policies

Derivative Instruments – The Company reviews debt agreements for embedded features. If these features are not clearly and closely related to the debt host, they meet the definition of a derivative and require bifurcation from the host contract. All derivative instruments, including embedded derivatives are recorded on the balance sheet at their respective fair values. The Company will adjust the carrying value of the derivative liability to fair value at each subsequent reporting date. The changes in the fair value of the derivatives are recorded in the period they occur.

### Liquidity and Going Concern

The accompanying condensed consolidated financial statements of the Company have been prepared assuming the Company will continue as a going concern and in accordance with generally accepted accounting principles in the United States of America. The going concern basis of presentation assumes that we will continue in operation one year after the date these financial statements are issued, and we will be able to realize our assets and discharge our liabilities and commitments in the normal course of business. As of June 30, 2020, we had cash of $2.2 million, a working capital deficiency of $101.7 million and an accumulated deficit of $507.6 million. We had a loss from operations of $41.1 million and a net loss of $56.4 million for the six months ended June 30, 2020. We have suffered losses from operations in the previous two fiscal years and did not generate positive cash flows from operations in fiscal year 2019. Management is projecting that it will continue to generate losses from operations

into the future.

As the global outbreak of COVID-19 continues to rapidly evolve, it could continue to materially and adversely affect our revenues, financial condition, profitability, and cash flows for an indeterminate period of time.

On July 20, 2020, RTI completed the disposition of its OEM business.  Upon the close of the transaction, the Company fully repaid all of its outstanding indebtedness, including its revolving line of credit with JP Morgan Chase Bank and both its term loan and incremental term loan commitment with Ares Capital Corporation. Additionally, the Company redeemed all of the outstanding shares of Series A Convertible Preferred Stock.  Management believes that after payment of taxes related to the transaction that it will have approximately $53 million of available cash.

As discussed in Note 24, the Securities and Exchange Commission ("SEC") has an active investigation that remains ongoing.  The Company continues to cooperate with the SEC in relation to its investigation. Additionally, as disclosed in Note 23, there is currently ongoing shareholder litigation.  Based on current information available to the Company, the impact associated with SEC investigation and shareholder litigation may have on the Company cannot be reasonably estimated.

Although there is uncertainty relate to the matters noted above, based on current information available, management  believes it will have sufficient cash and liquidity, such that it is not probable the Company will be unable to meet its obligations during the next year.

6

**3.      Recently Issued Accounting Standards**

In March 2020, the Financial Accounting Standards Board ("FASB") issued Accounting Standard Update ("ASU") No. 2020-04, *Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting* ("ASU 2020-04"), which provides optional expedients and exceptions for applying U.S. GAAP to contracts, hedging relationships and other transactions affected by the discontinuation of the London Interbank Offered Rate (LIBOR) and other interbank offered rates. This guidance is effective beginning on March 12, 2020 through December 31, 2022. The Company adopted ASU 2020-04 and it did not have an impact on its condensed consolidated financial statements.

In May 2019, the FASB issued ASU No. 2019-05 *Financial Instruments — Credit Losses (Topic 326)* which provides relief to certain entities adopting ASU 2016-13 (discussed below). The amendments accomplish those objectives by providing entities with an option to irrevocably elect the fair value option in Subtopic 825-10, applied on an instrument-by-instrument basis for eligible instruments, that are within the scope of Subtopic 326-20, upon adoption of Topic 326. The fair value option election does not apply to held-to-maturity debt securities. ASU 2019-05 has the same transition as ASU 2016-13 and is effective for periods beginning after December 15, 2019, with adoption permitted after this update. The Company adopted ASU 2019-05 and it did not have an impact on the condensed consolidated financial statements.

In April 2019, the FASB issued ASU No. 2019-04 *Codification Improvements to Topic 326, Financial Instruments — Credit Losses, Topic 815, Derivatives and Hedging, and Topic 825, Financial Instruments*, which provides updates and clarifications to three previously-issued ASUs: 2016-01 *Financial Instruments — Overall (Subtopic 825-10): Recognition and Measurement of Financial Assets and Financial Liabilities;* 2016-13 *Financial Instruments — Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments,* described further above and which the Company has not yet adopted; and 2017-12 *Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities,* which the Company early adopted effective January 1, 2018. The updates related to ASU 2016-13 have the same transition as ASU 2016-13 and are effective for periods beginning after December 15, 2019, with adoption permitted after the issuance of ASU 2019-04. The updates related to ASU 2017-12 are effective for the Company on January 1, 2020. The updates related to ASU 2016-01 are effective for fiscal years beginning after December 15, 2019. The Company adopted ASU 2017-12 and it did not have an impact on the condensed consolidated financial statements.

In June 2016, the FASB issued ASU 2016-13, *Financial Instruments — Credit Losses (Topic326): Measurement of Credit Losses on Financial Instruments* (ASU 2016-13), which replaces the incurred loss methodology with an expected loss methodology that is referred to as the current expected credit loss (CECL) methodology.  The CECL model utilizes a lifetime expected credit loss measurement objective for the recognition of credit losses for loans and other receivables at the time the financial asset is originated or acquired. The expected credit losses are adjusted each period for changes in expected lifetime credit losses. This model replaces the multiple existing impairment models previously used under U.S. generally accepted accounting principles, which generally require that a loss be incurred before it is recognized. The new standard also applies to financial assets arising from revenue transactions such as contract assets and accounts receivables. On January 1, 2020, the Company adopted ASU 2016-13.  The adoption did not have a material impact on the Company's condensed consolidated financial statements.

Credit losses for trade receivables is determined based on historical information, current information and reasonable and supportable forecasts.  The Company has concluded that the adoption of the standard was not material as the composition of the trade receivables at the reporting date is consistent with that used in developing the historical credit-loss percentages.  Further, the risk characteristics of the Company's customer and composition of the portfolio have not changed significantly over time.

In August 2018, the FASB issued Accounting Standards Update ("ASU") 2018-13, *"Fair Value Measurement (Topic 820): Disclosure Framework — Changes to the Disclosure Requirements for Fair Value Measurement."* This ASU modifies the disclosure requirements on fair value measurements by removing, modifying, or adding certain disclosures. ASU 2018-13 is effective for the Company beginning after December 31, 2019. Certain disclosures in ASU 2018-13 are required to be applied on a retrospective basis and others on a prospective basis. The Company adopted ASU 2018-13 and it did not have an impact on the condensed consolidated financial statements.

7

**4.   Leases**

The Company's leases are classified as operating leases and includes office space, automobiles, and copiers.  The Company does not have any finance leases and the Company's operating leases do not have any residual value guarantees, restrictions or covenants. The Company does not have any leases that have not yet commenced as of June 30, 2020. The Company's leases have remaining lease terms of 1 to 9 years, some of which include options to extend or terminate the leases.  The option to extend is only included in the lease term if the Company is reasonably certain of exercising that option. Operating lease ROU assets are presented within other assets-net on the condensed consolidated balance sheet.  The current portion of operating lease liabilities are presented within accrued expenses, and the non-current portion of operating lease liabilities are presented within other long-term liabilities on the condensed consolidated balance sheet.

A subset of the Company's automobile and copier leases contain variable payments.  The variable lease payments for such automobile leases are based on actual mileage incurred at the standard contractual rate. The variable lease payments for such copier leases are based on actual copies incurred at the standard contractual rate. The variable lease costs for all leases are immaterial.

The components of operating lease expense were as follows:

| | For the Three Months Ended June 30, | | | | For the Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2020 | | 2019 | | 2020 | | 2019 | |
| Operating lease cost | $ | 362 | $ | 440 | $ | 738 | $ | 784 |
| Short-term operating lease cost | | — | | - | | — | | 36 |
| Total operating lease cost | $ | 362 | $ | 440 | $ | 738 | $ | 820 |

Supplemental cash flow information related to operating leases was as follows:

| | For the Three Months Ended June 30, | | | | For the Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2020 | | 2019 | | 2020 | | 2019 | |
| Cash paid for amounts included in the measurement of lease liabilities | $ | 374 | $ | 397 | $ | 733 | $ | 691 |
| ROU assets obtained in exchange for lease obligations | | — | | - | | — | | 34 |

Supplemental balance sheet information related to operating leases was as follows:

| | Balance Sheet Classification | Balance at June 30, 2020 | | Balance at December 31, 2019 | |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Right-of-use assets | Other assets - net | $ | 1,883 | $ | 2,155 |
| **Liabilities:** | | | | | |
| Current | Accrued expenses | $ | 1,001 | $ | 1,159 |
| Noncurrent | Other long-term liabilities | | 1,440 | | 1,547 |
| Total operating lease liabilities | | $ | 2,441 | $ | 2,706 |

As of June 30, 2020, the weighted-average remaining lease term was 4.7 years. The Company's lease agreements do not provide a readily determinable implicit rate nor is it available to the Company from its lessors. Instead, the Company estimates its incremental borrowing rate based on information available at lease commencement in order to discount lease payments to present value. The weighted-average discount rate of the Company's operating leases was 4.8%, as of June 30, 2020.

As of June 30, 2020, maturities of operating lease liabilities were as follows:

| Maturity of Operating Lease Liabilities | Balance at June 30, 2020 | |
|---|---|---|
| 2020 (remaining) | $ | 666 |
| 2021 | | 778 |
| 2022 | | 298 |
| 2023 | | 160 |
| 2024 | | 159 |
| 2025 and beyond | | 716 |
| Total future minimum lease payments | | 2,777 |
| Less imputed interest | | (336) |

Total                                                                    $           2,441

**5.      Segment Reporting**

The Company has determined its operating segments in accordance with FASB issued Accounting Standards Codification ("ASC 280") - Segment Reporting.  Prior to the consummation of the Transaction, the overall strategy of the Company is to manage our business in two operating segments, Global Spine ("Spine") and Global OEM ("OEM"). The Spine segment focuses on sales, distribution and conducting research and development activities focused on the global spine market and the OEM segment focuses on the design, development and manufacturing of biologics and hardware medical technology. The value drivers of the Spine segment include growth through innovation and acquisition while the value drivers of the OEM segment focus on predetermined and relatively predictable execution. The Company is now organized into two distinct groupings, Spine and OEM, which are also our operating and reportable segments. As the adoption of the new structure was done in the fourth quarter of 2019, the comparative periods for the three and six months ended June 30, 2019 has been restated to conform to the new segment presentation.

The Spine and OEM reportable segments reflect the way the Company was managed prior to the Transaction, and for which separate financial information is available and evaluated regularly by the Company's chief operating decision maker ("CODM") in deciding how to allocate resources and assess performance. The Company's Chief Executive Officer is the CODM.

9

The segment revenues and segment net income (loss) for the three and six months ended June 30, 2020 and 2019 are included in the table below. All revenues are earned from external customers. The Company does not disclose total assets by Spine and OEM as the CODM does not receive or review with regularity assets on a Spine or OEM basis. Additionally, the Company does not disclose long-lived assets by geographic location as no country outside of the United States holds 10 percent or more of our consolidated Property, Plant and Equipment.

| | | For the Three Months Ended June 30, | | | For the Six Months Ended June 30, | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2020 | | 2019 | 2020 | | 2019 |
| **Revenues:** | | | | | | | |
| Spine | $ | 20,519 | $ | 32,747 | $ 47,628 | $ | 57,124 |
| OEM | | 33,706 | | 48,807 | 80,323 | | 94,451 |
| Total | $ | 54,225 | $ | 81,554 | $ 127,951 | $ | 151,575 |
| **Depreciation and amortization:** | | | | | | | |
| Spine | $ | 194 | $ | 2,979 | $ 285 | $ | 5,379 |
| OEM | | 2,254 | | 2,929 | 4,402 | | 4,929 |
| Total | $ | 2,448 | $ | 5,908 | $ 4,687 | $ | 10,308 |
| **Operating income (loss)** | | | | | | | |
| Spine | $ | (5,265) | $ | (6,296) | $ (15,673) | $ | (10,790) |
| OEM | | (4,729) | | 7,444 | 2,633 | | 13,373 |
| Unallocated corporate costs | | | | — | | | |
|    Asset impairment and abandonments | | 882 | | - | 2,761 | | 15 |
|    Gain on acquisition contingency | | (130) | | (1,590) | (130) | | (1,590) |
|    Restatement and related costs | | 7,818 | | - | 11,254 | | - |
|    Transaction and integration expenses | | 4,923 | | 1,953 | 14,203 | | 10,910 |
| Total unallocated corporate costs | | 13,493 | | 363 | 28,088 | | 9,335 |
| **Operating (loss) income** | $ | (23,487) | $ | 785 | $ (41,128) | $ | (6,752) |
| Interest expense | | (5,972) | | (3,635) | (9,537) | | (5,239) |
| Interest income | | 21 | | 26 | 71 | | 157 |
| Derivative loss | | (12,641) | | - | (12,641) | | - |
| Foreign exchange loss | | 217 | | (19) | (29) | | (50) |
| Loss before income tax benefit (expense) | $ | (41,862) | $ | (2,843) | $ (63,264) | $ | (11,884) |

The following table presents revenues by geographic location:

| | | For the Three Months Ended June 30, | | | For the Six Months Ended June 30, | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2020 | | 2019 | 2020 | | 2019 |
| | | | | (In thousands) | | | |
| Revenues: | | | | | | | |
|   North America | $ | 49,077 | $ | 72,426 | $ 115,890 | $ | 135,480 |
|   EMEA | | 4,118 | | 7,414 | 9,853 | | 12,997 |
|   Asia Pacific | | 880 | | 866 | 1,799 | | 1,348 |
|   Latin America | | 150 | | 848 | 409 | | 1,750 |
|     Total revenues | $ | 54,225 | $ | 81,554 | $ 127,951 | $ | 151,575 |

10

The following table presents percentage of total revenues derived from the Company's largest distributors all of which are OEM customers:

| | For the Three Month Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| Percent of revenues derived from: | | | | |
| Distributor | | | | |
| Zimmer Biomet Holdings, Inc. | 15% | 17% | 16% | 19% |
| Medtronic, PLC | 6% | 8% | 6% | 8% |
| DePuy Synthes | 5% | 4% | 5% | 4% |

Certain corporate costs have been allocated solely to the Spine reportable segment, including certain executive compensation costs and certain corporate costs including board of directors fees and board of directors stock-based compensation, public company expenses, legal fees, corporate compliance and communications costs, and business development expenses. These costs were not allocated to the OEM reportable segment because the basis for the changes to the internal organization of the Company was in contemplation of the pending sale of the OEM business, and these costs are expected to remain with the Spine reportable segment. Such presentation appropriately reflects that manner in which the CODM evaluates the ongoing performance and allocates resources of the Company.

**6. Revenue from Contracts with Customers**

The Company is organized into two business lines, which are also our operating and reportable segments: Spine and OEM. The following table presents revenues from these two segments for the three and six months ended June 30, 2020 and 2019:

| | For the Three Month Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| Revenues: | | | | |
| Spine Segment | | | | |
| Domestic | $ 16,951 | $ 26,351 | $ 39,228 | $ 46,570 |
| International | 3,567 | 6,396 | 8,400 | 10,554 |
| OEM Segment | | | | |
| OEM | 18,765 | 32,120 | 46,084 | 61,119 |
| Sports | 13,248 | 13,955 | 30,350 | 27,791 |
| International | 1,694 | 2,732 | 3,889 | 5,541 |
| Total revenues from contracts with customers | $ 54,225 | $ 81,554 | $ 127,951 | $ 151,575 |

The following table presents revenues recognized at a point in time and over time for the three and six months ended June 30, 2020 and 2019:

| | For the Three Month Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| Revenue recognized at a point in time | $ 41,463 | $ 64,412 | $ 96,572 | $ 118,509 |
| Revenue recognized over time | 12,762 | 17,142 | 31,379 | 33,066 |
| Total revenues from contracts with customers | $ 54,225 | $ 81,554 | $ 127,951 | $ 151,575 |

The Company's performance obligations consist mainly of transferring control of implants identified in the contracts. Some of the Company's contracts offer assurance-type warranties in connection with the sale of a product to a customer. Assurance-type warranties provide a customer with assurance that the related product will function as the parties intended because it complies with agreed-upon specifications. Such warranties do not represent a separate performance obligation and are not material to the condensed consolidated financial statements.

11

The opening and closing balances of the Company's accounts receivable, contract asset and current and long-term contract liability for the three and six months ended June 30, 2020 and 2019 are as follows:

| | Accounts Receivable | Contract Liability (Current) | Contract Liability (Long-Term) |
|---|---|---|---|
| Opening Balance, January 1, 2020 | $ 59,288 | $ 3,378 | $ - |

| | Accounts Receivable | Contract Liability (Current) | Contract Liability (Long-Term) |
|---|---|---|---|
| Closing Balance, June 30, 2020 | 46,865 | 3,721 | - |
| Increase/(decrease) | (12,423) | 343 | - |

| | Accounts Receivable | Contract Liability (Current) | Contract Liability (Long-Term) |
|---|---|---|---|
| Opening Balance, January 1, 2019 | $ 48,096 | $ 5,425 | $ 744 |
| Closing Balance, June 30, 2019 | 55,540 | 5,537 | 325 |
| Increase/(decrease) | 7,444 | 112 | (419) |

As of June 30, 2020 and December 31, 2019, $6,060 and $10,633 of unbilled receivables in connection with our exclusively built inventory contracts are included in accounts receivable.

7.      **Acquisition of Paradigm Spine, LLC**

On March 8, 2019, pursuant to the Master Transaction Agreement (the "Master Transaction Agreement"), dated as of November 1, 2018, by and among Legacy RTI, PS Spine Holdco, LLC, a Delaware limited liability company ("PS Spine"), the Company, and Bears Merger Sub, Inc., a Delaware corporation and direct wholly owned subsidiary of the Company ("Merger Sub"), the Company acquired all of the outstanding equity interests of Paradigm, through a transaction in which: (i) PS Spine contributed all of the issued and outstanding equity interests in Paradigm to the Company (the "Contribution"); (ii) Merger Sub merged with and into Legacy RTI (the "Merger"), with Legacy RTI surviving as a wholly owned direct subsidiary of the Company; and (iii) the Company was renamed "RTI Surgical Holdings, Inc." (collectively, the "Paradigm Transaction"). Legacy RTI retained its existing name "RTI Surgical, Inc."

Pursuant to the Master Transaction Agreement: (i) each share of common stock, par value $0.001 per share, of Legacy RTI issued and outstanding immediately prior to the Paradigm Transaction (other than shares held by Legacy RTI as treasury shares or by the Company or Merger Sub immediately prior to the Paradigm Transaction, which were automatically cancelled and ceased to exist) was converted automatically into one fully paid and non-assessable share of Company common stock , par value $0.001 per share; (ii) each share of Series A convertible preferred stock, par value $0.001 per share, of Legacy RTI issued and outstanding immediately prior to the Paradigm Transaction (other than shares held by Legacy RTI as treasury shares or by the Company or Merger Sub immediately prior to the Paradigm Transaction, which were automatically cancelled and ceased to exist) was converted automatically into one fully paid and non-assessable share of Series A convertible preferred stock, par value $0.001 per share, of the Company; and (iii) each stock option and restricted stock award granted by Legacy RTI was converted into a stock option or restricted stock award, as applicable, of the Company with respect to an equivalent number of shares of the Company common stock on the same terms and conditions as were applicable prior to the closing.

The consideration for the Contribution was $100,000 (the "Cash Consideration Amount") in cash and 10,729,614 shares of Company common stock (the "Stock Consideration Amount"). The Cash Consideration Amount was adjusted lower by Paradigm's working capital of $7,000.

In addition to the Cash Consideration Amount and the Stock Consideration Amount, the Company may be required to make further cash payments or issue additional shares of Company common stock to PS Spine in an amount up to $50,000 of shares of Company common stock to be valued based upon the Legacy RTI Price and an additional $100,000 of cash and/or Company common stock to be valued at the time of issuance, in each case, if certain revenue targets are achieved between closing, March 8, 2019, and December 31, 2022.  The Company originally estimated the fair value of the contingent liability related to the revenue-based earnout of $72,177 utilizing a Monte-Carlo simulation model as of March 8, 2019. A Monte-Carlo simulation is an analytical method used to estimate fair value by performing a large number of simulations or trial runs and thereby determining a value based on the possible outcomes. Accounted for as a liability to be revalued at each reporting period, the fair value of the contingent liability was measured using Level 3 inputs, which includes weighted average cost of capital and projected revenues and costs. Acquisition and integration related costs, specific to Paradigm, were approximately $15,537, (which includes business development expenses of $462 and severance expense of $896).

12

The Company has accounted for the acquisition of Paradigm under FASB ("ASC") 805, *Business Combinations*.  Paradigm's results of operations are included in the condensed consolidated financial statements beginning after March 8, 2019, the acquisition date.

The purchase price was financed as follows:

| | (In thousands) |
|---|---|
| Cash proceeds from second lien credit agreement | $ 100,000 |
| Fair market value of securities issued | 60,730 |
| Fair market value of contingent earnout | 72,177 |
| Total purchase price | $ 232,907 |

In the first quarter of 2019, the Company completed its valuations and purchase price allocations. The table below represents the final allocation of the total purchase price to Paradigm's tangible and intangible assets and liabilities fair values as of March 8, 2019.

| | Balance at March 8, 2019 (In thousands) |
|---|---|
| Cash | $ 307 |

| | |
|---|---:|
| Accounts receivable | 5,220 |
| Inventories | 17,647 |
| Other current assets | 934 |
| Property, plant and equipment | 379 |
| Other non-current assets | 1,079 |
| Current liabilities | (6,169) |
| Lease liabilities | (1,079) |
| Net tangible assets acquired | 18,318 |
| Other intangible assets | 79,000 |
| Goodwill | 135,589 |
| Total net assets acquired | $ 232,907 |

As of March 8, 2019, the inventory fair value was composed of current inventory of $7,122 and non-current inventory of $10,525.

Total net assets acquired as of March 8, 2019, were all part of the Company's only operating segment at that time. Fair values are based on management's estimates and assumptions including variations of the income approach, the cost approach and the market approach.

The Company believes that the acquisition of Paradigm, a spine focused business, offers the potential for substantial strategic and financial benefits. The transaction further advances the Company's strategic transformation focused on reducing complexity, driving operational excellence and accelerating growth. The Company believes the acquisition will enhance stockholder value through, among other things, enabling the Company to capitalize on the following strategic advantages and opportunities:

- Paradigm will strengthen the Company's spine portfolio with the addition of the coflex® Interlaminar Stabilization® device. Coflex is a differentiated and minimally invasive motion preserving stabilization implant that is FDA PMA-approved for the treatment of moderate to severe lumbar spinal stenosis ("LSS") in conjunction with decompression.

- Coflex allows the Company to provide surgeons who treat patients with moderate to severe LSS with a PMA-approved device supported by more than 12 years of clinical data.

These potential benefits resulted in the Company paying a premium for Paradigm resulting in the recognition of $135,589 of goodwill assigned to the Company's only operating segment and reporting unit at the time of the Paradigm acquisition.

13

The following unaudited pro forma information shows the results of the Paradigm's operations as though the acquisition had occurred as of the beginning of the prior comparable period, January 1, 2019, (in thousands):

| | For the Six Months Ended June 30, 2019 |
|---|---:|
| Revenues | $ 18,900 |
| Net loss applicable to common shares | (14,397) |

The pro forma results have been prepared for comparative purposes only and are not necessarily indicative of the actual results of operations had the acquisition taken place as of the beginning of the periods presented, or the results that may occur in the future.

## 8. Stock-Based Compensation

The Company's policy is to generally grant stock options at an exercise price equal to 100% of the market value of a share of common stock at closing on the date of the grant. The Company's stock options generally have five to ten-year contractual terms and vest over a one to five-year period from the date of grant. The Company's general policy is to grant restricted stock awards at a fair value equal to 100% of the market value of a share of common stock at closing on the date of the grant. The Company's restricted stock awards generally vest over one to three-year periods.

*2018 Incentive Compensation Plan* – On April 30, 2018, the Company's stockholders approved and adopted the 2018 Incentive Compensation Plan (the "2018 Plan"). The 2018 Plan provides for the grant of incentive and nonqualified stock options and restricted stock to key employees, including officers and directors of the Company and consultants and advisors. The 2018 Plan allows for up to 5,726,035 shares of common stock to be issued with respect to awards granted.

*Stock Options*

As of June 30, 2020, there was $2,252 of total unrecognized stock-based compensation related to unvested stock options. The expense related to these stock options is expected to be recognized over a weighted-average period of 3.34 years.

The following tables summarizes information about stock options outstanding, exercisable and available for grant as of June 30, 2020:

| | Weighted Average | Weighted Average Remaining | Aggregate |
|---|---|---|---|

| | Number of Shares | Exercise Price | Contractual Life (Years) | Intrinsic Value |
|---|---|---|---|---|
| Outstanding at January 1, 2020 | 4,536,461 | $ 3.75 | | |
| Granted | 755,866 | 4.21 | | |
| Exercised | (5,000) | 4.02 | | |
| Forfeited or expired | (599,630) | 4.31 | | |
| Outstanding at June 30, 2020 | 4,687,697 | $ 3.75 | 4.77 | $ 229 |
| Vested or expected to vest at June 30, 2020 | 4,369,996 | $ 3.73 | 4.45 | $ 192 |
| Exercisable at June 30, 2020 | 1,135,490 | $ 3.63 | 3.03 | $ 25 |
| Available for grant at June 30, 2020 | 2,738,076 | | | |

The aggregate intrinsic value in the table above represents the total pre-tax intrinsic value of stock options for which the fair market value of the underlying common stock exceeded the respective stock option exercise price. Estimated forfeitures are based on the Company's historical forfeiture activity. Compensation expense recognized for all option grants is net of estimated forfeitures and is recognized over the awards' respective requisite service periods.

14

Other information concerning stock options are as follows:

| | For the Six Months Ended June 30, | |
|---|---|---|
| | 2020 | 2019 |
| Weighted average fair value of stock options granted | $ 3.00 | $ 1.99 |
| Aggregate intrinsic value of stock options exercised | 3 | 161 |

The aggregate intrinsic value of stock options exercised in a period represents the pre-tax cumulative difference, for the stock options exercised during the period, between the fair market value of the underlying common stock and the stock option exercise prices.

*Restricted Stock Awards*

As of June 30, 2020, there was $3,857 of total unrecognized stock-based compensation related to unvested restricted stock awards. That expense is expected to be recognized on a straight-line basis over a weighted-average period of 1.62 years. The following table summarizes information about unvested restricted stock awards as of June 30, 2020:

| | Number of Shares | Weighted Average Grant Date Fair Value |
|---|---|---|
| Unvested at January 1, 2020 | 1,227,858 | $ 4.34 |
| Granted | 944,289 | 4.19 |
| Vested | (429,667) | 4.63 |
| Forfeited | (193,686) | 4.41 |
| Unvested at June 30, 2020 | 1,548,794 | $ 4.16 |

*Restricted Stock Units*

As of June 30, 2020, there was $583 of total unrecognized stock-based compensation related to unvested restricted stock units. That expense is expected to be recognized on a straight-line basis over a weighted-average period of 1.5 years. The following table summarizes information about unvested restricted stock units as of June 30, 2020:

| | Number of Shares | Weighted Average Grant Date Fair Value |
|---|---|---|
| Unvested at January 1, 2020 | 184,582 | $ 7.41 |
| Granted | — | — |
| Vested | — | — |
| Forfeited | (9,144) | 7.41 |
| Unvested at June 30, 2020 | 175,438 | $ 7.41 |

For the three and six months ended June 30, 2020 and 2019, the Company recognized stock-based compensation as follows:

| | For the Three Month Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| Stock-based compensation: | | | | |
| Costs of processing and distribution | $ 36 | $ 36 | $ 72 | $ 72 |
| Marketing, general and administrative | 983 | 1,216 | 2,242 | 2,328 |
| Research and development | 15 | 15 | 30 | 30 |
| Total | $ 1,034 | $ 1,267 | $ 2,344 | $ 2,430 |

15

## 9. Net Income Per Common Share

A reconciliation of the number of shares of common stock used in the calculation of basic and diluted net income per common share is presented below:

| | For the Three Month Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| Basic shares | 75,814,668 | 75,144,488 | 75,995,324 | 70,409,839 |
| Effect of dilutive securities: | | | | |
| Stock options | — | 823,707 | — | — |
| Preferred stock Series A | — | 15,152,761 | — | — |
| Diluted shares | 75,814,668 | 91,120,956 | 75,995,324 | 70,409,839 |

For the three months ended June 30, 2020   approximately 4,819,238 and for the six months ended June 30, 2020 and 2019, approximately 4,838,639 and 1,429,442, respectively, of issued stock options were not included in the computation of diluted net loss per common share because they were anti-dilutive because their exercise price exceeded the market price. For the three months ended June 30, 2019, options to purchase 823,707  shares of common stock were included in the computation of diluted loss per share because dilutive shares are factored into this calculation when net income is reported.

For the three months ended June 30, 2020 and six months ended June 30, 2020 and 2019, 50,000 shares of convertible preferred stock or 15,152,761 of converted common stock and accrued but unpaid dividends were anti-dilutive on an as if-converted basis and were not included in the computation of diluted net loss per common share.  For the three months ended June 30, 2019, 50,000 shares of convertible preferred stock or 15,152,761 of converted common stock and accrued but unpaid dividends were dilutive on an as if-converted basis and were included in the computation of diluted net income per common share.

## 10. Inventories

Inventories by stage of completion are as follows:

| | June 30, 2020 | December 31, 2019 |
|---|---|---|
| Unprocessed tissue, raw materials and supplies | $ 29,252 | $ 29,552 |
| Tissue and work in process | 35,989 | 35,740 |
| Implantable tissue and finished goods | 62,549 | 65,494 |
| Total | 127,790 | 130,786 |
| Less current portion | 122,596 | 124,149 |
| Long-term portion | $ 5,194 | $ 6,637 |

For the three months ended June 30, 2020 and 2019, the Company had inventory write-downs of $1,430 and $1,744, respectively, and for the six months ended June 30, 2020 and 2019 the Company had inventory write-downs of $1,947 and $3,274, respectively relating primarily to product obsolescence. As of June 30, 2020, the long-term portion of inventory relates to finished goods.

## 11. Prepaid and Other Current Assets

Prepaid and Other Current Assets are as follows:

| | June 30, 2020 | December 31, 2019 |
|---|---|---|
| Income tax receivable | $ 3,963 | $ 2,803 |
| Prepaid expenses | 4,642 | 1,865 |
| Other | 888 | 2,101 |
| | $ 9,493 | $ 6,769 |

**12. Property, Plant and Equipment**

Property, plant and equipment are as follows:

| | June 30, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| Land | $ | 2,092 | $ | 2,005 |
| Buildings and improvements | | 57,236 | | 58,208 |
| Processing equipment | | 46,304 | | 45,762 |
| Surgical instruments | | 848 | | 541 |
| Office equipment, furniture and fixtures | | 2,265 | | 1,730 |
| Computer equipment and software | | 20,820 | | 20,521 |
| Construction in process | | 14,749 | | 11,717 |
| | | 144,314 | | 140,484 |
| Less accumulated depreciation | | (74,183) | | (70,594) |
| | $ | 70,131 | $ | 69,890 |

For the three months ended June 30, 2020 and 2019, the Company had depreciation expense in connection with property, plant and equipment of $1,880 and $2,800, respectively and for the six months ended months ended June 30, 2020 and 2019, the Company had depreciation expense in connection with property, plant and equipment of $3,646 and $5,539, respectively. For the three and six months ended June 30, 2020, the Company recorded asset impairment and abandonment charges of $882 and $2,761, respectively related to property, plant and equipment in the Spine segment. The Spine asset group could not support the newly capitalized carrying amount of the property, plant and equipment, because the Spine asset group has projected negative cash flows over the useful life of the long-lived assets in the asset group. The fair value of property and equipment was measured utilizing an orderly liquidation value of each of the underlying assets.

**13. Goodwill**

The change in the carrying amount of goodwill for the six months ended June 30, 2020, is as follows:

| | June 30, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| Balance at January 1 | $ | 55,384 | $ | 59,798 |
| Goodwill acquired related to Paradigm acquisition | | — | | 135,589 |
| Goodwill impairment | | — | | (140,003) |
| Balance at end of period | $ | 55,384 | $ | 55,384 |

On March 8, 2019, we acquired Paradigm for a purchase price of approximately $232,907 and recorded goodwill of approximately $135,589. The goodwill arising from the Paradigm acquisition was specifically allocated to the Spine reporting unit. For the impairment test performed in 2019, it was concluded the fair value of goodwill is substantially in excess of our carrying value. For the Spine reporting unit test for the year ended December 31, 2019, it was concluded the carrying value was in excess of the fair value of goodwill and we recorded an impairment charge of all the goodwill in the Spine reporting unit totaling $140,003.

**14. Other Intangible Assets**

Other intangible assets are as follows:

| | June 30, 2020 | | | | | December 31, 2019 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Gross Carrying Amount | | Accumulated Amortization | | Net Carrying Amount | | Gross Carrying Amount | | Accumulated Amortization | | Net Carrying Amount |
| Patents | $ 5,128 | $ | 2,983 | $ | 2,145 | $ | 5,095 | $ | 2,768 | $ | 2,327 |
| Acquired licensing rights | 2,522 | | 157 | | 2,365 | | 1,413 | | 64 | | 1,349 |
| Marketing and procurement and other intangible assets | 16,509 | | 10,405 | | 6,104 | | 16,488 | | 9,672 | | 6,816 |
| Total | $ 24,159 | $ | 13,545 | $ | 10,614 | $ | 22,996 | $ | 12,504 | $ | 10,492 |

17

For the three months ended June 30, 2020 and 2019, the Company had amortization expense of other intangible assets of $568 and $995, respectively and for the six months ended June 30, 2020 and 2019, the Company had amortization expense of other intangible assets of $1,041 and $1,952, respectively.

At June 30, 2020, management's estimates of future amortization expense for the next five years are as follows:

| | Amortization Expense |
|---|---|

| | |
|---|---:|
| 2020 (remaining) | 1,150 |
| 2021 | 2,300 |
| 2022 | 2,300 |
| 2023 | 700 |
| 2024 | 700 |
| 2025 | 700 |

## 15.    Fair Value Information

Fair value is defined as the price that would be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants on the measurement date. Valuation techniques used to measure fair value maximize the use of observable inputs and minimize the use of unobservable inputs. The fair value hierarchy defines a three-level valuation hierarchy for classification and disclosure of fair value measurements as follows:

Level 1 – Quoted prices in active markets for identical assets or liabilities.

Level 2 – Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

Level 3 – Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

Embedded derivatives identified within the Ares incremental term loan entered into, assessed and adjusted to their estimated fair value during the second quarter of 2020. Fair value is measured as of the debt issuance date using Level 3 inputs. For the issuance, the derivative level 3 fair value was measured based on a probability-weighted discounted cash flow approach. Unobservable inputs included the probability of a shareholder approval (unobservable), a recovery scenario should shareholder approval not occur (unobservable), and an estimated discount rate based on market data of comparable debt (observable).

Long-lived assets, including property and equipment subject to amortization were impaired and written down to their estimated fair values during the first quarter of 2020. Fair value is measured as of the impairment date using Level 3 inputs. For the 2020 impairments, the long-lived asset level 3 fair value was measured base on orderly liquidation value for the Property, plant and equipment. Unobservable inputs for the orderly liquidation value included replacement costs (unobservable), physical deterioration estimates (unobservable) and market sales data for comparable assets and unobservable inputs for the income approach included forecasted cash flows generated from use of the intangible assets (unobservable).

The following table summarizes impairments of long-lived assets and the related post impairment fair values of the corresponding assets for the three and six months ended June 30, 2020.

| | For the Three Months Ended June 30, 2020 | | For the Six Months Ended June 30, 2020 | |
|---|---|---|---|---|
| | **Impairment** | **Fair Value** | **Impairment** | **Fair Value** |
| Property, plant and equipment - net | 882 | 803 | 2,761 | 803 |
| | $           882 | $           803 | $        2,761 | $           803 |

18

## 16.    Accrued Expenses

Accrued expenses are as follows:

| | June 30, 2020 | December 31, 2019 |
|---|---|---|
| Accrued compensation | $           5,283 | $           5,435 |
| Accrued severance and restructuring costs | 604 | 136 |
| Accrued distributor commissions | 4,274 | 4,569 |
| Accrued donor recovery fees | 4,191 | 8,921 |
| Accrued leases | 1,001 | 1,159 |
| Accrued transactions and integration expenses | 4,934 | 2,555 |
| Other | 9,633 | 10,562 |
| | $         29,920 | $         33,337 |

## 17.    Short and Long-Term Obligations

Short and long-term obligations are as follows:

| | June 30, 2020 | December 31, 2019 |
|---|---|---|

| | | | | |
|---|---|---:|---|---:|
| Ares Term loan | | $ 127,710 | $ | 104,406 |
| JPM Facility | | 64,096 | | 71,000 |
| Derivative Liability | | 23,020 | | - |
| Less unamortized debt issuance costs | | (2,686) | | (1,229) |
| Total | | 212,140 | | 174,177 |
| Less current portion | | 212,140 | | 174,177 |
| Long-term portion | | $ - | $ | - |

On June 5, 2018, the Company, along with its wholly-owned subsidiary, Pioneer Surgical, entered into that certain Credit Agreement (the "2018 Credit Agreement"), as borrowers, with JPMorgan Chase Bank, N.A. ("JPM"), as lender (together with the various financial institutions as in the future may become parties thereto, the "JPM Lenders") and as administrative agent for the JPM Lenders. The 2018 Credit Agreement provides for a revolving credit facility in the aggregate principal amount of up to $100,000 (the "JPM Facility") (subsequently reduced to $75,000, and later increased to $80,000, in each case, as described below). The Company and Pioneer Surgical will be able to, at their option, request an increase to the JPM Facility in an amount not to exceed $50,000, subject to customary conditions and the approval of JPM and the JPM Lenders providing such increased amount.

The JPM Facility is guaranteed by the Company's domestic subsidiaries and is secured by: (i) substantially all of the assets of the Company and Pioneer Surgical; (ii) substantially all of the assets of each of the Company's domestic subsidiaries; and (iii) 65% of the stock of the Company's foreign subsidiaries.

The Company may elect to apply either the CBFR or Eurodollar rate to any borrowing. The CBFR loans will bear interest at a rate per annum equal to the monthly REVLIBOR30 Rate plus the Adjusted LIBO Rate. The Company may elect to convert the interest rate for the Eurodollars Loans to a rate per annum equal to the adjusted LIBOR Rate plus the JPM Eurodollar Rate. The applicable margin was subject to adjustment after the end of each fiscal quarter, based upon the Company's average quarterly availability (subsequently modified by the Fourth Amendment to the 2018 Credit Agreement (as defined below)). The maturity date of the JPM Facility is June 5, 2023 (subsequently modified by the Fourth Amendment to the 2018 Credit Agreement (as defined below)). The Company may make optional prepayments on the JPM Facility without penalty. The Company paid certain customary closing costs and bank fees upon entering into the 2018 Credit Agreement.

19

The Company is subject to certain affirmative and negative covenants, including (but not limited to), covenants limiting the Company's ability to: incur certain additional indebtedness; create certain liens; enter into sale and leaseback transactions; and consolidate or merge with, or convey, transfer or lease all or substantially all of its assets to another person. The Company is required to maintain a minimum fixed charge coverage ratio of at least 1.00:1.00 (the "JPM Required Minimum Fixed Charge Coverage Ratio") on each JPM Calculation Date (as defined below) during either of the following periods (each, a "JPM Covenant Testing Period"): (i) a period beginning on a date that a default has occurred and is continuing under the loan documents entered into by the Company in conjunction with the 2018 Credit Agreement through the first date on which no default has occurred and is continuing; or (ii) a period beginning on a date that availability under the JPM Facility is less than the specified covenant testing threshold and continuing until availability under the JPM Facility is greater than or equal to the specified covenant testing threshold for thirty (30) consecutive days. The JPM Required Minimum Fixed Charge Coverage Ratio is measured on the last day of each calendar month during the JPM Covenant Testing Period (each a "JPM Calculation Date"), and is calculated using the minimum fixed charge coverage ratio for the twelve (12) consecutive months ending on each JPM Calculation Date. The amounts owed under the 2018 Credit Agreement may be accelerated upon the occurrence of certain events of default customary for facilities for similarly rated borrowers.

*First Amendment to Credit Agreement and Joinder Agreement*

On March 8, 2019, the Company entered into a First Amendment to Credit Agreement and Joinder Agreement dated as of March 8, 2019 (the "2019 First Amendment"), among the Company, Legacy RTI, as a borrower, Pioneer Surgical, as a borrower, the other loan parties thereto as guarantors, JP Morgan Chase Bank, N.A., as lender (together with the various financial institutions as in the future may become parties thereto) and as administrative agent for the JPM Lenders. The 2019 First Amendment amended the 2018 Credit Agreement by: (i) reducing the aggregate revolving commitments available to Legacy RTI and Pioneer Surgical from $100,000 to $75,000; (ii) joining the Company and Paradigm, and its domestic subsidiaries as guarantors as loan parties to the 2018 Credit Agreement; (iii) permitting the Ares Term Loan (as defined below); and (iv) making certain other changes to the 2018 Credit Agreement consistent with the foregoing including pro rata reductions to certain thresholds that were based on the aggregate commitments under the 2018 Credit Agreement.

*Second Amendment to Credit Agreement*

The Company entered into a Second Amendment to Credit Agreement dated as of December 9, 2019 (the "2019 Second Amendment"). The 2019 Second Amendment amended the 2018 Credit Agreement by increasing the aggregate revolving commitments available to Legacy RTI and Pioneer Surgical from $75,000 to $80,000.

*Third Amendment to Credit Agreement and Joinder Agreement*

On April 9, 2020, Legacy RTI entered into a Consent and Third Amendment to Credit Agreement and Joinder Agreement (the "Third Amendment to the 2018 Credit Agreement"), by and among the JPM Loan Parties and the JPM Lenders. The Third Amendment to the 2018 Credit Agreement amended the 2018 Credit Agreement by: (i) extending the deadline for delivery of certain annual audited financial statements of the Company from March 30, 2020 to April 30, 2020, (ii) modifying certain interest rates contained therein to contain a 1.00% floor, (iii) requiring the Company and each other Loan Party to close all of its deposit accounts and securities accounts at Wells Fargo Bank, N.A. or any affiliates thereof on or before June 19, 2020, and (iv) making certain other changes to the 2018 Credit Agreement consistent with the foregoing.

*Fourth Amendment to Credit Agreement and Joinder Agreement*

On April 27, 2020, Legacy RTI entered into a Fourth Amendment to Credit Agreement (the "Fourth Amendment to the 2018 Credit Agreement"), by and among the JPM Loan Parties, JPM and the JPM Lenders. The Fourth Amendment to the 2018 Credit Agreement amends the 2018 Agreement to: (i) provide for a $8,000 block on availability under the 2018 Credit Agreement until the earlier of: (a) the date upon which at least $25,000 of the Second Amendment Incremental Term Loan Commitments (as defined below) have been funded to Legacy RTI in accordance with the 2019 Credit Agreement and evidence of such funding, in form and substance satisfactory to JPM, shall have been received by JPM.; and (b) the date upon which (1) no default or event of default exists under the 2018 Credit Agreement; and (2) Ares notifies Legacy RTI that, for any reason, Second Amendment Incremental Term Loan Commitments have been terminated in accordance with the terms of the 2019 Credit Agreement and evidence of such termination, in form and substance satisfactory to JPMorgan Chase Bank, N.A., shall have been delivered to JPM; (ii) amend the applicable rate with respect to any loan to 2.75% per annum; and (iii) amend the maturity date to the earlier to occur of: (a) June 5, 2023, or any earlier date on which the commitments are reduced to zero or otherwise terminated pursuant to the terms of the 2018 Credit Agreement; and (b) the date that is 30 days prior to the maturity date of the Second Amendment Incremental Term Loan Commitments (as defined below), as the same may be extended from time to time pursuant to the terms of the 2019 Credit Agreement and such extension is agreed to by the JPM Lenders.

At June 30, 2020, the interest rate applicable to CBFR loans and Eurodollars under the JPM Facility was 3.75%. As of June 30, 2020, there was $64,096 outstanding on the JPM Facility and total remaining available credit on the JPM Facility was $7,404. The Company's ability to access the JPM Facility is subject to and can be limited by the Company's compliance with the Company's financial and other covenants.

20

*Second Lien Credit Agreement and Term Loan*

On March 8, 2019, Legacy RTI entered into a Second Lien Credit Agreement dated as of March 8, 2019 (the "2019 Credit Agreement"), among Legacy RTI, as a borrower, the other loan parties thereto as guarantors (together with Legacy RTI, the "Ares Loan Parties"), Ares Capital Corporation ("Ares"), as lender (together with the various financial institutions as in the future may become parties thereto, the "Ares Lenders") and as administrative agent for the Ares Lenders. The 2019 Credit Agreement provides for a term loan in the principal amount of up to $100,000 (the "Ares Term Loan") (subsequently increased to $130,000 as described below). The Ares Term Loan was advanced in a single borrowing on March 8, 2019 (other than any increase thereto as described below).

The Ares Term Loan is guaranteed by the Company and each of the Company's domestic subsidiaries and is secured by: (i) substantially all of the assets of Legacy RTI; (ii) substantially all of the assets of the Company; (iii) substantially all of the assets of the Company's domestic subsidiaries; and (iv) 65% of the stock of the Company's foreign subsidiaries.

*First Amendment to Second Lien Credit Agreement*

On March 3, 2020, the Company entered into a First Amendment to Second Lien Credit Agreement, dated March 3, 2020 (the "2020 First Amendment"), by and among the Ares Loan Parties and the Ares Lenders. The 2020 First Amendment amended the 2019 Credit Agreement: (a) amending the definition of "EBITDA" contained therein; (b) modifying the Leverage Ratio covenant contained therein; and (c) making certain other changes to the 2019 Credit Agreement consistent with the foregoing. These amendments will allow the Company to, among other things, support the investment being made to separate the OEM and Spine businesses in anticipation of the sale of the Company's OEM business.

*Second Amendment to Second Lien Credit Agreement*

On April 27, 2020, the Company entered into a Second Amendment to Second Lien Credit Agreement (the "Second Amendment to the 2019 Credit Agreement"), by and among the Ares Loan Parties and the Ares Lenders. The Second Amendment to the 2019 Credit Agreement amended the 2019 Credit Agreement to: (i) establish an incremental term loan commitment; (ii) provide for certain incremental term loans in an aggregate principal amount not to exceed $30,000 (the "Second Amendment Incremental Loan Commitments"); (iii) provide for a portion of the Second Amendment Incremental Loan Commitments up to $13,500 be available on a delayed-draw basis at any time after the effective date of the Ares Amendment and on or prior to August 31, 2020, subject to certain conditions; iv) increase the Base Rate applicable margin with respect to all Term Loans (other than the Second Amendment Incremental Term Loans) to 12.5% effective on September 1, 2020; and (v)make certain other changes to the 2019 Credit Agreement consistent with the foregoing. Pursuant to the terms of the Second Amendment to the 2019 Credit Agreement, Legacy RTI agreed pay to Ares, for the ratable benefit of each incremental term lender, a fee in an amount equal to 5.0% of the principal amount of the incremental term loan commitments provided by such lender on the effective date of the Ares Amendment. The maturity of the loans advanced under the Second Amendment Incremental Term Commitments (the "Second Amendment Incremental Term Loans") have a maturity date of April 27, 2021. The Second Amendment Incremental Term Loans must be repaid in their entirety, at which time a takeout fee ranging from $11,250 to $25,500 shall be due and payable (the "Takeout Fee"). The Takeout Fee is inclusive of all interest accruing due and payable with respect to the Second Amendment Incremental Term Loans. The interest rate on the Second Amendment Incremental Term Loans is 12.50% and, commencing on September 1, 2020 and on the first day of each of the next four calendar months thereafter, the interest in respect of the Second Amendment Incremental Term Loans shall increase on each such date, on a cumulative basis, by an additional 1.00% per annum (such that, after the fifth such increase, the Base Rate with respect to the Second Amendment Incremental Term Loans shall equal 17.50% per annum).

The Ares Term Loan will bear interest at a rate per annum equal to, at the option of Legacy RTI: (i) the monthly Base Rate plus an adjustable margin of up to 7.50% (the "Base Rate"); or (ii) the LIBOR plus an adjustable margin of up to 8.50% (the "Ares Eurodollar Rate") (as the Base Rate and the Ares Eurodollar Rate were subsequently modified as described below). Subject to customary notices, Legacy RTI may elect to convert the Ares Term Loan from Base Rate to Ares Eurodollar Rate or from Ares Eurodollar Rate to Base Rate. The applicable margin is subject to adjustment after the end of each fiscal quarter, based upon the Ares Loan Parties' Leverage Ratio (as subsequently modified as described below). At any time during the period commencing on March 8, 2019 and ending on March 8, 2021, if the Ares Loan Parties' Leverage Ratio is greater than 4.50:1.00, Legacy RTI shall have the option (the "PIK Option") to elect to pay 50% of the interest that will accrue in the subsequent quarterly period in kind by capitalizing it and adding such amount to the principal balance of the Ares Term Loan. If Legacy RTI exercises the PIK Option, the

adjustable margin applicable to the Ares Term Loan shall be increased by 0.75%.

The maturity date of the Ares Term Loan is December 5, 2023. Legacy RTI may make optional prepayments on the Ares Term Loan, provided that any such optional prepayments made on or prior to March 8, 2022, shall be subject to a make whole premium or a prepayment price, as the case may be. Legacy RTI is required to make mandatory prepayments of the Ares Term Loan based on excess cash flow and the Ares Loan Parties' Leverage Ratio, upon the incurrence of certain indebtedness not otherwise permitted under the 2019 Credit Agreement, upon consummation of certain dispositions, and upon the receipt of certain proceeds of casualty events. Legacy RTI was required to pay certain customary closing costs and bank fees upon entering into the 2019 Credit Agreement.

21

Legacy RTI is subject to certain affirmative and negative covenants, including (but not limited to), covenants limiting Legacy RTI's ability to: incur certain additional indebtedness; create certain liens; enter into sale and leaseback transactions; and consolidate or merge with, or convey, transfer or lease all or substantially all of its assets to another person. During any JPM Covenant Testing Period Legacy RTI is required to maintain a minimum fixed charge coverage ratio of at least 0.91:1.00 (the "Ares Required Minimum Fixed Charge Coverage Ratio"). The Ares Required Minimum Fixed Charge Coverage Ratio is measured on each JPM Calculation Date, and is calculated using the minimum fixed charge coverage ratio for the twelve (12) consecutive months ending on each JPM Calculation Date. The Ares Loan Parties are required to maintain an initial Leverage Ratio of 9.00:1.00, which ratio steps down each fiscal quarter of Legacy RTI resulting in a requirement that the Ares Loan Parties maintain a total net leverage ratio of 3.50:1.00 for the fiscal quarter ending June 30, 2021 (as subsequently modified as described below), and each fiscal quarter ending thereafter.

The amounts owed under the 2019 Credit Agreement may be accelerated upon the occurrence of certain events of default customary for facilities for similarly rated borrowers.

At June 30, 2020, the interest rate for the Ares Term Loan was 9.75%.

For the six months ended June 30, 2020 and 2019, interest expense associated with the amortization of debt issuance costs was $283 and $361, respectively. Included in the six months ended June 30, 2019, was $219 of accelerated amortization of debt issuance costs associated with the modification of the 2018 Credit Agreement. For the six months ended June 30, 2019, the Company incurred total debt issuance cost of $826.

As of June 30, 2020, the Company had approximately $2,229 of cash and cash equivalents and $7,404 of availability under the 2018 Credit Agreement.

The 2019 Credit Agreement contains a debt to EBITDA covenant, which requires the Company to maintain a 5.75:1 Leverage Ratio for each quarter ending in 2020, including the fiscal quarter ended March 31, 2020. The 2019 Credit Agreement provides that the Leverage Ratio reduces to 5.25:1 for the quarters ending March 31, 2021 and June 30, 2021, with a final reduction to 3.50:1 for each quarter ending thereafter. Our Leverage Ratio as of March 31, 2020 is approximately 5.98:1.

On April 9, 2020 and on May 8, 2020, the Company received waivers and consent agreements with respect to certain financial statement delivery requirements extending the due dates for delivering the required financial statements under the credit facilities. Further, Pursuant to two Consent Agreements, dated June 1, 2020, one with respect to the JPM Credit Facility and one for the Ares Term Loan, each of JPM, the JPM Lenders, Ares and the Ares Lenders, respectively, agreed to extend the deadline for the delivery of the fiscal year end 2019 financial statements to June 8, 2020. Further, each of JPM, the JPM Lenders, Ares and the Ares Lenders also agreed to waive the requirement with respect to the going concern qualification.

In connection with any repayment or prepayment of principal of the Second Amendment Incremental Loan Commitments (whether voluntary, mandatory, at maturity, by acceleration or otherwise), the Company is obligated to pay the Takeout Fee to the lender. The maximum potential Takeout Fee of $25.5 million will be recorded as initial debt discount and accrued over the expected life of the Second Amendment Incremental Loan Commitments until maturity using the effective interest method.

The Second Amendment Incremental Loan Commitments also contain a provision that allows the lender to accelerate the maturity of the debt upon the receipt of any proceeds from the incurrence of certain indebtedness, disposition of assets in excess of $2,500,000, or a casualty event. The Company will treat this provision as an embedded derivative feature that requires bifurcation and separate accounting from the debt host pursuant to ASC 815. The initial fair value of the embedded derivative of $10.4 million was recorded as a derivative liability that is presented as additional discount on the Second Amendment Incremental Loan Commitments being amortized over the term of the Second Amendment Incremental Loan Commitments using the effective interest method. The derivative liability will be marked to fair value over the term of the Second Amendment Incremental Loan Commitments at each reporting period. As of June 30, 2020, the value of the derivative liability had increased from $10.4 million to $23 million. The Company recorded the increase in fair value of $12.6 million through Other (expense) income in the Statement of Comprehensive Loss.

22

18. **Other long-term liabilities**

Other long-term liabilities are as follows:

| | June 30, 2020 | December 31, 2019 |
|---|---|---|
| Acquisition contingencies | $ | $ 1,130 |

| | | | |
|---|---|---|---|
| Lease obligations | | 1,440 | 1,547 |
| Other | | 876 | 470 |
| | $ | 2,316 | $ 3,147 |

Acquisition contingencies represent the Company's fair value estimate of the Zyga acquisition clinical and revenue milestones of $1,130 at December 31, 2019. As of June 30, 2020, there was a $130 reduction in the contingent liability estimate of the Zyga acquisition revenue earnout, as the probability weighted model has been updated based on the current updated forecast for the performance of the Zyga product portfolio. The clinical milestone of $1,000 has been reclassified to current as it will be paid in Q2 2021.

### 19. Income Taxes

The Company evaluates the need for deferred tax asset valuation allowances based on a more likely than not standard. The ability to realize deferred tax assets depends on the ability to generate sufficient taxable income within the carryback or carryforward periods provided for in the tax law for each applicable tax jurisdiction. The Company has evaluated all evidence, both positive and negative, and determined that its domestic deferred tax assets are not more likely than not to be realized. Accordingly, the Company has recorded valuation allowances in the amount of $62,975 and $51,508 at June 30, 2020 and December 31, 2019, respectively. In making this determination, numerous factors were considered including the cumulative recent loss position in the US.

The Company considers the removal of the going concern evaluation and the Company's foreign operations three-year cumulative income position to be objectively verifiable evidence which supports the Company's ability to utilize its foreign deferred tax assets. As a result, the valuation allowances against its foreign subsidiaries' deferred tax assets has been released, resulting in a tax benefit of approximately $3.4M. The Company expects its foreign deferred tax assets of $3,300, net of the valuation allowance at June 30, 2020 of $ 62,975, to be realized through the generation of future taxable income and the reversal of existing taxable temporary differences.

On March 27, 2020, the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act") was enacted by the United States Congress. As a result of the enactment of the CARES Act, net operating losses ("NOL's") can now be carried back for five years and resulted in the Company recognizing a benefit of approximately $3.5 million of related to a tax receivable. Our effective tax rate was 7.9 percent and 10.8 percent for the quarter and six months ended June 30, 2020, respectively.

The effective tax rate is impacted both for quarter and year-to-date by valuation allowances in the U.S., which reduce the tax benefit associated with pretax losses. The impact of the U.S valuation allowances is offset in part by the CARES Act and foreign valuation allowance release benefits referenced above. The June 30, 2019 effective tax rate was primarily a result of pretax earnings at statutory rates.

### 20. Preferred Stock

On June 12, 2013, the Company and WSHP Biologics Holdings, LLC, an affiliate of Water Street Healthcare Partners, a leading healthcare-focused private equity firm ("Water Street"), entered into an investment agreement. Pursuant to the terms of the investment agreement, the Company issued $50,000 of convertible preferred equity to Water Street in a private placement which closed on July 16, 2013, with preferred stock issuance costs of $1,290. The preferred stock accrued dividends at a rate of 6% per annum. To the extent dividends are not paid in cash in any quarter, the dividends which have accrued on each outstanding share of preferred stock during such three-month period will accumulate until paid in cash or converted to common stock.

On August 1, 2018, the Company and Water Street, a related party, entered into an Amended and Restated Certificate of Designation of Series A Convertible Preferred Stock of RTI Surgical, Inc. (the "Amended and Restated Certificate of Designation"). Pursuant to the Amended and Restated Certificate of Designation: (1) dividends on the Series A Preferred Stock will not accrue after July 16, 2018 (in the event of a default by the Company, dividends will begin accruing and will continue to accrue until the default is cured); (2) the Company may not force a redemption of the Series A Preferred Stock prior to July 16, 2020; and (3) the holders of the Series A Preferred Stock may not convert the Series A Preferred Stock into common stock prior to July 16, 2021 (with certain exceptions). The Company evaluated and concluded on a qualitative basis the amendment qualifies as modification accounting to the preferred shares, which did not result in a change in the valuation of the shares.

23

Preferred stock is as follows:

| | Preferred Stock Liquidation Value | Preferred Stock Issuance Costs | Net Total |
|---|---|---|---|
| Balance at January 1, 2020 | $ 66,519 | $ (109) | $ 66,410 |
| Amortization of preferred stock issuance costs | — | 46 | 46 |
| Balance at March 31, 2020 | 66,519 | (63) | 66,456 |
| Amortization of preferred stock issuance costs | — | 46 | 46 |
| Balance at June 30, 2020 | $ 66,519 | $ (17) | $ 66,502 |

| | Preferred Stock Liquidation Value | Preferred Stock Issuance Costs | Net Total |
|---|---|---|---|
| Balance at January 1, 2019 | $ 66,519 | $ (293) | $ 66,226 |
| Amortization of preferred stock issuance costs | — | 46 | 46 |

| | | | | | |
|---|---|---|---|---|---|
| Balance at March 31, 2019 | | 66,519 | | (247) | 66,272 |
| Amortization of preferred stock issuance costs | | — | | 46 | 46 |
| Balance at June 30, 2019 | $ | 66,519 | $ | (201) | $ 66,318 |

## 21. Severance and Restructuring Costs

As part of the acquisition of Paradigm in 2019, management implemented a plan for which remaining outstanding balances at December 31, 2019 were fully paid out during the first quarter of 2020. During the second quarter of 2020, management implemented a plan as part of the sale of OEM which resulted in $604 of severance and restructuring expense for the six months ended June 30, 2020 included in severance and restructuring costs within the Condensed Consolidated Statements of Comprehensive Gain (Loss). The severance plan is the transition of certain executives as a result of the sale of the OEM business and is composed of payroll expense all within the Spine segment, which cumulatively the plan will be $604. The total severance and restructuring costs are expected to be paid in full by the fourth quarter of 2020. Severance and restructuring payments are made over periods ranging from one month to six months and are not expected to have a material impact on cash flows of the Company in any quarterly period. The following table includes a roll-forward of severance and restructuring costs included in accrued expenses, see Note 16.

| | | |
|---|---|---|
| Accrued severance and restructuring costs at January 1, 2020 | $ | 136 |
| Severance and restructuring costs accrued in 2020 | | 604 |
| Subtotal severance and restructuring costs | | 740 |
| Severance and restructuring related cash payments | | (136) |
| Accrued severance and restructuring charges at June 30, 2020 | $ | 604 |

## 22. Commitments and Contingencies

*Sale of OEM Business* – On July 20, 2020, pursuant to the previously announced Equity Purchase Agreement, dated as of January 13, 2020, as amended by that certain First Amendment to Equity Purchase Agreement dated as of March 6, 2020, that certain Second Amendment to Equity Purchase Agreement, dated as of April 27, 2020 and that certain Third Amendment to Equity Purchase Agreement, dated as of July 8, 2020 (as amended, the "Purchase Agreement"), by and between the Company and Ardi Bidco Ltd. (the "Buyer"), an entity owned and controlled by Montagu Private Equity LLP, and each of the agreements ancillary to the Purchase Agreement, the transactions contemplated by the Purchase Agreement (the "Transactions") were consummated. As a result of the Transactions, among other things, the Company's original equipment manufacturing business and the Company's business related to processing donated human musculoskeletal and other tissue and bovine and porcine animal tissue in producing allograft and xenograft implants using BIOCLEANSE®, TUTOPLAST® and CANCELLE® SP sterilization processes were sold to the Buyer and its affiliates for a purchase price of $440 million of cash, subject to certain adjustments primarily relating to working capital delivered at closing. More specifically, pursuant to the terms of the Purchase Agreement, the Company and its subsidiaries sold to the Buyer and its affiliates all of the issued and outstanding shares of RTI OEM, LLC (which, prior to the Transactions, was converted to a corporation and changed its name to "RTI Surgical, Inc."), RTI Surgical, LLC (which, prior to the Transactions, was converted to a corporation and changed its name to "Pioneer Surgical Technology, Inc."), Tutogen Medical (United States), Inc. and Tutogen Medical GmbH. The Transactions were previously described in the Proxy Statement filed by the Company with the U.S. Securities and Exchange Commission (the "SEC") on June 18, 2020.

24

*Agreement to Acquire Paradigm* – On March 8, 2019, pursuant to the Master Transaction Agreement, the Company acquired Paradigm in a cash and stock transaction valued at up to $300,000, consisting of $150,000 on March 8, 2019, plus potential future milestone payments. Established in 2005, Paradigm's primary product is the coflex® Interlaminar Stabilization® device, a differentiated and minimally invasive motion preserving stabilization implant that is FDA premarket approved for the treatment of moderate to severe lumbar spinal stenosis in conjunction with decompression.

Under the terms of the agreement, the Company paid $100,000 in cash and issued 10,729,614 shares of the Company's common stock. The shares of Company common stock issued on March 8, 2019, were valued based on the volume weighted average closing trading price for the five trading days prior to the date of execution of the definitive agreement, representing $50,000 of value. In addition, the Company may be required to pay up to an additional $150,000 in a combination of cash and Company common stock based on a revenue earnout consideration. Based on a probability weighted model, the Company estimates a contingent liability related to the revenue based earnout of zero.

*Acquisition of Zyga* – On January 4, 2018, the Company acquired Zyga, a leading spine-focused medical device company that develops and produces innovative minimally invasive devices to treat underserved conditions of the lumbar spine. Zyga's primary product is the SImmetry® Sacroiliac Joint Fusion System. Under the terms of the merger agreement dated January 4, 2018, the Company acquired Zyga for $21,000 in consideration paid at closing (consisting of borrowings of $18,000 on its revolving credit facility and $3,000 cash on hand), $1,000 contingent upon the successful achievement of a clinical milestone, and a revenue based earnout consideration of up to an additional $35,000. Based on a probability weighted model, the Company estimates a contingent liability related to the clinical milestone of $1,000, which is within the Accrued expenses line of the Condensed Consolidated Balance Sheets.

*Distribution Agreement with Medtronic* – On October 12, 2013, the Company entered into a replacement distribution agreement with Medtronic, plc. ("Medtronic"), pursuant to which Medtronic will distribute certain allograft implants for use in spinal, general orthopedic and trauma surgery. Under the terms of this distribution agreement, Medtronic will be a non-exclusive distributor except for certain specified implants for which Medtronic will be the exclusive distributor. Medtronic will maintain its exclusivity with respect to these specified implants unless the cumulative fees received by us from Medtronic for these specified implants decline by a certain amount during any trailing 12-month period. The initial term of this distribution agreement was to have been through December 31, 2017. The term automatically renews for successive five-year periods, unless either party provides written notice of its intent not to renew at least one year prior to the expiration of the initial term or the applicable renewal period. Neither party provided notice of non-renewal on or before December 31, 2016, thereby triggering the five-year automatic renewal period upon the expiration of the initial term. The distribution agreement will therefore continue at least through December 31, 2022.

*Distribution Agreement with Zimmer Dental Inc.* - On September 3, 2010, the Company entered into an exclusive distribution agreement with Zimmer Dental, Inc. ("Zimmer Dental"), a subsidiary of Zimmer, with an effective date of September 30, 2010, as amended from time to time. The Agreement was assigned to Biomet 3i, LLC ("Biomet"), an affiliate of Zimmer Dental, on January 1, 2016. The Agreement has an initial term of ten years. Under the terms of this distribution agreement, the Company agreed to supply sterilized allograft and xenograft implants at an agreed upon transfer price, and Biomet agreed to be the exclusive distributor of the implants for dental and oral applications worldwide (except Ukraine), subject to certain Company obligations under an existing distribution agreement with a third party with respect to certain implants for the dental market. In consideration for Biomet's exclusive distribution rights, Biomet agreed to the following: 1) payment to the Company of $13,000 within ten days of the effective date (the "Upfront Payment"); 2) annual exclusivity fees ("Annual Exclusivity Fees") paid annually as long as Biomet maintains exclusivity for the term of the contract to be paid at the beginning of each calendar year; and 3) annual purchase minimums to maintain exclusivity. Upon occurrence of an event that materially and adversely affects Biomet's ability to distribute the implants, Biomet may be entitled to certain refund rights with respect to the then current Annual Exclusivity Fee, where such refund would be in an amount limited by a formula specified in this agreement that is based substantially on the occurrence's effect on Biomet's revenues. The Upfront Payment, the Annual Exclusivity Fees and the fees associated with distributions of processed tissue are considered to be a single performance obligation. Accordingly, the Upfront Payment and the Annual Exclusivity Fees are deferred as received and are being recognized as other revenues over the term of this distribution agreement based on the expected contractual annual purchase minimums relative to the total contractual minimum purchase requirements in this distribution agreement. Additionally, the Company considered the potential impact of this distribution agreement's contractual refund provisions and does not expect these provisions to impact future expected revenue related to this distribution agreement.

The Company's aforementioned revenue recognition methods related to the Zimmer distribution agreements do not result in the deferral of revenue less than amounts that would be refundable in the event the agreements were to be terminated in future periods. Additionally, the Company evaluates the appropriateness of the aforementioned revenue recognition methods on an ongoing basis.

**23.      Legal Actions**

The Company is, from time to time, involved in litigation relating to claims arising out of its operations in the ordinary course of business. Based on the information currently available to the Company, including the availability of coverage under its insurance policies, the Company does not believe that any of these claims that were outstanding as of June 30, 2020 will have a material adverse impact on its financial position or results of operations. The Company's accounting policy is to accrue for legal costs as they are incurred.

25

*Coloplast* — The Company is presently named as co-defendant along with other companies in a small percentage of the transvaginal surgical mesh ("TSM") mass tort claims being brought in various state and federal courts. The TSM litigation has as its catalyst various Public Health Notifications issued by the FDA with respect to the placement of certain TSM implants that were the subject of 510k regulatory clearance prior to their distribution. The Company does not process or otherwise manufacture for distribution in the U.S. any implants that were the subject of these FDA Public Health Notifications. The Company denies any allegations against it and intends to continue to vigorously defend itself.

In addition to claims made directly against the Company, Coloplast, a distributor of TSM's and certain allografts processed and private labeled for them under a contract with the Company, has also been named as a defendant in individual TSM cases in various federal and state courts. Coloplast requested that the Company indemnify or defend Coloplast in those claims which allege injuries caused by the Company's allograft implants, and on April 24, 2014, Coloplast sued RTI Surgical, Inc. in the Fourth Judicial District of Minnesota for declaratory relief and breach of contract. On December 11, 2014, Coloplast entered into a settlement agreement with RTI Surgical, Inc. and Tutogen Medical, Inc. (the "Company Parties") resulting in dismissal of the case. Under the terms of the settlement agreement, the Company Parties are responsible for the defense and indemnification of two categories of present and future claims: (1) tissue only (where Coloplast is solely the distributor of Company processed allograft tissue and no Coloplast-manufactured or distributed synthetic mesh is identified) ("Tissue Only Claims"), and (2) tissue plus non-Coloplast synthetic mesh ("Tissue-Non-Coloplast Claims") (the Tissue Only Claims and the Tissue-Non-Coloplast Claims being collectively referred to as "Indemnified Claims"). As of June 30, 2020, there are a cumulative total of 1,137 Indemnified Claims for which the Company Parties are providing defense and indemnification. The defense and indemnification of these cases are covered under the Company's insurance policy subject to a reservation of rights by the insurer.

Based on the current information available to the Company, the impact that current or any future TSM litigation may have on the Company cannot be reasonably estimated.

*LifeNet* — On June 27, 2018, LifeNet Health, Inc. ("LifeNet") filed a patent infringement lawsuit in the United States District Court for the Middle District of Florida (since moved to the Northern District of Florida) claiming infringement of five of its patents by the Company. The suit requests damages, enhanced damages, reimbursement of costs and expenses, reasonable attorney fees, and an injunction. The asserted patents are now expired. On April 7, 2019, the Court granted the Company's request to stay the lawsuit pending the U.S. Patent Trial and Appeal Board's (PTAB) decision whether to institute review of the patentability of LifeNet's patents. On August 12, 2019 the PTAB instituted review of three LifeNet patents, and on September 3 the PTAB instituted review of the remaining two. Final decisions with respect to the patentability of LifeNet's patents (which may be appealed by either party) is expected to take place in the second half of 2020. The Company continues to believe the suit is without merit and will vigorously defend its position. Based on the current information available to the Company, the impact that current or any future litigation may have on the Company cannot be reasonably estimated.

*Securities Class Action*—There is currently ongoing stockholder litigation related to the Company's Investigation (as defined below). A class action complaint was filed by Patricia Lowry, a purported shareholder of the Company, against the Company, and certain current and former officers of the Company, in the United States District Court for the Northern District of Illinois on March 23, 2020 asserting claims under Sections 10(b) and 20(a) the Securities Exchange Act of 1934 (the "Exchange Act") and demanding a jury trial ("Lowry Action"). The court appointed a shareholder as Lead Plaintiff and set August 16, 2020 as the deadline for the filing of any amended complaint. Counsel for Lead Plaintiff has filed a motion seeking to extend the deadline for the filing an amended complaint until August 31, 2020. . Based on the current information available to the

Company, the impact that current or any future litigation may have on the Company cannot be reasonably estimated.

*Derivative Lawsuits*—Three derivative lawsuits have also been filed on behalf of the Company, naming it as a nominal defendant, and demanding a jury trial. On June 5, 2020, David Summers filed a shareholder derivative lawsuit ("*Summers* Action") against certain current and former directors and officers of the Company (as well as the Company as a nominal defendant), in the United States District Court for the Northern District of Illinois asserting statutory claims under Sections 10(b), 14(a) and 20(a) of the Exchange Act, as well as common law claims for breach of fiduciary duty, unjust enrichment and corporate waste. Thereafter, two similar shareholder derivative lawsuits asserting many of the same claims were filed in the same court against the same current and former directors and officers of the Company (as well as the Company as a nominal defendant). The three derivative lawsuits have been consolidated into the first-filed *Summers* Action. No response to any complaint is due until after the Court rules on a leadership structure for plaintiffs' counsel and either a consolidated amended complaint is filed or the operative complaint is identified. Based on the current information available to the Company the financial or other impact of the Investigation cannot be reasonably determined.

In the future, we may become subject to additional litigation or governmental proceedings or investigations that could result in additional unanticipated legal costs regardless of the outcome of the litigation. If we are not successful in any such litigation, we may be required to pay substantial damages or settlement costs. Based on the current information available to the Company, the impact that current or any future stockholder litigation may have on the Company cannot be reasonably estimated.

The Company's accounting policy is to accrue for legal costs as they are incurred.

26

### 24. Regulatory Actions

*SEC Investigation*— As previously disclosed in the Company's Current Report on Form 8-K filed with the SEC on March 16, 2020, and the Form 10-K filed with the SEC on June 8,2020, the Audit Committee of the Board of Directors, with the assistance of independent legal and forensic accounting advisors, conducted an internal investigation of matters relating to the Company's revenue recognition practices for certain contractual arrangements, primarily with OEM customers, including the accounting treatment, financial reporting and internal controls related to such arrangements (the "Investigation"). The Investigation also examined transactions to understand the practices related to manual journal entries for accrual and reserve accounts. As a result of the Investigation, the Audit Committee concluded that the Company would restate its previously issued audited financial statements for fiscal years 2018, 2017 and 2016, selected financial data for fiscal years 2015 and 2014, the unaudited financial statements for the quarterly periods within these years commencing with the first quarter of 2016, as well as the unaudited financial statements for the quarterly periods within the 2019 fiscal year. The Investigation was precipitated by an investigation by the U.S. Securities and Exchange Commission initially related to the periods 2014 through 2016. The SEC investigation is ongoing and the Company is cooperating with the SEC in its investigation. Based on the current information available to the Company the financial or other impact of the Investigation cannot be reasonably determined.

*Environmental Protection Agency*—On January 28, 2020, RTI received an Opportunity to Show Cause letter from the United States Environmental Protection Agency ("EPA"). The letter alleged potential violations of hazardous waste regulations at the Company's Alachua, Florida facilities based on a November 20, 2019 inspection conducted by EPA, and offered the Company the opportunity to meet with EPA to explain why EPA should not take any formal enforcement action. The Company held a virtual meeting with EPA on May 19, 2020 to discuss the corrective actions it had taken in response to EPA's letter. During subsequent discussions, EPA has indicated that it intends to impose a penalty on the Company related to the allegations in the letter. The Company has recorded a liability for the amount the EPA has communicated they intend to impose on the Company related to the allegations in the letter which is included in accrued expenses in the condensed consolidated balance sheet. The Company is in negotiations with EPA.

### 25. Subsequent Events

The Company evaluated subsequent events as of the issuance date of the consolidated financial statements as defined by FASB ASC 855, *Subsequent Events*.

#### Sale of OEM Business

On July 15, 2020, RTI Surgical Holdings, Inc. (the "Company") the Company announced that it received all of the necessary approvals for the transactions contemplated by the previously disclosed Equity Purchase Agreement, dated as of January 13, 2020 (as amended, the "Purchase Agreement"), by and between the Company and Ardi Bidco Ltd., an entity owned and controlled by Montagu Private Equity LLP, and each of the agreements ancillary to the Purchase Agreement (the "Contemplated Transactions"), the Company's plans to change the name of the Company from "RTI Surgical Holdings, Inc." to "Surgalign Holdings, Inc." and the ticker symbol of the Company from "RTIX" to "SRGA" shortly after consummation of the Contemplated Transactions and the Company's leadership transitions.

On July 20, 2020, the Company announced the consummation of the Transactions, the Company's payment of its outstanding indebtedness, the Company's planned redemption of all of the outstanding shares of its Series A Convertible Preferred Stock, the Name Change, the Symbol Change and the Company's previously announced leadership transitions, including, without limitation, the appointment of Stuart F. Simpson as the Chairman of the Board, Terry M. Rich as a director and the President and Chief Executive of the Company and Jonathon M. Singer as the Chief Financial and Operating Officer of the Company.

On July 20, 2020, the Company filed: (i) a Certificate of Amendment of the Certificate of Incorporation with the Secretary of Delaware (the "Certificate of Incorporation Amendment"); and (ii) an Amended and Restated Certificate of Designation of Series A Convertible Preferred Stock (the "A&R Certificate of Designation") to change the name of the Company from "RTI Surgical Holdings, Inc." to "Surgalign Holdings, Inc." (the "Name Change"). In connection with the Name Change, the Company's common stock began trading under the new ticker symbol "SRGA;" trading

under the new ticker symbol is expected to begin on Thursday, July 23, 2020 (the "Symbol Change"). The new CUSIP number of the Company's common stock is 86882C 105.

The Name Change and Symbol Change do not affect the rights of the Company's security holders. The Company's common stock will continue to be quoted on Nasdaq. Following the Name Change, the stock certificates, which reflect the former name of the Company, will continue to be valid. Any certificates reflecting the Name Change will be issued in due course as old stock certificates are tendered for exchange or transfer to the Company's transfer agent.

27

**Discontinued Operations**

On July 20, 2020, pursuant to the previously announced Equity Purchase Agreement, dated as of January 13, 2020, as amended by that certain First Amendment to Equity Purchase Agreement dated as of March 6, 2020, that certain Second Amendment to Equity Purchase Agreement, dated as of April 27, 2020 and that certain Third Amendment to Equity Purchase Agreement, dated as of July 8, 2020 (as amended, the "Purchase Agreement"), by and between the Company and Ardi Bidco Ltd. (the "Buyer"), an entity owned and controlled by Montagu Private Equity LLP, and each of the agreements ancillary to the Purchase Agreement, the transactions contemplated by the Purchase Agreement (the "Transactions") were consummated. As a result of the Transactions, among other things, the Company's original equipment manufacturing business and the Company's business related to processing donated human musculoskeletal and other tissue and bovine and porcine animal tissue in producing allograft and xenograft implants using BIOCLEANSE®, TUTOPLAST® and CANCELLE® SP sterilization processes were sold to the Buyer and its affiliates for a purchase price of $440 million of cash, subject to certain adjustments. After consideration of initial working capital adjustments, we currently expect to record a pre-tax gain on disposition of the OEM business in the range of $245 million to $260 million during the third quarter of fiscal 2020. More specifically, pursuant to the terms of the Purchase Agreement, the Company and its subsidiaries sold to the Buyer and its affiliates all of the issued and outstanding shares of RTI OEM, LLC (which, prior to the Transactions, was converted to a corporation and changed its name to "RTI Surgical, Inc."), RTI Surgical, LLC (which, prior to the Transactions, was converted to a corporation and changed its name to "Pioneer Surgical Technology, Inc."), Tutogen Medical (United States), Inc. and Tutogen Medical GmbH. The Transactions were previously described in the Proxy Statement filed by the Company with the U.S. Securities and Exchange Commission (the "SEC") on June 18, 2020.

**Debt Retirement**

Effective on July 20, 2020, Surgalign Holdings, Inc. (i) paid in full its $80.0 million revolving credit facility under that certain Credit Agreement dated as of June 5, 2018, by and among Surgalign Spine Technologies, Inc. (formerly known as RTI Surgical, Inc.), as a borrower, Pioneer Surgical Technology, Inc., our wholly-owned subsidiary, as a borrower, the other loan parties thereto as guarantors, JPMorgan Chase Bank, N.A., as lender and as administrative agent for the JPM Lenders, as amended, (ii) terminated the 2018 Credit Agreement, (iii) paid in full its $100.0 million term loan and $30.0 million incremental term loan commitment under that certain Second Lien Credit Agreement, dated as of March 8, 2019, by and among Surgalign Spine Technologies, Inc., as borrower, the lenders party thereto from time to time and Ares Capital Corporation, as administrative agent for the other lenders party thereto, as amended and (iv) terminated the 2019 Credit Agreement.

**Retirement of Series A Convertible Preferred Stock and Related Events**

On July 17, 2020, the Company received a notification from WSHP Biologics Holdings, LLC ("WSHP") seeking redemption on or before September 14, 2020 of all of the outstanding shares of the Company's Series A Convertible Preferred Stock ("Series A Preferred Stock"), all of which are held by WSHP. On July 24, 2020 the Company redeemed the Series A Preferred Stock for approximately $67 million, a Certificate of Retirement was filed with the Delaware Secretary of State retiring the Series A Preferred Stock, and the WSHP representatives on the Company's Board of Directors, Curtis M. Selquist and Chris Sweeney resigned from the Board of Directors.

28

**Item 2.    Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Cautionary Statement Relating to Forward Looking Statements**

Information contained in this filing contains "forward-looking statements" which can be identified by the use of forward-looking terminology such as "anticipates," "expects," "intends," "plans," "believes," "seeks," "estimates," "requires," "hopes," "assumes" or comparable terminology, or by discussions of strategy. There can be no assurance that the future results covered by these forward-looking statements will be achieved. Some of the matters described in the "Risk Factors" section of our Annual Report on Form 10-K for the year ended December 31, 2019, or in subsequent Quarterly Reports on Form 10-Q (including this one), constitute cautionary statements which identify some of the factors regarding these forward-looking statements, including certain risks and uncertainties, that could cause actual results to vary materially from the future results indicated in these forward-looking statements. Other factors could also cause actual results to vary materially from the future results indicated in such forward-looking statements.

**Management Overview**

On July 20, 2020, RTI completed the disposition of the OEM business, and was renamed Surgalign Holdings, Inc.  References in this Form 10-Q to Surgalign or the Company refer to the Company as of June 30, 2020, prior to the disposition of the OEM business, unless otherwise noted or obvious from the context.   In conjunction with the sale of the OEM business the Company repaid and terminated all outstanding debt held on the books as of June 30, 2020.

Surgalign Holdings, Inc. is a global medical technology company advancing the science of spine care, focused on delivering innovative solutions that drive superior clinical and economic outcomes. The company is building off a legacy of high quality and differentiated products, and

continues to invest in clinically validated innovation to deliver better surgical outcomes and improve patient's lives. Surgalign markets products throughout the United States and in more than 50 countries worldwide through an expanding network of top independent distributors. Surgalign, a member of AdvaMed, is headquartered in Deerfield, Illinois, with commercial, innovation and, as of the date of this filing, has design centers in San Diego, California, and Wurmlingen, Germany. We were founded in 1997.

Domestic distributions and services accounted for 91% of total revenues in the first six months of 2020. Most of our implants are distributed directly to healthcare providers, hospitals and other healthcare facilities and various original equipment manufacturer ("OEM") relationships.

International distributions and services accounted for 9% of total revenues in the first six months of 2020. Our implants are distributed in over 50 countries through a direct sales force in Germany and through stocking distributors in the rest of the world outside of Germany and the U.S.

We continue to implement a focused strategy to expand our spine and OEM operations and create long-term, profitable growth for the Company. The core components of our strategy are:

- Reduce Complexity. We are working to reduce complexity in our organization by divesting non-core assets and investing in core competencies.

- Drive Operational Excellence. We are working to optimize material cost and drive operational efficiency to reduce other direct costs by pursuing world class manufacturing.

- Accelerate Growth. We are investing in innovative, niche high growth product categories leveraging core competency in the spine market; utilizing core technologies to expand OEM relationships and drive organic growth; and building relevant scale in our spinal portfolio to improve importance to the consolidating healthcare market driven by integrated delivery networks and group purchasing organizations.

In line with our strategy, on March 8, 2019, we acquired Paradigm Spine, LLC ("Paradigm"), a leader in motion preservation and non-fusion spinal implant technology. Paradigm's primary product is the coflex® Interlaminar Stabilization® device. Under the terms of the master transaction agreement dated March 8, 2019, we acquired Paradigm for $150.0 million in consideration paid at closing consisting of new debt financing of $100.0 million and $50.0 million of issued securities. In addition to the cash consideration amount and the stock consideration amount, we may be required to make further cash payments or issue additional shares of our common stock to Paradigm in an amount up to $50.0 million of shares of our common stock and an additional $100.0 million of cash and/or our common stock, in each case, if certain revenue targets are achieved between closing and December 31, 2022.

We believe this is a significant step toward focusing our business and advancing our efforts to generate predictable and sustainable operating results through disciplined execution and building scale to extend distribution of our products in those areas that offer the greatest opportunities to benefit our patients and shareholders.

29

We continue to maintain our commitment to research and development and the introduction of new strategically targeted allograft, xenograft, metal and synthetic implants as well as focused clinical efforts to support their acceptance in the marketplace. In addition, we consider strategic acquisitions from time to time for new implants and technologies intended to augment our existing implant offerings, as well as strategic dispositions from time to time in response to market trends or industry developments.

**Sale of OEM Business and Retirement of Debt**

On July 15, 2020, RTI Surgical Holdings, Inc. (the "Company") announced that the Company has received all of the necessary approvals for the transactions contemplated by the previously disclosed Equity Purchase Agreement, dated as of January 13, 2020 (as amended, the "Purchase Agreement"), by and between the Company and Ardi Bidco Ltd., an entity owned and controlled by Montagu Private Equity LLP, and each of the agreements ancillary to the Purchase Agreement (the "Contemplated Transactions"), the Company's plans to change the name of the Company from "RTI Surgical Holdings, Inc." to "Surgalign Holdings, Inc." and the ticker symbol of the Company from "RTIX" to "SRGA" shortly after consummation of the Contemplated Transactions and the Company's leadership transitions.

On July 20, 2020, the Company announced the consummation of the Transactions, the Company's payment of its outstanding indebtedness, the Company's planned redemption of all of the outstanding shares of its Series A Convertible Preferred Stock, the Name Change, the Symbol Change and the Company's previously announced leadership transitions, including, without limitation, the appointment of Stuart F. Simpson as the Chairman of the Board, Terry M. Rich as the President and Chief Executive of the Company and Jonathon M. Singer as the Chief Operating Officer of the Company.

On July 20, 2020, pursuant to the previously announced Equity Purchase Agreement, dated as of January 13, 2020, as amended by that certain First Amendment to Equity Purchase Agreement dated as of March 6, 2020, that certain Second Amendment to Equity Purchase Agreement, dated as of April 27, 2020 and that certain Third Amendment to Equity Purchase Agreement, dated as of July 8, 2020 (as amended, the "Purchase Agreement"), by and between the Company and Ardi Bidco Ltd. (the "Buyer"), an entity owned and controlled by Montagu Private Equity LLP, and each of the agreements ancillary to the Purchase Agreement, the transactions contemplated by the Purchase Agreement (the "Transactions") were consummated. As a result of the Transactions, among other things, the Company's original equipment manufacturing business and the Company's business related to processing donated human musculoskeletal and other tissue and bovine and porcine animal tissue in producing allograft and xenograft implants using BIOCLEANSE®, TUTOPLAST® and CANCELLE® SP sterilization processes were sold to the Buyer and its affiliates for a purchase price of $440 million of cash, subject to certain adjustments. More specifically, pursuant to the terms of the Purchase Agreement, the Company and its subsidiaries sold to the Buyer and its affiliates all of the issued and outstanding shares of RTI OEM, LLC (which, prior to the Transactions, was converted to a corporation and changed its name to "RTI Surgical, Inc."), RTI Surgical, LLC (which, prior to the

Transactions, was converted to a corporation and changed its name to "Pioneer Surgical Technology, Inc."), Tutogen Medical (United States), Inc. and Tutogen Medical GmbH. The Transactions were previously described in the Proxy Statement filed by the Company with the U.S. Securities and Exchange Commission (the "SEC") on June 18, 2020.

Effective on July 20, 2020, Surgalign Holdings, Inc. (formerly known as RTI Surgical Holdings, Inc.) ("Surgalign" or the "Company") (i) paid in full its $80.0 million revolving credit facility under that certain Credit Agreement dated as of June 5, 2018 (the "2018 Credit Agreement"), by and among Surgalign Spine Technologies, Inc. (formerly known as RTI Surgical, Inc.), as a borrower, Pioneer Surgical Technology, Inc., our wholly-owned subsidiary, as a borrower, the other loan parties thereto as guarantors, JPMorgan Chase Bank, N.A., as lender (together with the various financial institutions as in the future may become parties thereto, the "JPM Lenders") and as administrative agent for the JPM Lenders, as amended, (ii) terminated the 2018 Credit Agreement, (iii) paid in full its $100.0 million term loan and $30.0 million incremental term loan commitment under that certain Second Lien Credit Agreement, dated as of March 8, 2019 (the "2019 Credit Agreement"), by and among Surgalign Spine Technologies, Inc., as borrower, the lenders party thereto from time to time and Ares Capital Corporation, as administrative agent for the other lenders party thereto, as amended and (iv) terminated the 2019 Credit Agreement.

On July 17, 2020, the Company received a notification from WSHP seeking redemption on or before September 14, 2020 of all of the outstanding shares of the Series A Preferred Stock, all of which are held by WSHP. On July 24, 2020 the Company redeemed the Series A Preferred Stock for approximately $67 million, a Certificate of Retirement was filed with the Delaware Secretary of State retiring the Series A Preferred Stock, and the WSHP representatives on the Company's Board of Directors, Curtis M. Selquist and Chris Sweeney resigned from the Board of Directors.

30

**COVID-19**

The COVID-19 pandemic has directly and indirectly materially and adversely impacted the Company's business, financial condition and operating results. The extent to which these adverse impacts will continue will depend on numerous evolving factors that are highly uncertain, rapidly changing and cannot be predicted with precision or certainty at this time. The spread of COVID-19 has caused many hospitals and other healthcare providers to refocus their care on the surge of the COVID-19 cases and to postpone elective and non-emergent procedures, restrict access to these facilities, and in some cases re-allocate scarce resources to their critically ill patients. These efforts have impacted and could continue to impact our business activities, including our product sales, as many of our products are used in connection with elective surgeries. Further, disruptions in the manufacture and/or distribution of our products or in our supply chain may occur as a result of the pandemic or pandemic-related events that result in staffing shortages, production slowdowns, stoppages, or disruptions in delivery systems, any of which could materially and adversely affect our ability to manufacture and/or distribute our products, or to obtain the raw materials and supplies necessary to manufacture and/or distribute our products, in a timely manner, or at all.

In response to the COVID-19 novel coronavirus pandemic and the resulting federal and local guidelines, Surgalign furloughed or reduced the hours of over 500 of its U.S.-based employees, beginning on April 6, 2020. Although our operations are beginning to increase towards normal levels, we continue to have many employees working remotely. Surgalign cannot predict when it will be able to resume normal operations and will continue to carefully monitor the situation. COVID-19 has had an adverse effect on the overall productivity of our workforce, and we may be required to continue to take extraordinary measures to ensure the safety of our employees and those of our business partners. In addition, our employees may be required to take time off for extended periods of time due to illness or as a result of government-imposed changes to daily routines, including school closures. Additionally, these measures are hindering our ability to recruit, vet and hire personnel for key positions. It is unknown how long these disruptions could continue.

As the global outbreak of COVID-19 continues to rapidly evolve, it could continue to materially and adversely affect our revenues, financial condition, profitability, and cash flows for an indeterminate period of time. We are unable to accurately predict the full impact that the ongoing COVID-19 pandemic will have due to numerous factors that are not within our control, including the duration and severity of the pandemic. Stay-at-home/ shelter-in-place orders, business closures, travel restrictions, supply chain disruptions, employee illness or quarantines, and other extended periods of interruption to our business have resulted and could continue to result in disruptions to our operations, which have had and could continue to have adverse impacts on the growth of our business, have and could continue to cause us to cease or delay operations, and could prevent our customers from receiving shipments or processing payments. Some experts expect a second, more severe phase of the pandemic in the Fall of 2020 and Winter of 2021. Such a severe second phase would result in additional material adverse impacts upon the Company.

31

**Results of Operations**

The following table set forth, in both dollars and as a percentage of revenues, the results of our operations for the three and six months ended June 30, 2020 and 2019, respectively.

| | For the Three Months Ended June 30, | | | | For the Six Months June 30, | | | |
| | 2020 | | 2019 | | 2020 | | 2019 | |
|---|---|---|---|---|---|---|---|---|
| Revenues | $ 54,225 | 100.0% | $ 81,554 | 100.0% | $ 127,951 | 100.0% | $ 151,575 | 100.0% |
| Costs of processing and distribution | 31,093 | 57.3% | 35,430 | 43.4% | 64,366 | 50.3% | 67,564 | 44.6% |
| Gross profit | 23,132 | 42.7% | 46,124 | 56.6% | 63,585 | 49.7% | 84,011 | 55.4% |
| Expenses: | | | | | | | | |
| Marketing, general and administrative | 37,066 | 68.4% | 41,108 | 50.4% | 79,719 | 62.3% | 73,224 | 48.3% |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Research and development | 3,274 | 6.0% | 3,868 | 4.7% | 7,556 | 5.9% | 8,204 | 5.4% |
| Severance and restructuring costs | 604 | 1.1% | - | 0.0% | 604 | 0.5% | - | 0.0% |
| Gain on acquisition contingency | (130) | -0.2% | (1,590) | -1.9% | (130) | -0.1% | (1,590) | -1.0% |
| Asset impairment and abandonments | 882 | 1.6% | - | 0.0% | 2,761 | 2.2% | 15 | 0.0% |
| Goodwill impairment | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% |
| Transaction and integration expenses | 4,923 | 9.1% | 1,953 | 2.4% | 14,203 | 11.1% | 10,910 | 7.2% |
| Total operating expenses | 46,619 | 86.0% | 45,339 | 55.6% | 104,713 | 81.8% | 90,763 | 59.9% |
| Operating income (loss) | (23,487) | -43.3% | 785 | 1.0% | (41,128) | -32.1% | (6,752) | -4.5% |
| Other (expense) income: | | | | | | | | |
| Interest expense | (5,972) | -11.0% | (3,635) | -4.5% | (9,537) | -7.5% | (5,239) | -3.5% |
| Interest income | 21 | 0.0% | 26 | 0.0% | 71 | 0.1% | 157 | 0.1% |
| Derivative loss | (12,641) | -23.3% | - | 0.0% | (12,641) | -9.9% | - | 0.0% |
| Foreign exchange loss | 217 | 0.4% | (19) | 0.0% | (29) | 0.0% | (50) | 0.0% |
| Total other expense - net | (18,375) | -33.9% | (3,628) | -4.4% | (22,136) | -17.3% | (5,132) | -3.4% |
| Loss before income tax benefit (expense) | (41,862) | -77.2% | (2,843) | -3.5% | (63,264) | -49.4% | (11,884) | -7.8% |
| Income tax benefit (expense) | 3,298 | 6.1% | 3,031 | 3.7% | 6,837 | 5.3% | 2,721 | 1.8% |
| Net loss | (38,564) | -71.1% | 188 | 0.2% | (56,427) | -44.1% | (9,163) | -6.0% |
| Convertible preferred dividend | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% |
| Net income (loss) applicable to common shares | $ (38,564) | -71.1% | $ 188 | 0.2% | $ (56,427) | -44.1% | $ (9,163) | -6.0% |

The following table reflects revenues for the three and six months ended June 30, 2020 and 2019, respectively.

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| | (In thousands) | | | |
| Revenues: | | | | |
| Spine | $ 20,518 | $ 32,747 | $ 47,627 | $ 57,124 |
| OEM | 33,707 | 48,807 | 80,324 | 94,451 |
| Total revenues | $ 54,225 | $ 81,554 | $ 127,951 | $ 151,575 |

**Three Months Ended June 30, 2020, Compared With Three Months Ended June 30, 2019**

*Total Revenues* – Our total revenues decreased $27.3 million, or 33.5%, to $54.2 million for the three months ended June 30, 2020, compared to $81.6 million for the three months ended June 30, 2019, due to decreased demand as a result in the reduction of elective surgical procedures related to COVID-19 impacting both our Spine and OEM businesses.

*Spine* – Revenues from spine implants decreased $12.2 million, or 37.0%, to $20.5 million for the three months ended June 30, 2020, compared to $32.7 million for the three months ended June 30, 2019. Spine revenues decreased as a result of the impact of COVID-19.

*OEM* - Revenues from OEM decreased $15.1 million, or 31.2%, to $33.7 million for the three months ended June 30, 2020, compared to $48.9 million for the three months ended June 30, 2019. OEM revenues decreases entirely as a result of the impact of COVID-19.

*Costs of Processing and Distribution* – Costs of processing and distribution decreased $4.3 million, or 12.1%, to $31.1 million for the three months ended June 30, 2020, compared to $35.4 million for the three months ended June 30, 2019 Adjusted for the impact of purchase accounting step-up, cost of processing and distribution decreased $3.3 million or 9.4%, to $31.7 million, or 58.5% of revenue, for the three months ended June 30, 2020, compared to $35.0 million, or 42.9% of revenue, for the three months ended June 30, 2019. The decrease in costs of processing and distribution was primarily due to decreased revenue distributions and impact of unabsorbed overhead due to reduction of activity in our plants in response to COVID-19.

*Marketing, General and Administrative Expenses* – Marketing, general and administrative expenses decreased $4.0 million, or 9.7%, to $37.1 million for the three months ended June 30, 2020, compared to $41.1 million for the three months ended June 30, 2019. Marketing, general and administrative expenses increased as a percentage of revenues from 50.4% for the three months ended June 30, 2019, to 68.4% for the three months ended June 30, 2020. The decrease in marketing, general and administrative costs is driven by a reduction in distribution, marketing and commissions correlating to the reduction in revenue and the furlough of the majority of our sales resources offset by restatement and related costs of $7.8 million for the three months ended June 30, 2020..

*Research and Development Expenses* – Research and development expenses decreased $0.6 million or 15.4%, to $3.3 million from $3.9 million for the three months ended June 30, 2019. Research and development expenses decreased as a percentage of revenues from 4.7% for the three months ended June 30, 2019, to 6.0% for the three months ended June 30, 2020. The decrease in Research and development expenses is due to the furlough of a portion of our research and development team during the current quarter.

*Severance and restructuring costs* – Severance and restructuring costs were $0.6 million for the three months ended June 30, 2020, which is the result of employee transition in relation to the OEM transaction. There were no severance and restructuring costs for the three months ended June 30, 2019.

*Gain on acquisition contingency* – Gain on acquisition Contingency was $0.1 million for the three months ended June 30, 2020 compared to $1.6 million for the three months ended June 30, 2019. The gain on acquisition contingency was the result of an adjustment to our estimate of obligation for future milestone payments on the Zyga acquisition for both periods.

*Asset Impairment and Abandonments*– Asset impairment and abandonments expenses were $0.9 million for the three months ended June 30, 2020, which was primarily the result of Spine asset group Property, Plant and equipment being impaired. There were no asset impairment and abandonments for the three months ended June 30, 2019.

*Transaction and Integration Expenses* – Transaction and integration expenses related to the sale and separation of the OEM business were $4.9 million for the three months ended June 30, 2020, compared to $2.0 million of Paradigm acquisition costs for the three months ended June 30, 2019.

*Total Net Other Expense* – Total net other expense, which includes interest expense, amortization of debt discount, interest income, and foreign exchange loss, increased $14.8 million to $18.4 million as a result of amortization of debt discount of $12.6 million associated with the Ares incremental term loan and increased borrowings for the three months ended June 30, 2020, from $3.6 million for the three months ended June 30, 2019.

*Income Tax Benefit* – Income tax benefit for the three months ended June 30, 2020, was $3.3 million compared to $3.0 million for the three months ended June 30, 2019. Our effective tax rate for the three months ended June 30, 2020, was 6.1% compared to 106.6% for the three months ended June 30, 2019. For the three months ended June 30, 2020, the Company has provided a full valuation allowance against all of the net domestic deferred tax assets in the amount of $63 million.

33

**Six Months Ended June 30, 2020, Compared With Six Months Ended June 30, 2019**

*Total Revenues* – Our total revenues decreased $23.6 million, or 15.6%, to $128.0 million for the six months ended June 30, 2020, compared to $151.6 million for the six months ended June 30, 2019, due to decreased demand as a result in the reduction of elective surgical procedures related to COVID-19 impacting both our Spine and OEM businesses.

*Spine* – Revenues from spine implants decreased $9.5 million, or 16.3%, to $47.6 million for the six months ended June 30, 2020, compared to $57.1 million for the six months ended June 30, 2019. Spine revenues decreased primarily as a result of as a result of the impact of COVID-19.

*OEM* - Revenues from OEM decreased $14.2 million, or 15.1%, to $80.3 million for the six months ended June 30, 2020, compared to $94.5 million for the six months ended June 30, 2019. OEM revenues decreased primarily as a result of the impact of COVID-19.

*Costs of Processing and Distribution* – Costs of processing and distribution decreased $3.2 million, or 4.6%, to $64.4 million for the six months ended June 30, 2020, compared to $67.6 million for the six months ended June 30, 2019 Adjusted for the impact of purchase accounting step-up, cost of processing and distribution decreased $3.6 million or 5.4%, to $63.0 million, or 49.2% of revenue, for the six months ended June 30, 2020, compared to $66.6 million, or 43.9% of revenue, for the six months ended June 30, 2019. The decrease in costs of processing and distribution was primarily due to decreased revenue distributions and impact of unabsorbed overhead due to reduction of activity in our plants in response to COVID-19.

*Marketing, General and Administrative Expenses* – Marketing, general and administrative expenses increased $6.5 million, or 8.9%, to $79.7 million for the six months ended June 30, 2020, compared to $73.2 million for the six months ended June 30, 2019. Marketing, general and administrative expenses increased as a percentage of revenues from 48.3% for the six months ended June 30, 2019, to 62.3% for the six months ended June 30, 2020. The increase in marketing, general and administrative costs is primarily due to restatement and related costs of $11.3 million for the six months ended June 30, 2020 offset by a reduction in distribution, marketing and commissions correlating to the reduction in revenue and the furlough of a majority of our sales resources during the second quarter of 2020.

*Research and Development Expenses* – Research and development expenses decreased $0.6 million or 7.9%, to $7.6 million from $8.2 million for the six months ended June 30, 2019. Research and development expenses increased as a percentage of revenues from 5.4% for the six months ended June 30, 2019, to 5.9% for the six months ended June 30, 2020. The decrease in Research and development expenses is due to the furlough of a portion of our research and development team during the second quarter of 2020.

*Severance and restructuring costs* – Severance and restructuring costs were $0.6 million for the six months ended June 30, 2020, which is the result of employee transition in relation to the OEM transaction. There were no severance and restructuring costs for the six months ended June 30, 2019.

*Gain on acquisition contingency* – Gain on acquisition Contingency was $0.1 million for the six months ended June 30, 2020 compared to $1.6 million for the six months ended June 30, 2019. The gain on acquisition contingency was the result of an adjustment to our estimate of obligation for future milestone payments on the Zyga acquisition for both periods.

*Asset Impairment and Abandonments*– Asset impairment and abandonments expenses were $2.8 million for the six months ended June 30, 2020, which was primarily the result of Spine asset group Property, Plant and equipment being impaired. There were no asset impairment and abandonments for the six months ended June 30, 2019.

*Transaction and Integration Expenses* – Transaction and integration expenses related to the sale and separation of the OEM business were $14.2 million for the six months ended June 30, 2020, compared to $10.9 million of Paradigm acquisition costs for the six months ended June 30, 2019.

*Total Net Other Expense* – Total net other expense, which includes interest expense, amortization of debt discount, interest income, and foreign exchange loss, increased $17.0 million to $22.1 million as a result of amortization of debt discount of $12.6 million associated with the Ares incremental term loan and increased borrowings for the six months ended June 30, 2020, from $5.1 million for the six months ended June 30, 2019.

*Income Tax Benefit* – Income tax benefit for the six months ended June 30, 2020, was $6.8 million compared to $2.7 million for the six months ended June 30, 2019. Our effective tax rate for the six months ended June 30, 2020, was 5.3% compared to 22.9% for the six months ended June 30, 2019. For the six months ended June 30, 2020, the Company has provided a full valuation allowance against all of the net domestic deferred tax assets in the amount of $63 million. On March 27, 2020, the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act") was enacted by the United States Congress. As a result of the enactment of the CARES Act, net operating losses ("NOL's") can now be carried back for five years and resulted in the Company recognizing approximately $3.5 million of a tax receivable.

34

**Non-GAAP Financial Measures**

We utilize certain financial measures that are not calculated based on Generally Accepted Accounting Principles ("GAAP"). Certain of these financial measures are considered "non-GAAP" financial measures within the meaning of Item 10 of Regulation S-K promulgated by the SEC. We believe that non-GAAP financial measures provide an additional way of viewing aspects of our operations that, when viewed with the GAAP results, provide a more complete understanding of our results of operations and the factors and trends affecting our business. These non-GAAP financial measures are also used by our management to evaluate financial results and to plan and forecast future periods. However, non-GAAP financial measures should be considered as a supplement to, and not as a substitute for, or superior to, the corresponding measures calculated in accordance with GAAP. Non-GAAP financial measures used by us may differ from the non-GAAP measures used by other companies, including our competitors.

To supplement our condensed consolidated financial statements presented on a GAAP basis, we disclose non-GAAP net income applicable to common shares and non-GAAP gross profit adjusted for certain amounts. The calculation of the tax effect on the adjustments between GAAP net loss applicable to common shares and non-GAAP net income applicable to common shares is based upon our estimated annual GAAP tax rate, adjusted to account for items excluded from GAAP net loss applicable to common shares in calculating non-GAAP net income applicable to common shares. Reconciliations of each of these non-GAAP financial measures to the corresponding GAAP measures are included in the reconciliations below:

**Non-GAAP Net Income Applicable to Common Shares, Adjusted:**

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | 2020 | 2019 |
| | (In thousands) | | | |
| Net loss applicable to common shares, as reported | $ (38,564) | $ 188 | $ (56,427) | $ (9,163) |
| Severance and restructuring costs | $ 604 | $ - | $ 604 | $ - |
| Gain on acquisition contingency | (130) | (1,590) | (130) | (1,590) |
| Asset impairment and abandonments | 882 | — | 2,761 | 15 |
| Transaction and integration expenses | 4,923 | 1,953 | 14,203 | 10,910 |
| Restatement and related expenses | 7,818 | — | 11,254 | — |
| Inventory purchase price adjustment | 563 | 1,036 | 1,441 | 1,036 |
| Inventory write-off | — | — | 48 | — |
| Tax effect on adjustments | — | (3,313) | — | (2,696) |
| Non-GAAP net (loss) income applicable to common shares, adjusted | $ (23,904) | $ (1,726) | $ (26,246) | $ (1,488) |

**Non-GAAP Gross Profit, Adjusted:**

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | 2020 | 2019 |
| | (In thousands) | | | |
| Revenues | $ 54,225 | $ 81,554 | $ 127,951 | $ 151,575 |
| Costs of processing and distribution | 31,093 | 35,430 | 64,366 | 67,564 |
| Gross profit, as reported | 23,132 | 46,124 | 63,585 | 84,011 |
| Inventory write-off | — | — | 48 | — |
| Inventory purchase price adjustment | 563 | 1,036 | 1,441 | 1,036 |
| Non-GAAP gross profit, adjusted | $ 23,695 | $ 47,160 | $ 65,074 | $ 85,047 |

The following are explanations of the adjustments that management excluded as part of the non-GAAP measures for the three and six months ended June 30, 2020 and 2019. Management removes the amount of these costs including the tax effect on the adjustments from our operating results to supplement a comparison to our past operating performance.

35

2020 Asset impairment and abandonments – These costs relate to asset impairment and abandonments of certain long-term assets within the Spine asset group.

2020 Restatement and related expenses – These costs relate to consulting and legal fees and settlement expenses incurred as a result of the restatement, regulatory and related activities in 2020.

2020 Gain on acquisition contingency – The gain on acquisition contingency relates to an adjustment to our estimate of obligation for future milestone payments on the Zyga acquisition.

2020 Transaction and integration expenses – These costs relate to professional fees associated with the on-going SEC investigation and other matters.

2020 Restatement and related expenses – These costs relate to transaction and separation expenses due the Sale of OEM in 2020.

2020 Inventory purchase price adjustment – These costs relate to the purchase price effects of acquired Paradigm inventory that was sold during the three and six months ended June 30, 2020.

2019 Gain on acquisition contingency – The gain on acquisition contingency relates to an adjustment to our estimate of obligation for future milestone payments on the Zyga acquisition.

2019 Transaction and integration expenses – These costs relate to acquisition and integration expenses due to the purchase of Paradigm in 2019.

**Liquidity and Capital Resources**

On April 27, 2020, we entered into an amendment to the 2019 Credit Agreement. The amendment amended the 2019 Credit Agreement to: (i) establish an incremental term loan commitment in an aggregate principal amount not to exceed $30 million (the "Second Amendment Incremental Loan Commitments"); and (ii) provide for a portion of the Second Amendment Incremental Loan Commitments up to $13.5 million be available on a delayed-draw basis at any time after the effective date of the amendment and on or prior to August 31, 2020, subject to certain conditions as set forth in the amendment and the 2019 Credit Agreement. The maturity of the loans advanced under Second Amendment Incremental Loan Commitments have a maturity date of April 27, 2021. These term loans must be repaid in their entirety, at which time a takeout fee ranging from $11.25 million to $25.5 million shall be due and payable.

The accompanying consolidated financial statements of the Company have been prepared assuming the Company will continue as a going concern and in accordance with generally accepted accounting principles in the United States of America. The going concern basis of presentation assumes that we will continue in operation one year after the date these financial statements are issued, and we will be able to realize our assets and discharge our liabilities and commitments in the normal course of business. As of June 30, 2020, we had cash of $2.2 million, a working capital deficiency of $101.7 million and an accumulated deficit of $507.6 million. We had a loss from operations of $41.1 million and a net loss of $56.4 million for the six months ended June 30, 2020. We have suffered losses from operations in the previous two fiscal years and did not generate positive cash flows from operations in fiscal year 2019. Management is projecting that it will continue to generate losses from operations into the future. As of July 31, 2020, our cash balance was approximately $123.7 million.

As the global outbreak of COVID-19 continues to rapidly evolve, it could continue to materially and adversely affect our revenues, financial condition, profitability, and cash flows for an indeterminate period of time.

As a result of the Company not filing its 2019 10-K timely with the Securities and Exchange Commission ("SEC"), the Company is unable to issue securities until they have filed in a timely manner for at least 12 months. While management does not believe there is any need to raise capital over the near term, the Company is currently exploring strategic alternatives in relation to raising capital under an offering under Rule 144A.

On July 20, 2020, RTI completed the disposition of its OEM business. Upon the close of the transaction, the Company fully repaid all of its outstanding indebtedness, including its revolving line of credit with JP Morgan Chase Bank and both its term loan and incremental term loan commitment with Ares Capital Corporation. Additionally, the Company redeemed all of the outstanding shares of Series A Convertible Preferred Stock. Management believes that after payment of taxes related to the transaction that it will have approximately $53 million of available cash.

36

As discussed in Note 24, the Securities and Exchange Commission ("SEC") has an active investigation that remains ongoing. The Company continues to cooperate with the SEC in relation to its investigation. Additionally, as disclosed in Note 23, there is currently ongoing shareholder litigation. Based on current information available to the Company, the impact associated with SEC investigation and shareholder litigation may have on the Company cannot be reasonably estimated.

Although there is uncertainty relate to the matters noted above, based on current information available, management believes it will have sufficient cash and liquidity, such that it is not probable the Company will be unable to meet its obligations during the next year. As of June 30, 2020, we had cash of $2.2 million, working capital deficiency of $101.7 million and an accumulated deficit of $507.6 million. We had a loss from

operations of $41.1 million and a net loss of $56.4 million for the six months ended June 30, 2020. We have suffered losses from operations in the previous two fiscal years and did not generate positive cash flows from operations in fiscal year 2019.

Effective on July 20, 2020, the Company (i) paid in full its outstanding balance of $76.9 million on the $80.0 million revolving credit facility under that certain Credit Agreement dated as of June 5, 2018 (the "2018 Credit Agreement"), by and among Surgalign Spine Technologies, Inc. (formerly known as RTI Surgical, Inc.), as a borrower, Pioneer Surgical Technology, Inc., our wholly-owned subsidiary, as a borrower, the other loan parties thereto as guarantors, JPMorgan Chase Bank, N.A., as lender (together with the various financial institutions as in the future may become parties thereto, the "JPM Lenders") and as administrative agent for the JPM Lenders, as amended, (ii) terminated the 2018 Credit Agreement, (iii) paid in full its outstanding balance of $155.3 million on the $100.0 million term loan and $30.0 million incremental term loan commitment under that certain Second Lien Credit Agreement, dated as of March 8, 2019 (the "2019 Credit Agreement"), by and among Surgalign Spine Technologies, Inc., as borrower, the lenders party thereto from time to time and Ares Capital Corporation, as administrative agent for the other lenders party thereto, as amended and (iv) terminated the 2019 Credit Agreement.

At June 30, 2020, we had 60 days of revenues outstanding in trade accounts receivable, a decrease of 6 days compared to December 31, 2019. The decrease is primarily driven by the longer period receivables remain outstanding for contracts with customers where inventory is exclusively built with no alternative use to us, and where revenue is recognized over time under FASB ASC 606. While we previously recorded revenue and receivables at the time of shipment, they are now recorded over time. The customer, however, is only billed at the time of shipment.

At June 30, 2020, excluding the purchase accounting step-up of Paradigm inventory, we had 33 days of inventory on hand, a decrease of 10 days compared to December 31, 2019. The decrease in inventory days is primarily due to the acquisition of Paradigm. We believe that our inventory levels will be adequate to support our on-going operations for the next twelve months.

At June 30, 2020, our foreign subsidiaries held $2.5 million in cash. We intend to indefinitely reinvest the earnings of our foreign subsidiaries. If we were to repatriate indefinitely reinvested foreign funds, we would not be subject to additional U.S. federal income tax, however, we would be required to accrue and pay any applicable withholding tax and U.S. state income tax liabilities. We do not believe that this policy of indefinitely reinvesting the earnings of our foreign subsidiaries will have a material adverse effect on the business as a whole.

Our short and long-term obligations at June 30, 2020, increased $37.9 million to $212.1 million from $174.2 million at December 31, 2019. The 2018 Credit Agreement and the 2019 Credit Agreement contain customary covenants, including, in the case of the 2019 Credit Agreement, a debt to trailing twelve month EBITDA ratio (the "Leverage Ratio") which, assuming our short and long-term obligations remain constant, progressively requires the Company to achieve higher earnings before interest, depreciation, taxes, and amortization to outstanding debt ratio.

The 2019 Credit Agreement contains a debt to EBITDA covenant, which requires the Company to maintain a 5.75:1 Leverage Ratio for each quarter ending in 2020, including the fiscal quarter ended March 31, 2020. The 2019 Credit Agreement provides that the Leverage Ratio reduces to 5.25:1 for the quarters ending March 31, 2021 and June 30, 2021, with a final reduction to 3.50:1 for each quarter ending thereafter. With the termination of both credit agreements the financial covenant s for June 30, 2020 were no longer required.

To maintain an adequate amount of available liquidity and execute on our current business plan, we intend to utilize cash flow from the sale if the OEM business to fund operations and business expenses

As of June 30, 2020, we have no material off-balance sheet arrangements.

37

*Certain Commitments.*

Our long-term debt obligations and availability of credit as of June 30, 2020 are as follows:

|  | Outstanding Balance | Available Credit |
|---|---|---|
|  | (In thousands) | |
| Ares Term loan | $ 127,710 | |
| JPM facility | 64,096 | $ 7,404 |
| Derivative Liability | 23,020 | |
| Less unamortized debt issuance costs | (2,686) | |
| Total | $ 212,140 | |

The following table provides a summary of our long-term debt obligations, operating lease obligations and other significant obligations as of June 30, 2020.

| | Contractual Obligations Due by Period | | | | |
|---|---|---|---|---|---|
| | Total | Less than 1 Year | 1-3 Years | 4-5 Years | More than 5 Years |
| | | | (In thousands) | | |
| Long-term debt obligations | $ 212,140 | $ 212,140 | $ — | $ - | $ — |
| Operating lease obligations | 2,777 | 666 | 1,076 | 319 | 716 |
| Purchase obligations (1) | 15,874 | 15,874 | — | — | — |
| Total | $ 230,791 | $ 228,680 | $ 1,076 | $ 319 | $ 716 |

*(1)        These amounts consist of contractual obligations for capital expenditures and open purchase orders.*

38

### Item 3.    Quantitative and Qualitative Disclosures About Market Risk

We are subject to market risk from exposure to changes in interest rates based upon our financing, investing and cash management activities.  We are exposed to interest rate risk in the United States and Germany. Changes in interest rates affect interest income earned on cash and cash equivalents and interest expense on revolving credit arrangements. We have not entered into derivative transactions related to cash and cash equivalents or debt. Our borrowings under the Ares Term Loan and JPM Facility expose us to market risk related to changes in interest rates. As of June 30, 2020, our outstanding floating rate indebtedness totaled $175.7 million. The primary base interest rate is LIBOR. Assuming the outstanding balance on our floating rate indebtedness remains constant over a year, a 100-basis point increase in the interest rate would decrease net income and cash flow by approximately $1.4 million. Other outstanding debt consists of fixed rate instruments. We do not expect changes in interest rates to have a material adverse effect on our income or our cash flows in 2020. However, we can give no assurance that interest rates will not significantly change in the future.

The value of the U.S. dollar compared to the Euro affects our financial results. Changes in exchange rates may positively or negatively affect revenues, gross margins, operating expenses and net income. Our international operations currently transact business primarily in the Euro. Assets and liabilities of foreign subsidiaries are translated at the period end exchange rate while revenues and expenses are translated at the average exchange rate for the period. Intercompany transactions are translated from the Euro to the U.S. dollar. Based on June 30, 2020 outstanding intercompany balances, a 1% change in currency rates would have had a de-minimis impact on our results of operations. We do not expect changes in exchange rates to have a material adverse effect on our income or our cash flows in 2020. However, we can give no assurance that exchange rates will not significantly change in the future.

### Item 4.    Controls and Procedures

#### Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of June 30, 2020. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that as of June 30, 2020, due to the existence of the material weaknesses in our internal control over financial reporting described below, our disclosure controls and procedures were not effective to provide reasonable assurance that the information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to management as appropriate to allow timely decisions regarding required disclosure.

#### Material Weaknesses in Internal Control Over Financial Reporting

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

As previously identified and described more fully under Item 9A in the Company's Annual Report on Form 10-K for the year ended December 31, 2019, we identified material weaknesses in the control environment, risk assessment, control activities, monitoring activities, information and communication components of internal control as we did not appropriately design controls in response to the risk of misstatement due to changes in our business environment. The material weaknesses resulted in misstatements that were corrected in the restatement included in our Annual Report on Form 10-K for the year ended December 31, 2019. The material weaknesses have not been remediated as of June 30, 2020.

Additionally, the material weaknesses described above could result in a misstatement of the aforementioned account balances or disclosures that would result in a material misstatement of the annual or interim consolidated financial statements that would not be prevented or detected.

#### Remediation Efforts to Address Material Weakness

Our management, with oversight from our Audit Committee, continues to take action on the remediation plan more fully described under Item 9A in the Company's Annual Report on Form 10-K for the year ended December 31, 2019.  This plan includes enhancing the overall internal control environment, the addition of experienced internal resources and/or third-party advisors and the implementation of additional controls and procedures to strengthen our internal controls over financial reporting.  While the remediation plan has been developed, and action has been taken on resolution of required activities within it, there are still a significant number of steps to be taken to enable management to complete the remediation.  Accordingly, we concluded that the material weaknesses had not yet been remediated as of June 30, 2020.

#### Changes in Internal Control Over Financial Reporting

There have been no changes in our internal control over financial reporting during the six months ended June 30, 2020, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

39

### PART II. OTHER INFORMATION

### Item 1.    Legal Proceedings

**SEC and related Audit Committee Investigation**

As previously disclosed in the Company's Current Report on Form 8-K filed with the SEC on March 16, 2020, the Audit Committee of the Board, with the assistance of independent legal and forensic accounting advisors, conducted an internal investigation of matters relating to the Company's revenue recognition practices for certain contractual arrangements, primarily with OEM customers, including the accounting treatment, financial reporting and internal controls related to such arrangements (the "Investigation"). The Investigation also examined transactions to understand the practices related to manual journal entries for accrual and reserve accounts. The Investigation was precipitated by an investigation by the SEC initially related to the periods 2014 through 2016. The SEC investigation is ongoing and the Company is cooperating with the SEC in its investigation.

The Audit Committee completed its Investigation in the second quarter of 2020. On April 7, 2020, the Audit Committee of the Board concluded that the Company would restate its previously issued audited financial statements for fiscal years 2018, 2017 and 2016, selected financial data for fiscal years 2015 and 2014, the unaudited financial statements for the quarterly periods within these years commencing with the first quarter of 2016, as well as the unaudited financial statements for the quarterly periods within the 2019 fiscal year. The Company filed the restated financial statements on June 8, 2020.

Based on the results of the Investigation, the Company concluded that revenue for certain invoices should have been recognized at a later date than when originally recognized. In response to binding purchase orders from certain OEM customers, goods were shipped and received by the customers before requested delivery dates and agreed-upon delivery windows. In many instances the OEM customers requested or approved the early shipments, but the Company determined that on other occasions the goods were delivered early without obtaining the customers' affirmative approval. Some of those unapproved shipments were shipped by employees in order to generate additional revenue and resulted in shipments being pulled from a future quarter into an earlier quarter. In addition, the Company concluded that in July 2017 an adjustment was improperly made to a product return provision in the Direct Division. The revenue for those shipments was restated, as well as for other orders that shipped earlier than the purchase order due date in the system for which the Company could not locate evidence that the OEM customers had requested or approved the shipments. In addition, the Company concluded that in the periods from 2015 through the fourth quarter of 2018, certain adjustments were incorrectly or erroneously made via manual journal entries to accrual/reserve accounts, including a July 2017 adjustment to a product return provision in the Direct Division, among others. Accordingly, the Company restated its financial statements to correct these adjustments.

There is currently ongoing stockholder litigation related to the Company's Investigation. A class action complaint was filed by Patricia Lowry, a purported shareholder of the Company, against the Company, and certain current and former officers of the Company, in the United States District Court for the Northern District of Illinois on March 23, 2020 asserting claims under Sections 10(b) and 20(a) the Securities Exchange Act of 1934 (the "Exchange Act") and demanding a jury trial ("*Lowry* Action"). In the *Lowry* Action, another purported shareholder of the Company has filed a motion seeking to be appointed as Lead Plaintiff and for the court to appoint her counsel as Lead Counsel. The court has not yet ruled on that motion.

In the future, we may become subject to additional litigation or governmental proceedings or investigations that could result in additional unanticipated legal costs regardless of the outcome of the litigation. If we are not successful in any such litigation, we may be required to pay substantial damages or settlement costs. Based on the current information available to the Company, the impact that current or any future stockholder litigation may have on the Company cannot be reasonably estimated.

Three derivative lawsuits have also been filed on behalf of the Company, naming it as a nominal defendant, and demanding a jury trial. On June 5, 2020, David Summers filed a shareholder derivative lawsuit ("*Summers* Action") against certain current and former directors and officers of the Company (as well as the Company as a nominal defendant), in the United States District Court for the Northern District of Illinois asserting statutory claims under Sections 10(b), 14(a) and 20(a) of the Exchange Act, as well as common law claims for breach of fiduciary duty, unjust enrichment and corporate waste. Thereafter, two similar shareholder derivative lawsuits asserting many of the same claims were filed in the same court against the same current and former directors and officers of the Company (as well as the Company as a nominal defendant). The three derivative lawsuits have been consolidated into the first-filed *Summers* Action. No response to any complaint is due until after the parties file a Joint Status Report and Plaintiffs' counsel advise how they intend to proceed with the prosecution of the consolidated derivative action.

For a further description, we refer you to Part I, Item 1, Note 23 entitled "Legal Actions" to the condensed consolidated financial statements included in this Quarterly Report on Form 10-Q for a description of material legal proceedings.

## Item 1A. Risk Factors

There has been no material change in our risk factors as previously disclosed in Part I, Item 1.A., Risk Factors, of our Annual Report on Form 10-K for the year ended December 31, 2019, as filed with the Securities and Exchange Commission on June 8, 2020.

## Item 2. Unregistered Sales of Equity Securities and Use of Proceeds

The following table presents information with respect to our repurchases of our common stock during the six months ended June 30, 2020.

| | Total Number | Total Number of Shares Purchased as Part of Publicly | Approximate Dollar Value of Shares that May Yet Be Purchased |
|---|---|---|---|

| Period | of Shares Purchased (1) | Average Price Paid per Share | Announced Plans or Programs | Under the Plans or Programs |
|---|---|---|---|---|
| January 1, 2020 to January 31, 2020 | 7,215 $ 2.69 | | — | — |
| February 1, 2020 to February 28, 2020 | 3,208 $ 4.05 | | — | — |
| March 1, 2020 to March 31, 2020 | 38,950 $ 3.89 | | — | — |
| April 1, 2020 to April 30, 2020 | 8,125 $ 1.86 | | — | — |
| May 1, 2020 to May 31, 2020 | 7,513 $ 2.67 | | — | — |
| June 1, 2020 to June 30, 2020 | 2,791 $ 3.89 | | — | — |
| Total | 67,802 $ 3.39 | | — | — |

(1)     The purchases include amounts that are attributable to shares surrendered to us by employees to satisfy, in connection with the vesting of restricted stock awards, their tax withholdings obligations.

**Item 3.    Defaults Upon Senior Securities**

Not applicable.

**Item 4.    Mine Safety Disclosures**

Not applicable.

**Item 5.    Other Information**

In connection with the closing of the sale of the OEM business, Olivier Visa and John Varela resigned from the Company effective July 20, 2020.  Their resignation was not as a result of any disagreement with the Company regarding any operations, policies or practice.

41

**Item 6.    Exhibits**

2.1*     Second Amendment to Equity Purchase Agreement, dated April 27, 2020, by and between the Company and Ardi Bidco Ltd.(1)

2.2*     Third Amendment to Equity Purchase Agreement, dated July  8, 2020, by and between the Company and Ardi Bidco Ltd.(2)

3.1     Amended and Restated Certificate of Incorporation of the Company, effective as of March 8, 2019. (3)

3.2     Certificate of Amendment to Certificate of Incorporation of the Company, effective as of July 20, 2020. (4)

3.3     Amended and Restated Certificate of Designation of Series A Convertible Preferred Stock of the Company, effective as of July 20, 2020. (4)

3.4     Certificate of Retirement of Series A Convertible Preferred Stock of the Company, effective as of July 24, 2020.(5)

3.5     Amended and Restated Bylaws of the Company, effective as of July 20, 2020. (4)

10.1     Second Amendment to Equity Commitment Letter, dated as of April  27, 2020, by and among Montagu V LP, Montagu V (Non-US) LP, Montagu V (US) LP, Montagu V (D) LP, Ardi Bidco Ltd. and the Company.(1)

10.2     Second Amendment to Second Lien Credit Agreement, dated April  27, 2020, by and among RTI Surgical, Inc., the other loan parties thereto as guarantors, Ares Capital Corporation, as lender (together with the various financial institutions from time to time party thereto as lenders, the "Lenders") and as administrative agent for the Lenders. (1)

10.3     Fourth Amendment to Credit Agreement, dated April  27, 2020, by and among RTI Surgical, Inc., the other loan parties thereto as guarantors, JPMorgan Chase Bank, N.A., as lender (together with the various financial institutions from time to time party thereto as lenders, the "Lenders") and as administrative agent for the Lenders. (1)

10.4     Consultant Agreement, dated July 20, 2020, by and between the Company and Stuart F. Simpson.

10.5     Separation Agreement and General Release, dated July 17, 2020, by and between the Company and Camille Farhat.

10.6     Amended and Restated Employment Agreement, dated June 15, 2020, by and between the Company and Terry M. Rich.

10.7     Stand Alone Restricted Stock Agreement for Terry M. Rich, dated November 29, 2019, by and between the Company and Terry M. Rich.

10.8     Stand Alone Nonqualified Stock Option Agreement for Terry M. Rich, dated November 29, 2019, by and between the Company and Terry M. Rich.

31.1     Certification of Principal Executive Officer pursuant to Exchange Act Rules 13a-14(a)/15d-14(a) as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

31.2     Certification of Principal Financial Officer pursuant to Exchange Act Rules 13a-14(a)/15d-14(a) as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

32.1     Certification of Principal Executive Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley

Act of 2002.

32.2     Certification of Principal Financial Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

101.INS    Inline XBRL Instance Document – the instance document does not appear in the Interactive Data File because XBRL tags are embedded within the Inline XBRL document.

101.SCH    Inline XBRL Taxonomy Extension Schema Document

101.CAL    Inline XBRL Taxonomy Extension Calculation Linkbase Document

101.DEF    Inline XBRL Taxonomy Extension Definition Linkbase Document

101.LAB    Inline XBRL Taxonomy Extension Label Linkbase Document

101.PRE    Inline XBRL Taxonomy Extension Presentation Linkbase Document

104       Cover Page Interactive Data File (embedded within the Inline XBRL document)

_____

\*       Certain schedules have been omitted pursuant to Item 601(b)(2) of Regulation S-K. The registrant agrees to furnish supplementally a copy of such omitted schedule to the Securities and Exchange Commission upon request.

(1)     Incorporated by reference to Registrant's Current Report on Form 8-K filed by the Registrant on April 29, 2020.

(2)     Incorporated by reference to Registrant's Current Report on Form 8-K filed by the Registrant on July 9, 2020.

(3)     Incorporated by reference to Registrant's Current Report on Form 8-K12B filed by the Registrant on March 11, 2019.

(4)     Incorporated by reference to Registrant's Current Report on Form 8-K filed by the Registrant on July 20, 2020.

(5)     Incorporated by reference to Registrant's Current Report on Form 8-K filed by the Registrant on July 24, 2020.

42

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

SURGALIGN HOLDINGS, INC. (Registrant)

By:              /s/ Terry M. Rich

**Terry M. Rich**
**President and Chief Executive Officer**

By:              /s/ Jonathon M. Singer

**Jonathon M. Singer**
Chief Financial and Operating Officer

Date: August 12, 2020

43

**Exhibit_10.4**

## CONSULTANT AGREEMENT

This CONSULTANT AGREEMENT (this "Agreement"), dated July 20, 2020 (the "Effective Date"), is entered into by and between **Stuart F. Simpson** (the "Consultant") and **Surgalign Holdings, Inc.**, (f/k/a RTI Surgical Holdings, Inc.) a Delaware corporation ("Surgalign") (each individually a "Party", and collectively the "Parties").

### BACKGROUND

Surgalign is a global medical technology company advancing the science of spine care, focused on delivering innovative solutions that drive superior clinical and economic outcomes (the "Business"). The Consultant possesses and wishes to offer certain knowledge and expertise to Surgalign that are expected to be of assistance to the Business and Surgalign desires to receive the benefits of the Consultant's knowledge and expertise.

The Consultant has simultaneously been elected as the Chairman of the Board of Directors (the "Board of Directors") of Surgalign. It is expected that his services under this Agreement will significantly exceed the customary duties of the Chairman of the Board of Directors.

Accordingly, in consideration of the above and the mutual covenants contained in this Agreement, Surgalign and the Consultant agree as follows:

### TERMS

### 1 – CONSULTING MATTERS

1.1     The Consultant shall provide the consulting services ("Services") as Surgalign's: (a) Chief Executive Officer or his designee; (b) Lead Independent Director; or (c) Board of Directors may from time to time request. The Services to be provided by the Consultant may be adjusted from time to time as mutually agreed to in writing by the Parties.  It is expected that the Consultant shall devote up to two days per week to the performance of the Services.

1.2     The Consultant shall perform the Services in a professional manner, in compliance with all applicable federal, state and local laws, rules and regulations ("Laws"), including, without limitation, Laws regulating insider trading.

1.3     This Agreement shall in no way detract from or impair the Consultant's authority and responsibilities as Chairman of the Board of Directors.

1.4     At each quarterly meeting of the Board of Directors, the Consultant shall deliver a report concerning his activities over the preceding quarter and plans for the upcoming quarter.

1

*CONFIDENTIAL*

## 2 – <u>COMPENSATION</u>

2.1     The Consultant shall receive the following compensation for Services performed under this Agreement, as requested by Surgalign:

2.1.1     Cash compensation of $275,000 per year for time engaged in rendering Services for Surgalign (the "Annual Compensation"), payable in 12 equal monthly installments.

2.1.2     On the Effective Date, Surgalign and the Consultant are entering into the Restricted Stock Award Agreement attached as Exhibit A to this Agreement (the "Equity Compensation"). The Consultant acknowledges that the Equity Compensation is a one-time equity grant, with an approximate aggregate value of $825,000 as of the Effective Date, awarded in consideration for his entering into this Agreement and his expected contributions over the term of this Agreement. The Equity Compensation shall vest in equal annual installments over three years.

2.1.3     Reimbursement for reasonable and documented out-of-pocket expenses incurred by the Consultant in connection with performance of the Services.

2.1.4     For the avoidance of doubt, the Annual Compensation shall be in lieu of, and not in addition to, any other cash payments that members of the Board of Directors are otherwise entitled to receive. The Equity Compensation is intended to be in lieu of, and not in addition to, any equity award Consultant may have otherwise received as a member of the Board of Directors during the term of this Agreement as specified in Section 5.1.

## 3 – <u>CONFIDENTIAL INFORMATION</u>

3.1     During the term of this Agreement, as may be extended, and for a period of one year following the termination or expiration of this Agreement, the Consultant agrees to keep in confidence and not use any Confidential Information in any manner, other than for the sole purpose of assisting Surgalign pursuant to this Agreement. As used in this Agreement, "Confidential Information" means Surgalign trade secrets, processes, methods, know-how and other information related to the Business including, but not limited to, surgical implants, and associated patents and patent applications, trade secrets, know-how, inventions, surgical instruments, technical data, drawings or specifications, testing and/or production methods, business or financial information, research and development activities, product and marketing plans, medical records, and customer and supplier information, which are proprietary or of a confidential nature. The obligations of the Consultant under this Section 3 shall survive expiration or termination of this Agreement.

3.2     The Consultant shall not disclose, publish, communicate, or reveal Surgalign's Confidential Information to any third party unless:

a.     express prior written permission is given by Surgalign; or

b.     in the event Confidential Information is required to be disclosed to comply with applicable Laws, or with a court or administrative order, the Consultant shall: (i) provide Surgalign with prompt notice upon learning that such disclosure is required; (ii) use reasonable commercial efforts to assist Surgalign in taking all reasonable and lawful actions as deemed prudent by Surgalign to obtain confidential treatment for the Confidential Information

2

*CONFIDENTIAL*

for which disclosure is sought; and (iii) minimize the extent of such disclosure.

3.3     The provisions of this Agreement regarding confidentiality and non-use of Confidential Information will not apply to, and Confidential Information does not include, information which:

a.     was independently developed or discovered by the Consultant without use or benefit of Surgalign's Confidential Information, as demonstrated by the Consultant's written records;

b.     is already available to the public;

c.     becomes available to the public through no fault of the Consultant; or

d.     is provided to the Consultant without obligations of confidentiality and non-use by a third party having the right to so provide such information.

3.4     The Consultant shall not publish or share any Confidential Information developed or received under this Agreement without the prior written consent of Surgalign.

3.5     Upon the expiration or termination of this Agreement, or within 10 days from receipt of request by Surgalign, the Consultant shall return to Surgalign all originals, copies, and summaries of documents, material, and other tangible manifestations of Confidential Information in the possession or control of the Consultant, and destroy all intangible manifestations thereof (e.g., electronic files). The obligation of the Consultant to return Confidential Information to Surgalign and to destroy all intangible manifestations of the Confidential Information shall survive until fulfilled.

3.6     The Consultant acknowledges that Surgalign does business throughout the world and stipulates that the restrictions set forth in this Agreement are necessary to protect the legitimate business interests of Surgalign in guarding trade secrets and patentable subject matter, preserving the goodwill of its customers and business, preventing solicitation of its customers, and preventing the unauthorized use of its Confidential Information created under this Agreement.

## 4 – <u>NON-SOLICITATION, NON-INTERFERENCE AND NON-COMPETITION</u>

4.1     During the term of this Agreement and for a period of 12 months after the expiration or earlier termination of this Agreement (the "Restricted Period"), the Consultant agrees that he shall not, except in the furtherance of performing the Services, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, solicit, aid or induce any customer of Surgalign or any of its subsidiaries or affiliates to purchase goods or services then sold by Surgalign or any of its subsidiaries or affiliates from another person, firm, corporation or other entity relating to sales, distribution and/or research and development related to spine care, spine surgery and spine-related technology in the global spine market (the "Spine Business") or assist or aid any other person or entity in identifying or soliciting any such customer relating to the Spine Business.

4.2     During the Restricted Period, the Consultant agrees that he shall not, except in the furtherance of performing the Services, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity: (i) solicit, aid or induce any employee, representative or

3

*CONFIDENTIAL*

agent of Surgalign or any of its subsidiaries or affiliates to leave such employment or retention or to accept employment with or render services to or with any other person, firm, corporation or other entity unaffiliated with Surgalign or hire or retain any such employee, representative or agent, or take any action to materially assist or aid any other person, firm, corporation or other entity in identifying, hiring or soliciting any such employee, representative or agent; or (ii) interfere, or aid or induce any other person or entity in interfering, with the relationship between Surgalign or any of its subsidiaries or affiliates and any of their respective vendors, joint venturers or licensors. An employee, representative or agent shall be deemed covered by this Section 4.2 while so employed or retained and for a period of six months after the termination of employment or retention.

4.3     The Consultant acknowledges that: (i) the Consultant will perform services of a unique nature for Surgalign that are irreplaceable, and that the Consultant's performance of such services to a competing business (for the avoidance of doubt, in the Spine Business) may result in irreparable harm to Surgalign or its subsidiaries or affiliates; (ii) the Consultant has had and will continue to have access to Confidential Information which, if disclosed, would unfairly and inappropriately assist in competition against Surgalign or any of its subsidiaries or affiliates; and (iii) the Consultant will generate goodwill for Surgalign and its subsidiaries or affiliates in the course of the Consultant's performance of the Services. Accordingly, during the Restricted Period, the Consultant agrees that the Consultant will not, directly or indirectly, own, manage, operate, control, be employed by (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) or render services to any person, firm, corporation or other entity, in whatever form, engaged in competition with Surgalign or any of its subsidiaries or affiliates in the Spine Business in any country in which Surgalign conducts business. Notwithstanding the above, nothing in this Section 4.3 shall prohibit the Consultant from being a passive owner of not more than one percent of the equity securities of a publicly traded corporation engaged in a business that is in competition with Surgalign or any of its subsidiaries or affiliates, so long as the Consultant has no active participation in the business of such corporation.

## 5 - TERM AND TERMINATION

5.1     The term of this Agreement shall commence on the Effective Date and continue until the third anniversary of the Effective Date, unless otherwise terminated early as set forth in Section 5.2. This Agreement may be extended with the mutual written agreement of the Parties.

5.2     Either Party may terminate this Agreement at any time, with or without cause, by providing the other Party with 30 days' advance written notice. Sections 3, 4, 5.2 and 6 shall survive the termination or expiration of this Agreement.

## 6 – GENERAL PROVISIONS

6.1     The Consultant represents and warrants that he is not cognizant of any issues that would be a conflict of interest with the terms and provisions of this Agreement or the Consultant's performance under this Agreement. In the event Surgalign or the Consultant identifies a conflict of interest issue, the identifying Party will promptly notify the other Party in writing, and the Parties will work together to rectify the conflict of interest issue.

6.2     This Agreement may not be transferred or assigned by either Party, in whole or in part, except with the prior written consent of the other Party.

4

*CONFIDENTIAL*

6.3     This Agreement is governed by and shall be construed and enforced in accordance with the laws of the State of Delaware, without regard to conflict of law rules. Venue for any legal proceeding or action at equity or law arising out of or for purposes of this Agreement shall lie in the state courts of New Castle County, Delaware, or the United States District Court for the District of Delaware, and the Consultant agrees that such courts shall have personal jurisdiction over the Consultant and waives any objection to such jurisdiction. The prevailing Party in any dispute arising under, out of, or in relation to this Agreement shall be entitled to recover reasonable attorneys' fees and costs from the non-prevailing Party, at all levels of proceedings.

6.4     Nothing in this Agreement shall be construed as granting by implication, estoppel, or otherwise, any license or rights under patents, trade secrets, know-how, copyrights, or other intangible rights of Surgalign other than those specifically set forth in this Agreement.

6.5     The Parties do not intend that this Agreement shall confer on any third party any right, remedy or benefit or that any third party shall have any right to enforce any provision of this Agreement.

6.6     In signing this Agreement, the Consultant gives Surgalign assurance that the Consultant has read and considered all of the terms and conditions of this Agreement, including the restraints imposed under Section 3 and Section 4. The Consultant agrees that these restraints are necessary for the reasonable and proper protection of Surgalign and its subsidiaries and affiliates and their respective Confidential Information and that the restraints are reasonable in respect to subject matter, length of time and geographic area, and that these restraints, individually or in the aggregate, will not prevent the Consultant from obtaining other suitable consulting or employment during the period in which the Consultant is bound by the restraints.

6.7     If it is determined by a court of competent jurisdiction that any restriction in Section 3 or Section 4 is excessive in duration or scope or is unreasonable or unenforceable under applicable law, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the laws of that state.

6.8     In the event of any violation of the provisions of Section 3 or Section 4, the Consultant acknowledges and agrees that the post-termination restrictions contained in Section 3 and Section 4 shall be extended by a period of time equal to the period of such violation, it being the intention of the Parties that the running of the applicable post-termination restriction period shall be tolled during any period of such violation.

6.9     The right of either Party to terminate this Agreement, as provided under Section 5, shall not be an exclusive remedy, and either Party shall be entitled, if the circumstances warrant, alternatively or cumulatively, to damages for breach of this Agreement, or to an order or injunction requiring performance of the obligations of this Agreement or to any other remedy available at law or equity. Without limiting the generality of the above, the Consultant acknowledges and agrees that Surgalign's remedies at law for a breach or threatened breach of any of the provisions of Section 3 or Section 4 may be inadequate and, in recognition of this fact, the Consultant agrees that, in the event of such a breach or threatened breach, in addition to any remedies at law, Surgalign, without posting any bond or other security, shall be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available, without the necessity of showing actual monetary damages.

5

*CONFIDENTIAL*

6.10     This Agreement constitutes the entire agreement and understanding of the Parties with regard to the subject matter of this Agreement and supersedes all prior discussions, negotiations, understandings and agreements between the Parties concerning the subject matter of this Agreement. This Agreement may be amended only by written agreement of the Parties. If any term of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then this Agreement, including all of the remaining terms, will remain in full force and effect as if such invalid or unenforceable term had never been included.

6.11     Each Party to this Agreement agrees to execute, acknowledge and deliver all such further instruments as may be necessary or appropriate to carry out the intent and purposes of this Agreement.

6.12     The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

6.13     Any notice or other communication required under this Agreement shall be in writing and delivered to the other Party as follows:

**Consultant**:

Stuart F. Simpson
241 Highland Avenue
Ridgewood, New Jersey 07450

| **Surgalign**: | With copy to: |
|---|---|
| Surgalign Holdings, Inc. | Surgalign Holdings, Inc. |
| 520 Lake Cook Road, Suite 315 | 520 Lake Cook Road, Suite 315 |
| Deerfield, Illinois 60015 | Deerfield, Illinois 60015 |
| Attention:  Jonathon M. Singer | Attention: General Counsel |
| Chief Operating Officer | |

All notices shall be deemed duly served on the date delivered to the other Party at the address stated above, whether in person, or sent by Federal Express (or other similar recognized courier) postage prepaid. Either Party may change its address for purposes of this Agreement by giving the other Party written notice of such as provided in this Agreement.

6.14     Surgalign and the Consultant each acknowledge that they are independent contractors with regard to the subject matter of this Agreement. Nothing in this Agreement shall be interpreted or construed as creating or establishing the relationship of employer and employee between Surgalign and the Consultant.  Both Parties acknowledge that the Consultant is not an employee of Surgalign for state or federal tax purposes, workers' compensation, or any other purpose or benefit. Neither the Consultant nor Surgalign shall have any right to enter into any contract or commitment in the name of, or on behalf of the other, or to bind the other in any respect.

6.15     This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of which taken together shall constitute but one and the same instrument.

*[Signature Page Follows]*

6

*CONFIDENTIAL*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed as of the Effective Date.

**Stuart F. Simpson**                                        **Surgalign Holdings, Inc.**


Signature: _____        By: _____
      Stuart F. Simpson                                Name:  Terry M. Rich
                                                     Title:  President and Chief Executive Officer
Date:  July 20, 2020                                 Date:  July 20, 2020

EXHIBIT A

Restricted Stock Award Agreement

See attached.

**SURGALIGN HOLDINGS, INC.**
**RESTRICTED STOCK AGREEMENT**
**FOR**
**STUART F. SIMPSON**

1.     ***Award of Restricted Stock.*** SURGALIGN HOLDINGS, INC., a Delaware corporation (the "Company") hereby grants, as of July 20, 2020 (the "Date of Grant"), to Stuart F. Simpson (the "Recipient"), a number of restricted shares of the Company's common stock (collectively the "Restricted Stock") (rounded to the nearest whole number) equal to $825,000 based upon the closing price per share of the Company's common stock on the Nasdaq Stock Market on the Date of Grant. The Restricted Stock shall be subject to the terms, provisions and restrictions set forth in this Restricted Stock Agreement (this "Agreement") and the Surgalign Holdings, Inc. 2018 Incentive Compensation Plan, as may be amended from time to time (the "Plan"), which is incorporated herein for all purposes. As a condition to entering into this Agreement, and as a condition to the issuance of any Shares (or any other securities of the Company), the Recipient agrees to be bound by all of the terms and conditions herein and in the Plan. Unless otherwise provided herein, terms used herein that are defined in the Plan and not defined herein shall have the meanings attributable thereto in the Plan.

2.     ***Vesting of Restricted Stock.***

    (a)     ***General Vesting.*** The shares of Restricted Stock shall become vested in the following amounts, at the following times and upon the following conditions, provided that the Continuous Service of the Recipient continues through and on the applicable Vesting Date:

| Number of Shares of Restricted Stock | Vesting Date |
| --- | --- |
| 1/3 of the Restricted Stock | 07/20/2021 |
| 1/3 of the Restricted Stock | 07/20/2022 |
| the remainder of the Restricted Stock | 07/20/2023 |

Except as otherwise provided in Sections 2(b), 2(c) and 4 hereof, there shall be no proportionate or partial vesting of shares of Restricted Stock in or during the months, days or periods prior to each Vesting Date, and all vesting of shares of Restricted Stock shall occur only on the applicable Vesting Date.

    (b)     ***Acceleration of Vesting Upon Change in Control.*** In the event that a Change in Control of the Company occurs during the Recipient's Continuous Service, the shares of Restricted Stock subject to this Agreement shall become immediately vested as of the date of the Change in Control. Notwithstanding the foregoing, if in the event of a Change in Control the successor company assumes or substitutes another award for this Restricted Stock award, then the vesting of the Restricted Stock shall not be accelerated as described in this paragraph (b). For purposes of this paragraph, the Restricted Stock shall be considered assumed or substituted for if following the Change in Control the award substituting the Restricted Stock confers the right to receive, for each Share subject to the Restricted Stock award immediately prior to the Change in Control, on substantially the same vesting and other terms and conditions as were applicable to the Restricted Stock immediately prior to the Change in Control, the consideration (whether stock, cash or other

9

securities or property) received in the transaction constituting a Change in Control by holders of Shares for each Share held on the effective date of such transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding shares); provided, however, that if such consideration received in the transaction constituting a Change in Control is not solely common stock of the successor company or its parent or subsidiary, the Committee may, with the consent of the successor company or its parent or subsidiary, provide that the consideration to be received upon the vesting of the Restricted Stock shall be solely common stock of the successor company or its parent or subsidiary substantially equal to the fair market value to the per share consideration received by holders of Shares in the transaction constituting a Change in Control. The determination of such substantial equality of value of consideration shall be made by the Committee in its sole discretion and its determination shall be conclusive and binding.

(c) ***Acceleration of Vesting at Company Discretion.*** Notwithstanding any other term or provision of this Agreement, the Board or the Committee shall be authorized, in its sole discretion, based upon its review and evaluation of the performance of the Recipient and of the Company, to accelerate the vesting of any shares of Restricted Stock under this Agreement, at such times and upon such terms and conditions as the Board or the Committee shall deem advisable, provided that the minimum vesting requirements of Section 7(f) of the Plan have been satisfied.

(d) ***Definitions.*** For purposes of this Agreement, the following terms shall have the meanings indicated:

(i) "***Committee***" means the Compensation Committee of the Board of Directors of the Company.

(ii) "***Non-Vested Shares***" means any portion of the Restricted Stock subject to this Agreement that has not become vested pursuant to this Section 2.

(iii) "***Vested Shares***" means any portion of the Restricted Stock subject to this Agreement that is and has become vested pursuant to this Section 2.

3. ***Delivery of Restricted Stock.***

(a) ***Issuance of Stock Certificates and Legends.*** One or more stock certificates evidencing the Restricted Stock shall be issued in the name of the Recipient but shall be held and retained by the Records Administrator of the Company until the date (the "Applicable Date") on which the shares (or a portion thereof) subject to this Restricted Stock award become Vested Shares pursuant to Section 2 hereof, subject to the provisions of Section 4 hereof. All such stock certificates shall bear the following legends, along with such other legends that the Board or the Committee shall deem necessary and appropriate or which are otherwise required or indicated pursuant to any applicable stockholders agreement:

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO SUBSTANTIAL VESTING AND OTHER RESTRICTIONS AS SET FORTH IN THE RESTRICTED STOCK AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. SUCH RESTRICTIONS ARE BINDING ON TRANSFEREES OF THESE SHARES, AND INCLUDE VESTING CONDITIONS WHICH MAY RESULT IN THE COMPLETE FORFEITURE OF THE SHARES.

(b)      ***Stock Powers.***  The Recipient shall deposit with the Company stock powers or other instruments of transfer or assignment, duly endorsed in blank with signature(s) guaranteed, corresponding to each certificate representing shares of Restricted Stock until such shares become Vested Shares, on a form attached hereto as Exhibit B. If the Recipient shall fail to provide the Company with any such stock power or other instrument of transfer or assignment, the Recipient hereby irrevocably appoints the Secretary of the Company as his attorney-in-fact, with full power of appointment and substitution, to execute and deliver any such power or other instrument which may be necessary to effectuate the transfer of the Restricted Stock (or assignment of distributions thereon) on the books and records of the Company. In addition, the Company may require the spouse of the Recipient, if any, to execute and deliver to the Company the Consent of Spouse in the form attached hereto as Exhibit C.

(c)      ***Delivery of Stock Certificates.***  On or after each Applicable Date, upon written request to the Company by the Recipient, the Company shall promptly cause a new certificate or certificates to be issued for and with respect to all shares that become Vested Shares on that Applicable Date, which certificate(s) shall be delivered to the Recipient as soon as administratively practicable after the date of receipt by the Company of the Recipient's written request. The new certificate or certificates shall continue to bear those legends and endorsements that the Company shall deem necessary or appropriate (including those relating to restrictions on transferability and/or obligations and restrictions under the Securities Laws).

4.      ***Forfeiture of Non-Vested Shares***. If the Recipient's Continuous Service with the Company and the Related Entities is terminated for any reason, any Shares of Restricted Stock that are not Vested Shares and, that do not become Vested Shares pursuant to Section 2 hereof as a result of such termination, shall be forfeited immediately upon such termination of Continuous Service and revert back to the Company without any payment to the Recipient. If the Recipient breaches any restrictive covenant applicable to the Recipient through a Company policy, plan, or agreement between the Recipient and Company, all Non-Vested Shares (and upon written demand by the Company, in its sole and absolute discretion, any Vested Shares) shall be forfeited immediately upon such breach and revert or be transferred by the Recipient back to the Company without any payment to the Recipient. The Committee shall have the power and authority to enforce on behalf of the Company any rights of the Company under this Agreement in the event of the Recipient's forfeiture of Non-Vested Shares pursuant to this Section 4.

5.      ***Rights with Respect to Restricted Stock.***

(a)      ***General.***  Except as otherwise provided in this Agreement, the Recipient shall have, with respect to all of the shares of Restricted Stock, whether Vested Shares or Non-Vested Shares, all of the rights of a holder of shares of common stock of the Company, including without limitation (i) the right to vote such Restricted Stock, (ii) the right to receive dividends, if any, as may be declared on the Restricted Stock from time to time, and (iii) the rights available to all holders of shares of common stock of the Company upon any merger, consolidation, reorganization, liquidation or dissolution, stock split−up, stock dividend or recapitalization undertaken by the Company; provided, however, that all of such rights shall be subject to the terms, provisions, conditions and restrictions set forth in this Agreement (including without limitation conditions under which all such rights shall be forfeited).  Any Shares issued to the Recipient as a dividend with respect to shares of Restricted Stock shall have the same status and bear the same legend as the shares of Restricted Stock and shall be held by the Company, if the shares of Restricted Stock that such dividend is attributed to is being so held, unless otherwise determined by the Committee. In addition, notwithstanding any provision to the contrary herein, any dividends, whether cash dividends or any Shares received as a dividend, declared with respect to shares of Restricted Stock subject to this Agreement shall be held in escrow

11

by the Committee until such time as the shares of Restricted Stock that such dividends are attributed to shall become Vested Shares, and in the event that such shares of Restricted Stock are subsequently forfeited, the dividends attributable to such portion shall be forfeited as well. If the Recipient forfeits any rights he or she has under this Agreement, the Recipient shall, on the date of such forfeiture, no longer have any rights as a shareholder with respect to the forfeited Restricted Stock and shall no longer be entitled to vote or receive dividends on such shares.

(b)     **Adjustments to Shares.**  If at any time while this Agreement is in effect (or Shares granted hereunder shall be or remain unvested while Recipient's Continuous Service continues and has not yet terminated or ceased for any reason), there shall be any increase or decrease in the number of issued and outstanding Shares of the Company through the declaration of a stock dividend or through any recapitalization resulting in a stock split-up, combination or exchange of such Shares, then and in that event, the Board or the Committee shall make any adjustments it deems fair and appropriate, in view of such change, in the number of shares of Restricted Stock then subject to this Agreement.  If any such adjustment shall result in a fractional Share, such fraction shall be disregarded.

(c)     **No Restrictions on Certain Transactions.**  Notwithstanding any term or provision of this Agreement to the contrary, the existence of this Agreement, or of any outstanding Restricted Stock awarded hereunder, shall not affect in any manner the right, power or authority of the Company to make, authorize or consummate: (i) any or all adjustments, recapitalizations, reorganizations or other changes in the Company's capital structure or its business; (ii) any merger, consolidation or similar transaction by or of the Company; (iii) any offer, issue or sale by the Company of any capital stock of the Company, including any equity or debt securities, or preferred or preference stock that would rank prior to or on parity with the Restricted Stock and/or that would include, have or possess other rights, benefits and/or preferences superior to those that the Restricted Stock includes, has or possesses, or any warrants, options or rights with respect to any of the foregoing; (iv) the dissolution or liquidation of the Company; (v) any sale, transfer or assignment of all or any part of the stock, assets or business of the Company; or (vi) any other corporate transaction, act or proceeding (whether of a similar character or otherwise).

6.     **Transferability.**  Unless otherwise determined by the Committee, the shares of Restricted Stock are not transferable unless and until they become Vested Shares in accordance with this Agreement, other than by will or under the applicable laws of descent and distribution. The terms of this Agreement shall be binding upon the executors, administrators, heirs, successors and assigns of the Recipient. Except as otherwise permitted pursuant to the first sentence of this Section, any attempt to effect a Transfer of any shares of Restricted Stock prior to the date on which the shares become Vested Shares shall be void ab initio. For purposes of this Agreement, "Transfer" shall mean any sale, transfer, encumbrance, gift, donation, assignment, pledge, hypothecation, or other disposition, whether similar or dissimilar to those previously enumerated, whether voluntary or involuntary, and including, but not limited to, any disposition by operation of law, by court order, by judicial process, or by foreclosure, levy or attachment.

7.     **Tax Matters; Section 83(b) Election.**

(a)     **Section 83(b) Election.**  If the Recipient properly elects, within thirty (30) days of the Date of Grant, to include in gross income for federal income tax purposes an amount equal to the fair market value (as of the Date of Grant) of the Restricted Stock pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended (the "Code"), a form of which is attached hereto as Exhibit A, the Recipient shall make arrangements satisfactory to the Company to pay to the Company any federal, state or local income taxes required to be withheld with respect to the Restricted Stock.

12

If the Recipient shall fail to make such tax payments as are required, the Company shall, to the extent permitted by law, have the right to deduct from any payment of any kind (including without limitation, the withholding of any Shares that otherwise would be issued to the Recipient under this Agreement) otherwise due to the Recipient any federal, state or local taxes of any kind required by law to be withheld with respect to the Restricted Stock.

(b)     *No Section 83(b) Election.*  If the Recipient does not properly make the election described in paragraph 7(a) above, the Recipient shall, no later than the date or dates as of which the restrictions referred to in this Agreement hereof shall lapse, pay to the Company, or make arrangements satisfactory to the Committee for payment of, any federal, state or local taxes of any kind required by law to be withheld with respect to the Restricted Stock (including without limitation the vesting thereof), and the Company shall, to the extent permitted by law, have the right to deduct from any payment of any kind (including without limitation, the withholding of any Shares that otherwise would be distributed to the Recipient under this Agreement) otherwise due to Recipient any federal, state, or local taxes of any kind required by law to be withheld with respect to the Restricted Stock.

(c)     *Recipient's Responsibilities for Tax Consequences.*  Tax consequences on the Recipient (including without limitation federal, state, local and foreign income tax consequences) with respect to the Restricted Stock (including without limitation the grant, vesting and/or forfeiture thereof) are the sole responsibility of the Recipient. The Recipient shall consult with his or her own personal accountant(s) and/or tax advisor(s) regarding these matters, the making of a Section 83(b) election, and the Recipient's filing, withholding and payment (or tax liability) obligations.

8.     *Amendment, Modification & Assignment; Non-Transferability.*  This Agreement may only be modified or amended in a writing signed by the parties hereto. No promises, assurances, commitments, agreements, undertakings or representations, whether oral, written, electronic or otherwise, and whether express or implied, with respect to the subject matter hereof, have been made by either party which are not set forth expressly in this Agreement. Unless otherwise consented to in writing by the Company, in its sole discretion, this Agreement (and Recipient's rights hereunder) may not be assigned, and the obligations of Recipient hereunder may not be delegated, in whole or in part. The rights and obligations created hereunder shall be binding on the Recipient and his heirs and legal representatives and on the successors and assigns of the Company.

9.     *Complete Agreement.*  This Agreement (together with those agreements and documents expressly referred to herein, for the purposes referred to herein) embody the complete and entire agreement and understanding between the parties with respect to the subject matter hereof, and supersede any and all prior promises, assurances, commitments, agreements, undertakings or representations, whether oral, written, electronic or otherwise, and whether express or implied, which may relate to the subject matter hereof in any way.

10.     *Miscellaneous.*

(a)     *No Right to (Continued) Employment or Service.*  This Agreement and the grant of Restricted Stock hereunder shall not confer, or be construed to confer, upon the Recipient any right to employment or service, or continued employment or service, with the Company or any Related Entity.

13

(b)      **No Limit on Other Compensation Arrangements.**  Nothing contained in this Agreement shall preclude the Company or any Related Entity from adopting or continuing in effect other or additional compensation plans, agreements or arrangements, and any such plans, agreements and arrangements may be either generally applicable or applicable only in specific cases or to specific persons.

(c)      **Severability.**  If any term or provision of this Agreement is or becomes or is deemed to be invalid, illegal or unenforceable in any jurisdiction or under any applicable law, rule or regulation, then such provision shall be construed or deemed amended to conform to applicable law (or if such provision cannot be so construed or deemed amended without materially altering the purpose or intent of this Agreement and the grant of Restricted Stock hereunder, such provision shall be stricken as to such jurisdiction and the remainder of this Agreement and the award hereunder shall remain in full force and effect).

(d)      **No Trust or Fund Created.**  Neither this Agreement nor the grant of Restricted Stock hereunder shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company or any Related Entity and the Recipient or any other person.  To the extent that the Recipient or any other person acquires a right to receive payments from the Company or any Related Entity pursuant to this Agreement, such right shall be no greater than the right of any unsecured general creditor of the Company.

(e)      **Law Governing.**  This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of Delaware (without reference to the conflict of laws rules or principles thereof).

(f)      **Interpretation.** The Recipient accepts the Restricted Stock subject to all of the terms, provisions and restrictions of this Agreement and the Plan.  The undersigned Recipient hereby accepts as binding, conclusive and final all decisions or interpretations of the Board or the Committee upon any questions arising under this Agreement or the Plan.

(g)      **Headings.**  Section, paragraph, and other headings and captions are provided solely as a convenience to facilitate reference. Such headings and captions shall not be deemed in any way material or relevant to the construction, meaning or interpretation of this Agreement or any term or provision hereof.

(h)      **Notices.**  Any notice under this Agreement shall be in writing and shall be deemed to have been duly given when delivered personally or sent by nationally recognized courier postage prepaid, in the case of the Company, to the Company's Secretary at 520 Lake Cook Road, Suite 315, Deerfield, Illinois 60015, or if the Company should move its principal office, to such principal office, and, in the case of the Optionee, to the Optionee's last permanent address as shown on the Company's records, subject to the right of either party to designate some other address at any time hereafter in a notice satisfying the requirements of this Section.

(i)      **Non-Waiver of Breach.** The waiver by any party hereto of the other party's prompt and complete performance, or breach or violation, of any term or provision of this Agreement shall be effected solely in a writing signed by such party, and shall not operate nor be construed as a waiver of any subsequent breach or violation, and the waiver by any party hereto to exercise any right or remedy which he or it may possess shall not operate nor be construed as the waiver of such right or remedy by such party, or as a bar to the exercise of such right or remedy by such party, upon the occurrence of any subsequent breach or violation.

14

(j)       *Acceptance.*  The Recipient hereby acknowledges receipt of a copy of the Plan. The Recipient has read and understands the terms and provisions thereof and of this Agreement, and accepts the Restricted Stock subject to all of the terms and conditions of the Plan and this Agreement.  The Recipient acknowledges that there may be adverse tax consequences upon the grant or vesting of the Restricted Stock or disposition of the underlying shares and that the Recipient had been advised to consult a tax advisor prior to such grant, vesting, or disposition.

(k)       *Counterparts***.**  This Agreement may be executed in two or more separate counterparts, each of which shall be an original, and all of which together shall constitute one and the same agreement.

*[Signature page follows]*

15

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement as of the 20th day of July, 2020.

COMPANY:

**SURGALIGN HOLDINGS, INC.**

By: _____

Name:   Terry M. Rich
Title:      President and Chief Executive Officer

Dated:  July 20, 2020

Agreed and Accepted:

RECIPIENT:

By: _____

Stuart F. Simpson

Dated:   July 20, 2020

## **EXHIBIT A**

ELECTION UNDER SECTION 83(b) OF THE U.S. INTERNAL REVENUE CODE OF 1986

The undersigned taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended, to include in taxpayer's gross income for the current taxable year the amount of any compensation taxable to taxpayer in connection with his or her receipt of the property described below:

1.          The name, address, taxpayer identification number and taxable year of the undersigned are as follows:

Name:          _____

Spouse:        _____

Taxpayer I.D. No.:   _____

Address:       _____

                     _____

Tax Year:      _____

2.          The property with respect to which the election is made is described as follows: _____ (_____) shares of the common stock ("Common Shares") of Surgalign Holdings, Inc. (the "Company").

3.          The date on which the property was transferred is _____, 20__.

4.          The property is subject to the following restrictions:

The Common Shares are required to be returned to the Company in the event that the undersigned ceases to perform services for the Company through certain dates specified in the Restricted Stock Agreement between me and the Company dated as of _____, 20__. This right lapses with regard to a portion of the Common Shares based on my Continuous Service as an Employee, Consultant or Director over time.

5.          The fair market value at the time of transfer, determined without regard to any restriction other than a restriction which by its terms will never lapse, of such property is: $_____.

6.          The amount (if any) paid for such property is: [ ZERO].

7.          The amount to include in gross income is $_____, which is the result of the amount reported in Item 5 minus the amount reported in Item 6.

_____

The undersigned will file this election with the Internal Revenue Service office with which the taxpayer files [his/her] annual income tax return not later than 30 days after the date of the transfer of the property. The undersigned has also submitted a copy of this statement to the person for whom the services were performed in connection with the undersigned's receipt of the above-described property. The undersigned is the person performing the services in connection with which the property was transferred. The undersigned understands that the foregoing election may not be revoked except with the consent of the Commissioner.


Dated: _____, 20 _____        _____
                                                  Signature of Taxpayer

The undersigned spouse of taxpayer joins in this election.

Dated: _____, 20 _____        _____
                                                  Spouse of Taxpayer


_____

**EXHIBIT B**

ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED I, _____, hereby sell, assign and transfer unto _____(_____) shares of common stock of Surgalign Holdings, Inc. standing in my name of the books of said corporation represented by Certificate No. _____ herewith and do hereby irrevocably constitute and appoint _____ to transfer the said stock on the books of the within named corporation with full power of substitution in the premises.

This Stock Assignment may be used only in accordance with the Restricted Stock Agreement between Surgalign Holdings, Inc. and the undersigned dated_____, _____.

Dated: _____,_____

Signature: _____

Print Name: _____

*INSTRUCTIONS:*

***Please DO NOT fill in any blanks other than the signature lines.***
*The purpose of this assignment is to enable the Company to receive the return of the shares of common stock as set forth in the Restricted Stock Agreement, without requiring additional signatures on the part of the Recipient.*

**EXHIBIT C**

CONSENT OF SPOUSE

I, _____, spouse of _____, have read and approve the foregoing Restricted Stock Agreement (the "Agreement").  In consideration of the Company's grant to my spouse of the shares of common stock of Surgalign Holdings, Inc. as set forth in the Agreement, I hereby appoint my spouse as my attorney-in-fact in respect to the exercise of any rights under the Agreement and agree to be bound by the provisions of the Agreement insofar as I may have any rights in said Agreement or any shares of common stock issued pursuant thereto under the community property laws or similar laws relating to marital property in effect in the state or country of our residence as of the date of the signing of the foregoing Agreement.

Dated:  _____ , 20 _____

_____
Signature of Spouse

Print Name:  _____

**Exhibit_10.5**

### SEPARATION AGREEMENT AND GENERAL RELEASE

This Separation Agreement and General Release (this "Separation Agreement"), dated July 17, 2020, is made and entered into between Camille Farhat ("Executive") and RTI Surgical, Inc. ("Employer"), a subsidiary of RTI Surgical Holdings, Inc. ("Holdings").

BACKGROUND

Employer and Executive entered into an Employment Agreement dated January 26, 2017 (the "Employment Agreement").

Executive has elected to not extend the Employment Agreement, and Employer and Executive have agreed to waive the 60 day notice required under the Employment Agreement and establish August 3, 2020 as the effective date of separation.

Employer and Executive further agree to amend Section 9(b), 9(c)(i) and 9(c)(ii)(B) of the Employment Agreement with respect to the duration of the restrictive period.

Employer and Executive agreed that Executive is voluntarily retiring and Employer provides the payments and benefits set forth below in Section 2 in exchange for the General Release contained in this Separation Agreement, the Supplemental General Release to be executed by Executive upon his separation, and the amendments to Sections 9(b), 9(c)(i) and 9(c)(ii)(B) of the Employment Agreement.

Employer and Executive desire to amicably end their employment relationship and fully and finally settle any and all existing or potential claims and disputes between them, whether known or unknown as of the date of this Separation Agreement.

Accordingly, Executive and Employer agree as follows:

TERMS

### 1. Executive's separation and future relationship.

A.       Executive's employment by Employer will end effective as of the close of business on August 3, 2020, unless earlier terminated by Employer in its sole discretion or extended by written agreement ("Separation Date"); provided, however, that Executive shall no longer serve as Employer's President and Chief Executive Officer effective immediately after the closing of the transactions contemplated by that certain Equity Purchase Agreement, dated as of January 13, 2020, as amended, by and between Holdings and Ardi Bidco Ltd, which is currently expected to occur on July 20, 2020. From the date of this Separation Agreement through the Separation Date ("Transition Period"), Employee will continue to perform the duties reasonably required by Employer ("Services"). Executive agrees to perform those tasks and exercise that authority to the best of his ability, using the same talent, experience, skills, and effort previously used by him in working for Employer and in compliance with all applicable laws.

B.        During the Transition Period, Employer will continue to pay Executive's salary and provide him benefits as are provided him as of the date that this Separation Agreement is given to him and, within the applicable time after the date of this Separation Agreement, will provide the election notice necessary for Executive to elect continuation of any group medical insurance coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") and the terms and conditions of Employer's plans.

C.        Executive agrees not to disparage Employer or any of its parent companies, subsidiaries, affiliates or current or former directors, officers, employees, or agents, that is, he agrees that in the future he will not make negative comments about Employer or any of its parent companies, subsidiaries, affiliates or current or former directors, officers, employees, or agents or Employer's or its subsidiaries' or affiliates' products/services or personnel or about his employment or separation of employment from Employer, orally or in writing (such as through the use of emails, blogs, photographs, social media (Facebook; Twitter), etc. or any other electronic or web-based media). For the avoidance of doubt, each of WSHP Biologics Holdings, LLC and Water Street Healthcare Partners, LLC shall be considered affiliates of Employer for purposes of this Separation Agreement.

Employer agrees to instruct each member of the Board of Directors and each named executive officer, of Holdings, to not disparage Executive, that is, Employer shall instruct them that in the future they shall not make negative comments about Executive or about his employment or end of employment, whether such comments are made directly or indirectly, orally or in writing or in any other manner (such as through the use of emails, blogs, photographs, social media (Facebook; Twitter), etc. or any other electronic or web-based media). The prior sentence will not limit their rights to testify truthfully if required by law or from participating fully in a government or internal company investigation, including any conversations the identified individuals may have with any governmental agents and/or consultations with their or Employer's or Holdings' attorneys. Further, and separate and apart from: (i) the shareholder derivative lawsuit filed by David Summers on behalf of Holdings against certain current and former directors and officers of Holdings, including Executive, in the United States District Court for the Northern District of Illinois on June 5; and (ii) the shareholder derivative lawsuit filed by Niall Campbell on behalf of Holdings against certain current and former directors and officers of Holdings, including Executive, in the United States District Court for the Northern District of Illinois on June 12, 2020, Employer is unaware of claims it may have against Executive arising from Executive's employment with Employer.

D.        Executive agrees that after the Separation Date, and as long as it does not jeopardize any future employment or cause substantial inconvenience, he will be available, upon reasonable notice and with no additional compensation other than as provided in this Separation Agreement, to respond to questions and provide assistance to Employer regarding any transition issues or unfinished business arising from his departure. Employer will endeavor to schedule any meetings and/or calls at times that are mutually convenient and do not interfere with Executive's future activities or employment. Furthermore, Executive agrees that after the Separation Date, in accordance with Section 10 of the Employment Agreement,

2

#76198073 v14

he will fully cooperate with Employer regarding the United States Securities Exchange Commission's (the "SEC") investigation of matters relating to Holdings, together with any associated securities class action and derivative lawsuits. The Company will continue to honor its indemnification obligations (including the advancement of legal fees, as appropriate) to Executive after the Separation Date, including but not limited to with respect to the SEC investigation of matters related to Holdings, together with any associated securities class action and derivative lawsuits.

E.       Executive agrees that nothing in this Separation Agreement will modify any previously-executed "non-disclosure agreement" ("NDA") with Employer, and that he will continue to be bound by, and he agrees to abide by, all such obligations. Further, Executive agrees that nothing in Agreement will modify, amend, supersede, or otherwise change the provisions and requirements in Sections 9 and 10 of the Employment Agreement, unless expressed in this Separation Agreement.

F.       Executive agrees that, not later than the Separation Date, he will return to Employer all Employer property in his possession, custody or control which was obtained from Employer or from any of its customers/potential customers, vendors/potential vendors, merger/acquisition candidates, employees, contractors or consultants, including but not limited to the originals and all copies of any documents, files, data or information (electronic or hard-copy), access cards, credit cards, passwords and file-access methods/protocols, credit cards, and stored documents/files/information (with all documents, files and information being returned unaltered and unencrypted).

G.       If Executive has any vested Employer stock options or stock appreciation rights, he must exercise them as provided by the applicable plan and award agreements. Any unvested Employer stock options, stock appreciation rights or restricted stock, restricted stock units or other equity awards will be forfeited in accordance with the terms of Executive's award agreements with Employer and the applicable Employer plan(s). For the avoidance of any doubt, the 1,950,000 unvested performance-based stock options that were granted by Employer to Executive on January 26, 2017 shall continue to be subject to vesting as set forth in the terms of Executive's award agreement with Employer until such stock options expire.  Notwithstanding any provision of the Employment Agreement to the contrary, the characterization of Executive's separation as being a retirement shall not impact the right of the Executive to have the options vest and be exercised.  Executive understands and agrees that: (a) the federal "insider trading" securities laws continue to apply to him notwithstanding his separation of employment from Employer; (b) Employer's insider trading policy prohibits him from trading in Employer securities while in possession of material nonpublic information concerning Employer; and (c) the prohibition against such trading continues to apply to him after leaving Employer. Therefore, Executive agrees to abide by Employer's insider trading policy windows even after leaving Employer until such time as the insider information he possesses, if any, becomes public.

3

#76198073 v14

H.        Executive and Employer agree that Sections 9(b), 9(c)(i) and 9(c)(ii)(B) of the Employment Agreement are revised to extend the duration of Executive's non-competition, non-solicitation and non-interference covenants from 12 months after the termination of Executive's employment to 24 months after the Separation Date. For the avoidance of doubt, the duration of Executive's covenants contained in Section 9(c)(ii)(A) (non-solicitation of employees) shall remain 12 months after the termination of Executive's employment.

2. **Payments and Benefits to Employee.**

A.        If Executive continues employment through the Separation Date, executes and does not revoke this Separation Agreement, and further executes and does not revoke a Supplemental General Release to cover the Transition Period (in a form substantially similar to Exhibit A to this Separation Agreement) (the "Supplemental General Release"), Employer will:  (i) pay Executive the amount of $2,500,000, payable in a single payment on the eighth (8th) day following the execution of the Supplemental General Release; and (ii) pay on behalf of Executive, an amount, on a monthly basis, that covers the COBRA premiums for the duration of the 18-month COBRA benefits period (this amount is expected to be approximately $815 monthly) (items (i) and (ii) are collectively referred to as the "Separation Payment"). Executive agrees that the Separation Payment would not be paid absent this Separation Agreement.

B.        Subject to Sections 18 and 19 of the Employment Agreement (Indemnification), Executive understands and agrees that the monies and benefits described in paragraph 2.A above, together with the Accrued Benefits (as defined in the Employment Agreement), other than those listed in Section 7(a)(ii) of the Employment Agreement, are the sole obligations of Employer to him under this Separation Agreement, his Employment Agreement, or arising from his employment by Employer or the end of that employment, and those payments actually represent more than the monies or compensation to which he may now or may after the date of this Separation Agreement be entitled from Employer. Executive further affirms that, as of the date of this Separation Agreement, he has received all monies currently owed by Employer to him, including all compensation (including wages/salary and any earned bonuses and commissions), accrued paid time off and leave (paid or unpaid), and benefits, except for any benefits in which he has vested rights pursuant to the terms of the applicable plans under applicable laws.

C.        Executive agrees that Employer has not provided any tax advice related to the receipt of monies payable under this Separation Agreement.  Section 23 of the Employment Agreement is incorporated herein by reference.

3. **Employee's release of Employer.**

A.        In exchange for the benefits given by Employer to Executive under this Separation Agreement, Executive agrees, on his own behalf and on behalf of any other person entitled to make a claim on behalf of or through him, to release and forever discharge as of the date of this Separation Agreement Employer and its respective parent companies, subsidiaries, affiliates and all present, former and future managers, directors, officers,

4

#76198073 v14

employees, successors and assigns of Employer and its affiliates and direct or indirect owners (collectively, the "Released Parties") to the extent provide below. The Released Parties are intended to be third-party beneficiaries of this Separation Agreement, and this Separation Agreement may be enforced by each of them in accordance with the terms of this Separation Agreement in respect of the rights granted to such Released Parties under this Separation Agreement. Terms used in this Separation Agreement but not otherwise defined shall have the meanings given to them in the Agreement.

B.        Executive agrees that he resigns from any position as an officer, member of the board of managers, or directors (as applicable) or fiduciary of Employer or its affiliates (or reaffirm any such resignation that may have already occurred). Executive understands that any payments or benefits paid or granted to Executive under this Separation Agreement represent, in part, consideration for signing this Separation Agreement, and are not salary, wages or benefits to which Executive was already entitled. Executive further understands and agrees that Executive will not receive certain of the payments and benefits specified in Section 2 above unless Executive executes this Separation Agreement and does not revoke this Separation Agreement within the time period permitted hereafter. Executive understands and agrees that such payments and benefits are subject to Sections 9, 10 and 12 of the Employment Agreement, which (as noted below) expressly survive Executive's separation of employment and the execution of this Separation Agreement. Such payments and benefits will not be considered compensation for purposes of any employee benefit plan, program, policy or arrangement maintained or hereafter established by Employer or its affiliates.

C.        Except as provided in this Separation Agreement and except for the provisions of the Employment Agreement which expressly survive the termination of Executive's employment with Employer, Executive knowingly and voluntarily (for himself, his heirs, executors, administrators and assigns) releases and forever discharges Employer and the other Released Parties from any and all claims, suits, controversies, actions, causes of action, cross-claims, counter-claims, demands, debts, compensatory damages, liquidated damages, punitive or exemplary damages, other damages, claims for costs and attorneys' fees, or liabilities of any nature whatsoever in law and in equity, both past and present (through the date that this Separation Agreement becomes effective and enforceable) and whether known or unknown, suspected, or claimed against Employer or any of the Released Parties which Executive, his spouse, or any of his heirs, executors, administrators or assigns, may have, which arise out of or are connected with Executive's employment with, or Executive's separation from, Employer (including, but not limited to, any allegation, claim or violation, arising under: Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Age Discrimination in Employment Act of 1967, as amended (including the Older Workers Benefit Protection Act); the Equal Pay Act of 1963, as amended; the Americans with Disabilities Act of 1990; the Family and Medical Leave Act of 1993; the Worker Adjustment Retraining and Notification Act; the Employee Retirement Income Security Act of 1974; any applicable Executive Order Programs; the Fair Labor Standards Act; or their state or local counterparts; or under any other federal, state or local civil or human rights law, or under any other local, state, or federal law, regulation or ordinance; or under any public policy, contract or tort, or under common law; or arising under any policies, practices or procedures of Employer; or any claim for wrongful discharge, breach of contract, infliction of emotional distress, defamation; or any claim for costs, fees, or other expenses, including attorneys ' fees incurred in these matters) (all of the foregoing collectively referred to in this Separation Agreement as the "Claims").

5

#76198073 v14

D.        Executive represents that he has made no assignment or transfer of any right, claim, demand, cause of action, or other matter covered by paragraph 3.C above. Executive affirms that he has reported to Employer all facts suggesting that Employer has violated any federal, state, or local laws, regulations or rules. Executive represents that he has not filed any lawsuit, complaint, grievance or demand for arbitration against Employer, and agrees not to institute any such proceeding in the future other than a claim that Employer has breached the terms of this Separation Agreement.

E.        Executive agrees that this Separation Agreement does not waive or release any rights or claims that Executive may have under the Age Discrimination in Employment Act of 1967 which arise after the date Executive executes this Separation Agreement. Executive acknowledges and agrees that Executive's separation from employment with Employer in compliance with the terms of the Employment Agreement, and the terms set forth in this Separation Agreement, will not serve as the basis for any claim or action (including, without limitation, any claim under the Age Discrimination in Employment Act of 1967).

F.        Executive agrees that he waives all rights to sue or obtain equitable, remedial or punitive relief from any or all Released Parties of any kind whatsoever in respect of any Claim, including, without limitation, reinstatement, back pay, front pay, and any form of injunctive relief. Notwithstanding the above, Executive further acknowledges that Executive is not waiving and is not being required to waive any right that cannot be waived under law, including the right to file an administrative charge or participate in an administrative investigation or proceeding provided, however, that Executive disclaims and waives any right to share or participate in any monetary award resulting from the prosecution of such charge or investigation or proceeding. Additionally, Executive is not waiving: (i) any right to the Accrued Benefits, if any, to which Executive is entitled under the Employment Agreement; (ii) any claim relating to directors' and officers' liability insurance coverage or any right of indemnification under Employer's organizational documents or the Employment Agreement, or otherwise, (iii) any rights as an equity or security holder in Employer or its affiliates; or (iv) any claim to enforce any rights under this Separation Agreement.

G.        In signing this Separation Agreement, Executive acknowledges and intends that it will be effective as a bar to each and every one of the Claims mentioned above or implied. Executive expressly consents that this Separation Agreement will be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown and unsuspected Claims (notwithstanding any state or local statute that expressly limits the effectiveness of a general release of unknown, unsuspected and unanticipated Claims), if any, as well as those relating to any other Claims mentioned above or implied. Executive acknowledges and agrees that this waiver is an essential and material term of this Separation Agreement and that without such waiver Employer would not have agreed to the terms of the Agreement. Executive further agrees that in the event Executive should bring a Claim seeking damages against Employer, or in the event Executive should seek to recover against Employer in any Claim brought by a governmental agency on Executive's behalf, this Separation Agreement will serve as a complete defense to such Claims to the maximum extent permitted by law. Executive further agrees that Executive is not aware of any pending claim of the type described above, nor aware of any facts evidencing any improper conduct by Employer, as of the execution of this Separation Agreement.

6

#76198073 v14

H. Executive agrees that neither this Separation Agreement, nor the furnishing of the consideration for this Separation Agreement, will be deemed or construed at any time to be an admission by Employer, any Released Party or Executive of any improper or unlawful conduct.

I. Executive agrees that this Separation Agreement and the Employment Agreement are confidential and agree not to disclose any information regarding the terms of this Separation Agreement or the Employment Agreement, except to Executive's immediate family and any tax, legal or other counsel Executive may have consulted regarding the meaning or effect of this Separation Agreement or as required by law, and Executive will instruct each of the foregoing not to disclose the same to anyone.

J. Any non-disclosure provision in this Separation Agreement does not prohibit or restrict Executive (or Executive's attorney) from responding to any inquiry about this Separation Agreement or its underlying facts and circumstances by the SEC, the Financial Industry Regulatory Authority ("FINRA"), any other self-regulatory organization or any governmental entity.

K. Executive acknowledge and agrees that Sections 8 through 14, 18, 19, and 23 of the Employment Agreement, and as modified or amended by this Separation Agreement, will survive Executive's execution of this Separation Agreement, and execution of the Supplemental General Release.

L. Executive acknowledges and agrees that he may hereafter discover claims or facts in addition to or different than those which Executive now knows or believes to exist with respect to the subject matter of the release set forth above and which, if known or suspected at the time of entering into this Separation Agreement, may have materially affected this Separation Agreement and Executive's decision to enter into it.

M. Whenever possible, each provision of this Separation Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Separation Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction , such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Separation Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained in this Separation Agreement.

## 4. **Conditions to Employer's Obligations.**

Employer's execution of and performance of obligations under this Separation Agreement are specifically conditioned on: (a) Executive's execution, delivery to Employer and non-revocation of this Separation Agreement and the Supplemental General Release; (b) Executive's keeping confidential (other than as permitted by this Separation Agreement) the existence and terms of this Separation Agreement; (c) Executive's professional and competent performance of his job duties until the Separation Date; and (d) Executive's compliance with the terms of this Separation Agreement, his Employment Agreement, any Executive NDA or any customer-specific NDA, and the Supplemental General Release.

#76198073 v14

**5. Additional Terms.**

      **A.**       **Governing Law; Waiver of Jury Trial.** This Separation Agreement will be interpreted and enforced in accordance with the laws of the State of Delaware. Any litigation between the parties must be brought in a court having jurisdiction in New Castle County, Delaware, unless it is necessary for Employer to institute suit in another jurisdiction to obtain injunctive relief to enforce the terms of this Separation Agreement. Further, the Parties knowingly, voluntarily, and intentionally waive any right to a jury trial with respect to any claims arising in connection with this Separation Agreement.

      **B.**       **Entire Agreement.** This Separation Agreement, the Employment Agreement (as modified or amended by this Separation Agreement), any Executive NDA, and any customer-specific NDA, represent the sole and entire agreement between the parties and supersede any and all prior agreements, negotiations and discussions between the parties with respect to Executive's employment or the end of that employment by Employer.

      **C.**       **Severability.** If one or more paragraph(s) of this Separation Agreement are ruled invalid or unenforceable, such invalidity or unenforceability will not affect any other provision of that agreement, which will remain in full force and effect.

      **D.**       **Amendments/Modifications.** This Separation Agreement may not be modified orally but only by a writing signed by both Executive and Employer.

      **E.**       **Survivability/Assignments.** This Separation Agreement will inure to the benefit of and will be binding upon Employer, its successors and assigns. Executive's obligations and duties under this Separation Agreement are personal and not assignable, but Employer will have the right to assign its rights and obligations under this Separation Agreement to any Employer affiliate or successor or to any purchaser(s) of their assets.

      **F.**       **Confidentiality.** Executive and Employer agree that, unless required by law or by a court of competent jurisdiction, this Separation Agreement will remain confidential and will not be used for any purpose other than enforcing their specific terms in any proceeding between the parties to this Separation Agreement. If either document must be filed in any court, the person seeking to file it will do so only under seal unless prohibited by the court.

      **G.**       **Counterparts.** This Separation Agreement may be signed in counterparts, and all so executed counterparts will constitute one agreement which will be binding on all of the parties to this Separation Agreement, notwithstanding that all of the parties may not have each signed the same signature page.

      **H.**       **Reimbursement of Legal Fees.** Within 30 days of the presentation of a detailed invoice, Employer shall reimburse Executive up to $15,000 to cover his reasonable legal expenses in connection with the review and negotiation of this Separation Agreement.

8

#76198073 v14

BY SIGNING THIS SEPARATION AGREEMENT, EXECUTIVE REPRESENTS AND AGREES THAT:

1.  EXECUTIVE HAS READ IT CAREFULLY;

2.  EXECUTIVE UNDERSTANDS ALL OF ITS TERMS AND KNOWS THAT EXECUTIVE IS GIVING UP IMPORTANT RIGHTS, INCLUDING BUT NOT LIMITED TO, RIGHTS UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, AS AMENDED; TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED; THE EQUAL PAY ACT OF 1963; THE AMERICANS WITH DISABILITIES ACT OF 1990; AND THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED;

3.  EXECUTIVE VOLUNTARILY CONSENTS TO EVERYTHING IN IT;

4.  EXECUTIVE HAS BEEN ADVISED TO CONSULT WITH AN ATTORNEY BEFORE EXECUTING IT AND EXECUTIVE HAS DONE SO OR, AFTER CAREFUL READING AND CONSIDERATION, EXECUTIVE HAS CHOSEN NOT TO DO SO OF HIS OWN VOLITION;

5.  EXECUTIVE HAS HAD AT LEAST 21 DAYS FROM THE DATE OF HIS RECEIPT OF THIS SEPARATION AGREEMENT TO CONSIDER IT, AND THE CHANGES, IF ANY, MADE SINCE EXECUTIVE'S RECEIPT OF THIS SEPARATION AGREEMENT ARE NOT MATERIAL OR WERE MADE AT EXECUTIVE'S REQUEST AND WILL NOT RESTART THE REQUIRED 21-DAY PERIOD;

6.  EXECUTIVE UNDERSTANDS THAT HE HAS SEVEN (7) DAYS AFTER THE EXECUTION OF THIS SEPARATION AGREEMENT TO REVOKE IT AND THAT THIS SEPARATION AGREEMENT WILL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THE REVOCATION PERIOD HAS EXPIRED. IF EXECUTIVE DECIDES TO REVOKE THIS SEPARATION AGREEMENT WITHIN THE 7 DAYS, EXECUTIVE MUST DELIVER HIS REVOCATION BY THE 7TH DAY TO EMPLOYER'S GENERAL COUNSEL;

9

7.   EXECUTIVE HAS SIGNED THIS SEPARATION AGREEMENT KNOWINGLY AND VOLUNTARILY AND WITH THE ADVICE OF ANY COUNSEL RETAINED TO ADVISE EXECUTIVE WITH RESPECT TO IT; AND

8.   EXECUTIVE AGREES THAT THE PROVISIONS OF THIS SEPARATION AGREEMENT MAY NOT BE AMENDED, WAIVED, CHANGED OR MODIFIED EXCEPT BY AN INSTRUMENT IN WRITING SIGNED BY AN AUTHORIZED REPRESENTATIVE OF EMPLOYER AND BY EXECUTIVE.

[Signature Page Follows]

10

#76198073 v14

**IN WITNESS WHEREOF**, the parties have caused this Separation Agreement to be executed as of the date first written above.


SIGNED: _____     DATED: _____

Camille Farhat


RTI Surgical, Inc.

SIGNED: _____     DATED: _____

Joshua H. DeRienzis, its Vice President


11

#76198073 v14

**Exhibit A**

**<u>SUPPLEMENTAL GENERAL RELEASE</u>**

This Supplemental General Release, dated August 3, 2020 (this "Supplemental General Release"), is made and entered into between Camille Farhat ("Executive") and RTI Surgical, Inc., a subsidiary of Surgalign Holdings, Inc. (f/k/a RTI Surgical Holdings, Inc.) ("Employer").

BACKGROUND

Employer and Executive executed a Separation Agreement and General Release, dated July 17, 2020 (the "Separation Agreement"), setting forth Executive's separation from Employer. Pursuant to the Separation Agreement, Executive is entitled to certain specified payments in return for execution of the Separation Agreement and of this Supplemental General Release.

This Supplemental General Release is intended to cover the time period designated in the Separation Agreement as the Transition Period, and will apply to any claims that may or could have arisen during the Transition Period.

Accordingly, Executive and Employer agree as follows:

TERMS

1. **Executive's Release of Claims Against Employer**

A.        In exchange for the benefits given by Employer to Executive under the Separation Agreement and this Supplemental General Release, Executive agrees, on his own behalf and on behalf of any other person entitled to make a claim on behalf of or through him, to release and forever discharge, as of the date of execution of the Separation Agreement and the date of execution of this Supplemental General Release, Employer and its respective parent companies, subsidiaries, affiliates and all present, former and future managers, directors, officers, employees, successors and assigns of Employer and its affiliates and direct or indirect owners (collectively, the "Released Parties") to the extent provided below. The Released Parties are intended to be third-party beneficiaries of the Separation Agreement and this Supplemental General Release, and this Supplemental General Release may be enforced by each of them in accordance with the terms of the Separation Agreement or the Supplemental General Release in respect of the rights granted to such Released Parties. For the avoidance of doubt, each of WSHP Biologics Holdings, LLC and Water Street Healthcare Partners, LLC shall be considered affiliates of Employer for purposes of this Supplemental General Release.

12

#76198073 v14

B.　　　Executive acknowledges and agrees that any payments or benefits paid or granted to Executive under the Separation Agreement (as modified or amended by this Supplemental General Release) represent, in part, consideration for signing the Separation Agreement and this Supplemental General Release, and are not salary, wages or benefits to which Executive was already entitled. Executive further understands and agrees that Executive will not receive certain of the payments and benefits specified in Section 2 of the Separation Agreement unless Executive executes this Supplemental General Release and does not revoke this Supplemental General Release within the time period permitted hereafter.

C.　　　Except as provided in the Separation Agreement and this Supplemental General Release, and except for the provisions of the Employment Agreement which expressly survive the termination of Executive's employment with Employer, Executive knowingly and voluntarily (for himself, his heirs, executors, administrators and assigns) releases and forever discharges Employer and the other Released Parties from any and all claims, suits, controversies, actions, causes of action, cross-claims, counter-claims, demands, debts, compensatory damages, liquidated damages, punitive or exemplary damages, other damages, claims for costs and attorneys' fees, or liabilities of any nature whatsoever in law and in equity, both past and present (from the execution date of the Separation Agreement through the date that this Supplemental General Release becomes effective and enforceable) and whether known or unknown, suspected, or claimed against Employer or any of the Released Parties which Executive, his spouse, or any of his heirs, executors, administrators or assigns, may have, which arise out of or are connected with Executive's employment with, or Executive's separation from, Employer (including, but not limited to, any allegation, claim or violation, arising under: Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Age Discrimination in Employment Act of 1967, as amended (including the Older Workers Benefit Protection Act); the Equal Pay Act of 1963, as amended; the Americans with Disabilities Act of 1990; the Family and Medical Leave Act of 1993; the Worker Adjustment Retraining and Notification Act; the Employee Retirement Income Security Act of 1974; any applicable Executive Order Programs; the Fair Labor Standards Act; or their state or local counterparts; or under any other federal, state or local civil or human rights law, or under any other local, state, or federal law, regulation or ordinance; or under any public policy, contract or tort, or under common law; or arising under any policies, practices or procedures of Employer; or any claim for wrongful discharge, breach of contract, infliction of emotional distress, defamation; or any claim for costs, fees, or other expenses, including attorneys' fees incurred in these matters) (all of the foregoing collectively referred to in this Supplemental General Release as the "Claims").

D.　　　Executive represents that he has made no assignment or transfer of any right, claim, demand, cause of action, or other matter covered by paragraph 3.C above. Executive affirms that he has reported to Employer all facts suggesting that Employer has violated any federal, state, or local laws, regulations or rules. Executive represents that he has not filed any lawsuit, complaint, grievance or demand for arbitration against Employer, and agrees not to institute any such proceeding in the future other than a claim that Employer has breached the terms of this Supplemental General Release.

13

#76198073 v14

E.  Executive agrees that this Supplemental General Release does not waive or release any rights or claims that Executive may have under the Age Discrimination in Employment Act of 1967 which arise after the date Executive executes this Supplemental General Release. Executive acknowledges and agrees that Executive's separation from employment with Employer in compliance with the terms of the Employment Agreement, and the terms set forth in this Supplemental General Release, will not serve as the basis for any claim or action (including, without limitation, any claim under the Age Discrimination in Employment Act of 1967).

F.  Executive agrees that he waives all rights to sue or obtain equitable, remedial or punitive relief from any or all Released Parties of any kind whatsoever in respect of any Claim, including, without limitation, reinstatement, back pay, front pay, and any form of injunctive relief. Notwithstanding the above, Executive further acknowledges that Executive is not waiving and is not being required to waive any right that cannot be waived under law, including the right to file an administrative charge or participate in an administrative investigation or proceeding provided, however, that Executive disclaims and waives any right to share or participate in any monetary award resulting from the prosecution of such charge or investigation or proceeding. Additionally, Executive is not waiving: (i) any right to the Accrued Benefits, if any, to which Executive is entitled under the Employment Agreement; (ii) any claim relating to directors' and officers' liability insurance coverage or any right of indemnification under Employer's organizational documents or otherwise; or (iii) any rights as an equity or security holder in Employer or its affiliates.

G.  In signing this Supplemental General Release, Executive acknowledges and intends that it will be effective as a bar to each and every one of the Claims mentioned above or implied. Executive expressly consents that this Supplemental General Release will be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown and unsuspected Claims (notwithstanding any state or local statute that expressly limits the effectiveness of a general release of unknown, unsuspected and unanticipated Claims), if any, as well as those relating to any other Claims mentioned above or implied. Executive acknowledges and agrees that this waiver is an essential and material term of the Separation Agreement and this Supplemental General Release and that without such waiver Employer would not have agreed to the terms of the Separation Agreement or the Supplemental General Release. Executive further agrees that in the event Executive should bring a Claim seeking damages against Employer, or in the event Executive should seek to recover against Employer in any Claim brought by a governmental agency on Executive's behalf, this Supplemental General Release will serve as a complete defense to such Claims to the maximum extent permitted by law. Executive further agrees that Executive is not aware of any pending claim of the type described above, nor aware of any facts evidencing any improper conduct by Employer, as of the execution of this Supplemental General Release.

H.  Executive agrees that neither this Supplemental General Release, nor the furnishing of the consideration for this Supplemental General Release, will be deemed or construed at any time to be an admission by Employer, any Released Party or Executive of any improper or unlawful conduct.

14

#76198073 v14

I.        Executive agrees that this Supplemental General Release, the Separation Agreement and the Employment Agreement are confidential and agree not to disclose any information regarding the terms of this Supplemental General Release, the Separation Agreement or the Employment Agreement, except to Executive's immediate family and any tax, legal or other counsel Executive may have consulted regarding the meaning or effect of this Supplemental General Release and Separation Agreement, or as required by law, and Executive will instruct each of the foregoing not to disclose the same to anyone.

J.        Any non-disclosure provision in this Supplemental General Release does not prohibit or restrict Executive (or Executive's attorney) from responding to any inquiry about this Supplemental General Release or its underlying facts and circumstances by the United States Securities and Exchange Commission (the "SEC"), the Financial Industry Regulatory Authority ("FINRA"), any other self-regulatory organization or any governmental entity.

K.        Executive acknowledges and agrees that he may hereafter discover claims or facts in addition to or different than those which Executive now knows or believes to exist with respect to the subject matter of the release set forth above and which, if known or suspected at the time of entering into this Supplemental General Release, may have materially affected this Supplemental General Release and Executive's decision to enter into it.

L.        Notwithstanding anything in this Supplemental General Release to the contrary, this Supplemental General Release shall not relinquish, diminish, or in any way affect any rights or claims arising out of any breach, after the date of execution of this Supplemental General Release, by the Company or by any Released Party of the Employment Agreement .

M.        Whenever possible, each provision of this Supplemental General Release will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Supplemental General Release is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction , such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Supplemental General Release will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained in this Supplemental General Release.

N.        Executive acknowledges and agrees that any terms contained within the Separation Agreement but not contained in this Supplemental General Release will be incorporated into this Supplemental General Release and will have full force and effect.

## 2.        **Additional Terms.**

A.        **Governing Law; Waiver of Jury Trial.** This Supplemental General Release will be interpreted and enforced in accordance with the laws of the State of Delaware. Any litigation between the parties must be brought in a court having jurisdiction in New Castle County, Delaware, unless it is necessary for Employer to institute suit in another jurisdiction to obtain injunctive relief to enforce the terms of this Supplemental General Release. Further, the Parties knowingly, voluntarily, and intentionally waive any right to a jury trial with respect to any claims arising in connection with this Supplemental General Release.

15

#76198073 v14

**B.** **Entire Agreement.** This Supplemental General Release, the Separation Agreement, the Employment Agreement (as modified or amended by the Separation Agreement), any Executive NDA, and any customer-specific NDA, represent the sole and entire agreement between the parties and supersede any and all prior agreements, negotiations and discussions between the parties with respect to Executive's employment or the end of that employment by Employer.

**C.** **Severability.** If one or more paragraph(s) of this Supplemental General Release are ruled invalid or unenforceable, such invalidity or unenforceability will not affect any other provision of that agreement, which will remain in full force and effect.

**D.** **Amendments/Modifications.** This Supplemental General Release may not be modified orally but only by a writing signed by both Executive and Employer.

**E.** **Survivability/Assignments.** This Supplemental General Release will inure to the benefit of and will be binding upon Employer, its successors and assigns. Executive's obligations and duties under this Supplemental General Release are personal and not assignable, but Employer will have the right to assign its rights and obligations under this Supplemental General Release to any Employer affiliate or successor or to any purchaser(s) of their assets.

**F.** **Confidentiality.** Executive and Employer agree that, unless required by law or by a court of competent jurisdiction, this Supplemental General Release will remain confidential and will not be used for any purpose other than enforcing their specific terms in any proceeding between the parties to this Supplemental General Release. If either document must be filed in any court, the person seeking to file it will do so only under seal unless prohibited by the court.

**G.** **Counterparts.** This Supplemental General Release may be signed in counterparts, and all so executed counterparts will constitute one agreement which will be binding on all of the parties to this Supplemental General Release, notwithstanding that all of the parties may not have each signed the same signature page.

16

#76198073 v14

BY SIGNING THIS SUPPLEMENTAL GENERAL RELEASE, EXECUTIVE REPRESENTS AND AGREES THAT:

1.   EXECUTIVE HAS READ IT CAREFULLY ;

2.   EXECUTIVE UNDERSTANDS ALL OF ITS TERMS AND KNOWS THAT EXECUTIVE IS GIVING UP IMPORTANT RIGHTS, INCLUDING BUT NOT LIMITED TO, RIGHTS UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, AS AMENDED ; TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED ; THE EQUAL PAY ACT OF 1963; THE AMERICANS WITH DISABILITIES ACT OF 1990; AND THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ;

3.   EXECUTIVE VOLUNTARILY CONSENTS TO EVERYTHING IN IT;

4.   EXECUTIVE HAS BEEN ADVISED TO CONSULT WITH AN ATTORNEY BEFORE EXECUTING IT AND EXECUTIVE HAS DONE SO OR, AFTER CAREFUL READING AND CONSIDERATION, EXECUTIVE HAS CHOSEN NOT TO DO SO OF HIS OWN VOLITION;

5.   EXECUTIVE HAS HAD AT LEAST 21 DAYS FROM THE DATE OF HIS RECEIPT OF THIS SUPPLEMENTAL GENERAL RELEASE TO CONSIDER IT, AND THE CHANGES, IF ANY, MADE SINCE EXECUTIVE'S RECEIPT OF THIS SUPPLEMENTAL GENERAL RELEASE ARE NOT MATERIAL OR WERE MADE AT EXECUTIVE'S REQUEST AND WILL NOT RESTART THE REQUIRED 21-DAY PERIOD;

6.   EXECUTIVE UNDERSTANDS THAT HE HAS SEVEN (7) DAYS AFTER THE EXECUTION OF THIS SUPPLEMENTAL GENERAL RELEASE TO REVOKE IT AND THAT THIS SUPPLEMENTAL GENERAL RELEASE WILL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THE REVOCATION PERIOD HAS EXPIRED. IF EXECUTIVE DECIDES TO REVOKE THIS SUPPLEMENTAL GENERAL RELEASE WITHIN THE 7 DAYS, EXECUTIVE MUST DELIVER HIS REVOCATION BY THE 7TH DAY TO EMPLOYER'S GENERAL COUNSEL;

17

#76198073 v14

7.  EXECUTIVE HAS SIGNED THIS SUPPLEMENTAL GENERAL RELEASE KNOWINGLY AND VOLUNTARILY AND WITH THE ADVICE OF ANY COUNSEL RETAINED TO ADVISE EXECUTIVE WITH RESPECT TO IT;  AND

8.  EXECUTIVE AGREES THAT THE PROVISIONS OF THIS SUPPLEMENTAL GENERAL RELEASE MAY NOT BE AMENDED, WAIVED, CHANGED OR MODIFIED EXCEPT BY AN INSTRUMENT IN WRITING SIGNED BY AN AUTHORIZED REPRESENTATIVE OF EMPLOYER AND BY EXECUTIVE.

[Signature Page Follows]

18

IN WITNESS WHEREOF, the parties have caused this Supplemental General Release to be executed as of the date first written above.

SIGNED: _____     DATED: _____
                      Camille Farhat


RTI Surgical, Inc.

SIGNED: _____     DATED: _____
                Joshua H. DeRienzis, as Vice President


19

#76198073 v14

**Exhibit 10.6**

## RTI SURGICAL HOLDINGS, INC.

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

**AMENDED AND RESTATED EMPLOYMENT AGREEMENT** (this "Agreement") dated as of June 15, 2020, between RTI Surgical Holdings, Inc., a Delaware corporation (the "Company"), and Terry M. Rich (the "Employee").

## W I T N E S S E T H

**WHEREAS,** the Company has employed the Employee as the President of Spine (Global Spine) of the Company;

**WHEREAS,** the Company and the Employee previously entered into that certain Employment Agreement, dated as of November 25, 2019 (the "Prior Agreement"); and

**WHEREAS,** the Company and the Employee desire to enter into this Agreement to amend and restate the Prior Agreement in its entirety.

**NOW, THEREFORE,** in consideration of the foregoing, of the mutual promises contained herein and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      **POSITION AND DUTIES.**

(a)      During the Employment Term (as defined in Section 2 hereof), the Employee shall serve as the Company's President of Spine (Global Spine). In this capacity, the Employee shall have the duties, authorities and responsibilities as are required by the Employee's position, and such other duties, authorities and responsibilities as may reasonably be assigned to the Employee that are not inconsistent with the Employee's position as President of Spine (Global Spine) of the Company. The Employee's principal place of employment with the Company shall be in the Chicago, Illinois metropolitan area or (b) such other place as mutually agreed upon by the Employee and the Chief Executive Officer (the "CEO"), provided that the Employee understands and agrees that the Employee may be required to travel from time to time for business purposes.  The Employee shall report directly to the Company's CEO.

(b)      During the Employment Term, the Employee shall devote all of the Employee's business time, energy, business judgment, knowledge and skill and the Employee's best efforts to the performance of the Employee's duties with the Company; provided that the Employee shall be entitled to serve on for-profit, civic, charitable, educational, religious, public interest, or public service boards, and to manage the Employee's personal and family investments, in each case, to the extent such activities do not materially interfere with the performance of the Employee's duties and responsibilities hereunder, and provided further that the Employee shall not serve on more than one for-profit board without the consent of the Board of Directors of the Company (the "Board").

1

**2.** **EMPLOYMENT TERM.** Beginning on December 2, 2019 (the "Effective Date"), the Company agrees to employ the Employee pursuant to the terms of this Agreement, and the Employee agrees to be so employed, for a term of three years (the "Initial Term") commencing as of the Effective Date. On each anniversary of the Effective Date following the Initial Term, the term of this Agreement shall be automatically extended for successive one-year periods, provided, however, that either party hereto may elect not to extend this Agreement by giving written notice to the other party at least sixty (60) days prior to any such anniversary date. Notwithstanding the foregoing, the Employee's employment hereunder may be earlier terminated in accordance with Section 6 hereof, subject to Section 7 hereof. The period of time between the Effective Date and the termination of the Employee's employment hereunder shall be referred to herein as the "Employment Term."

**3.** **BASE SALARY.** The Company agrees to pay the Employee a base salary at an annual rate of not less than $450,000, payable in accordance with the regular payroll practices of the Company, but not less frequently than monthly. The Employee's Base Salary shall be subject to annual review by the Board (or a committee thereof), and may be increased, but not decreased below its then current level, from time to time by the Board or the CEO. The base salary as determined herein and adjusted from time to time shall constitute "Base Salary" for purposes of this Agreement.

**4.** **SHORT TERM INCENTIVE.** During the Employment Term, the Employee shall:

(a) receive a payment in the amount of $100,000 on the date the Company makes its 2019 annual discretionary incentive payments to it employees, but no later than March 31, 2020 (the "2019 Payment"); for the avoidance of doubt, the Employee shall not be eligible to receive any other discretionary incentive payments for calendar year 2019; and

(b) be eligible to receive an annual discretionary incentive payment under the Company's annual bonus plan as may be in effect from time to time (the "Annual Bonus") based on a target bonus opportunity of at least 100% of the Employee's Base Salary (the "Target Bonus"), upon the attainment of one or more pre-established performance goals to be established by the Company's Compensation Committee (the "Committee") or the CEO in its (or his) sole discretion.

**5.** **EMPLOYEE BENEFITS.**

(a) **EQUITY GRANTS.** On November 29, 2019, the Company and the Employee are entering into: (i) the Restricted Stock Award Agreement attached as Exhibit A; and (ii) the Stock Option Agreement attached as Exhibit B to this Agreement (collectively, the "Initial Equity Grants").

The Employee acknowledges that the Initial Equity Grants are in consideration for his being hired by the Company and his expected contributions over the first three years of his employment. If his Employee resigns his employment without Good Reason (as defined below) or is terminated for Cause (as defined below) before December 1, 2022, then the Employee shall forfeit the unvested Initial Equity Grants as of the date of such resignation or termination for Cause.

2

(b)        **BENEFIT PLANS.** During the Employment Term, the Employee shall be entitled to participate in any employee benefit plan that the Company has adopted or may adopt, maintain or contribute to for the benefit of its employees and other senior executives generally, subject to satisfying the applicable eligibility requirements, except to the extent such plans are duplicative of the benefits otherwise provided to hereunder. The Employee's participation will be subject to the terms of the applicable plan documents and generally applicable Company policies. Notwithstanding the foregoing, the Company may modify or terminate any employee benefit plan at any time.

(c)        **BUSINESS EXPENSES.** Upon presentation of reasonable substantiation and documentation as the Company may specify from time to time, the Employee shall be reimbursed in accordance with the Company's expense reimbursement policy, for all reasonable out-of-pocket business expenses incurred and paid by the Employee during the Employment Term and in connection with the performance of the Employee's duties hereunder.

**6.        TERMINATION.** The Employee's employment and the Employment Term shall terminate on the first of the following to occur:

(a)        **DISABILITY.** Upon ten (10) days' prior written notice by the Company to the Employee of termination due to Disability.  For purposes of this Agreement, "Disability" shall be defined as the inability of the Employee to have performed the Employee's material duties hereunder due to a physical or mental injury, infirmity or incapacity for one hundred eighty (180) days (including weekends and holidays) in any 365-day period as determined by the Board in its reasonable discretion. The Employee shall cooperate in all respects with the Company if a question arises as to whether the Employee has become disabled (including, without limitation, submitting to reasonable examinations by one or more medical doctors and other health care specialists selected by the Company and authorizing such medical doctors and other health care specialists to discuss the Employee's condition with the Company).

(b)        **DEATH.** Automatically upon the date of death of the Employee.

(c)        **CAUSE.** For Cause unless, to the extent correctable, such events are fully corrected in all material respects by Employee within thirty (30) days following written notification by the Company to the Employee of the occurrence of one of the reasons of Cause set forth below "Cause" shall mean the occurrence of one of the following events:

(i)        the Employee's willful misconduct or gross negligence in the performance of the Employee's material duties to the Company;

(ii)        the Employee's failure to perform the Employee's material duties to the Company or to follow the lawful directives of the Board (other than as a result of death or Disability);

(iii)        indictment for, conviction of, or pleading of guilty or nolo contendere to, any felony or any crime involving moral turpitude;

3

    (iv)   the Employee's violation of any laws, rules or regulations of any governmental or regulatory body, which violation is materially injurious to the Company's financial condition or reputation;

    (v)   the Employee's failure to reasonably cooperate in any audit or investigation of the business or financial practices of the Company or any of its subsidiaries;

    (vi)   the Employee's performance of any act of theft, embezzlement, fraud, material malfeasance, material dishonesty or misappropriation of the Company's property;

    (vii)   breach of a material provision of this Agreement or a material provision of any other agreement with the Company, or a material violation of the Company's code of conduct or a material violation of any material other written policy;

    (viii)   the Employee's possession or use of illegal drugs;

    (ix)   the Employee's legal use of alcohol or controlled substances in a manner that materially impairs the Employee's ability to effectively perform his job; or

    (x)   the Employee's commission of any act, in bad faith, that is materially injurious to the Company's financial condition or reputation.

The Company shall provide the Employee with a written notice detailing the specific circumstances alleged to constitute Cause within thirty (30) days after the Company becomes aware of such circumstances, and may actually terminate employment within ten (10) days following the expiration of the Employee's fifteen (15)-day cure period described above.

  (d)  **WITHOUT CAUSE.** Immediately upon written notice by the Company to the Employee of an involuntary termination without Cause (other than for death or Disability).

  (e)  **GOOD REASON.** Notwithstanding anything herein to contrary, upon written notice by the Employee to the Company of a termination for Good Reason. "Good Reason" shall mean the occurrence of any of the following events, without the express written consent of the Employee, unless such events are fully corrected in all material respects by the Company within thirty (30) days following written notification by the Employee to the Company of the occurrence of one of the reasons set forth below:

    (i)   material diminution in the Employee's Base Salary or Target Bonus;

    (ii)   material diminution in the Employees benefit plan or equity grants;

    (iii)   material diminution in the Employee's duties, authorities or responsibilities (other than temporarily while physically or mentally incapacitated or as required by applicable law); or

    (iv)   a material breach of this Agreement by the Company after notice.

4

The Employee shall provide the Company with a written notice detailing the specific circumstances alleged to constitute Good Reason, within ninety (90) days after the Employee becomes aware of such circumstances, and may actually terminate employment within ninety (90) days following the expiration of the Company's thirty (30)-day cure period described above. Otherwise, any claim of such circumstances as "Good Reason" shall be deemed irrevocably waived by the Employee.

Notwithstanding anything to the contrary set forth in this Agreement, if the Employee resigns without Good Reason during the period from January 1, 2020 to August 31, 2020, said resignation, unless the Employee has committed an act that would give rise to the Company's ability to terminate the Employee for Cause, shall be treated as a termination for Good Reason .

(f)        **WITHOUT GOOD REASON.** Upon thirty (30) days' prior written notice by the Employee to the Company of the Employee's voluntary termination of employment without Good Reason (which the Company may, in its sole discretion, make effective earlier than any notice date).

(g)        **EXPIRATION OF EMPLOYMENT TERM; NON-EXTENSION OF AGREEMENT.** Upon the expiration of the Employment Term due to a non-extension of the Agreement by the Company or the Employee pursuant to the provisions of Section 2 hereof.

**7.        CONSEQUENCES OF TERMINATION.**

(a)        **DEATH.** In the event that the Employee's employment and the Employment Term ends on account of the Employee's death, the Employee or the Employee's estate, as the case may be, shall be entitled to the following (with the amounts due under Sections 7(a)(i) through 7(a)(iv) hereof to be paid within sixty (60) days following termination of employment, or such earlier date as may be required by applicable law):

(i)        any unpaid Base Salary through the date of termination;

(ii)        any Annual Bonus earned but unpaid with respect to the fiscal year ending on or preceding the date of termination (for the avoidance of doubt, no Annual Bonus will be paid for any fiscal year during which the date of termination occurs);

(iii)        reimbursement for any unreimbursed business expenses incurred through the date of termination;

(iv)        any accrued but unused vacation time in accordance with Company policy; and

(v)        all other payments, benefits or fringe benefits to which the Employee shall be entitled under the terms of any applicable compensation arrangement or benefit, equity or fringe benefit plan or program or grant or this Agreement (collectively, Sections 7(a)(i) through 7(a)(v) hereof shall be hereafter referred to as the "Accrued Benefits").

5

(b)        **DISABILITY.**  In the event that the Employee's employment and/or Employment Term ends on account of the Employee's Disability, the Company shall pay or provide the Employee with the Accrued Benefits.

(c)        **TERMINATION FOR CAUSE OR AS A RESULT OF NON-EXTENSION OF THIS AGREEMENT BY THE EMPLOYEE.**  If the Employee's employment is terminated: (x) by the Company for Cause or (y) as a result of the non-extension of the Employment Term by the Employee as provided in Section 2 hereof, the Company shall pay to the Employee the Accrued Benefits other than, in the case of a termination for Cause, the benefit described in Section 7(a)(ii) hereof.

(d)        **TERMINATION WITHOUT CAUSE OR TERMINATION BY THE EMPLOYEE FOR GOOD REASON OR OTHERWISE.**  If the Employee's employment is terminated: (x) by the Company other than for Cause, (y) by the Employee for Good Reason or (z) the non-extension of the Employment Term by the Company as provided in Section 2 hereof, the Company shall pay or provide the Employee with the following, subject to the provisions of Section 23 hereof:

(i)        the Accrued Benefits;

(ii)        subject to the Employee's continued compliance with the obligations in Sections 8, 9 and 10 hereof, an amount equal to the Employee's monthly Base Salary rate (but not as an employee), paid monthly for a period of 12 months (or, if such termination occurs after a Change in Control, 18 months) following such termination (the "Severance Period"); provided that to the extent that the payment of any amount constitutes "nonqualified deferred compensation" for purposes of Code Section 409A (as defined in Section 23 hereof), any such payment scheduled to occur during the first six (6) months following the termination of employment shall not be paid until the first regularly scheduled pay period following the sixth month following such termination and shall include payment of any amount that was otherwise scheduled to be paid prior thereto; and the Company shall reimburse the Employee for reasonable outplacement services (which shall not exceed $30,000 in the aggregate) incurred during the one-year period following the date of termination.  Furthermore, if such termination changes following a Change in Control the Employee shall also be entitled to:

(1)        a prorated Target Bonus for the year of termination, based on the number of full months completed from the beginning of the fiscal year of termination through the date of termination, payable thirty (30) days following the termination of employment; and

(2)        provided the Employee elects continued welfare coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), the Company shall pay, during the period the Employee actually continues such coverage, but in any event not to exceed 18 months, the same percentage of the monthly premium costs for COBRA continuation coverage as it pays of the monthly premium costs for medical coverage for senior executives generally; provided that the Company may pay this amount by paying the Employee a monthly amount equal on an after-tax basis to such amount (the "Monthly Payments"); and

6

Payments and benefits provided in this <u>Section 7(d)</u> shall be in lieu of any termination or severance payments or benefits for which the Employee may be eligible under any of the plans, policies or programs of the Company or under the Worker Adjustment Retraining Notification Act of 1988 or any similar state statute or regulation.

For purposes of this Agreement, "<u>Change in Control</u>" shall mean the occurrence of any of the following:

(i) The acquisition by any Person, within the meaning of Section 3(a)(9) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of Beneficial Ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of more than thirty-five percent (35%) of either (A) the value of then outstanding equity securities of the Company (the "<u>Outstanding Company Stock</u>") or (B) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "<u>Outstanding Company Voting Securities</u>") (the foregoing Beneficial Ownership hereinafter being referred to as a "<u>Controlling Interest</u>"); provided, however, that for purposes of this clause (i), the following acquisitions shall not constitute or result in a Change in Control: (w) any acquisition by the Company; (x) any acquisition by any Person that as of the Effective Date owns Beneficial Ownership of a Controlling Interest; (y) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any subsidiary, or any business, corporation, partnership, limited liability company or other entity designated by the Board, in which the Company or a subsidiary holds a substantial ownership interest, directly or indirectly; or (z) any acquisition by any entity pursuant to a transaction which complies with clauses (A), (B) and (C) of subsection (iii) below; or

(ii) During any period of two (2) consecutive years (not including any period prior to the Effective Date) individuals who constitute the Board on the Effective Date (the "<u>Incumbent Board</u>") cease for any reason to constitute at least a majority of the Board; provided, however, that any individual becoming a director subsequent to the Effective Date whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board; or

7

(iii) Consummation of (A) a reorganization, merger, statutory share exchange or consolidation or similar transaction involving (x) the Company or (y) any of its Subsidiaries, but in the case of this clause (y) only if equity securities of the Company are issued or issuable in connection with the transaction (each of the events referred to in this clause (A) being hereinafter referred to as a "Business Reorganization"), or (B) a sale or other disposition of all or substantially all of the assets of the Company, or the acquisition of assets or equity of another entity by the Company or any of its Subsidiaries (each an "Asset Sale"), in each case, unless, following such Business Reorganization or Asset Sale, (1) all or substantially all of the individuals and entities who were the Beneficial Owners, respectively, of the Outstanding Company Stock and Outstanding Company Voting Securities immediately prior to such Business Reorganization or Asset Sale beneficially own, directly or indirectly, more than fifty percent (50%) of the value of the then outstanding equity securities and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of members of the board of directors (or comparable governing body of an entity that does not have such a board), as the case may be, of the entity resulting from such Business Reorganization or Asset Sale (including, without limitation, an entity which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) (the "Continuing Entity") in substantially the same proportions as their ownership, immediately prior to such Business Reorganization or Asset Sale, of the Outstanding Company Stock and Outstanding Company Voting Securities, as the case may be (excluding any outstanding equity or voting securities of the Continuing Entity that such Beneficial Owners hold immediately following the consummation of the Business Reorganization or Asset Sale as a result of their ownership, prior to such consummation, of equity or voting securities of any company or other entity involved in or forming part of such Business Reorganization or Asset Sale other than the Company), (2) no Person (excluding any employee benefit plan (or related trust) of the Company or any Continuing Entity or any entity controlled by the Continuing Corporation or any Person that as of the Effective Date owns Beneficial Ownership of a Controlling Interest) beneficially owns, directly or indirectly, fifty percent (50%) or more of the value of the then outstanding equity securities of the Continuing Entity or the combined voting power of the then outstanding voting securities of the Continuing Entity except to the extent that such ownership existed prior to the Business Reorganization or Asset Sale and (3) at least a majority of the members of the Board of Directors or other governing body of the Continuing Entity were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board, providing for such Business Reorganization or Asset Sale.

(e) **CODE SECTION 280G.**

(i) Anything in this Agreement to the contrary notwithstanding, in the event that it shall be determined that any payment, distribution, or other action by the Company to or for the benefit of the Employee (whether paid or payable or distributed or distributable pursuant to the terms of the Agreement or otherwise (each a "Payment")), would result in an "excess parachute payment" within the meaning of Section 280G(b)(i) of the Code, then the Payments shall be reduced to the "Reduced Amount;" provided, however, that no such reduction shall be made unless the net after-tax benefit received by the Employee after such reduction would exceed the net after-tax benefit received by the Employee if no such reduction was made. The "Reduced Amount" shall be an amount expressed in present value which maximizes the aggregate present value of Payments without causing any Payment to be an excess parachute payment under Section 280G(b)(i) of the Code. For purposes of this Section 7(e), present value shall be determined in accordance with Section 280G(d)(4) of the Code. If applicable, Payments shall be reduced in the following order: (A) any cash severance based on a multiple of Base Salary or Annual Bonus; (B) any other cash amounts payable to the Employee; (C) benefits valued as parachute payments; and (D) acceleration of vesting of any equity awards. If and to the extent necessary to avoid a violation of Section 409A, no amounts payable under any "nonqualified deferred compensation plan" subject to Section 409A shall be reduced until after all other Payments have been reduced.

(ii) All determinations required to be made under this Section 7(e), including the amount of any Reduced Amount and the Payments that are to be reduced pursuant to Section 7(e)(i) and shall be made by the Company's accountants serving immediately prior to the date of the applicable Change in Control (the "Accounting Firm"), which shall provide detailed supporting calculations both to the Company and the Employee within 15 business days of the receipt of notice from the Employee that there has been a Payment, or such earlier time as is requested by the Company. The Accounting Firm's decision as to which Payments are to be reduced shall be made in consultation with the Employee and shall be subject to the Employee's consent, which shall not be unreasonably withheld.

(f) **OTHER OBLIGATIONS.** Upon any termination of the Employee's employment with the Company, the Employee shall promptly resign from any position as an officer, director or fiduciary of any Company-related entity.

(g) **EXCLUSIVE REMEDY.** The amounts payable to the Employee following termination of employment and the Employment Term hereunder pursuant to Sections 6 and 7 hereof shall be in full and complete satisfaction of the Employee's rights under this Agreement and any other claims that the Employee may have in respect of the Employee's employment with the Company or any of its affiliates, and the Employee acknowledges that such amounts are fair and reasonable, and are the Employee's sole and exclusive remedy, in lieu of all other remedies at law or in equity, with respect to the termination of the Employee's employment hereunder or any breach of this Agreement.

8. **RELEASE.** Any and all amounts payable and benefits or additional rights provided pursuant to this Agreement beyond the Accrued Benefits shall only be payable if the Employee delivers to the Company and does not revoke a general release of claims in favor of the Company in substantially the form attached on Exhibit C hereto. Such release shall be executed and delivered (and no longer subject to revocation, if applicable) within sixty (60) days following termination.

9

**9.   RESTRICTIVE COVENANTS.**

(a)   **CONFIDENTIALITY.** During the course of the Employee's employment with the Company, the Employee will have access to Confidential Information. For purposes of this Agreement, "Confidential Information" means any confidential or proprietary data, information, ideas, concepts, discoveries, trade secrets, inventions (whether or not patentable or reduced to practice), innovations, improvements, know-how, developments, techniques, methods, processes, treatments, drawings, sketches, specifications, designs, plans, patterns, models, plans and strategies, and all other confidential or proprietary information or trade secrets in any form or medium (whether merely remembered or embodied in a tangible or intangible form or medium) whether now or hereafter existing, relating to or arising from the past, current or potential business, activities and/or operations of the Company or any of its affiliates, including, without limitation, any such information relating to or concerning finances, sales, marketing, advertising, transition, promotions, pricing, personnel, customers, suppliers, vendors, partners and/or competitors. The Employee agrees that the Employee shall not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any person, other than in the course of the Employee's assigned duties and for the benefit of the Company, either during the period of the Employee's employment or at any time thereafter, any Confidential Information or other confidential or proprietary information received from third parties subject to a duty on the Company's and its subsidiaries' and affiliates' part to maintain the confidentiality of such information, and to use such information only for certain limited purposes, in each case, which shall have been obtained by the Employee during the Employee's employment by the Company (or any predecessor). The foregoing shall not apply to information that: (i) was known to Employee or the public prior to its disclosure to the Employee; (ii) becomes generally known to the public subsequent to disclosure to the Employee through no wrongful act of the Employee or any representative of the Employee; or (iii) the Employee is required to disclose by applicable law, regulation or legal process (provided that the Employee provides the Company with prior notice of the contemplated disclosure and cooperates with the Company at its expense in seeking a protective order or other appropriate protection of such information); or (iv) approved for disclosure in advance in a signed writing; or (v) independently developed by the Employee without reference to the Confidential Information; or (vi) acquired by the Employee from a third party that was not prohibited by agreement or otherwise from disclosing the Confidential Information.

(b)   **NONCOMPETITION.** The Employee acknowledges that: (i) the Employee performs services of a unique nature for the Company that are irreplaceable, and that the Employee's performance of such services to a competing business will result in irreparable harm to the Company; (ii) the Employee has had and will continue to have access to Confidential Information which, if disclosed, would unfairly and inappropriately assist in competition against the Company or any of its affiliates; (iii) in the course of the Employee's employment by a competitor, the Employee may use or disclose such Confidential Information; (iv) the Company and its affiliates have substantial relationships with their customers and the Employee has had and will continue to have access to these customers; (v) the Employee has received and will receive specialized training from the Company and its affiliates; and (vi) the Employee has generated and will continue to generate goodwill for the Company and its affiliates in the course of the Employee's employment. Accordingly, during the Employee's employment hereunder and for a period of 12 months thereafter, the Employee agrees that the Employee will not, directly or indirectly, own, manage, operate, control, be employed by (whether as an employee, consultant,

10

independent contractor or otherwise, and whether or not for compensation) or render services to any person, firm, corporation or other entity, in whatever form, engaged in competition with the Company or any of its subsidiaries or affiliates in any material business in which the Company or any of its subsidiaries or affiliates is engaged on the date of termination or in which they have planned (that has been approved by the Board of Directors), on or prior to such date, to be engaged in on or after such date, in any locale of any country in which the Company conducts business (hereinafter, the "Noncompete Restrictions"). Notwithstanding the foregoing, nothing herein shall prohibit the Employee from being a passive owner of not more than one percent (1%) of the equity securities of a publicly traded corporation engaged in a business that is in competition with the Company or any of its subsidiaries or affiliates, so long as the Employee has no active participation in the business of such corporation. In addition, the provisions of this Section 9(b) shall not be violated by the Employee commencing employment with a subsidiary, division or unit of any entity that engages in a business in competition with the Company or any of its subsidiaries or affiliates so long as the Employee and such subsidiary, division or unit with which he is employed does not engage in a business in competition with the Company or any of its subsidiaries or affiliates. Notwithstanding anything in this Section 9(b) or this Agreement to the contrary, these Noncompete Restrictions shall not apply to any termination by Employee for Good Reason or by the Company without Cause on or before August 31, 2020.

(c)     **NONSOLICITATION;  NONINTERFERENCE.** (i) During the Employee's employment with the Company and for a period of 12 months thereafter, the Employee agrees that the Employee shall not, except in the furtherance of the Employee's duties hereunder, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity, solicit, aid or induce any customer of the Company or any of its subsidiaries or affiliates to purchase goods or services then sold by the Company or any of its subsidiaries or affiliates from another person, firm, corporation or other entity or assist or aid any other persons or entity in identifying or soliciting any such customer (the "Non-Interference Restrictions").

(ii)     During the Employee's employment with the Company and for a period of twelve (12) months thereafter, the Employee agrees that the Employee shall not, except in the furtherance of the Employee's duties hereunder, directly or indirectly, individually or on behalf of any other person, firm, corporation or other entity: (A) solicit, aid or induce any employee, representative or agent of the Company or any of its subsidiaries or affiliates to leave such employment or retention or to accept employment with or render services to or with any other person, firm, corporation or other entity unaffiliated with the Company or knowingly hire or retain any such employee, representative or agent, or take any action to materially assist or aid any other person, firm, corporation or other entity in identifying, hiring or soliciting any such employee, representative or agent, or (B) interfere, or aid or induce any other person or entity in interfering, with the relationship between the Company or any of its subsidiaries or affiliates and any of their respective vendors, joint venturers or licensors (the "Non-Solicitation Restrictions"). An employee, representative or agent shall be deemed covered by this Section 9(c)(ii) while so employed or retained and for a period of six (6) months thereafter. Notwithstanding anything in this Section 9(c) or this Agreement to the contrary, these Non-Solicitation Restrictions shall not apply to any termination by Employee for Good Reason or by the Company without Cause on or before August 31, 2020.

11

(d)      **INVENTIONS.** (i) The Employee acknowledges and agrees that all ideas, methods, inventions, discoveries, improvements, work products, developments, software, know-how, processes, techniques, works of authorship and other work product, whether patentable or unpatentable: (A) that are reduced to practice, created, invented, designed, developed, contributed to, or improved with the use of any Company resources and/or within the scope of the Employee's work with the Company or that relate to the business, operations or actual or demonstrably anticipated research or development of the Company, and that are made or conceived by the Employee, solely or jointly with others, during the Employment Term, or (B) suggested by any work that the Employee performs in connection with the Company, either while performing the Employee's duties with the Company or on the Employee's own time, shall belong exclusively to the Company (or its designee), whether or not patent or other applications for intellectual property protection are filed thereon (the "Inventions"). The Employee will keep full and complete written records (the "Records"), in the manner prescribed by the Company in writing, of all Inventions, and will promptly disclose all Inventions completely and in writing to the Company. The Records shall be the sole and exclusive property of the Company, and the Employee will surrender them upon the termination of the Employment Term, or upon the Company's request. The Employee irrevocably conveys, transfers and assigns to the Company the Inventions and all patents or other intellectual property rights that may issue thereon in any and all countries, whether during or subsequent to the Employment Term, together with the right to file, in the Employee's name or in the name of the Company (or its designee), applications for patents and equivalent rights (the "Applications"). The Employee will, at any time during and subsequent to the Employment Term, make such applications, sign such papers, take all rightful oaths, and perform all other acts as may be reasonably requested from time to time by the Company in writing to perfect, record, enforce, protect, patent or register the Company's rights in the Inventions, all without additional compensation to the Employee from the Company. The Employee will also execute assignments to the Company (or its designee) of the Applications, and give the Company and its attorneys all reasonable assistance (including the giving of testimony) to obtain the Inventions for the Company's benefit, all without additional compensation to the Employee from the Company, but entirely at the Company's expense.

(ii)      In addition, the Inventions will be deemed Work for Hire, as such term is defined under the copyright laws of the United States, on behalf of the Company and the Employee agrees that the Company will be the sole owner of the Inventions, and all underlying rights therein, in all media now known or hereinafter devised, throughout the universe and in perpetuity without any further obligations to the Employee. If the Inventions, or any portion thereof, are deemed not to be Work for Hire, or the rights in such Inventions do not otherwise automatically vest in the Company, the Employee hereby irrevocably conveys, transfers and assigns to the Company, all rights, in all media now known or hereinafter devised, throughout the universe and in perpetuity, in and to the Inventions, including, without limitation, all of the Employee's right, title and interest in the copyrights (and all renewals, revivals and extensions thereof) to the Inventions, including, without limitation, all rights of any kind or any nature now or hereafter recognized, including, without limitation, the unrestricted right to make modifications, adaptations and revisions to the Inventions, to exploit and allow others to exploit the Inventions and all rights to sue at law or in equity for any infringement, or other unauthorized use or conduct in derogation of the Inventions, known or unknown, prior to the date hereof, including, without limitation, the right to receive all proceeds and damages therefrom. In addition, the Employee hereby waives any so-called "moral rights" with respect to the Inventions. To the extent that the Employee has any rights in the results

12

and proceeds of the Employee's service to the Company that cannot be assigned in the manner described herein, the Employee agrees to unconditionally waive the enforcement of such rights. The Employee hereby waives any and all currently existing and future monetary rights in and to the Inventions and all patents and other registrations for intellectual property that may issue thereon, including, without limitation, any rights that would otherwise accrue to the Employee's benefit by virtue of the Employee being an employee of or other service provider to the Company.

(iii)     The parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

(iv)     18 U.S.C. § 1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

(e)     **RETURN OF COMPANY PROPERTY.** On the date of the Employee's termination of employment (or at a commercially reasonable time thereafter) with the Company for any reason (or at any time prior thereto at the Company's request), the Employee shall return all property belonging to the Company or its affiliates (including, but not limited to, any Company-provided laptops, computers, cell phones, wireless electronic mail devices or other equipment, or documents and property belonging to the Company). The Employee may retain the Employee's rolodex and similar address books provided that such items only include contact information.

13

(f) **REASONABLENESS OF COVENANTS.** In signing this Agreement, the Employee gives the Company assurance that the Employee has carefully read and considered all of the terms and conditions of this Agreement, including the restraints imposed under this Section 9 hereof. The Employee agrees that these restraints are necessary for the reasonable and proper protection of the Company and its affiliates and their Confidential Information and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area, and that these restraints, individually or in the aggregate, will not prevent the Employee from obtaining other suitable employment during the period in which the Employee is bound by the restraints. The Employee acknowledges that each of these covenants has a unique, very substantial and immeasurable value to the Company and its affiliates and that the Employee has sufficient assets and skills to provide a livelihood while such covenants remain in force. The Employee further covenants that the Employee will not challenge the reasonableness or enforceability of any of the covenants set forth in this Section 9, and that the Employee will reimburse the Company and its affiliates for all costs (including reasonable attorneys' fees) incurred in connection with any action to enforce any of the provisions of this Section 9 if either the Company and/or its affiliates prevails on any material issue involved in such dispute or if the Employee challenges the reasonableness or enforceability of any of the provisions of this Section 9. It is also agreed that each of the Company's affiliates will have the right to enforce all of the Employee's obligations to that affiliate under this Agreement, including without limitation pursuant to this Section 9.

(g) **REFORMATION.** If it is determined by a court of competent jurisdiction in any state that any restriction in this Section 9 is excessive in duration or scope or is unreasonable or unenforceable under applicable law, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the laws of that state.

(h) **TOLLING.** In the event of any violation of the provisions of this Section 9, the Employee acknowledges and agrees that the post-termination restrictions contained in this Section 9 shall be extended by a period of time equal to the period of such violation, it being the intention of the parties hereto that the running of the applicable post-termination restriction period shall be tolled during any period of such violation.

(i) **SURVIVAL OF PROVISIONS.** The obligations contained in Sections 9 and 10 hereof shall survive the termination or expiration of the Employment Term and the Employee's employment with the Company and shall be fully enforceable thereafter.

14

10.        **COOPERATION.** Upon the receipt of reasonable written notice from the Company (including outside counsel), the Employee agrees that while employed by the Company and thereafter, the Employee will respond and provide information with regard to matters in which the Employee has knowledge as a result of the Employee's employment with the Company, and will provide reasonable assistance to the Company, its affiliates and their respective representatives in defense of any claims that may be made against the Company or its affiliates, and will provide reasonable assistance to the Company and its affiliates in the prosecution of any claims that may be made by the Company or its affiliates, to the extent that such claims may relate to the period of the Employee's employment with the Company (collectively, the "Claims"). The Employee agrees to promptly inform the Company if the Employee becomes aware of any lawsuits involving Claims that may be filed or threatened against the Company or its affiliates.  The Employee also agrees to promptly inform the Company (to the extent that the Employee is legally permitted to do so) if the Employee is asked to assist in any investigation of the Company or its affiliates (or their actions) or another party attempts to obtain information or documents from the Employee (other than in connection with any litigation or other proceeding in which the Employee is a party-in-opposition) with respect to matters the Employee believes in good faith to relate to any investigation of the Company or its affiliates, in each case, regardless of whether a lawsuit or other proceeding has then been filed against the Company or its affiliates with respect to such investigation, and shall not do so unless legally required. During the pendency of any litigation or other proceeding involving Claims, the Employee shall not communicate with anyone (other than the Employee's attorneys and tax and/or financial advisors and except to the extent that the Employee determines in good faith is necessary in connection with the performance of the Employee's duties hereunder) with respect to the facts or subject matter of any pending or potential litigation or regulatory or administrative proceeding involving the Company or any of its affiliates without giving prior written notice to the Company or the Company's counsel. Upon presentation of appropriate documentation, the Company shall pay or reimburse the Employee for all reasonable out-of-pocket travel, duplicating or telephonic expenses incurred by the Employee in complying with this Section 10.

11.        **WHISTLEBLOWER PROTECTION.** Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall be interpreted so as to impede the Employee (or any other individual) from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures under the whistleblower provisions of federal law or regulation. The Employee does not need the prior authorization of the Company to make any such reports or disclosures and the Employee shall not be not required to notify the Company that such reports or disclosures have been made.

12.        **EQUITABLE RELIEF AND OTHER REMEDIES.** The Employee acknowledges and agrees that the Company's remedies at law for a breach or threatened breach of any of the provisions of Section 9 or Section 10 hereof may be inadequate and, in recognition of this fact, the Employee agrees that, in the event of such a breach or threatened breach, in addition to any remedies at law, the Company, without posting any bond or other security, shall be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available, without the necessity of showing actual monetary damages. In the event of a violation by the Employee of Section 9 or Section 10 hereof, any severance being paid to the Employee pursuant to this Agreement or otherwise shall immediately cease, and any severance previously paid to the Employee shall be immediately repaid to the Company.

15

**13.**     **NO ASSIGNMENTS.** This Agreement is personal to each of the parties hereto. Except as provided in this Section 13 hereof, no party may assign or delegate any rights or obligations hereunder without first obtaining the written consent of the other party hereto. The Company may assign this Agreement to any successor to all or substantially all of the business and/or assets of the Company, provided that the Company shall require such successor to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place. As used in this Agreement, "Company" shall mean the Company and any successor to its business and/or assets, which assumes and agrees to perform the duties and obligations of the Company under this Agreement by operation of law or otherwise.

**14.**     **NOTICE**. For purposes of this Agreement, notices and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given: (a) on the date of delivery, if delivered by hand, or (b) on the first business day following the date of deposit, if delivered by guaranteed overnight delivery service, addressed as follows:

> If to the Employee:
>
> At the address (or to the facsimile number) shown
> in the books and records of the Company.
>
> If to the Company:
>
> RTI Surgical Holdings, Inc.
> 520 Lake Cook Road, Suite 315
> Deerfield, Illinois 60015
> Attention: Chief Executive Officer

or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

**15.**     **SECTION HEADINGS; INCONSISTENCY.** The section headings used in this Agreement are included solely for convenience and shall not affect, or be used in connection with, the interpretation of this Agreement. In the event of any inconsistency between the terms of this Agreement and any form, award, plan or policy of the Company, the terms of this Agreement shall govern and control.

**16.**     **SEVERABILITY.** The provisions of this Agreement shall be deemed severable. The invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by applicable law.

**17.**     **COUNTERPARTS.** This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

16

**18.** **INDEMNIFICATION.** The Company hereby agrees to indemnify the Employee and hold the Employee harmless to the maximum extent permitted by law against and in respect of any and all actions, suits, proceedings, claims, demands, judgments, costs, expenses (including reasonable attorney's fees), losses, and damages resulting from the Employee's good faith performance of the Employee's duties and obligations with the Company. This obligation shall survive the termination of the Employee's employment with the Company.

**19.** **LIABILITY INSURANCE.** The Company shall cover the Employee under directors' and officers' liability insurance both during and, while potential liability exists, after the term of this Agreement in the same amount and to the same extent as the Company covers its other officers and directors.

**20.** **GOVERNING LAW; JURY WAIVER.** This Agreement, the rights and obligations of the parties hereto, and any claims or disputes relating thereto, shall be governed by and construed in accordance with the laws of the State of Delaware (without regard to its choice of law provisions). Each of the parties agrees that any dispute between the parties shall be resolved only in the federal courts of the United States of America or the courts of the State of Delaware in each case located in New Castle County, Delaware, and the appellate courts having jurisdiction of appeals in such courts. In that context, and without limiting the generality of the foregoing, each of the parties hereto irrevocably and unconditionally waives all right to trial by jury in any proceeding (whether based on contract, tort or otherwise) arising out of or relating to this Agreement or the Employee's employment by the Company or any affiliate of the Company, or the Employee's or the Company's performance under, or the enforcement of, this Agreement. The parties acknowledge and agree that in connection with any dispute arising hereunder, unless otherwise provided in this Agreement, each party shall pay all of its own costs and expenses, including, without limitation, its own legal fees and expenses.

**21.** **MISCELLANEOUS.** No provision of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing and signed by the Employee and such officer or director as may be designated by the Board. No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. This Agreement together with all exhibits hereto sets forth the entire agreement of the parties hereto in respect of the subject matter contained herein and supersedes any and all prior agreements or understandings between the Employee and the Company with respect to the subject matter hereof. No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either party which are not expressly set forth in this Agreement.

**22.** **REPRESENTATIONS.** Each party represents and warrants to the other party that: (a) it has the legal right to enter into this Agreement and to perform all of the obligations to be performed hereunder in accordance with its terms, and (b) it is not a party to any agreement or understanding, written or oral, and is not subject to any restriction, which, in either case, could prevent it from entering into this Agreement or performing all of the its duties and obligations hereunder.

17

**23.      TAX MATTERS.**

(a)      **WITHHOLDING.**  The Company may withhold from any and all amounts payable under this Agreement or otherwise such federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

(b)      **SECTION 409A COMPLIANCE.**

(i)      The intent of the parties is that payments and benefits under this Agreement comply with Internal Revenue Code Section 409A and the regulations and guidance promulgated thereunder (collectively "Code Section 409A") and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith. To the extent that any provision hereof is modified in order to comply with Code Section 409A, such modification shall be made in good faith and shall, to the maximum extent reasonably possible, maintain the original intent and economic benefit to the Employee and the Company of the applicable provision without violating the provisions of Code Section 409A. In no event whatsoever shall the Company be liable for any additional tax, interest or penalty that may be imposed on the Employee by Code Section 409A or damages for failing to comply with Code Section 409A.

(ii)      A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Code Section 409A and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." Notwithstanding anything to the contrary in this Agreement, if the Employee is deemed on the date of termination to be a "specified employee" within the meaning of that term under Code Section 409A(a)(2)(B), then with regard to any payment or the provision of any benefit that is considered deferred compensation under Code Section 409A payable on account of a "separation from service," such payment or benefit shall not be made or provided until the date which is the earlier of: (A) the expiration of the six (6)-month period measured from the date of such "separation from service" of the Employee, and (B) the date of the Employee's death, to the extent required under Code Section 409A. Upon the expiration of the foregoing delay period, all payments and benefits delayed pursuant to this Section 23(b)(ii) (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to the Employee in a lump sum**,** and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein.

(iii)      To the extent that reimbursements or other in-kind benefits under this Agreement constitute "nonqualified deferred compensation" for purposes of Code Section 409A: (A) all expenses or other reimbursements hereunder shall be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by the Employee; (B) any right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit; and (C) no such reimbursement, expenses eligible for reimbursement, or in-kind benefits provided in any taxable year shall in any way affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year.

18

(iv)     For purposes of Code Section 409A, the Employee's right to receive any installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments. Whenever a payment under this Agreement specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Company.

(v)     Notwithstanding any other provision of this Agreement to the contrary, in no event shall any payment under this Agreement that constitutes "nonqualified deferred compensation" for purposes of Code Section 409A be subject to offset by any other amount unless otherwise permitted by Code Section 409A.

**24.     REIMBURSEMENT OF LEGAL EXPENSES**. Within 60 days of the date of this Agreement, the Company will pay to the Employee up to $10,000 to cover his legal expenses in connection with the review and negotiation of this Agreement, so long as he provides sufficiently detailed backup for such expenses.

19

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first written above.

**COMPANY**

By: _____

   Name:    Camille I. Farhat
   Title:     President and Chief Executive Officer


**EMPLOYEE**

_____

Terry M. Rich


#75214946 v4

**Exhibit_10.7**

## RTI SURGICAL HOLDINGS, INC.

## STAND ALONE RESTRICTED STOCK AGREEMENT

## FOR

## TERRY M. RICH

1.     ***Award of Restricted Stock.*** RTI SURGICAL HOLDINGS, INC., a Delaware corporation (the "Company") hereby grants, as of November 29, 2019 (the "Date of Grant"), as an inducement to accept an offer of employment, to Terry M. Rich (the "Recipient"), a number of restricted shares of the Company's common stock (the "Shares") (rounded to the nearest whole number) equal to (x) $262,500 divided by (y) the volume weighted average price per share of the Company's common stock on the Nasdaq Stock Market for the thirty days ending on the closing of the market on the Date of Grant, as set forth on Schedule 4 attached to this Agreement (collectively the "Restricted Stock"). As a condition to entering into this Agreement, and as a condition to the issuance of any Shares (or any other securities of the Company), the Recipient agrees to be bound by all of the terms and conditions herein. Unless otherwise provided herein, terms used herein that are defined in the Employment Agreement between the Company and the Recipient, dated November 25, 2019 (the "Employment Agreement") and not defined herein shall have the meanings attributable thereto in the Employment Agreement.

2.     ***Vesting of Restricted Stock.***

    (a)     ***General Vesting.*** The shares of Restricted Stock shall become vested in the following amounts, at the following times and upon the following conditions, provided that, except as otherwise provided in the Employment Agreement, the Recipient's service to the Company continues through and on the applicable Vesting Date:

| Number of Shares of Restricted Stock | Vesting Date |
| --- | --- |
| 0 | Prior to the first anniversary of the Date of Grant. |
| 1/3 of the Restricted Stock | First anniversary of the Date of Grant. |
| 1/8 of the Restricted Stock | Quarterly beginning on the fifteenth month following the Date of Grant. |

    Except as otherwise provided in Sections 2(b), 2(c) and 4 hereof or the terms of the Employment Agreement, there shall be no proportionate or partial vesting of shares of Restricted Stock in or during the months, days or periods prior to each Vesting Date, and all vesting of shares of Restricted Stock shall occur only on the applicable Vesting Date.

    (b)     ***Acceleration of Vesting Upon Change in Control.*** In the event that a Change in Control of the Company occurs during the Recipient's service to the Company, the shares of Restricted Stock subject to this Agreement shall become immediately vested as of the date of the Change in Control. Notwithstanding the foregoing, if in the event of a Change in Control the

successor company assumes or substitutes another award for this Restricted Stock award, then the vesting of the Restricted Stock shall not be accelerated as described in this paragraph (b). For purposes of this paragraph, the Restricted Stock shall be considered assumed or substituted for if following the Change in Control the award confers the right to receive, for each Share subject to the Restricted Stock award immediately prior to the Change in Control, on substantially the same vesting and other terms and conditions as were applicable to the Restricted Stock immediately prior to the Change in Control, the consideration (whether stock, cash or other securities or property) received in the transaction constituting a Change in Control by holders of Shares for each Share held on the effective date of such transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding shares); provided, however, that if such consideration received in the transaction constituting a Change in Control is not solely common stock of the successor company or its parent or subsidiary, the Committee may, with the consent of the successor company or its parent or subsidiary, provide that the consideration to be received upon the vesting of the Restricted Stock shall be solely common stock of the successor company or its parent or subsidiary substantially equal in the fair market value to the per share consideration received by holders of Shares in the transaction constituting a Change in Control. The determination of such substantial equality of value of consideration shall be made by the Committee in its sole discretion and its determination shall be conclusive and binding.

(c)     ***Acceleration of Vesting at Company Discretion.***  Notwithstanding any other term or provision of this Agreement, the Board or the Committee shall be authorized, in its sole discretion, based upon its review and evaluation of the performance of the Recipient and of the Company, to accelerate the vesting of any shares of Restricted Stock under this Agreement, at such times and upon such terms and conditions as the Board or the Committee shall deem advisable.

(d)     ***Definitions.***  For purposes of this Agreement, the following terms shall have the meanings indicated:

(i)     "Committee" means the Compensation Committee of the Board of Directors of the Company.

(ii)     "Non-Vested Shares" means any portion of the Restricted Stock subject to this Agreement that has not become vested pursuant to this Section 2.

(iii)     "Vested Shares" means any portion of the Restricted Stock subject to this Agreement that is and has become vested pursuant to this Section 2.

2

3.      ***Delivery of Restricted Stock.***

        (a)      ***Issuance of Stock Certificates and Legends.***  One or more stock certificates evidencing the Restricted Stock shall be issued in the name of the Recipient but shall be held and retained by the Records Administrator of the Company until the date (the "Applicable Date") on which the shares (or a portion thereof) subject to this Restricted Stock award become Vested Shares pursuant to Section 2 hereof, subject to the provisions of Section 4 hereof.  All such stock certificates shall bear the following legends, along with such other legends that the Board or the Committee shall deem necessary and appropriate or which are otherwise required or indicated pursuant to any applicable stockholders agreement:

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO SUBSTANTIAL VESTING AND OTHER RESTRICTIONS AS SET FORTH IN THE RESTRICTED STOCK AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.  SUCH RESTRICTIONS ARE BINDING ON TRANSFEREES OF THESE SHARES, AND INCLUDE VESTING CONDITIONS WHICH MAY RESULT IN THE COMPLETE FORFEITURE OF THE SHARES.

        (b)      ***Stock Powers.***  The Recipient shall deposit with the Company stock powers or other instruments of transfer or assignment, duly endorsed in blank with signature(s) guaranteed, corresponding to each certificate representing shares of Restricted Stock until such shares become Vested Shares, on a form attached hereto as Schedule 2.  If the Recipient shall fail to provide the Company with any such stock power or other instrument of transfer or assignment, the Recipient hereby irrevocably appoints the Secretary of the Company as his attorney-in-fact, with full power of appointment and substitution, to execute and deliver any such power or other instrument which may be necessary to effectuate the transfer of the Restricted Stock (or assignment of distributions thereon) on the books and records of the Company.  In addition, the Company may require the spouse of the Recipient, if any, to execute and deliver to the Company the Consent of Spouse in the form attached hereto as Schedule 3.

        (c)      ***Delivery of Stock Certificates.***  On or after each Applicable Date, upon written request to the Company by the Recipient, the Company shall promptly cause a new certificate or certificates to be issued for and with respect to all shares that become Vested Shares on that Applicable Date, which certificate(s) shall be delivered to the Recipient as soon as administratively practicable after the date of receipt by the Company of the Recipient's written request. The new certificate or certificates shall continue to bear those legends and endorsements that the Company shall deem necessary or appropriate (including those relating to restrictions on transferability and/or obligations and restrictions under applicable state and federal securities laws).

4.      ***Forfeiture of Non-Vested Shares.***  Except as provided in the Employment Agreement, if the Recipient's service with the Company and Company-related entities is terminated other than: (a) by Recipient without "Good Reason" (as defined in the Employment Agreement) before December 1, 2022 or (b) by the Company with "Cause" (as defined in the Employment Agreement)

3

any Non-Vested Shares of Restricted Stock shall be forfeited immediately and revert back to the Company without any payment to the Recipient. If the Recipient breaches any of the Restrictive Covenants in the Employment Agreement, all Non-Vested Shares (and upon written demand by the Company, in its sole and absolute discretion, any Vested Shares) shall be forfeited immediately upon such breach and revert or be transferred by the Recipient back to the Company without any payment to the Recipient.

The Committee shall have the power and authority to enforce on behalf of the Company any rights of the Company under this Agreement in the event of the Recipient's forfeiture of Shares pursuant to this Section 4.

For the avoidance of doubt, any termination by Recipient with "Good Reason" or by the Company without "Cause" prior to December 1, 2022, shall result in the acceleration of vesting of any shares of Restricted Stock under this Agreement.

5.      *Rights with Respect to Restricted Stock.*

(a)      *General.*  Except as otherwise provided in this Agreement, the Recipient shall have, with respect to all of the shares of Restricted Stock, whether Vested Shares or Non-Vested Shares, all of the rights of a holder of shares of common stock of the Company, including without limitation (i) the right to vote such Restricted Stock, (ii) the right to receive dividends, if any, as may be declared on the Restricted Stock from time to time, and (iii) the rights available to all holders of shares of common stock of the Company upon any merger, consolidation, reorganization, liquidation or dissolution, stock split−up, stock dividend or recapitalization undertaken by the Company; provided, however, that all of such rights shall be subject to the terms, provisions, conditions and restrictions set forth in this Agreement (including without limitation conditions under which all such rights shall be forfeited).  Any Shares issued to the Recipient as a dividend with respect to shares of Restricted Stock shall have the same status and bear the same legend as the shares of Restricted Stock and shall be held by the Company, if the shares of Restricted Stock that such dividend is attributed to is being so held, unless otherwise determined by the Committee.  In addition, notwithstanding any provision to the contrary herein, any cash dividends declared with respect to shares of Restricted Stock subject to this Agreement shall be held in escrow by the Committee until such time as the shares of Restricted Stock that such cash dividends are attributed to shall become Vested Shares, and in the event that such shares of Restricted Stock are subsequently forfeited, the cash dividends attributable to such portion shall be forfeited as well.

(b)      *Adjustments to Shares.*  If at any time while this Agreement is in effect (or Shares granted hereunder shall be or remain unvested while Recipient's service with the Company continues and has not yet terminated or ceased for any reason), there shall be any increase or decrease in the number of issued and outstanding Shares of the Company through the declaration of a stock dividend or through any recapitalization resulting in a stock split-up, combination or exchange of such Shares, then and in that event, the Board or the Committee shall make any adjustments it deems fair and appropriate, in view of such change, in the number of shares of Restricted Stock then subject to this Agreement.  If any such adjustment shall result in a fractional Share, such fraction shall be disregarded.

4

(c)     ***No Restrictions on Certain Transactions.***  Notwithstanding any term or provision of this Agreement to the contrary, the existence of this Agreement, or of any outstanding Restricted Stock awarded hereunder, shall not affect in any manner the right, power or authority of the Company to make, authorize or consummate: (i) any or all adjustments, recapitalizations, reorganizations or other changes in the Company's capital structure or its business; (ii) any merger, consolidation or similar transaction by or of the Company; (iii) any offer, issue or sale by the Company of any capital stock of the Company, including any equity or debt securities, or preferred or preference stock that would rank prior to or on parity with the Restricted Stock and/or that would include, have or possess other rights, benefits and/or preferences superior to those that the Restricted Stock includes, has or possesses, or any warrants, options or rights with respect to any of the foregoing; (iv) the dissolution or liquidation of the Company; (v) any sale, transfer or assignment of all or any part of the stock, assets or business of the Company; or (vi) any other corporate transaction, act or proceeding (whether of a similar character or otherwise).

6.     ***Transferability.***  Unless otherwise determined by the Committee, the shares of Restricted Stock are not transferable unless and until they become Vested Shares in accordance with this Agreement, other than by will or under the applicable laws of descent and distribution. The terms of this Agreement shall be binding upon the executors, administrators, heirs, successors and assigns of the Recipient. Except as otherwise permitted pursuant to the first sentence of this Section, any attempt to effect a Transfer of any shares of Restricted Stock prior to the date on which the shares become Vested Shares shall be void ab initio. For purposes of this Agreement, "Transfer" shall mean any sale, transfer, encumbrance, gift, donation, assignment, pledge, hypothecation, or other disposition, whether similar or dissimilar to those previously enumerated, whether voluntary or involuntary, and including, but not limited to, any disposition by operation of law, by court order, by judicial process, or by foreclosure, levy or attachment.

7.     ***Tax Matters; Section 83(b) Election.***

(a)     ***Section 83(b) Election.***  If the Recipient properly elects, within thirty (30) days of the Date of Grant, to include in gross income for federal income tax purposes an amount equal to the fair market value (as of the Date of Grant) of the Restricted Stock pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended (the "Code"), a form of which is attached hereto as Schedule 1, the Recipient shall make arrangements satisfactory to the Company to pay to the Company any federal, state or local income taxes required to be withheld with respect to the Restricted Stock. If the Recipient shall fail to make such tax payments as are required, the Company shall, to the extent permitted by law, have the right to deduct from any payment of any kind (including without limitation, the withholding of any Shares that otherwise would be issued to the Recipient under this Agreement) otherwise due to the Recipient any federal, state or local taxes of any kind required by law to be withheld with respect to the Restricted Stock.

(b)     ***No Section 83(b) Election.***  If the Recipient does not properly make the election described in paragraph 7 (a) above, the Recipient shall, no later than the date or dates as of which the restrictions referred to in this Agreement hereof shall lapse, pay to the Company, or make arrangements satisfactory to the Committee for payment of, any federal, state or local taxes of any kind required by law to be withheld with respect to the Restricted Stock (including without limitation the vesting thereof), and the Company shall, to the extent permitted by law, have the right to deduct from any payment of any kind (including without limitation, the withholding of any Shares that otherwise would be distributed to the Recipient under this Agreement) otherwise due to Recipient any federal, state, or local taxes of any kind required by law to be withheld with respect to the Restricted Stock.

5

(c)    ***Recipient's Responsibilities for Tax Consequences.*** Tax consequences on the Recipient (including without limitation federal, state, local and foreign income tax consequences) with respect to the Restricted Stock (including without limitation the grant, vesting and/or forfeiture thereof) are the sole responsibility of the Recipient.  The Recipient shall consult with his or her own personal accountant(s) and/or tax advisor(s) regarding these matters, the making of a Section 83(b) election, and the Recipient's filing, withholding and payment (or tax liability) obligations.

8.    ***Clawback.***

(a)    The Company may: (x) cause the cancellation of the Restricted Stock; (y) require reimbursement with respect to the Restricted Stock; and (z) effect any other right of recoupment of equity or other compensation provided under this Agreement or otherwise in accordance with any Company policies generally applicable to the Company's officers and/or directors that currently exist or that may from time to time be adopted or modified in the future by the Company  to the extent required to comply with applicable law (each, a "Clawback Policy"), provided that the following conditions are satisfied: (1) there is an accounting restatement of the Company's financial statements or results; and (2) the restatement results from a noncompliance by the Company with any requirements under or related to the federal securities laws that is material, injurious to the Company or was the result of actions with bad intent.  In such an event, the clawback will be in an amount of up to the total economic gain from any stock-based grants within the five-year period preceding the restatement.  By accepting the Restricted Stock, the Recipient agrees to be bound to any existing or future Clawback Policy adopted by the Company, or any amendments that may from time to time be made to the Clawback Policy in the future by the Company, as required to comply with applicable laws or stock exchange requirements, and is further agreeing that all of the Recipient's equity awards may be unilaterally amended by the Company, without the Recipient's consent, to the extent that the Company in its discretion determines to be necessary or appropriate to comply with any Clawback Policy to the extent required to comply with applicable laws or stock exchange requirements.

(b)    If the Recipient, without the consent of the Company, while employed by or providing services to the Company or after termination of such employment or service: (i) violates a non-competition, non-solicitation or non-disclosure covenant or agreement or (ii) violates the Company's Corporate Governance Guidelines, Code of Conduct and Ethics, Code of Ethics for the Chief Executive Officer and Senior Financial Officer or any other corporate governance materials specified by the SEC or exchange on which common stock of the Company is listed, then, if, but only if, the violation set forth in (i) or (ii) above is both material and materially injurious to the Company: (1) any outstanding, unvested or vested (but only if vesting occurs within nine months of date of the violation), unearned or earned (but only if earned within nine months of the date of the violation) portion of the Restricted Stock may, at the Committee's discretion, be canceled and (2) the Committee, in its discretion, may require the Recipient or other person to whom any payment has been made or shares or other property have been transferred in connection with the Restricted Stock to forfeit and pay over to the Company, on demand, all or any portion of the gain (whether or not taxable) realized upon the sale of any Restricted Stock.  For the avoidance of doubt, this Section 8(b) clawback is only intended for material violations that are materially injurious to the Company and that are volitional or grossly negligent in nature.

6

9.      ***Amendment, Modification & Assignment; Non-Transferability.*** This Agreement may only be modified or amended in a writing signed by the parties hereto. No promises, assurances, commitments, agreements, undertakings or representations, whether oral, written, electronic or otherwise, and whether express or implied, with respect to the subject matter hereof, have been made by either party which are not set forth expressly in this Agreement. Unless otherwise consented to in writing by the Company, in its sole discretion, this Agreement (and Recipient's rights hereunder) may not be assigned, and the obligations of Recipient hereunder may not be delegated, in whole or in part.  The rights and obligations created hereunder shall be binding on the Recipient and his heirs and legal representatives and on the successors and assigns of the Company.

10.     ***Complete Agreement.***  This Agreement (together with those agreements and documents expressly referred to herein, for the purposes referred to herein) embody the complete and entire agreement and understanding between the parties with respect to the subject matter hereof, and supersede any and all prior promises, assurances, commitments, agreements, undertakings or representations, whether oral, written, electronic or otherwise, and whether express or implied, which may relate to the subject matter hereof in any way.

11.     ***Miscellaneous.***

        (a)     ***No Right to (Continued) Employment or Service***. This Agreement and the grant of Restricted Stock hereunder shall not confer, or be construed to confer, upon the Recipient any right to employment or service, or continued employment or service, with the Company or any Company-related entity.

        (b)     ***No Limit on Other Compensation Arrangements***. Nothing contained in this Agreement shall preclude the Company or any Company-related entity from adopting or continuing in effect other or additional compensation plans, agreements or arrangements, and any such plans, agreements and arrangements may be either generally applicable or applicable only in specific cases or to specific persons.

        (c)     ***Severability***.  If any term or provision of this Agreement is or becomes or is deemed to be invalid, illegal or unenforceable in any jurisdiction or under any applicable law, rule or regulation, then such provision shall be construed or deemed amended to conform to applicable law (or if such provision cannot be so construed or deemed amended without materially altering the purpose or intent of this Agreement and the grant of Restricted Stock hereunder, such provision shall be stricken as to such jurisdiction and the remainder of this Agreement and the award hereunder shall remain in full force and effect).

        (d)     ***No Trust or Fund Created***. Neither this Agreement nor the grant of Restricted Stock hereunder shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company or any Company-related entity and the Recipient or any other person. To the extent that the Recipient or any other person acquires a right to receive payments from the Company or any Company-related entity pursuant to this Agreement, such right shall be no greater than the right of any unsecured general creditor of the Company.

(e) **_Law Governing_**. This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of Delaware (without reference to the conflict of laws rules or principles thereof).

(f) **_Interpretation_**. The Recipient accepts the Restricted Stock subject to all of the terms, provisions and restrictions of this Agreement and the Employment Agreement. The undersigned Recipient hereby accepts as binding, conclusive and final all decisions or interpretations of the Board or the Committee upon any questions arising under this Agreement or the related provisions of the Employment Agreement.

(g) **_Headings_**. Section, paragraph and other headings and captions are provided solely as a convenience to facilitate reference. Such headings and captions shall not be deemed in any way material or relevant to the construction, meaning or interpretation of this Agreement or any term or provision hereof.

(h) **_Notices_**. Any notice under this Agreement shall be in writing and shall be deemed to have been duly given when delivered personally or when deposited in the United States mail, registered, postage prepaid, and addressed, in the case of the Company, to the Company's Secretary at 520 Lake Cook Road, Suite 315, Deerfield, Illinois 60015, or if the Company should move its principal office, to such principal office, and, in the case of the Recipient, to the Recipient's last permanent address as shown on the Company's records, subject to the right of either party to designate some other address at any time hereafter in a notice satisfying the requirements of this Section.

(i) **_Non-Waiver of Breach_**. The waiver by any party hereto of the other party's prompt and complete performance, or breach or violation, of any term or provision of this Agreement shall be effected solely in a writing signed by such party, and shall not operate nor be construed as a waiver of any subsequent breach or violation, and the waiver by any party hereto to exercise any right or remedy which he or it may possess shall not operate nor be construed as the waiver of such right or remedy by such party, or as a bar to the exercise of such right or remedy by such party, upon the occurrence of any subsequent breach or violation.

(j) **_Counterparts_**. This Agreement may be executed in two or more separate counterparts, each of which shall be an original, and all of which together shall constitute one and the same agreement.

[*Signature page follows*]

8

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement as of the 29th day of November, 2019.

COMPANY:
**RTI SURGICAL HOLDINGS, INC.**

By: _____

    Name:    Camille I. Farhat
    Title:    President and Chief Executive Officer

Agreed and Accepted:

RECIPIENT:

By: _____

    Terry M. Rich

## **SCHEDULE 1**

### ELECTION UNDER SECTION 83(b)
### OF THE U.S. INTERNAL REVENUE CODE OF 1986

The undersigned taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended, to include in taxpayer's gross income for the current taxable year the amount of any compensation taxable to taxpayer in connection with his or her receipt of the property described below:

1. The name, address, taxpayer identification number and taxable year of the undersigned are as follows:

  Name: _____

  Spouse: _____

  Taxpayer I.D. No.: _____

  Address: _____

    _____

  Tax Year: _____

2. The property with respect to which the election is made is described as follows: _____ (_____) shares of the common stock ("Common Shares") of RTI Surgical Holdings, Inc. (the "Company").

3. The date on which the property was transferred is _____, 20__.

4. The property is subject to the following restrictions:

The Common Shares are required to be returned to the Company in the event that the undersigned ceases to perform services for the Company through certain dates specified in the Restricted Stock Agreement between me and the Company dated as of November 29, 2019. This right lapses with regard to a portion of the Common Shares based on my Continuous Service as an Employee, Consultant or Director over time.

5. The fair market value at the time of transfer, determined without regard to any restriction other than a restriction which by its terms will never lapse, of such property is: $_____.

6. The amount (if any) paid for such property is: None.

The undersigned has submitted a copy of this statement to the person for whom the services were performed in connection with the undersigned's receipt of the above-described property. The transferee of such property is the person performing the services in connection with the transfer of said property. The undersigned understands that the foregoing election may not be revoked except with the consent of the Commissioner.

_____

Dated: _____, 20     _____
                                    Signature of Taxpayer


The undersigned spouse of taxpayer joins in this election.


Dated: _____, 20     _____
                                    Spouse of Taxpayer



3

## SCHEDULE 2

### ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED I, Terry M. Rich, hereby sell, assign and transfer unto _____(_____) shares of common stock of RTI Surgical Holdings, Inc. standing in my name of the books of said corporation represented by Certificate No. _____ herewith and do hereby irrevocably constitute and appoint _____ to transfer the said stock on the books of the within named corporation with full power of substitution in the premises.

This Stock Assignment may be used only in accordance with the Restricted Stock Agreement between RTI Surgical Holdings, Inc. and the undersigned dated November 29, 2019.

Dated:  _____ , _____

Signature: _____

Print Name: Terry M. Rich

*INSTRUCTIONS:*

***Please DO NOT fill in any blanks other than the signature lines.***
*The purpose of this assignment is to enable the Company to receive the return of the shares of common stock as set forth in the Restricted Stock Agreement, without requiring additional signatures on the part of the Recipient.*

4

## SCHEDULE 3

### CONSENT OF SPOUSE

I, _____, spouse of Terry M. Rich, have read and approve the foregoing Restricted Stock Agreement (the "Agreement"). In consideration of the Company's grant to my spouse of the shares of common stock of RTI Surgical Holdings, Inc. as set forth in the Agreement, I hereby appoint my spouse as my attorney-in-fact in respect to the exercise of any rights under the Agreement and agree to be bound by the provisions of the Agreement insofar as I may have any rights in said Agreement or any shares of common stock issued pursuant thereto under the community property laws or similar laws relating to marital property in effect in the state or country of our residence as of the date of the signing of the foregoing Agreement.

Dated: _____, 2019

_____
Signature of Spouse

Print Name: _____

5

## SCHEDULE 4

### RESTRICTED STOCK

| Closing Price Per Share | Shares of Restricted Stock |
|---|---|
| $2.09 | 125,598 |

Initials:

RTI SURGICAL HOLDINGS, INC.:_____

RECIPIENT:_____

6

**Exhibit 10.8**

**Execution Version**

**RTI SURGICAL HOLDINGS, INC.**

**STAND ALONE NONQUALIFIED STOCK OPTION AGREEMENT**
**FOR**
**TERRY M. RICH**

1.	***Grant of Option.*** RTI SURGICAL HOLDINGS, INC., a Delaware corporation (the "Company") hereby grants, as of November 29, 2019 ("Date of Grant"), as an inducement to accept an offer of employment, to Terry M. Rich (the "Optionee") an option (the "Option") to purchase up to 188,397 shares of the Company's common stock (the "Shares") (rounded to the nearest whole number), which is equal to (x) $262,500 divided by (y) the volume weighted average price per share of the Company's common stock on the Nasdaq Stock Market for thirty days ending on the closing of the market on the Date of Grant, as set forth on Schedule 1 attached to this Agreement (the "Exercise Price") multiplied by (z) 1.5. The Option shall be subject to the terms and conditions set forth herein and the Employment Agreement between the Company and the Optionee, dated November 25, 2019 (the "Employment Agreement"). The Option is a non-qualified stock option and not an incentive stock option under Section 422 of the Internal Revenue Code of 1986, as amended (the "Code").

2.	***Definitions.*** Unless otherwise provided herein, terms used herein that are defined in the Employment Agreement and not defined herein shall have the meanings attributed thereto in the Employment Agreement.

3.	***Exercise Schedule.*** Except as otherwise provided in Sections 6 or 9 of this Agreement, or in the Employment Agreement, the Option is exercisable in installments as provided below, which shall be cumulative. To the extent that the Option has become exercisable with respect to a number of Shares as provided below, the Option may thereafter be exercised by the Optionee, in whole or in part, at any time or from time to time prior to the expiration of the Option as provided herein. The following table indicates each date (the "Vesting Date") upon which the Optionee shall be entitled to exercise the Option with respect to the number of Shares granted as indicated beside the date, provided that the Continuous Service of the Optionee continues through and on the applicable Vesting Date:

| Number of Shares | Vesting Date |
|---|---|
| 0 | Any date prior to the first anniversary of the Grant Date. |
| 1/3 of the Restricted Stock | First anniversary of the Date of Grant. |
| 1/8 of the Restricted Stock | Quarterly beginning on the fifteenth month following the Date of Grant. |

Except as otherwise specifically provided herein or in the Employment Agreement, there shall be no proportionate or partial vesting in the periods prior to each Vesting Date, and all vesting shall occur only on the appropriate Vesting Date. Upon the termination of the Optionee's Continuous Service, any unvested portion of the Option shall terminate and be null and void.

1

4. **_Method of Exercise_**. The vested portion of this Option shall be exercisable in whole or in part in accordance with the exercise schedule set forth in Section 3 hereof by written notice which shall state the election to exercise the Option, the number of Shares in respect of which the Option is being exercised, and such other representations and agreements as to the holder's investment intent with respect to such Shares as may be required by the Company pursuant to the provisions of the Employment Agreement. Such written notice shall be signed by the Optionee and shall be delivered in person or by certified mail to the Secretary of the Company. The written notice shall be accompanied by payment of the Exercise Price. This Option shall be deemed to be exercised after both (a) receipt by the Company of such written notice accompanied by the Exercise Price and (b) arrangements that are satisfactory to the Compensation Committee of the Board of Directors of the Company (the "Committee") in its sole discretion have been made for Optionee's payment to the Company of the amount, if any, that is necessary to be withheld in accordance with applicable Federal or state withholding requirements. No Shares shall be issued pursuant to the Option unless and until such issuance and such exercise shall comply with all relevant provisions of applicable law, including the requirements of any stock exchange upon which the Shares then may be traded.

5. **_Method of Payment_**. Payment of the Exercise Price shall be by any of the following, or a combination thereof, at the election of the Optionee: (a) cash; (b) check; or (c) to the extent permitted by the Committee, with Shares owned by the Optionee, or the withholding of Shares that otherwise would be delivered to the Optionee as a result of the exercise of the Option; or (d) such other consideration or in such other manner as may be determined by the Committee in its absolute discretion.

6. **_Termination of Option._**

(a) **_General_**. Any unexercised portion of the Option shall automatically and without notice terminate and become null and void at the time of the earliest to occur of the following:

(i) three (3) months after the date on which the Optionee's service with the Company is terminated other than by reason of (A) by the Company or a Company-related entity for Cause (as defined in the Employment Agreement ), (B) a Disability of the Optionee as determined by a medical doctor satisfactory to the Committee, (C) the death of the Optionee, (D) Optionee's Retirement (as defined below) or (E) by the Optionee without Good Reason before December 1, 2022 (as defined in the Employment Agreement);

(ii) immediately upon the termination of the Optionee's service with the Company (A) by the Company or a Company-related entity for Cause or (B) by the Optionee without Good Reason before December 1, 2022;

(iii) twelve (12) months after the date on which the Optionee's service with the Company and/or any Company-related entity is terminated by the Optionee on account of his Retirement (as defined below);

(iv) twelve months after the date on which the Optionee's service with the Company and/or any Company-related entity is terminated by reason of a Disability as determined by a medical doctor satisfactory to the Committee;

2

(v)        twelve months after the date of termination of the Optionee's service with the Company and/or any Company-related entity by reason of the death of the Optionee; or

(vi)        the tenth (10th) anniversary of the date as of which the Option is granted.

For purposes of this Agreement, "Retirement" shall mean the date on which the Optionee voluntarily terminates his service with the Company and the Company-related entities <u>on or after</u> both (A) attaining age sixty (60) and (B) completing at least five (5) years of service with the Company and/or its Company-related entitites.

(b)        ***Cancellation***.  To the extent not previously exercised, (i) the Option shall terminate immediately in the event of (A) the liquidation or dissolution of the Company, or (B) any reorganization, merger, consolidation or other form of corporate transaction in which the Company does not survive or the Shares are exchanged for or converted into securities issued by another entity, or an affiliate of such successor or acquiring entity, unless the successor or acquiring entity, or an affiliate thereof, assumes the Option or substitutes an equivalent option or right, and (ii) the Committee in its sole discretion may by written notice ("<u>Cancellation Notice</u>") cancel, effective upon the consummation of any transaction that constitutes a Change in Control, the Option (or portion thereof) that remains unexercised on such date. The Committee shall give written notice of any proposed transaction referred to in this Section 6(b) a reasonable period of time prior to the closing date for such transaction (which notice may be given either before or after approval of such transaction), in order that the Optionee may have a reasonable period of time prior to the closing date of such transaction within which to exercise the Option if and to the extent that it then is exercisable (including any portion of the Option that may become exercisable upon the closing date of such transaction). The Optionee may condition his exercise of the Option upon the consummation of a transaction referred to in this Section 6(b).

7.        ***Transferability.***  Unless otherwise determined by the Committee, the Option granted hereby is not transferable other than by will or under the applicable laws of descent and distribution, and during the lifetime of the Optionee the Option shall be exercisable only by the Optionee, or the Optionee's guardian or legal representative.  In addition, the Option shall not be assigned, negotiated, pledged or hypothecated in any way (whether by operation of law or otherwise), and the Option shall not be subject to execution, attachment or similar process.  Upon any attempt to transfer, assign, negotiate, pledge or hypothecate the Option, or in the event of any levy upon the Option by reason of any execution, attachment or similar process contrary to the provisions hereof, the Option shall immediately become null and void. The terms of this Option shall be binding upon the executors, administrators, heirs, successors and assigns of the Optionee.

8.        ***No Rights of Stockholders.***  Neither the Optionee nor any personal representative (or beneficiary) shall be, or shall have any of the rights and privileges of, a stockholder of the Company with respect to any Shares purchasable or issuable upon the exercise of the Option, in whole or in part, prior to the date on which the Shares are issued.

3

9.      ***Acceleration of Exercisability of Option.***

(a)      ***Acceleration Upon Certain Terminations or Cancellations of Option***. This Option shall become immediately fully exercisable in the event that, prior to the termination of the Option pursuant to Section 6 hereof, (i) the Option is terminated pursuant to Section 6(b)(i) hereof, or (ii) the Company exercises its discretion to provide a cancellation notice with respect to the Option pursuant to Section 6(b)(ii) hereof.

Additionally, if the Optionee is terminated by the Company without Cause, or the Optionee terminates his employment for Good Reason prior to December 1, 2022, this Option shall become immediately fully exercisable.

(b)      ***Acceleration Upon Change in Control.*** This Option shall become immediately fully exercisable in the event that, prior to the termination of the Option pursuant to Section 6 hereof, and during the Optionee's service with the Company and/or a Company-related entity, there is a Change in Control.

(c)      ***Exception to Acceleration Upon Change in Control.*** Notwithstanding the foregoing, if in the event of a Change in Control the successor company assumes or substitutes for the Option, the vesting of the Option shall not be accelerated as described in Section 9(b). For the purposes of this paragraph, the Option shall be considered assumed or substituted for if following the Change in Control the Option or substituted option confers the right to purchase, for each Share subject to the Option immediately prior to the Change in Control, on substantially the same vesting and other terms and conditions as were applicable to the Option immediately prior to the Change in Control, the consideration (whether stock, cash or other securities or property) received in the transaction constituting a Change in Control by holders of Shares for each Share held on the effective date of such transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding shares); provided, however, that if such consideration received in the transaction constituting a Change in Control is not solely common stock of the successor company or its parent or subsidiary, the Committee may, with the consent of the successor company, or its parent or subsidiary, provide that the consideration to be received upon the exercise or vesting of the Option will be solely common stock of the successor company or its parent or subsidiary substantially equal in fair market value to the per share consideration received by holders of Shares in the transaction constituting a Change in Control. The determination of such substantial equality of value of consideration shall be made by the Committee in its sole discretion and its determination shall be conclusive and binding.

4

10.     ***Clawback.***

(a)      The Company may: (x) cause the cancellation of the Option, (y) require reimbursement with respect to the Option, and (z) effect any other right of recoupment of equity or other compensation provided under this Agreement or otherwise in accordance with any Company policies generally applicable to the Company's officers and/or directors that currently exist or that may from time to time be adopted or modified in the future by the Company to the extent required to comply with applicable law (each, a "Clawback Policy"), provided that the following conditions are satisfied: (1) there is an accounting restatement of the Company's financial statements or results; and (2) the restatement results from a noncompliance by the Company with any requirements under or related to the federal securities laws that is material, injurious to the Company or was the result of actions with bad intent.  In such an event, the claw back will be in an amount of up to the total economic gain from any stock-based grants within the five-year period preceding the restatement.  By accepting the Option, the Optionee agrees to be bound to any existing or future Clawback Policy adopted by the Company, or any amendments that may from time to time be made to the Clawback Policy in the future by the Company, as required to comply with applicable laws or stock exchange requirements**,** and is further agreeing that all of the Optionee's equity awards may be unilaterally amended by the Company, without the Optionee's consent, to the extent that the Company in its discretion determines to be necessary or appropriate to comply with any Clawback Policy to the extent required to comply with applicable laws or stock exchange requirements.

(b)      If the Optionee, without the consent of the Company, while employed by or providing services to the Company or after termination of such employment or service: (i) violates a non-competition, non-solicitation or non-disclosure covenant or agreement or (ii) violates the Company's Corporate Governance Guidelines, Code of Conduct and Ethics, Code of Ethics for the Chief Executive Officer and Senior Financial Officer or any other corporate governance materials specified by the SEC or exchange on which common stock of the Company is listed, then, if, but only if, the violation set forth in (i) or (ii) above is both material and materially injurious to the Company: (1) any outstanding, unvested or vested (but only if vesting occurs within nine months of date of the violation), unearned or earned (but only if earned within nine months of the date of the violation) portion of the Option may, at the Committee's discretion, be canceled and (2) the Committee, in its discretion, may require the Optionee or other person to whom any payment has been made or shares or other property have been transferred in connection with the Option to forfeit and pay over to the Company, on demand, all or any portion of the gain (whether or not taxable) realized upon the exercise of the Option.  For the avoidance of doubt, this Section 10(b) clawback is only intended for material violations that are materially injurious to the Company and that are volitional or grossly negligent in nature.

11.     ***No Right to Continued Employment.*** Neither the Option nor this Agreement shall confer upon the Optionee any right to continued employment or service with the Company.

12.     ***Law Governing.***  This Agreement shall be governed in accordance with and governed by the internal laws of the State of Delaware.

13. ***Interpretation / Provisions of Employment Agreement Control.*** This Agreement is subject to all the terms, conditions and provisions of the Employment Agreement. If and to the extent that this Agreement conflicts or is inconsistent with the terms, conditions and provisions of the Employment Agreement, the Employment Agreement shall control, and this Agreement shall be deemed to be modified accordingly. The Optionee accepts the Option subject to all of the terms and provisions of the Employment Agreement and this Agreement. The undersigned Optionee hereby accepts as binding, conclusive and final all decisions or interpretations of the Committee upon any questions arising under this Agreement and any related provisions of the Employment Agreement, unless shown to have been made in an arbitrary and capricious manner.

14. ***Notices.*** Any notice under this Agreement shall be in writing and shall be deemed to have been duly given when delivered personally or when deposited in the United States mail, registered, postage prepaid, and addressed, in the case of the Company, to the Company's Secretary at 520 Lake Cook Road, Suite 315, Deerfield, Illinois 60015, or if the Company should move its principal office, to such principal office, and, in the case of the Optionee, to the Optionee's last permanent address as shown on the Company's records, subject to the right of either party to designate some other address at any time hereafter in a notice satisfying the requirements of this Section.

[*Signature page follows*]

6

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement as of the 29th day of November, 2019.

COMPANY:
**RTI SURGICAL HOLDINGS, INC.**

By: _____

Name: Camille I. Farhat
Title: President and Chief Executive Officer

The Optionee acknowledges receipt of a copy of the Employment Agreement and represents that he has reviewed the provisions of the Employment Agreement and this Option Agreement in their entirety, is familiar with and understands their terms and provisions, and hereby accepts this Option subject to all of the terms and provisions of the Employment Agreement and the Option Agreement. The Optionee further represents that he has had an opportunity to obtain the advice of counsel prior to executing this Option Agreement.

Dated: _____  **OPTIONEE**:

By: _____
Terry M. Rich

**SCHEDULE 1**

**EXERCISE PRICE**

| Closing Price Per Share |
|---|
| $2.09 |

Initials:
RTI SURGICAL HOLDINGS, INC.:_____
RECIPIENT: ____

**Exhibit 31.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO
EXCHANGE ACT RULES 13a-14(a)/15d-14(a) AS ADOPTED PURSUANT TO
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Terry M. Rich, certify that:

(1)     I have reviewed this quarterly report on Form 10-Q of Surgalign Holdings, Inc.;

(2)     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3)     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(4)     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5)     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

/s/ Terry M. Rich                                                                                                   Dated: August 12, 2020
Terry M. Rich
President and Chief Executive Officer

**Exhibit 31.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER PURSUANT TO
EXCHANGE ACT RULES 13a-14(a)/15d-14(a) AS ADOPTED PURSUANT TO
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Jonathon M. Singer, certify that:

(1)     I have reviewed this quarterly report on Form 10-Q of Surgalign Holdings, Inc.;

(2)     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3)     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(4)     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5)     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

/s/ Jonathon M. Singer                                                                                           Dated: August 12, 2020
Jonathon M. Singer
Chief Financial and Operating Officer

**Exhibit 32.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO
18 U.S.C. SECTION 1350 AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of RTI Surgical Holdings, Inc. (the "Company") on Form 10-Q for the quarter ended June 30, 2020 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Camille I. Farhat, President and Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Camille I. Farhat                                                      Dated: August 12, 2020

Camille I. Farhat
President and Chief Executive Officer

The foregoing certification is being furnished solely pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and is not being filed as part of this Report or as a separate disclosure document.  A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

**Exhibit 32.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER PURSUANT TO
18 U.S.C. SECTION 1350 AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of RTI Surgical Holdings, Inc. (the "Company") on Form 10-Q for the quarter ended June 30, 2020 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Jonathon M. Singer, Chief Financial and Administrative Officer of the Company, hereby certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

1.    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


/s/ Jonathon M. Singer                                                              Dated: August 12, 2020

Jonathon M. Singer
Chief Financial and Operating Officer


The foregoing certification is being furnished solely pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and is not being filed as part of this Report or as a separate disclosure document.  A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.