**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

PATRICIA LOWRY, individually and on behalf of
all others similarly situated,

             Plaintiff,

        v.

RTI SURGICAL HOLDINGS, INC., CAMILLE I.
FARHAT, BRIAN K. HUTCHISON, JONATHON
M. SINGER, ROBERT P. JORDHEIM, and
JOHANNES W. LOUW,

             Defendants.

Case No. 1:20-cv-1939

Honorable Matthew F. Kennelly

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT BRIAN K. HUTCHISON'S MOTION TO DISMISS
THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

MURPHY & McGONIGLE, P.C.
1185 Avenue of the Americas, 21st Floor
New York, New York  10036
(212) 880-3999

ULMER & BERNE, LLP
500 West Madison Street, Suite 3600
Chicago, Illinois  60661-4587
(312) 658-6500

*Attorneys for Defendant Brian K. Hutchison*

**Table of Contents**

Preliminary Statement & Background ........................................................................... 1

Argument ..................................................................................................................... 5

I.    THE COMPLAINT'S LIABILITY THEORIES FAIL AS A MATTER OF LAW ............... 5

    A.    The Revenue Smoothing Alleged was not Deceptive or Manipulative ........................... 5

    B.    The Omissions Claims Assume a Nonexistent Duty to Disclose ................................... 7

    C.    Mr. Hutchison's Oral Statements Are Not Actionable ...................................... 8

    D.    RTI Did Not Materially Misstate 2015 Year-End Revenue ........................................... 8

II.   THE COMPLAINT FAILS TO PLEAD FACTS RAISING ANY –
      LET ALONE THE REQUIRED STRONG – INFERENCE OF SCIENTER ........................ 9

    A.    The Complaint Raises No Inference that Mr. Hutchison Had Scienter ......................... 10

    B.    The Facts Raise a Strong Inference that Mr. Hutchison Lacked Scienter .................... 13

III.  THE SECTION 20(a) CLAIM FAILS AS A MATTER OF LAW ..................................... 15

Conclusion ................................................................................................................. 15

## Table of Authorities

**Cases**

*Alizadeh v. Tellabs, Inc.*,
No. 13 C 537, 2015 WL 557249 (N.D. Ill. Feb. 9, 2015) ........................................................ 12

*City of Birmingham Ret. & Relief Sys. v. A.O. Smith Corp.*,
No. 19 C 1198, 2020 WL 3452971 (E.D. Wis. June 24, 2020) ......................................... 4, 5, 6

*Cornielsen v. Infinium Capital Mgmt., LLC*,
916 F.3d 589 (7th Cir. 2019) .............................................................................................. 10

*Davis v. SPSS, Inc.*,
385 F. Supp. 2d 697 (N.D. Ill. 2005) ................................................................................... 14

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ............................................................................................................. 5

*Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*,
No. 09-cv-5641, 2012 WL 1068761 (N.D. Ill. Mar. 29, 2012) ...................................... 7, 8, 12

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir.2009) ................................................................................................ 2

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) ........................................................................................ 7, 9, 12

*In re Bally Total Fitness Sec. Litig.*,
No. 04-c-3530, 2006 WL 3714708 (N.D. Ill. July 12, 2006) ................................................ 13

*In re Hansen Nat'l Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007) ............................................................................... 14

*In re Harmonic Inc. Sec. Litig.*,
No. C-00-2287, 2002 WL 31974384 (N.D. Cal. Nov. 13, 2002), *aff'd in part sub nom.*
*Knollenberg v. Harmonic, Inc.*, 152 Fed. App'x 674 (9th Cir. 2005) ................................... 12

*In re Newell Rubbermaid, Inc. Sec. Litig.*,
No. 99 C 6853, 2000 WL 1705279 (N.D. Ill. Nov. 14, 2000) ................................................ 9

*In re The Hain Celestial Group Inc. Sec. Litig.*,
No. 16-cv-4581, 2020 WL 1676762 (E.D.N.Y. Apr. 6, 2020) .......................................... 6, 15

*Janus Capital Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011) ............................................................................................................. 9

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
   897 F. Supp. 2d 168 (S.D.N.Y. 2012) ................................................................. 14

*Last Atlantis Capital LLC v. CBOE, Inc.*,
   455 F. Supp. 2d 788 (N.D. Ill. 2006) ................................................................. 5

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ................................................................. 4, 5

*Pugh v. Tribune Co.*,
   521 F.3d 686 (7th Cir.2008) ................................................................. 5, 10, 13

*Rossy v. Merge Healthcare Inc.*,
    169 F. Supp. 3d 774 (N.D. Ill. 2015) ................................................................. 10

*Roth v. OfficeMax Inc.*,
   527 F. Supp. 2d 791 (N.D. Ill. 2007) ................................................................. 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................. 10

*Tyler v. Liz Claiborne, Inc.*,
    814 F. Supp. 2d 323 (S.D.N.Y. 2011) ................................................................. 11

**Statutes**

15 U.S.C. § 78u-4(b)(2)(A) ................................................................. 10

15 U.S.C. § 78u-4(b)(3)(A) ................................................................. 10

Brian K. Hutchison respectfully submits this memorandum of law in support of his motion to dismiss the Consolidated Amended Class Action Complaint (the "complaint") pursuant to Rule 9(b) and Rule 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA") (the "Motion").[1]  For the reasons set forth below, the Court should grant the Motion and dismiss the complaint against Mr. Hutchison in its entirety with prejudice.

### Preliminary Statement & Background

Mr. Hutchison retired from RTI on December 16, 2016.  (*See* Exs. A [Compl.] ¶ 28; B [8-K (Dec. 19, 2016)] at 2).[2]  More than three years later, RTI restated financial results for all or parts of 2014 through 2019.  (*See* Exs. A ¶¶ 13, 15-16, 231; C [2018 10-K/A (Jun. 8, 2020)] at Explanatory Note, 35-36, 72).  The restatement followed an audit committee investigation that determined that RTI prematurely recognized revenue for the shipment of certain goods to certain customers, particularly in the commercial (OEM) division.  (*See* Ex. A ¶ 226, quoting Ex. C at Explanatory Note).  The investigation also determined that RTI's control environment was "not effective as of December 31, 2018."  (*Id.* ¶ 229, quoting Ex. C at 54).

Trying to capitalize on the investigation and restatement, the complaint claims that RTI and former and current executives, including Mr. Hutchison, violated Exchange Act Section 10(b) and SEC Rule 10b-5 by engaging in and failing to disclose a "revenue smoothing" scheme, misstating RTI's revenue recognition practices and financial results, and misstating that RTI's control environment was effective.  (*See id.* ¶¶ 3-4).  The complaint also claims that Mr.

---

[1] Pursuant to the Chief Judge's Sixth Amended General Order 20-0012 (Sep. 4, 2020), Mr. Hutchison is not filing a notice of motion.  At the Court's request, we can provide courtesy copies of Mr. Hutchison's motion papers.

[2] Unless stated otherwise, "Ex." refers to an exhibit to the Declaration of James K. Goldfarb, executed October 15, 2020 and filed with this memorandum of law; plaintiff's emphasis is removed; all other emphasis is added; and all internal citations and quotation marks are omitted.

Hutchison is liable as a control person under Exchange Act Section 20(a).  The plaintiff purports to sue on behalf of a putative class of shareholders who bought RTI common stock from March 7, 2016 through March 27, 2020 (the "proposed class period").  (*See id.* ¶ 1).

Three weeks before the proposed class period, and each quarter until he retired, Mr. Hutchison (and RTI) made disclosures that gut any claim he engaged in a fraudulent revenue smoothing scheme and misled investors about it.  In an earnings release filed with the SEC on February 16, 2016, RTI stated that 2016 would be 9.4 to 14 percent weaker for OEM than 2015. (*See* Ex. D [4Q 2015 Earnings Release (Feb. 16, 2016)] at 3 (stating that it "expects full year revenue from its [OEM]/other business to be between $124 million and $130 million, compared to $143.5 million for the full year 2015")).  On an earnings call that day, Mr. Hutchison said that RTI anticipated lower OEM revenue because OEM customers consolidated in 2015 and were not expected to buy in 2016 as they had in 2015:  "We got wind in our sails, if you will, from the consolidation of some big players at our customers.  And so, **we benefited by basically inventory pipeline fill.  This year, we expect to decline because we won't see those orders come in this year**."  (Ex. E [4Q 2015 Earnings Call Tr. (Feb. 16, 2016)] at 12).[3]

Two months later, in its first-quarter 2016 earnings release, RTI lowered its guidance and projected OEM revenue to decline 13 to 16 percent.  (*See* Ex. F [1Q 2016 Earnings Release (Apr. 28, 2016)] at 3).  On the quarterly earnings call, Mr. Hutchison reiterated, "we do not expect the benefits that we experienced in 2015 from the consolidation of some of our [OEM] customers to continue into 2016."  (Ex. G [1Q 2016 Earnings Call Tr. (Apr. 28, 2016)] at 6).

---

[3] Although the complaint cites and quotes from earnings releases and earnings calls that preceded RTI's 10-Qs and 10-Ks for 2016 through 2019, it conveniently omits the earnings release and earnings call that preceded the 2015 10-K.  The Court may consider those documents on this Motion.  *See Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009).

The next quarter, RTI again lowered its 2016 OEM guidance and forecasted revenue "in the range of 18 percent to 21 percent" below 2015. (Ex. H [2Q 2016 Earnings Release (Jul. 27, 2016)] at 3). On the quarterly earnings call, RTI's CFO, Robert Jordheim, said the issue was "primarily" one OEM customer that bought a lot of product in 2015 expecting to be able to sell it. **As quoted in the complaint**, Mr. Jordheim said:

> With the major acquisitions made last year by this particular [OEM] partner, the 2015 inventory balance, they *ordered a lot of product from us in anticipation of our sell-through opportunities or cross-selling opportunities. Those cross-selling opportunities have been slower than expected to materialize. So net in 2015, the orders were higher than they probably should have been and we're feeling the impact of that in 2016*.

(Ex. A ¶ 115, quoting Ex. I [Q2 2016 Earnings Call Tr. (Jul. 27, 2016)] at 7 (emphasis plaintiff's)). The market did not miss the message, as demonstrated by one analyst's follow-up question, not quoted in the complaint, "[H]ow long do you anticipate it will take to utilize that **excess inventory**?" (Ex. I at 7). Mr. Jordheim said it likely would be the end of 2016. Mr. Hutchison added, "The primary reason we changed our forecast was we have been given updates from [that distributor] twice in the past several months and the last update came in June, and it indicates just what Rob just said. They expect that it will be over this year, but as we said we will keep giving you updates." (*Id.*). In the third quarter, RTI again lowered its OEM forecast, "primarily due to continued softness in [OEM] orders." (Ex. J [3Q 2016 Earnings Release (Oct. 25, 2016)] at 3 (forecasting a 21 to 23 percent decline)).

Those disclosures are among several independent reasons to grant the Motion. When an executive aims to mislead investors about revenue, he tells them quarter after quarter that the company is meeting, and will continue to meet, rosy revenue projections; the company then stuffs customers with goods to "hit" those "revenue targets." (Ex. A ¶ 4). He does not, as Mr. Hutchison did, warn investors that last year's performance will not be repeated this year

3

because customers have too much inventory; the company does not lower forecasts quarter after quarter. *See City of Birmingham Ret. & Relief Sys. v. A.O. Smith Corp.*, No. 19 C 1198, 2020 WL 3452971, at *7 (E.D. Wis. Jun. 24, 2020). Mr. Hutchison's and RTI's disclosures belie a fraudulent revenue smoothing scheme.

In any event, shipping early to meet revenue goals is not fraudulent unless customers have an absolute right to return the product; if they do, the shipment is a consignment, not a sale, and the company may not recognize revenue. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008). The complaint does not allege that any customer could or did return early shipments. Indeed, it acknowledges that the shipments were pursuant to "binding purchase orders." Thus, the practice was not deceptive or manipulative, and did not violate Rule 10b-5(a) and (c). (*See* Arg. Point I.A, below).

Nor did the alleged misstatements violate Rule 10b-5(b). Omissions are actionable only if a defendant had a duty to disclose. Mr. Hutchison had no duty to disclose lawful activity, such as early shipping; and his alleged failure to disclose early shipping did not render other statements misleading. Mr. Hutchison's two oral statements are not actionable because the complaint does not, as the PSLRA requires, allege non-conclusory facts showing how – or even that – those statements were false. The claims based on 2015's misstated year-end revenue fail because the restated revenue did not differ materially from the originally reported revenue. In fact, when restated, 2015's year-end revenue **increased**. (*See* Arg. Point I.B-D, below).

Even if Mr. Hutchison made misstatements or knew about early shipping, the Rule 10b-5 claims still fail as a matter of law. To state a Rule 10b-5 claim, a complaint must allege facts raising a strong inference of scienter, an intent to deceive. But the complaint is devoid of a single non-conclusory allegation showing that Mr. Hutchison intended to deceive

4

anyone.  In fact, the complaint, the documents it relies on, and those the Court may consider raise a strong contrary inference.  (*See* Arg. Point II, below).

For those reasons, the reasons set forth below, and the non-conflicting reasons set forth in the other defendants' briefs, the Court should grant the Motion.

### Argument

To state a Rule 10b-5 claim, a plaintiff must at least plead that a defendant made a misstatement of material fact or engaged in a deceptive or manipulative act, with scienter.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005); *Last Atlantis Capital LLC v. CBOE, Inc.*, 455 F. Supp. 2d 788, 793 (N.D. Ill. 2006).  To state a Section 20(a) "control person" claim, a plaintiff must at least plead a primary securities violation.  *See Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).  The complaint fails to state a claim against Mr. Hutchison.

## I.   THE COMPLAINT'S LIABILITY THEORIES FAIL AS A MATTER OF LAW

### A.   The Revenue Smoothing Alleged was not Deceptive or Manipulative

The complaint alleges that the defendants violated Rule 10b-5(a) and (c) by "regularly shipping products to customers early so that management could hit quarterly revenue targets."  (Ex. A ¶ 4).  But early shipping to boost revenue is not fraudulent unless customers have an absolute right to return the products.  *See Tellabs*, 513 F.3d at 709 (explaining that when a customer has that right, the transaction is a consignment, not a sale, and revenue cannot be recognized).  The complaint does not allege that any customer returned or could have returned products shipped early.  In fact, it acknowledges that products were shipped pursuant to "binding purchase orders."  (Ex. A ¶ 226, quoting Ex. C at Explanatory Note).

Presented with a similar "scheme," the court in *A.O. Smith* dismissed securities fraud claims for at least two reasons that apply here.  First, there, as here, the complaint lacked any allegation that customers could or did return unwanted shipments.  *See* 2020 WL 3452971,

at *2, 5; *accord In re The Hain Celestial Group Inc. Sec. Litig.*, No. 16-cv-4581, 2020 WL 1676762, at *12 (E.D.N.Y. Apr. 6, 2020).  In fact, there, as here, customers allegedly complained about the company's sales pressure (*compare* 2020 WL 3452971, at * 7-8, *with* Ex. A ¶¶ 69, 85, 226), something they would not have done if they had an absolute right of return:  "If AOS had been illegally channel stuffing, the distributors would not have complained about sales pressure, for their inventory purchases would have lacked economic substance and they would have known that AOS would accept returns in future quarters or would repurchase inventory they could not sell."  2020 WL 3452971, at *6.

Second, there, as here, the defendants' disclosures belied a fraudulent scheme because they did not hide that inventories were high and future sales would suffer:

> Perpetrators of a channel-stuffing scheme generally try to hide the fact that sales in a quarter are "borrowed" from future quarters.  Thus, a company engaged in such a scheme likely would not tell investors that high sales in one quarter were caused by customers making unusually large purchases to qualify for volume discounts, which would negatively impact sales in future quarters….

*Id*.  So too here.  On the eve of the proposed class period, Mr. Hutchison told the market that RTI did not expect OEM to repeat its 2015 performance in 2016 because customer inventory was high ("we benefited by basically inventory pipeline fill").  RTI lowered its OEM forecast over the next three quarters as the issue persisted.  The market got it:  "[H]ow long do you anticipate it will take to utilize that **excess inventory**," an analyst asked during the July 2016 earnings call. (*See* pages 2-3, above).

The complaint itself belies an alleged scheme.  Quoting from RTI's restatement, the complaint alleges:  "In **many instances** the OEM customers requested or approved the early shipments, but the Company has determined that **on other occasions** the goods were delivered early without obtaining the customers' affirmative approval." (Ex. A ¶ 226, quoting Ex. C at

6

Explanatory Note). Far from suggesting a "large-scale," "coordinated" effort to manipulate revenue and deceive investors (*id.* ¶ 243), the disclosure indicates that in some instances, a lawful practice – early shipping – was executed aggressively. In short, the early shipping alleged here was neither deceptive nor manipulative.

> **B.** **The Omissions Claims Assume a Nonexistent Duty to Disclose**

The complaint alleges that the defendants violated Rule 10b-5(b) by failing to disclose that RTI shipped early "so that [it] could hit revenue targets." (*Id.* ¶ 51). But silence absent a duty to disclose is not securities fraud; a company has a duty to disclose only what is required by law or regulation, or to make its other statements not misleading. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007) (affirming dismissal); *Alizadeh v. Tellabs, Inc.*, No. 13 C 537, 2015 WL 557249, at \*13 (N.D. Ill. Feb. 9, 2015) (dismissing securities fraud claims). Neither circumstance applies here.

No law or regulation requires a company to disclose lawful practices, such as recognizing revenue from early shipping when customers have no absolute right of return. Further, Mr. Hutchison did not speak affirmatively about early shipping; neither he nor RTI represented that RTI did not ship early. Therefore, he had no duty to disclose the practice to make other RTI statements not misleading. *See Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-cv-5641, 2012 WL 1068761, at \*10 (N.D. Ill. Mar. 29, 2012) (dismissing omissions claims because the defendants did not speak affirmatively about the allegedly omitted issue).[4] Absent such a duty, the (alleged) omissions are not actionable as a matter of law.

---

[4] RTI did disclose that "Revenue is recognized upon shipping, or receipt by the Company's customers of the implant, depending on the Company's distribution agreements with the Company's customers or distributors. Other revenues are recognized when all significant contractual obligations have been satisfied." (Ex. A ¶ 93, quoting Ex. K [2015 10-K (Mar. 7, 2016)] at 51). Nothing in the complaint contradicts that; RTI is not alleged to have recognized revenue before shipping or recognized revenue on

7

### C. Mr. Hutchison's Oral Statements Are Not Actionable

The complaint alleges that Mr. Hutchison violated Rule 10b-5(b) by making two false oral statements.[5] The statements allegedly are false for the same boilerplate, conclusory reasons given for every other challenged statement. (*Compare* Ex. A ¶¶ 104, 131, *with id.* ¶¶ 99, 101, 109, 111, 116, 120, 123). But the PSLRA requires far more. It requires particularized allegations of fact that show how each statement was false. *See Anixter*, 2012 WL 1068761, at *4 (dismissing misrepresentation claims because the plaintiffs did not "explain, with particularity, the factual basis for their assertion that the statement was untrue"). The complaint has no such allegations. It does not allege any facts showing that OEM revenue had not "ebb[ed] and flow[ed] from year-to-year;" OEM had not "trend[ed] to growth long-term;" OEM had not "achieved compound average annual growth … of 7%" since 2005; the direct business did not grow 14 percent over the same period the prior year; the direct business's growth was not "offset by declines in [OEM];" and OEM's declines were not "primarily due to lower orders from [OEM] distributors in our spine and orthofixation product line." The absence of any allegations showing how, or even that, those statements were false is fatal.

### D. RTI Did Not Materially Misstate 2015 Year-End Revenue

The complaint alleges that the following disclosure contained misstatements that violated Rule 10b-5(b): "Our total revenues increased $19.5 million, or 7.4 percent, to $283.3

---

products never shipped. When disclosed information is "fully reconcilable" with undisclosed information, the omission is not actionable. *Alizadeh*, 2015 WL 557249, at *13.

[5] (*See* Ex. A ¶¶ 103 ("[W]e've seen revenue from [OEM] ebb and flow from year-to-year, but trending to growth long-term. In fact, from 2005 through today, [OEM] has achieved compound average annual growth rate [sic] of 7%"), quoting Ex. G [Q1 2016 Earnings Call Tr. (Apr. 28, 2016)] at 5); 125 ("[W]e saw continued strong performance from our direct business with growth of 14% compared to third quarter last year. This growth was offset by declines in [OEM], primarily due to lower orders from our [OEM] distributors in our spine and orthofixation product line"), quoting Ex. L [3Q 2016 Earnings Call Tr. (Oct. 25, 2016)] at 2)).

million … compared to $262.8 million for the year ended December 31, 2014." (Ex. A ¶ 95, quoting Ex. K [2015 10-K] at 31).  But a misstatement is not actionable unless material, meaning the fact misrepresented is something a reasonable investor would consider important in making her investment decision.  *See In re Newell Rubbermaid, Inc. Sec. Litig.*, No. 99 C 6853, 2000 WL 1705279, at *7 (N.D. Ill. Nov. 14, 2000) (dismissing securities fraud claims).  RTI's 2015 year-end revenue was not materially misstated as a matter of law.  Not only did the restated revenue differ from the originally reported revenue by less than five percent – a rule of thumb threshold for materiality (*see Higginbotham*, 495 F.3d at 759) – it **increased** by 0.3 percent.[6]  A reasonable investor who bought RTI common stock at a price that reflected the lower, originally reported revenue also would have bought at a price that reflected the higher, restated figure.  The upward revision would not have altered her investment decision.[7]

## II.    THE COMPLAINT FAILS TO PLEAD FACTS RAISING ANY – LET ALONE THE REQUIRED STRONG – INFERENCE OF SCIENTER

The required state of mind for a Section 10(b) claim is scienter, "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false."  *Higginbotham*, 495 F.3d at 756.  Under the "exacting" standards of the PSLRA, a plaintiff must "state with particularity facts giving rise to a

---

[6] (*See* Ex. C [2018 10-K/A] at 36 (top-line revenue "Adjustment" ($838) divided by top-line revenue "As Previously Reported" ($282,293))).  The other alleged misstatements were immaterial too.  Instead of increasing $19.5 million (7.4 percent) over 2014, 2015 year-end revenue, when restated, increased $23 million (8.85 percent).  (*See id.* (2015 top-line revenue "As Restated" minus the 2014 figure:  $283,131 - $260,121 = $23,010, divided by the 2014 figure, $260,121)).

[7] The complaint alleges that Mr. Hutchison signed RTI's 2016 10-K.  (*See* Ex. A ¶ 138).  That is demonstrably false.  Having retired on December 16, 2016, Mr. Hutchison did not sign the 2016 10-K.  Moreover, he is not liable for alleged misstatements in RTI filings after 2016 because he did not "make" those statements.  *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).  The complaint does not allege otherwise.  In any event, when restated, 2016 year-end revenue **increased** $3.1 million (as the complaint acknowledges (*see* Ex. A ¶ 227(a), quoting Ex. C at Explanatory Note), or 1.14 percent.  (*See id.* at 107 (2016 top-line revenue "Adjustment" ($3,119) divided by "As Previously Reported" figure ($272,865)).

**strong** inference that the defendant acted with" scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14 (2007) (quoting 15 U.S.C. § 78u-4(b)(2)). A strong inference is one that is "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." 551 U.S. at 314; *accord id.* at 324. A complaint that fails to plead facts raising a "strong inference" of scienter "shall" be dismissed. 15 U.S.C. § 78u-4(b)(3)(A); *accord Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (affirming dismissal). Here, the allegations do not raise any – let alone the required strong – inference that Mr. Hutchison intended to deceive. In fact, the complaint, the documents it relies on, and those the Court may consider support a strong contrary inference.

### A. The Complaint Raises No Inference that Mr. Hutchison Had Scienter

The PSLRA requires a complaint to "state with particularity facts giving rise to a strong inference that **the defendant** acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). By referencing "the defendant," Congress required plaintiffs to plead a strong inference of scienter as to **each** defendant. A complaint that fails to do so fails as a matter of law. *See Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 601-602 (7th Cir. 2019) (affirming dismissal); *Rossy v. Merge Healthcare Inc.*, 169 F. Supp. 3d 774, 781-84 (N.D. Ill. 2015) (dismissing securities fraud claims). The complaint fails to do so.

The complaint is devoid of any non-conclusory allegations of fact showing that Mr. Hutchison knew or should have known that revenue was being recognized improperly or that RTI's control environment was not effective. Instead, the complaint alleges that RTI's "top executives" and the "Individual Defendants" knew or should have known about the alleged fraud. (Ex. A ¶ 68, 241-42, 249). But the PSLRA proscribes such group-pleading of scienter. *See Pugh*, 521 F.3d at 693-94; *Rossy*, 169 F. Supp. 3d at 781. The complaint also relies on four confidential witnesses to try to support its claims. But their allegations are entitled to no weight

10

(*see* RTI Br. at 10-13) and, even if they were, they say nothing about Mr. Hutchison and, therefore, raise no inference that he knew or should have known about the alleged fraud.

Bereft of specific scienter allegations, the complaint resorts to proxies. But none is pleaded sufficiently, and even "when viewed in their totality" (Ex. A ¶ 239) they fail to raise any inference that Mr. Hutchison knew or should have known about the alleged fraud. To begin, the complaint alleges that the individual defendants must have known about the fraud because it centered on RTI's "core OEM business." (*Id.* ¶¶ 50, 240). But the core operations doctrine supports an inference of scienter, if at all, only for operations that are "essential to … corporate survival" or "constitute nearly all of a company's business." *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011) (dismissing securities fraud claims). OEM was neither during the time relevant to Mr. Hutchison. It accounted for only 46 percent of RTI's revenue in 2015 and 40.2 percent in 2016. (*See* Exs. M [2016 10-K (Mar. 13, 2017)] at 70 (2015 "Global commercial" segment percentage); C at 2 (2016 "OEM" revenue percentage as restated)).[8]

The complaint confirms the force of those figures: OEM "was **increasingly** important to RTI's financial results **as the Class Period progressed**, particularly as part [sic] the OEM business's **two-year transformation effort** that culminated in its growth offsetting the underperformance of RTI's spine business **in Q3 2019**." (Ex. A ¶ 240). As the allegation suggests, OEM's "transformation effort" began in the third quarter of 2017, at least six months after Mr. Hutchison retired.[9] OEM was not core during the time relevant to Mr. Hutchison and,

---

[8] RTI did not report OEM revenue as a percentage of overall revenue in its 2015 10-K. It did not report a restated figure in the 2018 10-K/A.

[9] The timeline also might explain why the examples of "Individual Defendants" allegedly focusing on OEM "during earnings conference calls and in press releases and SEC filings" and being "keenly attentive to [OEM] contractual arrangements" postdate Mr. Hutchison's tenure. (*Id.* ¶ 241).

11

therefore, the core operations doctrine raises no inference that he knew or should have known about the alleged fraud.

Next, the complaint alleges that "[b]ased on customer contracts and invoices, the information of when goods were supposed to be shipped to customers was available to and capable of being readily discovered by the Individual Defendants." (Ex. A ¶ 242). But access to contradictory information supports an inference of scienter, if at all, only if a defendant receives and reviews that information. *See Higginbotham*, 495 F.3d at 758 ("[T]here is a big difference between knowing about the reports … and knowing that the reports are false. The complaint documents the former but not the latter.").[10] The complaint lacks any allegation that Mr. Hutchison saw supposedly revealing customer contracts and invoices.

Even if he had, knowing "when goods were supposed to be shipped" is not the same as knowing that the company's financial disclosures were materially misleading. To get there, the Court must assume that the CEO of a company with annual revenues of $275 million reviewed customer contracts and invoices, saw invoices with shipping dates that predated contractually "agreed upon delivery windows" (Ex. A ¶ 242), traced when the company recognized revenue from those shipments, and concluded from that that the company's financial disclosures were wrong. Under the PSLRA, this unpled chain of implausible assumptions cannot bridge the gap between what is alleged and an inference of scienter. *See In re Harmonic Inc. Sec. Litig.*, No. C-00-2287, 2002 WL 31974384, at *11 (N.D. Cal. Nov. 13, 2002) (holding that a similar, but actually pled, "string of unsupported inferences" failed to show scienter), *aff'd in*

---

[10] *See also Alizadeh*, 2015 WL 557249, at *7, 12 (dismissing omissions claims because the complaint failed to allege "specific, contradictory information known" to the defendant when he made the allegedly incomplete disclosures); *Anixter*, 2012 WL 1068761, at *8 (same).

12

*part sub nom. Knollenberg v. Harmonic, Inc.*, 152 Fed. App'x 674 (9th Cir. 2005) (affirming dismissal of Exchange Act claims; reversing dismissal of Securities Act claims).

Finally, the complaint suggests that the restatement itself evinces scienter. (*See* Ex. A ¶¶ 5, 242, 245, 249). But alleging, based on a later disclosure, that a defendant must have known an earlier disclosure was false when made is "fraud by hindsight," a pleading ploy repeatedly rejected by the Seventh Circuit. *See Pugh*, 521 F.3d at 694-95.[11] And even when a restatement acknowledges that false statements were made, that "is not equivalent to admitting scienter. A false statement is one element of a securities fraud claim; scienter is a wholly separate element." *In re Bally Total Fitness Sec. Litig.*, No. 04-c-3530, 2006 WL 3714708, at *7 (N.D. Ill. July 12, 2006) (dismissing securities fraud claims).[12] Here, as in *Bally*, RTI's restatement did not admit that anyone, let alone Mr. Hutchison, deliberately or recklessly manipulated revenue or promoted a deficient control environment.

**B.      The Facts Raise a Strong Inference that Mr. Hutchison Lacked Scienter**

Far from raising an inference that Mr. Hutchison intended to deceive, the complaint, the documents it relies on, and those the Court may consider raise a strong contrary inference. The disclosures show that Mr. Hutchison told investors that RTI sold more to its OEM customers in 2015 than those customers could distribute, that customer inventories were "fill[ed]," and that OEM revenue would suffer for it in 2016. (*See* page 2, above). His openness

---

[11] *Accord Roth v. OfficeMax Inc.*, 527 F. Supp. 2d 791, 797-98 (N.D. Ill. 2007) (dismissing securities fraud claims: "[M]ere allegations of GAAP violations, the restatement of income, or statements regarding the internal controls of a company that are later proven to be false," "amount to pleading fraud by hindsight" and "are not sufficient to demonstrate that those who made the statements committed securities fraud."); *id.* at 801-802 ("The existence of inadequate controls alone does not demonstrate that those who made statements regarding those controls necessarily acted with the intent to deceive.").

[12] *Accord In re Hertz Global Inc.*, 905 F.3d 106, 117-18 (3d Cir. 2018) (affirming dismissal; holding that a restatement's admission of an "inappropriate tone at the top" (*compare* Ex. A ¶¶ 15, 245) was not an admission of "misconduct" and, therefore, did not "weigh in favor of inferring scienter").

13

betrays deception. *See Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 185 (S.D.N.Y. 2012) (dismissing securities fraud claims: "It defies logic to conclude that executives who are seeking to perpetrate fraudulent information upon the market would make such fulsome disclosures. If [the company's] executives sought to shield its investors from 'learning the truth of' its business, they needed to be measurably more opaque.").

The confidential witness and scheme allegations also support a strong inference that Mr. Hutchison did not intend to deceive. The scheme supposedly involved "large-scale, consistent coordination between distinct personnel … on a repetitive, ongoing basis spanning across multiple financial reporting periods and fiscal years." (Ex. A ¶ 243). Yet despite the scheme's "sheer scope" (*id.*), the confidential witnesses do not connect Mr. Hutchison to it. Their silence speaks volumes about his (alleged) involvement in the (alleged) scheme.

So does the restatement. When restated, 2015 and 2016 year-end revenue increased. (*See* Point I.D, above). If Mr. Hutchison schemed to make RTI's sales look stronger than they were (*see* Ex. A ¶¶ 52-53), "[u]nderstating [its] revenue certainly [did] not serve that purpose." *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 709 (N.D. Ill. 2005) (dismissing securities fraud claims).[13] Further, RTI restated its financial results because "revenue for certain invoices should have been recognized at a later date than when originally recognized," not because RTI booked unearned revenue. (Ex. A ¶ 226, quoting Ex. C at Explanatory Note).[14] So although RTI might have erred in the timing of revenue recognition, "real products were shipped to real

---

[13] That RTI's independent auditor gave an unqualified opinion as to RTI's financial position and control environment for 2015 and 2016 (*see* Exs. K at 44, M at 47) further undercuts an inference of scienter. *See In re Hansen Nat'l Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) (holding that the independent auditor's unqualified opinion was "highly probative of an absence of scienter").

[14] Indeed, the adjustments to "Revenue" and "Costs of processing and distribution" for 2014, 2015, and 2016 net out. Both line-items were adjusted down for 2014 but up for 2015 and 2016. The net was $154,000. (*See* Ex. C at 36 (2014 & 2015 figures), 107 (2016 figures)).

14

customers who paid real money," a fact that belies fraud.  *See In re The Hain Celestial Group Inc. Sec. Litig.*, No. 16-cv-4581, 2020 WL 1676762, at *11-12 (E.D.N.Y. Apr. 6, 2020); *see also Davis*, 385 F. Supp. 2d at 709 (holding that an understatement of revenue "leads one to infer not that [the company] purposely manipulated its financials, but that reporting errors occurred."). That Mr. Hutchison lacked any intent to deceive is the cogent, more compelling inference from the facts.

## III.     THE SECTION 20(a) CLAIM FAILS AS A MATTER OF LAW

The complaint does not state a primary securities violation for the time when Mr. Hutchison could have been a control person, March 7, 2016 to December 16, 2016.  The only other defendant who allegedly violated Rule 10b-5 during that time is Mr. Jordheim.  But the Rule 10b-5 claim against him fails for the reasons set forth in his and RTI's moving briefs. Consequently, the Section 20(a) claim against Mr. Hutchison fails.  *See Pugh*, 521 F.3d at 693.

## <u>Conclusion</u>

For the foregoing reasons, the Court should grant the Motion and dismiss the complaint against Mr. Hutchison in its entirety with prejudice.

Dated:   October 15, 2020                                       Respectfully Submitted,
         New York, New York
                                                               MURPHY & MCGONIGLE, P.C.


                                                               By:  /s/ James K. Goldfarb

 Of Counsel:                                                   James K. Goldfarb (*pro hac vice*)
                                                               jgoldfarb@mmlawus.com
   Alan M. Wolper                                              Stephen J. Crimmins
   awolper@ulmer.com                                          scrimmins@mmlawus.com
   Ulmer & Berne, LLP                                          1185 Avenue of the Americas, 21st Floor
   500 West Madison Street, Suite 3600                         New York, New York  10036
   Chicago, Illinois  60661-4587                               (212) 880-3999
   (312) 658-6500
                                                               *Attorneys for Defendant Brian K. Hutchison*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on **October 15, 2020**, a true and correct copy of the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BRIAN K. HUTCHISON'S MOTION TO DISMISS** was electronically filed with the Clerk of the United States District Court for the Northern District of Illinois, using the Court's CM/ECF System, which shall send notification of such filing to all parties registered to use ECF or are represented by a registered E-filer.  Parties may access this filing through the Court's CM/ECF System.

/s/ James K. Goldfarb

4814-7280-8644