**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PATRICIA LOWRY, individually and on behalf of all others similarly situated, | ) ) ) | Case No: 20-cv-01939 |
| Plaintiff, | ) ) ) | Honorable Matthew F. Kennelly |
| v. | ) ) ) | |
| RTI SURGICAL HOLDINGS, INC., CAMILLE I. FARHAT, BRIAN K. HUTCHISON, JONATHON M. SINGER, ROBERT P. JORDHEIM, and JOHANNES W. LOUW, | ) ) ) ) ) ) ) | CLASS ACTION |
| Defendants. | ) ) | |

**OMNIBUS OPPOSITION TO MOTIONS TO DISMISS**

# TABLE OF CONTENTS

TABLE AUTHORITIES ...................................................................................................... ii

I. INTRODUCTION .......................................................................................................... 1

II. STATEMENT OF FACTS ............................................................................................. 2

III. RELEVANT LEGAL STANDARDS ............................................................................ 10

IV. ARGUMENT ................................................................................................................. 11

    A. Plaintiff has adequately alleged Defendants made material misstatements ................ 11

        1. Defendants misstated that RTI had effective internal controls. ............................ 16

        2. Defendants misstated multiple metrics across several financial periods,
           irrespective of whether the Restatement increased revenue for some periods. ....... 17

        3. Defendants engaged in revenue smoothing and misstated RTI's revenue. ............ 17

        4. Defendants violated their duties to disclose and made misleading statements. ...... 19

        5. Defendants' misstatements were material. ............................................................. 21

    B. Plaintiff has adequately alleged facts giving rise to an inference of Defendants'
       scienter. ........................................................................................................................ 23

        1. The nature of RTI's Restatement, GAAP violations, and internal control
           failures supports an inference of scienter. ............................................................. 25

        2. The former employee allegations support an inference of scienter. ...................... 30

        3. Core operations theory supports an inference of scienter. .................................... 34

        4. Defendants' Sarbanes-Oxley Certifications support an inference of scienter. ....... 35

        5. The SEC investigation further supports an inference of scienter. ......................... 36

        6. Defendant Louw's resignation supports an inference of scienter. ........................ 36

        7. Allegations of motive are not required to plead scienter ...................................... 37

        8. Plaintiff adequately pleads RTI's corporate scienter. .......................................... 39

V. CONCLUSION ............................................................................................................. 40

## <u>TABLE AUTHORITIES</u>

**Cases**

*Brasher v. Broadwind Energy, Inc.,*
    No. 11 CV 991, 2012 WL 1357699 (N.D. Ill. Apr. 19, 2012)..................................................... 39

*City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.,*
    711 F. 3d 754 (7th Cir. 2013) ................................................................................................. 33

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.,*
    No. 11 C 8332, 2013 WL 566805 (N.D. Ill. Feb. 13, 2013).................................................... 31

*Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp.,*
    114 F. Supp. 3d 633 (N.D. Ill. 2015) ...................................................................................... 20

*Crowell v. Ionics, Inc.,*
    343 F. Supp. 2d 1 (D. Mass. 2004) ................................................................................... 26, 31

*Davis v. SPSS, Inc.,*
    385 F. Supp. 2d 697 (N.D. Ill. 2005) ...................................................................................... 26

*Epstein v. World Acceptance Corp.,*
    203 F. Supp. 3d 655 (D.S.C. 2016)..................................................................................... 36, 37

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.,*
    778 F.3d 228 (1st Cir. 2015)................................................................................................... 24

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.,*
    268 F. Supp. 3d 526 (S.D.N.Y. 2017) ................................................................................... 12

*Gelfer v. Pegasystems, Inc.,*
    96 F. Supp. 2d 10 (D. Mass. 2000)......................................................................................... 27

*Greater PA Carpenters Pension Fund v. Whitehall Jewellers, Inc.,*
    No. 04 C 1107, 2005 WL 61480 (N.D. Ill. Jan. 10, 2005) ...................................................... 12

*Higginbotham v. Baxter Int'l, Inc.,*
    495 F.3d 753 (7th Cir. 2007) .................................................................................................. 33

*In re Able Labs. Sec. Litig.,*
    No. 05—2681(JAG), 2008 WL 1967509 (D.N.J. Mar. 24, 2008)........................................... 38

*In re Akorn, Inc. Sec. Litig.,*
    240 F. Supp. 3d 802 (N.D. Ill. 2017) ............................................................................. passim

*In re Allied Prods. Corp., Inc. Sec. Litig.,*
    No. 99 C 3597, 2000 WL 1721042 (N.D. Ill. Nov. 15, 2000)................................................. 26

*In re ArthoCare Corp. Sec. Litig.*,
    726 F. Supp. 2d 696 (W.D. Tex. 2010) .................................................................. 26

*In re Ashanti Goldfields Sec. Litig.*,
    No. CV 00-0717(DGT), 2004 WL 626810 (E.D.N.Y. Mar. 30, 2014) .................................... 38

*In re Atlas Air Worldwide Holdings, Inc. Sec. Lit.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004) .................................................................. 13

*In re Avon Sec. Litig.*,
    No. 19 CIV. 01420 (CM), 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) .............................. 23

*In re Bally Total Fitness Sec. Litig.*,
    No. 04 C 3530, 2006 WL 3714708 (N.D. Ill. July 12, 2006) ...................................... 26

*In re Career Educ. Corp. Sec. Litig.*,
    No. 03 C 8884, 2007 WL 1029092 (N.D. Ill. Mar. 29, 2007) ...................................... 28

*In re Career Educ. Corp. Sec. Litig.*,
    No. 03 C 8884, 2008 WL 8666579 (N.D. Ill. June 26, 2008) ...................................... 28

*In re Cylink Sec. Litig.*,
    178 F. Supp. 2d 1077 (N.D. Cal. 2001) ................................................................ 13

*In re Diamond Foods, Inc., Sec. Litig.*,
    No. C 11-05386 WHA, 2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) ................................. 30

*In re DRDGOLD Ltd. Sec. Litig.*,
    472 F. Supp. 2d 562 (S.D.N.Y. 2007) .................................................................. 12

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) .................................................................. 18

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ................................................................ 31

*In re OCA, Inc. Sec. & Derivative Litig.*,
    No. 05-2165, 2006 WL 3747560 (E.D. La. Dec. 14, 2006) .......................................... 32, 36

*In re Peritus Software Servs., Inc. Sec. Litig.*,
    52 F. Supp. 2d 211 (D. Mass. 1999) .................................................................... 13

*In re Ramp Networks, Inc. Sec. Litig.*,
    201 F. Supp. 2d 1051 (N.D. Cal. 2002) ................................................................ 30

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ............................................................................ 33

*In re Sears, Roebuck & Co. Sec. Litig.*,
    291 F. Supp. 2d 722 (N.D. Ill. 2003) .................................................................. 34

*In re Silver Wheaton Corp. Sec. Litig.*,
No. 2:15-cv-5146-CAS (JEMx), 2019 WL 1512269 (C.D. Cal. Mar. 25, 2019) ................... 30

*In re St. Jude Med., Inc. Sec. Litig.*,
836 F. Supp. 2d 878 (D. Minn. 2011) ................................................................... 32

*In re SupportSoft, Inc. Sec. Litig.*,
No. C 04-5222 SI, 2005 WL 3113082 (N.D. Cal. Nov. 21, 2005) ........................................ 18

*In re The Goodyear Tire & Rubber Co. Sec. Litig.*,
436 F. Supp. 2d 873 (N.D. Ohio 2006) ................................................................... 13

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) .............................................................. 27, 37

*In re Veeco Instruments, Inc. Sec. Litig.*,
235 F.R.D. 220 (S.D.N.Y. 2006) ............................................................................ 27

*In re Vocera Commc'ns, Inc. Sec. Litig.*,
No. C-13-3567 EMC, 2015 WL 603208 (N.D. Cal. Feb. 11, 2015) ....................................... 18

*Jones v. Corus Bankshares, Inc.*,
701 F. Supp. 2d 1014 (N.D. Ill. 2010) ..................................................................... 34

*Lawrence E. Jaffe Pension Plan v. Household Intern., Inc.*,
No. 02 C 5893, 2006 WL 3332917 (N.D. Ill. Nov. 13, 2006) ................................................ 23

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ...................................................................... passim

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
437 F.3d 588 (7th Cir. 2006) ......................................................................... 30, 37

*Mulligan v. Impax Laboratories, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) ...................................................................... 33

*Murphy v. Precision Castparts Corp.*,
No. 3:16-cv-00521-SB, 2017 WL 3084274 (D. Or. June 27, 2017) ....................................... 18

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) .......................................................................................... 19

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
895 F.3d 933 (7th Cir. 2018) ............................................................................... 28

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*,
707 F. Supp. 2d 774 (N.D. Ill. 2010) ..................................................................... 32

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*,
778 F. Supp. 2d 858 (N.D. Ill. 2011) ................................................................ 12, 19, 20, 24

*Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
No. 16 C 10632, 2018 WL 844420 (N.D. Ill. Feb. 12, 2018) ................................................ 11

*Pugh v. Tribune Co.*,
521 F.3d 686 (7th Cir. 2008) ................................................................................ 29

*Rehm v. Eagle Fin. Corp.*,
954 F. Supp. 1246 (N.D. Ill. 1997) ......................................................................... 26

*Ross v. Career Educ. Corp.*,
No. 12 C 276, 2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) (Kennelly, J.) ...................... passim

*Roth v. OfficeMax, Inc.*,
No. 05 C 236, 2006 WL 2661009 (N.D. Ill. Sept. 13, 2006) ................................................ 12

*Rubinstein v. Gonzalez*,
241 F. Supp. 3d 841 (N.D. Ill. 2017) ....................................................................... 24

*S.E.C. v. Fisher*,
No. 07 C 4483, 2012 WL 3757375 (N.D. Ill. Aug. 28, 2012) ............................................... 25

*S.E.C. v. Goldstone*,
No. CIV. 12-0257 JB/GBW, 2015 WL 5138242 (D.N.M. Aug. 22, 2015) ............................. 12

*S.E.C. v. Kelly*,
663 F. Supp. 2d 276 (S.D.N.Y. 2009) ...................................................................... 21

*S.E.C. v. Koenig*,
No. 02 C 2180, 2007 WL 1074901 (N.D. Ill. 2007) ......................................................... 13

*Schleicher v. Wendt*,
529 F. Supp. 2d 959 (S.D. Ind. 2007) ...................................................................... 35

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) .................................................................... 38

*Stocke v. Shuffle Master, Inc.*,
615 F. Supp. 2d 1180 (D. Nev. 2009) ................................................................... 27, 36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 324 (2007) ....................................................................................... 24, 37

*Twin Master Fund, Ltd. v. Akorn, Inc.*,
No. 19 C 3648, 2020 WL 564222 (N.D. Ill. Feb. 5, 2020) (Kennelly, J.) ............................... 21

*U.S. S.E.C. v. Ustian*,
No. 16 C 3885, 2019 WL 7486835 (N.D. Ill. Dec. 13, 2019) ............................................... 19

*Van Noppen v. InnerWorkings, Inc.*,
   136 F. Supp. 3d 922 (N.D. Ill. 2015) ............................................................ 12, 21, 30

*Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
   28 F. Supp. 3d 93 (D. Mass. 2014) .......................................................................... 36

**Other Authorities**

17 C.F.R. § 210.4–01(a)(1) ......................................................................................... 13

## I.     INTRODUCTION

After an SEC investigation, internal investigation, and delay in filing a 2019 10-K, Defendants told investors to no longer rely on ***five years*** of RTI's previously-reported financials. Defendants subsequently restated those quarterly and annual financials and, in so doing, confirmed that those reports were materially inaccurate. To explain those material misstatements, Defendants admitted that "[t]he tone from ***executive management*** was insufficient to create the proper environment for effective internal control over financial reporting." Defendants also admitted that "goods were shipped and received by the customers before requested delivery dates and agreed-upon delivery windows" and "revenue for certain invoices should have been recognized at a later date than when originally recognized."

The restated financials revealed that Defendants had falsely portrayed the stabilization and growth of RTI's vital OEM Business. Those revelations, in turn, threatened RTI's lucrative sale of that business. When RTI finally published its restated financials for 2014 – 2018 and its 2019 10-K, the cascading effect of years of Generally Accepted Accounting Principles ("GAAP") violations and failed internal controls led to, *inter alia*, a $211 million net loss for 2019 and "substantial doubt" by RTI's auditor "about [RTI's] ability to continue as a going concern." As Defendants slowly made those stark admissions, RTI's investors lost millions of dollars. Those investors now seek relief for Defendants' series of material misstatements during the Class Period.

In response to the Complaint, Defendants have crafted a 70-page string of untenable positions that contradict Plaintiff's allegations and Defendants' damning admissions. Defendants invite the Court to ignore precedent and issue two unfounded rulings. First, Defendants ask this Court to hold that there is no plausible false statement, even though the Company has ***admitted*** that years of its filings contained material inaccuracies. Second, Defendants seek a holding that

years of accounting violations and erroneous financial statements are irrelevant to whether Defendants acted (at least) recklessly when disseminating false information to investors. Neither holding comports with the applicable law. In sum, Plaintiff's allegations exceed the pleading standards for falsity and scienter, and Defendants concede that the allegations suffice as to every other element of a Section 10(b) claim. Thus, Defendants' motions to dismiss should be denied.[1]

## II.    STATEMENT OF FACTS

Defendant Surgalign Holdings, Inc. (formerly RTI Surgical Holdings, Inc.) ("RTI" or the "Company" herein) is a surgical implant company that designs, develops, manufactures, and distributes biologic, metal, and synthetic implants worldwide. ¶¶ 25, 37.[2] Defendants Farhat, Hutchison, Singer, Jordheim, and Louw (collectively, "Individual Defendants") served in various executive roles for RTI, including as Chief Executive Officer (CEO), Chief Financial Officer (CFO), and Chief Operating Officer (COO). ¶¶ 27-31.

During most of the Class Period (March 7, 2016 to March 27, 2020), the Company had four main operating segments: (i) spine; (ii) sports; (iii) original equipment manufacturer ("OEM Business"); and (iv) international.[3] ¶ 40. The OEM Business accounted for the largest portion of the Company's overall revenue. ¶ 41. During the fiscal year ended December 31, 2018, for example, OEM accounted for 43% of RTI's total revenues. *Id.*

---

[1] *See* Mem. of Law in Support of Mot. to Dismiss by Defendants RTI, Farhat, and Singer ("RTI Mot.") [ECF No. 60]; Mem of Law in Support of Defendant Louw's Mot. to Dismiss ("Louw Mot.") [ECF No. 61]; Mem. of Law in Support of Defendant Jordheim's Mot. to Dismiss ("Jordheim Mot.") [ECF No. 63]; Mem. of Law in Support of Defendant Hutchison's Mot. to Dismiss ("Hutchison Mot.") [ECF No. 67].

[2] Citations to "¶" refer to the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") [ECF No. 53]. Unless otherwise noted, all emphasis has been added and internal citations and quotations have been omitted.

[3] Prior to October 1, 2017, RTI referred to the OEM Business as "commercial," with metrics for "global commercial" and "commercial/other." *See* ¶ 42; RTI Ex. 4 [ECF No. 60-4] at 5 of 242.

For every quarter and year during the Class Period, RTI—as required for publicly traded companies—reported to investors a host of material information about the Company's finances and operations. *See, e.g.*, ¶¶ 227-233. The Company and its management repeatedly stated that those publicly reported financial metrics complied with GAAP (*see* ¶¶ 54-56) and were accurate (*see* ¶¶ 98, 138, 166, 198). Management further certified that RTI's "internal controls over financial reporting" were "effective" and complied with the standards set by the Committee of Sponsoring Organizations of the Treadway Commission Report ("COSO Report"). *See* ¶¶ 59-66, 97, 108, 119, 130, 138, 140, 143, 170, 184, 194, 202, 207, 210, 215, 229. Those public filings provided investors with the necessary information to make informed decisions about investing in RTI. *See* ¶¶ 59-66, 274.

During the Class Period, Defendants' financial filings and statements showed that, while the OEM Business was struggling with erratic revenue declines in 2016, RTI was able to stabilize and grow those revenues thereafter. As alleged in the Complaint, however, that narrative was patently false.

In 2016, the OEM Business was highly volatile:

| 2016 | Year over Year Revenue Gain / Loss ($) | Year over Year Revenue % Gain / Loss (%) | Source |
|------|----------------------------------------|------------------------------------------|--------|
| 1st Quarter | -$3,600,000 | -12.4% | ¶ 107 |
| 2d Quarter | -$9,200,000 | -27.1% | ¶ 117 |
| 3d Quarter | -$4,900,000 | -16.2% | ¶ 128 |
| Full Year | -$30,800,000 | -23.7% | RTI Ex. 4 [ECF No. 60-4] at 43 of 242 |

To explain the volatile declines, RTI repeatedly focused on the timing of orders in the OEM Business (referred to by RTI as "commercial" (*see* n.3, *supra*)):

- Defendants Hutchison and Jordheim (11/7/16) (3Q16 10-Q): "Our global commercial revenue comparisons are impacted due to a significant amount of our revenue being derived from large global commercial stocking distributors, whose ***timing*** of orders can vary from quarter to quarter. These ordering

3

patterns can result in significant unit volume variations, which can result in significant variation in quarter over quarter comparisons." (¶ 128);

- <u>Press Release, February 23, 2017</u>: "The decline in commercial/other business is primarily related to significantly high orders in 2015 with lower orders in 2016" (¶ 133).

To allay investors' concerns, Defendants highlighted that the OEM Business's revenues were stabilizing:

- <u>Press Release (2/23/17)</u>: "[T]he commercial business showed signs of *stabilization* during the year" (¶ 133); and

- <u>Defendant Louw (2/23/17)</u>: "Despite the decline, we saw signs of *stabilization* in the commercial/other business during the year as the commercial/other business averaged $28 million over the last four quarters of 2016." (¶ 136);

In other words, Defendants set an expectation of steadier, more predictable metrics for the OEM Business going forward.

As 2017 progressed, RTI purportedly met that expectation. The Company reported the following metrics, showing not only growth but also less volatility:

| 2017 | Year over Year Revenue Gain / Loss ($) | Year over Year Revenue % Gain / Loss (%) | Source |
|---|---|---|---|
| 1st Quarter | -$1,700,000 | -6.9% | ¶ 142 |
| 2d Quarter | +$1,100,000 | +4.3% | ¶ 153 |
| 3d Quarter | +$829,000 | +1.1% | ¶ 163 |
| Full Year | +$3,900,000 | +3.9% | ¶ 168 |

As it reported those metrics, moreover, the Company repeatedly emphasized that the OEM Business was overcoming the volatility of order timing and, therefore, stabilizing:

- <u>Defendant Farhat (8/8/17)</u>: "I'm pleased to report that commercial continues to *stabilize* and has returned to growth" (¶ 149);

- <u>Defendant Jordheim (8/8/17)</u>: "Our commercial business continues to *stabilize* and grew 4% in the second quarter" (¶ 150); and

- <u>Defendant Farhat (8/9/17)</u>: "Our Commercial business continues to *stabilize*," (¶ 146).

The market listened, with analysts taking note of the stabilization:

4

- Stephens (8/8/17): "The commercial business exhibited signs of **stabilization**" (¶ 157);

- Raymond James (8/8/17): "The Commercial biz continued trends towards **stabilization**, following one-time orders in 2015 that did not repeat in 2016" (¶ 158).

Accordingly, RTI conveyed to investors that, in 2017, it had turned around the previous declines with the OEM Business, stabilized the volatility of customer orders, and created steadier growth.

RTI continued those representations into 2018 and 2019, reporting increased growth for the OEM Business:

| 2018 | Year over Year Revenue Gain / Loss ($) | Year over Year Revenue % Gain / Loss (%) | Source |
|---|---|---|---|
| 1st Quarter | +$5,000,000 | +19.8% | ¶ 177 |
| 2d Quarter | +$3,200,000 | +11.4% | ¶ 182 |
| 3d Quarter | +$1,300,000 | +4.6% | ¶ 192 |
| Full Year | +$10,000,000 | +9.0% | ¶ 201 |

| 2019 | Year over Year Revenue Gain / Loss ($) | Year over Year Revenue % Gain / Loss (%) | Source |
|---|---|---|---|
| 1st Quarter | -$1,100,000 | -3.7% | ¶ 206 |
| 2d Quarter | +$1,300,000 | 4.2% | ¶ 209 |
| 3d Quarter | +$2,200,000 | 7.5% | ¶ 213 |
| Full Year | *Not timely filed* | *Not timely filed* | ¶¶ 217, 225, 231 |

Explaining the OEM Business's performance, the Company repeatedly reiterated the importance of order timing:

- Defendants Farhat and Singer (5/4/18) (1Q18 10-Q): "OEM revenues increased primarily as a result of higher orders and due to **timing of delivery** to certain OEM distributors" (¶ 177);

- Defendants Farhat and Singer (8/3/18) (2Q18 10-Q): "OEM revenues increased primarily as a result of higher orders and due to **timing of delivery** to certain OEM distributors, primarily in the dental and trauma markets" (¶ 182);

- Defendants Farhat and Singer (11/7/18) (3Q18 10-Q): "OEM revenues increased primarily as a result of higher orders and due to **timing of delivery** to certain OEM distributors, primarily in the dental and trauma markets" (¶ 192);

- Defendant Singer (10/31/19): "We do and have had some products back order and so if we stabilize the supply side, from a donor and donor quality perspective that will impact the range and then there's always a certain element

5

of *delivery window* with the OEM customers that come into play at the end of the quarter" (¶ 212).

Accordingly, from the beginning of 2016 through the third quarter of 2019, Defendants portrayed to the market that they had stabilized a volatile OEM Business, leading to steadier and growing year-over-year results. The OEM Business purportedly had transitioned from 22% year-over-year losses in 2016 to a 3.9% gain in 2017 and 9.0% gain in 2018. The first three quarters of 2019, moreover, evinced that the OEM Business was poised to show an overall gain for 2019. Critically, Defendants recurrently confirmed that this growth and stabilization arose from adherence to RTI's documented revenue recognition policy. ¶¶ 93, 119, 139, 167, 169, 199-200. Indeed, revenue recognition policies are crucial to ensure that reported changes each quarter and year reflect actual sales. *See, e.g.*, ¶¶ 61-63. Without adherence to a stated revenue recognition policy, reported growth or stability might be illusory, reflecting methodology changes or gamesmanship rather than actual sales in a given financial period. *See id.*

In January 2020, Defendants' efforts to create stability and growth for the OEM business purportedly paid off. On January 13, 2020, RTI announced an agreement to sell the OEM Business to Montagu for $490 million. ¶ 47. RTI was positioned to garner that large amount because of the ostensible stabilization and growth conveyed by the financial filings from 2016 through 2019. *Compare* ¶ 47 *with* ¶ 235. For RTI and its investors, the lucrative sale of the OEM Business was a boon—driving RTI's stock price up 63% upon the announcement of the deal. ¶ 48.

***In reality, however, Defendants' financials, as reported to investors in 2016, 2017, 2018, and 2019 were materially false and misleading, as revealed through a series of partial disclosures with devastating results for investors***. *See* ¶¶ 99, 101, 104, 109, 111, 116, 120, 123, 126, 131, 134, 137, 141, 144, 147, 152, 156, 161, 165, 171, 173, 176, 179, 181, 185, 188, 191, 195, 197, 203, 205, 208, 211, 216. On March 16, 2020, RTI abruptly announced that:

- The SEC was investigating its financials from 2014 – 2016;

- The Company's Audit Committee "is in the process of conducting an internal investigation of current and prior period matters relating to the Company's revenue recognition practices regarding the timing of revenue with respect to certain contractual arrangements, primarily with OEM customers, including the accounting treatment, financial reporting and internal controls related to such arrangements";

- "The Company will not be in a position to file its Form 10-K until the Audit Committee concludes its investigation and the Company and its independent auditor assess the results of that investigation"; and

- "[N]o assurance can be given that" the Company could file its Form 10-K within the extension period ending March 31, 2020.

¶ 217. Because of those disastrous revelations about RTI's financial reporting, RTI's share price fell 27.6% by market close on March 18, 2020. ¶ 218. Investors could no longer rely on the narrative of stability and growth that Defendants had repeated since 2016. Nor could they rely on the lucrative sale of the OEM Business to Montagu, which was in jeopardy given the undependability of RTI's previous financial reporting and inability to report for 2019. As conceded by Defendants, who do not challenge loss causation, ***RTI's revelations had erased over one fourth of its entire market value as a company.***

Just two days later, the Company revealed that the Listing Qualifications Department of the Nasdaq Stock Market LLC had determined that RTI was not in compliance with the timely filing requirement for continued listing under Nasdaq Listing Rule 5250(c)(1). ¶ 219. Additionally, Defendant Louw—whom the Company had previously announced was elevating to the CFO role, effective after closing the OEM Business sale—was resigning by April 8, 2020. ¶ 219. On the next trading day, ***those stark revelations erased another 19.6% of RTI's market value***. ¶ 220.

RTI's detrimental revelations continued. In agreeing to purchase the OEM Business, Montagu had relied on RTI's effective internal controls and concomitant ability to timely report accurate metrics. But those controls had failed, and the reported metrics that purportedly

demonstrated a much-touted "stability" were wrong. Consequently, on March 30, 2020, RTI disclosed an allegation by Montagu that RTI was in breach of the Purchase Agreement for the OEM Business. ¶ 222. RTI additionally disclosed that it was postponing a special meeting of shareholders, which were voting on items necessary for the sale of the OEM Business. ¶ 223. ***Those revelations erased another 11% of RTI's market value***. ¶ 224.

Thereafter, RTI continued revealing the scope of false and misleading information from its previously-filed financials. On April 9, 2020, the Company announced that:

- The Company would ***restate five full years*** of publicly-filed audited financials for 2014, 2015, 2016, 2017, and 2018;

- The Company would restate every one of twelve quarterly unaudited financial statements over three years for 2016, 2017, and 2018;

- "Revenue for certain invoices should have been recognized at a later date than when originally recognized";

- For "certain OEM customers, goods were shipped and received by the customers before requested delivery dates and agreed-upon delivery windows";

- "Some of those unapproved shipments were shipped by employees in order to generate additional revenue and resulted in shipments being pulled from a future quarter into an earlier quarter"; and

- "There were also instances in which the Company could not locate evidence that the OEM customers had requested or approved the shipments."

¶¶ 225-227. These dramatic admissions showed that, for years, RTI had fraudulently altered the timing of orders in its OEM business. ¶¶ 4, 52-53. Former employees of RTI and an RTI customer corroborated that improper practice. ¶¶ 67-92. As a consequence, RTI's financials were materially inaccurate, violated the relevant accounting policies and principles, and provided investors with a materially misleading understanding of RTI's business. *See* ¶¶ 52-53, 227-237.

Those revelations were detrimental for RTI. Montagu imposed amended terms for its purchase of RTI's OEM Business. ¶ 235. The purchase price dropped by approximately $40 million, and RTI lost a $10 million ownership stake in the go-forward OEM Business. ¶ 235.

In sum, the OEM Business and RTI as a whole were not as Defendants had represented during the Class Period. As confirmed by Defendants' revelations—coupled with the details from the Restatement and 2019 10-K that RTI finally filed on June 8, 2020—the previously-touted growth and stabilization for the OEM Business had been inaccurate. Once RTI had reconciled its materially inaccurate financials, there was a drastic cascading effect into 2019.

RTI had portrayed 2017 as a turning point for stabilization and growth. In actuality, the OEM Business's year-over-year revenue growth of $3.9 million in 2017 was only $493,000—87% lower than what had been reported. RTI Ex. 1 [ECF No. 60-1] at 40 of 114. The OEM Business had grown only 0.4% since the substantial revenue declines in 2016 and was dangerously close to an additional decline. *Id.* The previously reported growth of 9% for 2018 was misleading as well. It was actually only 7.6% growth, on top of the modest 0.4% growth from 2017. *Id.*

For 2019, moreover, RTI retroactively reorganized its reporting segments, changing from Spine, Sports, OEM, and International to only Spine and OEM. RTI Ex. 5 [ECF No. 60-5] at 5, 93-94 of 153. The newly-consolidated OEM Business, when including the restated metrics for 2016 through 2018, showed even worse results: a revenue ***decline*** of 0.9% in 2018 and revenue growth of only 1.9% in 2019. *Id*. Those results—considerably different from the stability and growth previously touted by Defendants—justified the materially decreased purchase price that Montagu secured for the OEM Business.

The disastrous effects of RTI's misreporting spanned beyond the OEM Business. For 2018, the Restatement increased the company-wide net loss by 150%, from $1.2 million to $3.1 million.

RTI Ex. 1 [ECF No. 60-1] at 87 of 114. For 2019, RTI increased its net loss and lowered its goodwill by tens of millions of dollars. RTI Ex. 5 [ECF No. 60-5] at 123-127 of 153. Prior to the Restatement, RTI's most recent financial report had shown a company-wide net loss of $13.2 million for the first 9 months of 2019.[4] Upon filing the Restatement and the delayed 2019 10-K, RTI reported a ***net loss of $211.6 million for full-year 2019*** and disclosed that "***our independent auditors have indicated in their report on our financial statements for the year ended December 31, 2019 that there is substantial doubt about our ability to continue as a going concern***." RTI Ex. 5 [ECF No. 60-5] at 15, 31 of 153. After correcting years of misstatements, RTI's reconciled financials called into question RTI's very existence.

Defendants' false and misleading financial reporting artificially inflated RTI's stock price during the Class Period. ¶¶ 24, 239, 256, 258, 274. As the truth was revealed, the price dropped, causing millions of dollars in losses for RTI's investors, who had relied on RTI's internal controls and the accuracy of Defendants' financial reporting. ¶¶ 274-276. Based on those facts, Plaintiff raises claims against Defendants for violation of Section 10(b) and Section 20(a) of the Securities Exchange Act. ¶¶ 268-283.

### III.   RELEVANT LEGAL STANDARDS

"To prevail on a Rule 10b–5 claim, a plaintiff must prove that the defendant: (1) made a misstatement or omission of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which the plaintiff relied; and (5) the plaintiff's reliance was the proximate cause of its injuries." *Ross v. Career Educ. Corp.*, No. 12 C 276, 2012 WL 5363431, at

---

[4] RTI Surgical Holdings, Inc. Quarterly Report (Form 10-Q) (Nov. 7, 2019) at 2, https://www.sec.gov/Archives/edgar/data/1760173/000156459019041623/rtix-10q_20190930.htm#ITEM_1_UNAUDITED_CONDENSED_CONSOLIDATED (publicly accessed on December 4, 2020).

*2 (N.D. Ill. Oct. 30, 2012) (Kennelly, J.). Under Rule 9(b), "a party alleging fraud or mistake 'must state with particularity the circumstances constituting fraud or mistake,' but '[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally.' A complaint satisfies Rule 9(b) when it alleges 'the who, what, when, where, and how' of the fraud." *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc*., No. 16 C 10632, 2018 WL 844420, at *1 (N.D. Ill. Feb. 12, 2018). Furthermore, "[t]he PSLRA requires the plaintiff to 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading'" and "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id*. "Even though the PSLRA imposes a heightened standard, it requires no proof as opposed to plausible allegations." *Id*. at *3.

## IV.    ARGUMENT

Defendants raise two overarching arguments for dismissal.[5] First, they suggest the Complaint does not show Defendants made any misstatements. Second, they argue the Complaint does not give rise to an inference of Defendants' scienter. Both arguments fail.

**A.    Plaintiff has adequately alleged Defendants made material misstatements.**

Defendants contend Plaintiff has not adequately alleged any material misstatements. *See* RTI Mot. at 9–13; Hutchison Mot. at 5-9; Jordheim Mot. at 8-11; Louw Mot. at 4-9. This argument contravenes Plaintiff's allegations and the overwhelming weight of authority.

"To satisfy the material misrepresentation element of a § 10(b) claim, a plaintiff must allege that the defendant made a statement that was 'misleading as to a material fact.'" *In re Akorn, Inc. Sec. Litig*., 240 F. Supp. 3d 802, 814 (N.D. Ill. 2017) (quoting *Basic Inc. v. Levinson*, 485 U.S.

---

[5] The six Defendants filed four largely overlapping motions, with some motions also incorporating others. *See, e.g.*, Jordheim Mot. at 7; Louw Mot. at 1. For simplicity, Plaintiff generally refers to "Defendants."

224, 238 (1988)). "This requires a plaintiff to 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, [to] state with particularity all facts on which that belief is formed.'" *Ross*, 2012 WL 5363431, at *2 (quoting 15 U.S.C. § 78u–4(b)(1)). "In determining whether a statement is false or misleading, the relevant question a court must answer is 'whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.'" *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 878 (N.D. Ill. 2011) (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) ("*Tellabs I*")).

Numerous courts within the Seventh Circuit have held that a company's restatement of previously reported financials suffices to show falsity. *Akorn*, 240 F. Supp. 3d at 816 ("[T]he mere fact that financial results were restated is sufficient basis for pleading that those statements were false and misleading."); *Roth v. OfficeMax, Inc.*, No. 05 C 236, 2006 WL 2661009, at *4 (N.D. Ill. Sept. 13, 2006) ("Plaintiffs have adequately alleged that these statements were false or misleading because the Company restated its financial results[.]"); *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 951 (N.D. Ill. 2015) (collecting cases and finding restatement sufficient for falsity); *Greater PA Carpenters Pension Fund v. Whitehall Jewellers, Inc.*, No. 04 C 1107, 2005 WL 61480, at *6 (N.D. Ill. Jan. 10, 2005) (same).[6]

---

[6] Courts nationwide have also held that a restatement establishes falsity. *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017) ("In light of comScore's admission that it must restate its financial statements, there can be no dispute that the SAC pleads numerous false and misleading misstatements"); *S.E.C. v. Goldstone*, No. CIV. 12-0257 JB/GBW, 2015 WL 5138242, at *231 (D.N.M. Aug. 22, 2015) ("That Thornburg Mortgage restated its 2007 Form 10–K and stated in the Restated Form 10–K/A that the original OTTI determination was wrong is sufficient evidence for the SEC to survive summary judgment on the objective falsity issue."); *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562,

Indeed, a restatement confirms that the previous financial statements violated GAAP, and a GAAP violation, in turn, shows that the original financial statements were misleading. *See Akorn*, 240 F. Supp. 3d at 815-16 ("Pursuant to [GAAP], previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were issued . . . That [a company]'s financial statements were not prepared in accordance with GAAP further indicates that they were misleading"); *see also S.E.C. v. Koenig*, No. 02 C 2180, 2007 WL 1074901 (N.D. Ill. 2007) ("A GAAP violation is presumptively a false or misleading statement of material fact under Rule 10b-5."); 17 C.F.R. § 210.4–01(a)(1) ("Financial statements filed with the [SEC] which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate[.]").

This precedent forecloses Defendants' challenges to falsity. The Restatement confirmed the material inaccuracy of Defendants' numerous statements.

Aside from the erroneous numbers reported, moreover, Defendants stated that RTI's "internal control over financial reporting is effective," as assessed by "management, including our CEO and CFO," under the COSO Report. ¶¶ 59, 96, 97, 140, 170, 202. Defendants Hutchison, Jordheim, Louw, Farhat, and Singer certified, under the Sarbanes-Oxley Act (or "SOX"), that the financial reporting was accurate and that they had, *inter alia*, "[d]esigned such internal control over financial reporting . . . to provide reasonable assurance regarding the reliability of financial

---

569 (S.D.N.Y. 2007) ("With respect to DRD's restatement of earnings, misreported financial data are clearly false statements of fact."); *In re Atlas Air Worldwide Holdings, Inc. Sec. Lit.*, 324 F. Supp. 2d 474, 486–87 (S.D.N.Y. 2004) ("[T]he mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made."); *In re The Goodyear Tire & Rubber Co. Sec. Litig.*, 436 F. Supp. 2d 873, 894 (N.D. Ohio 2006) ("By definition … a restatement says that the prior financial statement was false."); *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001) ("[T]he existence of restated financial results is sufficient to support plaintiffs' belief that the statements were misstated."); *In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F. Supp. 2d 211, 223 (D. Mass. 1999) ("Company's restatement of its financial results satisfies the pleading requirement that a statement was materially misleading when made.").

reporting and the preparation of financial statements for external purposes in accordance with [GAAP]." ¶¶ 98, 138, 166, 198.

In contrast, Defendants later confirmed in the Restatement that "our disclosure controls and procedures were ***not*** effective as of December 31, 2018 because of certain material weaknesses in our internal control over financial reporting," "[w]e did ***not*** maintain an effective control environment based on the criteria established in the COSO [Report]," and "the Company's formal SOX compliance program did ***not*** have sufficient scope and focus on the key financial reporting risks." ¶¶ 229-230. Defendants even conceded that "[t]he tone from ***executive management*** was insufficient to create the proper environment for effective internal control over financial reporting." ¶ 229. More specifically, there were deficiencies with "adequate processes for oversight," "accountability for the performance of internal control over financial reporting responsibilities," "the appropriate training for personnel with key positions," and the implementation of "corrective activities." *Id*. Moreover, RTI suffered from "[i]nconsistent documentation and application of accounting policies," "insufficient resources within the accounting and financial reporting department," and "insufficient design and operation of certain control activities to respond to potential risk of material misstatements in the area of revenue recognition." *Id*. Those disclosures patently contradicted—and, therefore, demonstrated the falsity of—Defendants' earlier Class Period statements.

Defendants had also misrepresented that "[w]e recognize revenue upon shipping, or receipt by our customers of our products and implants, depending on our distribution agreements with our customers or distributors." ¶¶ 94, 199. Unencumbered by effective internal controls, RTI had actually recognized "revenue from certain customer orders that were shipped early to customers

without obtaining authorized approval" and in "instances in which the Company could not locate evidence that the OEM customers had requested or approved the shipments." ¶ 231.

As admitted by RTI, "these material weaknesses contributed to accounting errors," meaning the previously reported financials—which bolstered the "stabilization" consistently touted by Defendants during the Class Period (*see* ¶¶ 146, 149-150, 157-158)—were inaccurate. ¶ 229. The accurate financials reflected an unstable, floundering OEM Business, as well as a troubled RTI as a whole. The misleading metrics included (but were not limited to):

|  | Original Financials | Restated Financials | Source(s) |
|---|---|---|---|
| 2017 OEM Revenue Gain | 3.9% | 0.4% | ¶ 168; RTI Ex. 1 [ECF No. 60-1] at 40 of 114 |
| 2018 OEM Revenue Gain | 9.0% | 7.6% | ¶ 201; RTI Ex. 1 [ECF No. 60-1] at 40 of 114 |
| 2018 Consolidated OEM Revenue Gain | *Unreported* | -0.9% | RTI Ex. 5 [ECF No. 60-5] at 5, 93-94 of 153 |
| 2018 Net Gain/Loss | -$1,250,000 | -$3,123,000 | RTI Ex. 1 [ECF No. 60-1] at 87 of 114 |
| 1Q2019 Net Gain/Loss | -$9,087,000 | -$9,351,000 | RTI Ex. 5 [ECF No. 60-5] at 124-125 of 153 |
| 2Q2019 Net Gain/Loss | $744,000 | $188,000 | RTI Ex. 5 [ECF No. 60-5] at 125-126 of 153 |
| 3Q2019 Net Gain/Loss | -$4,852,000 | -$5,138,000 | RTI Ex. 5 [ECF No. 60-5] at 126 of 153 |
| 1Q, 2Q, 3Q 2019 Net Gain/Loss | -$13,195,000 | -$14,301,000 | RTI Ex. 5 [ECF No. 60-5] at 127 of 153 |
| Full 2019 Net Loss | *Unreported* | -$211,642,000 | RTI Ex. 5 [ECF No. 60-5] at 31 of 153 |

In sum, Defendants reported inaccurate metrics, coupled with other misstatements, that painted a misleading picture of the OEM Business's stabilization and growth, as well as RTI's overall performance. Defendants then reported an auspicious $490 million sale to Montagu, but unbeknownst to investors, those favorable terms sat on a foundation of Defendants' misrepresentations. When Defendants started to reveal the truth about the OEM Business, the

terms with Montagu changed, to the detriment of RTI's shareholders. Those allegations, when taken as true, establish that Defendants made misstatements to investors.

In response to those well-pleaded allegations, Defendants raise five arguments: (1) there were no misstatements as to effective internal controls; (2) there were no misstatements, because the Restatement increased revenue for some periods; (3) the allegations of revenue smoothing do not show any misstatements; (4) Defendants had no duty to disclose the subjects of the alleged fraud; and (5) the alleged misstatements were not material. Each argument fails.[7]

### 1. Defendants misstated that RTI had effective internal controls.

Defendant Louw argues there were no misstatements regarding "the efficacy of RTI's internal controls for 2016," claiming that "[a]ll internal control systems, no matter how well designed, have inherent limitations." Louw Mot. at 8; *see also* Jordheim Mot. at 9. Defendants' admissions demonstrate otherwise.

In RTI's 10-Ks for 2016, 2017, and 2018, Defendants stated that "the Company's internal control over financial reporting is effective" ¶ 140, 170, 202. But Defendants have since told investors that "[m]anagement, including our CEO and CFO, assessed the Company's internal control over financial reporting and concluded that they were not effective as of December 31, 2018" due to various "material weaknesses," and because those internal controls were deficient, Defendants have instructed investors to "no longer rely upon [those] previously released financial statements as of and for the years ended December 31, 2018, 2017, 2016, 2015, and 2014." ¶ 225 Thus, whether internal controls generally have inherent limitations is immaterial. When

---

[7] In addition to the below arguments, Defendants point to "what this lawsuit does *not* involve," averring that they did not book phony revenue, create fake contracts, or engage in channel stuffing. RTI Mot. at 9-10. Defendants reason that the absence of one type of fraud is a defense to other types of fraud. Not so. The absence of a different fraud is not a defense to the fraud that Plaintiff has alleged with the requisite specificity.

Defendants stated that their internal controls were effective, those internal controls were not effective. Nothing more is required to allege falsity at this stage.

### 2. Defendants misstated multiple metrics across several financial periods, irrespective of whether the Restatement increased revenue for some periods.

Defendants suggest that, because the Restatement increased the reported revenue for some financial periods, those original financials were not false. *See* Jordheim Mot. at 8; Hutchison Mot. at 8-9. The Restatement forecloses that argument.

Defendants did not report only revenue inaccurately. They restated dozens of metrics across five years, including fifteen quarterly periods. Defendants had provided investors wrong data on, *inter alia*, sales, costs, and net results for 2016, 2017, 2018, and 2019. The inaccurate metrics painted a false picture of RTI's performance and health, irrespective of revenue. Indeed, when Defendants finally untangled the web of misstated financial results, the effect was a ***$211 million net loss for 2019, a consolidated OEM Business with a 0.9% revenue decline, a material adjustment to the terms of the OEM Business sale to Montagu***, *and questions as to whether RTI could continue operations*. *See* Section II, *supra*. Simply put, the Restatement did not arise from underreporting revenue; it arose from years of inaccurately reported financials that, once rectified, reflected a much less successful company than previously reported.

### 3. Defendants engaged in revenue smoothing and misstated RTI's revenue.

Defendants argue that revenue smoothing is not always improper (Hutchison Mot. at 5-6) and that the alleged facts do not show "any improper revenue smoothing" (RTI Mot. at 9-13). Defendants further suggest that, even if RTI engaged in improper revenue smoothing, the allegations do not show that the Individual Defendants "participated in revenue smoothing at RTI or blindly ignored any such practice by others." RTI Mot. at 13. Those arguments fail.

As a threshold matter, Defendants have confirmed that RTI's financials were materially misstated. Regardless of whether revenue smoothing or other intentional or reckless conduct caused the misstatements, Plaintiff has sufficiently alleged facts showing that Defendants misrepresented financial results and, in turn, the state of RTI's business. *See* Section II, *supra*.

Furthermore, the allegations show improper revenue smoothing by Defendants. Altering the timing of reported sales can misrepresent a company's performance during the impacted financial reporting period. *See Murphy v. Precision Castparts Corp*., No. 3:16-cv-00521-SB, 2017 WL 3084274 (D. Or. June 27, 2017) (finding actionable misrepresentations where plaintiff alleged that defendants were "work[ing] aggressively to pull in future sales, by persuading customers to accept early delivery of product that would ordinarily ship in a future quarter"); *In re Vocera Commc'ns, Inc. Sec. Litig*., No. C-13-3567 EMC, 2015 WL 603208, at *1 (N.D. Cal. Feb. 11, 2015) (finding actionable misstatements where plaintiff alleged that the company "was not meeting its internal sales goal and artificially inflating sales revenues at the end of each quarter by shipping sales ahead of schedule"). Such conduct can render "statements . . . regarding [the company]'s growth . . . misleading." *In re Vocera*, 2015 WL 603208, at *1; *see also In re SupportSoft, Inc. Sec. Litig*., No. C 04-5222 SI, 2005 WL 3113082, at *6 (N.D. Cal. Nov. 21, 2005) (finding actionable misstatements where plaintiff alleged "that defendants converted ratable licenses into perpetual licenses in a conscious decision to conceal the fact that [the] business was not performing as well as expected"); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620 (E.D. Va. 2000) (finding actionable misstatements where plaintiff alleged that the company improperly recognized revenue in 4Q for a contract not in effect until the next quarter).

The Complaint alleges that Defendants engaged in this precise practice—*i.e.*, shipping products early so as to book revenue in particular quarters and, in turn, portray RTI in a

misleadingly positive light. ¶ 52 ("Simply put, RTI reported to investors that, during a financial period, the Company had made more sales than the Company, in fact, had made during that period."); ¶ 99 ("As a result . . ., Defendants' reported revenue figures were false."). Multiple former RTI employees, as well as a former employee of a major RTI customer, corroborated that practice. ¶¶ 67-92. Based on an internal investigation, moreover, Defendants have ***admitted*** that they engaged in that practice:

- "goods were shipped and received by the customers before requested delivery dates and agreed-upon delivery windows";

- "goods were delivered early without obtaining the customers' affirmative approval";

- "[s]ome of those unapproved shipments were shipped by employees in order to generate additional revenue and resulted in shipments being pulled from a future quarter into an earlier quarter"; and

- as a consequence, "***revenue for certain invoices should have been recognized at a later date than when originally recognized***."

¶ 226. At this stage, those admissions—particularly when coupled with Plaintiff's detailed factual allegations and the restated financials—sufficiently demonstrate improper revenue smoothing.

### 4. Defendants violated their duties to disclose and made misleading statements.

Defendants argue that they had no duty to disclose that they engaged in revenue smoothing. Hutchison Mot. at 7. Once again, Defendants ignore Plaintiff's allegations and the applicable law.

"Incomplete disclosures, or 'half-truths,' implicate a duty to disclose whatever additional information is necessary to rectify the misleading statements." *U.S. S.E.C. v. Ustian*, No. 16 C 3885, 2019 WL 7486835, at *32 (N.D. Ill. Dec. 13, 2019). Furthermore, "[e]ven [ ] statement[s] [that are] literally true [can still be actionable under § 10(b) as misleading] if they are susceptible to another interpretation by a reasonable investor." *Plumbers*, 778 F. Supp. 2d at 878; *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* 575 U.S. 175, 192 (2015)

19

("[L]iteral accuracy is not enough: [a company] must as well desist from misleading investors by saying one thing and holding back another."). "In making this determination, courts are to consider the context in which the statement was made." *Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 651 (N.D. Ill. 2015). Ultimately, the court need consider only "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Plumbers*, 778 F. Supp. 2d at 878.

In context, Defendants' Class Period statements were misleading. Defendants conveyed that they recognize revenue based on "distribution agreements with our customers or distributors" but later admitted that "goods were shipped and received by the customers before requested delivery dates and agreed-upon delivery windows," meaning that "revenue for certain invoices should have been recognized at a later date than when originally recognized." ¶¶ 199, 225. Defendants stated that "the design and operation of our disclosure controls and procedures were effective" but then stated that "investors should no longer rely upon the Company's previously released financial statements" and "our disclosure controls and procedures were not effective." ¶¶ 108, 130, 143, 155, 164, 178, 184, 194, 207, 210, 215, 225, 229. Defendants indicated that they had created their financial statements in compliance with GAAP but then restated those statements due to material accounting errors. *See, e.g.,* ¶¶ 138-140, 198, 202, 225-226. Defendants repeatedly described the OEM Business as stabilizing, until reporting for 2019 a revenue decline for the newly-consolidated OEM Business, a company-wide net loss of $211 million, and problems with the sale to Montagu. ¶¶ 222, 235; RTI Ex. 5 [ECF No. 60-5] at 15, 31 of 153 Accordingly, Defendants' Class Period statements portrayed a misleading picture of RTI's operations and performance, as sufficiently alleged in the Complaint.

5.      **Defendants' misstatements were material.**

"A misrepresentation is material if a reasonable investor would view it as significantly alter[ing] the total mix of information available and important to deciding whether to buy or sell a security." *Twin Master Fund, Ltd. v. Akorn, Inc*., No. 19 C 3648, 2020 WL 564222, at *5 (N.D. Ill. Feb. 5, 2020) (Kennelly, J.). "Materiality is a 'fact-specific inquiry' that 'depends on the significance the reasonable investor would place on the withheld or misrepresented information.'" *In re Akorn*, 240 F. Supp. 3d at 814–15 (quoting *Basic*, 485 U.S. at 240). "Accordingly, the determination of materiality requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *Id.* "[T]hus a materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Id.*

Furthermore, restatements are evidence of materiality, "as financial accounting standards provide that financial results shall be restated 'only when errors are material.'" *In re Akorn*, 240 F. Supp. 3d at 815 ("[T]hat Akorn issued a restatement to correct those results is further evidence of materiality."); *S.E.C. v. Kelly*, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009) ("[U]nder [GAAP], a restatement issues only when errors are material."); *Van Noppen*, 136 F. Supp. 3d at 951 ("Courts in this District have found restatements material even when the plaintiff did not plead the precise amount by which the corporate defendant's financial statements were in error.").

Similarly, "[a] drop in stock price . . . tends to establish materiality." *In re Akorn*, 240 F. Supp. 3d at 815; *Ross*, 2012 WL 5363431, at *4–6 ("The market's negative reaction further tends to show that defendants' alleged misstatements were material.").

This precedent forecloses Defendants' challenge to materiality. Even if the Court engaged in a more substantive analysis (rather than leaving this fact issue for the jury), the Complaint

establishes materiality. The Restatement confirms that Defendants viewed RTI's Class Period misstatements as material. RTI's stock drops—when investors learned of the Company's internal investigation into its revenue recognition practices, inability to timely file its 2019 10-K, violation of Nasdaq listing requirements, and alleged breach of the contract with Montagu—confirm that investors viewed Defendants' Class Period disclosures as material.

Attempting to bypass those hallmarks of materiality, Defendants raise three arguments. First, they point to the modest rise in RTI's stock price when the Restatement was filed. *See* Jordheim Mot. at 11. By that time, however, the market had responded to the series of partial revelations and priced in the risks posed by the investigation, suspect financials, and tenuous sale of the OEM Business. Thus, a post-Class Period stock increase when the Restatement was finally filed does not negate the materiality of Defendants' Class Period misstatements that caused losses as the truth was slowly revealed.

Second, Defendants suggest that the misstatements were immaterial to investors, given that the Restatement increased some individual metrics in particular years. Louw Mot. at 7; Jordheim Mot. at 10-11. This argument ignores Plaintiff's allegations. Defendants misstated multiple financial metrics for years and falsely portrayed RTI's performance during that time period. *See* Section II, *supra*. Even if the original financials understated, rather than overstated, certain metrics, the total mix of information provided to investors was incorrect. *See id.* Indeed, Montagu viewed RTI's Class Period disclosures in a negative light and forced less favorable terms to close the OEM Business purchase, and the reconciled financials raised doubts about RTI's ability to continue operating. *See id.*

Finally, Defendants contend that they revealed the alleged fraud to investors. *See* Hutchison Mot. at 6-7 ("On the eve of the proposed class period, Mr. Hutchison told the market

that RTI did not expect OEM to repeat its 2015 performance in 2016 because customer inventory was high. . . . RTI lowered its OEM forecast over the next three quarters as the issue persisted. The market got it[.]"). This halfhearted truth-on-the market defense does not protect Defendants.

"The truth on the market defense provides that a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." *Lawrence E. Jaffe Pension Plan v. Household Intern., Inc.*, No. 02 C 5893, 2006 WL 3332917, at *2 (N.D. Ill. Nov. 13, 2006). "The truthful corrective information, however, must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Id*. "[T]ruth on the market is rarely an appropriate basis for dismissing a 10(b) complaint at the pleadings stage," as "[t]hose inquiries present fact questions that cannot be resolved . . . on a motion to dismiss." *In re Avon Sec. Litig.*, No. 19 CIV. 01420 (CM), 2019 WL 6115349, at *15 (S.D.N.Y. Nov. 18, 2019).

Here, Defendants have not established that, during the Class Period, they revealed the full truth about RTI's flawed internal controls, financials, or OEM Business. And even if they had revealed some or all of the truth (they had not), Defendants have not established that those revelations were conveyed with the requisite intensity and credibility.

In sum, the Complaint provides abundant support for a finding that Defendants' misstatements were material to investors. Those allegations are sufficient at the pleading stage, and the jury will make the ultimate factual determinations as to materiality.

**B.    Plaintiff has adequately alleged facts giving rise to an inference of Defendants' scienter.**

To establish scienter, a plaintiff must show that a defendant "knew the statement was false or was reckless in disregarding a substantial risk that it was false." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704-05 (7th Cir. 2008) ("*Tellabs III*"). Moreover, "knowledge is

23

inferable from gravity." *Id.* at 704; *Rubinstein v. Gonzalez*, 241 F. Supp. 3d 841, 854 (N.D. Ill. 2017) (scienter may be demonstrated "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness"). "When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk." *Tellabs III*, 513 F.3d at 704. A complaint will survive a motion to dismiss "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 324 (2007) ("*Tellabs II*").

"In *Tellabs* [*II*], the Supreme Court made clear that a court reviewing the adequacy of a complaint under the PSLRA must conduct a holistic review of its allegations." *Plumbers*, 778 F. Supp. 2d at 885 (citing *Tellabs II*, 551 U.S. at 325). Therefore, "courts must consider the complaint in its entirety . . ." and ask "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 310. An inference favoring plaintiffs' claims "need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." *Id.*; *see also Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 241 (1st Cir. 2015) (holding that, if the inference of scienter is at least as compelling as any innocent explanation, a "tie goes to the plaintiff").

Viewed holistically, the Complaint's allegations indicate that Defendants acted, at a minimum, recklessly in making Class Period misstatements. Because of an SEC investigation and internal investigation, Defendants admitted to filing materially inaccurate financials, violating GAAP, violating RTI's internal accounting policies, and wrongly certifying that RTI had effective internal controls. Section II, *supra*. Defendants further admitted that those deficiencies spanned

financial filings for **_more than five years_**. *Id.* The Company confessed—and former employees have corroborated—that it violated its own revenue recognition policies by shipping orders early in order to alter financial results. *Id.* In the midst of the fallout, Defendant Louw, who was slated to become CFO, resigned from RTI after a 16-year tenure. *Id.* The corrected financials finally filed in 2020 undermined the much-touted performance, stability, and growth of the vital OEM Business; worsened the terms of RTI's blockbuster sale of its OEM Business; showed a $211 million in 2019; and raised a "substantial doubt about [RTI's] ability to continue as a going concern." *Id.* Those collective facts support a strong inference that Defendants acted at least recklessly when, for years, they reported to investors that RTI had effective internal controls and GAAP-compliant, accurate financial statements.

Seeking to contravene the "holistic" analysis required by *Tellabs II*, Defendants compartmentalize each indication of scienter and then argue, one by one, that scienter requires more than that particular indication. That tactic is misplaced. The Court should consider the collective facts addressed above, not facts in isolation. On the whole, the inference that it was reckless for Defendants to publish materially inaccurate financials, without adequate internal controls or GAAP compliance, for a three-year Class Period is at least as strong as the inference that it was not reckless to do so. Nonetheless, Plaintiff addresses Defendants' discrete arguments.

### 1. The nature of RTI's Restatement, GAAP violations, and internal control failures supports an inference of scienter.

Defendants contend that the Restatement and GAAP violations do not support an inference of scienter. RTI Mot. at 19-20. Those arguments mischaracterize the law and facts.

"[I]t is long settled that a magnitude of reporting errors lend weight to allegations of recklessness where defendants were in a position to detect the errors." *S.E.C. v. Fisher*, No. 07 C 4483, 2012 WL 3757375, at *13 (N.D. Ill. Aug. 28, 2012); *see also Akorn*, 240 F. Supp. 3d at 820

("The nature and extent of Defendants' misrepresentations of the 2014 financial results make the inference of scienter even more reasonable."); *In re ArthoCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 722 (W.D. Tex. 2010) ("[T]he magnitude of the Restatement in this case, the fact it occurred over a substantial period of time, the relative simplicity of the issues involved—while perhaps not sufficient on their own to establish scienter—do significantly contribute to a finding of scienter on the part of the Individual Defendants."); *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 16-17 (D. Mass. 2004) (finding that while a restatement alone does not support scienter, "the Court must ask whether the GAAP violations, combined with other circumstances indicative of fraudulent intent, raise a strong inference that defendants knowingly or recklessly misled investors.").

"The more serious the [accounting] error, the less believable are defendants protests that they were completely unaware of [the company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy." *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997); *In re Allied Prods. Corp., Inc. Sec. Litig.*, No. 99 C 3597, 2000 WL 1721042, at *5 (N.D. Ill. Nov. 15, 2000) ("The alleged circumstances surrounding the reallocation raise enough flags for this Court so as to withstand a motion to dismiss. The amount reallocated was relatively large, the actual reallocation was deferred as late as possible, and the accounting violation was, according to the plaintiffs, obvious.").[8]

Additionally, violations of GAAP and a company's own internal accounting policies,

---

[8] Citing *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697 (N.D. Ill. 2005), the RTI Defendants argue that, to support an inference of scienter, restated financials must be "so out of line with prior Company results to have triggered any reasonable suspicion about their accuracy when reported." RTI Mot. at 19-20. But *Davis* simply holds that a restatement's value to the scienter inquiry depends on whether it sheds light on "the intent behind the misstatements." 385 F. Supp. 2d at 713; *see also In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2006 WL 3714708 (N.D. Ill. July 12, 2006) (inaccurately cited by the RTI Defendants as applying a strict numbers threshold to restatement-based scienter; *Bally* also applies the *Davis* "intent" standard). Here, RTI's restatement spanned multiple line items and rendered *five years* of publicly-filed financial statements presumptively unreliable (¶¶ 13, 15, 226, 229), indicating Defendants' recklessness.

including improper revenue recognition, support an inference of scienter. *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 231-32 (S.D.N.Y. 2006) ("[A]ccounting manipulations involving premature revenue recognition…are especially indicative of conscious misbehavior since such violations do not commonly occur inadvertently, but instead suggest a conscious decision to improperly recognize revenue."); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975 (N.D. Cal. 2009) ("[O]verstating of revenues may state a claim for securities fraud, as under GAAP, revenue must be earned before it can be recognized."); *Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10 at 17-18 (D. Mass. 2000) (violation of internal accounting policies, in particular, "suggest[s] that Defendants' accounting practices recklessly disregarded another red flag—accounting standards the company adopted."). Furthermore, using inaccurate financials to "achieve consensus estimates" bolsters the inference of scienter. *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1191 (D. Nev. 2009); *Akorn*, 240 F. Supp. 3d at 820 (finding scienter sufficiently alleged where "violations made the difference between failure and success in meeting the annual revenue guidance . . . and Wall Street consensus revenue estimates for two quarters").

Under this precedent, RTI's accounting failures and Restatement support a strong inference of scienter. RTI did not make an anomalous accounting error to a single metric or in one financial report. Rather, RTI announced that investors should no longer rely on prior financial reports, as well as the Company's internal controls over financial reporting, for **the fiscal years ended December 31, 2014, 2015, 2016, 2017 and 2018; the quarterly periods for 2016-2018; and the nine months ended September 30, 2019**. ¶¶ 13, 229. The sheer number of inaccurate financial reports filed by RTI is a robust indicator that Defendants acted (at a minimum) recklessly in

preparing and publishing those reports.[9]

The magnitude of disclosures in the Restatement further confirms that Defendants acted recklessly. RTI revealed that its "disclosure controls and procedures were not effective as of December 31, 2018"; it broadly failed to "maintain an effective control environment based on the criteria established in the COSO framework"; and Defendants' revenue shuffling had impacted numerous critical line items including revenue, operating expenses, accounts receivable, inventories, and accounts payable. ¶¶ 15, 226, 229. RTI attributed the flawed controls to **"*[t]he tone from executive management*.**" ¶¶ 229, 245. The actual results belied the "signs of stabilization" Defendants had repeatedly touted or the OEM Business (*see* ¶¶ 133, 135-136, 146, 149-150) and degraded the terms for RTI's sale of its OEM Business (*see* ¶¶ 222, 235). Furthermore, RTI's belated annual report, filed with the Restatement, identified errors made in connection with the recording of the $300 million Paradigm acquisition (¶¶ 16, 232), erased tens of millions of dollars of goodwill, and reflected a net loss of $211 million for 2019 (RTI Ex. 5 [ECF No. 60-5] at 15, 31 of 153). The material weaknesses identified in the Restatement were so

---

[9] Notably, in Defendants' 70 pages of briefing, they identify only two cases in which the court found a lack of scienter in conjunction with a restated period spanning as long as RTI's. Both cases involved materially different circumstances from those at RTI.

In *In re Career Educ. Corp*., the company restated five years of financials allegedly "due to a change in its method of revenue recognition," not because of violating the existing revenue recognition policy or because of executive management's failure to implement effective internal controls. *See In re Career Educ. Corp. Sec. Litig.*, No. 03 C 8884, 2007 WL 1029092, at *1 (N.D. Ill. Mar. 29, 2007), v*acated pursuant to settlement sub nom. In re Career Educ. Corp. Sec. Litig*., No. 03 C 8884, 2008 WL 8666579 (N.D. Ill. June 26, 2008). Furthermore, that restatement was not the focus of plaintiff's operative complaint, and after dismissal, the case settled while on appeal. *Id.*

In *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp*., the plaintiff argued that three separate restatements in 2005, 2010, and 2011 demonstrated scienter, but the court noted that the "one error from 2005 recurred in 2010," while "[t]he errors leading to major restatements in 2011 were wholly unrelated to the problems of 2005." 895 F.3d 933, 939 (7th Cir. 2018). The court concluded that plaintiff "has failed to tell us why these errors are so alike as to make the recklessness inference at least as compelling as any other" and that the allegations "more plausibly suggest[]" a "breakdown lower in the corporate hierarchy." *Id.* at 939-41.

Neither case involved a single restatement spanning over five years and arising from a host of related deficiencies that admittedly emanated "from executive management." *See, e.g.*, ¶¶ 217, 229-230.

28

severe and widespread that, as of its quarterly statement filed August 12, 2020, RTI reported that the material weaknesses "have not been remediated as of June 30, 2020." ¶¶ 18, 237.

While making those critical misstatements to investors, moreover, Defendants were scrutinizing their accounting practices. During the Class Period, Defendants adopted a new accounting standard and conducted a comprehensive strategic review of the Company's business lines, all of which required an in-depth, retrospective examination of their contracts, including the ones later identified as highly problematic. ¶¶ 244, 254.

Critically, RTI admitted that a source of its drastic misstatements was that goods were delivered early without obtaining customers' affirmative approval. ¶¶ 17, 236. Knowledgeable former employees of RTI (and of RTI's biggest customer) confirmed that the practice was pervasive and internally well-known during the Class Period. ¶¶ 14, 69, 83-85, 89-90, 225.[10]

In sum, the Restatement's broad scope and magnitude, the type and frequency of RTI's GAAP violations, and Defendants' admissions about improper revenue recognition indicate that they acted with (at a minimum) recklessness. When viewed holistically with Plaintiff's other allegations, the inference of scienter is far more compelling than the opposing inference that it was not reckless for Defendants to violate accounting standards and misstate five years of financials.

In response to these severe allegations, however, the RTI Defendants argue that the Company's annual audits conclusively negate scienter and relieve them of responsibility for the Company's five years of inaccurate financials. *See* RTI Mem. at 21. Defendants are wrong.

---

[10] Defendants impermissibly rewrite the Complaint's allegations to argue "that, on occasion, *some lower level employees* at RTI shipped products early without first obtaining the customer's authorization …." (RTI Mem. at 19) (Emphasis added). This argument contradicts the Complaint's specific allegations that Defendant Jordheim and Vice-President of Operations John Varela directly authorized the conduct in question. ¶¶ 83-87. Defendants' contradiction of the Complaint is misplaced in the context of a Rule 12(b)(6) motion, where the court "tak[es] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiffs." *Pugh v. Tribune Co.*, 521 F.3d 686, 692 (7th Cir. 2008).

A clean audit is not synonymous with managerial innocence and does not constitute immunity from a finding of recklessness or knowledge. *See In re Diamond Foods, Inc., Sec. Litig.*, No. C 11-05386 WHA, 2012 WL 6000923, at *8 (N.D. Cal. Nov. 30, 2012) (rejecting argument that clean audit opinion negated scienter because "[s]enior management [has] an independent duty to ensure compliance with GAAP and maintain effective internal controls" and noting "[t]his duty cannot be delegated to [an auditor]"); *In re Ramp Networks, Inc. Sec. Litig.*, 201 F. Supp. 2d 1051, 1074 n.6 (N.D. Cal. 2002) ("The Court also rejects Defendants' assertion that scienter "cannot be shown" in the face of the clean audit opinion it received from Arthur Andersen."). Indeed, "many courts have found adequate allegations of scienter even when the defendants had obtained 'clean' audit opinions from their independent auditors and had ***never*** restated their financial statements." *In re Silver Wheaton Corp. Sec. Litig.*, No. 2:15-cv-5146-CAS (JEMx), 2019 WL 1512269, at *10 (C.D. Cal. Mar. 25, 2019) (collecting cases).

## 2.    The former employee allegations support an inference of scienter.

Defendants ask the Court to discount the statements by former employees (or FEs). RTI Mot. at 17. As a threshold matter, the Amended Complaint contains overwhelming allegations demonstrating scienter at the pleading stage, even if the former employees' statements were omitted. The FE statements serve only to bolster those comprehensive allegations. Nonetheless, there is no valid basis to discount the former employees' statements.

When relying on the statements of former employees, a plaintiff need only allege facts "support[ing] the probability that a person in the position occupied by the source would possess the information alleged." *Tellabs I*, 437 F.3d at 601. It is sufficient to allege each former employee's job title, period of employment, and job responsibilities. *Van Noppen*, 136 F. Supp. 3d at 922 ("There is no categorical discount of [former employee] allegations where . . . Plaintiff has described the witnesses with enough detail that this Court can determine that the [former

30

employees] have a foundation for their allegations."); *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, No. 11 C 8332, 2013 WL 566805, at *17 (N.D. Ill. Feb. 13, 2013) ("The complaint, however, need not provide name, rank, and serial number for each of these sources."). Accordingly, "evidence in the form of particularized allegations by knowledgeable former employees . . . add[s] to the inference of scienter." *Crowell*, 343 F. Supp. 2d 1 at 16; *see also Tellabs III*, 513 F.3d at 711 ("'[C]onfidential sources…are important sources for the allegations not only of falsity but also of scienter.").

The Complaint exceeds these standards. It provides the job titles, dates of employment, and employee responsibilities for each former employee. ¶¶ 67, 72, 75-76, 88. It provides additional facts showing each former employee had a solid foundation for the facts they have proffered. ¶¶ 68-71, 73-74, 88.

The four former employees of RTI and Medtronic (RTI's most important customer) document materially weak internal controls and significant accounting irregularities at RTI during the Class Period. ¶¶ 67-92. They allege that: (i) RTI regularly asked Medtronic to accept shipment of orders earlier than planned so that the order would come in before the end of a quarter or RTI simply shipped the orders without receiving permission (¶¶ 68, 89-90); (ii) it was commonplace for RTI ship orders early to customers other than Medtronic so the Company could meet monthly and quarterly revenue targets (¶¶ 70-71, 73, 78); and (iii) numerous high-ranking and otherwise notable employees knew of the premature shipments, (¶¶ 70-71, 73-74, 83-87). Those allegations corroborate that RTI's management was aware of (or at least reckless as to) the improper practices that led to the massive Restatement. *See In re New Century*, 588 F. Supp. 2d 1206 at 1230 (C.D. Cal. 2008) (when multiple former employees all tell the same story, it "indicate[s] an acute awareness within [the company] . . . making it highly unlikely that [Defendants] were unaware"

31

of any irregularities); *see also In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2006 WL 3747560, at *18 (E.D. La. Dec. 14, 2006) (holding that when multiple former employees all identified an accounting problem, "it would have been virtually impossible for defendants to not have known of the ongoing problems with, and, ultimately, the falsity of the company's [financial] figures"). The inference is even stronger here, because the Restatement itself corroborates the former employees' accounts of the improper practices.[11]

In response, Defendants raise four uncompelling arguments regarding the former employees. First, Defendants incorrectly suggest that former employees must "set forth individualized allegations as to the purported state of mind of each Defendant." RTI Mem. at 17 & n.35. The law imposes no such standard—*i.e.*, discounting witness statements entirely unless the witness speaks to a defendant's internal state of mind. *See, e.g.*, *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 899 (D. Minn. 2011) ("Defendants argue that . . the Complaint is simply bereft of any allegation by any Confidential Witness that any Individual Defendant knew or recklessly disregarded any material false statement in St. Jude's reported financial results. But no such requirement exists. Rather, the requisite inference of scienter is drawn from all of the plausible allegations and weighed against any competing inference of non-culpable conduct.").

Second, Defendants insist that the reliability of the former employees should turn on whether they were employed during the Class Period. RTI Mot. at 17. But that bright-line rule is a fiction. "Pre-class [period] data" is "relevant" for purposes of establishing knowledge "at the start of the class period." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001)

---

[11] This fact extinguishes Defendants' claim that "Plaintiff's revenue smoothing theory rests exclusively on conclusory allegations from four confidential witnesses …." RTI Mot. at 10. For the same reason, *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 707 F. Supp. 2d 774, 783-84 (N.D. Ill. 2010), which involved a complaint premised solely on confidential witness allegations, is inapposite. *Id.* at 11.

Accordingly, former employees from prior to the class period can provide relevant information for pleading purposes. *See, e.g., Mulligan v. Impax Laboratories, Inc.*, 36 F. Supp. 3d 942, 953 (N.D. Cal. 2014) (accepting testimony of confidential witnesses over a "relevant period" of years preceding the class period). Here, the former employees have relevant knowledge because they worked at RTI or Medtronic during the relevant period covered by the Restatement. Hence, Defendants' request to discount that knowledge is baseless.[12]

Third, Defendants argue that, in analyzing evidence from a former employee, a court must consider that they "'may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, [and] may even be nonexistent.'" RTI Mot. at 10-11 (citing *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F. 3d 754, 759 (7th Cir. 2013)). Yet, Defendants ignore that, in *Livonia*, the district court discounted a vague reference to "internal e-mails" because plaintiffs implied, but failed to identify, the existence of any former employee. *Livonia*, 711 F.3d at 759. After allowing plaintiffs to amend their complaint to include allegations from a confidential witness and alleged former employee, the court, on the basis of the confidential witness's allegations, denied defendants' motion to dismiss. *Id*. The Seventh Circuit subsequently discounted the witness and dismissed the complaint only after the record revealed that the confidential witness had ***never worked*** at the company. *Id*. at 759-60.

Finally, Defendants claim that *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007) imposes a general "discount" of confidential witnesses. *See* RTI Mem. at 11 n.15. However, *Tellabs III* limited *Higginbotham* and confirmed that courts may rely on allegations from confidential witnesses if they are sufficiently detailed and the witness's position provided a basis

---

[12] Defendant Jordheim, in particular, argues that the Federal Rules of Evidence bar FE3's allegations. Jordheim Mem. at 13-24. However, FE3 reported directly to Defendant Hutchison and was well-equipped to be aware of the proffered account. ¶¶ 75-87.

for knowledge of the relevant facts. *See Ross*, 2012 WL 5363431, at \*10 (statements by confidential witnesses should be discounted "only when the complaint lacks enough detail for the Court to determine whether the unnamed witnesses were 'in a position to know at first hand the facts to which they are prepared to testify'" (*quoting Tellabs III*, 513 F.3d at 712)).

### 3. Core operations theory supports an inference of scienter.

Courts in the Seventh Circuit assume that officers of a company "know of facts critical to a business's core operations or to an important transaction that would affect a company's performance." *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003); *see also Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1029 (N.D. Ill. 2010) ("[W]hile a court cannot presume scienter, a strong inference of scienter may still be credited where it is almost inconceivable that an individual defendant would be unaware of the matters at issue.").

As alleged in the Complaint, the revenue that RTI improperly recognized and reported was connected with its core OEM Business, which:

- accounted for the largest portion of the Company's overall revenue (¶¶ 41, 241);

- was a regular and important focus of discussion by the Individual Defendants with analysts and the market during earnings conference calls and in press releases and SEC filings (¶¶ 240-41); and

- was sold to Montagu in a $490 million deal that later suffered as the truth of RTI's accounting practices, internal controls, and performance were coming to light (¶¶ 47, 222, 235).

Accordingly, RTI's OEM Business was precisely the type of core business operation about which courts in this Circuit presume management's knowledge. *See Jones*, 701 F. Supp. 2d at 1029.

Attempting to downplay the OEM Business's importance, Defendants' contend that there is no inference of scienter because the OEM Business accounted for "only" 40% of RTI's revenue rather than a majority of revenue. RTI Mem. at 18. Defendants further argue that, even if

Defendants knew about the OEM Business, they did not necessarily know about the revenue smoothing. RTI Mem. at 18. Those arguments are flawed.

First, the core operations doctrine involves facts critical to "core operations" and "important transactions," not just operations that constitute more than 50% of revenue. *See Schleicher v. Wendt*, 529 F. Supp. 2d 959, 975 (S.D. Ind. 2007) (finding scienter supported where defendants "repeatedly touted" strong cash flows but were "inflating cash flow artificially"). Indeed, if a company does not have any segment that individually accounts for more than 50% of revenue, the company's officers would still be aware of the major facts affecting the company's primary segments. RTI is no different. As alleged, the OEM Business and the sale of that business were critical components of RTI's operations, irrespective of whether the OEM Business crossed an arbitrary threshold of 50% of revenues. *See* ¶¶ 41, 47-48, 222, 235, 241.

Second, the Complaint alleges that the Individual Defendants were aware of specific, longstanding shipping and revenue recognition practices for the OEM Business. The Individual Defendants repeatedly spoke about the timing of customer orders affecting the OEM Business. ¶¶ 106, 117-118, 128, 129, 142, 153-154, 177, 182, 192, 212, 241. Former employees confirmed that management dictated a pervasive system of revenue smoothing via early shipments. *See* ¶¶ 68-71, 73-74, 78-87; *see also* ¶ 229 ("The tone from executive management was insufficient to create the proper environment for effective internal control over financial reporting."). Defendants identified improper early shipments as a primary cause of the material errors in and massive Restatement of five years of financials. *See* ¶¶ 217, 225-226. Those allegations create an inference of recklessness and/or knowledge by the Individual Defendants.

### 4. Defendants' Sarbanes-Oxley Certifications support an inference of scienter.

"Courts have found that certifications filed under the [Sarbanes-Oxley Act] may provide additional evidence of scienter if the certifications were false and misleading and the defendant

knew that, or was deliberately reckless in issuing the certifications." *Stocke*, 615 F. Supp. 2d at 1190; *In re OCA*, 2006 WL 3747560, at *22. Where "certifications show that both defendants stated that they designed and evaluated [the company's disclosure controls] to ensure that they worked to provide them with material information…while at the same time failing to disclose serious, unremedied internal control problems[,]" there is an inference of scienter. *See Akorn*, 240 F. Supp. 3d at 819 (granting weight to SOX certifications); *In re OCA*, 2006 WL 3747560, at *22. Thus, Defendants' years of inaccurate certifications further support the inference of scienter.

### 5. The SEC investigation further supports an inference of scienter.

Although a government investigation alone is not sufficient to establish scienter, it is "one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter." *Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 115-16 (D. Mass. 2014) (collecting cases); *see also Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 671 (D.S.C. 2016) (considering "government scrutiny and investigation" as part of its "holistic analysis determining the existence of scienter.").

Here, the SEC is ***still*** conducting an investigation regarding the Company's Restatement, internal controls, and other related matters. ¶ 217. The Company's most recent quarterly report, filed on November 16, 2020, states that "the financial or other impact of the [SEC] Investigation cannot be reasonably determined."[13] Taking a "holistic view" of the facts as they relate to scienter, the presence of a government investigation is yet another "piece of the puzzle" supporting scienter.

### 6. Defendant Louw's resignation supports an inference of scienter.

Resignations or terminations raise an inference of scienter when "accompanied by

---

[13] *See* Surgalign Holdings, Inc. Quarterly Report (Form 10-Q) (Nov. 16, 2020) at 22 https://www.sec.gov/ix?doc=/Archives/edgar/data/1760173/000156459020054200/srga-10q_20200930.htm (publicly accessed on December 4, 2020).

additional evidence of the defendant's 'wrongdoing.'" *See Ross*, 2012 WL 5363431, at *10; *see also UTStarcom*, 617 F. Supp. 2d at 975-76 ("Although proximate resignations of high-ranking officers or directors do not alone support scienter, when corporate reshuffling occurs in tandem with financial restatements, these changes add one more piece to the scienter puzzle."); *Epstein*, 2016 WL 4485312, at *12 (considering "the resignation of the Company's three most senior executive officers" in its "holistic analysis determining the existence of scienter.").

Since 2003, Defendant Louw had been a part of RTI's finance team, in various roles including Vice President of Financial Planning and Analysis. ¶ 246. Additionally, in January 2020, RTI had announced Louw's promotion to CFO, contingent and effective upon RTI's proposed sale of its OEM business. ¶ 246. Instead, as the SEC investigation and internal investigation illuminated years of false reporting and revenue smoothing, culminating in a five-year Restatement and a $211 million net loss in 2019, the Company terminated Defendant Louw just days after revealing the accounting scandal. His removal as proposed CFO further supports an inference of scienter.

### 7. Allegations of motive are not required to plead scienter.

The RTI Defendants argue that the Complaint does not plead any facts showing that Defendants had a motive to commit fraud. RTI Mot. at 14. However, this argument ignores the law, as well as the multitude of allegations giving rise to an inference of scienter.

The Supreme Court and Seventh Circuit have confirmed that a showing of motive is unnecessary to plead scienter. *See Tellabs II*, 551 U.S. at 325 ("absence of a motive allegation" is "not fatal"); *Tellabs I*, 437 F.3d at 601 (plaintiffs may state claim "by pleading either motive and opportunity *or* strong circumstantial evidence of recklessness or conscious misbehavior"). The Complaint pleads strong circumstantial (and direct) evidence of reckless and/or conscious misbehavior; thus, allegations of an additional motive are unnecessary.

37

For the same reason, Defendants cannot rely on their purported increased in collective RTI holdings during the Class Period. RTI Mot. at 15. Courts have repeatedly held that stock purchases or sales are not a prerequisite to pleading scienter. *See, e.g., In re Ashanti Goldfields Sec. Litig.*, No. CV 00-0717(DGT), 2004 WL 626810, at *5 (E.D.N.Y. Mar. 30, 2014) ("While net purchases or sales of stock may be relevant with respect to a motive for fraud claim, when the claim is based on conscious misbehavior or recklessness net purchases of stock by defendants do not necessarily negate an inference of scienter on a motion to dismiss."); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1149 (N.D. Cal. 2017) (finding a lack of stock sales not dispositive as to scienter; "[p]laintiff's theory of the case is that Defendants felt pressure to live up to the targets announced at Analyst Day, ***not that they sought personal financial gain***") (Emphasis added).

In any case, at the pleading stage, it is unclear what trading plans existed, whether they were valid under SEC regulations, when they were agreed to, when they were implemented, and what non-public information each Individual Defendant possessed when the plans were implemented. Those are issues for discovery and cannot negate the substantial allegations indicating an inference of scienter. *See In re Able Labs. Sec. Litig.*, No. 05—2681(JAG), 2008 WL 1967509, at *27 n.40 (D.N.J. Mar. 24, 2008) (defenses based on trading plans require an additional finding of good faith and are therefore premature at the pleading stage).

Finally, although not required, Plaintiff's allegations do show motive. Defendants had motive to misrepresent the ongoing performance of the OEM Busines. Defendants recklessly or knowingly bypassed internal controls, violated the stated revenue recognition policy, and smoothed the numbers. In so doing, they portrayed consistent and stable growth, leading to a lucrative end game of selling the OEM Business to Montagu, while also inflating RTI's stock

price. Defendants revealed the truth only after scrutiny from an SEC and internal investigation.[14]

**8.    Plaintiff adequately pleads RTI's corporate scienter.**

Even if the Court were to conclude that the Complaint failed to allege scienter for each Individual Defendant, the allegations still establish scienter for RTI. "[I]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *Tellabs III*, 513 F.3d at 708, 710; *see also Brasher v. Broadwind Energy, Inc.,* No. 11 CV 991, 2012 WL 1357699, at *24 (N.D. Ill. Apr. 19, 2012) ("At this point, two Defendants remain: [the Company] and [CEO]. Plaintiffs have adequately pled corporate scienter as to the timing of the impairment write-down so the case against [the Company] will go forward."). As explained by the Seventh Circuit, "[t]he plausibility of an explanation depends on the plausibility of the alternative explanations." *Tellabs III*, 513 F.3d at 710. Of course, it is possible for a company to make false statements without scienter, meaning "a cascade of innocent mistakes, or acts of subordinate employees, either or both resulting in a series of false statements." *Id.* But it is also possible that there was "scienter at the corporate level at which the statements were approved," meaning someone sufficiently high in the corporate hierarchy acted with knowledge or recklessness when the company made false statements. *Id.* (acknowledging "[t]here would be a strong inference of corporate scienter" when a company makes "an announcement

---

[14] The Complaint also alleges that Defendant Singer sold 11,450 Company shares on inside information, for a gain of approximately $44,444. ¶¶ 29, 252. Defendant Singer has not sold stock since then. Those sales allow an inference of motive to inflate RTI's stock price during the relevant period. *See Pugh*, 521 F.3d at 695 (recognizing that "unusual or suspicious" stock sales may provide circumstantial evidence of motive and scienter); *Takara Tr. v. Molex  Inc.*, 429 F. Supp. 2d 960, 981 (N.D. Ill. 2006) (finding that suspiciously timed stock sales "help establish a strong inference of scienter"). Moreover, the fact that a defendant maintains a large percentage of his or her holdings does not undermine the relevance of a suspicious stock sale. *See Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS (SHx), 2008 WL 2676364, at *15 (C.D. Cal. July 1, 2008) (finding that even a defendant's sale of a small percentage of holdings would still be suspect based on timing just "months before" company's negative announcement).

[that] would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false").

Applying this standard, Plaintiff has adequately pled corporate scienter for RTI. During the Class Period, RTI misstated over three years of financial metrics, repeatedly misrepresented that it had adequate internal controls, and mischaracterized the OEM Business's performance. It admitted to shipping orders early in violation of its revenue recognition policy, and former employees confirmed that practice. RTI further admitted that:

> ***The tone from executive management*** was insufficient to create the proper environment for effective internal control over financial reporting and to ensure that: (i) there were adequate processes for oversight; (ii) there was accountability for the performance of internal control over financial reporting responsibilities; (iii) personnel with key positions had the appropriate training to carry out their responsibilities; and (iv) corrective activities were appropriately applied, prioritized, and implemented in a timely manner.

¶ 229. And RTI's Audit Committee found the practice of premature revenue recognition persisted throughout the periods in which the Individual Defendants served. ¶¶ 225-26.

Innocent mistakes and acts of subordinate employees may explain a misstated metric across a quarter or two but not a multitude of misstatements across fifteen quarters (1Q16 – 3Q19). At the pleading stage, the inference of corporate scienter—*i.e.*, that RTI's corporate management acted at least recklessly—is at least as compelling as the opposing inference posited by Defendants.[15]

## V.     CONCLUSION

For the reasons above, Plaintiff respectfully requests that the Court deny the motions. If the Court does grant the motions, Plaintiff respectfully requests leave to amend.

---

[15] Defendants' challenges to control person liability under Section 20(a) rely solely on the arguments as to primary liability under Section 10(b) and, therefore, fail for the same reasons identified herein. *See* RTI Mot. at 25; Hutchison Mot. at 15; Jordheim Mot. at 15; and Louw Mot. at 15 n.5.

Dated: December 4, 2020                    Respectfully submitted,


                                           **POMERANTZ LLP**

                                           /s/ *Louis C. Ludwig*
                                           Patrick V. Dahlstrom
                                           Louis C. Ludwig
                                           10 South LaSalle St., Ste. 3505
                                           Chicago, IL 60603
                                           312.377.1181
                                           pdahlmstrom@pomlaw.com
                                           lcludwig@pomlaw.com

                                           Jeremy A. Lieberman
                                           J. Alexander Hood II
                                           600 Third Avenue, 20th Floor
                                           New York, NY 10016
                                           212.661.1100
                                           jalieberman@pomlaw.com
                                           ahood@pomlaw.com

                                           Velvel (Devin) Freedman
                                           Kyle W. Roche
                                           Ivy T. Ngo
                                           Constantine P. Economides
                                           **ROCHE CYRULNIK FREEDMAN LLP**
                                           200 South Biscayne Blvd, Ste. 5500
                                           Miami, FL 33131
                                           305.851.5997
                                           vfreedman@rcfllp.com
                                           kyle@rcfllp.com
                                           ingo@rcfllp.com
                                           ceconomides@rcfllp.com

                                           *Co-Lead and Proposed Class Counsel*

                                           Brian Schall*
                                           brian@schallfirm.com
                                           **THE SCHALL LAW FIRM**
                                           1880 Century Park East, Ste. 404
                                           Los Angeles, CA 90067
                                           424.303.1964

                                           *Additional Counsel for Lead Plaintiff*