**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| PATRICIA LOWRY, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | No.: 20-cv-01939 Honorable Matthew F. Kennelly |
| RTI SURGICAL HOLDINGS, INC., CAMILLE I. FARHAT, BRIAN K. HUTCHISON, JONATHON M. SINGER, ROBERT P. JORDHEIM, and JOHANNES W. LOUW, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**RTI DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF**
**THEIR MOTION TO DISMISS THE AMENDED COMPLAINT**

**HOLLAND & KNIGHT LLP**
Martin G. Durkin
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606

Louise McAlpin
Stephen Warren
Allison Kernisky
701 Brickell Avenue, Suite 3300
Miami, Florida 33131

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    PLAINTIFF'S NEW FRAUD THEORY IS NONSENSICAL.......................................1

III.   PLAINTIFF FAILS TO SHOW A STRONG INFERENCE OF SCIENTER ................3

    A.    The High Scienter Pleading Standard is Not Met By Allegations About The Scope and Magnitude of The Restatement ........................................................................3

    B.    Unreliable CW Allegations Fail to Demonstrate Scienter ...........................................5

    C.    Core Operations Allegations are Insufficient to Demonstrate Scienter .......................7

    D.    Plaintiff's Motive Allegations Fail to Demonstrate a Strong Inference of Scienter ..........................................................................................................................11

    E.    "Must Have Known" Allegations Regarding Unnamed Management Do Not Establish Corporate Scienter......................................................................................13

CONCLUSION..................................................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) ................................................................................3, 4, 11

*Alaska Elec. Pension Fund v. Asar*,
768 F. App'x 175, 182 (5th Cir. 2019) ....................................................................................11

*In re Allied Products Corp., Inc. Sec. Litig.*,
2000 WL 1721042 (N.D. Ill. Nov. 15, 2000) ...........................................................................3

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010)......................................................................................3

*In re Bally Total Fitness Sec. Litig.*,
2007 WL 551574 (N.D. Ill. Feb. 20, 2007) ..............................................................................6

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008)............................................................................12

*Brasher v. Broadwind Energy, Inc.*,
2012 WL 1357699 (N.D. Ill. Apr. 19, 2012) ..........................................................................14

*City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
711 F.3d 754, 759 (7th Cir. 2013) .............................................................................................5

*City of New Orleans Emps.' Ret. Sys. v. PrivateBankcorp, Inc.*,
2011 WL 5374095 (N.D. Ill. Nov. 3, 2011) ............................................................................14

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*,
2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ..............................................................................5

*Crowell v. Ionics, Inc.*,
343 F. Supp. 2d 1 (D. Mass. 2004) ............................................................................................3

*Davis v. SPSS, Inc.*,
431 F. Supp. 2d 823 (N.D. Ill. 2006) .........................................................................................6

*Desai v. Gen. Growth Properties, Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009) .........................................................................................8

*In re Diamond Foods, Inc., Sec. Litig.*,
2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) ..........................................................................4

*In re Hansen Natural Corp. Sec. Litig.*,
   527 F. Supp. 2d 1142 (C.D. Cal. 2007) ...................................................................................4

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007) .............................................................................................5, 8

*Jones v. Corus Bankshares, Inc.*,
   701 F. Supp. 2d 1014 (N.D. Ill. 2010) ................................................................................8

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ...........................................................................................13, 14

*Mulligan v. Impax Laboratories, Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) .................................................................................6

*In re OCA, Inc. Sec. & Derivative Litig.*,
   2006 WL 3747560 (E.D. La. Dec. 14, 2006).....................................................................11

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
   895 F.3d 933 (7th Cir. 2018) ......................................................................................8, 9, 10

*Pugh v. Tribune Co.*,
   521 F.3d 686 (7th Cir. 2008) .................................................................................5, 11, 13, 14

*In re Ramp Networks, Inc. Sec.*,
   201 F. Supp. 2d 1051 (N.D. Cal. 2002) .............................................................................5

*Rehm v. Eagle Fin. Corp.*,
   954 F. Supp. 1246 (N.D. Ill. 1997) ....................................................................................3

*Rossy v. Merge Healthcare Inc.*,
   169 F. Supp. 3d 774 (N.D. Ill. 2015) ..............................................................................5, 6

*Roth v. OfficeMax, Inc.*,
   527 F. Supp. 2d 791 (N.D. Ill. 2007) ..............................................................................7, 10

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)..................................................................................................6

*In re Silicon Storage Tech., Inc.*,
   2006 WL 648683 (N.D. Cal. Mar. 10, 2006).....................................................................6

*In re Silver Wheaton Corp. Sec. Litig.*,
   2019 WL 1512269 (C.D. Cal. Mar. 25, 2019)...................................................................4

*Stocke v. Shuffle Master Inc.*,
   615 F. Supp. 2d 1180 (D. Nev. 2009)...............................................................................11

iii

*Takara Tr. v. Molex Inc.*,
429 F. Supp. 2d 960 (N.D. Ill. 2006) ......................................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...............................................................................................12

*Van Noppen v. InnerWorkings, Inc.*,
136 F. Supp. 3d 922 (N.D. Ill. 2015) .......................................................................5

**Statutes**

Private Securities Litigation Reform Act.........................................................................7

**Other Authorities**

SEC Div. of Enforcement Annual Report 2019, at p.7 (sec.gov/files/enforcement-
annual-report-2019.pdf) .........................................................................................14

## I. INTRODUCTION

Neither Plaintiff's initial theory plead in the AC,[1] nor the new one raised in the Omnibus Opposition to Motions to Dismiss ("Opposition"), supports a plausible theory of securities fraud by the RTI Defendants.[2] In both instances Plaintiff has not come forward with particularized facts to give rise to the statutorily-required strong inference of scienter — that is, a strong inference that the Defendants knew during the Class Period, or were aware of but ignored red flags that presented a substantial risk, that a small percentage of RTI's revenues were improperly recognized or that the Company's internal controls were deficient. Instead, Plaintiff's theories are based on improper fraud-by-hindsight allegations that the Defendants must have known about the revenue recognition or internal control issues because they were later acknowledged in RTI's Restatement. The federal securities laws require more than such "must have known" allegations to state a claim a claim for securities fraud. Therefore, the AC should be dismissed as a matter of law.

## II. PLAINTIFF'S NEW FRAUD THEORY IS NONSENSICAL

In the AC, Plaintiff theorized that RTI had, during the Class Period, engaged in a multi-year scheme of "revenue smoothing" by shipping products early to OEM customers. Plaintiff also theorized that RTI's leadership, including the Individual Defendants, had orchestrated and participated in this scheme in order to "hit quarterly revenue targets."[3] However, the AC lacks facts to support that theory. As explained in Defendants' Motion to Dismiss ("Motion" or "Mot."),

---

[1] All defined terms have the same definitions as set forth in the RTI Defendants' Motion to Dismiss the Amended Complaint and Incorporated Memorandum of Law. ECF No. 60.

[2] The RTI Defendants are RTI Surgical Holdings, Inc., Camille I. Farhat, and Jonathon M. Singer.

[3] *See, e.g.*, AC ¶ 4 ("At the heart of RTI's revenue recognition manipulation was the practice of 'revenue smoothing,' through which the Company regularly shipped products to customers early so that management could hit quarterly revenue targets. 'Revenue smoothing' included fraudulent conduct on the part of RTI leadership – including the Individual Defendants – that ranged from prodding account managers to ask customers to accept early shipments for purchase orders to ordering shipments to go out early without the customer's permission.").

the AC fails to specify, among other things, what the revenue targets were, who set them, what was to be gained by hitting them, who authorized the early shipments, or how much revenue was generated early as a result. Mot. at 10.

Perhaps recognizing these shortcomings, Plaintiff has adopted an entirely new theory in the Opposition. Now Plaintiff contends that following "erratic revenue declines" in the OEM business in 2016, RTI's management hatched a plan in 2017 to allay investors' fears by emphasizing that the OEM revenues were stabilizing (and that the Individual Defendants would later portray 2017 as a "turning point for stabilization and growth"). Opp. at 3, 9. According to Plaintiff, this plan "paid off" in January 2020 when RTI announced an agreement to sell the OEM business for $490 million. *Id.* at 6. Plaintiff contends the turnaround story was a mirage because the stabilization and growth that the OEM business experienced in 2017-19 was the result of fraudulently altering the timing of OEM orders. *Id.* at 8.

Whereas Plaintiff's original theory lacked factual support, the new fraud theory lacks both factual support and logic. Plaintiff repeatedly emphasizes that RTI's Restatement covered five fiscal years (2014-18) and the proposed Class Period begins in March 2016, yet Plaintiff's new theory is that RTI's management began accelerating shipments in 2017 in an attempt to stabilize and grow revenues in the OEM business. That is a temporal disconnect. Moreover, there is no basis to suggest that RTI's management knew in 2017 that the stabilization scheme would pay off in a sale of the OEM business three years later. As set forth in RTI's SEC filings, it was not until April 2019 that a financial advisor first suggested to RTI's management that it might want to consider separating the Spine and OEM businesses. *See* RTI Proxy Statement (filed June 8, 2020) at 34 (attached as Ex. 12). Consequently, Plaintiff's new theory is illogical.

## III. PLAINTIFF FAILS TO SHOW A STRONG INFERENCE OF SCIENTER

### A. The High Scienter Pleading Standard is Not Met By Allegations About The Scope and Magnitude of The Restatement

Without any facts to show that the Individual Defendants had actual knowledge that RTI shipped products to OEM customers in advance of requested delivery dates without the customers' approval, Plaintiff asserts in the Opposition that circumstantial evidence—namely, RTI's Restatement—supports a strong inference of scienter. Plaintiff does not contest, however, that standing alone, a financial restatement and GAAP violations do not support a strong inference of scienter. Instead, Plaintiff argues that the magnitude of RTI's Restatement supports a strong inference of scienter. Opp. at 25. The cases cited in the Opposition tell a different story.

Plaintiff cites numerous cases for the proposition that the magnitude of a restatement can contribute to a finding of scienter. *Id.* at 25-26. But those authorities are factually distinguishable because they involved substantial reductions in revenue or income combined with other allegations to support a strong inference of scienter; allegations not present in the AC.[4] Here, by comparison, the accelerated shipments on which the AC is premised had very little impact on RTI's annual revenues, as the chart below demonstrates.

---

[4] *See In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) (alleging assurances that financial results were accurate despite years of auditor opinions of ineffective internal controls and remarking that revenue had been inflated by 8.4% and net income had been inflated by 194.7%); *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 721 (W.D. Tex. 2010) (allegations that company engaged in multiple practices including double-billing, split invoices, false physician claims, in addition to restatement reduction of revenue in various years between 1% and 12.4% and net income between 12.6% and 98.9%); *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 18 (D. Mass. 2004) (allegedly shifting losses from corporate books to a subsidiary to reduce tax liabilities, falsification of tax documents, failure to record and properly account for costs and expenses related to cost overruns, false explanation of reason for restatement combined with restatement's "downward revision of income for the first two quarters of that year from a total of $4,000,000 to a total of $2,700,000"); *In re Allied Products Corp., Inc. Sec. Litig.*, 2000 WL 1721042, at *5 (N.D. Ill. Nov. 15, 2000) (allegations that company's 1998 deferred recognition of $5.3 million in costs using accounting method prohibited since 1981 had inflated annual income by 26%); *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1255-56 (N.D. Ill. 1997) (allegations of 300% understatement of known credit losses and remarking that company "had to record a massive year-end increase of $5 million in credit loss reserves and slash its reported yearly earnings from $3.530 million to $325,000").

3

| Year | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| Revenue (original) | $282.3M | $272.9M | $279.6M | $280.9M |
| Revenue (restated) | $283.1M | $276M | $280.3M | $280.4M |
| Effect and Percentage | Increase of $0.8M (0.3%) | Increase of $3.1M (1.1%) | Increase of $0.7M (0.2%) | Decrease of $0.5M (0.1%) |

Thus, the Restatement impact on RTI's revenue varied between 0.1% and 1.1%, which is quantitatively immaterial. Equally important, the Restatement reduced revenue in some years and increased it in others, which is not indicative of a fraudulent scheme by RTI's senior management. *Cf. In re Akorn*, 240 F. Supp. 3d at 820 ("Akorn's accounting violations had the near-uniform effect of *increasing* its reported revenue and net income, . . . unlike what one might expect from a random series of innocent mistakes.").[5]

In the Opposition, Plaintiff contends that the RTI Defendants argued in the Motion that "the Company's annual audits conclusively negate scienter." Opp. at 29. That is incorrect. The Motion stated that the issuance of clean audits by Deloitte, year after year, casts substantial doubt on Plaintiff's assertion that "the issues were so obvious that the Individual Defendants must have known about them during the Class Period." Mot. at 21. In fact, the cases Plaintiff cites in her Opposition recognize that, while clean audit opinions do not automatically foreclose a finding of scienter, they can support a finding that the defendants did not have scienter.[6] Here, the unqualified

---

[5] Plaintiff attempts to demonstrate "magnitude" by pointing to the restatement of the first three quarters of fiscal year 2019, which "erased tens of millions of dollars of goodwill, and reflected a net loss of $211 million." Opp. at 28. However, the 2019 restatement was primarily focused on the acquisition of Paradigm Spine, LLC in March 2019, and how the company allocated goodwill arising from that transaction. *See* Ex. 5 at 121. The Paradigm accounting errors were identified "apart from the Investigation," did not involve revenue, and have no relevance to Plaintiff's claims, which are based on accelerated shipments in the OEM business. *See id.* at 138. In any event, the revenue for the first three quarters of 2019 *increased* by $139,000 (or 0.6%) as a result of the Restatement. *See id.* at 151.

[6] *See In re Silver Wheaton Corp. Sec. Litig.*, 2019 WL 1512269, at *10 (C.D. Cal. Mar. 25, 2019) (noting that "courts have found the opinions of independent auditors to be 'highly probative of an absence of scienter'") (quoting *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1157-58 (C.D. Cal. 2007)); *In re Diamond Foods, Inc., Sec. Litig.*, 2012 WL 6000923, at *8 (N.D. Cal. Nov. 30, 2012) (noting

audit opinions from Deloitte are consistent with the immaterial revenue impact and support a finding that Defendants did not act with scienter.

### B. Unreliable CW Allegations Fail to Demonstrate Scienter

The Motion demonstrated that the CW allegations were insufficient to plead an alleged revenue smoothing practice at RTI, much less that any Individual Defendant was intentionally or recklessly involved in any such practice. Mot. at 10-13. In response, Plaintiff contends there is no basis for discounting the CWs' accounts because the AC alleges the CWs' "job title[s], period[s] of employment, and job responsibilities," and the CWs' accounts purportedly "bolster" other scienter allegations against the Individual Defendants.[7] Opp. at 30. She is wrong.

Where, as here, the CWs' employment information, as well as their own accounts, show that they were *not* in a position to, and *did not*, have first-hand knowledge of the statements attributed to them,[8] their accounts are unreliable and cannot support an inference of scienter.[9] The

---

that "[a] clean audit opinion may possibly support the conclusion that defendants did not act with scienter"); *In re Ramp Networks, Inc. Sec.*, 201 F. Supp. 2d 1051, 1074 n.6 (N.D. Cal. 2002) (remarking that cases cited in defendants' motion "support the conclusion that a clean audit may be considered in determining whether there is scienter").

[7] Like the AC, the Opposition impermissibly lumps the Individual Defendants together in contravention of Plaintiff's obligation to plead "a strong inference of scienter with respect to each individual defendant." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (recognizing rejection of group pleading doctrine).

[8] Plaintiff's authority (Opp. at 30-31) does not impugn the first-hand knowledge requirement. *See Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 935 (N.D. Ill. 2015) (concluding "where particular allegations lack a sufficient foundation, they will be discounted on an allegation-by-allegation basis"); *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *17 (N.D. Ill. Feb. 13, 2013) (noting court would consider allegations from "sufficiently described" confidential sources and "discount them as appropriate").

[9] Plaintiff attempts to sow doubt over the Seventh Circuit's decisions expressing significant skepticism of confidential witness allegations (Opp. at 33-34), which generally "require a heavy discount." *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756–57 (7th Cir. 2007). But contrary to Plaintiff's assertion (Opp. at 33), *Boeing*'s language was not case-specific, and *Tellabs* did not impose a limit on *Higginbotham*'s application, a fact borne out by courts' continued reliance on this precedent when discounting CW allegations. *See, e.g.*, *Rossy v. Merge Healthcare Inc.*, 169 F. Supp. 3d 774, 782-84 (N.D. Ill. 2015) (relying on *Higginbotham* and rejecting confidential witness statements that were "wholly lacking in detail" and failed to "reference any defendant or allege any specific information known to any of them").

CWs, who were either not employed at RTI during the Class Period (FE1 and FE4) or were employed for less than half of it (FE2 and FE3), lack personal knowledge of the Company's affairs during that time to provide any reliable account of them.[10] And the lone CW allegation mentioning an Individual Defendant is based entirely on second-hand information from a former employee who is not alleged to have been employed at RTI during the Class Period. (AC ¶ 86).[11]

Even assuming, for the sake of argument, that the CWs' statements were reliable and based on personal knowledge (which they are not), they nevertheless fail to support a strong inference of scienter because they "reveal nothing about any defendant's knowledge or state of mind."[12] Tellingly, most of the CWs' allegations are innocuous statements about the CWs' employment history (AC ¶¶ 67, 72, 75-77, 89), or entirely proper requests by RTI to its customers for permission to ship products early (AC ¶¶ 68, 70, 73-74, 78-80), that are unrelated to any Individual Defendant and add nothing to the scienter scale. Moreover, none of the CWs allegedly had any first-hand

---

[10] Plaintiff's argument that CWs who were not employed at RTI during the Class Period can provide relevant information about the state of affairs of the Company during the time of the Restatement is misplaced. Opp. at 32-33. The Second Circuit's *Scholastic* decision, cited by Plaintiff, did not deal with former employee statements, but rather pre-Class Period sales data, which the Court determined was relevant "to establish at the start of the class period, defendants had a basis for knowing" increased sales of their flagship line of books "were unlikely in the third quarter due to marked decreased sales experienced in the second quarter." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). Plaintiff's reliance on *Mulligan v. Impax Laboratories, Inc.*, 36 F. Supp. 3d 942 (N.D. Cal. 2014) to support this argument is also disingenuous. Unlike Plaintiff's CWs, the CWs in *Mulligan* were employed at the company *during* the Class Period and could provide relevant information regarding the company's pervasive manufacturing and quality control deficiencies. *Id.* at 953-56. One critical distinction here is that the CWs' pre-Class Period testimony lacks the requisite personal knowledge to provide insight into the knowledge of later-employed Defendants or events that occurred during the Class Period. In addition, Messrs. Farhat and Singer were not even employed at RTI until 2017 after most of the CWs left their employment. *See, e.g.*, *In re Silicon Storage Tech., Inc.*, 2006 WL 648683, at *11 (N.D. Cal. Mar. 10, 2006) (rejecting "largely irrelevant statements by informants who were not present at the [company] at the time of the alleged misrepresentations" as a basis for scienter because there was no connection between pre-Class Period facts and defendants' alleged scienter).

[11] *See In re Bally Total Fitness Sec. Litig.*, 2007 WL 551574, at *7 (N.D. Ill. Feb. 20, 2007) (concluding plaintiff's second-hand allegations are "unreliable and an insufficient basis for an inference of scienter"); *Davis v. SPSS, Inc.*, 431 F. Supp. 2d 823, 831 (N.D. Ill. 2006) ("*Davis* II") (same).

[12] *Rossy*, 169 F. Supp. 3d at 782; *In re Bally*, 2007 WL 551574, at *8 (concluding allegations of confidential witness who had never interacted with individual defendant were insufficient to establish scienter).

interaction with any Individual Defendant, so it necessarily follows that they cannot provide credible information regarding those Defendants' state of mind.[13] The same is true for Plaintiff's claim that the CWs' accounts document weak internal controls and accounting irregularities at RTI that are corroborated by the Restatement. Opp. at 31-32. Such accounts say nothing about the Individual Defendants' supposed knowledge of, or involvement in, the early recognition of revenue at the time of the Challenged Statements and amount to "fraud-by-hindsight" allegations that cannot form the basis for a securities fraud claim.[14]

### C.      Core Operations Allegations are Insufficient to Demonstrate Scienter

Plaintiff's "core operation doctrine" allegations also fall short of establishing a strong inference of scienter. Plaintiff erroneously contends that RTI's OEM business, which generated approximately 40% of the Company's revenue during the Class Period, "accounted for the largest portion of the Company's overall revenue" and as a result the Court should impute knowledge of the Company's early revenue recognition issues to the Individual Defendants. Opp. at 34.

As explained in the Motion and the Company's SEC filings (which are incorporated by reference into the AC), it was RTI's Direct business, not the OEM business, that was RTI's largest source of the company's revenue, accounting for approximately 60% of its revenue during the Class Period. Mot. at 18; Ex. 1 at 43. That RTI chose to report operating results for its Direct business in more detail by providing a breakdown of the specific revenue for each Direct business

---

[13] Plaintiff's conclusory assertion that "numerous high-ranking and otherwise notable employees" (none of whom are identified as any of the Individual Defendants), "knew of the premature shipments" also falls short of establishing scienter on the part of the Individual Defendants. Opp. at 31. By failing to expressly identify the Individual Defendants, Plaintiff's theory rests on impermissible "must have known" allegations, which are "not a particularized basis for inferring scienter" under the PSLRA. *See Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 798–99 (N.D. Ill. 2007).

[14] *See, e.g.*, *Roth*, 527 F. Supp. 2d at 797 ("[M]ere allegations of . . . the restatement of income, or statements regarding the internal controls of a company that are later proven to be false[] are not sufficient to demonstrate that those who made the statements committed securities fraud.").

sub-segment, does not change that fact. Plaintiff cites no case in which a court applied the core operations doctrine to impute knowledge to those who, like the Individual Defendants, made statements about a non-core division generating less than half of the company's revenues.

Even assuming *arguendo* that the core operations doctrine applies, it would not, as Plaintiff claims, cure the AC's scienter pleading defects. The doctrine is intended to impute knowledge of information that is so central to a company that it would be "almost inconceivable" for an officer not to have known about the matter at issue.[15] In an apparent attempt to satisfy this standard, Plaintiff suggests that the Individual Defendants' alleged knowledge of "shipping and revenue recognition practices for the OEM Business" and their repeated references to "the timing of customer orders" demonstrates the improbability that they were unaware of the revenue recognition issues during the Class Period. Opp. at 35.

But Plaintiff's theory suffers from a fatal flaw. There is an important distinction between: i) knowing about customary OEM business practices, the variability of orders in that division, and revenue figures reported up the chain; and ii) knowing (or being reckless in not knowing) that those revenue figures were inaccurate because a small number of orders were being shipped early, without customer approval, in violation of the Company's revenue recognition practices. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758 (7th Cir. 2007) (affirming dismissal of securities action against Baxter and its executives founded on restatement of financials triggered by fraud at foreign subsidiary because "there is a big difference between knowing about the reports

---

[15] *See Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1029 (N.D. Ill. 2010) (strong inference of scienter possible "where it is almost inconceivable" that officer would be "unaware of the matters at issue"); *Desai v. Gen. Growth Properties, Inc.*, 654 F. Supp. 2d 836, 860 (N.D. Ill. 2009) (same); *but see Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 937 (7th Cir. 2018) (refusing to apply core operations doctrine to impute knowledge to executives of atypical accounting errors that led to multiple restatements).

from Brazil and knowing that the reports are false").[16] With regard to the former category, the Individual Defendants knew that OEM revenue was properly recognized at the time of shipment and that OEM customers sometimes asked RTI to ship products early or agreed to an RTI request to ship early. *See* Ex. 1 at 12. So the mere fact that product was shipped early would not have put the Individual Defendants on notice that the reported revenue was inaccurate. To sufficiently plead facts demonstrating the intentional or reckless behavior comprising the latter category, Plaintiff would have to allege facts showing that the Individual Defendants knew (or were recklessly blind to the fact) that OEM products were, on occasion, shipped early *without customer approval*, when those shipments accounted for between 0.1% and 1.1% of the Company's annual revenues. It is no surprise that the AC is devoid of any such allegations because not even RTI's auditors, who are trained to ferret out accounting issues, uncovered the revenue recognition timing issues.

The case of *Pension Trust Fund for Operating Engineers v. Kohl's Corp.*, 895 F.3d 933 (7th Cir. 2018) further demonstrates the scienter pleading deficiencies in the AC and why this Court should not apply the core operations doctrine here. In *Kohl's*, the Seventh Circuit expressly refused to impute knowledge of atypical accounting errors to the officer defendants (even where the challenged statements related to a core part of the company's business), because the complaint lacked the necessary "connective tissue" to show why their failure to discover the accounting issues earlier was reckless, rather than simply negligent. *Id.* at 939. In so doing, the Seventh Circuit

---

[16] The two other allegations cited by Plaintiff add nothing to the mix of the Defendants' state of knowledge at the time the Challenged Statements were made. As demonstrated in the Motion and herein at Section III.B, the CW accounts (Opp. at 35) fail altogether to tie the Individual Defendants to the alleged revenue smoothing practice so they provide no insight into whether the Individual Defendants were aware of that purported practice during the Class Period. Nor does the hindsight allegation that "Defendants identified improper early shipments as a primary cause . . . of the . . . Restatement" (Opp. at 35) say anything about the state of Defendants' knowledge at the earlier relevant time when the Challenged Statements were made.

9

rejected the same "simplistic" default application of the core operations doctrine as requested by Plaintiff here, reasoning that:

> We must consider the relative probability of whether, taken as a whole, the false statements alleged here were the result of merely careless mistakes at the management level based on false information fed it from below or reflect an intent to deceive or a reckless indifference to whether the statements were misleading.

*Id.* at 936-37 (internal quotation marks omitted). The court held that allegations: about the restatement of several years of financial statements stemming from accounting errors involving leases, a core part of the company's business; that defendants were employing an aggressive leasehold improvement strategy: and identifying insider stock sales, were insufficient to tip the scales from negligence to recklessness because there was no showing that the defendants had earlier been put on notice of the possibility of accounting issues but blindly disregarded any such red flags. *Id.* at 939 ("[T]he allegations do nothing to show why it was reckless, rather than just negligent, that Kohl's executives did not realize that something was amiss.").

The same result is warranted here. Although RTI restated several years of financial statements and acknowledged that its internal controls had deficiencies, Plaintiff has not alleged facts showing that the Individual Defendants were, during the Class Period, presented with red flags that put them on notice of revenue recognition or internal control issues at RTI, and they ignored those red flags.[17] Given the lack of such necessary factual allegations that could demonstrate recklessness, Plaintiff has failed to meet the high scienter pleading standard via the core operations doctrine or otherwise.[18]

---

[17] *See Roth*, 527 F. Supp. 2d at 799 ("Although an allegation that defendants actually knew about 'red flags' might be sufficient to bolster allegations that those defendants must have known about the fraud or at least recklessly disregarded a risk of fraud, unsupported allegations that defendants 'must have known' about such red flags are insufficient to draw any inference, much less a compelling one, of scienter.").

[18] Rather than support Plaintiff's argument that the Individual Defendants' Sarbanes-Oxley certifications should be factored into the scienter analysis, the cases cited by her demonstrate the opposite. *See* Opp. at

### D. Plaintiff's Motive Allegations Fail to Demonstrate a Strong Inference of Scienter

In the Motion, the RTI Defendants demonstrated that Plaintiff's motive theory premised on alleged stock "sales" by Mr. Singer was not indicative of scienter because, among other things: Plaintiff had failed to demonstrate that the two challenged "sales" by Mr. Singer (representing only two percent of Mr. Singer's total RTI holdings) were unusual or suspicious; the sales in question were used to pay tax obligations arising from the vesting of stock grants to Mr. Singer; courts routinely hold that such transactions do not support scienter; there is no allegation that any of the four other Individual Defendants sold a single RTI share during the Class Period; and the Individual Defendants collectively increased their RTI holdings by 37% during that time. Mot. at 14-16. The Opposition, like the AC, fails to mention, much less address, the publicly reported fact that the challenged transactions by Mr. Singer were triggered by the vesting of his stock awards and the resulting tax obligation for those awarded shares. Nor does Plaintiff mention or distinguish the cases cited in the Motion which hold that "[s]elling shares to pay taxes weighs against a nefarious motive." *See Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 182 (5th Cir. 2019); *see also* Mot. at 16, n.33.[19]

---

36. In each of those cases, the courts found the certifications added to a scienter showing because the defendants had been on notice of prior internal control deficiencies that had not been remediated, but knowingly or recklessly certified that the companies' internal controls were adequate. *See In re Akorn, Inc.*, 240 F. Supp. 3d at 820 (finding that defendants, who were on notice of internal control deficiencies from prior auditing firms but failed to remediate the deficiencies, acted recklessly in certifying company's internal controls); *Stocke v. Shuffle Master Inc.*, 615 F. Supp. 2d 1180, 1191 (D. Nev. 2009) (officers "acted with reckless disregard" in failing to rectify prior "internal deficiencies" and making SOX certifications); *In re OCA, Inc. Sec. & Derivative Litig.*, 2006 WL 3747560, at *22 (E.D. La. Dec. 14, 2006) (holding defendants' actions were probative of scienter where they "certified that controls were effective, while at the same time failing to disclose serious, unremedied internal control problems"). That is not the case here. Plaintiff has not plead any fact suggesting that during the Class Period the Individual Defendants knew about, but ignored, any pre-existing internal control problem at RTI. As a result, the Sarbanes-Oxley certifications fail to assist Plaintiff in satisfying the stringent scienter pleading standard.

[19] Instead of addressing the relevant issue here of whether stock sales made for tax purposes are indicative of motive, the three cases cited in the Opposition (Opp. at 39, n.14), *Pugh v. Tribune Co.*, 521 F.3d 686,

11

Instead, Plaintiff claims "that a showing of motive is unnecessary to plead scienter" and because the AC includes allegations of recklessness, "Defendants cannot rely on" record facts undermining any purported motive, including the Defendants' "increase[] in collective RTI holdings during the Class Period." Opp. at 37-38. However, although motive is not necessary to plead scienter, where, as here, a motive is alleged, the Court may properly consider record facts, such as the increase in the Individual Defendants' RTI stock holdings and the lack of sales by the other named Defendants during the Class Period, which demonstrate a competing non-culpable inference.[20] *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) ("[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences.").

Moreover, Plaintiff's latest motive theory, first advanced in the Opposition (Opp. at 38), is as baseless and implausible as her original one. According to Plaintiff, the Defendants were motivated to falsely portray consistent and stable growth so they could inflate RTI's stock price and ultimately sell the OEM Business. But there are no well-plead facts in the AC to support this new motive. If, as Plaintiff claims, there was some calculated scheme among the Defendants to prop up the OEM Business's metrics to later sell it, there would likely be evidence of same. But there is none. The AC includes no witness account, email, or any other source documenting a purported sell-off scheme. In fact, the record evidence shows that a sale of the OEM Business was

---

695 (7th Cir. 2008), *Takara Tr. v. Molex Inc.*, 429 F. Supp. 2d 960, 981 (N.D. Ill. 2006), and *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *15 (C.D. Cal. July 1, 2008), stand for the unremarkable proposition that stock sales that are shown to be suspicious may provide some circumstantial evidence of motive.

[20] Plaintiff also contends that "it is unclear what trading plans existed" and, therefore, the Court should not consider the Individual Defendants' increase in collective RTI holdings and their lack of sales during the Class Period. Opp. at 38. This is a red herring. The issue here is the *lack* of sales by the Individual Defendants during the Class Period, not the *timing*. Consequently, the possible existence of an RTI trading plan, which would have restricted the Individual Defendants to selling or purchasing RTI stock during certain "trading windows," has no bearing here.

12

not even contemplated until April 2019, years after Plaintiff claims the purported sell-off plan was hatched and long after two of the Individual Defendants had already left RTI. *See* Ex. 12 at 34.

Nor does the AC allege why the Individual Defendants were purportedly motivated to intentionally alter the financial results of the OEM Business in order to sell it. As explained above and in the Motion, except for Mr. Singer's two stock transactions to satisfy his tax obligations, the AC includes no allegation that any of the Individual Defendants sold any of their stock holdings during the Class Period while the stock price was supposedly artificially inflated. Nor does the AC allege any other purported financial benefit to any of the Individual Defendants from the OEM sale. Thus, the lack of well-plead facts substantiating the purported motive, including the lack of any articulated personal benefit to the Individual Defendants for pursuing the alleged sell-off scheme, demonstrates the implausibility of this latest motive theory.

**E.     "Must Have Known" Allegations Regarding Unnamed Management Do Not Establish Corporate Scienter**

Plaintiff claims she can plead corporate scienter without demonstrating that any Individual Defendant acted with scienter. Plaintiff contends that, due to the "multitude of misstatements" that led to the Restatement and the admissions therein, some unnamed member of RTI's management must have been involved in or known about the allegedly fraudulent revenue smoothing scheme. Opp. at 39-40. This argument is legally untenable.

The Seventh Circuit has rejected the concept of collective corporate scienter and instead requires district courts to focus on "the state of mind of the individual corporate official or officials who make or issue the statement . . ." when determining whether corporate scienter has been sufficiently plead.[21] Courts routinely reject allegations of corporate scienter unless the complaint

---

[21] *Makor Issues & Rights, Ltd. v. Tellabs Inc*., 513 F.3d 702, 707-08 (7th Cir. 2008) (quotation omitted); *see also Pugh*, 521 F.3d at 697 (same).

adequately alleges scienter by either a named individual defendant or a corporate officer who made, or was responsible for, the challenged statements.[22] The Court should do the same here because the AC not only includes insufficient scienter allegations against the Individual Defendants, but also fails to identify any other corporate officer who made, or was responsible for, the Challenged Statements and who supposedly knew, or acted reckless to the fact, they were false.

Plaintiff attempts to sidestep this dispositive authority by invoking a rare exception where, in certain extraordinary circumstances, "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud."[23] No such circumstances involving a dramatic announcement by RTI of obvious lies causing massive losses are adequately alleged to provide a basis for any inference of corporate scienter.[24] Thus, the Section 10(b) claim against RTI fails as a matter of law.[25]

---

[22] *Pugh*, 521 F.3d at 697 (concluding no corporate scienter where "the complaint fails to plead facts sufficient to support a strong inference of scienter on the part of any of the [company's] individual defendants"); *City of New Orleans Emps.' Ret. Sys. v. PrivateBankcorp, Inc*., 2011 WL 5374095, at *9 (N.D. Ill. Nov. 3, 2011) (granting dismissal where plaintiff failed to successfully plead scienter "with respect to any officer defendant and [] failed to identify anyone else who allegedly made false statements with scienter").

[23] *Tellabs*, 513 F.3d at 710. In *Tellabs*, the Seventh Circuit provided a hypothetical example of the extreme circumstances that could give rise to a strong inference of scienter where the alleged misstatement was an announcement "so dramatic" about company sales that it "would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Id.* (noting there would be a strong inference of corporate scienter if "General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero"). The sole case on which Plaintiff relies is illustrative of the type of dramatic announcement required to invoke this rare exception. *See Brasher v. Broadwind Energy, Inc*., 2012 WL 1357699, at *23 (N.D. Ill. Apr. 19, 2012) (concluding scienter adequately plead as to corporate defendant where company's announcement of $82.2 million impairment charge write-down, which represented 63% of company's goodwill and intangible balances, was the sort of loss that "do[es] not fall out of the sky").

[24] Contrary to Plaintiff's insinuation (Opp. at 36), nothing untoward should be read from the fact that the SEC investigation of RTI, which began in July 2019, is still ongoing. As disclosed in the SEC's annual report, the average SEC investigation lasts just under two years. *See* SEC Div. of Enforcement Annual Report 2019, at p.7 (sec.gov/files/enforcement-annual-report-2019.pdf).

[25] Because the AC fails to sufficiently plead a primary Section 10(b) claim against any of the Defendants, the secondary control person claim under Section 20(a) must also be dismissed. *See Pugh,* 521 F.3d at 693.

## CONCLUSION

For the reasons set forth herein and in the Motion, Defendants RTI and Messrs. Farhat and Singer respectfully request that the Court enter an order dismissing the AC in its entirety.

Dated: January 4, 2021

Respectfully Submitted,

By: */s/* Martin G. Durkin
**HOLLAND & KNIGHT LLP**
Martin G. Durkin
martin.durkin@hklaw.com
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
T: 312.263.3600
F: 312.578.6666

Louise McAlpin*
louise.mcalpin@hklaw.com
Stephen P. Warren*
stephen.warren@hklaw.com
Allison Kernisky*
allison.kernisky@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
T: 305.374.8500
F: 305.789.7799

* Admitted *pro hac vice*

*Counsel for Defendant RTI Surgical Holdings, Inc., Camille I. Farhat, and Jonathon M. Singer*

15

**CERTIFICATE OF SERVICE**

I hereby certify that on January 4, 2021, I electronically filed the foregoing document using the ECF System for the United States District Court for the Northern District of Illinois. Notice of this filing will be sent by operation of the Court's electronic filing system to all counsel of record in this matter registered on the ECF system.

*/s/ Martin G. Durkin*
Martin G. Durkin

#81062213_v6