**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| PATRICIA LOWRY, individually and on behalf of all others similarly situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>RTI SURGICAL HOLDINGS, INC., CAMILLE I. FARHAT, BRIAN K. HUTCHISON, JONATHON M. SINGER, ROBERT P. JORDHEIM, and JOHANNES W. LOUW, )<br><br>Defendants. ) | No.: 20-cv-01939<br>Honorable Matthew F. Kennelly |

## NOTICE OF FILING SUPPLEMENTAL AUTHORITY

Pursuant to the Court's Order dated January 25, 2021 (ECF 75), Defendants file the Opinion and Order issued by District Judge Sara L. Ellis on January 12, 2021 in *In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457 (N.D. Ill. Jan. 12, 2021) in support of their respective motions to dismiss (ECF 59, 61, 62, 65). In dismissing federal securities claims similar to those alleged in this action, Judge Ellis addressed (and rejected) many of the same scienter arguments that Plaintiff has made here, including, among others, those regarding core operations, magnitude of the restatement, internal controls certifications, complexity of GAAP principles, meeting financial expectations, employee resignations and corporate scienter.

Dated: January 26, 2021

By: */s/* Martin G. Durkin
**HOLLAND & KNIGHT LLP**
Martin G. Durkin
martin.durkin@hklaw.com
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
T: 312.263.3600

Respectfully Submitted,

By: */s/James K. Goldfarb*
**MURPHY & MCGONIGLE PC**
James K. Goldfarb*
james.goldfarb@mmlawus.com
Stephen J. Crimmins
Stephen.Crimmins@mmlawus.com
1185 Avenue of the Americas, Floor 21

1

F: 312.578.6666

Louise McAlpin*
louise.mcalpin@hklaw.com
Stephen P. Warren*
stephen.warren@hklaw.com
Allison Kernisky*
allison.kernisky@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
T: 305.374.8500
F: 305.789.7799


*Admitted *pro hace vice*

*Counsel for Defendant RTI Surgical Holdings, Inc., Camille I. Farhat, and Jonathon M. Singer*

By: */s/Deborah Meshulam*
**DLA PIPER LLP (US)**
Deborah Meshulam*
deborah.meshulam@dlapiper.com
500 8th Street NW
Washington, DC 20004
T: (202) 799-4511



Keara M. Gordon*
keara.gordon@dlapiper.com
1251 Avenue of the Americas, 27th Floor
New York, NY 10020-1104
T: (212) 335-4632


Yan Grinblat
yan.grinblat@dlapiper.com
444 W Lake Street, Suite 900
Chicago, IL 60606
T: (312) 368-2183

*Admitted *pro hace vice*

*Counsel for Defendant Robert P. Jordheim*

New York, NY 10036
T: (212) 880-3999


By: */s/Alan M. Wolper*
**ULMER & BERNE, LLP**
Alan M Wolper
awolper@ulmer.com
500 W Madison Street, Suite 3600
Chicago, IL 60661-4587
T: (312) 658-6500


*Admitted *pro hace vice*

*Counsel for Defendant Brian K. Hutchison*


By: */s/ Russell Koonin*
HOMER BONNER JACOBS ORTIZ
Russell Koonin*
Adam Schwartz*
1200 Four Seasons Tower
1441 Brickell Avenue
Miami Florida 33131
T: 305.350.5100
E: rkoonin@homerbonner.com
E: aschwartz@homerbonner.com
* Admitted pro hac vice
-and-
Jayaram Law, Inc.
125 S. Clark Street
Suite 1175
Chicago Illinois 60603
Phone: 312-212-8676
Fax: 312-661-5910

Vivek Jayaram, Esq.
IL Bar No. 6284388
vivek@jayaramlaw.com
and
Elizabeth Austermuehle, Esq.
IL Bar No. 6302326
liz@jayaramlaw.com

*Counsel for Defendant Johannes W. Louw*

2

2021 WL 100457
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

IN RE BAXTER INTERNATIONAL INC. SECURITIES LITIGATION

No. 19 C 7786
|
Signed 01/12/2021

## OPINION AND ORDER

SARA L. ELLIS, United States District Judge

**\*1** An individual shareholder brought this putative securities class action lawsuit on behalf of himself and all others who purchased or acquired common stock in Baxter International Inc. ("Baxter") from February 21, 2019 through October 23, 2019 (the "Class Period"), alleging that Baxter and certain of its officers engaged in federal securities fraud. After the Court appointed putative class members Varma Mutual Pension Insurance Company ("Varma") and Louisiana Municipal Police Employees' Retirement System ("LAMPERS") as Lead Plaintiffs, they filed an amended complaint, in which they allege that Defendants Baxter, José Almeida, and James Saccaro violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), codified at 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.[1]

Defendants move to dismiss the amended complaint [39]. They also move to have the Court consider exhibits they attach to their motion to dismiss based on the incorporation-by-reference doctrine or judicial notice [42]. Lead Plaintiffs do not oppose Defendants' request for consideration of their exhibits, and the Court may take judicial notice of or otherwise consider these exhibits in deciding Defendants' motion to dismiss, so the Court grants Defendants' motion to consider their exhibits [42]. And because Lead Plaintiffs have failed to allege facts that give rise to a strong inference of scienter on the part

of any Defendant, the Court grants Defendants' motion to dismiss [39]. The Court's dismissal, however, is without prejudice.

## BACKGROUND[2]

### I. The Parties
**\*2** The Court appointed Varma and LAMPERS as Lead Plaintiffs in this litigation on January 29, 2020. Varma is based in Finland and "manages the pension savings for approximately 900,000 Finns." Doc. 34 ¶ 22.[3] "LAMPERS is a statewide retirement system that provides retirement, disability, and survivor benefits to full-time police officers in Louisiana and their families." *Id.* ¶ 21. During the Class Period, Varma and LAMPERS last purchased Baxter stock on September 17, 2019 and October 23, 2019, respectively.

Baxter is a Delaware corporation that maintains its principal executive offices in Deerfield, Illinois. It develops, manufactures, and sells a variety of renal and hospital products. Although Baxter is a U.S.-based company, it has substantial global operations and derives significant revenues from outside the United States. Baxter manufactures products in more than twenty countries and has operations in Europe, the Middle East, Africa, Asia, Latin America, and Canada. Baxter also sells its products in more than 100 countries. From 2017 through 2019, Baxter generated more than $33 billion in total sales, with just shy of $19 billion of those sales (57.5 percent) coming from outside the United States. Baxter's common stock trades on the New York Stock Exchange.

Almeida joined Baxter as an executive officer in October 2015 and has served as Baxter's Chairman, President, and Chief Executive Officer ("CEO") since January 2016. Saccaro served as Baxter's Corporate Vice President and Chief Financial Officer ("CFO") during the Class Period and as Baxter's Corporate Vice President and Treasurer from 2011 to 2013.

### II. Baxter's Accounting for Foreign Transactions

Because Baxter generates most of its revenues outside the United States, a large portion of its assets and liabilities are initially denominated in foreign currencies. But Baxter reports its financial figures in U.S. dollars. Therefore, Baxter must periodically convert the value of a sale, purchase, or other financial transaction carried out using foreign currency to U.S. currency by using foreign currency exchange ("FX") rates.

Foreign currency conversion is "a critical and routine function for [Baxter], to both fund its operations and to manage currency risk." Doc. 34 ¶ 5. Baxter's central corporate management "was responsible for accounting for and reporting financial results concerning Baxter's transactions in foreign currencies." *Id.* ¶ 31. In particular, Baxter's senior financial executives, including Saccaro and Baxter's Treasurer during the Class Period, Scott Bohaboy, oversaw Baxter's various foreign currency conversion functions. Moreover, Saccaro was personally responsible for Baxter's foreign currency conversion and accounting practices when he served as Baxter's Treasurer from 2011 through 2013.

FX rates fluctuate, and the FX rate on the day a foreign transaction takes place might differ significantly from the FX rate on the day a company reports the foreign transaction. Generally Accepted Accounting Principles ("GAAP") provide a framework for addressing this issue. Under GAAP, a company should initially assess the value of the foreign transaction using the FX rate as of the date the transaction takes place and then reassess the value of the foreign transaction at the end of the reporting period (when the figures are recorded) using the FX rate at that time. *Id.* ¶ 43 (citing Accounting Standards Codifications ("ASC") 830-20-30, 830-20-35). The company should then report any gain or loss based on the difference between the initial value and the reassessed value as part of its net income. *Id.* (citing ASC 830-20-35).

**\*3** Baxter's process for converting the value of foreign transactions into their reporting currencies (the "FX Convention") did not adhere to this framework. For its initial assessment, Baxter did not use the FX rate on the date a foreign transaction took place; it initially assessed the value of all foreign transactions in a particular month using an FX rate from a specified date near the middle of the previous month. Then, instead of reassessing the value of a foreign transaction at the end of the reporting period based on the FX rate at that time, Baxter reassessed the value of foreign transactions at the end of each month using FX rates from a specified date near the middle of the current month. In short, the FX Convention used non-current foreign exchange rates for both the initial assessment and the subsequent reassessment. The upshot

was that individuals were able to undertake foreign transactions after the related exchange rates were already known, and, as Baxter would discover and disclose, individuals used this ability to undertake transactions to improperly generate non-operating FX gains or avoid FX losses.[4]

Baxter reported any gains or losses based on the fluctuation in FX rates as non-operating income or expenses that comprised one component of the "Other (Income) Expense, net" line item of its financial statements. *Id.* ¶ 83; Doc. 41-3 at 62.[5] The "Other (Income) Expense, net" line item, in turn, was one component that Baxter subtracted from its operating income to arrive at net income. *See, e.g.*, Doc. 41-3 at 48. Thus, gains based on the change in FX rates for foreign transactions increased Baxter's net income, and losses decreased Baxter's net income. From 2014 through the first half of 2019, Baxter consistently reported net foreign exchange gains based on FX rate fluctuations: $8 million in 2014, $113 million in 2015, $28 million in 2016, $50 million in 2017, $73 million in 2018, and $22 million for the first half of 2019.

Leading up to the Class Period, Defendants touted Baxter's "foreign exchange gains as a driver of Baxter's future performance." Doc. 34 ¶ 57. For example, during an April 2016 earnings call with analysts, Saccaro represented that Baxter's first-quarter results for 2016, which compared favorably to its expectations, were driven by "a lower negative impact from foreign exchange," and on the same call, Almeida "specifically tied favorability from foreign exchange versus previous guidance to reported quarterly adjusted earnings of $0.36 per diluted share, exceeding [Baxter's] guidance range by between 20% and 32%." *Id.* ¶¶ 58–59. During an October 2017 earnings call with investors, Saccaro "stressed that [Baxter's] top line growth exceeded our expectations, driven in substantial part by a favorable foreign exchange benefit." *Id.* ¶ 62. And during an earnings call to discuss Baxter's fourth-quarter 2017 results, "Saccaro highlighted that adjusted earnings increased 12% to $0.64 per diluted share, which exceeded [Baxter's] previous guidance of $0.56 to $0.59 per share driven by...a modest benefit from foreign exchange gains on balance sheet positions." *Id.*

### III. Defendants' Allegedly False and Misleading Statements

Lead Plaintiffs allege that from January 2019 through July 2019, Defendants made a series of false and misleading statements or omissions regarding Baxter's income and

other key financial metrics related to FX rate fluctuations, its compliance with GAAP, and the adequacy and effectiveness of its internal controls over financial reporting.

### A. Baxter's 2018 10-K and Related Statements

**\*4** On January 31, 2019, Baxter issued an earnings press release in which it reported adjusted earnings-per-share ("EPS") of $3.05 for 2018.[6] After the stock market closed on the first day of the Class Period, February 21, 2019, Baxter filed its 10-K annual report for 2018 (the "2018 10-K"), which Almeida and Saccaro signed. Baxter's 2018 10-K reported the following financial figures:

• For 2018, "$73 million of income related to foreign currency fluctuations"; for 2017, $50 million of income from foreign currency fluctuations; and for 2016, $28 million of income from foreign currency fluctuations;

• "Other (income) expense, net" was $139 million of income in 2018, $19 million of expense in 2017, and $4.275 billion of income in 2016;

• "$14.2 billion and $14.483 billion retained earnings to begin the fiscal years of 2017 and 2018, respectively"; and

• GAAP EPS of $2.99 for 2018, $1.30 for 2017, and $9.01 for 2016. Doc. 34 ¶¶ 132–34. Lead Plaintiffs further allege that Defendants represented in the 2018 10-K that "Baxter prepar[ed]...the financial statements in conformity with generally accepted accounting principles (GAAP)" and that Baxter's

outside auditor had concluded that the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2018 in conformity with accounting principles generally accepted in the United States of America.

*Id.* ¶¶ 149–50. Finally, the 2018 10-K contained the following statements "with respect to Baxter's internal control over financial reporting":

**Evaluation of Disclosure Controls and Procedures**

Baxter carried out an evaluation, under the supervision and with the participation of its Disclosure Committee and management, including the Chief Executive Officer and Chief Financial Officer, of the effectiveness of Baxter's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1394 [sic], as amended (the Exchange Act)) as of December 31, 2018. Baxter's disclosure controls and procedures are designed to ensure that information required to be disclosed by Baxter in the reports it files or submits under the Exchange Act is recorded, processed, summarized and reported on a timely basis and that such information is communicated to management, including the Chief Executive Officer, Chief Financial Officer and its Board of Directors, to allow timely decisions regarding required disclosure.

*Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the company's disclosure controls and procedures were effective as of December 31, 2018.*

**Management's Assessment of Internal Control Over Financial Reporting**

**\*5** Management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. The company's internal control over financial reporting is a process designed under the supervision of the principal executive and financial officers, and effected by the Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America.

Management performed an assessment of the effectiveness of the company's internal control over financial reporting as of December 31, 2018. In making this assessment, management used the framework in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. *Based on that assessment under the framework in Internal Control-Integrated Framework (2013), management concluded that the*

*company's internal control over financial reporting was effective as of December 31, 2018.*

The effectiveness of the company's internal control over financial reporting as of December 31, 2018 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein.

*Id.* ¶ 156 (emphases in amended complaint).

### B. Baxter's 2019 First Quarter

On April 25, 2019, Baxter held an "earnings call with analysts discussing the financial results of the first quarter of 2019." *Id.* ¶ 139. During the call, Saccaro stated that "adjusted other income totaled $25 million in the quarter driven by pension benefits and a gain on an equity investment as well as foreign exchange gains on balance sheet positions." *Id.* On May 8, 2019, Baxter filed its 10-Q quarterly report for the first quarter of 2019 (the "2019 Q1 10-Q"), which Almeida and Saccaro signed. The 2019 Q1 10-Q reported that "foreign exchange gains, net" was $5 million for the first quarter of 2019 and that

> [o]ther income, net was $25 million and $18 million in the first quarters of 2019 and 2018, respectively. The increase was primarily due to a benefit in the current-year period from fair value adjustments in marketable equity securities, an impairment of an investment in the prior-year period, and higher pension benefits in the current-year period. Partially offsetting the benefits were lower foreign exchange gains in the current-year period.

*Id.* ¶ 138.

### C. Baxter's May 2019 Annual Shareholders' Meeting

On May 7, 2019, Baxter held its annual shareholders'

meeting. At the meeting, a shareholder asked Almeida and Saccaro "whether shareholders could rely on Baxter's reporting of its financial condition through the use of both GAAP financial metrics and non-GAAP metrics, i.e., metrics that deviate from the reported GAAP metrics." *Id.* ¶ 151. Almeida responded by assuring "the shareholder about the accuracy and reliability of Baxter's GAAP and non-GAAP financial metrics" and representing "that Defendants followed 'specific rules' when reporting those metrics" and "Baxter's financial reporting complied with GAAP":

> I'd like to correct you. Our auditors who are sitting beside you there, they audit our books, which are -- and we represent GAAP and non-GAAP. There's specific rules that allow you to exclude some numbers from your GAAP number, but both of them are available to you. We're reporting both of them. As a matter of fact, we would not have gotten the most transparent company in S&P 500, if we did not provide the investors with significant amount of information about the numbers."

**\*6** *Id.* Saccaro then added: "Joe. You are exactly right. We have a very rigorous practice by which we assess what adjustments are made to GAAP numbers." *Id.* ¶ 152.

### D. Baxter's 2019 Second Quarter

On July 25, 2019, Baxter held an "earnings call with analysts discussing the financial results of the second quarter of 2019." *Id.* ¶ 143. During the call, Saccaro stated that "other income totaled $28 million in the quarter driven by pension benefits and foreign exchange gains on balance sheet positions." *Id.* On July 30, 2019, Baxter filed its 10-Q quarterly report for the second quarter of 2019 (the "2019 Q2 10-Q"), which Almeida and Saccaro signed. The 2019 Q2 10-Q reported that "foreign exchange gains, net" were $17 million for the second quarter of 2019 and that

> [o]ther income, net was $28 million

and $53 million in the second quarter and first half of 2019, respectively, and $31 million and $49 million in the second quarter and first half of 2018, respectively. The decrease in the second quarter of 2019 compared to the prior year was primarily due to fair value declines in marketable equity securities in the current year. The increase in the first half of 2019 compared to the prior year was primarily due to the impairment of an investment in the prior-year period and higher pension benefits in the current-year period, partially offset by lower foreign exchange gains in the current-year period.

*Id.* ¶ 142.

**E. Almeida's and Saccaro's Certifications**

In Baxter's 2018 10-K, 2019 1Q 10-Q, and 2019 2Q 10-Q, Almeida and Saccaro both signed certain certifications that federal law requires. Almeida and Saccaro made the first certification at issue pursuant to Rules 13a-14(a) and 15d-14(a) and § 302 of the Sarbanes-Oxley Act ("SOX") (the "Section 302 Certifications").[7] In their Section 302 Certifications, Almeida and Saccaro certified that:

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d[-]15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) *Designed such internal control over financial reporting, or caused such internal control over*

*financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;*

(c) *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and*

**\*7** (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*; and

(b) *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.*

*Id.* ¶¶ 157–58 (emphases in amended complaint).

Almeida and Saccaro made the second certification at issue pursuant to 18 U.S.C. § 1350 and § 906 of SOX (the "Section 906 Certifications"). For these certifications, Almeida and Saccaro certified that:

(1) The Company's Annual Report on Form 10-K for the year ended December 31, 2018 [or, for the 2019 Q1 and Q2 10-Q, those reports] as filed with the Securities and Exchange Commission on the date hereof (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

*Id.* ¶¶ 159–60.

### IV. Baxter's Internal Investigation and Restatement

On October 24, 2019 (the day after the end of the Class Period), Baxter announced in a press release issued before the market opened that it had recently begun investigating certain intra-company transactions that had been undertaken to generate foreign exchange gains or losses (the "Transactions"). These Transactions "used a foreign exchange rate convention historically applied by" Baxter—the FX Convention—that "was not in accordance with generally accepted accounting principles" and that enabled the Transactions "to be undertaken after the related exchange rates were already known." *Id.* ¶ 82. The Transactions, Baxter continued, "resulted in certain misstatements in [its] previously reported non-operating income related to net foreign exchange gains." *Id.* Baxter indicated that its investigation would cover at least 2014 through the first half of 2019 and that upon completion of the investigation and its evaluation of the materiality of the misstatements, Baxter expected to restate its financial statements. Baxter also stated that it would "consider the extent to which these matters impact the effectiveness of its internal control over financial reporting," and the press release quoted Almeida as saying that Baxter was "taking steps to strengthen and enhance its internal controls." Doc. 41-6 at 7. The day of the press release, Baxter's stock price closed at $79.08 per share, down from $87.95 per share the previous day.

**\*8** Shortly before issuing its October 24 press release, Baxter terminated Scott Bohaboy, its Treasurer since 2015, "unexpectedly and without explanation." Doc. 34 ¶ 114. As Treasurer, Bohaboy "was the Baxter executive personally responsible for ensuring the accurate measurement and translation of foreign currency denominated assets and liabilities into U.S. dollars." *Id.* Shortly after issuing the October 24 press release, Baxter announced that it hired another individual to serve as Treasurer and, among other things, assist Baxter with its ongoing evaluation of internal controls.

On February 13, 2020, Baxter announced its belief that its internal investigation into the Transactions, "as it pertains to the evaluation of related financial statement impacts,"

was "substantially complete." *Id.* ¶¶ 87–88; Doc. 41-7 at 3. In characterizing its FX Convention and the transactions at issue, Baxter explained:

[Baxter] previously had applied a longstanding convention for the initial measurement of foreign exchange transactions and the subsequent remeasurement of foreign currency denominated monetary assets and liabilities that was not consistent with U.S.

Generally Accepted Accounting Principles ("U.S. GAAP"). Beginning years after the adoption of that convention, certain intra-Company transactions were undertaken, after the related exchange rates were already known, solely for the purpose of generating non-operating foreign exchange gains or avoiding foreign exchange losses.

Doc. 34 ¶ 87. Baxter went on to report that its previously misstated foreign exchange gains and losses rendered unreliable its consolidated financial statements for 2016, 2017, 2018, and the first two quarters of 2019. Baxter provided preliminary, unaudited statements of the misstated non-operating foreign exchange gains and losses, noting that the misstatements were not limited to the intra-company transactions that had been undertaken to solely generate gains or avoid losses, i.e., the Transactions. Baxter also explained that the cumulative impact of correcting its misstatements regarding non-operating foreign exchange gains and losses would reduce its opening retained earnings. Finally, Baxter disclosed that in light of the misstatements, it had "determined that one or more material weaknesses in [Baxter's] internal control over financial reporting existed, including a material weakness related to foreign exchange gains and losses," which rendered Baxter's disclosure controls and procedures ineffective as of the end of 2018, the end of the first quarter in 2019, and the end of the second quarter in 2019. *Id.* ¶ 90.

On March 17, 2020, Baxter filed its 10-K for 2019 ("2019 10-K"). In its 2019 10-K, Baxter announced that its internal investigation, "as it pertains to the evaluation of related financial statement impacts," was complete. Doc. 41-4 at 5. Among other things, Baxter reiterated that its "longstanding" FX Convention "was not consistent with" U.S. GAAP, and it expressed its belief that the use of the FX Convention to generate non-operating foreign exchange gains and avoid losses had been going on for at least ten years. *Id.*

Baxter also admitted that it had not "maintain[ed] effective controls over the accounting for certain exchange gains and losses." Doc. 34 ¶ 97. Specifically,

Baxter "did not have controls in place to monitor and quantify the difference between the foreign exchange gains and losses that [it] reported and the foreign exchange gains and losses that [it] would have reported using exchange rates determined in accordance with U.S. GAAP." *Id.* Nor were Baxter's "policies and controls related to approvals and monitoring of intracompany transactions" sufficient "to prevent or detect intra-company transactions undertaken solely for the purpose of generating foreign exchange gains or avoiding losses under [Baxter's] historical exchange rate convention." *Id.* Baxter announced measures to remedy this material weakness. Among other things, Baxter confirmed that it was discontinuing its use of the FX Convention and would instead use FX rates as prescribed by GAAP; it updated "its policy to require additional approvals of intra-company transactions"; and it implemented "a requirement that such transactions be supported by a documented business purpose." *Id.* ¶ 98. In addition, Baxter hired a new treasurer, created two new roles to address treasury governance and controls, and continued to add resources to improve its "financial reporting controls related to treasury activities." *Id.* ¶ 99.

**\*9** The material weakness in its internal controls also resulted in Baxter restating its consolidated financial statements and other financial data for certain time periods (the "Restatement").[8] Baxter's Restatement showed that with respect to its gains or losses related to FX rate fluctuations, Baxter had overreported $96 million for 2017, $64 million for 2018, $5 million for the first quarter of 2019, and $26 million for the second quarter of 2019—for a total of $191 million over the two-and-a-half year period. As for Baxter's net "other (income) expense" line item (of which Baxter's FX gains and losses were a part), Baxter's net income, and Baxter's retained earnings, the original and restated figures for 2017, 2018, and the first two quarters of 2019 were as follows (all amounts are in millions of U.S. dollars):

| | Net other (income) expense[9] | | Net Income | | Retained Earnings | |
| --- | --- | --- | --- | --- | --- | --- |
| | Originally Reported | Restated | Originally Reported | Restated | Originally Reported | Restated |
| 2017 | 19 | 133 | 717 | 602 | 14,483 | 14,014 |
| 2018 | (139) | (78) | 1,624 | 1,546 | 15,626 | 15,075 |
| Q1 2019 | (25) | (21) | 347 | 342 | 15,970 | 15,414 |
| Q2 2019 | (28) | 4 | 343 | 313 | 16,184 | 15,598 |

*Id.* ¶ 78. Baxter's restated financial figures also revealed that it would have experienced lower adjusted EPS in 2016, 2017, and 2018, and would not have met its own guidance and consensus estimates for adjusted EPS in 2017 and 2018, had it properly reported its FX gains and losses:

| | Company Guidance | Consensus Estimates | Original Adjusted EPS | Restated Adjusted EPS |
| --- | --- | --- | --- | --- |
| 2016 | ~ $1.90 | $1.91 | $1.96 | $1.91 |
| 2017 | ~ $2.42 | $2.43 | $2.48 | $2.28 |
| 2018 | ~ $2.99 | $3.00 | $3.05 | $2.90 |

*Id.* ¶ 69. In sum, Baxter's Restatement showed that in at least 2017 and 2018, it had overstated its foreign exchange gains, which led to an overstatement of its non-operating income, which led to an overstatement of its net income—"the 'bottom line' "—which led to overstating Baxter's reported retained earnings and EPS. *See id.* ¶ 95.

## V. Almeida's and Saccaro's Compensation

From 2017 through 2019, Almeida received approximately $18.7 million in Baxter stock and $15.2 million in Baxter stock options under Baxter's "Long Term Incentive Program" and approximately $7.2 million in cash bonuses under Baxter's "Annual Incentive Program." *Id.* ¶¶ 122–23. Over the same time frame, Saccaro received approximately $9.2 million in stock, $3.8 million in stock options, and $2.5 million in cash bonuses under the same programs. This compensation was based, at least in part, on financial metrics that were artificially inflated by Baxter's use of the FX Convention to manufacture FX gains and avoid losses. After the Restatement, however, Baxter recouped $1.1 million from Almeida's 2019 cash bonus and just over $500,000 from Saccaro's 2019 cash bonus to conform their bonuses paid for 2015 through 2018 to the performance Baxter actually achieved. Baxter further reduced Saccaro's 2019 cash bonus by nearly $165,000 to account for the Restatement and the material weakness in Baxter's internal controls over financial reporting. As a result of these reductions, Saccaro received no cash bonus for 2019.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor.

*Kubiak*, 810 F.3d at 480–81. To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

**\*10** Securities fraud claims must also satisfy Rule 9(b)'s particularity requirement, which requires a party to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019); *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614–15 (7th Cir. 2011). "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted).

Congress further heightened the pleading standards for securities fraud claims when it enacted the Private Securities Litigation Reform Act ("PSLRA") "[a]s a check against abusive litigation by private parties" in securities fraud suits. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* ("*Tellabs II*"), 551 U.S. 308, 313 (2007).[10] The PSLRA requires "complaints alleging securities fraud [to] 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Cornielsen*, 916 F.3d at 598–99 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). The PSLRA also requires "[a]ny complaint alleging a material misstatement or omission [to] 'specify each statement alleged to have been misleading' and the 'reason or reasons why the statement is misleading.' " *Id.* at 599 (quoting 15 U.S.C. § 78u-4(b)(1)). On motion by a defendant, the Court must dismiss a complaint that does not meet these requirements. 15 U.S.C. § 78u-4(b)(3)(A).

## ANALYSIS

Lead Plaintiffs' amended complaint sets forth two claims. First, Lead Plaintiffs allege that all Defendants—Baxter, Almeida, and Saccaro—have violated § 10(b) of the Exchange Act and SEC Rule 10b-5 by engaging in misconduct that artificially inflated the price of Baxter's common stock and maintained the artificially inflated prices, caused Lead Plaintiffs and other class members to purchase the stock at artificially inflated prices, and then concealed Baxter's true condition from the investing public (the "§ 10(b) claim"). Second, Lead Plaintiffs seek to hold Almeida and Saccaro individually liable under § 20(a) of the Exchange Act as "controlling persons" of Baxter (the "§ 20(a) claim"). Defendants move to dismiss both claims.

### I. Section 10(b) Claim (Count I)

Section 10(b) of the Exchange Act and SEC Rule 10b-5 "prohibit fraudulent or misleading statements of material fact in connection with the purchase or sale of a security." *Walleye Trading LLC v. AbbVie Inc.*, 962 F.3d 975, 977 (7th Cir. 2020). Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security...[of] any manipulative or deceptive device or contrivance in contravention of" the SEC's rules and regulations. 15 U.S.C. § 78j(b). Relevant here, Rule 10b-5 implements § 10(b) by making it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading...in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b).

To state a claim under § 10(b) and Rule 10b-5(b), a plaintiff must allege that "(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages." *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 896 (N.D. Ill. 2020) (citations omitted). Defendants' motion addresses the first element (falsity) with respect to some of the statements challenged by Lead Plaintiffs, and the third element (scienter) with respect to all the challenged statements. Because Defendants' scienter argument is dispositive, the Court only addresses that argument.

**\*11** The scienter element refers to the defendant's required state of mind. *Cornielsen*, 916 F.3d at 601. For Lead Plaintiffs' § 10(b) claim, "that state of mind is 'an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false.' " *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018) (quoting *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007)). Courts define "recklessness" in this context as "an extreme departure from the standards of ordinary care...to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 756 (7th Cir. 2013) (citations omitted). As a practical matter, though, this definition only requires knowledge of the danger or risk because the latter part of the definition ("danger...so obvious that the defendant must have been aware of it") infers knowledge from the gravity of the risk. *Makor Issues & Rights, Ltd. v. Tellabs Inc.* ("*Tellabs III*"), 513 F.3d 702, 704 (7th Cir. 2008). "Alleging that a defendant *should have known* about fraud is not enough to show that the defendant was reckless." *In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.* ("*CBOE*"), 435 F. Supp. 3d 845, 861 (N.D. Ill. 2020) (emphasis added).

The PSLRA requires a plaintiff to "satisfy a heightened standard of plausibility" in pleading scienter. *Kohl's*, 895 F.3d at 936. The plaintiff must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind" for "each act or omission alleged to violate this chapter." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). To meet this "strong inference" standard, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs II*, 551 U.S. at 314. In determining whether a complaint has met this standard, the Court must account for "plausible, nonculpable explanations for the defendant's conduct" and weigh them against the strength of the inferences in favor of scienter. *Id.* at 323–24; *Pugh*, 521 F.3d at 693. In the end, the Court must determine whether all the facts set forth in the amended complaint and other sources that it may consider on a motion to dismiss, accepted as true and taken collectively, "give rise to a strong inference of scienter." *Tellabs II*, 551 U.S. at 322–23, 326.

Lead Plaintiffs allege that Defendants made false or misleading statements between January 2019 and July 2019 that fall into three categories. First, Defendants inaccurately reported Baxter's income and other key financial metrics related to FX rate fluctuations. Second, Defendants misrepresented that Baxter's financial

statements complied with GAAP. Third, Defendants misrepresented that Baxter's internal controls over financial reporting were adequate and effective. Lead Plaintiffs further allege that the factual allegations in their amended complaint give rise to a strong inference that

> throughout the Class Period, Defendants knew or recklessly disregarded that Baxter used a convention for measuring and re-measuring foreign currency denominated assets and liabilities that did not comply with GAAP, and exploited the aforementioned GAAP violation by executing intra-company transactions after the FX rates were already known solely for the purpose of generating foreign exchange gains or avoiding foreign exchange losses.

Doc. 34 ¶ 104. Essentially, Lead Plaintiffs contend that Defendants knew or recklessly disregarded two items of information: first, that Baxter's FX Convention did not comply with GAAP; and second, that individuals at Baxter were using the FX Convention to execute foreign transactions solely for the purpose of generating FX gains or avoiding FX losses. Knowledge or reckless disregard of either of these items presumably also demonstrated knowledge or reckless disregard of the inadequacy and ineffectiveness of Baxter's internal controls.

**\*12** Lead Plaintiffs must allege facts showing that Defendants "had the requisite scienter at the time that they made each allegedly fraudulent statement." *In re NeoPharm, Inc. Sec. Litig.*, No. 02 C 2976, 2007 WL 625533, at \*6 (N.D. Ill. Feb. 23, 2007); *Smyth v. China Agritech, Inc.,* No. CV 13-03008-RGK (PJWx), 2013 WL 12145047, at \*3 (C.D. Cal. Sept. 26, 2013) ("The scienter analysis focuses on the state of mind of defendants at the time the false statements were made."). Moreover, because Lead Plaintiffs contend that Baxter, Almeida, and Saccaro all violated § 10(b), they must plead a strong inference of scienter with respect to *each* Defendant. *See Cornielsen*, 916 F.3d at 601–02; *Pugh*, 521 F.3d at 692–95, 697–98 (where the plaintiffs alleged that both a corporate defendant and its executive officers violated § 10(b), addressing separately whether the plaintiffs had adequately pleaded scienter for the individual officers and the corporate defendant).

The Court first considers whether Lead Plaintiffs have sufficiently pleaded Almeida's and Saccaro's scienter. Then, the Court addresses whether Lead Plaintiffs have sufficiently pleaded Baxter's scienter.

### A. Almeida and Saccaro

In opposing Defendants' motion to dismiss, Lead Plaintiffs make several arguments as to why their amended complaint sufficiently alleges Almeida's and Saccaro's scienter.[11] The Court addresses each argument separately, although not necessarily in the order presented by Lead Plaintiffs, and then considers the arguments and their accompanying allegations collectively. *See Tellabs II*, 551 U.S. at 322–23; *Kohl's*, 895 F.3d at 939–40 (addressing scienter allegations "one at a time" but recognizing the "need to look at the allegations as a whole").

### 1. Familiarity with Treasury's Operations

First, Lead Plaintiffs argue that "Almeida and Saccaro had obvious 'deep connections to and an intimate familiarity with [Treasury's] operations' and the topics at issue." Doc. 43 at 18 (citation omitted). In particular, Lead Plaintiffs contend that "Baxter's admitted accounting scheme to inflate its profits was centered at its headquarters in Chicago, where its Treasury was primarily responsible for the misconduct implicated in this case"; Bohaboy, Baxter's Treasurer during the Class Period, reported to Almeida and Saccaro; and Saccaro previously served as Treasurer from 2011 to 2013. *Id.*

These arguments are not persuasive. The Court cannot reasonably infer that Almeida and Saccaro were intimately familiar with Treasury's operations (including the FX Convention and the Transactions) simply because they worked in the same corporate headquarters where Treasury is located. Perhaps such an inference would be more sustainable if Baxter were a three-man shop made up of a CEO, CFO, and Treasurer who all worked in the same office. But that is not what Lead Plaintiffs allege, and without similar allegations, it is not reasonable for the Court to impute knowledge of everything that occurs at Baxter's corporate headquarters (or, specifically, in Treasury) to Almeida and Saccaro. Moreover, even if Bohaboy reported to both Almeida and Saccaro, a

corresponding inference of scienter on Almeida's and Saccaro's behalf relies upon two underlying inferences: (1) that Bohaboy knew that Baxter's FX Convention did not comply with GAAP, that individuals were exploiting the FX Convention to carry out the Transactions, or both; and (2) that Bohaboy then reported these issues to Almeida and Saccaro. Even assuming the viability of the first inference, there are no factual allegations to support the second inference—that Bohaboy relayed any issues he knew about or suspected to Almeida and Saccaro. Thus, Bohaboy's service as Baxter's Treasurer and any knowledge he may have obtained in that role has no bearing on *Almeida*'s and *Saccaro*'s scienter. Finally, Saccaro's previous service as Treasurer, without more, does not help demonstrate his scienter because "a pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Arbitrage Event-Driven Fund v. Tribune Media Co.*, No. 18 C 6175, 2020 WL 60186, at *10 (N.D. Ill. Jan. 6, 2020) (citation omitted); *accord Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 673 F. Supp. 2d 718, 747 (S.D. Ind. 2009) ("[R]espective positions within the company prove nothing about fraud or knowledge thereof but rather are exactly the type of generalized allegations the court must disregard under the' PSLRA." (citation omitted)), *aff'd*, 679 F.3d 952 (7th Cir. 2012).[12]

## 2. Existence of GAAP Violations

**\*13** Second, Lead Plaintiffs argue that "[t]he persistent, significant GAAP violations that took place on [Almeida's and Saccaro's] watch...provide powerful circumstantial evidence of their scienter." Doc. 43 at 18–19 (citations omitted) (internal quotation marks omitted). Although GAAP violations "provide some evidence of *scienter*, they fall far short of raising a strong inference of knowing or reckless misrepresentation." *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 715 (N.D. Ill. 2005). Moreover, the mere fact that GAAP violations or other improprieties occurred while Almeida and Saccaro were at the helm does not move the needle with respect to their scienter. Such an argument is simply a different way of asserting that the Court should infer scienter based on Almeida's and Saccaro's executive positions—an assertion that courts have rejected. *See, e.g.*, *Arbitrage Event-Driven Fund*, 2020 WL 60186, at *10 (finding the defendants' positions as CEO and

CFO insufficient to establish scienter); *Zimmer Holdings*, 673 F. Supp. 2d at 724, 746 (rejecting the plaintiff's argument "that knowledge may be inferred from [the CEO's] and [the CFO's] executive positions").

## 3. The "Core Operations" Inference

Third, Lead Plaintiffs contend that Treasury is a "key" area that was "primarily responsible for...Baxter's improper accounting methodologies and currency conversion practices," Doc. 43 at 18–19, and that "the conversion of foreign-currency-denominated assets and liabilities was critical to Baxter's financial performance and reporting," *id.* at 21. These arguments appear to invoke the "core operations" inference, under which "officers of a company can be assumed to know of facts critical to a business's core operations or to an important transaction that would affect a company's performance." *In re Supreme Indus., Inc. Sec. Litig.*, No. 3:17CV143PPS-MGG, 2018 WL 2364931, at *8 (N.D. Ind. May 23, 2018) (citation omitted); *see also Société Générale Sec. Servs., GbmH v. Caterpillar, Inc.*, No. 17 cv 1713, 2018 WL 4616356, at *8 (N.D. Ill. Sept. 26, 2018) (noting that the "core operations" inference appears to be viable in the Seventh Circuit). "Core operations 'include matters critical to the long[-]term viability of the company and events affecting a significant source of income,' " but "[t]he doctrine 'typically applies only where the operation in question constitute[s] nearly all of a company's business.' " *Das v. Rio Tinto plc*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018) (citations omitted). Although the "core operations" inference generally will not establish a strong inference of scienter by itself, it "can be one relevant part of a complaint" supporting that inference. *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784–85 (9th Cir. 2008).

Defendants argue that the "core operations" inference does not apply because "Baxter's 'core operation' is providing renal and hospital products to health providers, not the accounting treatment for certain intra-Company transactions." Doc. 40 at 22. Some courts have drawn a similar distinction where the alleged fraud involved accounting practices. *See, e.g.*, *Reilly v. U.S. Physical Therapy, Inc.*, 17 Civ. 2347 (NRB), 2018 WL 3559089, at *2, *18 (S.D.N.Y. July 23, 2018) (where the alleged fraud concerned the corporate defendant's "accounting practices for its managing therapists' non-controlling [ownership] interests," the defendant's "core operation [was] operating physical therapy clinics, not accounting

for its managing therapists['] non-controlling interests"); *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, No. CV 13-08440 MMM (SHx), 2015 WL 1775221, at *31 (C.D. Cal. Apr. 14, 2015) (where the misrepresentation at issue involved the "allegedly intentional misapplication of accounting principles," noting that "[n]umerous courts have found that accounting and related tax determinations are not part of a company's core operations"). At the same time, in *Kohl's*, where the corporate defendant's leasing obligations constituted a "significant part" of its financial picture (the defendant leased about 65 percent of its more than one thousand stores), the Seventh Circuit suggested that accounting errors involving those leasing obligations might support a "core operations" inference: "Kohl's counters that technical accounting errors [involving leases] are well below the pay grade of its executives. But leases are a significant part of Kohl's financial picture that cannot be expected to evade executive knowledge altogether." *Kohl's*, 895 F.3d at 936–37 (citing *S. Ferry*, 542 F.3d at 784, for the proposition that "a 'core-operations inference' can support" scienter after *Tellabs II*). In light of *Kohl's*, the Court concludes that errors and wrongdoing involving accounting may support a "core operations" inference when they concern a "significant part" of a corporate defendant's financial picture. *Id.*; *see also May v. KushCo Holdings, Inc.*, No. 8:19-cv-00798-JLS-KES, 2020 WL 6587533, at *6 (C.D. Cal. Sept. 25, 2020) ("Accounting errors that prove to have a significant impact on core business operations– *i.e.* cash, revenue, profits, liquidity, or viability of a product, sometimes give rise to a compelling inference of scienter." (citation omitted)).

**\*14** Moreover, Defendants too narrowly define the "operations" at issue as the Transactions and Baxter's accounting for these Transactions. The Court does not understand Lead Plaintiffs to be alleging fraud based only on Baxter's use of the FX Convention to undertake the Transactions, but also based on Baxter's use of the FX Convention *in general*. Because Baxter's FX Convention does not comply with GAAP, its use arguably tainted Baxter's conversion and reporting of any foreign revenue it received for several years, even that revenue that was derived from legitimate foreign transactions. *See S.E.C. v. Sys. Software Assocs., Inc.*, 145 F. Supp. 2d 954, 958 (N.D. Ill. 2001) ("A financial statement that recognizes revenue and does not conform to the requirements of GAAP is presumptively a false or misleading statement of material fact under Rule 10b–5."); 17 C.F.R. § 210.4-01(a)(1) (financial statements that are not GAAP-compliant "will be presumed to be misleading or inaccurate"). And Baxter's foreign revenue comprises a "significant part" of its financial picture—more than 57 percent of its total sales from 2017 through 2019, totaling

almost $19 billion. These facts lend support to Lead Plaintiffs' allegation that foreign currency conversion is a "critical" operation for Baxter. Doc. 34 ¶ 5.

That said, any inference that the Court can draw in these circumstances does not support a strong inference of scienter. Based on the importance of foreign currency conversion to Baxter, the Court can at best infer that Almeida and Saccaro knew that Baxter used a foreign currency conversion convention and that Saccaro—as CFO and a former Treasurer—perhaps knew what that convention entailed. But the Court cannot infer that Almeida and Saccaro also knew that the FX Convention violated GAAP or that there was a risk that this was the case. *See Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, No. 10 C 7031, 2012 WL 1030474, at *10 (N.D. Ill. Mar. 27, 2012) (explaining that "[t]he fact that enrollments were vital to DeVry's business [did] not create a 'strong inference' that the defendants knew whether or how often its recruiters crossed the line" "to meet management's enrollment expectations"); *cf. Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 266 F. Supp. 3d 1154, 1166 (E.D. Wis. 2017) ("[K]nowing an accounting rule and knowing that it is not being followed by your company's accountants are two different things."), *aff'd*, 895 F.3d 933 (7th Cir. 2018). Given that Baxter already had been using the FX Convention for years by the time Saccaro became Baxter's Treasurer (2011) and Almeida joined Baxter in any capacity (2015), it is more likely that Saccaro and Almeida assumed that the existing FX Convention was GAAP-compliant, as a company presumably would not intentionally put itself in a position to issue false or misleading financial statements as a matter of course. *See Sys. Software Assocs.*, 145 F. Supp. 2d at 958; 17 C.F.R. § 210.4-01(a)(1). As for knowledge of the improper Transactions themselves, the Court can only infer from the amended complaint that Almeida and Saccaro knew that Baxter was reporting certain transactions that resulted in FX gains; it cannot infer that Almeida and Saccaro knew or recklessly disregarded that these transactions were bogus. *See Higginbotham*, 495 F.3d at 758 ("[T]here is a big difference between knowing about the reports...and knowing that the reports are false."). In fact, that the Transactions had been occurring for over a decade without being flagged by Baxter's independent auditor or the individuals who preceded Almeida and Saccaro in their executive officer roles undermines the inference that Almeida and Saccaro knew about or recklessly ignored the Transactions. *Cf. Webb v. SolarCity Corp.*, 884 F.3d 844, 857–58 (9th Cir. 2018) (finding that an accounting error was not "immediately obvious" to the defendants where, among other things, it was not discovered for seven consecutive quarters and was only

discovered after consultation with the company's independent auditor).

### 4. Access to "Non-Public and Proprietary Information"

Fourth, Lead Plaintiffs assert that "Almeida and Saccaro controlled Baxter's public statements, approved and reported Baxter's false financial results, and touted the positive impact of FX rate fluctuations on Baxter's financial performance" while having "access to non-public and proprietary information" that contradicted these statements. Doc. 43 at 20 (citation omitted). Based on their review of this information, Lead Plaintiffs continue, Almeida and Saccaro "attested...that Baxter's financial reports and results did, in fact, comply with GAAP" and "even addressed Baxter's accounting methods and compliance in comments to investors." *Id.* Lead Plaintiffs' argument and amended complaint, however, fail to particularly identify *what type* of "non-public and proprietary information" allegedly undermined Almeida's and Saccaro's statements, so their purported access to this information does not help show a strong inference of scienter. *See Cornielsen*, 916 F.3d at 602 ("[A] complaint fails to satisfy the PSLRA's particularity requirements by making conclusory allegations of scienter derived from a defendant's mere access to information."); *Fryman*, 462 F. Supp. 3d at 902 (rejecting the plaintiffs' scienter arguments based on the defendants' alleged access to information that undermined the veracity of their statements because the plaintiffs failed to "state with particularity the information to which [the] [d]efendants had access"); *City of New Orleans Emps.' Ret. Sys. v. PrivateBancorp, Inc.*, No. 10 C 6826, 2011 WL 5374095, at *8 (N.D. Ill. Nov. 3, 2011) ("Vague allegations that defendants had 'access to undisclosed information' have been rejected under the PSLRA.").

### 5. Section 302 Certifications and "Red Flags"

**\*15** Fifth, Lead Plaintiffs assert that "Almeida's and Saccaro's personal involvement in the design and evaluation of Baxter's deficient internal controls" further indicate scienter. Doc. 43 at 22. Lead Plaintiffs point to Almeida's and Saccaro's Section 302 Certifications, where Almeida and Saccaro "certified that they designed (or had designed for them) specific 'disclosure controls and procedures' that 'ensure[d] that material information' impacting financial reporting was 'made known to [them]' by others," *id.* (quoting Doc. 34 ¶ 157), and the fact that Baxter's internal controls, in actuality, "suffered from a material weakness that enabled Defendants' widespread accounting violations to occur and persist," *id.* But Almeida's and Saccaro's Section 302 Certifications "add nothing substantial to the scienter calculus" here. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1003–04 (9th Cir. 2009). Indeed, to allow a Section 302 Certification (or any other certification that SOX requires) "to create an inference of scienter in 'every case where there was an accounting error or auditing mistake made by a publicly traded company' would 'eviscerat[e] the pleading requirements for scienter set forth in the PSLRA.' " *Id.* at 1004 (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006), and citing other appellate court decisions). The Section 302 Certifications, therefore, are only probative of scienter if Lead Plaintiffs allege additional facts showing that, *at the time they made these certifications*, Almeida and Saccaro knew or were reckless in failing to recognize that Baxter's internal controls and procedures were ineffective. *See In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 118 (3d Cir. 2018) ("An allegation that a defendant signed a SOX certification attesting to the accuracy of an SEC filing that turned out to be materially false does not add to the scienter puzzle in the absence of any allegation that the defendant knew he was signing a false SEC filing or recklessly disregarded inaccuracies contained in an SEC filing."); *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248 (8th Cir. 2008) (finding SOX certifications regarding internal controls unpersuasive in the scienter analysis where the plaintiffs did not allege specific facts from which the court could infer that the individuals knew that the company's "internal accounting controls were deficient" when they made the certifications); *Garfield*, 466 F.3d at 1266 (holding "that a Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements").

Here, Lead Plaintiffs have not alleged these requisite facts.[13] Although Lead Plaintiffs point out that Baxter ultimately determined that its internal controls "suffered from a material weakness," Doc. 43 at 22, Baxter first reported this conclusion in February 2020, several months *after* Almeida and Saccaro made their Section 302 Certifications in 2019. And alleging that a company discovered or reported weaknesses in its internal controls

several months after its officers made certifications regarding those controls does "not give rise to a strong inference that the certifications were knowingly false *when made*." *Ceridian*, 542 F.3d at 248 (emphasis added); *see also In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13 Civ. 8846 (LGS), 2014 WL 7176187, at *8 (S.D.N.Y. Dec. 16, 2014) ("[T]he weak accounting controls with regard to revenue recognition are not alleged to have been flagged by the auditors or brought to the attention of Defendants until after the allegedly false and misleading financial statements were issued and in conjunction with the restatement. The accounting controls were an after-the-fact explanation for why the error had occurred, not a red flag before it was discovered."). Lead Plaintiffs' argument is similar to the one the Eighth Circuit rejected in *Ceridian*, where the plaintiffs argued that three corporate officers must have knowingly made false SOX certifications regarding internal controls because the corporate defendant later found substantial accounting deficiencies and admitted the need to improve internal controls and training. 542 F.3d at 245, 248. As the *Ceridian* court explained, in the absence of specific facts giving rise to an inference that the officers knew that the company's "internal accounting controls were deficient" when they made the certifications, "inferences of inadvertent mistake or mere negligence [were] more compelling" than an inference of scienter. *Id.* at 248. Similarly, Baxter's later determination that its internal controls suffered from a material weakness and were ineffective simply suggests, without more, that Almeida and Saccaro were mistaken or negligent when they made their Section 302 Certifications. To infer more without additional factual allegations would be imputing later knowledge of fraud to Almeida's and Saccaro's earlier statements based on nothing more than hindsight, which is impermissible. *See Higginbotham*, 495 F.3d at 759–60.

**\*16** Lead Plaintiffs also attempt to rely upon the purported presence of "red flags" to support their scienter argument. A corporate officer may be severely reckless in making a SOX certification if he "had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Garfield*, 466 F.3d at 1266. More generally, "[d]eliberately ignoring 'red flags' can constitute the sort of recklessness necessary to support § 10(b) liability." *Geinko v. Padda*, No. 00 C 5070, 2001 WL 1163728, at *8 (N.D. Ill. Sept. 28, 2001) (citations omitted). Lead Plaintiffs contend that Defendants' financial manipulations caused Baxter to consistently generate "positive FX gains every quarter

from at least 2017 through the Class Period," which was a "clear red flag" that Defendants either knew of or recklessly disregarded. Doc. 43 at 21 (emphases omitted); *see also id.* at 11 ("Red flags, like unfailing quarter-after-quarter FX gains that defied natural market forces, further put Almeida and Saccaro on notice.").

As an initial matter, the Court does not see any allegations in the amended complaint alleging that Baxter reported positive FX gains *every quarter*, without fail, from 2017 through the Class Period. In any event, while Lead Plaintiffs argue that Baxter's "unvarying, positive [FX] results [are] nearly impossible absent clairvoyance (or fraud)," *id.* at 21, they do not allege any *facts* from which the Court can infer that this is the case. It may not be atypical for a multi-billion-dollar international company like Baxter to report positive FX gains quarter after quarter for a few years. And even if it is out of the ordinary, Lead Plaintiffs do not allege any facts showing "why it was reckless, rather than just negligent, that [Baxter's] executives did not realize that something was amiss." *Kohl's*, 895 F.3d at 939. Without additional factual allegations, the Court cannot say that Baxter's positive FX gains were a "red flag" that Almeida and Saccaro recklessly ignored.

### 6. Motive to Defraud Investors

Sixth, Lead Plaintiffs contend that their allegations regarding Almeida's and Saccaro's cash bonuses, stock, and stock options show that they were highly motivated to defraud investors and, therefore, support a strong inference of scienter. From 2017 through 2019, Almeida received approximately $18.7 million in Baxter stock and $15.2 million in Baxter stock options under Baxter's long-term incentive program and approximately $7.2 million in cash bonuses under Baxter's annual incentive program Over the same time frame, Saccaro received approximately $9.2 million in stock, $3.8 million in stock options, and $2.5 million in cash bonuses under the same programs. This compensation was based, at least in part, upon financial metrics that were artificially inflated by Baxter's use of its FX Convention to manufacture FX gains and avoid FX losses. In other words, Baxter's alleged fraud enabled Almeida and Saccaro to be compensated more under both the long-term and annual incentive programs.

These allegations do not contribute to a strong inference of scienter. The long-term and annual incentive programs

under which Almeida and Saccaro received their compensation appear to be performance-based compensation plans that "are typical of nearly every corporation," *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 635–36 (S.D.N.Y. 2008) (citation omitted), and that Almeida and Saccaro were compensated more under such plans if the company performed better establishes little, if anything, in the way of scienter, *see* *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 955–56 (7th Cir. 2012) (refusing to infer scienter on the basis that the CEO "and other top managers had an incentive to make [the defendant corporation] look good in order to keep their jobs, improve their bonuses, and increase the value of their stock options" because "the fact that managers benefit from higher stock prices does not imply that any particular manager committed fraud"). "The desire to increase the value of a company and attain the benefits that result, such as meeting analyst expectations and reaping higher compensation, are basic motivations not only of fraud, but of running a successful corporation." *Davis*, 385 F. Supp. 2d at 714. As such, allegations regarding a corporate officer's motivation to earn bonuses, stock, or other compensation "are too common among corporations and their officers to be considered evidence of scienter." *In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2006 WL 3714708, at *9 (N.D. Ill. July 12, 2006); *see* *Zimmer Holdings*, 679 F.3d at 956 (an alleged incentive to improve bonuses and increase the value of stock options was "too generic to satisfy" *Tellabs II*). Indeed, if courts accepted the motive to reap higher compensation "as sufficient to establish *scienter*, most corporate executives would be subject to such allegations, and the heightened pleading requirements for these claims would be meaningless." *Davis*, 385 F. Supp. 2d at 714; *see also Kohl's*, 895 F.3d at 939–40 ("[A] generalized motive common to all corporate executives is not enough to establish scienter. Otherwise, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.' " (quoting *Zucco*, 552 F.3d at 1005)); *In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1045 (S.D. Cal. 2014) ("[I]f the existence of performance-based compensation and motive to increase short-term profits were enough to establish scienter, scienter could be found for almost any executive."). What is more, Baxter's allegedly artificially inflated stock constituted a large chunk of Almeida's and Saccaro's compensation from 2017 through 2019, and the amended complaint does not allege that Almeida and Saccaro sold any of this stock. This further weighs against a finding of scienter because "the fact that [Almeida and Saccaro] are not alleged to have sold the stock at the inflated prices mean[s] that they stood to lose a lot of money if the value of [Baxter's] stock fell." *Pugh*, 521 F.3d at 695; *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, --- F. Supp. 3d ----, 2020 WL 6118605, at *32 (N.D. Ill. Oct. 15, 2020) (fact that executive officers "bought, rather than sold[,] stock at the allegedly inflated prices...weigh[ed] against the possibility of a strong inference of scienter").

### 7. Baxter's "Claw Back" of Bonuses

**\*17** Seventh, Lead Plaintiffs contend that Baxter's "claw back" of $1.1 million from Almeida's 2019 cash bonus and the entirety of Saccaro's 2019 cash bonus (more than $660,000) after the Restatement shows scienter. The Court is not convinced. There are no allegations from which the Court can reasonably infer that Baxter's recoupment of money from Almeida signified punishment for his knowledge of or reckless indifference to Baxter's non-compliance with GAAP or the Transactions that exploited the FX Convention. To the contrary, Baxter represented that it clawed back this money to conform Almeida's 2019 bonus "to performance actually achieved" by Baxter. Doc. 34 ¶ 124. And Baxter recouped the lion's share of Saccaro's 2019 bonus (approximately $502,000 out of approximately $667,000) for the same reason. Baxter's reduction of Almeida's and Saccaro's bonuses "to reflect actual performance does not give rise to a compelling inference of scienter." *Christian v. BT Grp. PLC*, No. 2:17-cv-497-KM-JBC, 2018 WL 3647213, at *8 (D.N.J. Aug. 1, 2018).

True, Baxter linked its recoupment of the remainder of Saccaro's bonus to the Restatement and "the material weakness in Baxter's internal controls over financial reporting." Doc. 34 ¶ 125. But this linkage does not contribute to a strong inference of scienter here. Lead Plaintiffs allege that Saccaro, as CFO, was "responsible for, and certified the accuracy of, Baxter's financial reporting." *Id.* ¶ 112. It is reasonable to infer that Baxter clawed back the remainder of Saccaro's bonus to hold him accountable for the material weakness that manifested on his watch or his failure to adequately supervise Baxter's financial reporting *regardless* of what he knew or did not know. *See In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1064, 1073–74 (N.D. Cal. 2002) (refusing to infer scienter where the plaintiff did not identify any "particularized allegation refuting the

reasonable assumption that" the company fired its CFO "simply because the errors that [led] to the restatement occurred on his watch or because he failed adequately to supervise his department"). And especially given that Saccaro is still serving as Baxter's CFO, this explanation is more compelling than the one Lead Plaintiffs seek to establish—that by recouping the remainder of Saccaro's bonus, Baxter acknowledged that Saccaro acted with an intent to deceive—because if Baxter believed this, it is unlikely that it would have kept Saccaro on as CFO. *See* *Pugh*, 521 F.3d at 693 ("[W]e must weigh the strength of the plaintiffs' inferences in comparison to plausible nonculpable explanations for the defendants' conduct."); *In re Cyberonics Inc. Sec. Litig.*, 523 F. Supp. 2d 547, 553–54 (S.D. Tex. 2007) (reasoning that the defendant company would not have retained its former CFO as a consultant after she resigned if she had been involved in fraudulent conduct).

#### 8. Complexity of GAAP Principles

Eighth, Lead Plaintiffs assert that "[t]he inference of scienter is particularly strong here because Baxter's admitted GAAP transgressions did not involve [the] application of complex rules, but repeated, unvarying violations of straightforward principles for over a decade." Doc. 43 at 19. Some courts have found that violating straightforward accounting rules may point towards a finding of scienter. *See, e.g.*, *Norfolk Cty. Ret. Sys. v. Ustian*, No. 07 C 7014, 2009 WL 2386156, at *10 (N.D. Ill. July 28, 2009) ("The accounting errors here were allegedly relatively straightforward...and therefore easily identified by responsible corporate management."); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638 (E.D. Va. 2000) ("[V]iolations of simple rules are obvious, and an inference of scienter becomes more probable as the violations become more obvious."). However, the Court cannot say that the GAAP violation at issue here is as straightforward as Lead Plaintiffs contend. Lead Plaintiffs have not cited any court decisions holding as much, and the Court has not found any itself. *See* *Knurr v. Orbital ATK Inc.*, 272 F. Supp. 3d 784, 806 (E.D. Va. 2017) (refusing to infer scienter based on the purported simplicity of an accounting method because, in part, the plaintiffs did not cite any authority indicating that the method at issue was as simple as they contended); *Ixia*, 2015 WL 1775221, at *33 (same). Moreover, the relevant ASC explains that "[l]iteral application of [its] standards" could be burdensome and that "because

translation at the exchange rates at the dates the numerous revenues, expenses, gains, and losses are recognized is generally impractical," the use of "other time- and effort-saving methods to approximate the results of detailed calculations" is permitted. ASC 830-10-55-10. This explanation indicates that the relevant standard is not as simple as it may seem on first blush. And it does not appear that Baxter's independent auditor, PwC—which "expressly recognizes GAAP's requirements for measuring and recording intercompany foreign exchange transactions[ ] and instructs its auditors...to account for those transactions consistent with those obligations," Doc. 34 ¶ 44—concluded at any time before the October 2019 press release that the FX Convention violated GAAP. This further suggests that the GAAP violation "was not so straightforward and basic as to give rise to an automatic inference of scienter." *Ixia*, 2015 WL 1775221, at *33.

**\*18** What is more, a plaintiff "cannot merely point at a GAAP principle and contend that a correct interpretation was simple or obvious," *May*, 2020 WL 6587533, at *5 (citation omitted), or, as Lead Plaintiffs allege, that the applicable GAAP provisions are "clear and unambiguous," Doc. 34 ¶ 43. Rather, the plaintiff must at least plead facts showing (1) "that the defendant was aware of the relevant GAAP principle," (2) that the "defendant knew how that princip[le] was being interpreted," and (3) "how the defendant's incorrect interpretation was so unreasonable or obviously wrong that it should give rise to an inference of deliberate wrongdoing." *May*, 2020 WL 6587533, at *5. Here, Lead Plaintiffs do not allege any facts from which the Court can infer that Almeida—who oversees *all* of Baxter—knew the ins and outs of GAAP's rules regarding FX conversion or that Baxter's FX Convention did not comply with these rules when he made any of the statements that Lead Plaintiffs challenge. And although Saccaro, as Baxter's CFO and former Treasurer, would be more likely to know about the relevant GAAP principles and their applicability, even if he did, Lead Plaintiffs do not allege any facts suggesting that Baxter's FX Convention "was so unreasonable or obviously wrong" in light of these principles that the Court should infer deliberate wrongdoing on Saccaro's part. *See id.*

#### 9. Magnitude of the Restatement

Ninth, Lead Plaintiffs contend that the magnitude of the Restatement—in terms of its temporal scope, the amount of the restated figures, and the number of material line

items involved—further supports an inference of scienter. Some courts have reasoned that the magnitude of the reporting errors or purported fraud at issue can contribute to an inference of scienter. *E.g.*, *Akorn*, 240 F. Supp. 3d at 820; *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 619 (S.D.N.Y. 2015); *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997). As the court in *Rehm* put it: "The more serious the error, the less believable are defendants['] protests that they were completely unaware of [the company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy." 954 F. Supp. at 1256.

There may be circumstances in which this reasoning properly supports a strong inference of scienter, but the Court does not find that to be the case here. *See Kohl's*, 895 F.3d at 935, 937–41 (refusing to find a strong inference of scienter for the corporate defendant and two of its executives even though the company "understated its liabilities from about 26 to 39 percent annually and its assets from about 9 to 12 percent annually as a result of" errors that required the company to restate its financial figures for more than ten years). Lead Plaintiffs do not allege any facts from which the Court can infer that the temporal scope of Baxter's misstatements about its FX income was evident or obvious to Almeida or Saccaro before October 24, 2019, when Baxter announced that it was initiating an internal investigation that would cover at least 2014 through the first half of 2019. Similarly, Lead Plaintiffs do not allege any facts suggesting that the financial magnitude of Baxter's FX income misstatements or any other financial metrics that flowed from these misstatements was evident or obvious to Almeida or Saccaro before early 2020, when Baxter reported its preliminary estimates of its misstated figures. Therefore, the Court does not see how the magnitude of the restatement can provide a basis to infer Almeida's and Saccaro's scienter when they made all the challenged statements before August 2019.

Indeed, making such an inference strikes the Court as inferring fraud by hindsight, which is prohibited. *E.g.*, *Higginbotham*, 495 F.3d at 759–60; *Société Générale*, 2018 WL 4616356, at *3 (the PSLRA's heightened pleading requirements are intended "to discourage claims of so-called fraud by hindsight" (citations omitted) (internal quotation marks omitted)). As one district court explained, "[i]nferring scienter from the magnitude of fraud" requires a court to

blend hindsight, speculation[,] and

conjecture to forge a tenuous chain of inferences: (1) because the magnitude of the fraud was large, conspicuous warning signs must have existed; (2) these warning signs must have been available to the [defendants] during the [relevant time frame]; (3) these warning signs must have made the fraud obvious and conspicuous to the [defendants]; and therefore (4) the [defendants] must have known of the fraud.

**\*19** *Reiger v. PricewaterhouseCoopers LLP*, 117 F. Supp. 2d 1003, 1013 (S.D. Cal. 2000), *aff'd sub nom. DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002); *see also La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 484 (6th Cir. 2010) ("[T]o infer scienter solely from the magnitude of the fraud would require hindsight, speculation, and conjecture."). The Court similarly concludes that inferring Almeida's and Saccaro's state of mind in early- to mid-2019 based on the extent of a Restatement that did not become known until late 2019 or early 2020 impermissibly requires hindsight and speculation.

### 10. Meeting Financial Expectations

Tenth, Lead Plaintiffs argue for an inference of scienter because "the accounting fraud enabled Baxter to repeatedly exceed its guidance and analyst expectations, which [Almeida and Saccaro] bragged about on earnings calls." Doc. 43 at 22. Some courts have found that the fact that a company's accounting violations or mistakes enabled the company to meet financial expectations can help support an inference of scienter. *See, e.g.*, *Akorn*, 240 F. Supp. 3d at 820 (accounting violations supported an inference of scienter because they "made the difference between failure and success in meeting" the company's annual revenue guidance and "Wall Street consensus revenue estimates for two quarters"); *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1191 (D. Nev. 2009) (accounting mistakes that allowed the company's "reported earnings to achieve consensus estimates" contributed to a strong inference of scienter).

Even so, the Court believes that this reasoning also amounts to impermissibly inferring "fraud by hindsight." *See* 🚩 *Higginbotham*, 495 F.3d at 759–60. Based on Baxter's March 2020 Restatement, Lead Plaintiffs determined and alleged in June 2020 (when they filed their amended complaint) that Baxter would not have met its own guidance and consensus estimates for adjusted EPS in 2017 and 2018 without the alleged fraud. But these determinations made in 2020 do not shed any light on what Almeida and Saccaro knew or recklessly disregarded in 2019, when they made the statements that Lead Plaintiffs challenge.[14] Stated differently, the ad-hoc determination that Baxter would not have met certain goals without the alleged fraud is a hindsight conclusion that does nothing to show that Almeida and Saccaro knew between January 2019 and July 2019 that the alleged fraud was the reason why Baxter was meeting these goals. *See* 🚩 *Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641, 2012 WL 1068761, at *12 (N.D. Ill. Mar. 29, 2012) ("Post-class period statements by Defendants recognizing that their business has experienced a downturn do nothing to suggest that Defendants had contemporaneous knowledge (yet failed to disclose) that their company was earlier experiencing a downturn."); 🚩 *Bally Total Fitness*, 2006 WL 3714708, at *1–2, *6–7 (February 2005 press release did not support an inference of scienter because its findings were "simply hindsight conclusions" that did "not assist in determining the state of mind behind the misstatements at the time they were made" between August 1999 and April 2004).

### 11. The Court's Consideration of the Facts Collectively

**\*20** Looking collectively at all the alleged facts discussed above, the Court concludes that Lead Plaintiffs have failed to plead facts giving rise to a strong inference of scienter on either Almeida's or Saccaro's part. Notably missing from Lead Plaintiffs' amended complaint are particularized factual allegations suggesting that when they made their challenged statements between January 2019 and July 2019, Almeida or Saccaro knew that Baxter's FX Convention did not comply with GAAP, that individuals at Baxter were using the FX Convention to execute the Transactions, or that Baxter's internal controls were inadequate and ineffective. Nor does the amended complaint provide factual allegations from which the Court can reasonably infer that Almeida or Saccaro were

aware of (but disregarded) other information that would give them a reason to know about these problems. Ultimately, an inference of scienter is not as compelling as the inference that Almeida and Saccaro did not discover and were not reckless in failing to discover any of these issues until at least Baxter initiated its internal investigation in October 2019, which was after they made their allegedly false and misleading statements. Accordingly, the Court dismisses Lead Plaintiffs' § 10(b) claims against Almeida and Saccaro.

### B. Baxter

Lead Plaintiffs further contend that they have sufficiently pleaded Baxter's scienter. "Corporations, of course, have no state of mind on their own. Instead, the scienter of their agents must be imputed to them." 🚩 *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1254 (11th Cir. 2008). "Accordingly, the corporate scienter inquiry must focus on 'the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.' " 🚩 *Pugh*, 521 F.3d at 697 (quoting 🚩 *Tellabs III*, 513 F.3d at 708). "The critical question, therefore, is how likely it is that the allegedly false statements [are] the result of merely careless mistakes at the management level based on false information fed it from below, rather than of an intent to deceive or a reckless indifference to whether the statements were misleading." 🚩 *Tellabs III*, 513 F.3d at 709.

As already discussed, Lead Plaintiffs' amended complaint "fails to plead facts sufficient to support a strong inference of scienter on the part of" either Almeida or Saccaro, so Baxter's "scienter cannot be based on their state of mind." 🚩 *Pugh*, 521 F.3d at 697. And Lead Plaintiffs' amended complaint only names one other corporate official from whom the Court could potentially infer Baxter's scienter: Scott Bohaboy, Baxter's former Treasurer. But Lead Plaintiffs' amended complaint fails to include any allegations linking Bohaboy to any particular statement that Lead Plaintiffs attribute to Baxter, whether by alleging that Bohaboy made the statement, approved the statement, or furnished information or language to include in the statement. *See id.* Without this link, Bohaboy's state of mind, whatever it may have been,

cannot reflect Baxter's scienter. *In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 818 (S.D. Tex. 2012) ("In order to adequately plead scienter as to a corporate defendant, Plaintiffs must link the statement to a corporate officer who can be seen as acting on behalf of the corporation in making the statement."); *see also* 15 U.S.C. § 78u-4(b)(2)(A) (requiring the plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for "*each* act or omission alleged to violate this chapter" (emphasis added)).

Furthermore, even if Bohaboy's state of mind could provide the basis for Baxter's scienter, Lead Plaintiffs do not allege any facts from which the Court can reasonably infer that Bohaboy (and therefore Baxter) knew about or recklessly ignored the inadequacy of Baxter's internal controls, the FX Convention's failure to comply with GAAP, or the Transactions that exploited this non-compliance. Lead Plaintiffs allege that (1) Bohaboy oversaw the Treasury and was personally responsible for the accuracy of Baxter's FX conversions while the Transactions took place, and (2) Baxter terminated Bohaboy shortly before disclosing its discovery of the Transactions and its failure to comply with GAAP. At best, the first allegation shows that Bohaboy, based on his position and responsibilities, perhaps *should have* known about the alleged fraud. But this is not enough to show knowledge of or reckless indifference to the alleged fraud. *See CBOE*, 435 F. Supp. 3d at 861 ("Alleging that a defendant should have known about fraud is not enough to show that the defendant was reckless."); *Arbitrage Event-Driven Fund*, 2020 WL 60186, at *10 ("[A] pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." (citation omitted)). As for the second allegation, the fact that Baxter terminated its Treasurer just before it revealed a significant failing in its Treasury's operations is neither remarkable nor surprising. *See Zucco*, 552 F.3d at 1002 (noting that the defendant corporation's independent accounting firm's resignation "a month after the restatement was issued [was] not surprising" because the firm "had just been partially responsible for the corporation's failure to adequately control its accounting procedures"); *U.S. Aggregates*, 235 F. Supp. 2d at 1074 ("[A]fter a restatement of earnings and a subsequent loan default, it is unremarkable that the Company would seek to change its management team."). "[A] corporation may choose to terminate [an officer] for making errors due to negligence, oversights, etc., or simply for incompetence," *In re Interpool, Inc. Sec. Litig.*, No. CIV. 04-321 (SRC), 2005 WL 2000237, at *17 (D.N.J. Aug. 17, 2005), or the corporation may terminate an officer "simply because the

optics of changing management are better for investors and regulators," *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019). Lead Plaintiffs have not alleged any facts "refuting the reasonable assumption" that Baxter terminated Bohaboy for any of these reasons, as opposed to any culpable state of mind. *See Zucco*, 552 F.3d at 1002; *U.S. Aggregates*, 235 F. Supp. 2d at 1074.

**\*21** Lead Plaintiffs also ask the Court to infer scienter based on the states of mind of unnamed Baxter officials. The Seventh Circuit has recognized that "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted or disseminated the fraud." *Tellabs III*, 513 F.3d at 710. According to Lead Plaintiffs, "Baxter's admissions of actual knowledge raise an overwhelming inference that at least one Baxter official who participated in making the alleged misstatements...knew or recklessly disregarded the truth" and that it is "plausible that...the senior officials responsible for overseeing the processes and results at issue...furnished the reported information" about Baxter's accounting and FX fluctuations before Baxter made the alleged misstatements. Doc. 43 at 28.

Lead Plaintiffs' contentions are not persuasive. To start, it is unclear what "admissions of actual knowledge" purportedly "raise an overwhelming inference" of Baxter's scienter. Lead Plaintiffs do not cite to any paragraph from their amended complaint alleging that a Baxter official admitted that he or she knew about Baxter's GAAP non-compliance, the Transactions, or the inadequacy of Baxter's internal controls between January 2019 and July 2019. Nor does the Court see any such allegation in the amended complaint. Furthermore, it is not enough that it might be "plausible" that certain unnamed senior officials furnished information knowing or recklessly disregarding the falsity of the information. To infer scienter, the inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs II*, 551 U.S. at 314.

Indeed, Lead Plaintiffs' allegations do not paint a picture anything like the hypothetical scenario *Tellabs III* set forth as an example of where a court can strongly infer corporate scienter without the names of "the individuals who concocted or disseminated the fraud"—a company announces that it had sold one million products, but the actual number was zero. 513 F.3d at 710. In that scenario, "[t]here would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials

sufficiently knowledgeable about the company to know that the announcement was false." *Id.* Here, though, Baxter's statements about its financial metrics related to FX fluctuations, its compliance with GAAP, and its internal controls over financial reporting are not in the same ballpark as representing the sale of a million products when not one product has been sold. And although the Court can infer that statements about these subject areas are important to Baxter, they do not rise to the level of importance as would statements about the demand for Baxter's most important products, which is what the Seventh Circuit addressed in finding a strong inference of corporate scienter in *Tellabs III. See* 513 F.3d at 706–07, 709, 711–12.

In sum, the Court cannot infer Baxter's scienter based on the states of mind of Almeida, Saccaro, or Bohaboy, and Lead Plaintiffs' amended complaint does not otherwise set forth allegations from which the Court can infer corporate scienter based on unidentified Baxter corporate officials. Thus, the Court also dismisses Lead Plaintiffs' § 10(b) claim against Baxter.

## II. Section 20(a) Claim (Count II)

Lead Plaintiffs' second claim alleges that Almeida and Saccaro violated § 20(a) of the Exchange Act as "controlling persons" of Baxter. "Section 20(a) provides a basis for holding individuals liable for acts of securities fraud if they control other individuals or businesses that violate the securities laws." *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 886 (N.D. Ill. 2011) (citing 15 U.S.C. § 78t). However, "to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws—here, a violation of § 10(b) and Rule 10b-5." *Pugh*, 521 F.3d at 693. Because Lead Plaintiffs have

failed to adequately plead their § 10(b) claims, the Court dismisses Lead Plaintiffs' § 20(a) claims as well. *Id.* at 698 ("[B]ecause the plaintiffs have not adequately alleged the direct liability of any defendant [under § 10(b) and Rule 10b-5], their § 20(a) claim was also correctly dismissed."); *Fryman*, 462 F. Supp. 3d at 891, 905 (dismissing § 20(a) claims against the corporate defendant's CEO and CFO where the plaintiffs failed to adequately plead § 10(b) claims).

## CONCLUSION

**\*22** For the foregoing reasons, the Court grants Defendants' motion to dismiss [39] and Defendants' motion to consider the exhibits attached to their motion to dismiss [42]. The Court also directs the Clerk to remove Brian C. Stevens as a defendant from the Court's docket for this case. Because this is the Court's first dismissal of Lead Plaintiffs' complaint, the dismissal is without prejudice. *See Kohl's*, 895 F.3d at 941 (" '[A] plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed. This admonition carries special weight in securities fraud cases because '[i]n this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error.' " (citations omitted)). The Court gives Lead Plaintiffs twenty-one days to amend their amended complaint if they can do so consistent with Federal Rule of Civil Procedure 11 and this Opinion.

**All Citations**

Slip Copy, 2021 WL 100457

## Footnotes

1    The original complaint also named Brian C. Stevens as a defendant. But the operative amended complaint does not name Stevens as a defendant, and it does not contain any allegations regarding Stevens. Accordingly, Stevens is no longer a defendant in this case.

2    In setting forth the relevant background, the Court has accepted as true all well-pleaded factual allegations from Lead Plaintiffs' amended complaint and drawn all reasonable inferences from those allegations in Lead Plaintiffs' favor. *See Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). The Court has also considered the seven exhibits to Defendants' motion to dismiss. Exhibits 1, 2, 3, 5, and 6 are filings Baxter made with the SEC, and Exhibit 7 contains Baxter's stock prices from February 20, 2019

through March 18, 2020. All these documents contain publicly available information of which the Court can properly take judicial notice. *See, e.g.,* Pugh v. Tribune Co., 521 F.3d 686, 691 n.2 (7th Cir. 2008) ("We may take judicial notice of documents in the public record, including publicly reported stock prices, without converting a motion to dismiss into a motion for summary judgment."); Patten v. N. Tr. Co., 703 F. Supp. 2d 799, 803 n.2 (N.D. Ill. 2010) (taking "judicial notice of matters of public record, such as stock prices and SEC filings"). The remaining exhibit, Exhibit 4, is a partially updated June 2019 foreign currency guide from PricewaterhouseCoopers ("PwC"), Baxter's outside auditor. Paragraph 44 of the amended complaint refers to Exhibit 4, and the document appears to address measuring and recording foreign transactions, which is an issue that is front-and-center in this lawsuit. *See* 188 LLC v. Trinity Indus., Inc., 300 F.3d 730, 735 (7th Cir. 2002) (in ruling on a motion to dismiss, a court may consider as part of the pleadings "documents attached to a motion to dismiss...if they are referred to in the plaintiff's complaint and are central to his claim" (citation omitted)). And even if Exhibit 4 is not necessarily "central" to Lead Plaintiffs' claims, Lead Plaintiffs do not challenge its validity or authenticity, and it is publicly available online. *See* Mueller v. Apple Leisure Corp., 880 F.3d 890, 895 (7th Cir. 2018) (noting that the incorporation-by-reference rule "is a liberal one—especially where...the plaintiff does not contest the validity or authenticity of the extraneous materials"); Garross v. Medtronic, Inc., 77 F. Supp. 3d 809, 818 (E.D. Wis. 2015) (taking judicial notice of a document that was publicly available on the FDA's website and whose authenticity neither party disputed).

3    Unless otherwise noted, the Court's quotations of the amended complaint omit all alterations, emphases, and quotation marks contained in the amended complaint's original allegation.

4    Baxter referred to its FX Convention as "longstanding" and "historical," *e.g.*, Doc. 34 ¶¶ 13, 49, but the amended complaint does not allege when Baxter first implemented this convention. However, based on Baxter's statement that the improper transactions began years after Baxter adopted its FX Convention and its statement in March 2020 that the transactions had been occurring for at least ten years, it is reasonable to infer that Baxter implemented its FX Convention by the mid-2000s, at the latest.

5    For all ECF filings other than Lead Plaintiffs' amended complaint, the Court cites to the page number(s) set forth in a document's ECF header.

6    The amended complaint alleges that Baxter issued an earnings press release on February 1, 2019 reporting an adjusted EPS of $3.05 for 2018, but later, the amended complaint alleges that the February 1, 2019 press release reported this figure "for the year ended December 31, 2017." *Compare* Doc. 34 ¶ 69 n.5, *with id.* ¶ 134. It appears, however, that Baxter issued an earnings press release on January 31, 2019—not February 1—and this press release reported adjusted EPS of $3.05 for 2018. *See* Press Release, Baxter Reports 2018 Fourth-Quarter and Full-Year Results, at 1, 3 (Jan. 31, 2019), *available at* https://www.baxter.com/sites/g/files/ebysai746/files/2019-01/Baxter-Reports-2018-Fourth-Quarter-And-Full-Year-Results.pdf.

7    Rules 13a-14(a) and 15d-14(a) implement § 302 of SOX. A.C. Pritchard, *The Irrational Auditor and Irrational Liability*, 10 Lewis & Clark L. Rev. 19, 39 (2006).

8    The Restatement restated unaudited selected financial data as of December 31, 2017 and for 2016 and 2015; unaudited interim financial information for different interim periods in 2018 and 2019; and audited consolidated financial statements as of December 31, 2018 and for 2017 and 2018. Doc. 41-4 at 5.

9    This line item expresses an expense or loss as a positive number and income or gain as a negative number, which is indicated by placing the number in parentheses. *See* Doc. 34 ¶ 78 n.6. For example, Baxter originally reported a $28 million gain in net "other (income) expense" in the second quarter of 2019, but upon restatement, reported a $4 million loss.

10   *Tellabs I* was the Seventh Circuit's decision in Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d

588 (7th Cir. 2006), which the Supreme Court's decision in *Tellabs II* vacated and remanded.

11      The Court only considers the arguments and corresponding allegations identified by Lead Plaintiffs in their opposition to Defendants' motion to dismiss and does not consider any other allegations that Lead Plaintiffs fail to discuss in their opposition. *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015) ("[A] party generally forfeits an argument or issue not raised in response to a motion to dismiss.").

12      Lead Plaintiffs cite ⚑ *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008), to support its reliance on Saccaro's prior role as Treasurer, but *Silverman* is distinguishable. In *Silverman*, the court found an inference of scienter for certain corporate executives because it was "almost inconceivable that [these executives] were not aware of the production problems faced by the significant new product launch in the division that accounted for the largest share of sales in the company." *Id.* at *14. But as the *Silverman* court recognized, it was considering "a production problem in an important new product line," which distinguished it from cases where "an accounting issue [ ] may have flown under the radar of some executives." *Id.* The alleged misconduct here is more akin to the latter scenario than the former. Moreover, the *Silverman* plaintiffs also offered statements from confidential witnesses indicating that the executives knew about the production problems at issue. *Id.* Lead Plaintiffs do not offer similar allegations here.

13      This failure distinguishes Lead Plaintiffs' amended complaint from the complaints in ⚑ *In re Akorn, Inc. Securities Litigation*, 240 F. Supp. 3d 802, 819 (N.D. Ill. 2017), and ⚑ *Dobina v. Weatherford International Ltd.*, 909 F. Supp. 2d 228, 247–48 (S.D.N.Y. 2012), which Lead Plaintiffs cite to support their argument based on the Section 302 Certifications. In *Akorn*, the plaintiffs alleged that the officers that "had the duty to design or supervise Akorn's internal controls over financial reporting" also personally knew about the internal control deficiencies. ⚑ 240 F. Supp. 3d at 819. And in *Dobina*, the plaintiffs alleged that the CFO who was personally involved in designing and evaluating the company's internal controls was aware of problems with internal controls when he made his certifications. ⚑ 909 F. Supp. 2d at 237, 246–48.

14      Defendants contend that Lead Plaintiffs' allegations amount to speculation because they are not supported by particularized facts, such as the source of the consensus EPS estimates. The Court disagrees. Lead Plaintiffs sufficiently identified the documents underlying their calculations regarding Baxter's EPS figures and explained how they arrived at these calculations. Doc. 34 ¶¶ 69–70 & n.5. And although Lead Plaintiffs did not identify the source of their allegations regarding consensus estimates, the Court does not read even the heightened pleading standards of Rule 9(b) and the PSLRA as requiring a plaintiff to identify every evidentiary source that supports a factual allegation.

---

**End of Document**                                        © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 26, 2021, I electronically filed the foregoing document using the ECF System for the United States District Court for the Northern District of Illinois. Notice of this filing will be sent by operation of the Court's electronic filing system to all counsel of record in this matter registered on the ECF system.

*/s/ Martin G. Durkin*
Martin G. Durkin

#81703292_v1