**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **PATRICIA LOWRY, individually and on behalf of all others similarly situated,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 20 C 1939** |
| ) | |
| **RTI SURGICAL HOLDINGS, INC., CAMILLE I. FARHAT, BRIAN K. HUTCHINSON, JONATHON M. SINGER, ROBERT P. JORDHEIM, and JOHANNES W. LOUW,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Patricia Lowry filed this suit against RTI Surgical Holdings, Inc. (RTI) and five of its current and former officers—Camille Farhat, Jonathon Singer, Brian Hutchinson, Robert Jordheim, and Johannes Louw (collectively, the individual defendants)—on behalf of a class of individuals who acquired RTI common stock between March 7, 2016 and March 27, 2020 (the class period). Rosy Yeretsian, who has been appointed as the lead plaintiff, asserts that the defendants engaged in improper "revenue smoothing"—a practice of shipping products to customers early to hit quarterly revenue targets, in violation of RTI's internal policy and without customer authorization. The SEC and the company's internal audit committee investigated RTI for its questionable accounting practices, and RTI subsequently announced that it would restate five consecutive years of SEC filings. As a result, RTI's share price dropped; it lost one-fourth of its market

value as a company, causing stockholders significant economic loss.

Yeretsian alleges that the defendants' improper revenue recognition practice during the class period violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5. The defendants have moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the Court denies the defendants' motions to dismiss.

### Background

RTI is a surgical implant company based in Deerfield, Illinois. It designs, develops, manufactures, and distributes surgical implants worldwide. On a quarterly basis and at the end of each fiscal year, RTI's management—including the individual defendants—updates investors and analysts on the company's performance. Also, the SEC requires companies like RTI to submit financial reports on a quarterly basis (Forms 8-K and 10-Q) and for each fiscal year (Form 10-K). RTI routinely files these forms with the SEC.

Before and during the class period, RTI had four lines of business—spine, sports, original equipment manufacturer (OEM), and international. OEM accounted for the largest portion of its business, and during the class period, RTI represented that OEM was its most profitable business segment. Yeretsian asserts that as early as 2014—unbeknownst to RTI investors—RTI was improperly recognizing revenue and reporting false information about the performance of its OEM business to the SEC, investors, and analysts.

The individual defendants in this case are current and former RTI officers. Yeretsian alleges that each of them directly participated in RTI's management, oversaw

2

day-to-day operations at the highest levels, and were privy to confidential information regarding business performance. Defendant Camille Farhat has served as RTI's CEO since March 2017. His predecessor, defendant Brian Hutchinson, was RTI's CEO from December 2001 to December 2016. Defendant Jonathon Singer has served as CFO and administrator since September 2017. His predecessor, defendant Robert Jordheim, served as RTI's executive vice president and CFO from July 2013 until September 2017, and as interim CEO from December 2016 to March 2017. Defendant Johannes Louw served as RTI's vice president of financial planning and analysis from September 2018 until he was terminated in April 2020. Defendant Louw had a brief stint as CFO in January 2020; at that time, Singer, who was CFO, was promoted to the role of COO.

## A. RTI's revenue recognition practice

Yeretsian's securities fraud claims are based in part on statements from confidential witnesses, three of whom are former RTI employees and one of whom was employed by a key RTI customer, Medtronic, from 2006 to 2015. Yeretsian alleges that during the class period, RTI's management, including some of the individual defendants, directed account managers (employees who coordinate product orders and shipments with RTI customers) to ask customers to accept early shipments so that RTI could hit its monthly and quarterly revenue targets. She asserts that RTI's management also directed account managers to ship products early even without the customer's authorization. By these practices, Yeretsian contends, RTI misleadingly portrayed potential future sales as current sales.

For instance, Yeretsian's first confidential witness, Former Employee 1 (FE1), a

director of corporate accounts at RTI just before the class period, stated that "on orders from top executives, RTI . . . regularly asked its largest customer, Medtronic, to accept shipment of orders earlier than planned so that the order would come in before the end of a quarter." Am. Compl. ¶¶ 67-68 (dkt. no. 53). At one point, FE1 was instructed to ask Medtronic to ship a $2-3 million order early, but when Medtronic refused, RTI "shipped the order early anyway." *Id.* ¶ 69. Former Employee 2 (FE2), a senior executive assistant to an RTI executive vice president, stated that they sat in on a meeting involving defendant Louw, where "the practice of early shipping to RTI customers" was discussed. *Id.* ¶ 73.

Another confidential witness, Former Employee 3 (FE3), who worked at RTI from 2002 to 2017 stated that "it was commonplace for RTI to ship orders early to [OEM] customers so the Company could meet monthly and quarterly revenue targets." *Id.* ¶¶ 75-79, 83. This witness reported to defendant Hutchinson. In another instance, defendant Jordheim told an RTI employee that "RTI needed to book additional revenue before the end of the quarter and that the Company would be shipping a purchase order early to one of [the] . . . product distributors." *Id.* ¶ 86.

Yeretsian's final confidential witness, Former Employee 4 (FE4), was a Medtronic employee from 2006 to 2015 and dealt directly with RTI. FE4 "attest[s]" to RTI's "practice of shipping products in months other than the months those products were due to arrive," and in some cases, RTI "shipped products early to Medtronic without first obtaining permission to do so." *Id.* ¶¶ 88-90.

**B.  RTI's financial reporting during the class period**

At the start of the class period, on March 7, 2016, RTI filed a Form 10-K for the

fiscal year ending on December 31, 2015 with the SEC; defendant Hutchinson (then CEO) and defendant Jordheim (then executive vice president and CFO) signed the form. In relevant part, RTI's 2015 10-K stated that "Revenue is recognized upon shipping, or receipt by the Company's customers of the implant, depending on the Company's distribution agreements with the Company's customers or distributors. Other revenues are recognized when all significant contractual obligations have been satisfied." *Id.* ¶ 93. The 2015 10-K further stated that RTI's annual revenue had increased $19.5 million compared to the prior fiscal year (ending on December 31, 2014). The 10-K also stated that "[o]ur year over year revenue comparisons were impacted due to a significant amount of our revenue being derived from large commercial stocking distributors, whose timing of orders can vary from year to year." *Id.* ¶ 95. Finally, RTI represented in the 2015 10-K that its "internal control over financial reporting is effective." *Id.* ¶ 96. Yeretsian asserts that all of these statements were false and misleading because RTI's revenue recognition practice was improper and its internal controls were actually ineffective.

On April 28, 2016, RTI announced Q1 2016 financial results in a Form 8-K with the SEC. The form reflected an increase of 18 percent in international revenue compared to Q1 2015. That same day, RTI leaders—defendants Jordheim and Hutchison—held a conference call with investors and analysts. During the call, defendant Hutchison "we've seen revenue from our commercial [OEM] business ebb and flow from year-to-year, but trending to growth long-term." *Id.* ¶ 103. They also stated that the OEM business "has achieved compound average annual growth rate of 7%." *Id.* RTI filed its Q1 2016 report on Form 10-Q; it was signed by defendants

Hutchison and Jordheim and stated that they "concluded that the design and operation of our disclosure controls and procedures were effective as of the end of the period covered by this report." *Id.* ¶ 108. Yeretsian contends that all of these statements were materially false and misleading.

Yeretsian's remaining allegations of RTI's false statements concern similar communications made to external stakeholders and in SEC forms submitted between 2016 and 2019: RTI's quarterly and annual SEC filings (Form 8-K, Form 10-Q, and Form 10-K) and RTI management's communications to investors and analysts on quarterly earnings calls. Each filing with the SEC was signed by RTI's CEO and CFO. As explained previously, each individual defendant served as CEO or CFO at some point during or after the class period. Each of them is alleged to have signed at least one SEC filing reflecting RTI's financial results within the class period. Yeretsian also alleges that on quarterly earnings calls with investors and analysts, every individual defendant, at some point between 2016 and 2019, either made false statements about RTI's performance or misrepresented the effectiveness of the company's internal controls. Yeretsian contends that the defendants' alleged misrepresentations concerned RTI's "most critical segment": the OEM business. Am. Compl. ¶¶ 3, 50.

## C. RTI prepares to sell OEM business

On January 10, 2020, RTI promoted defendant Singer to COO and promoted Louw to CFO, contingent and effective upon RTI's proposed sale of its most profitable segment—the OEM business—which RTI reported had record results in Q2 2019. On January 13, 2020, RTI announced that it reached an agreement to sell its OEM business to a private equity firm. Upon the announcement of the deal, RTI shares

jumped over 63 percent.

**D.    RTI announces investigation into revenue recognition practices and related disclosures**

On March 16, 2020, RTI issued a press release announcing that it could not file SEC Form 10-K for the fiscal year ending on December 31, 2019 because RTI's internal audit committee was investigating the company's revenue recognition practices. The press release stated, in relevant part:

> The Audit Committee . . . of the Company's Board of Directors, with the assistance of independent legal and forensic account advisors, is in the process of conducting an internal investigation of current and prior period matters relating to the Company's revenue recognition practices regarding the timing of revenue with respect to certain contractual arrangements, primarily with OEM customers, including the accounting treatment, financial reporting and internal controls related to such arrangements.

Am. Compl. ¶ 217. The press release also stated that the internal investigation "was precipitated by an ongoing SEC investigation related to the periods 2014 through 2016." *Id.* ¶ 218. Two days after the issuance of the press release, the per-share price of RTI stock dropped by approximately 27.6 percent. Yeretsian alleges that less than three weeks before the March 16, 2020 disclosure, defendant Singer sold 11,450 shares, for a gain of approximately $44,444. Yeretsian further asserts that RTI's previous financial statements violated generally accepted accounting principles (GAAP). *See id.* ¶¶ 54-58.

On March 20, 2020, RTI filed with the SEC a report on a Form 8-K, in which it stated that it was not in compliance with the timely filing requirement under the Nasdaq exchange's listing rules. In that same report, RTI announced that defendant Louw, who had recently been promoted to CFO, would no longer be employed at RTI as of April 8, 2020. The next trading day, the price of RTI's shares fell again, by 19.6 percent.

7

On March 30, 2020, RTI announced that it had received a letter stating that it had breached the purchase agreement for the OEM sale by failing to file a proxy statement with the SEC.  In that same report, RTI announced that it was postponing both its annual shareholder meeting and a special shareholder meeting; the latter meeting had been set for shareholders to vote on various proposals necessary to close the OEM business sale.  That day, the price of RTI's shares fell 11 percent.

On April 9, 2020, in an SEC Form 8-K filing, RTI disclosed that the internal audit committee concluded that the company had to restate the following financial statements to the SEC, which RTI had previously issued:  annual statements for 2014, 2015, 2016, 2017, and 2018, as well as quarterly statements for 2016, 2017, 2018, and the first three quarters of 2019.  Further, RTI stated that

> investors should no longer rely upon the Company's previously released financial statements as of and for the years ended December 31, 2018, 2017, 2016, 2015, and 2014, and the reports on the financial statements and internal control over financial reporting of the Company's independent registered public accounting firm thereon; or the quarterly financial statements and other financial data released related to the Relevant Periods.
>
> The Company has concluded that the revenue of certain invoices should have been recognized at a later date than when originally recognized.  In response to binding purchase orders from certain OEM customers, goods were shipped and received before requested delivery dates and agreed-upon delivery windows.  In many instances, the OEM customers requested or approved the early shipments, but the Company has determined that on other occasions, the goods were delivered early without obtaining the customers' affirmative approval.

Am. Compl. ¶ 225.  RTI also stated that it would "revise its financial statements to correct these errors and any others as it finalizes the Investigation."  *Id.*

On June 8, 2020, RTI filed an amended Form 10-K for 2018, in which it stated that revenue should have been recognized at a later date, it had delivered goods

without customer approval, and "[s]ome of those unapproved shipments were shipped by employees in order to generate additional revenue and resulted in shipments being pulled from a future quarter into an earlier quarter." *Id.* ¶ 226. RTI's amended Form 10-K also included statements concerning "certain material weaknesses" in RTI's "disclosure controls and procedures." *Id.* ¶ 229. RTI also stated that "[w]e did not maintain an effective control environment" and that "[t]he tone from executive management was insufficient to create the proper environment for effective internal control over financial reporting." *Id.* That same day, RTI filed Form 10-K for 2019, in which it referenced these same errors regarding OEM business revenue. On June 29, 2020, RTI filed a Q1 2020 report with the SEC, in which it reported the same revenue recognition errors.

On March 23, 2020, plaintiff Lowry filed a complaint against RTI and senior management personnel alleging violations of federal securities laws. Several other similar lawsuits followed. On August 31, 2020, after her appointment as lead plaintiff, Yeretsian filed a consolidated amended complaint. In count 1, Yeretsian alleges that the defendants violated section 10(b) of the Securities Exchange Act and SEC Rule 10b-5. Specifically, she alleges that the misstatements RTI made during the class period—primarily concerning its OEM business—and later disclosed as erroneous were material. Further, she contends these statements were made by RTI and the individual defendants with scienter: intentionally, knowingly, or, at minimum, with deliberate recklessness. Yeretsian alleges that these actions caused her and the class members economic loss because the price of RTI common stock they purchased was artificially inflated, and its value declined significantly when RTI made its corrective disclosures.

Accordingly, Yeretsian and the other members of the class assert that that the defendants are liable to the putative class for damages.

In count 2 of the amended complaint, Yeretsian alleges—based on the same factual allegations—that each of the individual defendants, as RTI corporate officers in positions of control and authority during the class period, are liable under section 20(a) of the Securities Exchange Act on the ground that they were "controlling persons" of RTI within the meaning of the Act.

### Discussion

The defendants have moved to dismiss Yeretsian's claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and for failure to plead fraud with particularity under Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b)(1). In deciding a motion to dismiss for failure to state a claim, the Court must accept as true all well-pleaded factual allegations in the complaint and must draw all reasonable inferences in the plaintiff's favor. *NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 299 (7th Cir. 2019). To survive a motion to dismiss for failure to state a claim, the plaintiff must allege facts sufficient for a court to draw a plausible inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Both of Yeretsian's claims against the defendants are based on fraud and are therefore subject to heightened pleading standards. Rule 9(b) requires a plaintiff to allege "with particularity" the circumstances that constitute fraud, which is the "who, what, when, where, and how" of the deceptive conduct. *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016). This standard

requires a plaintiff to allege fraud with precision and "some measure of substantiation."
*Id.* (internal quotations omitted). Yeretsian's section 10(b) claim must also meet the
more stringent standard set forth in the PSLRA, which requires a plaintiff to plead with
particularity:

> each statement alleged to have been misleading, the reason or reasons
> why the statement is misleading, and the basis for the belief that the
> defendants' statements were misleading, and, if an allegation regarding
> the statement or omission is based on information and belief, the
> complaint shall state with particularity all facts on which that belief is
> formed.

15 U.S.C. § 78u-4(b)(1)(B); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588,
594 (7th Cir. 2006), *vacated and remanded on other grounds*, 551 U.S. 308 (2007).
And unlike Rule 9(b), the PSLRA also requires plaintiffs to "state with particularity facts
giving rise to a strong inference that the defendant acted with the requisite state of
mind." 15 U.S.C. § 78u-4(b)(2)(A).

The defendants argue that Yeretsian has failed to allege facts sufficient under
these standards to support any of their fraud claims. The elements of a claim under
section 10(b) and SEC Rule 10b-5 are: (1) a material misrepresentation or omission by
the defendant; (2) scienter; (3) a connection between the misrepresentation or omission
and the purchase or sale of a security; (4) justifiable reliance by the plaintiff; (5)
economic loss; and (6) loss causation. *Pension Tr. Fund for Operating Eng'rs v. Kohl's
Corp.*, 895 F.3d 933, 936 (7th Cir. 2018) (quoting *Pugh v. Tribune Co.*, 521 F.3d 686,
693 (7th Cir. 2008)). Specifically, the defendants contend that Yeretsian has not
adequately alleged two elements of her securities fraud claim: material
misrepresentation and scienter. The individual defendants have also moved to dismiss
Yeretsian's section 20(a) claim. They contend that because there is no primary violation

11

under section 10(b) of the Securities Exchange Act, there can be no control person liability under section 20(a).  *See Pugh*, 521 F.3d at 693.

## A.    Section 10(b) claim

### 1.    Material misstatements

"To satisfy the material misrepresentation element of a § 10(b) claim, a plaintiff must allege that the defendant made a statement that was 'misleading as to a material fact.'"  *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 814 (N.D. Ill. 2017) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  "A misrepresentation is material if a reasonable investor would view it as significantly alter[ing] the total mix of information available and important to deciding whether to buy or sell a security."  *Twin Master Fund, Ltd. v. Akorn, Inc.*, No. 19 C 3648, 2020 WL 564222, at *5 (N.D. Ill. Feb. 5, 2020) (Kennelly, J) (citing *Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 616 (7th Cir. 2012)).

The defendants contend that Yeretsian has not adequately alleged material misstatements.  They argue that the original reports were not materially false because the restatement increased RTI's reported revenue for certain financial periods and otherwise had an "insignificant overall quantitative effect on the Company's key metrics."  RTI's Mem. in Support of Mot. to Dismiss at 25 n.56 (dkt. no. 60); Hutchinson's Mem. in Support of Mot. to Dismiss at 8-9 (dkt. no. 67).  Defendants also contend that Yeretsian's allegations lack "specificity" about "how any particular early shipment, in any particular quarter, rendered a particular revenue figure false."  Jordheim's Mem. in Support of Mot. to Dismiss at 8 (dkt. no. 63); *see also* RTI Mem. in Support of Mot. to Dismiss at 9-11.  The defendants also assert that revenue smoothing

is not necessarily deceptive because a customer could return products that RTI shipped early. Hutchinson's Mem. at 5-6. Finally, the defendants contend that the Court should "discount" Yeretsian's allegations because they "rest[] exclusively on conclusory allegations" from confidential witnesses. RTI's Mem. at 10.

The Court concludes Yeretsian has adequately alleged that the defendants made material misstatements. She alleges that RTI and its management reported inaccurate financial results to the SEC for at least five consecutive years; RTI's filings violated GAAP requirements; RTI was subject to an investigation by the SEC as well as an internal audit committee for its erroneous revenue recognition practices in the OEM business and ineffective internal controls; RTI's improper activities led it to resubmit five years' worth of financial reports. A company's restatement of previously reported financial results is likely enough by itself to show materiality. The reason for this is that under GAAP, previously-issued financial statements should be restated only to correct material accounting errors. *See Akorn*, 240 F. Supp. 3d at 816 (citing *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 437 (S.D.N.Y. 2005); *Roth v. OfficeMax, Inc.*, No. 05 C 236, 2006 WL 2661009, at *4 (N.D. Ill. Sept. 13, 2006) ("Plaintiffs have adequately alleged that [the company's] statements [regarding its financial results] were false or misleading because the Company restated its financial results . . . .").

In addition, the fact that RTI's stock price dropped by a significant amount within one trading day of corrective disclosures tends to "confirm[] that [its] misstatements were material." *Akorn*, 240 F. Supp. 3d at 816; *see also Ross v. Career Educ. Corp.*, No. 12 C 276, 2012 WL 5363431, at *6 (N.D. Ill. Oct. 30, 2012) (concluding that "[t]he market's negative reaction further tends to show that defendants' alleged misstatements were

13

material") (Kennelly, J.); *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 902 (N.D. Ill.

2001) (observing that even "a little" reaction from the market may indicate materiality).

Taken together, Yeretsian's allegations plausibly indicate "a substantial likelihood" that

RTI's disclosures were "viewed by the reasonable investor as having significantly

altered the total mix of information made available." *Matrixx Initiatives, Inc. v.*

*Siracusano*, 563 U.S. 27, 38 (2011) (discussing the materiality requirement) (internal

quotation marks omitted). At the pleading stage, Yeretsian's allegations are sufficient;

the defendants' alleged misstatements about RTI's financial results between 2015 and

2019—in SEC filings of Form 8-K, Form 10-K, and Form 10-Q, as well as quarterly

earnings calls—"qualify as material misrepresentations." *Id.*

## 2. Scienter

The defendants also argue that Yeretsian has not adequately alleged that each

of them had the requisite mental state. For a section 10(b) claim, scienter is

"knowledge of the statement's falsity or reckless disregard of a substantial risk that the

statement is false." *Pugh*, 521 F.3d at 693; *Makor Issues & Rights, Ltd. v. Tellabs Inc.*,

513 F.3d 702, 704-05 (7th Cir. 2008) ("*Tellabs III*"). Under the PSLRA's stringent

pleading standard, the plaintiff's allegations must support "a strong inference" of

scienter. 15 U.S.C. § 78u-4(b)(2)(A). In the Seventh Circuit, "[p]leading 'collective

scienter' for a group of defendants does not meet the PSLRA's particularity standard,

and a plaintiff must plead a defendant's scienter as to each statement or omission

underly a section 10(b) claim.'" *Twin Master Fund, Ltd.*, 2020 WL 564222, at *13

(quoting *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 600 (7th Cir. 2019)).

Yeretsian advances several arguments in support of her contention that she has

14

adequately alleged facts giving rise to a strong inference of the defendants' scienter. Pl.'s Resp. Mem. at 23-40.  Her factual allegations indicate that it was RTI's management—including each of the individual defendants—who, as corporate officers, "acted, at a minimum, recklessly" when they repeatedly asserted in SEC filings and on earnings calls between 2015 and 2019 that RTI's internal controls were effective during the class period, yet admitted in corrective disclosures issued in 2020 that these same controls were ineffective.  *Id.* at 24.  Yeretsian further contends that the "magnitude" and "sheer number of inaccurate financial reports filed by RTI"—five years' of inaccurate reporting to the SEC, investors, and analysts—"is a robust indicator" of the defendants' recklessness.  *Id.* at 27-28.  Moreover, RTI openly admitted in corrective disclosures that it violated its own revenue recognition practice by shipping goods to customers early without their authorization.  *Id.* at 29.  Yeretsian also relies on plausibly reliable statements from confidential witnesses, including three former employees, each of whom appear to have personal knowledge of (1) it being "commonplace for RTI [to] ship orders early . . . so the Company could meet monthly and quarterly revenue targets" and (2) management's awareness, and perhaps encouragement, of "improper practices that led to the massive Restatement."  *Id.* at 31.

　　In reviewing the amended complaint, the Court finds that Yeretsian has included specific factual allegations plausibly implicating RTI's management—namely the individual defendants—as the key personnel responsible for designing and maintaining RTI's internal controls; these same individuals later acknowledged RTI's internal control deficiencies.  Am. Compl. ¶ 247.  Yeretsian has also alleged specific facts plausibly indicating that at least some of the individual defendants directed account managers to

ship products early (or were aware of and condoned this practice) and that each defendant signed SEC filings attesting to the accuracy of RTI's financial reports even though those reports were erroneous. *See* Am. Compl. ¶ 86 ("Jordheim told . . . RTI needed to book additional revenue before the end of the quarter"), ¶ 73 (Louw attended meeting where "practice of early shipping to RTI customers" was discussed), ¶ 75 (confidential witness who reported to Hutchison and managed revenue confirmed that "it was commonplace for RTI to ship orders early to customers so the Company could meet monthly and quarterly revenue targets").

In response, the defendants urge this Court to dismiss the section 10(b) claim on the ground that Yeretsian's factual allegations do not sufficiently indicate scienter. For instance, RTI contends that Yeretsian has not alleged "a cogent motive" for fraud. RTI's Mem. at 13-15. In particular, RTI and the individual defendants suggest that if the individual defendants wanted to commit fraud, they would have sold their RTI stock at "supposedly artificially inflated prices." *Id.*

Next, RTI argues that the Court should disregard the confidential witnesses' statements because they do not "set forth individualized allegations as to the purported state of mind of each Defendant." *Id.* at 17 & n.35. The defendants challenge reliance on confidential witnesses because some were not employed during the class period or are otherwise unreliable. RTI's Mem. at 17. RTI also asserts that "[t]he fact that RTI restated its financial statements and had to improve its internal controls does not, without more, support an inference . . . [of] scienter." *Id.* at 19. Finally, RTI contends that the factual allegations support a more compelling "non-culpable inference": "negligent oversight of overzealous accounting" or some other "breakdown lower in the

16

corporate hierarchy." *Id.* at 23-24 (quoting *Kohl's Corp.*, 895 F.3d at 939, 941). The individual defendants offer similar arguments to support the contention that Yeretsian's factual allegations are insufficient to show scienter. *See, e.g.*, Hutchinson's Mem. at 10-11 (arguing that the scienter allegations lack specificity, are conclusory, and improperly rely on confidential witnesses); Jordheim's Mem. at 11-14; Louw's Mem. in Support of Mot. to Dismiss at 9-14 (dkt. no. 61).

The defendants' arguments are unsupported by the law and misconstrue Yeretsian's contentions. Her allegations are sufficient to give rise to a compelling inference of scienter regarding each individual defendant. First, as Yeretsian argues, she is not required to plead facts regarding the defendants' motive to commit fraud to establish scienter; a plaintiff need only plead facts indicating an "intent to deceive or reckless disregard for the truth." *Costello v. Grundon*, 651 F.3d 614, 634 (7th Cir. 2011); Pl.'s Resp. Mem. at 37. Second, as Yeretsian points out, RTI's "clean audit" from an external accounting firm does not negate her factual allegations of scienter. Pl.'s Resp. Mem. at 30. Also, Yeretsian has alleged facts plausibly indicating that each of the individual defendants-- all of whom served as RTI's CEO, CFO, or other high-level roles during the class period—was responsible for designing and supervising RTI's internal controls over financial reporting. *See Akorn*, 240 F. Supp. 2d at 819.

For these reasons, the defendants' argument that Yeretsian's allegations improperly rely on group pleading, *see Cornielsen*, 916 F.3d at 600, lacks merit. The Seventh Circuit's analysis in *Tellabs III* is instructive: "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *Tellabs III*, 513 F.3d at 710. In this case,

Yeretsian has not alleged that RTI's "management" or "each corporate officer" should be liable for securities fraud based merely on "group-published documents" like "annual reports and press releases." *See id.* Rather, Yeretsian has pleaded several facts indicating that each individual defendant repeatedly mischaracterized RTI's OEM business revenue to the SEC, investors, and analysts, condoned business practices that violated internal RTI policies, and directed individual employees and customers to engage in business activities in order to smooth RTI's revenue on a monthly and quarterly basis. Moreover, RTI admitted that the "tone from executive management" specifically prevented the company from exercising effective internal controls. Am. Compl. ¶ 229.

Further, statements from Yeretsian's confidential witnesses—former employees whose work responsibilities made them aware of RTI's deficient internal controls—include facts plausibly indicating that it was "commonplace" for RTI to flout its own revenue recognition policies during the class period and leading up to it. *See id.*; Pl.'s Resp. Mem. at 31; *see Van Noppen*, 136 F. Supp. 3d at 934-35 (if the plaintiff "describe[s] the witnesses with enough detail," the "Court can determine that the confidential witnesses have a foundation for their allegations").

In *Tellabs III*, the Seventh Circuit suggested that it is appropriate for courts to rely on statements from "confidential sources" who "consist of persons who from the description of their jobs [are] in a position to know at first hand the facts to which they are prepared to testify." *Tellabs III*, 513 F.3d at 712. In this case, Yeretsian's confidential witnesses—three former RTI employees and one RTI customer—each provide detailed, firsthand accounts of RTI's improper practices.

In addition, "the nature and extent of Defendants' misrepresentations" regarding RTI's performance and internal controls makes "the inference of scienter even more reasonable." *See Akorn*, 240 F. Supp. 3d at 820. Each individual defendant in this case was in a leadership position that made him privy to RTI's operations at the highest levels and accountable for RTI's internal business practices, especially with regard to its most important business segment that RTI, at a certain point, was preparing to sell. *See Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1029 (N.D. Ill. 2010) ("[W]hile a court cannot presume scienter, a strong inference of scienter may still be credited where it is almost inconceivable that an individual defendant would be unaware of the matters at issue."). Moreover, each individual defendant signed his name on SEC filings—including Form 8-K, Form 10-Q, Form 10-K—containing misleading information about RTI's revenue. *See Twin Master Fund, Ltd.*, 2020 WL 564222, at *13-14 (concluding that "[t]he plaintiffs' allegations are . . . sufficient" in part because they are based on "allegedly fraudulent" information in "Forms 8-K and 10-Q" that that the defendant signed); *see also SEC v. Sys. Software Assocs., Inc.*, 145 F. Supp. 2d 954, 958 (N.D. Ill. 2001) (concluding that the SEC sufficiently alleged securities fraud against corporate officers based on inaccurate financial statements that they each signed).

The fact that each defendant attested to the accuracy of information in quarterly and annual SEC filings yet failed to even once detect a risk of erroneous financial reporting during the class period is more than sufficient at the pleading stage to indicate recklessness. *SEC v. Fisher*, No. 07 C 4483, 2012 WL 3757375, at *13 (N.D. Ill. Aug. 28, 2012) ("[I]t is long settled that a magnitude of reporting errors lend weight to allegations of recklessness where defendants were in a position to detect the errors.").

19

Finally, the fact that the SEC and RTI's internal audit committee initiated an investigation into RTI's revenue recognition practices and internal controls "provides additional support for finding that scienter has been adequately pleaded." *See Akorn*, 240 F. Supp. 3d at 820.

On these facts, "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) ("*Tellabs II*"). Thus Yeretsian's allegations of the defendants' scienter satisfy the PSLRA's heightened pleading standard for the section 10(b) claim.

## B. Section 20(a) claim

In count 2, Yeretsian alleges that the individual defendants—each of whom "participated in the operation and management of RTI"—knew, "[b]ecause of their senior positions," the "adverse non-public information about RTI's current financial position and future business prospects." Am. Compl. ¶ 279. Further, Yeretsian asserts that they each "acted as a controlling person of RTI," "had the power to direct the actions of [RTI]" and caused the company "to engage in the unlawful acts and conduct" described earlier in the complaint. *Id.* ¶ 282. Accordingly, Yeretsian contends, the individual defendants, each of whom was a "control person" of RTI during the class period, are liable under section 20(a) of the Securities Exchange Act. *Id.* ¶ 283.

The defendants do not present any meaningful argument to defeat Yeretsian's argument in support of control person liability under section 20(a) of the Securities Exchange Act. *See, e.g.*, RTI's Mem. at 25 (one-sentence argument to dismiss section 20(a) claim); Hutchinson's Mem. at 15 ("The complaint does not state a primary

20

securities violation for the time when Mr. Hutchinson could have been a control person . . . ."); Jordheim's Mem. at 15 ("Because the AC has not alleged any primary violation, the control person claim against Mr. Jordheim also should be dismissed."); Louw's Mem. at 15 n.5 (relegating argument requesting dismissal of section 20(a) claim to a footnote). In their opening briefs and reply briefs, the defendants summarily reject Yeretsian's contention that they are liable under section 20(a) on the basis that she failed to allege a plausible section 10(b) claim. But the Court has determined that Yeretsian *has* adequately alleged a section 10(b) claim and therefore survives the motions to dismiss. No defendant has advanced any other argument in support of dismissing count 2. The Court therefore denies all of their motions to dismiss the section 20(a) claim.

### Conclusion

For the foregoing reasons, the Court denies the motions to dismiss submitted collectively by defendants RTI, Farhat, and Singer [dkt. no. 59], defendant Hutchinson's motion to dismiss [dkt. no. 65], defendant Jordheim's motion to dismiss [dkt. no. 62], and defendant Louw's [dkt. no. 61] motion to dismiss. The defendants are directed to answer the amended complaint by no later than April 29, 2021. The parties are also directed to confer regarding a discovery and pretrial schedule to propose to the Court and are to submit a joint status report containing an agreed or separate proposals by no later than April 22, 2021. The Court also assumes that it may dismiss the related cases (Case Nos. 20 C 3464, 20 C 3347, and 20 C 3953) and directs the parties to address this point in the status report as well. The case is set for a telephonic status hearing on May 3, 2021 at 8:40 a.m., using call-in number 888-684-8852, access code 746-1053.

Counsel should wait for the case to be called before announcing themselves.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  April 1, 2021